1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
2                     Newport News Division

3

4    - - - - - - - - - - - - - - - - - -
     JOANN WRIGHT HAYSBERT,           )
5                                     )
            Plaintiff,                )
6                                     )          CIVIL CASE NO.
     v.                               )           4:20cv00121
7                                     )
     BLOOMIN' BRANDS, INC., et al.,   )
8                                     )
            Defendants.               )
9    - - - - - - - - - - - - - - - - - -

10

11          TRANSCRIPT OF VIDEO CONFERENCE PROCEEDINGS
                    **(Motions Hearing)**
12
                      Norfolk, Virginia
13
                      March, 30, 2021
14

15

16   BEFORE:   THE HONORABLE DOUGLAS E. MILLER,
               United States Magistrate Judge

17

18

19   APPEARANCES:

20           CRANDALL & KATT
             By:  David A. McKelvey
21           and
             HAYSBERT MOUTRIE, LLP
22           By:  Nazareth M. Haysbert
                  Counsel for the Plaintiff
23
             BANCROFT MCGAVIN HORVATH & JUDKINS PC
24           By:  John D. McGavin
                  Counsel for the Defendants
25

```
 1                  (The hearing commenced at 10:32 a.m.)
 2              THE CLERK:  Joann Wright Haysbert v. Bloomin'
 3   Brands, Inc., Civil Action No. 4:20cv121.
 4              Are the parties ready to proceed?
 5              THE COURT:  If everybody could just kind of weigh in
 6   verbally so I can make sure I can hear everybody.
 7              Mr. McGavin, are you there?
 8              MR. MCGAVIN:  Yes.  Good morning, Your Honor.  John
 9   McGavin, on behalf of the defendants.  I'm ready to proceed
10   in today's hearing.
11              THE COURT:  All right.  Mr. Haysbert?
12              MR. HAYSBERT:  Good morning, Your Honor.  Nazareth
13   Haysbert, for the plaintiff.  I'm also ready to proceed, Your
14   Honor.
15              THE COURT:  And Mr. McKelvey is here.  Good morning,
16   Mr. McKelvey.
17              MR. MCKELVEY:  Good morning, Your Honor.
18              THE COURT:  There are two lines for the court
19   reporter?
20              THE CLERK:  Yes, sir.  They're both for
21   Ms. Jeffreys.  She just has a call-in line.
22              THE COURT:  All right.  That's fine.
23              We are here on various motions.  I have a list.  I
24   think a couple of them are pretty simple, and I plan to just
25   resolve them without argument, unless there's a need to
```

1   argue.

2           One was Mr. Haysbert's motion to expedite a

3   resolution of some of the pending motions.  Perhaps the Court

4   didn't get to it quite as fast as Mr. Haysbert would have

5   liked, but, nonetheless, we're here, and I've made

6   accommodation for the discovery schedule that I think was

7   motivating that motion.  So I plan to just indicate that that

8   motion has been resolved by the setting of this hearing and

9   the Court's actions on the discovery schedule, and so I'll

10  just have the minute entry reflect that the motion was

11  granted in part and resolve it in that fashion.

12          Is that acceptable, Mr. Haysbert?

13          MR. HAYSBERT:  Yes, Your Honor.

14          THE COURT:  Okay.  So I'm going to grant in part

15  ECF No. 40 and resolve it by conducting this hearing and

16  making the rulings that are called for in the other motions.

17          The other one that doesn't appear to require much

18  discussion is Mr. McGavin filed a motion to quash several

19  depositions and subpoenas.  The dates for response have all

20  passed.  I intend to take up the issue of the discovery

21  schedule when we're done with this, and they can be

22  re-noticed, but I was planning to simply terminate that

23  motion to quash as mooted by the passage of time,

24  Mr. McGavin.  Any problem with that?

25          MR. MCGAVIN:  No, Your Honor.

1            THE COURT:  Mr. Haysbert, any problem with that?

2            MR. HAYSBERT:  No, Your Honor.

3            THE COURT:  All right, then, I'm going to terminate

4    34 as moot.

5            All right.  The next -- I think the next one --

6    well, did you-all have a particular order you wanted to

7    address these in?  I think Mr. Haysbert wanted to address the

8    motion for leave to amend and the motion to remand, which are

9    kind of connected, before we wade into the other discovery

10   motions, including the motion for sanctions, the motion to

11   compel.  I guess there are two motions to compel.  So I was

12   planning to deal with the motion for leave to amend and the

13   motion to remand next.

14           Does that sound like a reasonable way to proceed,

15   Mr. Haysbert?

16           MR. HAYSBERT:  That is my preferred way to proceed,

17   Your Honor, so thank you very much.

18           THE COURT:  Mr. McGavin?  They were filed first, and

19   it appears to make more -- now, I plan to address them.  I

20   plan to give you-all some thoughts.  The motions present

21   dispositive questions -- the motion to remand, at least.

22   It's not always completely clear whether a motion for leave

23   to amend is dispositive, but in this instance I expect the

24   motion for leave to amend will be dispositive, because

25   Mr. McGavin is opposing it on the basis of futility.  So my

```
 1   expectation is to hear your argument, share some
 2   observations, write a report and recommendation, and then --
 3   because that's all I have the jurisdiction to do.
 4          But I did speak to the District Judge.  She asked me
 5   to weigh in on this issue, so that's my plan.  So I can't
 6   really give you a final answer on that, but I can give you my
 7   answer on that, and then we'll proceed to address the
 8   discovery motions.
 9          MR. HAYSBERT:  Awesome.  Thank you, Your Honor.
10          THE COURT:  Okay.  So the motion for leave to
11   amend -- I have read everything.  I'm happy to hear anything
12   else you want to say.  I did look at the Supreme Court case
13   that you cited to me, Krupski v. Crociere, and some of the
14   other cases.  Obviously, I mean, this is an issue that comes
15   up from time to time, the issue of relation back and also of
16   adding individual parties to a negligence action, so is there
17   anything you want to -- I have a few questions, but is there
18   anything you want to say, Mr. Haysbert, to amplify your
19   written filings?  And I'm obviously considering them
20   together, because the motion to remand lives or dies on the
21   motion for leave to amend.
22          MR. HAYSBERT:  Sure.  Thank you, Your Honor, for the
23   opportunity to address the Court.
24          There was some recent information provided to us.  I
25   want to say a couple of days after the close of the written
```

1    briefing we received supplemental discovery, and in that

2    supplemental discovery defendants, for the first time,

3    identified Lisa Crosby as a former managing partner, which

4    puts her on the same level of liability as Chip Chase, since

5    she apparently has ownership interest in the establishment as

6    well.

7              So the initial response provided to the Court was

8    that we were under a misunderstanding about the roles that

9    these two individuals played, and the defendants exacerbated

10   that misunderstanding by withholding information about

11   Mr. Chase and Ms. Crosby and the hostess, who still remains

12   unidentified, until, at the earliest, early February of this

13   year, when we were told they no longer had any relationship

14   with one of the defendants.  You know, our belief is that

15   they must have known about the lawsuit; otherwise, how would

16   the defendants have known how to respond to plaintiff's

17   discovery requests?

18             We still have not received sufficient verification.

19   We've only received a verification for Bloomin' Brands'

20   second supplemental answer to interrogatories, which includes

21   a verification containing a signature that we don't

22   recognize.  It does not include a printed name as well, so we

23   don't know who is authorizing any of the responses that we've

24   received so far from either of the defendants, whether it's

25   Lisa Crosby, Mr. Chase, or some other identified individual.

1          The defendants have repeatedly stated they were not

2     involved in the incident but that local employees were

3     involved.  We've done this through discovery that we've

4     shared with the Judge, but they've not produced the franchise

5     agreement.  The responses have been confusing and

6     contradictory regarding who is responsible for what occurred

7     that day.

8          So we believe that their arguments are unavailing.

9     The amendment is not barred by the statute of limitations.

10    Again, we just received, as of March 15th, information

11    regarding Lisa Crosby being a former managing partner of the

12    Outback Steakhouse.  Same for Mr. Chase, in February of this

13    year, very late.

14         So we don't believe that this is a futile motion at

15    all.  We believe that their discovery tactics have been in

16    bad faith, in fact, looking at the claims they're making.

17    We've been trying to discover facts necessary to assert

18    claims against Ms. Crosby and Mr. Chase for months --

19         THE COURT:  Let me -- one of the things that the

20    *Krupski* case stands for and I think is correctly cited for is

21    that it's not so much what the plaintiff knows or how long it

22    takes the plaintiff to discover information that is going to

23    save a relation-back motion.  What's important is what did

24    the new putative parties know, based on the information that

25    was available to them, within the 4(m) period that is

1    referenced in Rule 15.

2            And, so, while I'm sympathetic -- and I know the

3    issues are presented in the discovery motions regarding the

4    allegations of delay and your complaints about the timing of

5    the defendant's response.  When I look at the original

6    complaint that was filed in this case, I have a hard time

7    finding any party in that case that could be confused for

8    either of the individuals or any of the three individuals

9    that you're seeking to name.  And that, I think, is the

10   problem that you have.

11           It's not so much that the plaintiff took a while to

12   find out who did what and when, it's that the statute of

13   limitations protects these parties unless these parties --

14   Ms. Crosby, Mr. Chase, and Jane Doe -- knew prior to the

15   period that you had made a mistake in naming the two entities

16   that you named.  And so I'm just having a hard time figuring

17   out how either of them would know that, since there were no

18   individuals named as parties in your original complaint.

19           MR. HAYSBERT:  So, Your Honor, I think this boils

20   down to a couple of things.

21           Number one, if Lisa Crosby and Norman Chase are

22   managing partners or were former managing partners of the

23   Outback Steakhouse, they would have been owners of the

24   Outback Steakhouse, from what we can tell.

25           It defies belief that they would -- and the statute

Heidi L. Jeffreys, Official Court Reporter

```
 1    is -- I'm sorry.  The Chases should have known as well.  It's
 2    not that they actually had to know but that they should have
 3    known, and that's a lower standard, to me.  And so our
 4    response or our position is they should have known that there
 5    was a lawsuit pending because they were also co-owners of the
 6    Outback Steakhouse and should have been sued for vicarious
 7    liability.
 8              THE COURT:  But what is it -- I understand your
 9    argument, but, again, I'm trying to understand what --
10    because you did name the owning entities, so what is it about
11    the -- right?  You named Bloomin' Brands and Outback.
12              MR. HAYSBERT:  Yes.
13              THE COURT:  And these are companies that still
14    exist, right?
15              MR. HAYSBERT:  That's correct.
16              THE COURT:  They didn't fold or go away.
17              MR. HAYSBERT:  That's correct.
18              THE COURT:  So what I'm trying to figure out is what
19    is it about your original complaint or anything that happened
20    prior to the 4(m) period that would lead either of them to
21    conclude that you intended not to name the entities but to
22    name them as individuals?
23              MR. HAYSBERT:  They -- well, I think the way you put
24    it -- it's that they had an ownership interest in the
25    establishment, and the intent was to capture the owners of
```

Heidi L. Jeffreys, Official Court Reporter

1   the establishment.  We had no idea at the time and for a
2   while after, since defendants were recognizing her only as
3   the associate manager who was on duty at the time, that she
4   was an owner of the operation.
5            And our contention is that the people, the person,
6   the individual -- an individual has to sign these
7   verifications.  When we sent out discovery, we sent out
8   discovery, I believe, in July of last year and -- or August
9   of last year and received discovery responses back by the end
10  of August.  Those discovery responses were not verified.  No
11  discovery responses since then have been verified by Outback
12  Steakhouse.  We have no individuals signing these discovery
13  responses.  Our belief is that they should have known,
14  because how else would those discovery responses have been
15  able to be generated?
16           Outback Steakhouse is not an individual person, an
17  individual breathing human being.  The breathing human beings
18  are behind the Outback Steakhouse, and we have reason to
19  believe that Lisa Crosby and Norman Chase were also co-owners
20  of the business, should have been the ones verifying the
21  information, because who else would know the answers to the
22  questions we were asking except for these living, breathing
23  human beings?  And also --
24           THE COURT:  Let me ask -- go ahead.  Did you want to
25  say something else?

1          MR. HAYSBERT:  Well, in terms of being a co-owner of

2    the business, it defies belief that co-owners and managing

3    partners of the company would not have received notice that a

4    lawsuit had been filed against them.

5          THE COURT:  Right, but it's not just notice that a

6    lawsuit was pending.  They have to have known that but for a

7    mistake in identity they would have been not just involved or

8    mentioned in the complaint, but they would have been a party

9    to the lawsuit.  And that's, I think, the hurdle that you

10   have; is that your lawsuit didn't name any individuals.  It

11   didn't assert that an individual owner or an individual

12   employee had any responsibility as a party for what happened

13   to your client.

14         MR. HAYSBERT:  We now know as of the March 15

15   discovery responses that managing partners of the Outback

16   Steakhouse are owners, co-owners, of the Outback Steakhouse.

17   We requested the franchise agreement and never received it.

18   We requested verified discovery responses and never received

19   them.

20         If they were an owner of this organization, they

21   should have known about the lawsuit, and they would have been

22   included as parties to the lawsuit but for an error in

23   knowing that they were owners.  We didn't know at the time

24   that the managing partners were owners of the company, and if

25   we had known that, Your Honor, we would have included them as

1    individual parties to the lawsuit.

2          THE COURT:  So let me -- there's a second tier of

3    difficulty for me in understanding why these two have been

4    named or sought to be named individually.

5          Your complaint alleges certain things on information

6    and belief, particularly with respect to Ms. Crosby, that she

7    had some personal involvement in some way with creating a

8    hazardous condition, and I want to understand what is the

9    source of that information and belief?  I mean, you have

10   proffered a complaint that suggests that she either knew of a

11   spill and didn't clean it up or cleaned it up improperly.

12   And you have alleged that on information and belief, and that

13   means there must be something informing that allegation.

