```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     Newport News Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                       )
 5   JOANN WRIGHT HAYSBERT,            )
                                       )
 6           Plaintiff,                )
                                       )   CIVIL ACTION NO.
 7   v.                                )   4:20cv121
                                       )
 8   BLOOMIN' BRANDS, INC., AND        )
     OUTBACK STEAKHOUSE OF FLORIDA,    )
 9   LLC,                              )
                                       )
10           Defendants.               )
     - - - - - - - - - - - - - - - - - -

11

12

13                   TRANSCRIPT OF PROCEEDINGS

14                           DAY 1

15                      Norfolk, Virginia

16                      August 8, 2023

17

18   BEFORE:  THE HONORABLE REBECCA BEACH SMITH
             United States District Judge

19

20

21   APPEARANCES:

22           CRANDALL & KATT
             By:  David A. McKelvey
23                     And
             HAYSBERT & MOULTRIE LLP
24           By:  Nazareth M. Haysbert
                  Counsel for the Plaintiff

25
```

```
 1    APPEARANCES CONT'D:

 2
              McGAVIN, BOYCE, BARDOT, THORSEN & KATZ, P.C.
 3            By:  John D. McGavin
                   Emily Blake
 4                 Counsel for the Defendants

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Hearing commenced at 11:01 a.m.)
 2          THE CLERK:  In case number 4:20cv121, JoAnn Wright
 3   Haysbert versus Bloomin' Brands, Inc., and Outback
 4   Steakhouse of Florida, LLC.
 5          Mr. McKelvey, is the plaintiff ready to proceed?
 6          MR. McKELVEY:  Yes, ma'am.
 7          THE COURT:  Mr. McGavin, are the defendants ready
 8   to proceed?
 9          MR. McGAVIN:  Yes.  Good morning, Your Honor.  I'm
10   John McGavin.  I'm here on behalf of defendants.  Also
11   seated with me at counsel table is Emily Blake, who has
12   entered an appearance in this case, and Ray Graham, who is
13   our corporate representative for these proceedings.
14          THE COURT:  All right.  Well, good morning to all
15   three of you.
16          Good morning, Mr. McKelvey.
17          MR. McKELVEY:  Good morning, Your Honor.
18          THE COURT:  Mr. Haysbert is walking in now, so you
19   can note his presence.  He wasn't here when we started the
20   court and called the case.
21          Counsel, the first thing that we are going to take
22   up this morning will be the outstanding motion involving
23   Dr. Haider because that needs to be resolved before we can
24   proceed with trial, because we need to know who the
25   witnesses are going to be and how they are going to be
```

4

```
 1   presented.  So I believe, Mr. McKelvey, Mr. Haysbert, it is
 2   your motion, and you may come up to the podium and argue it
 3   to the Court.
 4          MR. HAYSBERT:  Good morning, Your Honor.  My
 5   apologies for my delay.  I was in the restroom upstairs.
 6          THE COURT:  Good morning.
 7          MR. HAYSBERT:  So the motion before the Court now,
 8   and I apologize, we had the final status conference on
 9   August 1st.  I was under the impression that my expert
10   witness would be there, and she gave me no indication that
11   she would not.
12          But what I didn't know at the time, and what she
13   didn't tell me until after, was that on July 24th, her
14   father was admitted to the hospital, and he wasn't released
15   from the hospital until the day after the final status
16   conference, which is August 2nd, and that she is responsible
17   for his end-of-life care, and his oxygen levels were
18   dropping.
19          If you recall earlier this year, Your Honor, I
20   stipulated to the extension of the trial date because I had
21   an uncle who was very ill, he died in my presence, and when
22   I was there with him in the hospital room, I know the
23   feeling of seeing someone's oxygen levels go down as they
24   are preparing for the end of their life.  So it is my
25   understanding that he is at the end of his life, and that
```

JODY A. STEWART, Official Court Reporter

1    she needs to be near him to take care of him until his death

2    or if he fully recovers.  But she said he is out of the

3    hospital, his oxygen levels are dropping, and that if they

4    were to get to a certain level, he would have to be

5    readmitted.  He was admitted initially to the hospital

6    because of pneumonia that turned into a respiratory failure.

7            So, Your Honor, I just wanted to say this final

8    thing.  Dr. Haider says she is willing to come in on the 9th

9    or the 10th at your discretion.  I did put the exact time in

10   the motion, not that we have to adhere to that time, but

11   just that if the Court wanted her to be at a certain time,

12   she can be there, and that's the time that she could commit

13   to.  But whatever time is necessary, we are happy to do it

14   for her.

15           THE COURT:  Well, first of all, I would have

16   certain questions because the rules are very strict in this

17   regard.  Rule 43 of the Federal Rules of Civil Procedure

18   specifically state that testimony must be taken in open

19   court, and, of course, any exceptions that were there

20   through the pandemic are no longer in place.

21           But I would also tell you that even during the

22   pandemic, this Judge did not take testimony by zoom in

23   trials because it's very important for the trier of fact to

24   observe the witness so that they can then determine the

25   credibility, and it's something that to do in person is very

1  important because you can look at the body language, you can

2  look at the contact, eye contact.  But, in any event, this

3  is not something that this Judge has allowed during a trial,

4  a jury trial, and the only time it has been allowed was when

5  it was for a motion, and in a criminal case, and the expert

6  that they had on the matter was actually expected to die any

7  minute.  So it was the witness who was the individual.

8       I don't recall taking, and if I have, I'm not aware

9  of taking any testimony by zoom during a jury trial, and the

10 only time, that I recall, was during a hearing before the

11 Court only.

12      But, in any event, I just want that to be clear,

13 because this is not a situation where this request is being

14 treated any differently than any other request that comes

15 before the Court.  That's the first thing I wanted to note.

16 The second is, is that the exceptions, it says here that the

17 only exceptions are a federal statute, the Federal Rules of

18 Evidence, these rules, or other rules adopted by the Supreme

19 Court that provide otherwise.  Then it says for good cause

20 and compelling circumstances and with appropriate

21 safeguards, the Court may permit testimony in open court by

22 contemporaneous transmission from a different location.

23 That has been interpreted by the courts, and it's been

24 interpreted very strictly by the courts.  I've got this to

25 give to everybody because it is filed court only under seal,

1    and at a threshold level, I know you've got a copy of the

2    filing that was made last night for the electronic

3    equipment.  Yes, it was made yesterday morning at 6:05 a.m.

4    The Court endeavored to write a lengthy reason for its

5    denial.  One of the matters that was mentioned in here but

6    not ruled upon, and, again, these are always filed court

7    only under seal, and they go back to the individual who has

8    made the request.

9         I do have one, and this is a court only document,

10   if you would please give this to Mr. McGavin and Ms. Blake,

11   because it does have a lengthy statement of reasons in

12   there.  It goes to Mr. McGavin.  Mr. Haysbert has already

13   received it.  He had it e-mailed to him as soon as the Court

14   had finished the product, because it does have lengthy

15   reasons in there.

16        Normally, it's just a form that is approved or not

17   approved by the Court and goes back by e-mail to the counsel

18   who has filed it.  Mr. McKelvey filed one on behalf of you

19   and your team back in July, and that's mentioned.  A laptop

20   was approved, the same as Mr. McGavin filed, and it was the

21   same approval for a laptop and the use of the Court's

22   evidence presentation system.  That's what the defendants

23   filed, was approved.  That's what Mr. McKelvey filed, and

24   that was approved.

25        I would note that I do believe that local counsel

1    is supposed to be signing the pleadings when they are coming
2    into the Court.  I haven't checked, so much has been coming
3    in, but, Mr. McKelvey, you are local counsel, and you are
4    responsible to the Court.  That's why we have local counsel.
5    I'm quite disappointed that it appears that you have not
6    been actively participating in this case or actively giving
7    guidance to out-of-town counsel because we keep getting
8    filings that are coming from Mr. Haysbert.  That's fine, but
9    they need to be also signed and coming from you.  Do you
10   understand?
11            MR. McKELVEY:  Yes, ma'am.
12            THE COURT:  I'm going to continue in a minute.
13   Going back to the reason why we got off on this is because
14   that particular statement of reasons, it's lengthy.  It
15   particularly mentioned, is it Haider, is that the way the
16   doctor says her name?
17            MR. HAYSBERT:  Your Honor, sometimes I mess it up
18   myself.  I think it's Dr. Haider.
19            THE COURT:  Haider?
20            MR. HAYSBERT:  Correct.  It's sort of in between.
21   I think that will be fine.
22            THE COURT:  It is addressed on Pages 3 and 4.  The
23   reason I do it is because there are case cites in those
24   reasons.  I did say I was not going to address it in this,
25   and that's why we are here this morning, but that it did

 1   cite case cites in there.  So there are a number of
 2   questions that aren't answered and aren't presented through
 3   affidavit.  Just at a threshold level, how old is the
 4   father?  Where does he live?  Is he hospitalized where
 5   Dr. Haider is?  Is he in Houston?  Where is he?  I don't
 6   know where he is.  I don't know how old he is.  I don't know
 7   where he's hospitalized.  There is no indication whether he
 8   has a spouse, a partner, siblings, other children, other
 9   relatives, whether somebody in Dr. Haider's position has
10   money for a caretaker.  There are no medical records.
11        In these particular cases, you submit a medical
12   record to verify what the person has said.  They are filed
13   under seal, obviously.  We don't file people's medical
14   records or anybody in open court.  Here it's just a
15   statement with no indication.  He went into the hospital in
16   July, and he came out, when was it.
17        MR. HAYSBERT:  August 2nd.
18        THE COURT:  So there is none of that information.
19   The other is, you said you were planning to have her here.
20   Well, where are the reservations?  Something that
21   Mr. McGavin mentioned, where are your plane reservations?
22   There would be a confirmation of those.  Where are your
23   hotel reservations?  There would be a confirmation of that.
24   Where is your correspondence as between you and the doctor
25   regarding her appearance and whether she can be here?

1    That's something that there is no record of.  It is just

2    somebody saying my father is ill, very ill, I'm the

3    caretaker, and I can't be there.  So it's your expert.  You

4    mentioned the subpoena.

5         The other thing is subpoenas only are good within

6    100 miles.  A subpoena from this court cannot compel

7    somebody to come to court when it's more than a distance of

8    a hundred miles.  That's right in the federal rules.  I

9    didn't see any signed subpoena.  So if she was subpoenaed,

10   and, number one, she is your expert, you shouldn't have to

11   subpoena her.  It should be part of your agreement with the

12   expert.  I don't know.  You mentioned a subpoena, but there

13   is no signed subpoena.  Even if there is a subpoena, it

14   really is hard to enforce a subpoena that is more than a

15   hundred miles.  That's a problem that individuals have.

16        If there is an indication they're not going to be

17   here, then at least the other side would have had an

18   opportunity, if they so elected.  There's been no notice

19   that this person wasn't going to appear, and they elected

20   not to take her deposition.  They apparently didn't find

21   anything, as they represented I believe at the conference on

22   August 1, they didn't see any need to take her deposition.

23   They looked at a report.  The report didn't bother them, or

24   for whatever reason, and they had that ability.  You can't

25   just try a case at the 11th hour or by ambush, not in

1     federal court.

2          So then we move from those things that I've

3     mentioned to you to the caselaw.  The caselaw is very

4     specific when it talks about the advisory notes, and when

5     they talk about somebody that has a compelling circumstance,

6     such as an accident or illness that affects his or her

7     ability to be at trial in person.  Caselaw says it's that

8     person.  It's not a relative.  There are cases out there

9     that say being a caretaker doesn't count.  I don't know if

10    there are other caretakers.

11          This is the caselaw.  *Donohue v. U.S. Department of*

12    *Homeland Security* that is cited, noting the witness's

13    caretaking responsibilities but denying the request for

14    remote testimony.  The case of *In re Kirkland*, underscoring

15    that, "Remote testimony is the exception, and live,

16    in-person testimony is strongly preferred."

17          The New York case *Radosti v. Hudson's Bay Company*,

18    which says that no caselaw permits remote witness testimony,

19    "Based solely on caretaking responsibilities."  So even if

20    that caselaw wasn't there, this is still within the Court's

21    discretion.  The zoom requests are supposed to be made in

22    advance, and this was the 11th hour.  So tell the Court what

23    you did to get the witness here.  Did you have plane

24    tickets?

25          MR. HAYSBERT:  So, Your Honor, the way that my

```
1   practice is, has been with Dr. Haider, and it happened
2   whenever we were here a year ago preparing to go to trial,
3   and she was appearing to testify live, we were here in
4   March.  She was appearing to testify live.  Neither of those
5   situations involved anyone on my team.
6           The regular practice of the way that we conduct our
7   business is I pay Dr. Haider up to the point of trial, and
8   we show a zero invoice, and she handles her own flight and
9   hotel arrangements.  So that's been the way that we've
10  always worked.
11          THE COURT:  Do you have an agreement to that
12  effect?
13          MR. HAYSBERT:  Your Honor, there is nothing
14  specific in an agreement that says that you take care of my
15  flights, but it's always been that case.  She would take
16  care of her own flights and her own hotel arrangements,
17  pursuant to the fact that I paid her the balance that's
18  owed, and then I also pay her for the trial testimony as
19  well.  So we have an agreement that here is how much my
20  trial testimony is going to cost, and that would include
21  flights and everything else.  I pay her that specific
22  amount, and that specific amount has been paid.  Now it's up
23  to her to make, through her office, her own flight
24  arrangements and hotel arrangements, and that's never been
25  changed.
```

1          So I made sure that my firm had paid her everything
2    that she was owed and also everything that she would need to
3    testify at trial.  There is a specific amount, and that
4    amount has been paid, and it was paid even before the last
5    trial date.  So, you know, they confirmed with me, you paid
6    for the trial.  I've paid for the trial already.  It is a
7    matter of her getting on the plane and getting here using
8    her own office.  She has her own office and assistant and
9    staff to do the flight arrangements and the hotel
10   arrangements as she sees fit.  My job is only to pay her,
11   and I've done that.  I'm happy to provide confirmation to
12   Your Honor regarding that.  No problem at all.
13         The issue here is that it is up to your discretion,
14   and I do want to make it clear, Your Honor, that this was an
15   ambush for me as well.  I didn't know, and sometimes these
16   things happen.  At the same time that Mr. McGavin's expert
17   was having back surgery and brought it to my attention a
18   week before trial, and he wanted to do a *de bene esse*
19   deposition three days or four days before trial.  The same
20   time that was going on, Dr. Haysbert's brother was entering
21   into his end of life, and that was an issue that happened
22   suddenly and overnight.
23         So I'm aware that human beings are human beings.  I
24   don't know what goes on in the lives of human beings.  I
25   just try and deal with whatever I can.  In this particular

1    case she informed me that she could not make the trial in
2    person, not that she couldn't do it at all, but that she
3    couldn't make it in person because she is responsible for
4    her father's end-of-life care, and apparently she believes
5    he is dying because his oxygen levels are decreasing.  I
6    know I've been through that situation myself.  I didn't ask
7    a bunch of questions about, you know, which hospital and
8    where is he.  I assume that she would be telling me the
9    truth.

10           Now, I can go back to her and find out whether or
11   not he is in Houston with her, or if she is even in Houston.
12   I think she is.  She's put that in her affidavit that she
13   was in Houston, Texas.  I'm assuming that he is there in
14   Houston with her.  I'm assuming that, you know, she may be
15   his only relative.  She's responsible for his end-of-life
16   care.  I don't know what, you know, to do about that other
17   than to bring that to the Court's attention, and let you
18   deal with the matter at hand.

19           But, Your Honor, this is not a situation, as I
20   said, where I knew going into that final status conference
21   she would not be here.  It didn't come up until afterwards
22   on the 2nd when she told me her father was out of the
23   hospital -- or had been released or discharged from the
24   hospital on August 2nd and was now recuperating, and his
25   oxygen levels were lower.

1          I'm happy to go back to her and say, "Can you

2     please provide me with medical evidence of all of this, his

3     location, and is there anyone else that can care for him?"

4     I'm happy to do that, Your Honor, and redo the affidavit, if

5     you prefer.  I can get back to her immediately and find out,

6     you know, what we can do about this.

7          THE COURT:  Let me respond to a couple of things

8     that you've said.  Again, as we've talked at the August 1

9     conference, we are not going back over things.  Every

10    continuance that occurred was for a good reason, and you

11    agreed to that continuance in March, and, in any event, a *de*

12    *bene esse* deposition is the way you take care of something

13    like that, if a witness can't be available.  That is a way

14    that is allowed under the rules.

15         But it never came to the Court's attention other

16    than through the motions and the agreement.  In other words,

17    we are not going back over all of that.  That's the first

18    thing.  We are here today, this trial has been set since

19    March, and so I haven't seen a copy of whatever agreement

20    you had with Dr. Haider.  You claim that you had an

21    agreement where she's going to pay to get to trial.  I've

22    not been aware of such an agreement, and what correspondence

23    did you have with her?  You have certainly been able to

24    e-mail constantly to the Court, and what do you have to back

25    up what you're saying?  I'm just saying that you claim there

1    is an agreement.  They said something else, and I'm going to

2    hear from Mr. McGavin, something about an appearance for

3    trial.  So somebody's seen an agreement somewhere.

4           So I have questions about, you say it's an

5    agreement, and she's fully paid.  She hasn't said that she

6    had an agreement, and she's been fully paid, and that she

7    was to make the trial arrangements, and she didn't.  I mean,

8    all of this is just representations to the Court.  There

9    needs to be an affidavit.  I can't imagine you don't have an

10   agreement with an expert, because people just don't take

11   experts without agreements.  You have to have an hourly

12   rate.  You have to have appearance rates.

13          So there's been no agreement presented to the Court

14   that said she was responsible for getting herself here, and

15   if she was, then I think that in the future you ought to be

16   careful about such agreements because you're leaving it up

17   to somebody else to be responsible for their appearance in

18   court, but you ultimately are responsible as counsel.