14   What is it that informs that allegation?

15         MR. HAYSBERT:  Well, before I answer that question,

16   Your Honor, I think the -- I want to just say that based on

17   the discovery responses we received as of March 15, that

18   question is irrelevant, because she's now -- we now know that

19   she's an owner of the business.  So it's an easier standard

20   to prove her liability with respect to this incident now that

21   we are sure -- and I've received discovery responses

22   indicating that she was a managing partner and owner of the

23   Outback Steakhouse at the time, much like Norman Chase.  If

24   we had known that, then we would have -- you know, it would

25   not have been necessary to include her in the complaint in

1    the way that we did.

2           But to answer the question, Your Honor, what we did

3    was extrapolate from the limited discovery responses that we

4    were provided that there was an affirmative action that she

5    was taking that, you know, she was --

6           THE COURT:  What were they?  I mean, I've seen those

7    discovery -- I've seen some of those discovery responses, and

8    I can't figure out how you could allege in good faith that

9    she had -- even on information and belief, that she had

10   failed to clean something up or left cleaning fluid on the

11   floor.  I just don't see any evidence that would lead you to

12   make that conclusion.

13          MR. HAYSBERT:  Well, that wasn't the only allegation

14   we were making, it was or that she was controlling the

15   process and, you know, saw someone who did something and

16   didn't say anything, you know, just kind of didn't say what

17   she needed to say, because she was the operator and manager

18   of the restaurant at the time.

19          So, you know, the circumstance, based on the

20   information that we received, was that she had some sort of

21   affirmative conduct herself that bore some responsibility --

22          THE COURT:  Again, when you say, "based on the

23   information we received," what information did you receive

24   that -- just because she was there, that she was physically

25   present?

1          MR. HAYSBERT:  Well, not that she was just

2   physically present but that she was active.  I mean, she was

3   literally putting together the claim form for the client

4   herself.  She was providing the client with information to

5   follow up on.

6          THE COURT:  After the fall.

7          MR. HAYSBERT:  That's correct.

8          THE COURT:  Right.

9          MR. HAYSBERT:  She was on duty at the time.  She was

10  responsible for what was occurring on the premises at the

11  time.  This is according to their discovery responses.

12         THE COURT:  Again -- but, I mean, ultimately, the

13  real core problem which you're going to have to deal with

14  eventually is that Bloomin' Brands and Outback says there was

15  nothing wrong with the floor.  And so you keep saying it's

16  their responsibility to identify this or produce discovery,

17  but if they say nothing is wrong with the floor, then where

18  does that leave you?

19         That's what they're saying; there wasn't anything

20  wrong with the floor.  And I'm asking you -- you've alleged

21  on information and belief that there was something wrong with

22  the floor.  What is informing that belief?  What information

23  are you relying on to conclude that there was anything

24  slippery on the floor?

25         MR. HAYSBERT:  The client fell, Your Honor, and

```
 1   smashed her head against the ground.  And, unfortunately, we
 2   have a situation here where the one thing that could make all
 3   of this enlightening for us is gone.  And that's the subject
 4   of a different motion, but that's the centerpiece of what
 5   we're discussing here.
 6           THE COURT:  We'll get to the video in a moment.
 7           MR. HAYSBERT:  Sure.
 8           THE COURT:  Again, I'm not trying to belabor this.
 9   I am trying to get information, if there is any.  And if
10   there isn't any, it gives me some pause, frankly.  If you
11   just alleged, "Well, we know she fell, so the floor must have
12   been slippery," that's not a good-faith basis.  If you have
13   no idea what caused her to fall, I don't think you can just
14   say, "Well, it must have been their fault."
15           MR. HAYSBERT:  If there was nothing slippery on the
16   floor, why would a claim form be generated?  Why would we
17   have discovery responses indicating that there was an
18   incident report put together for the incident in anticipation
19   of litigation?  So we currently don't have access to any of
20   that information because, apparently, it's attorney work
21   product.  There are a whole host of problems that we can't
22   just ignore on our way to excusing owners of this
23   organization from any liability for what has occurred in this
24   case.  They have neatly -- if you -- if you -- I mean, I can
25   see it very clearly.  They have neatly packaged this case in
```

1    such a way that they have been able to figure out every kind

2    of angle, including not verifying any discovery responses --

3    which is completely inappropriate and unjustified and a

4    violation of the Federal Rules -- in order to get us to the

5    point where you're even asking these questions.  The

6    questions you're asking we've asked.  We're not getting any

7    responses for them.  What we have we've been able to

8    extrapolate upon information and belief.

9         She was the associate manager at the time.  We've

10   asked for sweep sheets.  What were the employees doing?  When

11   were they supposed to mop?  You know, were they required to

12   wear certain shoes?  Were they wearing them on this

13   particular day?  Who were the employees that were working on

14   this particular day?  We served this discovery in August of

15   last year, and we don't have any responses to these questions

16   still.

17        What we have been able to obtain is that Ms. Crosby

18   is an owner of this organization, so we don't need to go to

19   the next step of trying to figure out what she did or didn't

20   do.  Now we have the information.  It conveniently came after

21   the close of all the briefing in this case so that nothing in

22   writing, you know, would be shared with the Court in a timely

23   fashion for this hearing.

24        But I can state unequivocally under penalty of

25   perjury this is the discovery responses that we received:

1    She's an owner of this organization.  She should have known
2    about the lawsuit as an owner of the organization.  And it
3    would be unfair and unjust to say that she wouldn't have
4    known about this, that there was an error.  She knew that she
5    was an owner of this organization at the time of the
6    incident.
7          THE COURT:  They're not arguing that she didn't --
8    well, they may be arguing, but that's not the basis of their
9    opposition that she had no idea that a lawsuit was filed.
10   The basis of their opposition is that she didn't know that
11   but for a mistaken identity she would have been named as a
12   party.  That's the issue of relation back.
13         MR. HAYSBERT:  And our argument, our position, now
14   that we have the discovery of March 15, that they
15   conveniently didn't provide us, and knew long prior to that
16   but didn't provide it even at the point that they filed their
17   opposition, is that she was an owner of the organization and
18   should have known about the lawsuit.  Because in her capacity
19   as the owner of the organization she should have known, and
20   also -- and traveling further, that she would have been a
21   party to the action because we included all the owners that
22   we knew about.  She would have been a party to this action if
23   we had known that she was an owner of the organization.
24         THE COURT:  Okay.  Let me hear from Mr. McGavin, and
25   then I'll -- and, Mr. McGavin, is Ms. Crosby an owner?  What

1    does it mean to be a managing partner?  Is she an owner?  Or
2    how many owners --
3            MR. MCGAVIN:  No, she's not an owner.  And the
4    answer to interrogatory that Counsel is referring to says
5    that Lisa Crosby is a former managing partner and Chip Chase
6    is a former managing partner.  We don't say she's an owner.
7    She's not an owner, she's a managing partner.
8            MR. HAYSBERT:  Can you put that on the verification?
9            THE COURT:  Just a minute, Mr. Haysbert.  I'm going
10   to give you a chance at the end of Mr. McGavin's comments,
11   but please don't crosstalk with him.
12           MR. HAYSBERT:  I'm sorry about that.
13           MR. MCGAVIN:  So we've verified with Bloomin' Brands
14   and with Outback that the managing partners don't have an
15   ownership interest.  So we've gone to Bloomin' Brands to
16   verify this, and we have confirmed that.
17           And this argument goes back to our initial set of
18   discovery and our initial motion to compel and plaintiff's
19   initial discovery in this case to us, in which they said,
20   "Please admit that you knew about the condition."  Our
21   response was, "There's no condition.  The floor was clean and
22   dry."
23           And then we filed in our discovery a motion to
24   compel plaintiff to tell us what was the defect, if you
25   recall, Your Honor, to which plaintiff had objected to

1    telling us what the defect was.  And the Court ordered the

2    plaintiff to identify the defect, and the plaintiff said she

3    had no idea what the defect was because she blacked out.

4           So this effort to add to this case these two

5    individuals is not based upon any evidence that they were

6    involved.

7           I would also remind the Court that on June 22, 2018,

8    Mr. Haysbert wrote to "Chip Chase, managing partner of the

9    Outback Steakhouse."  That's who he sent his spoliation

10   letter to.  So if he believed that being a managing partner

11   exposed you to liability as an owner, then perhaps when he

12   filed suit on July 13, 2020, taking full advantage of the

13   tolling provisions of the coronavirus, he might have sued him

14   then.

15          Simply stated, Your Honor, there's no basis that's

16   been presented that somehow we've withheld the name or

17   identity of any property, number one, or, number two --

18          THE COURT:  What about -- Mr. Haysbert raised the

19   issue of the fact that an incident report was prepared, that

20   there was some activity after Mr. Haysbert fell, and that

21   this might be evidence that would lead them to understand

22   what happened on the floor.  Have you withheld that incident

23   report?

24          MR. MCGAVIN:  We have.  We've withheld that, yes,

25   Your Honor.

1          THE COURT:  On the basis of attorney/client
2     privilege?
3          MR. MCGAVIN:  That's right, yes, and prepared in
4     anticipation of litigation.
5          THE COURT:  So it's a work product objection.
6          MR. MCGAVIN:  Yes, that's right, Your Honor.
7          THE COURT:  Okay.
8          MR. MCGAVIN:  So it goes in to Risk Management for
9     them to consider, and then a month later we get a note from
10    Mr. Haysbert, June 22, his request to preserve information.
11         THE COURT:  Okay.  Does the -- I mean, if the report
12    says something about the condition of the floor, then he
13    would probably have -- it doesn't appear anybody has any
14    memory of this.  He would probably have an argument that he
15    could not obtain that through another means.  Do you know
16    what it says about the condition of the floor?
17         MR. MCGAVIN:  I do, Your Honor, and it's going to
18    say that the floor was clean and dry.  And Lisa Crosby, she
19    came to speak to Ms. Haysbert after she fell.  There's no
20    dispute she fell, and she spoke to Ms. Haysbert.  She
21    declined medical assistance and left.
22         So that's the extent of it.  They have to submit
23    these reports when somebody has a fall, and that's why they
24    did it.
25         THE COURT:  Okay.

Heidi L. Jeffreys, Official Court Reporter

```
 1            MR. HAYSBERT:  Let me get this right.

 2            THE COURT:  Just a minute, Mr. Haysbert.  He's not

 3    quite done.

 4            MR. MCGAVIN:  If I had some information that there

 5    was some defect on the floor somewhere from some source, I

 6    would disclose that.  We have -- that's why we have

 7    consistently said there is no defect, the floor was not wet,

 8    there was no defect, and that's why we asked that specific

 9    question, to know what Ms. Haysbert was contending was the

10    problem.  Is it overly waxed?  Is it somebody spilled a

11    drink?  Is there a Bloomin' Onion on the floor?  Any of those

12    things, in a run-of-the-mill slip and fall case -- okay, then

13    we can try to address that.  But our evidence will be at the

14    trial of this case there was nothing like that on the floor;

15    there was no defect.

16            THE COURT:  Okay.

17            MR. HAYSBERT:  And, Your Honor, can I speak?

18            THE COURT:  Let me just ask, is there anything else,

19    Mr. McGavin, before I hear from Mr. Haysbert in response?

20            MR. MCGAVIN:  Your Honor, it just seems to me that

21    this is an effort to divest the Court of jurisdiction and

22    send the case back to state court.

23            And even if there was an amendment, what is it that

24    is going to be alleged that was supposed to be done

25    differently by these individuals?  And there's nothing in
```

1   there.  Although, apparently, I guess in the amended

2   complaint they're now trying to argue there was a soapy

3   substance, which is not what is in any of the discovery so

4   far.

5         THE COURT:  Okay, Mr. Haysbert.  What did you want

6   to say?

7         MR. HAYSBERT:  Sure.  Your Honor, so Counsel -- what

8   troubled me is that Counsel has made a number of claims or

9   observations, conversations with the owners of this store --

10   restaurant.

11         For example, when he talks about the fact that it

12   was clean and dry, there's no verification -- there's no

13   verified response supporting the truth of that statement.

14   It's simply Counsel saying it orally at a hearing.  It has no

15   effect whatsoever without a verification.  It means nothing.

16   It -- you might as well throw it out and say that it's not

17   true.  We can't go that far; we don't know.  There's no

18   verified response to that question.  There's no verified

19   response to --

20         THE COURT:  I meant to ask him a question about

21   that, and I neglected to.  Let me get Mr. McGavin on the

22   record about that.

23         Mr. McGavin, who is verifying the defendants'

24   discovery responses?

25         MR. MCGAVIN:  We have a new managing partner at the

1    property who would be signing for Outback.  Bloomin' Brands

2    has already submitted their responses, which are signed, and

3    I would have to check with Ms. Johansen on this issue of

4    verification.  I'm sorry.  I know she's been working with

5    Outback at the location.

6              But as to this challenge, it's in our responses to

7    requests for admission, too, so that's binding on Bloomin'

8    Brands and Outback as well.  So we stated this in requests

9    for admission affirmatively, not just denying but explaining.

10   So we haven't -- it's not just the answers to

11   interrogatories, it's also in the requests for admission,

12   which are not -- they're not verified, but they have the same

13   force and effect.

14             THE COURT:  So you're going to get -- he says you've

15   gotten sworn responses from Bloomin' Brands; they're trying

16   to track down a verification from Outback.  But --

17             MR. HAYSBERT:  We don't have -- we don't have

18   the -- he's saying that they're sworn responses.  We have an

19   illegible scribble of a signature without a printed name.  We

20   have no idea who that person is.  If we wanted to depose that

21   person, we couldn't, because we have --

22             THE COURT:  Well, we have a simple problem,

23   Mr. Haysbert.  We're not going to get hung up over someone's

24   signature not being able to be read.

25             MR. HAYSBERT:  Well, we have to know who the person

1    is.  We don't know who the person is.

2           THE COURT:  Well, pick up the phone and ask them who

3    it is.