19          Did you say, "Have you made your plane

20   reservations?  When are you coming in?" if you're planning

21   your witnesses.  There is nothing before the Court other

22   than her saying, "My father is in the hospital, I'm his

23   caretaker, and his oxygen levels are going down."  I'm not

24   saying that any of that isn't correct, but under the

25   caselaw, frankly, in my mind is not a grounds to exercise my

```
 1    discretion to say, all right, at the 11th hour, you can't
 2    get here and be here in person.  You've been retained as an
 3    expert, and you've got to fulfill your expert duties.
 4            An expert is very important.  This is one of your
 5    liability experts.  Do you have another liability expert?
 6            MR. HAYSBERT:  This is not one of the liability
 7    experts, Your Honor.  She is the damages expert.  She's the
 8    neurologist.  And also, she never indicated in her sworn
 9    testimony that she is a caretaker.  She just said that she
10    is responsible for his end-of-life care.
11            THE COURT:  That is a caretaker.
12            MR. HAYSBERT:  I make a distinction because I
13    wasn't my uncle's caretaker, but I watched him literally
14    take his last breath in front of me.  I was responsible for
15    his end-of-life care.  The doctors talked to me when it came
16    to all of those things at the end, but I certainly wasn't
17    his caretaker.  I would make that distinction and
18    distinguish that.  There are a line of cases talking about
19    caretakers.  She never indicated she was his caretaker.
20    This is strictly the fact that his oxygen levels are
21    dropping, and he's probably going -- you know, about to
22    transition.  That, I think, is where the distinction is.
23    There is also sworn testimony.
24            I can only accept it for what she said, that this
25    is what's happening to him under penalty of perjury, and I'm
```

1   responsible for his end-of-life care under penalty of

2   perjury.  And, Your Honor, I have another damages expert who

3   is coming live.

4          THE COURT:  Wait just a minute, please.  I want to

5   find her affidavit.  Where is it in your filing, your

6   plaintiff's motion for leave?  I know I saw it.

7          MR. HAYSBERT:  The declaration is attached as

8   Exhibit A.

9          THE COURT:  Exhibit A.  She says that she is

10  responsible for her father's end-of-life care.  So I don't

11  know how that is not a caretaker.

12         MR. HAYSBERT:  Again, I'm making the distinction

13  based on my own experience.  End-of-life care, meaning a

14  person is about to transition.  They're not necessarily a

15  caretaker.  A caretaker can be someone who is stable, whose

16  oxygen levels are not dropping.  May be seriously ill but is

17  not in danger of dying in the next one or two days.  That's

18  what I would distinguish it as.

19         THE COURT:  I don't think we should mince

20  definitions, caretaker, because, in any event, she doesn't

21  say that there is no one else responsible.  Does he have a

22  spouse?  Does he have a partner?  Does he have other

23  children?  Does he have siblings?  There are a lot of people

24  who can be responsible for your end-of-life care.

25         MR. HAYSBERT:  If I may respond to that, Your

JODY A. STEWART, Official Court Reporter

1    Honor.

2         THE COURT:  Let's move on.  We are not going to

3    mince words over when she says end-of-life care.  She hasn't

4    given an adequate reason in this particular declaration for

5    the rules and under the law, that I would exercise my

6    discretion without more.  There is just nothing here to tell

7    the Court how old this person is, whether he's there.  If

8    you're responsible, is she there?  Is there a spouse?  Is

9    there a partner?  All those things.  Not that there is no

10   one else available.  So she is responsible.  There may be

11   five people responsible.

12         There are no medical records here to show the state

13   of the individual.  On top of that, there is nothing before

14   the Court to show that she was really planning to come.  Did

15   you all correspond by e-mail?  You were a week before trial

16   on August 1.  You had to have been lining up your witnesses.

17   At the end you all were asking about that, and I believe I

18   told you, you all talk about your witnesses and your

19   scheduling.

20         So I don't know what went on with your

21   conversations, but we had done the final pretrial, and she

22   was listed, and she was listed as a person who was going to

23   appear as a witness.  Is there anything else you want to say

24   new about these matters?  Do you have your agreement?

25         MR. HAYSBERT:  Your Honor, I could bring up the

1    agreement between us.  I'm relatively sure it doesn't say

2    anything about travel arrangements in the agreement itself,

3    but I will double-check it.

4            THE COURT:  Let me hear from Mr. McGavin, and then

5    I'll give you a chance to respond, Mr. Haysbert.

6            MR. HAYSBERT:  Thank you.

7            MR. McGAVIN:  Your Honor, John McGavin on behalf of

8    Outback and Bloomin' Brands.  I do have a copy of the

9    National Brain Injury Institute deposition and trial fees

10   and payment terms effective September 25, 2020, that we

11   referenced in our papers, and I can provide that to the

12   Court.  We don't have an updated fee schedule, but what it

13   says is, "Trial testimony is an eight-hour minimum of

14   $8,000.  In regard to travel time, that's $350 an hour,

15   billed in advance; preparation time, $500 an hour minimum;

16   travel charges at cost, billed in advance; invoice for

17   balance sent immediately upon completion of services;

18   payment due within 10 business days of receipt of invoice.

19   Cancellation policy:  14 days' notice, deposit retainer will

20   be fully refunded.  Less than 14 days' notice, deposit

21   retainer is non-refundable.  All non-refundable travel

22   expenses are due regardless of notice amount."  I can

23   provide a copy of this to Your Honor if that would be

24   helpful for the record.

25           THE COURT:  Yes, it would be.  I'll mark that as

1  Defense Exhibit Number 1.

2        MR. McGAVIN:  Thank you, Your Honor.

3        (Defendant's Exhibit 1 received in evidence.)

4        MR. McGAVIN:  It contains my highlighting as I was

5  preparing for trial.

6        THE COURT:  That's fine.  This was produced during

7  discovery?

8        MR. McGAVIN:  Yes, Your Honor.  It was part of the

9  Rule 26 disclosure.

10        THE COURT:  All right.  Did you get any CV at all?

11        MR. McGAVIN:  We did, Your Honor.  I have that, as

12  well, in the Rule 26 disclosure.

13        THE COURT:  I would like to see that because when I

14  researched the doctor on the computer, or ran her name, it

15  says she is an anesthesiologist.  Now, I know that she's

16  part of the brain center, but it does say, I think, that

17  she's an anesthesiologist.  Her CV may say more, but I don't

18  count on the Internet bios because who knows who puts them

19  up, but I think it was the bio that was with her group, was

20  what my law clerk ran up, was her biography with her group,

21  but I would prefer to see her CV.

22        MR. McGAVIN:  Your Honor, I do have the CV that was

23  provided in the Rule 26 disclosure, and she is board

24  certified in anesthesiology.  She has obtained some

25  certifications from the -- she is board certified in

1    neurocritical care through the United Council of Neurologic

2    Subspecialties.  But she is not residency, fellowship

3    trained in neurology.  So I can present that to Your Honor.

4            THE COURT:  That will be Defense Exhibit Number 2.

5            (Defendant's Exhibit 2 received in evidence.)

6            MR. McGAVIN:  Certainly, Your Honor, that is and

7    was going to be a matter the defense intended to explore

8    with Dr. Haider.

9            THE COURT:  You can go ahead and continue.

10           MR. McGAVIN:  Thank you, Your Honor.  We rely upon

11    what we've submitted in our papers.  The missing pieces here

12    are, as I mentioned in our papers, where is the hotel

13    reservations?  Where is the plane ticket or confirmation?

14    Even if Dr. Haider is doing that reservation, did she ever

15    purchase plane tickets?  Those would be non-refundable under

16    the agreement.  And did she actually have any time that she

17    had reserved in her calendar?  She gives us one time for

18    the -- under her declaration, 4:00 p.m., and she doesn't say

19    what she is doing the rest of the day.  I speculate, and

20    purely speculation, but knowing doctors as they are, when

21    they say it's a 4:00 deposition, they might be seeing

22    patients during the day.

23           So arranging a doctor, particularly an out-of-state

24    doctor, there has to be significant logistical details

25    worked out.  You need the expert to come in the day before

1  because of flight challenges.  You need to have a meeting

2  the day before, and then you put the witness on, depending

3  upon the Court's calendar, and when the Court will be

4  entertaining evidence the following day, then the expert

5  would fly back out.  We have none of that.

6        What we have is, when we went to see Judge Miller,

7  we learned for the first time that there was going to be an

8  issue with Dr. Haider for the settlement conference, but if

9  Mr. Haysbert knew this on the 2nd, that certainly was not

10  brought to our attention.  And there is a pattern here.  I

11  also have a subpoena which was issued to Nick Seifert and

12  served yesterday morning for trial on Wednesday, the 9th, no

13  fee for him.

14        THE COURT:  We are going to get to that.  You are

15  jumping ahead of yourself.  You can say that's part of the

16  11th hour pattern, is what you are arguing.

17        MR. McGAVIN:  Yes, it is.

18        THE COURT:  I haven't ruled on that.  That's the

19  other matter that we are going to take up today.

20        MR. McGAVIN:  I'm sorry, Your Honor.  That's part

21  of this 11th hour, the way this case is being put together.

22  All new jury instructions are coming in.  Finding

23  instructions.  It's as if this was not prepared and ready to

24  go.  My experts have been lined up for months.  Pretrial

25  meetings have occurred.  Payments have been made.  You just

1    don't have a case where you don't have correspondence,

2    invoices, canceled checks, arrangements are made,

3    particularly when you run the risk of an out-of-state expert

4    coming from California -- he's got two California experts;

5    one in Houston and one in Florida.  There are plenty of

6    great doctors right here in Virginia; MCV, you name it.

7    There are plenty of great medical schools and physicians

8    here.

9         So for all of these reasons, Your Honor, number

10   one, the subpoena is invalid and signed -- we noted signed

11   by Mr. Haysbert, not by local counsel.  It's not properly

12   served.  We don't have any reference on that.  An effort to

13   subpoena her, in and of itself, is improper because the

14   attorney is actually representing that it's valid by trying

15   to serve it or present it.

16        Then there is no good cause that has not been

17   explained why we waited until the last minute and have no

18   evidence other than this declaration.  There are no

19   compelling circumstances, as the Court has pointed out.  So

20   we respectfully submit that the motion for remote testimony

21   should be denied.  Thank you.

22        THE COURT:  Let me check one thing, Mr. McGavin.

23   Actually, Exhibit A appears to be the subpoena, at least in

24   the package that I printed off.  Exhibit A is Page 3 of 6,

25   and the next page is Page 4 of 6.  So that's the subpoena.

```
 1    First of all, this subpoena wasn't issued until August 4,

 2    2023.

 3              MR. McGAVIN:  That's correct, Your Honor.

 4              THE COURT:  How in the world are you going to get a

 5    subpoena down to -- well, again, it wouldn't matter because

 6    if there had been a motion -- you don't subpoena somebody --

 7    there are other ways you do it.  If you want testimony from

 8    somebody outside of the hundred miles, and they can't be

 9    here, first of all, they are your expert.  Second of all,

10    you would move for a de bene esse deposition, and whatever

11    the cause would be at that time would depend upon whether or

12    not you would get the de bene esse.  This is a subpoena that

13    went out from Mr. Haysbert on August 4, and it doesn't bear

14    the signature of the clerk or deputy clerk.

15              Did the clerk issue the subpoena?  Why doesn't it

16    bear the signature?

17              MR. HAYSBERT:  Bears my signature, Your Honor.

18              THE COURT:  It's typed with an S.  So you just did

19    this up.

20              MR. HAYSBERT:  I can explain it to the Court, Your

21    Honor.

22              THE COURT:  Wait just a minute.  Let me finish

23    looking at it.

24              Mr. McGavin, is there anything else?

25              MR. McGAVIN:  No.  Thank you, Your Honor.
```

1          THE COURT:  You can come back and respond,
2    Mr. Haysbert.
3          MR. HAYSBERT:  Your Honor, the subpoena was --
4    because I never subpoenaed an expert of mine before, it was
5    simply to encourage Dr. Haider to come.  It was something
6    that I explored with her.  If I send you a subpoena, will
7    you come?  Now, she is not an attorney.  I don't know if she
8    is aware of the fact that the subpoena power of the court
9    doesn't extend beyond a hundred miles.  But I did that in an
10   attempt to get her here.  That was all that was.
11         THE COURT:  Excuse me for a minute.  Did you just
12   mail it, e-mail it?  How did you send it to her?
13         MR. HAYSBERT:  I e-mailed it to her.
14         THE COURT:  You didn't have a process server?
15         MR. HAYSBERT:  Did not have a process server.
16         THE COURT:  It hasn't even been served?
17         MR. HAYSBERT:  No, Your Honor, it has not been
18   served, not through a process server, but it was sent to
19   her, you know, asking her please come.  "The judge really
20   needs you here," you know.
21         THE COURT:  Not the judge that needs you here.
22   Your client needs her here.
23         MR. HAYSBERT:  That's certainly correct, Your
24   Honor.  My client does need her here, but given the
25   circumstances, you know, that was the next best thing I

1    could think of.  Unfortunately, her response was, "I'm happy
2    to sign this one affidavit to tell the Judge" because it was
3    going to you as a motion, "Why I cannot be there in person."
4    That's what she provided me.  But I think the facts speak
5    for themselves.
6         THE COURT:  The facts do speak for themselves, and
7    the facts don't speak favorably to allowing remote
8    testimony.  That's the problem.
9         MR. HAYSBERT:  Well, I wanted to handle the point
10   that was being made about all this 11th hour business.  This
11   is the first time there has been an 11th hour situation with
12   me and my firm.  With respect to my experts, they are all
13   coming with the exception of Dr. Haider, you know, depending
14   on what the Court's scheduling is and how we get through.
15   Everybody else is coming.  Everybody else is here.  I don't
16   have logistical problems with local counsel, with trial
17   tech, with attorneys that work with me, with the plaintiff,
18   with the plaintiff's daughter, with other witnesses.  We
19   don't have any of these issues.
20         The problem is only with Dr. Haider, and the issue
21   wasn't an issue until the day after the final status
22   conference when she informed me that her father had been
23   discharged from the hospital.  That's when I was told that,
24   and unfortunately, my hands are tied.  What could I do but
25   try and attempt to get her here?  I did speak about it with

1    the Magistrate Judge because it had come up, and it was

2    something that came up suddenly.  It was something that was

3    not in my control.

4            So I'm happy to do whatever the Court wants to do,

5    but, unfortunately, she's provided a sworn declaration

6    saying my father is at end of life, and I'm his end-of-life

7    care person.  That's what I do, at the end of his life.  So

8    I can't argue with that.  The person -- her family member is

9    dying, her father.  This is not some associate.  This is her

10   father we are talking about.

11           THE COURT:  When did you e-mail the subpoena?  This

12   says August 4.  What time?

13           MR. HAYSBERT:  That must have been the day I

14   e-mailed it, Your Honor.

15           THE COURT:  Was it after your conference with Judge

16   Miller?

17           MR. HAYSBERT:  It was after the conference with

18   Judge Miller.

19           THE COURT:  And that was because Judge Miller

20   mentioned Rule 43 to you?

21           MR. HAYSBERT:  It wasn't because he mentioned Rule

22   43 to me, but he did express concern that she would not be

23   able to come unless you, you know.

24           THE COURT:  So he didn't mention Rule 43?

25           MR. HAYSBERT:  He did mention Rule 43.  He did.

```
1              THE COURT:  So you have a conference.  You found
2     out on the day after, you found out on the 2nd that she
3     couldn't be here.
4              MR. HAYSBERT:  Her father was discharged on the
5     2nd.
6              THE COURT:  I thought you said you found out on the
7     2nd?
8              MR. HAYSBERT:  Her father was discharged on the
9     2nd.  I spoke to her, I believe it was the 2nd.  It was
10    before I spoke with Magistrate Judge.  So the conference on
11    the 3rd, so it would have been the 2nd, Your Honor.
12             THE COURT:  The conference was on the 4th.
13             MR. HAYSBERT:  Then it may have been on the 3rd.
14             THE COURT:  The conference was on the 4th.
15             MR. HAYSBERT:  Okay.  Then my conversation with her
16    may have been on the 3rd, then, is what I'm suggesting.  I'd
17    have to go back and check.  I don't have anything in front
18    of me to be able to verify for the Judge when that
19    conversation happened because that would be on my cell
20    phone.
21             THE COURT:  So you didn't e-mail her about her
22    appearance, she just called you and said, "This is the
23    situation," and then on the 4th you mentioned it to Judge
24    Miller, he raises Federal Rule of Civil Procedure 43, and
25    then later that day you send out the subpoena?
```

1          MR. HAYSBERT:  Yes, Your Honor, I believe that's

2     the case.

3          THE COURT:  Then at 10:01 on Sunday night you filed

4     this motion?

5          MR. HAYSBERT:  That is correct, Your Honor.

6          THE COURT:  Well, I'm going to take a brief recess,

7     and I would like for you to present to the Court your

8     agreement with the expert that says she was responsible for

9     being here and paying her own costs and doing all of that.

10    If that's an agreement, I want to see that, and then we will

11    go from there.  You say that you had met all the payments in

12    the agreement.  There is a lot of verification that can be

13    provided to a Court that isn't here right now; the

14    information about her father and the information about what

15    arrangements you have actually made to get the witness here.

16    This trial was set in March, and you don't wait until a

17    week, less than a week before trial to start worrying about

18    whether your witnesses are going to be here.  It's just not

19    timely.  You have to take responsibility for it if that is

20    what happened.