4           MR. HAYSBERT:  Your Honor, I've asked, you know, who

5    is verifying these responses.  We've included this in our

6    motions, and this is -- these are exhibits to our

7    applications for this information, and we haven't received

8    it.

9           THE COURT:  Okay.  We're moving off the subject of

10   this motion.  We'll get to the discovery in a bit.  And I

11   know you have a complete motion to compel, which we'll go

12   through in some detail.

13          MR. HAYSBERT:  But I --

14          THE COURT:  As to these issues, I'm still struggling

15   to figure out how either of these parties would have known

16   within the 4(m) period that but for a mistake in identity --

17   that is, that you actually intended to name -- and

18   Mr. McGavin says they are not owners.  They have the title of

19   "Managing Partner," but they are not owners.

20          MR. HAYSBERT:  Mr. McGavin is not a party to this

21   action.  Mr. McGavin is not speaking under oath.  Mr. McGavin

22   is not verifying these responses.

23          THE COURT:  Mr. Haysbert, you're relying on him to

24   say they are owners.

25          MR. HAYSBERT:  No.

1          THE COURT:  You're relying on his discovery to say

2     they are owners, but you're not going to rely on his

3     discovery to say they're not?

4          MR. HAYSBERT:  And now you see the problem that we

5     have; is that we're relying on discovery that we're getting

6     that isn't even verified.

7          And, Your Honor, they have to verify these

8     responses.  How else -- why are we here?  How are we going to

9     finish this discovery, period, relying on information we're

10    receiving from unverified --

11         THE COURT:  I don't find this persuasive,

12    Mr. Haysbert.

13         MR. HAYSBERT:  They're not verified?

14         THE COURT:  I don't find this argument persuasive on

15    the issues that you are arguing to the Court.  The issues

16    you're arguing to the Court are that these two individuals,

17    both of whom you knew about prior to filing the lawsuit --

18    Ms. Crosby is mentioned by name in the original complaint.

19    Mr. Chase received your letter within 30 days after the

20    accident happened.  You knew about both of them.

21         Your original complaint did not name any individual

22    person, and I'm struggling to find out why it is either of

23    them should now, a year after the complaint was filed,

24    believe that in identifying two entities, Bloomin' Brands and

25    Outback, that you really intended to name them as

1    individuals.  I don't understand how that could possibly be
2    understood by either of them within the Rule 4(m) period.
3           And I understand you have other complaints about
4    discovery, but that's not persuasive to me on the question
5    that I have to decide with respect to this leave to amend.
6    So is there anything else you want to say about the leave to
7    amend standard?
8           MR. HAYSBERT:  Well, I will say this:  We issued
9    subpoenas to Lisa Crosby and Chip Chase so that they could
10   both answer questions under oath about whether or not they
11   have an ownership interest in the company, when they knew
12   about the lawsuit, whether they knew that they were expected
13   to be sued, but for some error that occurred.
14          We set dates certain for those depositions.  There
15   was a motion to quash.  When we found out they no longer
16   worked for the company and we had to go get them ourselves,
17   then we filed the papers that we filed.  And we sent Counsel
18   an e-mail taking off the calendar depositions because they
19   couldn't produce them.
20          It's all very convenient.  We don't know when Lisa
21   Crosby and Chip Chase were no longer affiliated with the
22   Outback Steakhouse.  We don't know whether or not they had an
23   ownership.  We can't take Counsel's word for it.  You know,
24   he's telling us through his discovery responses that there's
25   no camera above the hostess stand when we can clearly see it

1    ourselves.

2           So the Court should set dates for those depositions

3    shortly after this hearing so we can get the information that

4    we need from them.  And this is in the interest of justice.

5    Because of the no verified responses that we've received so

6    far from Outback Steakhouse, we don't know who responded to

7    these questions.  He's never identified a current managing

8    partner and how that person would know any of the information

9    that was occurring at the time of the incident, when we know

10   for sure Chip Chase was a managing partner and we now know

11   that Lisa Crosby was a managing partner as well.

12          THE COURT:  But they're not owners, it's just a

13   title they give them.

14          MR. HAYSBERT:  Your Honor, you're just taking his

15   word for it.  It seems like --

16          THE COURT:  You are, too, Mr. Haysbert.

17          MR. HAYSBERT:  I'm not taking his word for it.

18          THE COURT:  Okay.

19          MR. HAYSBERT:  What I'm asking for --

20          THE COURT:  I want to speak to local counsel.

21          Mr. McKelvey, your name is on this pleading.  Your

22   name is on the pleading that alleges that Ms. Crosby

23   personally failed to clean up something or left a slippery

24   substance on the floor; that, on information and belief, she

25   had personal involvement in these actions.  Can you tell me

1   what source of information the plaintiff is relying on for

2   that statement?

3        MR. MCKELVEY:  Judge, this is based on my

4   recollection.  And I'm not by any means saying that there is

5   no other information out there, but based on my recollection

6   there was -- the Court's question is kind of twofold.

7        One is the question of is there a -- was there a

8   response or a responsibility by someone, the person named, to

9   not -- to clean up, in other words.  And there was a

10  discovery response that was issued by one of the two

11  corporate entities that said that it was -- that they were

12  supervising on site and that type of thing, so I have that as

13  far as their responsibility.

14       As far as the wet, slippery substance, I think

15  it's -- my assumption is that it's based on a -- either -- I

16  guess if she blacked out, it's based on what we would expect

17  to have happened.  I'm not --

18       THE COURT:  But on what -- I mean, why would you

19  have expected that to happen, other than the fact of her

20  falling?  Is it essentially just the fact that your client

21  fell?

22       MR. MCKELVEY:  The fact that she fell and -- Judge,

23  I would honestly defer to Mr. Haysbert on that.  I mean, we

24  discussed it.  He said that he thought there was a basis for

25  it.

Heidi L. Jeffreys, Official Court Reporter

1          MR. HAYSBERT:  I'll tell you.

2          THE COURT:  I've heard your answer, Mr. Haysbert.

3          MR. HAYSBERT:  My answer wasn't complete, Your

4    Honor.

5          THE COURT:  What else was it, Mr. Haysbert?

6          MR. HAYSBERT:  So we have been trying to track down

7    the witness to the incident.  I can't recall the name at the

8    moment.

9          THE COURT:  That's not responsive to my question.

10   It's not responsive to my question that you don't know.  My

11   question was you had to know something.  You alleged on

12   information and belief that Ms. Crosby engaged in conduct or

13   failed to engage in conduct.

14         MR. HAYSBERT:  I'm answering your question, Your

15   Honor.  You have to let me finish.

16         What I'm saying is I had a private investigator go

17   and try and find one of the witnesses, including the witness

18   who was identified in defendant's discovery responses --

19   unverified discovery responses.  She had a conversation with

20   this person over the phone, and this person was saying, "Oh,

21   you're talking about the old lady who fell on the slippery

22   substance."

23         THE COURT:  Who said that?

24         MR. HAYSBERT:  The person who was on the phone with

25   the private investigator.

```
1              THE COURT:  What is that the private investigator's
2    name?
3              MR. HAYSBERT:  I can give you that information, Your
4    Honor, and I believe I put it in the -- give me one second.
5              (There was a pause in the proceedings.)
6              MR. HAYSBERT:  And I can have her submit an
7    affidavit under oath, Your Honor, to her conversation.
8              THE COURT:  Well, it seems to me that's something
9    that should have been produced, if that's information that
10   you've gathered in connection with your investigation.
11             MR. HAYSBERT:  Well, that was the "upon information
12   and belief."
13             THE COURT:  Well, again, if you have information
14   that some person at Outback observed a slippery substance on
15   the floor, that's kind of important for everyone to
16   understand.
17             MR. HAYSBERT:  Her name is Christina Perry, from a
18   company called People Hunter.
19             THE COURT:  Okay.  And when did Ms. Perry speak
20   to -- and Ms. Perry, you're saying, is going to submit an
21   affidavit saying that she spoke to a former employee?
22             MR. HAYSBERT:  She spoke to someone that we were
23   able to identify on the witness list provided by defendants,
24   who indicated that they remember the incident and that the
25   person was an older lady and that she slipped -- fell on a
```

1    slippery substance.  That's what she said her conversation

2    was.

3                When she tried to follow up with that person, that

4    person didn't respond to her phone calls after that point.

5                THE COURT:  When did all this take place,

6    Mr. Haysbert?

7                MR. HAYSBERT:  Give me one second, Your Honor.  I

8    can tell you.  She sent it to me in an e-mail.

9                (There was a pause in the proceedings.)

10               MR. HAYSBERT:  The first e-mail that I got from

11   Christina was on September 28, 2020, who wanted to give me an

12   update on the witness, potential witness, Chris Robinson.

13               THE COURT:  Chris Robinson is the witness's name?

14               MR. HAYSBERT:  That's what is indicated here, but

15   the name could be -- yeah, that's what it says here.  She

16   says, "Last week I reached out to a guy through text who

17   claimed he was Chris when he began the text, and by the end

18   he claimed he was the son of Chris.  He said that his dad was

19   the one that witnessed the fall but was unable to talk

20   because he's in the Navy on a boat overseas.  I did not

21   believe that he was telling me the truth and believed that it

22   was Chris.  He was able to tell me in a few short texts about

23   the fall and knew exactly what I was talking about.  The

24   phone number that I reached him on was a new number."

25               THE COURT:  So you have somebody communicating with

1    a private investigator who says his father witnessed the fall
2    but the investigator doesn't believe him.  She believes he's
3    really the person who witnessed the fall.
4          MR. HAYSBERT:  He claimed he was the person at the
5    beginning of the text, and by the end he claimed that he was
6    the son of the person.
7          THE COURT:  Okay.
8          MR. HAYSBERT:  So I indicated in my filings the
9    difficulty that we've been having with the witnesses and this
10   particular witness in the case by indicating that we had a
11   private investigator working on this.  But Christina will be
12   able to put under oath exactly what she heard, include the
13   text messages, and that's the basis upon which we believe
14   that Lisa was involved and the spill on the floor -- she's
15   the only person that we currently know was an employee and
16   was on duty at the time.  We have no other names of any other
17   employees who were working at the time.  We've gotten no
18   other information whatsoever about anyone else except for
19   Mr. Chase and Ms. Crosby.
20         THE COURT:  Okay.  All right.
21         MR. HAYSBERT:  And we don't --
22         THE COURT:  I don't need any more argument on that.
23   I would like you to prepare an affidavit for your private
24   investigator to sign, documenting her conversation with this
25   person as the basis for that allegation, and produce it to

1     Mr. McGavin.  I'll give you 14 days to get that

2  accomplished.

3         All right.  I don't need to hear any more argument.

4  As I said, I'm going to need to prepare a report and

5  recommendation, but I am going to be recommending that the

6  Court deny leave to amend.  I do not believe that there is a

7  basis for either of these people to have understood, within

8  the period of time specified in Rule 15 and 4(m), that, but

9  for a mistaken identity, they would have been named as

10  parties in the litigation that was filed.  And, therefore, I

11  do not believe any amendment adding them as parties would

12  relate back to that original.  If it does not relate back, it

13  is barred by the statute of limitations, so I believe the

14  motion to amend should be denied as futile, and I'm going to

15  recommend that the motion for leave to amend be denied on

16  that basis.

17         Because the motion for leave to amend is the only

18  basis on which the plaintiff seeks remand, I'm going to also

19  recommend that the Court deny the motion to remand.

20         I'll try and get something together in writing

21  within the next ten days, and you'll have an opportunity to

22  object if you believe I've made a mistake, and you'll have

23  14 days to file those objections.  The District Court will

24  review the objections, anything that's objected to, de novo

25  and make a separate determination, if I made an error.

1          MR. HAYSBERT:  Your Honor, if I may, why not stay

2     the ruling on both, give us the opportunity to depose them or

3     get verified responses to the information that we've already

4     submitted to defendants so we can get the answers to those

5     questions?  Because what I'm concerned about is you're

6     denying this motion despite the fact that we don't have any

7     verified responses, and we don't have adequate discovery in

8     this case, and we haven't had an opportunity to depose either

9     one of these individuals.

10          THE COURT:  Again, it isn't based on what you knew.

11     That's what -- I mean, frankly, this *Krupski* case is very

12     helpful to me in understanding, because that's what -- you

13     know, the argument in *Krupski* was no relation back because

14     the plaintiff should have known this, and the plaintiff

15     didn't find out, and the plaintiff should have known, and

16     therefore they denied leave to amend because "the plaintiff

17     should have known" was not the standard.

18          The standard is whether the putative defendant

19     should have known.  And even if you learn a whole bunch of

20     new information based on what was available to these

21     individuals, based on looking at your complaint and what

22     discovery has shown thus far about their role in the company,

23     there's no basis that either of them would have concluded

24     that you named, for example, Bloomin' Brands, LLC but really

25     meant to name an individual manager who worked for Bloomin'

1    Brands, LLC.  There's just no -- there's no similarity.

2         The *Krupski* case is very instrumental of when this

3    happens.  It happens when there are multiple entities or

4    possibly multiple individuals, although much harder with

5    individuals because each individual is a separate person and

6    has their separate role in what happened.  You clearly

7    understood when you filed the original complaint that there

8    were individuals and that those individuals had

9    responsibility for carrying out the company's responsibility

10   to maintain a safe premises, but you chose to name the

11   company.

12        You didn't name any individuals.  You could have

13   named them.  You knew who one of them, Chip Chase, was, and

14   you knew who Crosby was.  You may not have understood that

15   she had the title of Managing Partner, but that doesn't

16   really meaningfully change the analysis.

17        So I'm not going to stay my recommendation.  As I've

18   said, you'll have an opportunity to object, and that will be

19   clear when I issue something in writing concerning the

20   decision that I --

21        MR. HAYSBERT:  I just want to make one final

22   statement on the record.