21         So that's the kind of agreement.  Whatever you have

22    as an agreement in writing with her, and whatever e-mail

23    correspondence you have with her about her appearance here,

24    I want that produced, and I'm going to take a 15-minute

25    recess, and I want you to produce it.  You've got a tech

```
 1    person here.  You've got it on your computer, so produce it.
 2            MR. HAYSBERT:  Your Honor, if I may, I believe the
 3    contract that we had is Exhibit A that defense attorney
 4    provided you.  I don't think there is anything different,
 5    but we will check.
 6            THE COURT:  That's it?
 7            MR. HAYSBERT:  That's the fee agreement.  If I'm
 8    not mistaken, that is the fee agreement, and that fee
 9    agreement did not provide for me to provide her airfare and
10    a hotel.
11            THE COURT:  I thought you said just the reverse,
12    that the agreement provided that said that she had to do
13    that.
14            MR. HAYSBERT:  No.
15            THE COURT:  You said that earlier.
16            MR. HAYSBERT:  No, Your Honor.  What I said was I
17    have to pay her a stated amount that covers everything,
18    including whatever airfare and hotel arrangements she
19    decides to make.
20            THE COURT:  Tell me where that is in this
21    agreement.
22            MR. HAYSBERT:  It's implied in the agreement.
23    Everything -- it says it in the agreement that I pay her an
24    amount for trial, and then I'm responsible for the cost of
25    her airfare and all the other things.  It doesn't say in
```

1  that agreement that I am to make her hotel arrangements and

2  her flight arrangements.

3       THE COURT:  Mr. McKelvey, you are local counsel.

4  I'm going to hold you responsible for some of this because

5  there are no signatures on this agreement.  Your signature

6  is not on it, Mr. McKelvey's signature isn't on it, and her

7  signature isn't on it.  This is just deposition and trial

8  fees and payment terms.  It says that her services, her

9  deposition and trial services, that she was the subject

10  matter expert.  She would review medical records and

11  literature.  She would prepare and self-study, and she would

12  give time for deposition and trial.  The deposition was a

13  thousand an hour, six hour minimum.  It goes and talks about

14  the deposition terms.  Then the trial, a thousand an hour,

15  eight-hour minimum charge, 8,000.  8,000 deposition retainer

16  due in order to reserve date.  Did you pay that?

17       MR. HAYSBERT:  Yes, we paid -- that's what I was

18  referring to earlier.  The $8,000 is the amount that I paid

19  to make sure that she -- there were no issues of her being

20  here to trial.

21       THE COURT:  It just said in order to reserve date.

22  That's all it says here.

23       MR. HAYSBERT:  That's correct.

24       THE COURT:  Doesn't say in order to reserve date,

25  and it says, if between two and eight hours, any credit will

```
 1    be returned within 90 days.  If greater than eight hours,
 2    the balance will be billed.  She's got preparation time,
 3    she's got travel time, and it says billed in advance.  So
 4    did you get any travel time billed in advance?
 5         MR. HAYSBERT:  My understanding, Your Honor, is all
 6    of that was part of it.
 7         THE COURT:  That's not what this says.  It's an
 8    exhibit before the Court, and it was produced by you during
 9    discovery.  You can have understandings with people, but
10    when you're dealing with contract services, you need to have
11    it in writing.  This doesn't say that.  It says, "Travel
12    charges at cost, billed in advance."  So did she bill you
13    any travel?  Did you ask her, "Why haven't I had any travel
14    charges at cost billed in advance?  What about your plane?"
15    Travel time is different.  Travel time is set out here at
16    350 an hour billed in advance, and it tells you what it's
17    going to be, and if there's leftover money, if the
18    trial testimony is not greater than eight hours, you get a
19    return, and if it's greater than eight hours, the balance
20    will be billed.  There is a distinction here in billed and
21    billed in advance.  Then it goes on to say, "Travel time,
22    350 per hour billed in advance."  So somebody is charging
23    350 an hour to travel, and that's not unusual for experts.
24    "Travel charges at cost, billed in advance."  So you have to
25    have something in your file.  When did you contact her to
```

1    testify in this case?  What's going on, Mr. Haysbert?

2          MR. HAYSBERT:  What I have, Your Honor, is a sworn

3    declaration from her explaining that her father is ill, and

4    at the end of his life, and his oxygen levels are dropping.

5    I cannot allow the Court to dismiss the sworn declaration of

6    a doctor who is explaining why she cannot make it to trial

7    live.  She's already indicated that she can do it via zoom.

8          The focus here is on the compelling circumstances

9    that does not allow this expert to get here, not on whether

10   or not I billed -- I purchased her a flight or a hotel room.

11   I purchased hotel rooms for people that work for me that are

12   here for trial.  I haven't purchased hers.  But I have a

13   room or rooms of hotel rooms for people that are coming in

14   for trial.  But the issue here is about the compelling

15   circumstances as to why she can't make it here live, and the

16   compelling circumstances, Your Honor, is her father is ill,

17   and she would prefer to be by his bedside or in the hospital

18   than being here live in case anything happens to him, and I

19   understand that.

20          I focused the declaration on exactly what the

21   circumstances require, and that is compelling evidence that

22   they cannot appear live.  And it appears to me that the

23   Court is asking me questions about all these other things

24   I'm not prepared to respond to that I have to go back and

25   research that have to do with e-mails and flights and hotels

1  when the issue here is compelling circumstances, and the
2  compelling circumstances is her father is near death, and
3  because her father is near death, she has to be there with
4  him, which I completely understand.  I think any human being
5  would understand it.  I understand that.  I understood it
6  when you caught COVID the day before trial.  I understood it
7  when his witness had a back injury and had to get surgery on
8  the day of trial, essentially, and I understand it with
9  Dr. Haider when she says my father is ill, and I cannot make
10  it to court in person.  I've got to appear via zoom.
11          Now, I can get back to her and say, "The Judge will
12  not allow you to do it, you've got to get on a plane,"
13  because if she doesn't get on a plane, then that is going to
14  affect the plaintiff's case.  So I'm between a rock and a
15  hard place.  On one hand I've got a doctor who is saying I
16  can't be here because my father is ill.  On the other hand I
17  have Your Honor, the Judge, who gets to make the decision
18  whether or not this case is going to go forward with an
19  important expert, a damages expert, who is supposed to come
20  here and talk about, you know, what issue she's having in
21  her brain and the damages she is going to suffer for the
22  rest of her life as a result of the fall.
23          She is our causation expert.  She is one of them on
24  whether or not the fall was the cause of her injuries.  So
25  if the person can't make it, and she's given me this reason,

1  I can go back and try to, what do you mean?  Where is your

2  father? and all this.  She is providing sworn testimony.  I

3  just don't understand what's happening here.

4          THE COURT:  Let me interject something.  What's

5  happening here is you are the one between a rock and a hard

6  place.  I am totally sympathetic to Dr. Haider's situation,

7  but the rules and the law, all I'm doing is applying the

8  rules and the law, and, frankly, defendants would have a

9  good appeal point on an abuse of discretion as not permitted

10 under the rules and the law and at the 11th hour.

11         I have not been able to find a case in your favor.

12 The rule is very specific, says exceptional circumstances.

13 The courts who have considered it say this is not

14 exceptional circumstances.  You are the one between a rock

15 and a hard place.  You are saying you have shown the Court

16 nothing that you expected her to be here.  Nothing.  You

17 have not shown the Court anything where you have expected

18 her to be here and that you've acted timely.

19         You haven't presented the Court, and I'm going to

20 ask Mr. McKelvey as local counsel what contact has been

21 made.  He is local counsel.  He is responsible.  He is

22 responsible to the Court.  He took on being local counsel,

23 and our rules are very clear.  You are an officer of the

24 Court at this point *pro hac vice*, as is Mr. McKelvey.  So I

25 want to know.  You keep trying to put this on any human

 1  being would be sympathetic and understanding.  Well, I am

 2  sympathetic and understanding.  I've certainly had

 3  end-of-life situations in my family with my parents, with a

 4  husband.  So I've had end of life circumstances, and I think

 5  it's very important, and I'm certainly sympathetic.  But I

 6  have to follow the law and the rules.  All you keep saying

 7  is any human being would understand.

 8          Well, I do understand.  But the point being is,

 9  what have you done as an attorney?  You are between a rock

10  and a hard place, and you put your client between a rock and

11  a hard place.  But you haven't done anything but stand up

12  there and repeat and repeat and repeat a page and a half

13  affidavit to the Court.  You have not cited any law.  You

14  have not produced anything other than this one page that is

15  somewhat contrary to what you represented to the Court.

16          It says here that when somebody hadn't contacted

17  you a week before trial, when it says that, do you have

18  anything in writing that says you paid your own expenses?

19  This is my agreement.  That's not what this says.  This says

20  travel charges at cost billed in advance.  What is there in

21  your file to show the efforts or the basis that you were

22  expecting her here?  This agreement is contrary to she was

23  going to make her own arrangements and pay for them.  And if

24  she was, did you follow up on it?  You can't just wait until

25  a few days before trial and say, when are you coming?

1    You've got to prepare somebody.  So where in your records do

2    you have that your correspondence -- you have to have been

3    corresponding with an expert -- that she had made her

4    arrangements and you were expecting her for trial?  What is

5    your basis for that?

6            MR. HAYSBERT:  Your Honor, we were expecting her

7    for trial.  We have paid her everything that she needs for

8    trial.  We have done that.  That's what our basis was.  You

9    have an agreement that says -- there is certain amount that

10   has to be paid for the expert for them to be prepared for

11   trial, and we made that payment.  What happened in this case

12   is, to me, very simple.  Her father is ill, and whether he's

13   at the hospital where she is, or has a caretaker that is in

14   addition to her, those things I'm happy to address for the

15   Court, update the affidavit if need be.

16           But we cannot get away from the compelling

17   circumstances, which is what the rules are.  Rule 43 and 45

18   don't talk about anything but the compelling circumstances

19   to why that expert can no longer come to trial, and the fact

20   of the matter is she's not able to be here because under her

21   sworn testimony her father is ill, and that is the basis for

22   the compelling circumstances.

23           There is nothing else that can be the basis for the

24   compelling circumstances but that.  That's it.  She cannot

25   be here live, she said, under her sworn testimony, because

```
1   my father is ill, and I need to be near him so in case he
2   had to go to the hospital again, which is imminent.
3           THE COURT:  She doesn't say that.  She doesn't
4   say --
5           MR. HAYSBERT:  She said his oxygen levels are
6   dropping.  I understood that because I have been in a
7   situation where a family member's oxygen levels dropped
8   until they were dead.  I'm sure anyone who has had a family
9   member they had to take care of, who was in front of them
10  and died in front of them, has had the same experience that
11  I have had.  So I understood it.  His oxygen levels are
12  dropping.  He just came out of the hospital.  He had
13  pneumonia and respiratory failure.  This is a man who is
14  likely not going to live.  So you need to be there with him,
15  next to him, in the hospital if he goes back in there, close
16  to him.  If you get a phone call, and you're here testifying
17  live, that your father died, and we had an opportunity to
18  make sure that didn't happen by just allowing her to come in
19  via zoom, that is something I don't want on my heart.
20          THE COURT:  Anything else?
21          MR. HAYSBERT:  That's all, Your Honor.
22          THE COURT:  Mr. McKelvey, please come up to the
23  podium.
24          MR. McKELVEY:  Yes, Your Honor.
25          THE COURT:  I would assume as local counsel that
```

1    you have been copied on e-mails and correspondence and are

2    aware of the arrangements made for experts?

3        MR. McKELVEY:  I have not been copied on any

4    e-mails with regard to experts other than like the

5    disclosures, and things of that nature.  The specifics of

6    reserving them for trial, I've not been involved in.

7        THE COURT:  So you haven't been involved in

8    arranging for the experts?

9        MR. McKELVEY:  To appear here logistically, no,

10   ma'am, I have not.  I don't know anything beyond what

11   Mr. Haysbert has said, one way or the other.

12       THE COURT:  What did Mr. Haysbert indicate to you

13   about the appearance of Dr. Haider before this motion was

14   filed, and when was it indicated to you?

15       MR. McKELVEY:  The only thing indicated to me was

16   that the motion needed to be filed and the contents of the

17   motion, Your Honor, and then we discussed it, and I told

18   him, you know, that I thought we were going to try to do it,

19   we should file a formal motion requesting the Court that

20   that was where that want, and I wasn't part of the

21   settlement conference because I had court already scheduled

22   during that time, so the conversations with Judge Miller I

23   wasn't privy to.

24       THE COURT:  Well, your signature is on the motion.

25   Did you authorize your signature to go on that motion?

1          MR. McKELVEY:  Yes, ma'am, I authorized my

2   signature to go on the motion and request the Court to allow

3   the doctor to appear remotely, based on when the information

4   came to my knowledge and the contents of the motion and the

5   affidavit, to the best of my knowledge, when they were

6   filed, and, I mean, even now are accurate.  I don't have any

7   independent knowledge.

8          I only know what I've been told, and I understand

9   it is a late motion.  I do understand the timing of it, but

10  as far as bringing it before the Court, you know, the

11  position would be to raise it at least in advance as opposed

12  to during trial and trying to bring it up at that point.

13         THE COURT:  Obviously, it would be too late.  When

14  you sign a pleading, you certify that it's correct.

15         MR. McKELVEY:  Yes, ma'am, and it is to the best of

16  my knowledge.  I can't -- like I say, I mean, I can't be --

17  to my knowledge it's correct based on the representations

18  that I have spoken with Mr. Haysbert, yes, but, I mean, I

19  don't have independent knowledge of every fact a witness

20  puts on an affidavit.  I had to believe that the affidavit

21  was true when I filed it.

22         THE COURT:  Well, you didn't sign the affidavit,

23  she did.

24         MR. McKELVEY:  Right.  And the contents of the

25  motion, to my knowledge, are true, Judge.  I wouldn't file

1    something that I didn't think was true.  If there is

2    something the Court is concerned about specifically, I'm

3    happy to address it, but, I mean, in my mind it's a

4    procedural motion for a last-minute situation that is

5    unfortunate, and in all respects, it sounds like, and then

6    the Court is just going to have to make a ruling on what is

7    in front of it, as far as, you know, what's in the affidavit

8    is what we have and what the rule is what it is, you know.

9    I mean, the Court is going to have to make a ruling on that.

10            THE COURT:  Well, you're local counsel.  Where are

11    the e-mails and the correspondence?  You are going to have

12    to see that Mr. Haysbert gets those and produces them.  I'm

13    going to take a recess.  There has to have been some

14    correspondence with this witness over appearing.  This was

15    set in March, and it's August.  There has to be some

16    communication with the witness over a period.

17            MR. McKELVEY:  Your Honor, I have no knowledge one

18    way or the other but I will -- I'm sorry.

19            THE COURT:  Excuse me.

20            MR. McKELVEY:  I'm sorry.

21            THE COURT:  You are responsible for having

22    knowledge, and you are responsible for the case as local

23    counsel.  I'm telling you, you get with Mr. Haysbert and

24    talk to him and find out exactly what occurred between March

25    and whenever this was, August 2nd or 3rd, in terms of

1    arrangements to have this witness here.

2            MR. McKELVEY:  Understood.

3            THE COURT:  Because there is nothing before the

4    Court that shows that there were any arrangements to get

5    this witness here.  Nothing.  So if there were no

6    arrangements, then it would indicate that she wasn't

7    planning to be here in person.

8            MR. McKELVEY:  I have no knowledge of that, Your

9    Honor, that she wasn't planning to be here.

10           THE COURT:  That's not what I'm asking, that you

11   have knowledge.  I'm just saying there has to be something

12   going back and forth.  You don't go from March until August

13   and not correspond with your witnesses and tell them the

14   date of the trial and when they have to be there.  You just

15   don't do it.

16           MR. McKELVEY:  Understood.

17           THE COURT:  You just don't.  The Court has nothing

18   before it now except the affidavit.  I'll go through what

19   needs to be updated.  But I first have to be assured that

20   the witness actually expected to be here.

21           MR. McKELVEY:  Understood.

22           THE COURT:  There is nothing before the Court that

23   says I know this has come up, but did she expect to be here?

24   It was very unusual when somebody says to a Court, and, oh,

25   I can be here at 4:00 by zoom, which would be tomorrow, and

1    you are going to start a witness in front of a jury at 4:00?
2    What do you do?  You've got direct examination.  I've read
3    the report.  You can't put the report in.  You have to ask
4    her questions, then you have cross-examination, and you have
5    redirect.  This could go until 10:00 at night.  I don't
6    know.  Somebody comes back and says, well, I can be here at
7    4:00.  The witnesses don't set the schedule.
8         The Court, in conjunction with knowing how long a
9    witness is going to take, we set that schedule once we get
10   going.  This just isn't supportive, except by an affidavit
11   of somebody saying my father is very ill, and I'll call it
12   caretaker, I'm responsible for end-of--life care, then you
13   are caretaker for end of life, I would say.
14        But, in any event, I don't know, there must be
15   correspondence.  There has to be something there in the
16   records that show.  Because that has been admitted does not
17   support what has been represented to the Court about the
18   travel.  It simply doesn't.
19        So, consequently, I'm going to take a 15 -minute
20   recess, and I want produced to the Court, first of all, I
21   want to know what arrangements were being made to get her
22   here.  If you have to contact her, and she may have to
23   submit those.  That may have to be something that she is
24   going to have to end up submitting, too.  But I want to know
25   first what the attorneys did to ensure that the witness was

1    going to be here?

2            The Court will take a 15-minute recess.

3            (Recess from 12:11 p.m. to 12:29 p.m.)

4            THE COURT:  Mr. McKelvey, what have you come up

5    with?

6            MR. McKELVEY:  Your Honor, I went through

7    Mr. Haysbert's phone with him for e-mails.  There is nothing

8    that I can find one way or the other.  He has contacted the

9    expert's office, and they are -- and is requesting that they

10   send over communications.  So that's what we've got right

11   now.