23        We didn't get any substantive discovery responses,

24   still unverified, until October.  The deadline to amend the

25   complaint to include individuals was September of last year;

1    all very convenient that we received discovery responses in

2    August of last year and then again in October that were

3    unverified.  We need the opportunity to be able to ask the

4    question did Lisa Crosby or Chip Chase assist --

5            THE COURT:  Mr. Haysbert, I've heard enough on this

6    motion, and if you can't stay focused on the remaining work

7    that we have to do, I'll ask Mr. McKelvey to step in and

8    argue on that for your client.

9            I know you're more familiar with the case, and I

10   want to hear what you have to say, but you're repeating

11   yourself, and I don't need to hear any more, all right?

12           MR. HAYSBERT:  All right.  Thank you, Your Honor.

13           THE COURT:  All right.  I think it's going to be

14   easiest to take up the motion for sanctions next with respect

15   to this video, and I'm going to -- rather than open up a big

16   can of worms, I just have some very specific questions for

17   each side about this motion.

18           The first question -- and we're now moving to Motion

19   No. 42, which is the motion for sanctions alleging spoliation

20   of electronic evidence; namely, security video or video from

21   the cameras that were installed at the Outback where the

22   accident happened.

23           So the first question that I have, Mr. Haysbert, is

24   the photograph of the camera above the hostess station.  Did

25   you take that photograph?

```
1              MR. HAYSBERT:  I did, Your Honor.

2              THE COURT:  And when did you take it?

3              MR. HAYSBERT:  Approximately two months after the

4    incident.

5              THE COURT:  Okay.  So is that going to be part of

6    your attestation, that it was taken two months after the

7    incident?

8              MR. HAYSBERT:  Yes, that is, approximately two

9    months after the incident.  I can't remember the exact day,

10   but it was approximately two months after the incident

11   occurred.

12             THE COURT:  Okay.  So let me ask you, Mr. McGavin.

13             You have indicated that this camera that is above

14   the hostess station was not present at the time of the

15   accident.  Do you know when it was put in?

16             MR. MCGAVIN:  I do, Your Honor.  I have the

17   chronology.  We've been working with the installer.

18             Our information is that in February of 2018 there

19   were six video cameras installed at the restaurant.  Three

20   were placed in the interior; one covered the office, one

21   covered the to-go area, and the other covered the meat

22   freezer.  There were three cameras on the exterior; front

23   door, back door, to-go area, parking lot.  And in April

24   of 2019 there was an installation of a camera in the bar

25   area, and then in October of 2020 the entire video system was
```

1    upgraded and hard drive replaced.

2         And we do -- we've been -- I think we have gotten

3    the receipts for all that service work.

4         THE COURT:  In April of 20 -- so you're suggesting

5    that the camera in the bar area -- I'm assuming the camera in

6    the bar area is the one that's depicted in the photograph

7    that Mr. Haysbert took.

8         MR. MCGAVIN:  I think that's right, Your Honor,

9    but -- I believe that's right.  And I don't know which view

10   the camera that Mr. Haysbert is talking about -- what that

11   covers, whether that covers -- is aimed at the to-go area.  I

12   don't know that.  And this is -- we have the service records

13   to present on this as well as to when cameras were purchased,

14   and this is what they've told us.

15        THE COURT:  Okay.  And have those been produced, or

16   were they sought in discovery?

17        MR. MCGAVIN:  I don't know that they were sought,

18   Your Honor, and I think that the actual records from -- the

19   provider is a third-party provider.  I think we have obtained

20   those as recently as last week.

21        So we've interviewed these folks, and that's the

22   basis of what I've represented to the Court.  And I believe

23   that we received those supplemental documents last week.

24   Ms. Johansen has been working with that outside provider to

25   go ahead and get those actual service order documents,

1    receipts, and purchase orders.

2          THE COURT:  Okay.  Mr. McGavin, did anyone, as a

3    result of Ms. Haysbert's fall, look at the video after it

4    happened?  Did anyone at Bloomin' Brands examine the video to

5    see, one way or another, whether it captured anything?

6          MR. MCGAVIN:  Not at Bloomin' Brands corporate, they

7    did not.  It was not until Mr. Haysbert's letter and he

8    started calling in to Bloomin' Brands, which is -- Bloomin'

9    Brands handles the risk management piece; Outback Steakhouse

10   of Florida operates the restaurant.  So Bloomin' Brands is

11   the umbrella corporation.  They have various restaurants

12   underneath that corporate name of Bloomin' Brands.

13         So the risk management piece goes up to Bloomin'

14   Brands, and, no, they did not look at it at the time.  But

15   when the request came in to search for video and the letter

16   came in to Chip Chase, in terms of Bloomin' Brands they did

17   not -- or they searched for the video.  It was not available

18   at that point.

19         THE COURT:  I guess my question is Mr. Haysbert has

20   observed that there was a fall, they prepared an incident

21   report.  Did anybody -- Ms. Crosby or anyone on the ground at

22   the Chesapeake Outback -- go to the security camera footage

23   and say, "I wonder if this captured what happened," and look

24   at it to see whether it captured what happened?

25         MR. MCGAVIN:  I don't know the answer to that, so I

1    don't -- I don't think anyone was really, truly believing

2    that there was a lawsuit coming, I guess, at the local level.

3    I mean, they're just -- somebody fell, they offered her

4    medical assistance, she left, and then it goes up to Risk

5    Management at Bloomin' Brands, which requires it, in their

6    view, in anticipation of litigation anytime there's a fall.

7              THE COURT:  Okay.

8              MR. MCGAVIN:  I'd have to ask Ms. Crosby, Your

9    Honor, and I don't -- I don't know the answer to that, so I

10   don't want to overstate or understate what I actually know.

11             THE COURT:  Okay.  All right.  Mr. Haysbert, I have

12   read all your papers, I understand your argument on this

13   motion.

14             I do think that there's a bit of a problem with the

15   timing of the preservation letter.  It looked like it

16   literally went out on -- it appears on the 30th day following

17   the fall at something like 8:30 at night, from the receipts

18   that you submitted.  So there wasn't any earlier

19   communication with them, right?

20             MR. HAYSBERT:  That's not correct.  In the same

21   motion I indicated that I had a conversation with the

22   managing partner.

23             THE COURT:  Oh.  So are you saying that the

24   conversation was before the letter?

25             MR. HAYSBERT:  That's correct.

1          THE COURT:  Well, I guess I need to understand what

2     you're attesting to, Mr. Haysbert, because I understood that

3     the letter was the first notice they would have received.

4          MR. HAYSBERT:  No.  I had a conversation with two

5     different people before the letter went out.  One of those

6     individuals was Chip Chase.  One individual was a -- I can't

7     think of the -- it was a man that I spoke with.  I can't

8     think of the name, but I think he was affiliated with

9     Bloomin' Brands.

10          THE COURT:  Okay.  Well, I guess I need a little

11     more facts before I can rule on this motion.  I'm going to

12     have to take it under advisement and ask you-all to

13     supplement the record.

14          Mr. McGavin, I'm going to ask you to confirm whether

15     either Mr. Chase -- whether anybody at Outback watched the

16     video before it was overwritten, because that, to me, would

17     be a relevant fact, if they watched the video as a result

18     of -- I'm not just talking about, you know, checking to see

19     if it was working properly, I mean did someone, after

20     Ms. Haysbert's fall, go back because of her fall and watch

21     the video.

22          And if they did -- if they didn't, then the answer

23     is just, "Nobody did that."  If they did, then I guess I need

24     to understand what was on the video.  But it's more important

25     to me to know just whether they did or did not go to the

1    video because of the fall and examine the video to see if it

2    captured her fall.

3           And I would also like you to supplement with

4    whatever facts you have indicating that this camera installed

5    in April of 2019 was the first time that a camera was in that

6    location at the hostess station.

7           And, Mr. Haysbert, if you're relying on the timing

8    of a call to Mr. Chase before the letter -- because your

9    affidavit includes date-stamped receipts for e-mail and

10   letters, so if you're relying on a call that preceded that,

11   you need to tell me when that call happened, and that needs

12   to be a matter of the record in a sworn statement.  And I

13   guess we'll need to hear -- who knows?  We may need to take

14   evidence on it.  I don't know whether -- well, we'll have to

15   see what Mr. Chase says and what the investigation reveals.

16          I mean, the bottom line under Rule 37 is if they

17   never knew the tape was there, they never knew anything was

18   captured, they didn't have any obligation after 30 days to do

19   anything, and I think you're not going to win a motion for

20   sanctions.

21          On the other hand, if they did know, if they watched

22   the tape or somebody told them beforehand within the time

23   where they could have preserved it, then there may be an

24   argument.  But it sounds like there's factual disputes about

25   when they knew and exactly what happened.

1             MR. HAYSBERT:  So, Your Honor, I included a signed

2      sworn declaration indicating that I had a conversation prior

3      to the letters going out.  I also included in that same

4      filing information I received from them, unverified, but

5      still information I received from them that they had

6      communicated with me and that that information was in the

7      incident report that we still haven't received.  So we still

8      haven't produced --

9             THE COURT:  Your declaration, Mr. Haysbert, says, "I

10     spoke by phone with the general manager or an agent or

11     employee, who confirmed the existence of working surveillance

12     cameras within the restaurant."  That's what it says.  It

13     doesn't say even who you spoke with, it doesn't say when you

14     spoke with them, it just says you spoke with someone who said

15     there were working cameras at the restaurant.  That's what

16     you said.

17            MR. HAYSBERT:  But I also included in the same

18     filing that there was information that they sent me in their

19     discovery responses indicating that they had communicated

20     with me and that this was part of their incident report, the

21     claimed filing.  I can indicate where that is, if you would

22     give me a moment.

23            So it's not just me saying that I had a conversation

24     with them, it's the defendant saying the same thing.

25            THE COURT:  The question is when did that

1    conversation take place?

2         MR. HAYSBERT:  Your Honor, the best -- it would have

3    happened before the letters were sent out.  I had the

4    conversation before the letters were sent out.

5         And then the other part of it is they prepared an

6    incident report apparently in anticipation of litigation that

7    will contain the dates that I spoke with them, and we have

8    been asking for this information and have not received it.

9         THE COURT:  Okay.

10        MR. HAYSBERT:  So don't take it from me.  The

11   incident report should show the date that I actually had a

12   conversation with them, since they included that as part of

13   their discovery responses.  We've requested the incident

14   report.  We don't have it.

15        THE COURT:  Was this incident report prepared after

16   Mr. Haysbert communicated with Outback, Mr. McGavin?

17        MR. MCGAVIN:  No, no.  What he's talking about is

18   we're referencing that in our claim notes Mr. Haysbert called

19   and was told that there was no video.  So -- and that's what

20   we were trying to say, is that he started calling in -- I'm

21   checking when the first call was, but I --

22        MR. HAYSBERT:  None of this --

23        THE COURT:  Your brief says that he was told in July

24   that there was no tape.

25        MR. MCGAVIN:  I think that's right.  And I'm sure

1    that that's where we took it, is from the notes.

2              THE COURT:  Okay.

3              MR. HAYSBERT:  Your Honor, the notes were produced,

4    and there's no verification of this, even though we've

5    requested all of it.

6              THE COURT:  I'm going to ask he -- I have asked

7    Mr. McGavin to produce a declaration identifying the

8    documents regarding the installation of the camera and any

9    information about whether the tape was reviewed prior to it

10   being overwritten.

11             MR. HAYSBERT:  But wouldn't the incident report also

12   contain information of the claim documents?

13             THE COURT:  I don't know whether -- I will -- if you

14   want me to look at the incident report *in camera*, I'll look

15   at the incident report *in camera* and determine whether it

16   contains any information relevant to this motion.

17             So I'm going to ask that you produce the incident

18   report, a copy of the claim notes, for my *in camera* review.

19             MR. HAYSBERT:  Thank you, Your Honor.

20             MR. MCGAVIN:  How do we do that, logistically,

21   Judge?

22             THE COURT:  Just send it to me.

23             MR. MCGAVIN:  Directly in an envelope and --

24             THE COURT:  Just send it to me, to my attention, not

25   to the Clerk's Office.

1          MR. MCGAVIN:  Since we do everything electronically,

2     do I send that by paper copy, rather than electronically, or

3     do I send that to Ms. Dodge, or what's the logistics of that?

4          THE COURT:  You can do it either way.  You can send

5     it just in an envelope addressed to me.  That's probably the

6     simplest way.  Just send it in an envelope and say, "For

7     *in camera* review."

8          MR. MCGAVIN:  So, let's see.  I'm looking at these

9     claim notes right now, Your Honor, so that I can figure out

10    how far along, because they continue to generate claim notes,

11    I'm sure, based upon my reports and so forth.  So I'm just

12    checking, and I want to tell you what I'm going to send you

13    so we have an understanding.

14         It looks like the claim notes that might have

15    anything to do with this end September 10, 2018, and then

16    they restart in May of 2020, two years later.  So what I will

17    do then, Your Honor, is just send the notes through

18    September 10, 2018, and then they restart in May of 2020.

19         THE COURT:  Why don't you just send me through that

20    first entry in May of 2020.

21         MR. MCGAVIN:  Okay.  All right.  I will.

22         THE COURT:  Okay.  I'm going to hold the motion for

23    sanctions under advisement until I get that supplement.

24         And again, Mr. Haysbert, if you want to point me to

25    something in your sworn statement that says you spoke to him

1    before then, I will look at it.  I don't see that in the

2    affidavit that you have filed.

3            MR. HAYSBERT:  I can supplement the declaration,

4    Your Honor.

5            THE COURT:  If you would, do that in 14 days.

6            MR. HAYSBERT:  Sure.  I think the issue is I don't

7    recall the exact date and time of that phone call.  I know it

8    was before I sent out the letter.  So that's the concern I

9    have that could be alleviated by having the information that

10   they currently have, which is the date and time of the calls

11   they received.

12           THE COURT:  Okay.  Well, I'll -- do the claim notes

13   show a call on -- well, let me just look at the claim notes,

14   and I'll see what they say.