12           THE COURT:  Well, let me tell you what we'll do for

13   now.  I'll take the motion under advisement pending a

14   supplemental affidavit from Dr. Haider, and I will go slowly

15   and repeat it.  It doesn't have to be in this order,

16   obviously, but this is the information that is needed.  The

17   age of her father, where he resides, the hospital that he

18   was in, with a copy of his medical records while he was

19   hospitalized, which will be under seal, a statement whether

20   they're not available, but is there a spouse, partner,

21   siblings, other children, other relatives or funds for a

22   caretaker for two days, and if not, then list whether there

23   are any of these people and where they're located.  Just

24   don't say there is nobody.  I want to know the spouse, if

25   there is one, a partner, siblings.  I want names and

1    addresses.  If this is a doctor who has founded a brain

2    institute, National Brain Injury Institute, there certainly

3    should be funds and arrangements that can be made for a

4    caretaker for a couple of days.  So we have age, place of

5    residence of the father, hospital where he was hospitalized,

6    medical records under seal, and a statement, if there is a

7    spouse, partner, siblings, other children, other relatives,

8    and availability of funds for a caretaker, and the names and

9    addresses of all of those individuals.  You have to

10   establish exceptional circumstances.

11           I would note that no one was even requesting

12   anything like zoom for civil trials.  You might have a *de*

13   *bene esse* deposition until COVID.  As I say, I never took

14   any testimony except one where the person himself was unable

15   to even move and travel.  But be that as it may, you still

16   have to show that, and that rule has not been changed before

17   or after COVID.  The rule remains the same and has been the

18   same for years.  I'm not finished with what needs to be in

19   the affidavit.  I would require Dr. Haider to state under

20   oath when she first provided notice to Mr. Haysbert of her

21   father's condition and the fact that she could not testify

22   in person at trial.

23           I'm going to require Dr. Haider to state under oath

24   what prior travel arrangements had been made for her

25   appearance at trial, and if no arrangements were made, then

1   why not?  I'm going to require Dr. Haider to state under

2   oath whether any patient appointments were made or scheduled

3   in advance to take place on August 8 and 9, 2023, and if so,

4   the time frame that those appointments were made.  I'm going

5   to require Dr. Haider and Mr. Haysbert to produce a

6   timeline, going to have her produce it under oath, and I'm

7   going to have Mr. Haysbert produce it, if he can, from his

8   files of all notifications provided to Dr. Haider between

9   March, whatever date that we set.  You can look at the

10  docket.  Was it March 23rd?  I think that's when it was.

11          MR. HAYSBERT:  I believe it was earlier.

12          THE COURT:  I'm going to have the clerk look at it.

13  May have been March 3rd.  March 1st.  Between March 1st and

14  the date that Mr. Haysbert says he got the first

15  notification.  I believe he said it was either August 2nd or

16  3rd, or you can say through August 4th, because that's the

17  first time that it was mentioned apparently to Judge Miller

18  in a settlement conference.  Of course, the undersigned is

19  not a part of that.

20          Do you need the Court to repeat any of that?

21          MR. HAYSBERT:  Not me, Your Honor.

22          THE COURT:  That affidavit needs to be here on or

23  before 5:00 p.m. tomorrow.  I'm also going to require, there

24  are, I believe, three other experts, and I'm going to

25  require that an affidavit be submitted by each of those

1   experts that they plan to be at trial and that arrangements

2   have been made and what arrangements have been made.

3         We are not going to get in the middle of a jury

4   trial and start having people not appearing.  I fear that's

5   what's going to happen.  So you've got two people from

6   California.  There has to be some arrangements now.  You

7   just don't make flight arrangements at the last minute.  If

8   they are coming by another mode of transportation, they

9   should have already left.

10        Likewise, you've got somebody coming in from

11  Florida.  So the arrangements should be made, and you should

12  be prepared to have flight confirmations for the Court if

13  that's the way they're coming, because then if a flight gets

14  canceled, that can be checked.

15        Mr. McKelvey, do you need me to repeat any of those

16  things?

17        MR. McKELVEY:  No, Your Honor.  I think I have them

18  all.

19        THE COURT:  Mr. Haysbert, do you need me to repeat

20  any of those things?

21        MR. HAYSBERT:  No, Your Honor.  I have them all.

22        THE COURT:  All of this is due to the Court on or

23  before 5:00 p.m. tomorrow.  I would just make two comments.

24  As I say, I take the motion under advisement pending receipt

25  of this further information.  At this point the Court does

1  not have sufficient information about the timing of these

2  events, the severity of these events, whether there is

3  anybody else who can take care of these matters, whether the

4  doctor made appointments.  If the doctor made appointments

5  well in advance, then she wasn't planning to be here.

6        So there is a lot of information out there that's

7  lacking if you're going to show exceptional circumstances.

8  That's going to have to be produced.  You just don't come in

9  and say someone is very ill, and I'm their caretaker.  I

10 note something that I find interesting.  There was a

11 disconnect there, in the Court's mind, when Mr. Haysbert was

12 saying why he issued the subpoena.  He issued it knowing

13 that it wasn't valid, but she wasn't a lawyer, she wouldn't

14 know, and that could put pressure on her.  Well, he had the

15 information, he said, by August 4th, and yet he's a lawyer.

16 Is he trying to dupe an expert?  I don't know what's going

17 on, but there was a disconnect between why did you send a

18 subpoena to say that might put pressure on her, if she

19 wouldn't know the rules, and yet then explaining that

20 anybody with a heart, any sense of human kindness would

21 understand end-of-life care.

22       I think we all understand and feel very strongly

23 about end-of-life care, because I'm sure most of us, I agree

24 with Mr. Haysbert, have experienced it.  The other is,

25 Mr. McKelvey, I would just say that it seems like there has

1    been a lack of communication between local counsel and the

2    *pro hac vice* counsel, and that's the whole reason for local

3    counsel.

4             If you look at our local rules, I can turn to you

5    at any time and say you're going to examine the witness.

6    I'm looking to you to take care of this.  I find that very

7    disappointing as someone who is a member of the bar of our

8    court, that there, obviously, has not been the communication

9    that is expected of local counsel and the responsibility

10   that is expected of local counsel.  I'm not talking about

11   Friday.  I know that you said you couldn't be there, and it

12   was a last-minute settlement conference that was set up, so

13   I'm not talking about that.  I'm just talking about the

14   disconnect and the other communication.

15            MR. McKELVEY:  I apologize, Your Honor.

16            THE COURT:  Thank you.  The next thing that we are

17   going to take up is this motion to quash the subpoena.  Wait

18   just a moment.  You can argue that.  Who is going to argue

19   the motion to quash?

20            MR. McGAVIN:  John McGavin on behalf of Bloomin'

21   Brands and Outback, Your Honor.  This issue that comes

22   before the Court is our objection and motion to quash a

23   subpoena served on Nick Seifert yesterday morning.

24            THE COURT:  Remind me again.  I don't have it right

25   in front of me.  Who is Nick Seifert?

1          MR. McGAVIN:  He is a regional manager, regional

2     executive with Outback Steakhouse, and he owns several and

3     manages several stores, restaurants, in the Tidewater area,

4     including the subject restaurant in question.

5          THE COURT:  Go ahead.

6          MR. McGAVIN:  So Mr. Seifert was previously

7     deposed.  We had no indication that he was on the witness

8     list that plaintiff was going to subpoena him.  We were not

9     planning on calling him.  He really offers no evidence, in

10    our view, that was significant to what is really a

11    run-of-the-mill slip and fall case.  So yesterday around

12    10:00 I got a call from him that he'd been served a

13    subpoena, and he asked the process server, well, since I've

14    been subpoenaed before in this case, is there a check for

15    the witness fee and mileage?

16          According to Mr. Seifert, as I put in my papers,

17    the process server said something to the effect of, I don't

18    really do this very often, I don't know, but don't worry,

19    you'll get it.

20          THE COURT:  Can you wait just a minute?  I'm

21    looking for something.

22          MR. McGAVIN:  Yes, Your Honor.

23          THE COURT:  So you said you didn't have notice.  So

24    you didn't have notice ahead of the August 1st conference

25    because when I did the order, I took everything that we had

1    done and put the witnesses and the exhibits into a final

2    order that I entered on August 2nd.  So it was August 1st

3    when you first knew he was going to be called?

4          MR. McGAVIN:  No, Your Honor.  He had been listed

5    previously.  He's on the list.

6          THE COURT:  Right.

7          MR. McGAVIN:  But we did not intend to call him,

8    and he was not served previously.

9          THE COURT:  I just wanted to be sure.  So he was on

10   the list, and he had been served previously?

11         MR. McGAVIN:  For the previous cases, and he had

12   also been served and given a deposition.

13         THE COURT:  Did he return the checks for the

14   witness fee and the travel?

15         MR. McGAVIN:  Previously, do you mean, Your Honor?

16         THE COURT:  Yes.

17         MR. McGAVIN:  No, he did not.

18         THE COURT:  Why not?  Are you supposed to?  This is

19   an administrative matter.  I know that when you serve

20   someone, process, you have to provide those advance fees.

21         MR. McGAVIN:  I don't know whether he is required

22   to return those or not, Your Honor.  I've never looked into

23   that.

24         THE COURT:  I haven't either.

25         MR. McGAVIN:  But I think the larger issue is

1    serving him with a subpoena the day before, and, again, it's

2    the same last-minute issue.  He had made plans for business

3    meetings out of the area, and obviously if subpoenaed, and

4    the Court overrules our objection, he will be here.  He will

5    make himself available.  His meetings were up in Richmond,

6    so he's not far away.  I'm not claiming that.

7          But what I'm objecting to is the last-minute nature

8    of how this has happened, and it seems to me that as this is

9    unfolding, this case wasn't ready, and there was no effort

10   to plan in advance.  As a further example, Your Honor, the

11   exhibits for trial were FedExed to my office and arrived

12   this morning in Fairfax.  I don't have the exhibit book

13   other than what we've put together before the pretrial.

14         So why the plaintiff was FedExing two exhibit books

15   to my office that arrived this morning, and my secretary

16   called me at 7:30 to say, "Well, I got a box with two books

17   with the exhibits."  So, as you know, Your Honor, I had an

18   exhibit book, which I gave to you, and I had my staff create

19   another one when I went back to the office on Wednesday, and

20   so I have that.  And I don't know if what was sent to me is

21   any different.  But this is what's happening in this case,

22   and it's very unfair to the defendants to have things being

23   served the day before.  That's not consistent with the

24   rules, a five-day notice for a witness.

25         THE COURT:  That's in the orders, too, it's in the

1   rules, and a lot of these deadlines were in the pretrial

2   order.

3           MR. McGAVIN:  I understand, Your Honor.  So I'm

4   objecting to this last-minute use of the system, and I don't

5   even have an actual copy of the affidavit.  What I got

6   was -- he sent it to me.  He took a picture of it, and so it

7   was on my phone.  But he didn't have it, he didn't scan it.

8   He didn't scan it, he took a picture of it and sent it to

9   me.

10          THE COURT:  What is this?

11          MR. McGAVIN:  Mr. Seifert.  So simply stated, Your

12  Honor, this comes too late.  It didn't come with the check

13  and the witness fee, although once -- apparently once the

14  plaintiff saw my objection, they got a certified check,

15  which they went over and put on his door about 5:00 last

16  evening.

17          Then this morning he was out at the gym, and he got

18  another subpoena for trial, the same one.  They served him

19  this morning again.  So this is not County Court.  This

20  isn't General District Court.  This is Federal Court with

21  strict rules, and this is extremely unfair and does not

22  comply with the rules, and he's not a critical witness in

23  any event.  This is a run-of-the-mill slip and fall.  Was

24  the floor wet?  Was it slippery?  Did the plaintiff look?

25  Did she see?  Why did she fall?  And what is her injury?

1    That's all.  This is not a pharmaceutical case on a patent
2    litigation.  We are up to 290 entries in the court file.
3    Depositions hours upon hours upon hours, multiple motions.
4            So at some point this has to stop, and we are
5    asking the Court to intervene as we prepare, let's put on
6    our evidence, whatever evidence there is going to be, and
7    let's try this case.  That's all I have to say on it, Your
8    Honor.  It is pretty straightforward.  Thank you.
9            THE COURT:  Mr. Haysbert, Mr. McKelvey.
10           MR. HAYSBERT:  Your Honor, we attempted to obtain
11   the deposition of Theresa Siebert in the case, was a
12   facilities manager for Bloomin' Brands, one of the corporate
13   defendants.
14           THE COURT:  We are talking about Nicholas Seifert.
15           MR. HAYSBERT:  I understand.  I'm making the
16   argument.  We also attempted to take the person most
17   knowledgeable deposition of Bloomin' Brands itself, and we
18   were unable to.  Nicholas Seifert is a critical witness in
19   that he was a joint venture partner for Outback Steakhouse.
20   Bloomin' Brands is a franchisor of Outback Steakhouse.  They
21   facilitate management decisions through folks like Nicholas
22   Seifert.
23           THE COURT:  Go back again so that I can get the
24   relationship in my mind.
25           MR. HAYSBERT:  Okay.

1          THE COURT:  Nicholas Seifert is with which company?

2          MR. HAYSBERT:  Outback Steakhouse.

3          THE COURT:  Outback Steakhouse.

4          MR. HAYSBERT:  Yes.  Because Seifert reports to

5    Jackie Myers, who is the regional vice president.

6          THE COURT:  He is with Outback Steakhouse?

7          MR. HAYSBERT:  Correct.

8          THE COURT:  Go ahead.

9          MR. HAYSBERT:  If I could continue with that.

10         THE COURT:  Sure.

11         MR. HAYSBERT:  She reports to Greg Scarlet, who is

12   the COO of Outback Steakhouse who reports to a gentleman

13   named, I believe it was Brett Davis, or something of that

14   effect, who is the president of Outback Steakhouse, and the

15   president of Outback Steakhouse reports to executive of

16   Bloomin' Brands.

17         So the way that Nicholas Seifert, what he testified

18   to at his deposition was that he corresponds with Bloomin'

19   Brands whenever there is work that needs to be done at

20   Outback Steakhouse.  The decisions have to be made at a

21   higher level than him and that those decisions were made

22   with Bloomin' Brands.

23         When it comes to a determination of whether or not

24   Bloomin' Brands has any liability in this case, Your Honor,

25   it's an open question at the moment.  They have already

1    admitted that they are the franchisor, but there is the

2    additional test that we need to meet, and that is whether

3    they exercise sufficient control over the instrumentalities

4    of the restaurants, including one instrumentality would be

5    its floors, so whether or not they exercise control over

6    when, how the floors got repaired, how they were cleaned, so

7    on and so forth.

8            Nicholas Seifert is the best person in a position

9    to establish that Bloomin' Brands was responsible for that

10   instrumentality.  It is his testimony that is critical, Your

11   Honor, for this case.  When I looked through the subpoenas

12   that we received from defendant, I assumed, because Nicholas

13   Seifert was on his part of the list, that he would be

14   bringing him.

15           THE COURT:  Please stop right there.  You cannot

16   assume things in litigation and in Federal Court.

17           MR. HAYSBERT:  I understand.

18           THE COURT:  You just can't assume.  They're not

19   obligated to call him and unless you have an agreement with

20   them to call him.  Did you have an agreement with the

21   defendant to call him?

22           MR. HAYSBERT:  Your Honor, there was no specific

23   agreement that defendants would call him.

24           THE COURT:  Let me just state the rules because all

25   I'm concerned with is, I want to follow the rules.  As I

1    said to you all the other day, the Judge is like a referee.

2    The Judge calls balls and strikes and follows the rules.

3    The rules are there in Federal Court.  You have the Federal

4    Rules of Evidence, the Federal Rules of Civil Procedure.

5    You have local rules.  You have a public website that sets

6    out rules for use of electronic equipment and court

7    security.  It's all there if you look for it.

8            But the bottom line is, they listed him.  I'm just

9    going to repeat what you said.  They listed him.

10            MR. HAYSBERT:  Yes, Your Honor.

11            THE COURT:  But they never gave assurance they

12    would call him.  A party is not required to call any of his

13    or her witnesses.  That's the first thing.  If you're going

14    to call the witness or that you want the witness, you then

15    become responsible, unless you have an agreement in writing

16    from the other side or some representation we will produce

17    that witness for you, you don't need to subpoena them.  What

18    you're telling me is they had it on their list, they decided

19    not to call, and you didn't have any agreement from them

20    that they would produce the witness for you.

21            MR. HAYSBERT:  That is correct.

22            THE COURT:  Is that correct?

23            MR. HAYSBERT:  That is correct, Your Honor.

24            THE COURT:  So that aside, I'm listening to the

25    importance of this witness, too.

1          MR. HAYSBERT:  Absolutely, Your Honor.  So part of

2     the importance goes back to what I said earlier.  We were

3     not able to let depose Theresa Siebert, we were not able to

4     get Theresa Siebert to trial, we were not able to depose

5     Bloomin' Brands.  We served a subpoena for Bloomin' Brands

6     to testify at trial, but we don't know who would show up to

7     testify on their behalf.

8          So, you know, the best way to establish the

9     evidence that we have connecting Bloomin' Brands to the

10    floor is through Nicholas Seifert.  In fact, it really is,

11    other than primary evidence that we could show the Court in

12    terms of evidence, you know, I feel like part of the exhibit

13    list goes to just, you know, Bloomin' Brands is on the

14    insurance documents.  So not putting the insurance document

15    in for the insurance of it but for the fact that we are

16    establishing or attempting to establish Bloomin' Brands has

17    control over that instrumentality.  So anything that

18    happened on the floor had to be reported to Bloomin' Brands.

19         So we have this evidence, but then the question

20    becomes, who do we get it in through?  Who has sufficient

21    connection to Bloomin' Brands to be able to establish that

22    Bloomin' Brands is also either directly vicariously liable

23    to what happened to the plaintiff, and Nicholas Seifert is

24    that person.

25              THE COURT:  Well, let me ask you why you would have

1    a subpoena served the day before trial?

2          MR. HAYSBERT:  So, Your Honor, I can't really

3    answer that question.  I have a company that serves

4    subpoenas, and we approached that company to serve subpoenas

5    for Nicholas Seifert.  I can't recall when exactly I did

6    that, but it can take a few days.  It can take three, four

7    days.  Sometimes it can take a week.  I can confirm that we

8    served Deajah Clark, but she -- it took us weeks and months

9    to find her.  So it just happens that way.  But, Your Honor,

10   ultimately we do have Nick Seifert's deposition.  So if he's

11   unable to come to trial, you know, we can always use his

12   deposition to establish some evidence, but since he won't be

13   live, he won't be able to be cross-examined.