15           MR. MCGAVIN:  Okay.

16           MR. HAYSBERT:  I think the other issue, though, Your

17   Honor, is that with respect to the cameras, the incident

18   occurred in May of 2018.  All the cameras that he discussed

19   would have been installed at that time.  They do not account

20   for the camera that was above the hostess stand.  They state

21   that there were only three cameras inside the restaurant; in

22   the to-go area, the office, and the freezer.  They provided a

23   diagram of the fourth camera.  Of all four cameras, they say

24   the fourth camera was installed in the bar area.  That isn't

25   the camera that's observed right above the hostess stand.  In

1    fact, the hostess stand camera is blocked from recording the
2    bar area, if you were to look at the pictures that I
3    included.  So the bar is in a different area than the hostess
4    stand, very different.
5         THE COURT:  Again, I can't tell what this camera
6    would have picked up, and my understanding is that it wasn't
7    present.  So if you're going to submit a declaration that you
8    took this picture at some specific point in time, you would
9    need to supplement the record.  Right now, you know, it's not
10   inconsistent with what Mr. McGavin has said, that this camera
11   was installed in 2019, after the fall.
12        MR. HAYSBERT:  The camera above the hostess stand?
13        THE COURT:  Yes.
14        MR. HAYSBERT:  Okay.  There's no way that camera
15   could have been installed in 2019, because I physically went
16   into the location within a couple of months of the incident
17   happening and took the picture that I showed there of that
18   camera.
19        THE COURT:  Okay, I understand that.  I understand
20   that's your position, but that was not in your declaration.
21   So it would be important for the Court to understand that, if
22   that is your sworn statement, that you took this photograph
23   within two months of the fall.
24        MR. HAYSBERT:  And should I -- I mean, I can hire
25   a -- I think there's even a part of the camera that will tell

1    you exactly when the picture was taken.  I don't know what

2    level of detail, but it will tell you exactly -- I want to

3    include this as an exhibit, if possible, because, you know,

4    it's important that the Court understand this picture was

5    taken within a couple of months of the incident happening and

6    not in 2019.

7              THE COURT:  It's important for me to understand

8    exactly when it was taken, also, so whatever information you

9    have to demonstrate when the photograph was taken and where

10   it was taken would be helpful for me to understand.

11             MR. MCGAVIN:  Your Honor, may I address the Court on

12   that?

13             THE COURT:  Sure.

14             MR. MCGAVIN:  May we have the original digital image

15   so that we can check the properties of it, rather than just

16   have a date stamp on it?  Because the properties should be

17   digitally preserved and can be reviewed.

18             THE COURT:  So can you e-mail the photograph in its

19   native format to Mr. McGavin?

20             MR. HAYSBERT:  Yes, Your Honor, I'll figure out how

21   to get that done, and I'll do that.  And I'll also do the

22   same thing in an amended declaration to the Court.

23             THE COURT:  Okay, that would be fine.

24             Okay.  So I'm going to hold the motion for sanctions

25   in abeyance until I get those supplements, and I've asked

you-all to prepare whatever you want to supplement the record with within 14 days.

Okay. So the only two that we have left are the two motions to compel. You know, these are -- well, with respect to -- I think that's all we have left, right, Nos. 41 and 43? Am I correct about that? 41 is the plaintiff's motion to compel; 43 is the defendants' motion to compel.

MR. MCGAVIN: That's what I understand, Your Honor.

MR. HAYSBERT: And 44 as well, but yes.

THE COURT: I think 44 is just a brief. Maybe it's been recorded wrong, but I think 44 is just a brief in support of the motion to compel, which is 43.

MR. HAYSBERT: Okay.

THE COURT: So 43 -- I don't know that I need to spend a lot of time on 43, because it seeks to depose the plaintiff and have her submit to an IME. And that seems to me to be a scheduling issue. Mr. Haysbert, obviously your client is going to have to be deposed, and in a case like this, where there's an allegation of a brain injury, it doesn't seem like you object to her submitting to an independent -- or a medical examination by a defendants' doctor, do you?

MR. HAYSBERT: No.

THE COURT: Okay. So are you-all in a position to just agree on some dates when that can happen? When --

1          MR. HAYSBERT:  Your Honor, I never -- I have always

2     been forthcoming about dates.  The only issue was that at one

3     point the client was stricken with COVID and needed to

4     recover.  But we believe --

5          THE COURT:  By the way, has she recovered?  Is she

6     okay now?

7          MR. HAYSBERT:  She's -- you know, as far as I know,

8     yes, she's feeling much better.  But it's taken a while for

9     her to fully recover because of her age.

10          But I wanted to ask -- not ask, but the comment I

11     wanted to make on this is that we're trying to organize and

12     schedule all of the depositions that we've been requesting to

13     do if this case, including of Chip Chase, Lisa Crosby, the

14     persons most knowledgeable for Outback and Bloomin' Brands,

15     so we've been trying to schedule all of that together.  So

16     the question for the Court, really, is we requested an

17     additional 90 days to get everything together.  We've lost so

18     much time, and I don't know what the Court's ruling is going

19     to be on the motion to compel, our motion to compel, but

20     that's something that we need to have in the back of our

21     minds -- I have in the back of my mind -- is how much time

22     are we going to receive for additional discovery so we can

23     get everything scheduled appropriately?

24          THE COURT:  Okay.  Well, I think I'm going to have

25     to set some new discovery cut-offs as a result of the motions

```
 1    that are pending and the decisions that are going to be made
 2    and the recommendations that are going to be made, so I'll do
 3    that.
 4            My plan -- when was the plaintiff's original
 5    discovery cut-off?  Was it late February?
 6            MR. HAYSBERT:  No, it was March -- I want to say
 7    our --
 8            THE COURT:  So it was the expert deadline that was
 9    approaching?
10            MR. HAYSBERT:  Yeah, there was the expert deadline
11    approaching, and then our deadline to serve additional
12    discovery, which I assume to include subpoenas and so on, I
13    believe, was March 6.
14            THE COURT:  Okay.
15            MR. HAYSBERT:  So we served the subpoenas before
16    then, but, you know, opposing counsel got back to us:  "We're
17    not prepared; we need new dates."  So we're happy to do all
18    of that, but we just need to know what time period we're
19    going to be dealing with so we can put it all together.  And
20    we might have to request that the Court provide dates
21    certain, because it's been difficult to schedule dates for
22    opposing counsel's deponents.
23            THE COURT:  Okay.  Well, I'm inclined to just push
24    all of the dates the same -- in other words, keep them
25    separated -- the plaintiff 's dates are going to run before
```

1    the defendants' dates -- but just push everything 60 days.

2    And so that would push your expert disclosure dates out

3    60 days, your discovery dates out 60 days, and it would push

4    yours out 60 days, too, Mr. McGavin.  And I think that's

5    justified by the difficulties that have been encountered in

6    discovery, and it's unlikely to impact when the case might

7    come to trial, given how civil cases are proceeding here.  So

8    I'm comfortable just extending everybody's dates 60 days, and

9    that should give you time to do the discovery that remains to

10   be done and get these depositions taken and scheduled.

11           Mr. McGavin, are you going to have any issues

12   getting these folks available for deposition within that time

13   frame?

14           MR. MCGAVIN:  I don't think so.  I think the problem

15   that we had is that without any advance request we just

16   received notices and subpoenas.  So --

17           THE COURT:  I understand.

18           MR. MCGAVIN:  And so we've got to have at least some

19   lead time to prepare and not just be expected to produce

20   people on Mr. Haysbert's schedule.

21           So we've got to work together, and that's why we

22   sent letters to Mr. Haysbert saying, "Hey, we've got to have

23   an IME; we've got deadlines."  So I'm sure all those things

24   can be worked out, but it does take two to tango, so to

25   speak.  So we look forward to cooperating, and we'll

1    schedule, we'll provide dates, but there has to be some

2    back-and-forth.

3              THE COURT:  So here's -- with respect to the motion,

4    Motion 33, I am going to grant the motion to compel an IME

5    and to compel a deposition of the plaintiff.

6              I'm going to extend all the discovery dates and

7    expert disclosure dates by 60 days, keeping them the same

8    staggered way apart.

9              And I'm going to direct the parties to meet and

10   confer on dates for these depositions and the other discovery

11   that we're going to address in a moment and to agree on those

12   dates -- I'm not saying the depositions have to happen within

13   14 days, but I want you-all to confer and get the depositions

14   set within the next 14 days -- do you understand? -- so that

15   by the end of 14 days you'll know when these depositions are

16   going to take place.

17             MR. HAYSBERT:  Well, Your Honor, our position is

18   that we've been requesting deposition dates since at least

19   late January of this year, early February of this year, and

20   we're consistently being pushed back.  They've had our PMK

21   notice, deposition request, for a while now, so my concern is

22   that --

23             THE COURT:  What is a PMK deposition?

24             MR. HAYSBERT:  Sorry.  The person most knowledgeable

25   on various issues for Outback and Bloomin' Brands.  My

1    apologies for that.

2          So I don't want it to be a situation where we're

3    trying to negotiate dates 15 days before the discovery

4    cut-off again, because that doesn't help us, especially if we

5    don't get the information that we need.  We need to be able

6    to come back to the Court and compel deposition testimony or

7    compel additional discovery.

8          THE COURT:  Well, this really shouldn't be

9    difficult.  I was giving you 14 days because I don't want to

10   have to sit here and look at your schedules and do this for

11   you.  I mean, this is not something the Court should have to

12   baby-sit.  If I have to, I will, but I don't think I should

13   be required to do it.

14         So if you want me to do it in seven days, I'll do it

15   in seven days, but I really don't want to have to be the one

16   who picks this.  Because if I am the one who does it, this is

17   the way it's going to happen:

18         I'm going to order every lawyer in the case to give

19   me their calendar -- you, Mr. McKelvey, Mr. McGavin, every

20   associate on the file -- and say, "Let me have the

21   schedules."  Then I'm going to pick who does the deposition

22   and when it occurs, and I'm going to decide those issues.  So

23   you don't want me to have to wade into it, either of you.

24   You ought to both be able to agree on this.  It shouldn't be

25   that difficult, okay?

1          MR. HAYSBERT:  I love it.  I mean, I'm going to

2    serve the subpoenas, and we'll see what happens.

3          THE COURT:  What do you mean subpoenas?  Why would

4    you need to subpoena these folks?  They're going to produce

5    them.  Well, no, the people who are not employees will need

6    to be subpoenaed.

7          You need to coordinate those dates with Mr. McGavin

8    and the other lawyers in his office.  So produce --

9          MR. MCGAVIN:  That's all I'm asking, Judge, is

10   before a subpoena goes out, run a couple of dates by us, just

11   as we will with Ms. Haysbert, to make sure the date we're

12   talking about matches her schedule and Mr. Haysbert's and

13   Mr. McKelvey's.

14         THE COURT:  Okay.  So that's the ruling with respect

15   to No. 43.  Now let's talk about No. 41.

16         MR. MCKELVEY:  Your Honor, I'm sorry to interrupt.

17   I had a question about the dates and the deadlines, and I was

18   wanting to bring it up with the Court now.

19         Since all this has happened my son has some surgery

20   scheduled in Boston the first week of June, and they're

21   telling me two to three weeks.  It's right smack dab in the

22   middle of this.  I thought it was going to be later.  His

23   local doctor requested it be moved up, and that's the first

24   date we could get.  The preop is the day after the pretrial

25   hearing, and then the trial is set for the third week.  He

1    should be home that week; he may not.  I'm planning to stay
2    up there.  I didn't know how I go about -- if the Court wants
3    something formal, I can do it, but I just thought when we
4    were talking about these deadlines there might be a way to
5    address, you know, a continuance or moving it a week out.  I
6    mean, I wouldn't need much time, but --
7              THE COURT:  I think this trial is going to come off
8    from that June date, given the pending motion for leave to
9    amend and motion to remand and the discovery breather that I
10   have just ordered.  I need to speak to the District Judge
11   about exactly what's going to happen with it, but I suspect
12   it's going to come off from that date.
13             MR. MCKELVEY:  Hypothetically, I mean, if I haven't
14   heard anything should I follow back up?  How long should I
15   wait before I follow back up with the Court on that issue, if
16   I haven't heard anything?
17             THE COURT:  If you haven't heard that the date has
18   come off within, you know, the next 30 days, I would reach
19   back out, but I expect you will.
20             MR. MCKELVEY:  Okay.  Thank you, Your Honor.
21             THE COURT:  All right.  Now, I guess the first issue
22   on this motion to compel is, obviously, if the responses are
23   still unexecuted, they need to be executed.
24             So, Mr. McGavin, Mr. Haysbert says he still doesn't
25   have executed responses.  You've indicated, I guess, that

1    some responses were executed; you're not sure by who.

2         MR. MCGAVIN:  Bloomin' Brands has executed

3    responses, and I've gotten an e-mail from Ms. Johansen today

4    that we have Outback's signature for the current managing

5    partner, so she's executed, and we'll send that today.  So

6    then all of our discovery should be fully executed.

7         THE COURT:  Okay.  Go ahead, Mr. Haysbert.

8         MR. HAYSBERT:  Your Honor, that tells us nothing.

9    We've served at least three different sets of discovery in

10   this case.  There's discovery that's gone back to August.

11   There were objections that haven't been executed.  We have --

12        THE COURT:  Well, the lawyers can execute the

13   requests for admission, right?  The lawyer can execute the

14   request for admission.  I'm assuming they did that; they

15   submitted it to you with an electronic signature.

16        MR. MCGAVIN:  Yes, we did.

17        THE COURT:  And the same with requests for

18   production.  The lawyers can sign the requests for

19   production.  They're the ones who are producing the material.

20        It's just the interrogatories that were

21   unexecuted -- were unsworn, right?

22        MR. HAYSBERT:  Right.  So that's three different

23   sets of interrogatories that we've submitted, the first going

24   back to August of last year.  And that's the key one, because

25   we don't know when Lisa Crosby and Chip Chase were no longer

1    managing partners.  We don't know who -- that was the main

2    discovery that we served when we were requesting all this

3    information.  I can't understand how a new managing partner

4    would know it, but, nevertheless, that's what we served, and

5    I want to be sure that is what he's referring to as having

6    been verified and executed.  If that was executed by the new

7    managing partner, then, you know, that's one thing.