14         THE COURT:  Let me ask you this.  You didn't put

15   out the subpoena until August 4, the same time that you put

16   out the one to Dr. Haider?

17         MR. HAYSBERT:  Yes, we put the subpoena out on

18   August 4th, Your Honor.

19         THE COURT:  That's my question.  Why would you wait

20   until August 4 to subpoena a witness this important?

21         MR. HAYSBERT:  Well, what we also did was subpoena

22   Bloomin' Brands, which is a corporate defendant for trial.

23   So, in my opinion, was just, you know, if we are unable to

24   get Bloomin' Brands here at trial, for whatever reason, at

25   least we depose a person, Nicholas Seifert, who has that

1    connection, and so it's just a way of trying to, you know,

2    get this evidence in through a witness, and if not able to

3    do that, then we would have to make our arguments to the

4    Court on the evidence, which we are happy to do.  It just

5    makes it a lot harder.

6            THE COURT:  Thank you.

7            Mr. McGavin, any response?

8            MR. McGAVIN:  Your Honor, I'm unaware of any

9    subpoena to Bloomin' Brands, and I'm not even sure what that

10   is.  So I don't know what Mr. Haysbert's talking about, and

11   if that was issued August 4 signed by him and sent down to

12   Florida, that's not a valid subpoena.  So apparently he's

13   issued some subpoena, signed a subpoena, and sent that to

14   Bloomin' Brands.  I don't know anything about that.  But I

15   believe this was issued August 4, must have been after the

16   settlement conference or mediation conference, and I believe

17   it was signed by Mr. Haysbert, just like the others.

18            There is litigation -- well, I won't belabor the

19   point.  It's quite obvious it's last minute, it comes too

20   late, and does not comply with the rules, and I would ask

21   that it be quashed.  By the way, that doesn't give

22   Mr. Haysbert the right to read Mr. Seifert's deposition in

23   because he hasn't approved unavailability.  It is

24   unavailable due to his failure to follow the rules, and

25   there is no designation of testimony that he might

1    anticipate using.  He didn't do a pretrial designation of

2    deposition testimony.  I don't have that.  So I don't know

3    when I'm going to get that, if that was the plan.  This is

4    just last-minute, causing the defense to have to scramble to

5    respond, whether it's a last-minute motion to have

6    Dr. Haider appear, to sending me the exhibits at my office

7    in Fairfax, to issuing a subpoena, and now I've got to file

8    a brief when I'm in the middle of preparing for witnesses.

9    This is just -- it's a sharp practice, it's late, and it

10   forces us to respond and defend, and it doesn't comply with

11   the rules.  Thank you.

12        THE COURT:  Well, this is my ruling on quashing the

13   subpoena.  I do agree with Mr. McGavin on a couple of

14   points.  Unavailability has not been shown because the

15   person is local and is with the company and there has been a

16   representation that, you know, if required, he can alter his

17   schedule.  So unavailability itself has not been shown.  I

18   would also agree that there has been no proper deposition

19   designation under our rules at the final pretrial

20   conference.  There has been no such deposition designations.

21        The most, under those circumstance, might be to use

22   something for impeachment.  However, I'm going to deny the

23   motion to quash because I do find that he is an important

24   witness.  If he was in charge of the Outback, he's with

25   Outback, and he was employed or in charge of that particular

1    location where Dr. Haysbert fell, and so I am going to rule

2    that ultimately, although it would be late, that is within

3    my discretion to allow the late process.  It is late.  I

4    just think that because he is local, number one; number two,

5    he said he can cancel; number three, he's an employee of the

6    defendant.  So the defendant has access to that individual

7    before trial, and that you've got his deposition, and he

8    ultimately did receive the appropriate checks.  I don't

9    think they do have to be returned because that's the risk

10   you run when a case is continued.  You lose that subpoena,

11   and you lose that money.  That's what I believe is the case.

12          So, consequently, if anything should be returned,

13   you can let me know, but I don't think through the clerk

14   that there is a return of those fees in travel, once the

15   process server gives it.  So I don't think there is any

16   violation there, I'm not aware of any, and if there is,

17   someone can let me know, number one; number two, it is late;

18   but number three, I don't disagree with Mr. McGavin that the

19   witness isn't important because the witness is with Outback,

20   and was, I guess, responsible in some ways for that

21   location.  I'll just have to find out because he'll have to

22   testify.

23          So I agree with what you're saying, Mr. McGavin,

24   and it's a hard call for the Court, but I do think that, we

25   need to try this case, and we have the plaintiff.  We have

1    her daughter.  We have the witnesses that we have, and we

2    let it go forward and see what happens.  So I do deny the

3    motion to quash.

4           Mr. McGavin, I know that you will see that

5    Mr. Seifert is available.

6           MR. McGAVIN:  Yes, Your Honor.

7           THE COURT:  Thank you.  The next question that I

8    have is, I believe that at the conference last Tuesday, a

9    week ago on August 1, and then I issued the order on August

10   2, that at the conference I believe that the ruling on

11   Filler, is that the name, Dr. Filler?

12          MR. HAYSBERT:  Yes, Your Honor, Dr. Filler.

13          THE COURT:  The ruling on that exhibit, the

14   demonstrative was that you were to give the edited version

15   of that to the Court by noon, and I haven't seen that.  That

16   was the document where he had all the court rulings, and I

17   ruled, and everybody agreed that you would produce a revised

18   demonstrative exhibit that you were going to use at trial by

19   noon Friday, and I haven't seen it.  Have you seen it,

20   Mr. McGavin?

21          MR. McGAVIN:  I don't believe so, Your Honor.

22          THE COURT:  Can you address that, Mr. Haysbert?

23   Also, Mr. McKelvey, you were there.

24          MR. HAYSBERT:  Yes, sir, Your Honor, I can address

25   this.

1           THE COURT:  Come up to the podium, please.

2           MR. HAYSBERT:  My apologies, Your Honor.  So I am

3  not able to -- because the way that the material came to me,

4  it came through a PDF -- to delete that information myself

5  without a special program.

6           So I contacted Dr. Filler's office and asked them

7  to delete all of the case material and to resubmit it to me.

8  They have not done so.  But I have the ability now with the

9  trial tech to erase that information and re-submit it to the

10  Court, if the Court would allow me to.  But we don't -- we

11  didn't have the ability before now.

12          THE COURT:  Well, if you can do it now, why

13  couldn't you have done it then?  Explain that.

14          MR. HAYSBERT:  I didn't have the technology to do

15  it, but we have a trial tech here who can do with PDF

16  documents.

17          THE COURT:  Well, you had a trial tech with you

18  last week.  His name was Al, last name started with an H.

19          MR. HAYSBERT:  Yes.  Al had to return home to where

20  he's from.  There was an emergency.  So we got a new trial

21  tech who come in at the last minute, came in on Monday.

22          THE COURT:  Is that trial tech with your firm?

23          MR. HAYSBERT:  That trial tech is not with my firm.

24  He is an independent trial tech.  He works through a local

25  company that is based in Virginia Beach, but he lives

1  himself in Texas.

2          THE COURT:  It would have been helpful if you had

3  at least notified the Court the reason that you couldn't do

4  it, because when a Court sets a deadline, and I've read all

5  the reports, I've been trying to prepare diligently for this

6  trial, and that was an improper exhibit citing other court

7  cases.  I just would have appreciated if you could have at

8  least notified the Court that you were unable to do it at

9  this time, that you would have it next week, because I'm not

10  going to let you use it if we don't have it in advance.

11  That's the Court's ruling.  So when can you get that exhibit

12  done?

13          MR. HAYSBERT:  We will have it done to you today.

14          THE COURT:  To the other side, too.

15          MR. HAYSBERT:  Of course, Your Honor.

16          THE COURT:  Now, I want to ask you one more

17  question.

18          MR. HAYSBERT:  Yes.

19          THE COURT:  Why would you Federal Express exhibits

20  that we all need for trial up to a Fairfax office on the day

21  of trial?  Somebody on your behalf sent them yesterday.  You

22  know the trial starts today.  Why would you send them to

23  somebody's office in Fairfax when you knew the trial was

24  starting today?

25          MR. HAYSBERT:  Your Honor, there is not any real

1    substantial difference between the exhibit list or binder

2    that we have and what Mr. McGavin has always had.  So there

3    is not really much difference at all.  We just decided to

4    mail the updated one.  For example, we took off an Exhibit

5    4, there was some policy procedure rulings that you made on

6    that list, and we took that off.

7         The document is still the same.  We just made the

8    change and then re-sent it to him as a courtesy, Your Honor.

9    I mean, this is something we went through together.  He

10   could have reprinted it himself.  We didn't receive, for

11   example, a new defendant's exhibits after the final status

12   conference with everything updated in it.  We were just

13   doing it as a courtesy, and then also we served that last

14   week.  I don't know why -- FedEx isn't what it used to be

15   in -- some things go through FedEx on Friday and not get

16   there till the next Tuesday.  This was supposed to be

17   overnighted.

18        THE COURT:  Where is your FedEx receipt?

19        MR. HAYSBERT:  I know we sent it out on Saturday,

20   Your Honor, for overnight Monday.

21        THE COURT:  Where is the receipt, because you check

22   those things on a receipt.

23        MR. HAYSBERT:  Yes, of course.  I know.

24        THE COURT:  Where is the receipt that you have for

25   sending it?

```
 1          MR. HAYSBERT:  We -- I believe I have it in my
 2   e-mail, Your Honor, and I don't think I have it on paper,
 3   but I could get it.
 4          THE COURT:  Well, let me see your e-mail.
 5          MR. HAYSBERT:  Okay.  I would have to go get my
 6   phone, Your Honor.  But I know that I have -- the reason why
 7   I know is I have two people with me on my trial team who
 8   were with me when I FedExed it on Saturday.
 9          THE COURT:  I want to see the receipt, please.
10          MR. HAYSBERT:  Sure.
11          THE COURT:  There is so much going on, and it's
12   just becoming a nightmare to get this case to trial.  The
13   Court wants to get it to trial.
14          Is this a new exhibit list for defendant's
15   exhibits?  Have you put them in the order that we had in my
16   final order?
17          MR. McGAVIN:  Yes.  They are unchanged.  It's the
18   same.  I only have a handful of exhibits, Your Honor.
19          THE COURT:  It was confusing, and I found out about
20   the confusion.  The courtroom deputy routinely calls the
21   attorneys before trial, and particularly if it's a big
22   document case, but in all trials, they always call and say,
23   give a final exhibit and witness list so I can check it off
24   at trial when exhibits are offered, admitted, and so forth.
25   So it was not the one that you handed me or you all handed
```

1    me on Tuesday, was not one that had been electronically

2    filed.  That doesn't supersede something that the Court had

3    done, like Judge Krask's final pretrial and the supplemental

4    and then my order.

5         That's just the way of the clerk, so as exhibits

6    come in.  In other words, some cases, if it's a construction

7    case, they may list a thousand exhibits, but they are really

8    only going to put in 200.  So you have to have a list that

9    you can check off, and you put when submitted, and the same

10   with when a witness testifies.  So that was a request from

11   the clerk.  That's why the Court wasn't aware of it, and the

12   Court hadn't seen it because it isn't electronically filed.

13   It is used at court, and then afterwards, with the clerk's

14   minutes, that may or may not get filed depending upon what

15   they do.  But, in other words, that was the confusion over

16   that.  So what I tried to do was in that one order bring

17   everything together.  Do your numbers comport with the

18   numbers in my order?  That's what I'm asking.

19        MR. McGAVIN:  I believe so, Your Honor.  I don't

20   believe we changed anything.  It would be the same exhibits

21   that the defendant previously offered.  We only had a

22   handful, Your Honor.

23        THE COURT:  My law clerk has checked through them

24   and the clerk.  Is it the same as in my order?

25        THE CLERK:  Yes, Your Honor.

```
1              THE COURT:  It's the same as was put in my order.
2    So do you have the defendants' exhibit and witness list?
3              MR. HAYSBERT:  I don't have an updated one.
4              THE COURT:  This is updated.  Do you have it,
5    Mr. McKelvey?
6              MR. HAYSBERT:  I don't have it, Your Honor.
7              THE COURT:  I'm asking local counsel, who is
8    responsible.  Do you have it?
9              MR. McKELVEY:  If it was the one sent previously,
10   then, yes.  If it's the one that was sent at the hearing
11   before the last pretrial -- the last final pretrial, the one
12   before that, then we have that, I know.  If it's been
13   something sent after that, I haven't.
14             MR. McGAVIN:  These were produced at the pretrial,
15   Your Honor.  In other words, the rule is that we are
16   supposed to bring the actual exhibits in advance, hard
17   copies, and that's what I produced.
18             THE COURT:  I know.  You did have them, but I'm
19   talking about, I then issued the order on August 2nd.
20             MR. McGAVIN:  Right.
21             THE COURT:  Did the numbering comport with that
22   order?
23             MR. McGAVIN:  Yes.  I haven't changed anything.
24             THE COURT:  I agree.  You had just changed the ones
25   that had been omitted from the plaintiff, and that's how the
```

1    numbers got off.

2            MR. McGAVIN:  That's right.

3            THE COURT:  They had withdrawn certain exhibits,

4    and so we had to do a new numbers system for them.

5            MR. McGAVIN:  Yes.

6            THE COURT:  Okay.  So you have that.

7            MR. McKELVEY:  Can I speak to Mr. McGavin?

8            THE COURT:  This is what I'm going to do.  I'm

9    going to take another 15-minute recess, and I'm going to

10   have you all confer and be sure you are on the same page

11   with your exhibits.

12           As I understand, this is what the Court has.  I

13   have this right here from the defendants, and I have this

14   from the plaintiff.  Again, I fear to assume, my assumption

15   is that this comports with my final order that says these

16   are the exhibits, these are the numbers, so we are all on

17   the same page for trial.  I understand from the clerk that

18   you may have another exhibit book here, the same as you

19   FederalExpressed up to Fairfax.  I'll let you talk to her,

20   and we will take a 15-minute recess because we want to get

21   the exhibits in order.

22           Yes.

23           MR. McKELVEY:  Your Honor, could we perhaps look at

24   what the Court has and compare to what we have as a group

25   and so we are all on the same page, both literally and

1    figuratively?

2         THE COURT:  Yes.  I will leave them with the

3    courtroom deputy, and she will have to remain while you all

4    do that.

5         MR. McKELVEY:  I understand.

6         THE COURT:  If you need a quick five-minute recess

7    after that, she can let me know when we are ready to come

8    back in.

9         MR. McKELVEY:  Thank you.

10        MR. HAYSBERT:  Thank you, Your Honor.

11        THE COURT:  Here are the exhibits.  Court stands in

12   recess for approximately 15 minutes.

13        (Recess from 1:19 p.m. to 1:43 p.m.)

14        THE COURT:  All the counsel are here, the plaintiff

15   and the corporate representative.

16        Now, let's go back to where we left off.  The first

17   thing that when we took a recess, you all were going to

18   check to be sure that you each had copies of the exhibits

19   that the Court had from defendant and plaintiff.

20        Mr. McKelvey.

21        MR. McKELVEY:  Your Honor, I think everything is

22   good to go.

23        THE COURT:  Mr. McGavin?

24        MR. McGAVIN:  Your Honor, we are still checking and

25   comparing it to the exhibit list because the clerk needed to

1    make a photocopy and had to take it, so we had a bit of a
2    delay to kind of work through that.  We are working on it.
3    We are almost there.
4          THE COURT:  Well, let's do a couple of other
5    things, and then we will get back to that.
6          MR. McGAVIN:  Ms. Blake is going through it now,
7    Your Honor.
8          THE COURT:  Okay.
9          MR. McGAVIN:  Thank you.  One thing that we don't
10   have, there was animations that were supposed to be produced
11   from Dr. Haider.  I don't believe we have those.
12         THE COURT:  I think the animation was from
13   Dr. Filler.
14         MR. McGAVIN:  I believe the animation is
15   Dr. Haider's animation.
16         MR. HAYSBERT:  The animation is for both to use, if
17   they prefer, but it is an animation.
18         THE COURT:  When you talk to the Court, our rules
19   require that you come up to the podium.  The reason for that
20   is because of the microphones, the size of the courtroom,
21   and the reverberation.  So we are now on the animation.  The
22   Court did receive that, as I recall.  So I have received it,
23   but the defendants didn't.  You were going to do it to both
24   of them.
25         MR. HAYSBERT:  That's correct, Your Honor.  We have

1  submitted the brain map to them, that animation to them via

2  mail, FedEx.  We also have it on e-mail, as well, that we

3  can submit it to them as well.  I believe that we have

4  submitted the brain map to them via e-mail as well.  You

5  should have it both.

6          THE COURT:  It was a drive.

7          MR. HAYSBERT:  Right.  The same drive we gave you,

8  we gave them a flash drive in the mail that they received

9  apparently today.

10         THE COURT:  FedEx today?

11         MR. HAYSBERT:  Your Honor, no.  It was FedExed last

12  Saturday for overnight Monday.

13         THE COURT:  Do you have those receipts?

14         MR. HAYSBERT:  Yes, we do, Your Honor.

15         THE COURT:  Then we will do that in a minute.  I

16  believe I got mine on Friday, as I recall.  I know I got it

17  before the weekend because it had to be checked by IT, and

18  it had to be cleared before it ever came into chambers.

19  That was done last week.

20         So, again, I don't like using that word.  I assumed

21  you would follow what you said you were going to do at the

22  conference and send one to the defendants.  Why didn't you

23  just do it at the same time?

24         MR. HAYSBERT:  Do?

25         THE COURT:  The same time you sent it to the Court,

 1   why didn't you send it to the defendant?