8            THE COURT:  Are they going to execute all the

9    discovery that's pending, Mr. McGavin?

10           MR. MCGAVIN:  Yes, she's the person that Outback has

11   designated.  And I don't know that Counsel has requested when

12   Chip Chase or Lisa Crosby separated from Outback.  I don't

13   know if that's in the request or not.  I can't answer that.

14   So if that was asked, I don't know.

15           MR. HAYSBERT:  Well, one of the things that we did

16   ask for, Your Honor, was the subject franchise agreement,

17   because that's going to answer a lot of the questions that we

18   have and I think will bring back into our orbit the motion to

19   amend.

20           It's that franchise agreement that determines how

21   things worked between the parties, from what we understand,

22   so -- between the parties and the current nonparties, Lisa

23   Crosby and Norman Chase.  We don't currently have that

24   document.

25           THE COURT:  I really don't understand how the

```
 1    franchise agreement is going to bear on who did or didn't
 2    take care of the floor on the date that your client was in
 3    Outback.  I really have a hard time understanding how that
 4    document could be relevant.
 5             MR. HAYSBERT:  The document is relevant for a host
 6    of reasons.  Predominantly, it determines -- it states who
 7    has an ownership interest in the particular franchise
 8    location.
 9             THE COURT:  But I understood you had the owner,
10    right?
11             The owner is one of the two entities that is in the
12    lawsuit; is that right, Mr. McGavin?
13             MR. MCGAVIN:  Yes, Your Honor.
14             MR. HAYSBERT:  That hasn't been verified, Your
15    Honor.
16             THE COURT:  It's going to be verified, Mr. Haysbert.
17    You have the owners.  They have not denied that they own the
18    premises.  So one of these two entities owns this Outback
19    Steakhouse and is responsible for employing the people who
20    were at the Outback Steakhouse.
21             MR. HAYSBERT:  But this entity that's saying that
22    it's the owner of the location is saying that it's not
23    responsible for what occurred.  It's saying that it will not
24    provide me with all of the --
25             THE COURT:  No, Mr. Haysbert.  You're testing my
```

1    patience, because you're misstating the record in this case.

2              MR. HAYSBERT:  How am I --

3              THE COURT:  They are not saying that they are not

4    responsible.  They are saying that nothing was wrong with the

5    floor.  That's a different way of saying they're not

6    responsible.  They are not --

7              Mr. McGavin, is the company saying that they have

8    been incorrectly named because some other entity is

9    responsible for running the restaurant?

10             MR. MCGAVIN:  No.  What we're saying is that

11   Outback Steakhouse of Florida is the party -- that that's

12   their defendant.  Bloomin' Brands is the franchisor, it's a

13   corporate entity up above.  Outback Steakhouse of Florida is

14   the entity that operates this location, and if there's a

15   defect in the floor that he identifies that should have been

16   cleaned up, it's Outback Steakhouse of Florida.  That's the

17   party.

18             But as you correctly state, Your Honor, we don't

19   have any information of any defect on the floor, and to the

20   contrary.  What Lisa Crosby has said throughout is the floor

21   was clean and dry.

22             THE COURT:  Okay.  I don't see any relevance to the

23   franchise agreement.  I don't understand how the franchise

24   agreement could be relevant to the issues that are present in

25   this case, which is what was on the floor; if it was there,

1    who was responsible for cleaning it up.  I don't see how the

2    relationship between the franchisor and the franchisee bears

3    on any of those questions.

4             MR. HAYSBERT:  It bears on a whole host of questions

5    that are relevant to this action, Your Honor.

6             THE COURT:  Name one, Mr. Haysbert.  Name one.

7             MR. HAYSBERT:  A whole host of them.  There are a

8    number of -- and I just named one of the main ones.

9             It will -- it will put to rest the question of who

10   owns -- and I know -- I don't want you to get upset by this,

11   but we don't know if they're a hundred percent owner, we

12   don't know if they're 50 percent, we don't know who else owns

13   this particular franchise location.  There are a number of

14   issues that we need to address with that franchise agreement,

15   so, yes, we requested it, and we expect to receive it.

16            THE COURT:  Okay.  I deny your motion to compel the

17   franchise agreement.  I'm not going to order them to produce

18   the franchise agreement.

19            MR. HAYSBERT:  Oh, wow!

20            THE COURT:  I do not believe the franchise agreement

21   is relevant to any issues in this case.

22            MR. HAYSBERT:  Your Honor, the Federal Rules are not

23   based on relevance with respect to getting responses to

24   requests for production of documents in the sense that it may

25   not be -- it may be relevant or it could lead to potentially

1   relevant information.  And I believe that that information,

2   that franchise agreement, could lead to --

3          THE COURT:  That's not what the case says.

4   Relevance is the cornerstone of discovery.  Relevance is the

5   number one issue that you look to when you're ordering

6   discovery.

7          So I don't think you're right that discovery permits

8   you to ask for any document in order to potentially uncover

9   relevant information.

10          MR. HAYSBERT:  We're not asking for any document,

11   we're asking for the central agreement between the franchise

12   location and Outback Steakhouse, which Counsel is saying is

13   the owner, but we have no verified responses indicating that

14   they are and who else might be.

15          So I think this is going -- I'll just stop.

16          THE COURT:  Well, I've made a decision.  I don't

17   believe that that document is discoverable.  I don't think

18   you've articulated a basis why it would be relevant to the

19   issues that are present in this case.

20          It's not clear to me that ownership has any

21   relevance to the case.  You've got the owners.  You have the

22   owner.  They've said that they were the owner.  Why do you

23   disagree with that?

24          MR. HAYSBERT:  Because, Your Honor, there are a

25   number -- and this isn't even an argument.  We've submitted

```
 1    all of the interrogatory responses that we received and the

 2    request for production of document responses that we

 3    received, and it is clear from those -- and I submitted a

 4    spreadsheet that identified every single detail of every one

 5    of the responses that we received, where it should be

 6    clear -- it's clear to me --

 7              THE COURT:  Show me that.  Where is that in the

 8    record?  Tell me where -- I didn't see any spreadsheet in the

 9    materials that I reviewed, so I may not have read all of your

10    exhibits.  So show me what you're talking about.

11              MR. HAYSBERT:  Hold on just one second, Your Honor.

12              (There was a pause in the proceedings.)

13              MR. HAYSBERT:  So Exhibit H and I.

14              THE COURT:  Do you have a document number or the ECF

15    number?

16              MR. HAYSBERT:  This would be Document No. 41.

17              THE COURT:  41-2?

18              MR. HAYSBERT:  Hold on just a second.  Let me

19    just...

20              (There was a pause in the proceedings.)

21              THE COURT:  Yes, that's it.

22              MR. HAYSBERT:  Document No. 41-2, yes, and this

23    would be Exhibit Number H, I --

24              THE COURT:  Okay, I've got it.

25              MR. HAYSBERT:  Okay.
```

1            THE COURT:  I've got it.

2            Do you have that, Mr. McGavin?

3            MR. MCGAVIN:  I'm sorry, Your Honor?

4            THE COURT:  He's referring to a summary of the

5    request for production that he's seeking to compel.

6            MR. MCGAVIN:  I have it, Your Honor, yes.  It was

7    Exhibit J.  Is that the one?  Or I guess J is the request for

8    admissions.

9            MR. HAYSBERT:  So the first one is H.

10           THE COURT:  I've got it, H.

11           MR. HAYSBERT:  And that's the request for

12   production.

13           THE COURT:  Yes.  The insuring agreement --

14           MR. MCGAVIN:  I have it.

15           THE COURT:  Is there an insuring agreement?  I'm

16   looking at -- I'm walking down some of these objections.

17           So request 3 does ask for an insuring agreement.  Is

18   there an insuring agreement, or is the entity self-insured?

19           MR. MCGAVIN:  They're self-insured and then there's

20   excess above, and -- so I don't recall what the CSIR is, but

21   there's excess coverage up above the SIR.

22           THE COURT:  Okay.  Well, if the SIR is below the

23   amount sued for, then I am going to require that you produce

24   the insurance policy.

25           MR. MCGAVIN:  Okay.

Heidi L. Jeffreys, Official Court Reporter

1          THE COURT:  So that's Request No. 3.

2          MR. MCGAVIN:  All right.  Thank you.

3          THE COURT:  Let's take up this issue of condition,

4   which is addressed in Request No. 4.

5          So this is part of the problem with these discovery

6   responses and the objections and the responses, is this use

7   of a defined term "the condition."  I don't have -- well,

8   maybe I have it in some of this 212-page exhibit, but what is

9   "the condition" referring to?

10          MR. MCGAVIN:  Are you asking me, Your Honor, or

11   Mr. Haysbert?

12          THE COURT:  No, I'm asking Mr. Haysbert.  What is

13   "the condition" referring to?

14          MR. HAYSBERT:  The condition -- Your Honor, it's

15   been the same throughout the -- all of the discovery that

16   we've submitted, and it describes the floor and the

17   slipperiness of the floor itself.

18          THE COURT:  Again, if the defendants take the

19   position that the floor was not slippery, that it was an

20   ordinary hardwood floor that was not defective in any way,

21   and you ask them to identify any complaint related to the

22   condition or a similar condition, then they don't have any

23   way to respond to that, because -- I guess unless there were

24   complaints related to a clean and dry floor.

25          Do you understand why that's difficult to respond

1   to?

2          MR. HAYSBERT:  I don't think that that is exactly

3   the way that we worded the term "condition," Your Honor.  The

4   way that we worded it refers to the state of the floor,

5   including but not limited to the grit, slipperiness, wetness,

6   oiliness, greasiness, or dirtiness at the subject location

7   where the incident occurred.  So it refers to the state of

8   the floor, including but not limited to the grit and whatever

9   may have been on it.

10         THE COURT:  Okay.  So I guess what you're really

11  seeking is were there any other falls in this area within a

12  particular period of time.

13         MR. HAYSBERT:  That's correct, Your Honor.

14         THE COURT:  So let's frame the request, Mr. McGavin,

15  as were there any other falls as a result of the condition of

16  the floor in this area of the store within the last, let's

17  say, 18 months.  Do you object to producing the identity of

18  people, if there were such falls?

19         MR. HAYSBERT:  Why just 18 months?

20         THE COURT:  Well, I'm just trying to frame some

21  reasonable period of time; 18 months, 2 years, some period of

22  time.

23         MR. HAYSBERT:  We asked for 5 years.

24         THE COURT:  I understand what you asked for.

25         MR. MCGAVIN:  Do you want me to respond?

```
1              THE COURT:  Yes, I want you to respond.
2              MR. MCGAVIN:  The question is do I object to
3   producing any information about any falls within 18 months at
4   that subject location?
5              THE COURT:  Or 2 years, something like that.
6              MR. MCGAVIN:  Here's the problem, Your Honor, that
7   I'm having with this exercise:
8              We've asked the plaintiff to tell us what was the
9   defect, and in a premises case the question for the defendant
10  is, for example, if you have a problem with water being
11  tracked in from the outside or you have a location that's
12  next to the kitchen and the kitchen staff are tracking grease
13  out onto the floor, tell me what it is that I did wrong.
14  That's why we asked that question in our interrogatories.
15  What's the defect?  Plaintiff objects, refuses to answer.  We
16  file a motion to compel, and plaintiff's answer to
17  interrogatory in this case, under oath, as the record is now,
18  is, "I blacked out; I have no idea."  So I'm defending a
19  straw man.
20             So if I go back and respond 2 years ago -- and I
21  don't know.  I don't know if there are any falls at that
22  location or not, but let's say I go back and somebody says,
23  "Well, somebody spilled a Bloomin' Onion."  Then plaintiff is
24  going to change the claim and say, "Well, there was a
25  Bloomin' Onion there for my fall, too."  So it's incumbent on
```

1    the plaintiff to tell me what is the claim.  Is it overly

2    waxed?  Is it soapy?  Did a waitress just spill a bunch of

3    drinks?  I've done a lot of Outback cases over many years in

4    many locations, and in every case we're confronted with a

5    claim, this is what the defect is, and so I'm fighting a

6    shadow here.

7            So to make it relevant to this proceeding, it's not

8    just did somebody claim they fell, but tell he what it is

9    your claim is.  What is your defect?  We're now almost three

10   years from the date of the incident, and it's not incumbent

11   upon the defendant to say anything more than we have.  The

12   floor was dry and clean.

13           So that's where I'm struggling here.  I'm fighting

14   against an unknown enemy, so to speak, as to what we did

15   wrong.

16           THE COURT:  Yeah.

17           MR. HAYSBERT:  Well, one of the things that we have

18   coming, Your Honor, is this declaration or affidavit from the

19   private investigator who has been trying to find the

20   witnesses to the incident, who has already indicated -- I've

21   already indicated will share more information about what that

22   person said and the fact that that person stated that there

23   was a slippery substance on the floor.

24           The bottom line here is that the individual who fell

25   and had her head smashed against the flooring in the Outback

1   Steakhouse suffered a traumatic brain injury which is

2   permanent and cannot recall what was happening at that

3   exact -- she came to to a person's feet.  What I think any

4   reasonable person would expect, communicating with people

5   over the phone, filling out claim forms, talking to a person

6   named Tristal, is that they would look for, identify, and

7   preserve the video of what happened so that we would all know

8   what happened on that fateful day, especially if it's going

9   to be difficult to get in touch with witnesses who were there

10  at the time.

11          THE COURT:  Mr. Haysbert, it still doesn't answer

12  the question.  I'm going to order some limited production on

13  this topic, but I am very mindful of the issue Mr. McGavin

14  has raised, which is that it is the plaintiff's burden.  I

15  understand it may be a difficult burden in this case, and I'm

16  certainly sympathetic to your client's fall, but it's the

17  plaintiff's burden to show that the defendant was negligent

18  in some way, and so far I don't see any specific allegation

19  of negligence.