 2          MR. HAYSBERT:  Your Honor, I think it was just the

 3   timing.  We had a settlement conference that day, so I think

 4   it was a lot going on that day.  However, I know for sure we

 5   did send it out in Saturday mail and received the flash

 6   drive.  We will make sure, if they haven't received it,

 7   because it is also online.  You can actually click a link on

 8   an e-mail, and it will open up.  We had the trial tech do

 9   that, and we will make sure that is available to them in

10   minutes.  We get another break, we will shoot right over to

11   them.  But they should have it, though, by now.

12          THE COURT:  I'll let them check.  I'll come back to

13   that in a minute.  Now, do you have the FedEx receipts that

14   when they were sent out and when they were to be delivered?

15          MR. HAYSBERT:  Your Honor, if you can give me

16   another minute.

17          THE COURT:  Why did you say you have it?

18          MR. HAYSBERT:  We do have it, Your Honor.  I just

19   don't see it in the box I thought it was in, so just a

20   moment to go retrieve it from the car.

21          THE COURT:  I'll sit right here because I will tell

22   you that you must have a receipt when you FedEx something

23   for reimbursement, because under the Rules of Professional

24   Responsibility and under the rules an attorney cannot pay

25   the cost of litigation.  The client has to pay the cost of

```
 1    litigation.  You cannot pay the cost of the filing fee.  You
 2    cannot pay Federal Express costs, copying, those things.
 3           You have to get reimbursed from the client, or if
 4    you're the prevailing party, in certain circumstances, you
 5    can move to get those costs for your client from the party
 6    who doesn't prevail.  But you cannot pay the cost of
 7    litigation, and you must have receipts for any expenses that
 8    you've incurred.  You have to be reimbursed, and you then
 9    can't waive it under the Rules of Professional
10    Responsibility and the rules of procedure.  So you have to
11    have receipts for the costs.  So find it, please.
12           MR. HAYSBERT:  We will do, Your Honor.  You want me
13    to leave?
14           THE COURT:  Yes, if you must.  I want to see it,
15    because we've had a lengthy break to sort out exhibits.  Now
16    it turns out that the animation isn't there.  Where are you
17    going?  You are leaving court.
18           MR. HAYSBERT:  I thought you were asking me to go
19    and retrieve them for you.
20           THE COURT:  I asked you a minute ago, and you said
21    you had it, then you went looking in a box, and then you
22    said it wasn't in the box that you thought it was.  So now
23    where are you going?
24           MR. HAYSBERT:  I was going to go to the vehicle to
25    get the receipt for you, Your Honor.
```

1          THE COURT:  If it's on a phone, you can't bring a

2    phone in.

3          MR. HAYSBERT:  I know I can't.  But I believe that

4    it was printed, but I just have to double-check it.  And if

5    it wasn't, then I can verify, I can confirm for you.

6          THE COURT:  I want to see the receipt.  If you have

7    to call Federal Express and get a duplicate, I want to see

8    the receipt.

9          MR. HAYSBERT:  I will absolutely do that.

10          THE COURT:  Because I have never experienced a case

11    like this that is so untimely and disorganized and

12    everything being done at the last minute.  I simply have

13    never experienced this before where everything is being done

14    at the last minute, and you send trial documents to opposing

15    counsel by Federal Express that arrives the day of the trial

16    in Fairfax.  I asked you how you did it.  You said Federal

17    Express.  Then I assume you made a joke that Federal Express

18    isn't what it used to be.

19          Then I asked you before the break, I said I wanted

20    to see the receipt.  You have to have receipts for expenses.

21    You have to be reimbursed one way or the other, either

22    through your client or through the prevailing party to

23    opposing party, and you have to have the documents to be

24    reimbursed.  If you win costs, you can't say, well, I did

25    Federal Express and different costs, whether you got Monday

```
1    delivery, whether you get a Tuesday delivery, a next day
2    delivery, a weekend delivery, there are all different costs,
3    the weight of the package.  So now you're going to your car
4    to get a receipt?
5              MR. HAYSBERT:  Yes, Your Honor.
6              THE COURT:  All right.  I will sit here and wait.
7              MR. HAYSBERT:  Okay.
8              THE COURT:  It's five minutes to 2:00.
9              Ms. Blake, if you will use this time to continue
10   checking the exhibits, that will be a good use of the time.
11             MS. BLAKE:  I will, Your Honor.  It's completely
12   the same.  It is in compliance with this Court's order that
13   was issued last week.  The only thing that's different is
14   that it looks like they've withdrawn Exhibit 3 because it is
15   no longer included in the binder.
16             THE COURT:  Let me just check that.  That would be
17   excerpts of the National Brain Injury?
18             MS. BLAKE:  Yes, Your Honor.
19             THE COURT:  It's not in the binder?  Mr. McKelvey,
20   do you know the answer to the question?
21             MR. McKELVEY:  Your Honor, that's where we withdrew
22   the life care plan portion.  Those were the charts for the
23   life care plan.  I believe they were withdrawn.
24             THE COURT:  Well, let's wait until Mr. Haysbert
25   gets back, and let's be sure.  We don't want to get in the
```

1   middle of a jury trial and not know what exhibits are coming

2   in.  Importantly, that an exhibit is coming in that hasn't

3   been included.

4          MR. McGAVIN:  Your Honor, this is a significant

5   change to the exhibits.

6          THE COURT:  I understand.  I remember my ruling,

7   and I remember putting all this together for that order.  I

8   got it out pretty quickly with us completing a conference at

9   5:30 or so on Tuesday, and I got that complete order

10  summarizing everything that had been done.  I believe I got

11  it filed on August 2nd.

12         MR. McGAVIN:  Your Honor, the changes, they have

13  withdrawn the claim for future medical expenses that

14  Dr. Haider was going to testify about.  That exhibit is

15  withdrawn.

16         THE COURT:  Let's wait for Mr. Haysbert to get back

17  and see if he and Mr. McKelvey can work it out.

18         Mr. McGavin, I just thought of something.  I don't

19  know if you can contact your office.  There should be a

20  receipt on your Federal Express package, I think, when it

21  arrives there is a receipt.

22         MR. McGAVIN:  Should be.  I don't have a way to

23  contact them, Your Honor.  I'd have to leave the courthouse.

24         THE COURT:  I understand that.  What I will do is

25  have my law clerk escort you out of the front door of the

1    courtroom and take you around to my chambers, and you can

2    use the phone the way Ms. Blake did the other day, if you

3    can, if you can try to do that.

4            MR. McGAVIN:  Sure.

5            THE COURT:  If they've got it, it can be e-mailed

6    to my chambers.

7            MR. McGAVIN:  If the law clerk can.

8            THE COURT:  Ms. Ruggeri.

9            MR. McGAVIN:  Sure.  Okay.  Which way?

10            THE COURT:  Go out the front door of the courtroom

11    and she will take you.

12            I know you all haven't had lunch.  I'm not unaware

13    of the human need for lunch, for food.  If it makes you feel

14    any better, neither has the Court, the law clerk, the

15    courtroom deputy, the court security officer, or the court

16    reporter.

17            MRS. KINNEY [Plaintiff's jury consultant]:  Would

18    it expedite things for the plaintiff if I try to find

19    Mr. Haysbert, and if he has the receipt by e-mail, that he

20    should e-mail it to chambers?  Because otherwise they will

21    have to find a printer somewhere.  I don't know if he has a

22    hard copy or not in his car.

23            THE COURT:  Let's just wait.

24            (Pause from 2:09 p.m. to 2:15 p.m.)

25            THE COURT:  Mr. McGavin and Ms. Ruggeri have

1    returned to the courtroom, and I want to put on the record

2    that local counsel, Mr. McKelvey, has been here the entire

3    time.  So we have not done anything without the local

4    counsel here.

5              Do you have a receipt?

6              MR. McGAVIN:  Your Honor, I'm told that the staff

7    used the same box that arrived and forwarded that box to me

8    at my hotel.  So I don't know if I have a receipt, and the

9    person who did all that was out at lunch, and they're trying

10   to go grab her, and I have an e-mail for the Court, and we

11   will e-mail the information as soon as possible, if we have

12   it.

13             THE COURT:  If you have it.  Okay.

14             MR. McGAVIN:  But I don't know the answer.

15             THE COURT:  So the box has now been sent overnight

16   to you in your hotel?

17             MR. McGAVIN:  That's correct, Your Honor.

18             THE COURT:  All right.

19             MR. McGAVIN:  Hopefully, I think they wanted to

20   schedule it, and not familiar with this, but first out.

21             THE COURT:  I just know that you have choices, at

22   least when I've done e-mails myself personally, you have

23   choices of arrival.  I think first out means the first

24   plane, the first truck or plane that leaves that center

25   headed your way.

1          MR. McGAVIN:  That's what I asked them to do.  But

2    I'm waiting for one staff person to get back from her lunch.

3          THE COURT:  I think the best thing is, we will take

4    a brief luncheon recess.  There are not a lot of places

5    around here, but there are some.  Let's take a brief

6    luncheon recess.  I did comment, and someone on the luncheon

7    recess can get in touch with Mr. Haysbert and tell him that

8    lunch, and whether he finds it or not, he needs to be back

9    here.  It's now 2:20, and we will take a luncheon recess

10   until 3:15.  Please contact him and tell him he needs to be

11   back in court by 3:15, and if not we are just going to

12   proceed with local counsel to the extent he's able to answer

13   these questions, and if he can't, I've got a number of

14   questions.  I've got a question about the Bloomin' Brands

15   subpoena that came up, that I made a note to go back to that

16   because Mr. McGavin said he wasn't aware of any subpoena,

17   and I want to see that.  I need some information about

18   Mr. Bingham since he is not with the firm.  He is obviously

19   a private IT person.  That's what I understood Mr. Haysbert

20   to say, he's not with the firm.  We have to locate the

21   animation and where it is, as well as the Federal Express

22   for the exhibits and the animation.  We have to straighten

23   out this life care plan issue on Plaintiff's 3.

24         I have some questions about Dr. Filler's office

25   that we need to ask, and the IT person would need to be here

```
 1   probably for that.  I think that's everything that I've got
 2   notes on my pad and on some Post-Its.  I would also mention
 3   to you, Mr. McKelvey, that somebody better be getting in
 4   touch with these experts that have to have affidavits in
 5   here by tomorrow at 5:00 p.m.
 6          So I'm not going to accept the excuse we were in
 7   Court, we couldn't get to it.  You've got a firm.
 8   Mr. Haysbert has a firm.  There are people here.  I can see
 9   them.  I don't know who they are, they aren't listed, but
10   there are two individuals, other than the plaintiff, and you
11   are with Mr. Haysbert?
12          MR. KINNEY:  Yes, we are.
13          THE COURT:  I usually have the names.  I like to
14   use people's names.  I usually have a sheet.
15          MRS. KINNEY:  Sure.
16          THE COURT:  You weren't listed on here.
17          MRS. KINNEY:  Yes, that's correct.  We won't be
18   participating, but we are jury consultants.  Christiane
19   Kinney.
20          MR. KINNEY:  My name is Shawn Kinney.
21          THE COURT:  So are you related?
22          MR. KINNEY:  We are.
23          MRS. KINNEY:  We are married.
24          THE COURT:  You are jury consultants?
25          MR. KINNEY:  Yes, we are.
```

1          MRS. KINNEY:  I'm an attorney, but in California,

2     so I won't be participating.

3          THE COURT:  Thank you.  So we will be in recess

4     until 3:15.  I would let you know that I did release the

5     jury because I did not want to keep them sitting there while

6     we sorted out all of these pretrial issues that need to be

7     sorted out, and they need to eat, too.  So it was getting

8     late, so they were excused around 2:00 p.m. so we are not

9     holding the jury up.

10          I do want you all to make your phone calls and get

11     these affidavits underway, because I will not accept the

12     excuse in the morning that we couldn't get to them.  What I

13     was concerned about, and I may give you five more minutes,

14     what I was concerned about with Dr. Filler, Mr. Haysbert

15     said earlier that he had not responded to the request to

16     edit the document, and that gives the Court concern.  If he

17     didn't respond to the request, has he responded to anything?

18     I mean, again, I don't want to run into this issue.

19          What was represented earlier, and I wrote it down,

20     is that he had not responded to the request.  So has there

21     been any follow-up with him that he's going to be here?

22     Because he has not responded to the request, and so that

23     gives the Court some concern.  I think somebody ought to

24     follow up on that, Mr. McKelvey.

25          MR. McKELVEY:  Yes, ma'am.

1           THE COURT:  The Court will stand in recess until

2     3:25.

3           (Luncheon recess from 2:23 p.m. to 3:27 p.m.)

4           THE COURT:  Everyone is here, attorneys and their

5     party representatives.  Dr. Haysbert can certainly sit at

6     the table, if she wants.  She doesn't have to sit behind the

7     attorneys.  I don't know if she wants to or not.

8           MRS. HAYSBERT:  Thank you very much, Your Honor.

9           THE COURT:  You are certainly able to sit at the

10    table, a party if you want.

11          MRS. HAYSBERT:  That's all right.  Thank you.

12          MR. HAYSBERT:  Thank you, Judge.

13          MR. McKELVEY:  Your Honor, I think we have made a

14    little progress since lunch, if I'm allowed to.  I've got

15    the FedEx document from the notebooks.  So the notebook and

16    the demonstrative both were shipped to Mr. McGavin.  They

17    were dropped off on Saturday and didn't arrive still today

18    or this morning.  It shows the chronology of that.  We have

19    confirmed that the notebooks are the same.  We just gave

20    Mr. McGavin a thumb drive of the demonstrative that has the

21    MP4 on it, the video.  I think it has also been e-mailed as

22    well to Mr. McGavin.

23          We called Dr. Filler's office about the issue, and

24    they confirmed on the phone at lunch they were coming.  We

25    also have their rental car flight, like an e-mail of those

1    receipts for Dr. Filler.  He was under the impression that

2    he was just going to bring the modified demonstrative with

3    him as opposed to provide it ahead of time, so that was a

4    miscommunication on our part.  He is going to be providing

5    that, though, in short order, and we will obviously get that

6    to everyone as soon as we have it.  We requested it.

7           Let's see.  The life care plan number 3 was

8    withdrawn.  That's why that was in the exhibit binder.

9    That's why that was taken out, so we have withdrawn that,

10   the offering of those exhibits.

11          We are working on those affidavits.  Obviously, we

12   can't get all that to the Court over lunch.  But one

13   question we did have was with regard to the father's medical

14   records.  If we find out that there is a HIPAA issue, since

15   he's not a party, or he isn't the actual expert, and we are

16   obtaining those, if the Court would want us to just put that

17   in the affidavit or how the Court would want us to proceed

18   in that scenario.  If it comes up, we are obviously going to

19   ask for it, but if it comes up.  That was the one question

20   we had on that ruling.

21          THE COURT:  If she's in charge of his life care

22   plan, and she's making decisions, then she should be able to

23   sign the form.

24          MR. McKELVEY:  Understood.  And if something is

25   weird about that, I guess we will just have to deal with

1    that then with the Court, you know, just whatever comes up.

2    I'm thinking she can get it.  That was an issue that we

3    thought of at lunch.

4            Then the other thing was the trial tech,

5    Mr. Bingham, he is with trial -- IN2 Trial, I-N the number 2

6    and then Trial, and they are out of Virginia Beach, but he

7    lives in Texas.  He's here helping us.

8            THE COURT:  Wait.  Go back to Mr. Bingham.

9            MR. McKELVEY:  Yes, ma'am.  He's with IN2 Trial,

10    and he's the trial tech that's helping us with like the

11    technology and things of that nature.

12            THE COURT:  With IN2, that's the name of the

13    company?

14            MR. McKELVEY:  Yes, ma'am.  I-N the number 2 and

15    then Trial.  Yeah, I'm sorry.  Then the Bloomin' Brands

16    subpoena, that was just something that we e-mailed to

17    Mr. McGavin to, I guess the intent was would he accept it or

18    not.  It was never served, so it's moot.  At this point in

19    the case it's just a moot situation because it was never

20    served.  It was e-mailed to Mr. McGavin.

21            I think the intent behind it was, will he accept it

22    on the defendants' behalf.  Obviously, that's his right, and

23    obviously, you know, it hadn't been served so it is what it

24    is, as far as that goes.

25            THE COURT:  All right.

 1          MR. McKELVEY:  I think I have covered everything

 2   other than the affidavits, which were not going to be

 3   able -- I can't get those over lunchtime, but we are going

 4   to work on those.  Does the Court have any other questions?

 5          THE COURT:  I'll go back through each of these.

 6          MR. McKELVEY:  I wanted to bring the Court up to

 7   speed.

 8          THE COURT:  Thank you.  I've listened, and I think

 9   I've gotten straight, but I've got notes, and I'll go back

10   through them.

11          MR. McKELVEY:  Yes, ma'am.

12          THE COURT:  I need a minute.  The first thing I

13   need is to look at the FedEx receipt here.  This is not for

14   the animation?  This isn't for the thumb drive, this is just

15   for the binder?

16          MR. McKELVEY:  My understanding is both were sent

17   in the same package.  So there should only be one receipt

18   for the whole kit and caboodle.

19          THE COURT:  So the thumb drive should be in the

20   package?

21          MR. McKELVEY:  Yes, ma'am.

22          THE COURT:  Which is coming to you, I think, at

23   your hotel?

24          MR. McGAVIN:  Yes.

25          THE COURT:  I'll mention all this later, but I want

1    to check something.

2              MR. McKELVEY:  Yes, ma'am.

3              THE COURT:  Now, Mr. Haysbert, if you will come up

4    to the podium.  I want to ask you a couple of questions.

5              MR. HAYSBERT:  Yes, Your Honor.

6              THE COURT:  You said you were present on Saturday

7    when the package was shipped, and you were there with two

8    people from your office?

9              MR. HAYSBERT:  Yes, Your Honor.  I actually -- we

10   were breaking for lunch, a late lunch, and I went to go mail

11   the package, and they went to go to the restaurant where we

12   were going to eat.