20          Nonetheless, I will order that the plaintiff produce

21  the identities and, if known, the -- the identity of anybody

22  who reported a fall in the Outback Steakhouse for -- in this

23  Outback Steakhouse -- for the two years preceding this fall

24  and, if known, what it was that caused that person to fall,

25  for two years preceding this fall.

1          But that's pretty broad relief, in light of a very,

2    very limited record, so I'm sort of bending over backward to

3    try and give you some information.  I don't think it's going

4    to be all that useful to you, but I don't want you to feel

5    that I'm hamstringing your investigation and will look at

6    whatever this private investigator produces.  Frankly, from

7    your description of it on the record, it didn't sound

8    compelling to me, and I doubt it is to you, either, or it

9    would have been a more central feature of your argument thus

10   far.

11          But I'm moving on.

12          MR. MCGAVIN:  Judge Miller, before you move on,

13   would you permit us, if there are any of these -- and I don't

14   know -- to not produce the individuals' names who had the

15   fall?  I think the issue is notice and whether it is of the

16   same alleged condition, whatever that is, that the plaintiff

17   encountered, without adding some of our customers to get

18   phone calls from Mr. Haysbert, which may be something that

19   perhaps they may not enjoy.

20          THE COURT:  Well, for right now identify them by

21   their initials and the date of the accident and the

22   circumstances that were known to the Outback, and we'll look

23   at whether we need to go any further than that after we see

24   what's there.

25          MR. MCGAVIN:  Thank you, Your Honor.

Heidi L. Jeffreys, Official Court Reporter

1      THE COURT:  There are several of these objections --
2  I mean, several of the motion to compel arguments relate to
3  whether documents have been withheld, so let me just ask you
4  a blanket question, Mr. McGavin.
5      Other than attorney/client privilege or work
6  product, have you withheld documents on the basis of an
7  overbreadth argument or a vagueness argument?  Are you aware
8  of documents that are responsive to these requests that you
9  have withheld?
10      MR. MCGAVIN:  No, Your Honor, we are not withholding
11  documents.  We have our claim notes, which I'll be sending to
12  you with the incident report, but nothing that I know of.
13      THE COURT:  Okay.
14      MR. HAYSBERT:  Your Honor, we know what information
15  hasn't been produced that still needs to be produced and has
16  been withheld.  The most important thing was the sweep
17  sheets, who was working at the time.  Because we don't have a
18  video and because it's very difficult to get the witnesses,
19  we need to know who was working at the time, and those people
20  could answer a lot of these questions that we currently have.
21      THE COURT:  Okay.  I hadn't gotten to that part, but
22  that is an important factor in the motion.
23      Does Outback really not have records of who was
24  working on the day this happened?
25      MR. MCGAVIN:  That's what I've been told, Your

1    Honor, but that does sound surprising, I acknowledge that, so
2    we will go back and double check that.  But I don't know what
3    a sweep sheet is, so --
4          THE COURT:  Well, I mean, I know what it is.  It
5    shows that if the floor is supposed to be cleaned on a
6    periodic basis that it's being done; that somebody has been
7    out there and looked and swept it or cleaned it or mopped it.
8          MR. MCGAVIN:  Well, that's what I thought it meant.
9    In other words, a maintenance record as to when any
10   particular part of the floor was maintained or cleaned or
11   swept.  But in listening to Mr. Haysbert, I'm not sure that
12   he's talking about that, as opposed to the identity of all
13   employees who were on duty that day.
14         So I don't want to misconstrue what we're discussing
15   and make sure I'm producing the correct document.  I'm not
16   aware of any -- if sweep sheets are the maintenance logs,
17   "Joe Smith came through and swept the floor at 4:00," I'm not
18   aware of any of those documents available.
19         THE COURT:  Okay.  Well, I am going to order that
20   you -- if they're available, if you have them, that you
21   produce any documents related to the maintenance of the
22   Outback on the day in question, whether it's periodic, end of
23   day, beginning of day, any documents presently in the
24   possession, custody, or control of either defendant related
25   to the maintenance -- and I'm going to say anyone.  I mean,

1    if they're there, it's not that burdensome to produce them.

2              So any maintenance at the Outback on the day in

3    question.  And I also don't think it's overbroad to request

4    the identity of everyone who's working during the shift when

5    Ms. Haysbert fell.  So anyone who was in the store -- the

6    restaurant on the day in question at the time Ms. Haysbert

7    fell, if either defendant has access to those records, I'm

8    going to require that they be produced, first and last names.

9    And we'll see who's there.  You may have to provide contact

10   information, if these folks aren't still with Outback.

11             But it is puzzling why they don't have that

12   information.  That does seem like something that should have

13   been produced.

14             MR. MCGAVIN:  I can only say we've investigated that

15   and tried to get it.  This is what we've been told, but it

16   bears another swipe at that, for sure.

17             THE COURT:  Okay.  I'm going to give you 14 days to

18   file a supplement, and if the supplement is they don't have

19   them, then I'd like a little explanation about what their

20   record-keeping policy is regarding -- at least regarding

21   who's working there.

22             MR. MCGAVIN:  Okay.

23             THE COURT:  Because it seems odd that they wouldn't

24   have some payroll record of who worked when that could show

25   who was on duty at the time.

```
 1              MR. MCGAVIN:  All right.

 2              THE COURT:  Okay.  So that takes care of -- that is

 3     granting relief as to request 11 and 12.

 4              13.  I'm not going to order any additional -- you've

 5     produced some job description type documents?

 6              I mean, the core of the problem is you don't know

 7     who was there; is that right, Mr. Haysbert?

 8              MR. HAYSBERT:  That is the core of the problem, but

 9     everything kind of builds from there.  We need to know what

10     the responsibilities were for these employees to know whether

11     they were compliant, the policies.  We need to know whether

12     they were compliant with the policies at the time of the

13     incident, so we've requested information as well, and we

14     don't know that we've received everything.  We've received a

15     couple of pages of documents, but we don't -- there's no like

16     response saying, you know, "We've responded to Request No. 9

17     with this particular document," so we have no idea, which is

18     why I think it's completely appropriate to ask if they've

19     sent over everything.  But even what we have received, we

20     don't know what it's responding to, in terms of the requests

21     we've made.

22              THE COURT:  Okay.  I have looked through the rest of

23     the requests that are outlined on your Exhibit 8, and I think

24     that the discovery that I've directed is an adequate

25     supplement, and I am going to order that production.
```

Heidi L. Jeffreys, Official Court Reporter

1          I'm moving on to interrogatories --

2          MR. HAYSBERT:  Before we do, Your Honor, I just have

3     one comment or request.

4          We don't know whether or not there was written

5     statements provided by anyone from the Outback Steakhouse,

6     and it seems to be contradictory.  On one hand, you know,

7     they include in their initial disclosures there was a

8     witness, but on the other hand they indicate that they don't

9     have any statements or they know a person was a witness.

10         THE COURT:  You would obviously be entitled to

11    statements if they have them, but in reading their response

12    to your Request No. 6 it says there have been no statements

13    obtained, that they did not take any statements.

14         Is that right, Mr. McGavin?

15         MR. MCGAVIN:  That's correct, we don't have any

16    statements.

17         THE COURT:  Okay.

18         MR. MCGAVIN:  If I go -- now, obviously, if I in my

19    process secure a statement with a private investigator or

20    whatever, that would be part of my work product.  But even on

21    that, I don't have any recorded statements even now.

22         THE COURT:  So there are not any statements.  That's

23    what they said.

24         And you're not withholding any statements on the

25    basis of work product?

Heidi L. Jeffreys, Official Court Reporter

1          MR. MCGAVIN:  No, not yet.  If I can find this
2     Mr. Robinson and get a statement from him, maybe, but, you
3     know, that -- the first I've heard today is that there was a
4     private investigator attempting to interview him.
5          THE COURT:  Okay.  Now I'm moving on to the
6     interrogatories.
7          I mean, Request No. 1, that's really the core issue,
8     isn't it, Mr. Haysbert:  "Do you contend you did not have
9     actual knowledge?"  They don't believe there was any
10    condition.  You know, how can you have or not have knowledge
11    of something that you don't believe existed?
12         MR. HAYSBERT:  Verify it.
13         THE COURT:  All right.  They're going to produce
14    verified answers.  So that's the only issue.  Their
15    verification will address -- I think, otherwise, their
16    response is adequate for Interrogatory No. 1.
17         MR. HAYSBERT:  It is, but what we're missing -- the
18    only thing, I think, is the context of the fact that we don't
19    currently have a lot of information.  We don't have a video,
20    we don't have employees, we don't have witnesses, so I'm
21    just -- within that context, yes.  Then as long as these are
22    verified, we can move on from that and go on to other
23    business.  But there's a lot in the background, and I'm sorry
24    to waste the Court's time.
25         THE COURT:  No, I mean, I understand your concern,

1    and the issue of the employees is very puzzling.  We'll try

2    to get to the bottom of that.

3              The video -- I do not expect a big change in the

4    video.  I don't expect them to suddenly find a video.  I

5    guess there's an issue about Rule 37 and whether you can show

6    that they, you know, destroyed it or allowed it to be

7    overwritten with knowledge of its relevance.  But, you know,

8    you keep saying, "Oh, there's video, there's video," or,

9    "There should be video," but I think if there had been video,

10   they would have produced it.

11             MR. HAYSBERT:  No, Your Honor, the concern really is

12   kind of two parts.

13             Because we've actually gotten some discovery

14   responses, we now have an issue whether or not the camera

15   that's situated right above the hostess stand that would have

16   captured the incident was actually there at the time of the

17   incident.  And I'm contending that it was because of, you

18   know -- and they're contending that it wasn't at that time.

19             So that's going to be an issue that's easily cleared

20   up, but, again, it leads into the central question:  "Well,

21   how is it you missed the camera in the center of the

22   restaurant, right above the hostess stand?"  And they're

23   indicating through Counsel that there was no camera there.

24   It boggles the mind, but, again, that's something --

25             THE COURT:  There's a disconnect in that evidence

1    that we may have to get to the bottom of in some future

2    proceeding, but I've already ordered some supplemental

3    production on that.

4           MR. HAYSBERT:  Sure.  Thank you, Your Honor.

5           THE COURT:  The safety guidelines and procedures --

6    I'm looking at Interrogatory No. 6 -- you have produced

7    those.  It looks like there was some production of the

8    cleaning process and the standard practice in the restaurant

9    from maintaining the floors.

10          MR. MCGAVIN:  Yes, Your Honor, we have produced the

11   documents that would pertain to maintenance, cleaning,

12   et cetera, for the floor.

13          THE COURT:  Okay.  So it looks like your main issue

14   with regard to this is who are these people doing it, and

15   I've already ordered that if it's available, he's required to

16   produce that information.

17          I'm not sure I understand your motion to compel on

18   Request 8, that the issue about shoes is contradictory to

19   Request for Admission 23.  Are you referring to the original

20   answer or the supplemental answer; do you know, Mr. Haysbert?

21          MR. HAYSBERT:  They -- can you give me just one

22   second, Your Honor, to go back to the request for admission?

23   I'm not currently looking at it, but I know there was a big

24   issue with this one, if you wouldn't mind just granting me a

25   few moments.

```
 1              THE COURT:  Okay.
 2              (There was a pause in the proceedings.)
 3              THE COURT:  Do you have anything, Mr. Haysbert?
 4    Because I want to get through the rest of these.
 5              MR. HAYSBERT:  My apologies, Your Honor.  I'm only
 6    seeing the response where they indicate that discovery was
 7    pending.
 8              THE COURT:  Okay.  Well, in any event, it appears
 9    that they do wear special shoes, so they've supplemented.
10    I'm not going to order any further supplement on that
11    question.
12              The next issue presented by Interrogatories 11 and
13    12 is, basically, are there -- it's really 10, 11, and 12,
14    describing how the defendants respond when there are
15    incidents.  There was an objection to 11 because Bloomin'
16    Brands was not involved; it said its employees were involved.
17              Lisa Crosby is the person who was involved; is that
18    right, Mr. McGavin?
19              MR. MCGAVIN:  Yes, Your Honor.
20              THE COURT:  Was anyone else involved, that you're
21    aware of from investigating the incident?
22              MR. MCGAVIN:  Not to my knowledge, Your Honor, no.
23              THE COURT:  Okay.  So I'm not going to order any
24    further production on these interrogatories.  You're going to
25    depose Ms. Crosby, and you can ask her about what she did and
```

1    how she did it and whether she followed their procedures, and

2    I think that's an adequate response.

3            MR. HAYSBERT:  Well, the question I did have is when

4    they say they were not involved, what precisely does that

5    mean?

6            THE COURT:  I'm assuming it just means that the

7    corporations weren't involved; that it was employees of the

8    corporations that were involved.  Is that right, Mr. McGavin?

9            MR. MCGAVIN:  Right.  So when you have an incident

10   in Outback, it's the local manager on duty who is responsible

11   to get the person's information, see if they need medical

12   care, call 911, if that's what they want, and then report

13   that to Corporate, which would be Bloomin' Brands.

14           But it's Outback Steakhouse that runs the

15   restaurant, and that's who Ms. Crosby was responsible to, as

16   the managing partner on duty at the time, and so she is the

17   person that's tasked with talking to someone who has had a

18   fall, or is dissatisfied with their meal, or whatever.

19           THE COURT:  Okay.  Again, I'm not ordering any

20   additional production with respect to that interrogatory.

21           Interrogatory No. 17 asked for the contact

22   information for a person who I think you've now identified as

23   Tristal Hall.  Have you provided contact information?  She's

24   not an employee any longer, right?

25           MR. MCGAVIN:  I don't believe she's still an

1    employee with Bloomin' Brands.  She was in the Risk

2    Management team, and I don't know -- I can't remember if

3    she's gone.  I think so, but I don't want to --

4            THE COURT:  Well, what Mr. Haysbert has related in

5    his summary is that you identified her and said she was a

6    former employee.  He says you didn't provide her contact

7    information.  So if you're not going to produce her, I think

8    he's entitled to try and contact her himself.