13             THE COURT:  Where were you on Saturday?

14             MR. HAYSBERT:  On Saturday I was in Virginia Beach

15   close to Regent Law School, and we went to the closest FedEx

16   to that location, which would have been the one off of

17   Virginia Beach Boulevard.

18             THE COURT:  Okay.  Well, there's some discrepancy

19   here between this travel history and the one that came with

20   the package, and there could be an explanation for it, but

21   Mr. McGavin, they had the tracking.  They have the tracking

22   number, and they sent that.  It was sent in to my chambers,

23   and I checked back behind that tracking number to be sure

24   the information that they had sent was correct, and I got

25   the same information when I tracked.

JODY A. STEWART, Official Court Reporter

1          Now, it indicates that this package originated in

2    Malibu, California, and that was where the label was created

3    on Saturday.  It's what it says.  It says, "Label created

4    8-5-23, 3:01 p.m. Saturday," and that the package then was

5    going to Norfolk.  They had the package on 8-7-23, and then

6    it was sent overnight to Herndon, to Fairfax, and it went

7    through Herndon and was delivered in Fairfax at 8:23, 7-28.

8    The ship date, it looks like what happened is a label was

9    created out in California, and somehow was sent here and was

10   put on a package here.

11          But it shows here that it didn't ship until 8-7-23,

12   and that at that time it was FedExed first overnight, and it

13   was to be delivered on 8-8-23, and it was delivered -- it

14   was to be delivered before 8:00 a.m. and arrived at 7:28

15   a.m.  So I'm trying to compare this.  Let me check these

16   tracking numbers.  So how do you explain that?

17          MR. HAYSBERT:  Your Honor, what I did personally

18   was mail the package from the Virginia Beach Boulevard FedEx

19   location.  I don't know where it went from there, but I was

20   told that it would be overnighted and would arrive at his

21   office on Monday.  That's what I was told there when I

22   dropped the package off and paid the money.  It's out of my

23   control after that, but I know for sure.

24          THE COURT:  Why is it saying that a label

25   originated in Malibu, California, or at least it was

 1    created?  It doesn't say it was on a package.  It said a

 2    label was created.

 3          MR. HAYSBERT:  I have no idea.  I don't have an

 4    office in Malibu.  I don't have any connection in Malibu

 5    except a Post Office Box.  Your Honor, I was just given a

 6    note that FedEx labels use master account addresses often.

 7    I don't know if that rings any bell.  But why this was

 8    labeled for Malibu.

 9          MR. BINGHAM:  Your Honor, if I may, as a tech

10    person.  So -- I apologize, but if I make a label in

11    California, I can then PDF -- I can send it to the person

12    who actually has a physical package anywhere in the country.

13    So a master account is what the account is registered to,

14    and it will be the address that they always associate with,

15    whatever activity you do on FedEx.  I apologize for the

16    interruption.

17          THE COURT:  That's okay.  But that's what I'm

18    assuming from this, is a label was created out there and

19    then sent here.  Then they had the package on 8-7-23 at 4:30

20    p.m., and then it went to transit overnight.  But I'm not

21    disputing what you're saying.  That's what I'm trying to

22    say, he wasn't in Malibu.  Somehow the label was created

23    there and then sent to Norfolk for the package to be sent,

24    and then it's sent from Norfolk, this is showing on 8-7-23

25    at 4:30 p.m.  It's in transit and arrives there, as I said,

1   8-8, and then it is says here -- got to check these tracking

2   numbers.  Do you have the tracking number on your travel

3   history here?

4           MR. HAYSBERT:  Yes, Your Honor.

5           THE COURT:  Let me check the tracking numbers here.

6   Let me just take a moment because it's unusual.  I was just

7   looking at your travel history, but let me look at this.

8   The tracking numbers are the same.  It says, "Ship date,

9   August 7."  I'm looking at what you've just given me.  This

10  says, "Recipient, Fairfax, Virginia, U.S., shipper Malibu,

11  California."  This is on what you've given, which is

12  matching what was taken from the package that arrived.  This

13  says, "Shipper, Malibu, California; recipient, Fairfax,

14  Virginia."  I understand the label was created, and that's

15  what this says, "Label created."

16          And then the ship date was August 7, 2023, and the

17  delivery date was August 8, 2023.  It says here, "FedEx

18  overnight."  So if you did FedEx overnight, then that would

19  match this receipt.  So, in other words, this matches this,

20  and then you gave me this receipt.  It says, "Scheduled

21  delivery date," this is the FedEx office receipt, and

22  whatever day you sent it there, it looks like here, it

23  wasn't until the 7th.  The scheduled delivery date on your

24  receipt says 8-8-2023.  I'm looking at it.

25          MR. HAYSBERT:  Your Honor, if I may.

1          THE COURT:  Let me finish.

2          MR. HAYSBERT:  Sure.

3          THE COURT:  Then this track history would comport

4    because Saturday, and there is a label created, and it's

5    tendered to the FedEx.  You're sending it, shipping the

6    label from Norfolk.  That's what's happening here.  It

7    didn't actually go out until Monday, 8-7-2023.  Then it

8    arrived on Tuesday.

9          Match the travel history with the FedEx receipts

10   and this receipt.  So are you telling me as an officer of

11   the Court that you did a FedEx package on Saturday for

12   overnight delivery for Monday, when none of the receipts are

13   showing that?  Are you going to stand there and tell me

14   that, Mr. Haysbert?

15         MR. HAYSBERT:  As an officer of the Court, Your

16   Honor, I have no problem telling you directly that I shipped

17   the FedEx package on Saturday at 4:00 p.m. from an address

18   in Virginia Beach Boulevard at FedEx in Virginia Beach

19   Boulevard, and that information will be in the documents

20   that you have in front of you.

21         THE COURT:  I'll just put them on record.  What

22   happened is the label is created in California on Saturday.

23   Then it comes to Virginia Beach Boulevard, and you go and

24   get the label for the package, or you take the package

25   there.  Yes, I believe the package itself did go from

JODY A. STEWART, Official Court Reporter

1    Virginia Beach Boulevard, but this says FedEx first out
2    overnight, and it is the same tracking number, and it's
3    addressed to 990 Fairfax Boulevard, John M., scheduled
4    delivery date 8-8-2023.
5         So if you did overnight delivery, then the latest,
6    if you did it on Saturday, the latest it would have been
7    would have been Monday.  None of this is saying this, and
8    you produced these.
9         MR. HAYSBERT:  Your Honor, from what I was told by
10   FedEx.
11        THE COURT:  What you were told by FedEx is hearsay
12   at this point.  The documents speak for themselves.  You
13   submitted these documents to me, and they don't comport.
14   I'm not going to argue about it anymore.  They just simply
15   don't comport with all you've said, and I'll put them both
16   on record as Court Exhibit Number 1.
17        This is what you have submitted.  The first page is
18   the following, it's the proof of delivery for the tracking
19   number, and it says starting in Malibu, California, and then
20   shipping out on August 7, 2023, for a FedEx first overnight
21   to arrive on August 8, 2023.
22        The second page is a FedEx receipt, and it is from
23   Virginia Beach, Norfolk location.  It's got the transaction
24   number.  It's got a tracking number, the same, and it's got
25   the recipient and the delivery date, 8-8-2023, and 9792 on a

```
 1    credit card.  So what's the date of the charge on the credit
 2    card?  I guess it would be out in Malibu?
 3          MR. HAYSBERT:  No, Your Honor.  It would have been
 4    here, and it was August 5th, the date that I mailed the
 5    package.
 6          THE COURT:  Well, all I can say is that all of
 7    these are showing that it was picked up in Norfolk at 4:30
 8    on Monday, 8-7, and it arrived on Tuesday, next day
 9    delivery.  They are basically the same information but in
10    different formats.
11          MR. HAYSBERT:  I also have the credit card receipt
12    I can give you.
13          THE COURT:  I'm just going to leave it at this.
14    I've asked for the receipts, and all I can do is go by the
15    receipts here and the tracking record.  The one that was
16    produced by Mr. Haysbert will be Court Exhibit 1 for this
17    hearing.  The one that was produced from the tracking number
18    on FedEx will be Court Exhibit Number 2.
19               (Court Exhibit 1 received in evidence.)
20               (Court Exhibit 2 received in evidence.)
21          THE COURT:  So that finishes the FedEx, and I
22    appreciate it if you let me know, counsel, either Ms. Blake
23    or Mr. McGavin, if the thumb drive is in the package,
24    because I did get an e-mail over lunch from Tammy Armstrong,
25    and she's our courtroom deputy.  Because the thumb drive is
```

JODY A. STEWART, Official Court Reporter

1    coming as an external document, that particular thumb drive

2    that arrived at the Court has been checked and cleared.

3          So the thumb drive that's got to be used during the

4    testimony is the one that was sent to the Court and has been

5    cleared by IT, because I can't download a Dropbox and open

6    up the Court's computers, the bells and whistles will go

7    off, even if I open it up with our firewalls.  So that's

8    fine.  I ask you to send the actual thumb drive.  So the

9    thumb drive was checked by our IT.  The thumb drive has been

10   cleared, and that's the one that will be used for the

11   demonstrative exhibit.

12         I've looked at it.  I think it's six or seven

13   minutes, and it's an animation.  So that is what will be

14   shown to the jury, the animation, if admitted or allowed.

15   So I think that clears up everything on those exhibits that

16   were FedExed and the thumb drive that you should have.  You

17   can look at it and do what you want with it, but I don't

18   want any external thumb drives put in any computers that are

19   here at the court.  We are going to use the thumb drive that

20   I have maintained through the clerk and in my office.

21         MR. McGAVIN:  Your Honor, may I inquire?  Counsel

22   provided me after lunch a thumb drive with the Haider

23   demonstrative, and just to be clear, I cannot plug that in

24   in the courthouse.

25         THE COURT:  You can do it.  You don't have a

```
1    computer in your hotel room?
2            MR. McGAVIN:  Yes, of course.  We do all that
3    outside the courtroom?
4            THE COURT:  Yes.  You do all that outside the
5    courtroom, and if you want -- I can't give you a copy of
6    what the Court has because it's an animation, so I can't do
7    that.  But, yes, you should view it outside of the
8    courthouse on your computer, or if you want to give it, I
9    can have it cleared through IT.
10           MR. McGAVIN:  I will view it, Your Honor, and let
11   you know if there is an issue.
12           THE COURT:  Okay.
13           MR. McGAVIN:  Thank you.
14           MR. HAYSBERT:  Just as a final cleanup matter, Your
15   Honor, because this may come up later, the demonstrative,
16   the brain animation can be used by both experts, both
17   experts on the brain, so both can use it, Dr. Haider and
18   also Dr. Filler.
19           THE COURT:  It's listed for both of them, and you
20   can use it for both of them, if it's ruled okay.  It's just
21   that we will use the one that you sent to the Court.
22           MR. HAYSBERT:  Thank you, Your Honor.
23           THE COURT:  We were also on the exhibits, and I
24   want to go to P3.  I think that's the one that you have
25   removed, which was, I believe, the report.  It was the life
```

1    care plan?

2              MR. HAYSBERT:  Yes, Your Honor.

3              THE COURT:  Of Dr. Haider?

4              MR. HAYSBERT:  That's correct, Your Honor.

5              THE COURT:  You're not going to present that at

6    all?

7              MR. HAYSBERT:  No, we are not, Your Honor.

8              THE COURT:  Are you going to present that

9    testimony?

10             MR. HAYSBERT:  No, Your Honor.  In fact, we would

11   ask the Court -- we can do this on written motion or

12   orally -- that no information regarding how much money she's

13   made or what she makes every year, all that stuff would be

14   irrelevant because we are not asking for future lost wages,

15   not asking for past lost wages.  We are not asking for

16   future medicals, not asking for past medicals as well.

17   There are no economic damages that we are going to be

18   arguing to the jury, and so none of that would be relevant

19   and should be inadmissible.

20             THE COURT:  You would have to file a motion *in*

21   *limine* because what was argued to the Court, or what I

22   understand the argument is, that regardless of damages, it

23   goes to liability.  I'm just summarizing.  I don't know if

24   this is exactly what it is, but their argument is that this

25   is a highly skilled person who remains highly skilled and is

JODY A. STEWART, Official Court Reporter

```
1    in a very distinguished position and is functioning in that

2    position to the point that her contract has just been

3    renewed.

4         This is what was represented at the other hearing,

5    and so wasn't presented to me to rule.  But they said at

6    that hearing that regardless, that they should be able to

7    say that if she's in a highly paid job, and she's highly

8    functioning in that job.  Now, she may contend otherwise, I

9    don't know.  The plaintiff testifies, and the plaintiff may

10   contend otherwise.  I don't know what her testimony will be,

11   but that's what they want to cross-examine.  They want to

12   cross-examine on that, as I understand it.  So I guess I'll

13   hear from Mr. McGavin, and then if you want to file a motion

14   in limine, you can.

15        MR. HAYSBERT:  We have filed it already, Your

16   Honor.  It is motion in limine number 9 regarding financial

17   condition of the plaintiff.

18        THE COURT:  That was ruled on.

19        MR. HAYSBERT:  That was reserved.

20        THE COURT:  Motion in limine, where is it?

21        MR. HAYSBERT:  Number 9.  It's on the court docket.

22        THE COURT:  Why is it in the --

23        MR. HAYSBERT:  There were ten motions that were to

24   be ruled on.  Some of them were ruled on, and some were

25   reserved.  There is an order, I believe it is docket number
```

1    235, that would be the order on the motions *in limine* as

2    well as document number, I believe, 233 or 238 that would

3    specify.

4            THE COURT:  I hate to have to check behind you, but

5    I do because at the other conference you were arguing things

6    that had been resolved, and I kept telling you that, once

7    it's been resolved through a ruling that has become final in

8    this case, you can't re-litigate it again here, and we had

9    to go through that briefly.  So I've got a lot of papers.

10   Do you have the docket there?

11           MR. McKELVEY:  Your Honor, I have it.

12           THE COURT:  I've got the docket up here.

13           MR. McKELVEY:  I have the order where he's talking

14   about it.

15           THE COURT:  235 is the order.

16           MR. McKELVEY:  Yes, ma'am, Page 6, number 8.

17           THE COURT:  Let me read the entry, and then I'll

18   take a look.

19           These are subject to a proper and timely objection

20   at trial.  So you filed the motion *in limine*, and it was

21   denied without prejudice subject to an objection at trial.

22   So you have to make an objection to it at trial.

23           MR. HAYSBERT:  Your Honor --

24           THE COURT:  I don't have the context of how it's

25   going to come in yet, but it says here that:  "The motion *in*

1    *limine* to exclude references to Haysbert's financial

2    condition was denied without prejudice subject to timely and

3    proper objection at trial."

4         So I've read this opinion.  It's subject to an

5    objection.  You can always forgo an objection.  An objection

6    is not required, but it says here it's without prejudice to

7    your being able to make an objection.  So at trial, if they

8    try to get it in, and you think it's improper, then you

9    object and give me the grounds.  But I can't rule on it in a

10   vacuum at this point because it may well be proper

11   cross-examination depending upon what is asked on direct.

12        So I can't rule on it now because I don't know what

13   you're going to present.  So I have to see if it's subject

14   to cross-examination or subject to impeachment or whatever

15   they are planning to do.  They may not be planning to make

16   reference to it.  So you've got your objection preserved but

17   the motion *in limine* has been ruled on.  There is no

18   outstanding motion *in limine* on this.

19        MR. HAYSBERT:  Understood.  If I may just, Your

20   Honor.

21        THE COURT:  Please just don't belabor.

22        MR. HAYSBERT:  I won't belabor, I promise.  The

23   reason why it was denied, obviously I think the Court knows,

24   is because we had the future lost wage information in the

25   exhibit list, and so that was what the Court made its

1    decision, it turned on.

2         The other future lost wage exhibit, you have an

3    economist is going to be testifying regarding her wages and

4    her damages in the future, depending on what she is making

5    now, and obviously we were at that time, we are no longer

6    making that argument because of what lost wages have come

7    out.  The economist is not coming.

8         So that's why we are bringing it up to the Court's

9    attention again, and will do during trial in case they open

10   the door to that or attempt to, we will object very

11   strenuously that that is not something that should come in

12   because there is no economist, there is no future lost

13   wages.  There is nothing, you know, that -- there is nothing

14   relevant about bringing up her financial condition, the

15   amount of money she makes, the exact dollar amount that she

16   makes for the contract each year.  All of that would be

17   irrelevant and thus inadmissible into evidence.

18        THE COURT:  Well, I'll just have to see how it's

19   offered, because you are claiming any bodily injuries JoAnn

20   Wright Haysbert sustained, and I'm not saying that I'm going

21   to give this jury instruction, but you submitted this

22   instruction on 8-7, which was yesterday, and it says, "You

23   shall consider any of the following which you believe by the

24   greater weight of the evidence was caused by the

25   negligence," and this instruction is Bloomin' Brands, and

1    you've done another set for Outback Steakhouse.  But, "One,

2    any bodily injuries JoAnn Wright Haysbert sustained and

3    their effect on her health according to their degree and

4    probable duration."  She may be subject to cross-examination

5    on her health if she continues to work and hasn't suffered

6    from, you say --

7            MR. HAYSBERT:  That's fine, Your Honor.

8            THE COURT:  -- and probable duration.  I don't

9    know.  I don't know what the testimony is going to be.  Then

10   you've got any physical pain and mental anguish she suffered

11   in the past and that she may be reasonably expected to

12   suffer in the future.  I don't know if she is going to claim

13   mental anguish because she can't think as quickly or

14   something, you said respond as quickly at meetings.

15           Then you've got any disfigurement or deformity or

16   any associated humiliation or embarrassment.  It would

17   certainly be humiliating and embarrassing if an individual

18   in her position couldn't function properly, because she's in

19   a very high position, very respected, and any inconvenience

20   caused in the past and any that probably will be caused in

21   the future.