9            MR. MCGAVIN:  Okay.  I just -- she's in the Claims

10   Department, Your Honor, so she's not -- she's not a -- she's

11   not on the floor.  This is like my claims person is John

12   White, and you're going to see in the claim notes there's

13   claims people.  So she's at Bloomin' Brands taking intake on

14   a claim.  So that's -- I don't know -- he's not going to -- I

15   do not believe he should be contacting her or taking her

16   deposition on claims efforts.

17           THE COURT:  Okay.

18           MR. HAYSBERT:  Your Honor, I disagree

19   wholeheartedly.  They are making the claim that my client was

20   not contacting -- or was not being responsive to Tristal

21   Hall, which is absolutely incorrect.  She was trying to

22   communicate with her.  Tristal and her did have a

23   conversation.  My thought is that there is some helpful

24   information to be gleaned from Tristal Hall about the

25   conversation she had with the client.  The client may have

1    been able to provide some information to her at that point

2    that she no longer remembers.  I don't know.  But that's -- I

3    mean, I think it would be helpful to this case to depose her

4    and get from her the communication she had with the client

5    and what she did in terms of the claim.

6         THE COURT:  Okay.  Well, I don't know whether --

7    you're just talking about factual information; that somehow

8    she might have information factually that might inform what

9    happened to your client?

10        MR. HAYSBERT:  That's correct, Your Honor.  She'd

11   have a ton of information regarding the --

12        THE COURT:  Are you asking to depose her?

13        MR. HAYSBERT:  Yes, Your Honor.

14        THE COURT:  I don't know what the deposition is

15   going to be, but --

16        MR. MCGAVIN:  It's going to be a fight, Your Honor.

17   You're talking about taking the deposition of somebody in the

18   claims department for a self-insured entity, and --

19        MR. HAYSBERT:  She --

20        MR. MCGAVIN:  Excuse me, Mr. Haysbert.  If you don't

21   mind, I'll finish.

22        I strongly object to this.  And what difference does

23   it make?  We're not calling her as a witness.  She didn't

24   take a recorded statement.  She had some contact, apparently,

25   with Ms. Haysbert about this, trying to find out, "Are you

1   okay," or any follow-up.  And what is the possible benefit of

2   injecting that into this case?  It's information which is

3   just as easily known to the plaintiff as it is to the

4   defendant as to what the plaintiff said.  It's just an

5   unnecessary fishing expedition, and, frankly, based upon the

6   course of this discovery, it's going to end up in a fight.

7   It's not going to be --

8          THE COURT:  I'm concerned about it, too.  I'm not

9   inclined to order the deposition until I see some of the

10  claims stuff and see something in there that suggests she has

11  some separate factual information.  So I'll revisit the

12  question after I look at the incident report and the claim

13  notes, but I'm not going to order them to produce a claims

14  person or a risk management person for a deposition, unless

15  there's some reason to believe that she has information that

16  wouldn't already be available to your client.

17         MR. HAYSBERT:  That's what we're saying, Your Honor,

18  that she might have some information that is not available to

19  my client currently.  You know, I don't want to, you know,

20  overstate this, but she has suffered a permanent traumatic

21  brain injury and does not recall many of the events

22  surrounding the incident.  And it's unfortunate, but we're in

23  this position, as with any TBI like it, where we need to have

24  as much information as we can from other sources.

25         THE COURT:  Well, I'm not going to order it at this

1    time.  I'll take a look at what will be produced to me

2    *in camera*.  If it appears she has some kind of factual

3    information, then I'll consider whether to order her to be

4    deposed.  I want to move on.

5              So Chris Robinson is identified in discovery.  This

6    is a person you identified, Mr. McGavin?

7              MR. MCGAVIN:  We had his name, and we gave it to the

8    other side.  We've never been able to speak to him.

9              THE COURT:  Okay.

10             MR. MCGAVIN:  That I --

11             THE COURT:  That's all you have?  All you have is

12   his phone number?

13             MR. MCGAVIN:  Right.

14             THE COURT:  Okay.

15             MR. HAYSBERT:  So, Your Honor, I do want to just

16   make the point that we don't know, based on these responses,

17   whether Lisa Crosby spoke with him, whether Norman Chase

18   spoke with him, whether they received information from him.

19   We don't know if they're verifying these responses --

20   apparently, they're not verifying the responses, so --

21             THE COURT:  You asked for statements.  They don't

22   have a statement from them.  I don't know what other

23   information there is, but you have contact information you

24   can reach out and try and speak to.  They apparently have not

25   had any luck.  It sounds like you may have had a little more

1    luck.  We'll wait and see what the private investigator says.

2          MR. HAYSBERT:  Well, with respect to Tristal, she,

3    from what we have been able to gather, was responsible for

4    creating the claim.

5          THE COURT:  I understand that.

6          So there are photographs?  You've already produced

7    photographs of what the floor looked like?  I'm looking at

8    Request No. 22.  It says there are two photographs taken of

9    the floor and the footwear of the plaintiff, so these have

10   been produced?

11         MR. MCGAVIN:  Right, yes.

12         MR. HAYSBERT:  Your Honor, we -- we included a whole

13   section in our motion to compel on this part.

14         The two photographs did not have the information

15   he's requesting from me, the original metadata.  We don't

16   know if they came from a camera or whether or not they came

17   from a video, spliced into a photograph.  We have no idea --

18         THE COURT:  Do you know whether the electronic

19   native images of these photographs still exist, Mr. McGavin?

20         MR. MCGAVIN:  I don't know, Your Honor, no.

21         THE COURT:  If they do -- if they do, if the native

22   images still exist, if they're saved on someone's hard drive

23   somewhere, these two photographs, I'm going to order that you

24   produce them in native format to Mr. Haysbert.

25         MR. MCGAVIN:  Okay.

Heidi L. Jeffreys, Official Court Reporter

1          MR. HAYSBERT:  Just photographing a piece of floor,
2     there's not even a date of when they --
3          THE COURT:  They took a picture of your client's
4     shoes.  I mean, are you disputing that they're her shoes?
5          MR. HAYSBERT:  We're disputing that they took a
6     picture of the shoes.  We're disputing the fact of where they
7     took the picture.  How did they take the picture of it?  What
8     happened -- I mean --
9          THE COURT:  Does your client know?  I mean, does
10     your client dispute that they're her shoes?
11          MR. HAYSBERT:  So what she does dispute is that
12     there was anyone behind her taking a picture --
13          THE COURT:  No, no, Mr. Haysbert, that's not my
14     question.  You can argue all you want, but I'm asking the
15     question.
16          Does your mother look at those shoes and say, "Those
17     are not my shoes"?
18          MR. HAYSBERT:  We produced pictures of the shoes
19     pursuant to the discovery request above for the shoes.
20          THE COURT:  Were these photographs produced by
21     Outback?  Are they photographs taken on the day --
22          MR. HAYSBERT:  No.  There was one paragraph produced
23     by Outback of what they're describing as her shoes, but they
24     didn't even describe it fully.  They said, this is the
25     footwear of the plaintiff.  Here's one photograph of her --

```
 1              THE COURT:  Mr. Haysbert, I don't know why this is
 2    difficult.
 3              MR. HAYSBERT:  It's not difficult.
 4              THE COURT:  Well, then, why won't you answer my
 5    question?
 6              Does the photograph that they produced depict your
 7    mother's -- I mean, your client's shoes?  Does it or does it
 8    not?
 9              MR. HAYSBERT:  Judge, how can I answer that
10    question?  We don't know the date --
11              THE COURT:  It's a simple question.
12              MR. HAYSBERT:  No, we don't know the date.
13              THE COURT:  Have you shown the photograph to your
14    client and asked, "Are these your shoes?"
15              MR. HAYSBERT:  The photograph -- I mean, can we pull
16    up the photograph?
17              THE COURT:  No, I don't want -- I asked you a
18    question.  Have you shown the photograph to your client?
19              MR. HAYSBERT:  I have shown the photograph to my
20    client, Your Honor, and --
21              THE COURT:  Does she believe that it depicts her
22    shoes?
23              MR. HAYSBERT:  You can't even really tell --
24              THE COURT:  I didn't ask what you can tell, I asked
25    whether she thinks it shows her shoes.
```

1          MR. HAYSBERT:  Your Honor, I wouldn't -- I wouldn't
2     be able to provide you that information, because I don't know
3     when that photograph was taken, by who --
4          THE COURT:  Mr. McKelvey, Mr. Haysbert will not
5     answer my question.
6          Do you know, Mr. McKelvey, whether your client
7     believes this photograph depicts her shoes or not?
8          MR. MCKELVEY:  I do not know one way or the other.
9          THE COURT:  All right.  I'm going to move on.  I'm
10    not ordering any other responses to the request other than
11    the ones that I've already described.
12         MR. HAYSBERT:  So we will be getting the metadata of
13    the --
14         THE COURT:  Oh, no, I did order that.  I did order
15    that.  If the metadata exists, if the photographs exist in
16    native format, I'm requiring Mr. McGavin to turn them over.
17         MR. HAYSBERT:  And, Your Honor, part of that is
18    where the -- it's a black and white, essentially, photo of a
19    person looking at their feet.  It doesn't clearly show
20    anything, and because you're not looking at it now I can't
21    fully describe it for you.
22         THE COURT:  I don't need to have it fully described.
23    I've made a ruling.  I've ordered him to produce the native
24    image, if it exists.
25         I didn't know there were photographs.  I mean, I

Heidi L. Jeffreys, Official Court Reporter

1    didn't know -- I thought you were just being asked to take

2    Mr. McGavin's word for the fact that the floor was clean and

3    dry, but there's apparently a photograph of the floor that

4    you disbelieve, so that just changes the tenor in my mind.

5            MR. HAYSBERT:  Not that I disbelieve.  There's a

6    photograph of a brown square.  It has no -- there's no

7    context to it.  It doesn't show that it's inside of a

8    building.  It could be someone putting a brown piece of

9    square wood on a piece of paper and taking a picture of it.

10   The same thing with the --

11           THE COURT:  All right.  I don't need any more

12   argument on --

13           MR. HAYSBERT:  The same thing with the --

14           THE COURT:  I don't need any more argument on it,

15   Mr. Haysbert.

16           MR. HAYSBERT:  Sure.

17           (There was a pause in the proceedings.)

18           THE COURT:  Just for the record, I'm reading through

19   Document No. 41-2, the last exhibit, which are the specific

20   objections, responses, and motions to compel with respect to

21   requests for admission.

22           (There was a pause in the proceedings.)

23           MR. HAYSBERT:  This appeared to be missing in my

24   earlier read-through, Your Honor, but I've found that Request

25   for Admission No. 23 that provides the contradiction.

1          THE COURT:  Yes, that does appear to conflict with
2     your earlier supplemental response, so do you need to amend
3     that response, Mr. McGavin?  You had said that you do not
4     require -- or you denied that you required employees to wear
5     nonslip footwear, and then you supplemented, so do you need
6     to amend Response No. 23?

7          MR. MCGAVIN:  Sure.

8          THE COURT:  Okay.  I'm going to direct that you file
9     any supplemental response to Request No. 23 within 14 days.

10         Okay.  I think that takes care of it.  I didn't see
11    any other basis to order a supplemental response to the
12    request for admission.  Again, it goes back to a number of
13    the points that you raised in your written spreadsheet
14    related to the definition of "condition."  And I understand
15    you-all disagree about that.  Maybe you think that a
16    different response is warranted, but I have looked at the
17    objections, and based on my understanding of the phrasing of
18    the requests for admission, the objections and responses are
19    proper as to those requests that have incorporated the term
20    "condition" or asked either of the defendants to admit
21    knowledge, responsibility, et cetera, for "the condition," as
22    it's defined in those requests for admission, so I'm not
23    ordering any supplemental response to any of the other
24    requests for admission.

25         Okay.  So that takes care of the last motion to

92

1    compel.  As I said, I've ordered the responses that I've
2    ordered within 14 days.  I'll look also for your supplemental
3    submissions on the pending motion for sanctions.  I will be
4    writing an R&R on the motion for leave to amend and motion to
5    remand, and you'll probably have that in the same time frame
6    that I receive your objections.
7         I'm also directing you all to promptly meet and
8    confer regarding deposition dates, and I've extended the
9    discovery deadline 60 days, as outlined, and will communicate
10   with the District Judge regarding the impact of those
11   decisions on the presently scheduled trial date.
12        Okay.  Mr. Haysbert, is there anything else we need
13   to take up today?
14        MR. HAYSBERT:  No, I think that's all, Your Honor.
15   I would defer to Mr. McKelvey.
16        THE COURT:  Mr. McKelvey, do you have anything else?
17        MR. MCKELVEY:  No, Your Honor, not at this point.
18        THE COURT:  Mr. McGavin, anything else we need to
19   take up for either of the defendants?
20        MR. MCGAVIN:  No, thank you, Your Honor.
21        THE COURT:  All right.  Look, I know this is a
22   difficult case, and you-all have struggled to get this
23   discovery accomplished.  I really want to encourage both
24   sides to continue trying to cooperate and do the best you can
25   to work these things out without court intervention.  If it's

1    impossible to do that, we'll be available to assist you
2    further, but I hope that the guidance that you've gotten
3    today and the Court's comments and orders with respect to
4    these pending motions will be helpful in getting the case
5    moving forward on a track so that it's ready for resolution
6    at some point, all right?
7              MR. MCGAVIN:  Thank you, Your Honor.
8              THE COURT:  All right.  Thank you all.
9              MR. HAYSBERT:  Thank you, Your Honor.
10             THE COURT:  Court will be in recess.
11             (The hearing adjourned at 12:51 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                        CERTIFICATION

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6                             /s

7                       Heidi L. Jeffreys

8

9                       April 6, 2021

10                           Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Heidi L. Jeffreys, Official Court Reporter