22           I don't know what the testimony is going to be, and

23   I don't know how it will relate to these damages.  So I

24   don't know if it's going to be proper to ask her about her

25   position and how she's functioning.  I don't know that her

1    financial condition, it's a high functioning position.  This

2    isn't something where you're not required to think.  You

3    have to be pretty sharp to be a provost of a university and

4    a prominent university.

5         So I don't know if that's what they're going to be

6    asking or not.  You've compared her at the hearings to Ruth

7    Bader Ginsburg and how bright and quick she is, and so I

8    just don't know.  It's hard to rule on these things when you

9    haven't heard the evidence.  So that's all I'm saying, is

10   that you make an objection, and I'll rule on it based on the

11   evidence.

12        MR. HAYSBERT:  Thank you, Your Honor.

13        THE COURT:  So you're not presenting the life care

14   plan?

15        MR. HAYSBERT:  I am not, Your Honor.

16        THE COURT:  Then what are you presenting Dr. Haider

17   for?

18        MR. HAYSBERT:  Dr. Haider is -- she's not only the

19   neurologist, but she is also a life care planner.  She does

20   both.  So the wonderful thing about that is that you get the

21   person who treats, who examines, who renders opinions about

22   what she -- what she sees, and she can also create a life

23   care plan based on that.  It's the life care portion that is

24   not going to be something we will get into.

25        THE COURT:  So her life care skills, I'm not

1    questioning those.  You're not going to present life care

2    plan testimony?

3            MR. HAYSBERT:  Correct.  We are not going to

4    provide medical costs, we are not going to be talking about

5    how much it is going to cost for in-home care person.  We

6    are not going to be talking about in-home care person.  We

7    are not going to be talking about a life care plan.  We are

8    not going through all that information, all of that economic

9    damages, and we are not making that economic damages case.

10           Our case is purely going to turn -- on our economic

11   damages, as you just read from the jury instructions, the

12   economic damages are out.  So we don't -- and because it's

13   out, we have to revisit the ruling made at trial -- at the

14   first final status conference that any medical information,

15   medical costs information comes in.  At this point it's

16   irrelevant.

17           THE COURT:  I know you're not claiming medical

18   costs.  You said that on August 1.

19           MR. HAYSBERT:  Yes.

20           THE COURT:  Said you weren't claiming any medical

21   costs or any lost wages at the time up through 2023.

22           MR. HAYSBERT:  Right.  Past medical costs, we were

23   saying we are not claiming.  Then afterwards we made the

24   decision that we are going to take out future medical costs.

25   So future economic damages are now out, as well as the past

1    economic damages -- excuse me -- that we are discussing were

2    coming out at the time of the final status conference.  So

3    both are now out, no life care plan.

4         THE COURT:  So no life care plan, and all of the

5    economic damages and medical damages are out?

6         MR. HAYSBERT:  Correct.  Economic damages, the

7    medical damages, yes, they're out, and we will object if

8    counsel intends to go into a lot of inquiry that discusses

9    her cost of care, you know, do you need an in-home care

10   person.  Anything that's in the life care plan, we would

11   strenuously object to.

12        THE COURT:  Well, if you haven't presented that

13   evidence, then they're not going to be able to ask her are

14   you going to need this because you haven't presented

15   evidence that you need it.

16        MR. HAYSBERT:  Absolutely.

17        THE COURT:  That's one thing.  It's another to

18   present evidence, as you have said, subjective and objective

19   traumatic brain injury.

20        MR. HAYSBERT:  That is correct, Your Honor.  That

21   evidence we will be presenting through Dr. Filler,

22   especially who will be appearing here at trial and will be

23   discussing the brain animation, which is based on her actual

24   tests.  You can actually see the brain on pictures that you

25   will see in the animation.  That's why it's animated.  So,

1    yes, they will be talking about the physicality of the

2    injuries that you see on her brain and how it relates to the

3    fall.

4            THE COURT:  Well, I'll hear the evidence, and I'll

5    make the ruling at that time.

6            MR. HAYSBERT:  Thank you, Your Honor.

7            THE COURT:  Can you be seated, please?

8            MR. HAYSBERT:  Yes.

9            THE COURT:  I'm going to ask you, Mr. McGavin, is

10   there anything further you need clarified about that

11   exhibit?  Because you had asked for clarification on that

12   before.  That's on my list.

13           MR. McGAVIN:  That's correct, Your Honor.  So we

14   will see how the evidence develops and what the plaintiff

15   tries to put in, but he has maintained throughout that there

16   is permanent disability for Mrs. Haysbert.  So we will see

17   how it plays out.  There is no evidence of disability, and

18   there is now, particularly in this case, a major causation

19   issue, which the Court mentioned repeatedly at our pretrial

20   conference, and just as a preview, Dr. Filler has no

21   information and clinical correlation to offer an opinion as

22   to her current condition.

23           His report, as Your Honor I'm sure saw, talks about

24   she might have, she may have, she would have had.  He has

25   never interviewed her.  There is no report of a physical

1    exam, and he is a diagnostician talking about statistical

2    likelihood.  That's why the testimony of Dr. Haider is so

3    critical and why we believe she should be here to be

4    cross-examined on this clinical correlation issue.  But we

5    will see how the evidence develops, and I'm certain that we

6    can present our argument when we get there.  Thank you.

7           THE COURT:  We have taken care of the life care

8    plan and the animation.  Those were the two exhibit

9    questions that came up in the last hearing.  I'm of the

10   opinion that they have now been resolved for now.

11          As I understand the Bloomin' Brands's subpoena,

12   that reference was to something sent to an attorney, and it

13   was no process for it, and so there is no Bloomin' Brands'

14   representative that has been subpoenaed for trial.

15          Mr. McKelvey has already represented that to the

16   Court, and I'm asking him is that what has been represented

17   to the Court?

18          MR. McKELVEY:  Yes, Your Honor.  The subpoena is

19   moot.  What Mr. McGavin does is -- I can't say whether he

20   will bring somebody or not, but as of right now we don't

21   have a subpoena issued.

22          THE COURT:  That's what I mean because Mr. McGavin

23   stood up and said he wasn't aware of what Mr. Haysbert was

24   referring to.  You stood up and said we made progress, and

25   you listed certain things.

1          MR. McKELVEY:  Yes, ma'am.

2          THE COURT:  I'm just going through now what you've

3    already represented to the Court so that I know what's

4    happening, and the issue is there was no proper subpoena

5    issued for a Bloomin' Brands' representative?

6          MR. McKELVEY:  Correct.

7          THE COURT:  Thank you.  This is a question that I

8    have.  I mentioned that I had dismissed the jury at

9    approximately 2:00 p.m.  I want to know if any counsel or

10   any representatives of counsel had any contact with any

11   juror when they were dismissed?  If you have, stand up, and

12   I'll identify you and ask you the appropriate questions.

13          Now, no one stood up, and when I voir dire the

14   jury, I'm going to ask them if they recognize or know any of

15   the individuals, after I've introduced you, which you always

16   do during voir dire, I'll introduce your name and your law

17   firm, that's the ruling of the Court, and not where you

18   practice or anything like that.  That was in that motion *in

19   limine*.  So if anybody thinks they had contact with any

20   other group of people that were leaving the courthouse, they

21   need to let the Court know.  No one has stood up.

22          I heard what you said about Dr. Filler, is that he

23   didn't respond to the request because there was some type of

24   miscommunication, but he's going to be here for trial, and

25   you are going to get the affidavit?

1          MR. McKELVEY:  Yes, Your Honor.  We've provided the

2     Court with a stack, like an e-mail chain that has his travel

3     arrangements and all as well.  That was handed up.

4          THE COURT:  Let me do that, because I'll introduce

5     that.  This is the gmail that you handed up?

6          MR. McKELVEY:  Yes, ma'am.  It should have a chain

7     with like all that stuff in it.

8          THE COURT:  That's fine.  This would just be Court

9     Exhibit Number 3.  It's under seal because it has somebody's

10    future travel plans, and I wouldn't put that on the record

11    with everything that goes on this day and time.

12         I'll make that Court Exhibit Number 3 under seal.

13    Thank you.

14         MR. McKELVEY:  Thank you.

15         (Court Exhibit 3 received in evidence.)

16         THE COURT:  It's good to know his schedule so that

17    we can try to make the best arrangements we can for him to

18    testify.  I'll allow you to call him out of order, if you

19    need to, to comport with his travel schedule.

20         MR. HAYSBERT:  Thank you, Your Honor.

21         THE COURT:  Mr. Bingham, can you come up to the

22    podium.  I'd like to ask you a couple of questions, please.

23         MR. BINGHAM:  Sure thing.  Yes, Your Honor.

24         THE COURT:  Do you have a resume that you can give

25    to the Court?

```
1              MR. BINGHAM:  I can get one, yes.

2              THE COURT:  That would be helpful because since

3     you're not an attorney admitted, and you're not with one of

4     the law firms, it would be helpful to have it.  I'm not

5     questioning your skills or your abilities, but it's

6     something that would be appropriate to have in the Court's

7     file since I didn't know you were going to be part of the

8     trial team.

9              MR. BINGHAM:  Sure thing.

10             THE COURT:  We had another IT person here last

11    week.  Let me mention one thing.  I'm not particularly

12    computer savvy, but I'm not particularly computer

13    illiterate, either.  I'm somewhere in the old age/middle.  I

14    don't think it was that hard for a PDF document to be

15    changed.  You could always drop pages out of it, can't you?

16             MR. BINGHAM:  Yes, absolutely.  That part is not

17    hard.  Redaction, if you wanted me to take a section out of

18    a document, that's where it gets complicated, but removing

19    pages, no problem.

20             THE COURT:  And dropping a page that has court

21    cites, and so forth?

22             MR. BINGHAM:  Easy.

23             THE COURT:  You will be able to do that if

24    Dr. Filler, for some reason, doesn't come through with this

25    exhibit?
```

1            MR. BINGHAM:  No problem.

2            THE COURT:  Thank you.

3            I just want to put on the record that I do rely on

4    the cases that I mentioned.  I didn't give full cites, but

5    the full cites are in ECF Number 285 when I took under

6    advisement the ruling on Dr. Haider.  Both sides have that

7    document.  It was sent immediately yesterday when it was

8    done by e-mail.  It was then given to the defense counsel

9    this morning, so everybody has that document, and I

10   mentioned the cases.

11           So rather than go back and cite those cases for the

12   ruling to withhold the decision on the zoom request, pending

13   the receipt of further information, and I didn't say I would

14   grant it on further information, I said pending the receipt

15   of it, I do rely on those cases cited in ECF Number 285 of

16   which everyone has a copy, and I mentioned those cases in my

17   earlier ruling when I took it under advisement and asked for

18   further information.

19           Now, the last thing here, Mr. Haysbert, is you sent

20   in yet another electronic device policy request this

21   morning, and I don't understand why you sent it in since

22   Mr. McKelvey is local counsel, and he has already been

23   approved for a laptop and a charging cable.  He calls it an

24   extension cord.  This is the same request, so why do you

25   need this request?  It's the same as I've already approved.

1          MR. HAYSBERT:  Your Honor, my understanding is

2     that --

3          THE COURT:  Come up to the podium, please.

4          MR. HAYSBERT:  Sorry.  My understanding is that our

5     names had to appear, or the people that were going to be

6     here to do the trial tech information, had to appear on the

7     document itself.  When I looked at the order that the judge

8     approved for local counsel, my name wasn't on it and neither

9     was the trial tech member.  So I just wanted to make sure

10    that we completed whatever information was necessary.  What

11    you're saying is only one needed to be provided, then I

12    would withdraw what I submitted.

13         THE COURT:  I just wanted to be sure that you

14    weren't counting on saying to me tomorrow, you've approved

15    one for Mr. McKelvey, so now you are approving one for us.

16    That would not be what I would do.  The authorized persons,

17    I can either write on the other one or I can put on here

18    supersedes approval of July 27.  I think that was the date.

19         MR. HAYSBERT:  Yes, it was.

20         THE COURT:  Supersedes approval of July 27, and

21    then I would put on here, "And Mr. McKelvey and Mr. Bingham,

22    your trial tech."  It's very unusual for a Court to approve

23    a trial tech that's not part of the law firm, but it would

24    still be for all of you all, one laptop, because that's all

25    you need.  You have the laptop, and I assume that

1    Mr. Bingham will operate that, and then everybody has

2    screens.  That's the way the Court is set up, the Court's

3    evidence presentation.

4            In other words, the jury will see it as it comes

5    up, you will see it, counsel will see it, and you ask your

6    questions.  Whoever is examining a witness should not be

7    operating the computer.  You can, but if it holds the Court

8    up, it's not a good thing for the jury, they don't like

9    that, but you really only need a presentation device that

10   brings everything up, and the person examining.

11           You have to get everything on the screen, and so I

12   would assume that all you're going to need is the laptop

13   with the charging cable for the three of you.  Mr. Bingham

14   is going to operate it, and you're going to examine, or

15   Mr. McKelvey will examine the witnesses from what's on the

16   screen.

17           MR. HAYSBERT:  That is correct, Your Honor.

18           THE COURT:  Now, as I understand it, through

19   Mr. Otero, who is in charge of training, that no one from

20   your team has been trained on the court's system, and that

21   he reached out to you.  I think he was expecting you at 8:30

22   this morning, and there was no one that showed up.

23           So I have some reservations, and I'm going to tell

24   you that, if there is delay, you say, oh, my goodness, this

25   doesn't work, or, oh, my goodness, this doesn't work, you've

1    pretty much missed your opportunity to have your training.

2    It was supposed to be done a while back, but it has not been

3    done.  Do you have any reason that you haven't done it?

4          MR. HAYSBERT:  Your Honor, no.  There is no reason

5    I can -- no excuse I can give you.  It hasn't been done, and

6    I would offer, if it's possible, there might be another

7    break, five minutes, anytime where he can check out the

8    equipment with Mr. Otero, we will be grateful for that.

9          THE COURT:  I don't know what his schedule is.  He

10   can't drop everything and take care of something that should

11   have been done that he was here this morning to do.  He was

12   waiting.  He came by chambers.

13         MR. HAYSBERT:  It should have been done, Your

14   Honor, and we apologize, and I apologize on behalf of my

15   team for not being there at the 8:30 call time.

16         THE COURT:  I will get this adjusted form in that

17   says Mr. Haysbert and Mr. McKelvey, counsel, trial counsel

18   and Mr. Bingham, trial tech, and you will be authorized for

19   one computer and one charging cable, and IT clearance is not

20   waived.  So IT will check and clear everything and devices

21   that they put on your devices.  If you take them from the

22   court, they will be checked every day you come to court.

23   The electronics just don't come into this courthouse.

24   You've read the electronics policy.  That's the last thing I

25   have, and I'm not aware of anything else that needs to be

 1    done.

 2            MR. HAYSBERT:  I did have one thing, Your Honor.

 3            THE COURT:  All right.

 4            MR. HAYSBERT:  I had requested that the Court

 5    provide us with an easel.

 6            THE COURT:  I think the clerk responded to that.  I

 7    believe that you sent those questions in Friday.  I think I

 8    mentioned in my reasons yesterday that I said the time you

 9    sent the e-mail in and that the courtroom deputy got back to

10    you with answers to all of your questions except the

11    approval of the electronic device form, which the form

12    didn't actually come in until, what was it, 6:05 a.m. I

13    think on Monday.  So that was all answered.  You were told

14    there was an easel, weren't you?

15            MR. HAYSBERT:  I was told, I just didn't see it.  I

16    just wanted to confirm.

17            THE COURT:  So there is an easel here, and it will

18    be available for you.

19            MR. HAYSBERT:  Thank you very much, Your Honor.

20            THE COURT:  Mr. McKelvey, do you have anything

21    else?

22            MR. McKELVEY:  No, Your Honor.

23            THE COURT:  Anything else from defense counsel?

24            MR. McGAVIN:  No.  Thank you, Your Honor.

25            THE COURT:  Then when the jury clerk dismissed the

1    jury, she told them to return at 11:00 tomorrow.  So you all

2    be here early to get yourself set up and ready to go because

3    I plan to bring, and that was one of your questions, the

4    whole jury panel.  Everybody might not show up.  There will

5    be a show cause issued for anybody who doesn't show up, and

6    they will be subject to, I forgot what it is, I think maybe

7    it's three days in jail.  We do issue a show cause and a

8    fine.  The magistrate judges now do the show cause, but we

9    do issue those.  So I don't know how many people.  I think

10   we've got at least 40 that have been summonsed.  So they

11   will all come in, and we will call the roll, and I will

12   conduct the voir dire.  That was one of your questions.  The

13   judges conduct the voir dire in this court.

14           I have a system where I will never impanel a jury

15   until I've given everybody an opportunity.  So don't jump up

16   and say I have an objection because I will always say, is

17   there any objection to the Court's voir dire so far?  I will

18   ask you all that, and then we will perhaps send the jury out

19   and go through cause.  I will never not give you a chance to

20   object.

21           In the end, before I impanel the jury, it's the

22   last thing that I'm going to ask you.  I'm aware of your

23   *Batson* motion.  You've asked that.  So you don't need to

24   worry about preserving your objection when I ask a question.

25   I will ask, and then you will have an opportunity to object.

JODY A. STEWART, Official Court Reporter

1    I'll ask if you have anything else you want the Court to

2    inquire of.  I'll go through all of that.  So don't worry

3    about having your opportunity, because I try to be pretty

4    meticulous in doing it and giving everybody an opportunity

5    to respond.

6            If there is nothing further, then the Court stands

7    in recess until 11:00 a.m. tomorrow morning.

8            (Hearing adjourned at 4:27 p.m.)

9                       CERTIFICATION

10

11        I certify that the foregoing is a correct transcript

12   from the record of proceedings in the above-entitled matter.

13

14

15        X_____/s/_____x

16               Jody A. Stewart

17               X_____8-22-2023 _____x

18               Date

19

20

21

22

23

24

25

JODY A. STEWART, Official Court Reporter