1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2                 Newport News Division

3

4   - - - - - - - - - - - - - - - - - -
                                      )
5   JOANN WRIGHT HAYSBERT,            )
                                      )
6          Plaintiff,                 )
                                      )    CIVIL ACTION NO.
7   v.                                )    4:20cv121
                                      )
8   BLOOMIN' BRANDS, INC., AND        )
    OUTBACK STEAKHOUSE OF FLORIDA,    )
9   LLC,                              )
                                      )
10         Defendants.                )
    - - - - - - - - - - - - - - - - - -

11

12

                    TRANSCRIPT OF PROCEEDINGS
13
                            DAY 3
14
                       Norfolk, Virginia
15
                      August 10, 2023
16

17

18  BEFORE:  THE HONORABLE REBECCA BEACH SMITH, and a Jury
            United States District Judge
19

20

21  APPEARANCES:

22          CRANDALL & KATT
            By:  David A. McKelvey
23                   And
            HAYSBERT & MOULTRIE LLP
24          By:  Nazareth M. Haysbert
                 Counsel for the Plaintiff
25

JODY A. STEWART, Official Court Reporter

```
1    APPEARANCES CONT'D:

2

3            McGAVIN, BOYCE, BARDOT, THORSEN & KATZ, P.C.
             By:  John D. McGavin
4                 Emily Blake
                  Counsel for the Defendants
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2    PLAINTIFF'S
     WITNESSES              DIRECT    CROSS    REDIRECT    RECROSS
3
     JOANN HAYSBERT         273       306      400
4    AARON FILLER, PH.D.    408       432
     AARON FILLER, PH.D.    445       486      511
5

6    DEFENDANT'S
     WITNESSES              DIRECT    CROSS    REDIRECT    RECROSS
7

8    NONE

9                        E X H I B I T S

10

11   PLAINTIFF'S
     NO.                                                   PAGE
12
      NONE
13

14

15   DEFENDANT'S
     NO.                                                   PAGE

16    9                                                    378

17

18

19

20

21

22

23

24

25
```

JODY A. STEWART, Official Court Reporter

264

```
1              (Hearing commenced at 10:03 a.m.)
2              THE COURT:  Two quick matters.  The Court was
3    advised through the clerk that Mr. Haysbert had some type of
4    objection to opening statement.  The Court is not going to
5    entertain that objection for three reasons:  Number one, the
6    jury is specifically told that opening statements are not
7    evidence, so that is not evidence that has come before the
8    jury.  It also is not argument.  It is just something that
9    you tell the jury, this is what the case is going to be
10   presented.
11             Number three, there was only one objection that I
12   recall during opening statement.  I overruled that
13   objection.  I stand by that ruling.  We are not going to
14   re-do everything in this case and as soon as something
15   occurs and you go back and think about it or look at it, you
16   want to make an objection.  If there was an objection to
17   opening statement, we had a lengthy sidebar yesterday.  It
18   was never brought up.  So it is too late to make an
19   objection to opening statement, and I will reiterate.  It is
20   not evidence.  It is not argument.  There was one objection.
21   The objection was overruled.  It was never mentioned
22   contemporaneously with the opening statements, and it was
23   never mentioned in the sidebar that we had, and we are not
24   going to come in every day and re-visit things that should
25   have been made known to the Court at the time they occurred.
```

JODY A. STEWART, Official Court Reporter

```
 1    I find no problem with the opening statements.  In fact, to
 2    remedy, if you have a problem, is at the end, when the case
 3    is over, you tell the jury, so and so said during opening
 4    statements, but that evidence didn't come in to you.
 5          So that is what you do.  It's your way of setting
 6    up trust with the jury.  One side says, well, Mr. Smith said
 7    that he was going to present so and so to you in his opening
 8    statement, and it hadn't been done.  So that's the way you
 9    handle that.  So I will not entertain, a day later,
10    something over opening statements that I think were in total
11    approximately 30 minutes, the total opening statements.
12    That's the first thing.
13          The second thing, I understand that there remains
14    an objection from the defense to the Filler report, and I
15    understand that.  We will take up any of that before
16    Dr. Filler comes, and we will not hold up the jury this
17    morning.  So, consequently, I would direct that the jury be
18    brought in, and the clerk call the case and the roll of the
19    jury.
20          MR. McGAVIN:  Your Honor, may I just pass up some
21    case authority for the Court to consider before we get to
22    Dr. Filler so that the counsel and the law clerk and the
23    Court has a copy?
24          THE COURT:  Certainly.
25          MR. McGAVIN:  Thank you.
```

1          THE COURT:  Did you give opposing counsel a copy?

2          MR. McGAVIN:  I did, Your Honor, and I highlighted

3    the section I would like the Court to consider, and for the

4    record the case is called *Vilseck v. Campbell*.  There is

5    two, one for the law clerk.  Thank you, Tammy.

6          THE COURT:  So the authority, and you've given a

7    copy to plaintiff's counsel, you've given two copies to the

8    Court, and you've highlighted the case of particular

9    interest.

10          MR. McGAVIN:  Yes, Your Honor.  For the record,

11    it's *Vilseck v. Campbell*, 242 Virginia 10, a 1991 opinion

12    from the Virginia Supreme Court.  Thank you.

13          MR. HAYSBERT:  Your Honor --

14          THE COURT:  We are not going to argue.

15          MR. HAYSBERT:  I'm not arguing anything.  I'm going

16    to give my stuff in the record.  He's given his in the

17    record as well.

18          THE COURT:  All he is doing is giving support.

19          MR. HAYSBERT:  Of course.

20          THE COURT:  An objection that has already been

21    made.  I'm not entertaining arguments right now.

22          MR. HAYSBERT:  I'm not giving you arguments.

23          THE COURT:  Stop interrupting, please.  I'm trying

24    to talk, and you're talking over me.  Don't do that anymore.

25          MR. HAYSBERT:  I'm sorry, Your Honor.

1          THE COURT:  All he did was hand up some authorities

2     so the Court could be prepared in advance.  That's all that

3     he did.  He didn't argue.  I don't even know what the

4     authority says.  Now what are you going to say?

5          MR. HAYSBERT:  I'm not going to argue.  This is

6     something completely different from what he's talking about.

7     So I have before me some information that I would like the

8     Court to read into the record in the jury's presence that

9     has to do with the witness that we intend to call today,

10    Nick Seifert.

11         So this is information that relates to Bloomin'

12    Brands' operational control over the subject at the

13    Chesapeake restaurant.  So I'd like to hand this over to the

14    Judge and have the Judge read this into evidence.

15         THE COURT:  I don't read things like that into the

16    record.  You get it into evidence through a witness.  I

17    don't sit and read documents into the record.  The only

18    thing I would read into the record would be a stipulation

19    that you all had made.  I'm going to do that as soon as they

20    come in.  I'm not going to read a document as the Judge into

21    the record.  That's your job as an attorney to get that

22    document into the record.  Is it listed in your exhibits?

23         MR. HAYSBERT:  Your Honor, it's a stipulation we

24    are talking about.  That's what I was referring to.

25         THE COURT:  All I'm reading is what you gave me as

1   a stipulation.  If you want more than what you were

2   stipulated to, that's your role as an attorney to get it in.

3   All I'm reading is a stipulation, it looks like it's one

4   line, and that's what the parties have agreed on.  The

5   parties did not give to the Court any such document for the

6   Court to read as a stipulation.

7           MR. HAYSBERT:  Your Honor, the parties' stipulation

8   is here regarding Bloomin' Brands' omission --

9           THE COURT:  I've got it.  You have given it to me.

10          MR. HAYSBERT:  We also --

11          MR. McKELVEY:  Your Honor, can I clarify?

12          THE COURT:  Something needs to be clarified.  I

13   have a jury waiting.  I don't understand why you all can't

14   get your acts together before you arrive in the courtroom

15   each day.

16          MR. McKELVEY:  Your Honor, so there was a -- the

17   final pretrial order from the initial pretrial conference

18   contained three stipulations of undisputed facts, and that

19   is Docket 243, the first page.  We are requesting that the

20   Court read those three stipulated facts, the stipulation

21   that we discussed earlier, and then the admission in the

22   second pretrial order.  This work order was agreed that the

23   document is a business record, which was an agreement by

24   defense counsel during that -- it was an admission or

25   stipulation by defense counsel during that hearing.  What I

269

1    would like to propose, Your Honor, is I showed defense

2    counsel the three documents that we are referring to and

3    then tender to the Court.

4              THE COURT:  Let's go to where they are in the

5    record.

6              MR. McKELVEY:  Yes, ma'am.

7              THE COURT:  I've got everything right here in front

8    of me.

9              MR. McKELVEY:  Okay.

10             THE COURT:  Additional stipulation is as follows:

11   First of all, you have the stipulations in the final

12   pretrial order, and I was going to read those.  They start

13   on Page 1, and I believe it is three stipulations.

14             MR. McKELVEY:  Yes, ma'am.

15             THE COURT:  The other stipulation is the one that

16   was filed on 8-7-2023, and it's one admission stipulation.

17   That's all that I have in front of me.

18             MR. McKELVEY:  Your Honor, if you would look at the

19   final pretrial, this is the same thing, Docket 243, Page 8.

20             THE COURT:  Wait just a minute, please.

21             MR. McKELVEY:  Yes, ma'am.

22             THE COURT:  I've got a very large notebook here.

23             MR. McKELVEY:  I understand.

24             THE COURT:  The final pretrial, the supplemental

25   final pretrial?

JODY A. STEWART, Official Court Reporter

1         MR. McKELVEY:  This is the final pretrial -- the

2    same docket, 243, so it would be the same thing that the

3    other undisputed fact, the three numbered stipulations.  If

4    you go to Page 8 of that document, there is another one

5    there that came out of the initial pretrial conference with

6    Judge Krask, I believe.  It's number 30.

7         THE COURT:  Page 8 of that document?

8         MR. McKELVEY:  Page 8, block 30.

9         THE COURT:  Well, that would come up when you try

10   to introduce the document.  In other words, there is no

11   objection.  That's not a stipulation.  All they're doing is

12   saying the work order request -- this is just standard

13   discovery practice.  This is not what's called our standard

14   discovery and then reduction to the pretrial order.

15        This is, you want to get in a work order, and he

16   reserved for the trial judge whether it was admissible.

17   Once we determine the admissibility, then they agree that

18   you don't have to overcome the authenticity.  All they're

19   agreeing to is that it is a business record, but they're not

20   agreeing to admissibility.  So I wouldn't read a stipulation

21   that a document is authentic if it may not even come into

22   the record.  So, no, that is not a stipulation, and I will

23   not read it.  I will read the four that have been labeled

24   stipulation.  That's my ruling.

25        MR. McKELVEY:  Understood.

```
 1              MR. HAYSBERT:  Thank you, Your Honor.

 2              THE COURT:  Can you bring the jury in, please.

 3              (Jury in at 10:14 a.m.)

 4              THE COURT:  Good morning, ladies and gentlemen of

 5    the jury.  I hope that you had a very nice evening, and I

 6    would ask that the clerk call the case and the roll of the

 7    jury.

 8              THE CLERK:  In case number 4:20cv121, JoAnn Wright

 9    Haysbert versus Bloomin' Brands, Inc., and Outback

10    Steakhouse of Florida, LLC.

11              Mr. McKelvey, Mr. Haysbert, is the plaintiff ready

12    to proceed?

13              MR. McKELVEY:  Yes.

14              THE COURT:  Good morning, counsel.

15              THE CLERK:  Mr. McGavin, Ms. Blake, are the

16    defendants ready to proceed?

17              MR. McGAVIN:  Yes.  Good morning, Your Honor.  John

18    McGavin on behalf of the defendants, Emily Blake at counsel

19    table with me, and Ray Graham also at counsel table.  Thank

20    you.

21              THE COURT:  Good morning.

22              THE CLERK:  Now, members of the jury, please answer

23    present as your name is called.

24              (Roll call of jury.)

25              THE CLERK:  All jurors are present, Your Honor.
```

1          THE COURT:  All right.  Thank you.

2          Ladies and gentlemen of the jury, we are ready to

3    begin the case.  However, before we begin, I mentioned to

4    you in the preliminary instructions that there may be some

5    stipulations, and there are a few, and I'm going to read

6    those to you, and since the parties have so stipulated as to

7    these matters or facts, you should take those stipulations

8    as true and accept them as facts for the case.

9          The parties stipulate to the following facts as

10    being undisputed between them:  One, on May 23, 2018,

11    defendant Outback Steakhouse of Florida, LLC, owned and

12    operated the Outback Steakhouse in Chesapeake, Virginia, at

13    4312 Portsmouth Boulevard; two, plaintiff fell while

14    visiting the Outback restaurant in Chesapeake, Virginia on

15    May 23, 2018; three, plaintiff was a business invitee of

16    Outback Steakhouse of Florida, LLC, when she entered the

17    Chesapeake Outback Steakhouse on May 23, 2018.  Further,

18    defendant Bloomin' Brands states as follows to a request for

19    a stipulation, admit that you were the franchisor of the

20    subject location at the time of the incident.  Response is

21    admit.

22          So they have agreed, Bloomin' Brands has agreed

23    that it was the franchisor of the Outback Steakhouse that

24    was located on Portsmouth Boulevard that I just mentioned to

25    you.

1          Those are the stipulations for the case, and you

2    can call your first witness, Mr. Haysbert.

3          MR. HAYSBERT:  Thank you, Your Honor.

4          I'm going to call Dr. JoAnn Haysbert to the witness

5    stand.

6          THE COURT:  Dr. Haysbert, if you would please come

7    forward and be sworn.

8          (Witness was sworn.)

9          JOANN HAYSBERT, called by the plaintiff, having

10   been first duly sworn, was examined and testified as

11   follows:

12                        DIRECT EXAMINATION

13   BY MR. HAYSBERT:

14   Q.  Good morning, Dr. Haysbert.

15   A.  Good morning.

16   Q.  Where did you grow up?

17   A.  I grew up in a small town, Kingstree, South Carolina.

18   Q.  What do you do for a living?

19   A.  I am a professional educator.

20   Q.  Why did you choose that career?

21   A.  I always wanted to be helpful in what I call touching the

22   future.  Young people are not just here for the day, they

23   grow up, and they are going to be leaders of tomorrow, and

24   I've always wanted to be a part of that educational process.

25   Q.  Can you share with the jury what brings you here today?

Haysbert, J. - Direct                                              274

```
 1   A.  Yes.  Today I am the plaintiff in the slip and fall
 2   negligence case against Outback Steakhouse.
 3   Q.  Before we get into the details of your slip and fall, can
 4   you explain for the jury what your average day was like
 5   before the slip and fall accident?
 6   A.  Certainly.  As a professional educator at a university
 7   where I work, my average day was 10, 12 hours day, at least
 8   average of 8 to 10 meetings, not counting the unexpected
 9   requests that may come from a parent or student, faculty
10   member, or my colleagues.
11        So it was obviously very, very, very fast paced, and
12   required a great deal of dealing with complex issues as well
13   as with those that are not so complex.  So just a very, very
14   busy day, that required meetings and dealing with a lot of
15   people on a lot of different fronts.
16   Q.  What was your family life like?
17   A.  My family life was a good life in the sense of my five
18   children and I always had fun times together.  We had quality
19   time because I worked very hard, as you can tell from what I
20   said.  So we always looked forward to having quality time.
21   Most of our quality time was spent on weekends, and to be
22   honest with you, in church or some church function that my
23   kids were involved in and I was involved in as well.  I did a
24   lot of with them.  I like doing things like going to thrift
25   stores and stuff like that.
```

Haysbert, J. - Direct                                        275

Q.  On the day of the accident, and we are going to be
talking about the accident now of May 23rd, 2018, can you
please walk the jury through what happened that day.
A.  Certainly.  That day was planned as a great day for my
daughter and I, my oldest daughter.  We live together, and
she lived with me, and because of our work schedules, we
typically didn't have time to do a lot of things together.

So that day to me was a beautiful day, not thinking
about what the weather was, that's not what I was referring
to, but because I was going to get time, had time to spend
with my daughter.  So what we did was decided we would go get
our hair done in Chesapeake.  We live in Hampton, which is
about a 20-, 30-minute ride away, depending on what the
traffic-wise.  So we went to the salon that we have gone to
often, and we went together.  We had our hair done and
afterwards decided to go pick up something to eat rather than
having to go home and cook.

So we decided to go to the closest restaurant that I
can think of at the moment, which was the Outback Steakhouse.
And we went there.  We sat in the car, and we placed a
takeout order.  I drove there in my car.  My daughter was
riding with me.  And as we placed the takeout order, I told
her that, I thought, I'll go to the bathroom, I'll be right
back, and she said, okay, and I got out of the car and went
inside to go to the bathroom.

JODY A. STEWART, Official Court Reporter

Haysbert, J. - Direct                                    276

1            When I got inside, as I recall, as much as I can

2    recall, there was a hostess stand, and I went up to the

3    hostess stand, and I told the young lady behind the hostess

4    stand that I'd like to go to the bathroom.  We come to take a

5    takeout order, could she direct me to it?  It was a young

6    African-American lady that walked from around the stand, and

7    she walked and pointed to, like this (indicating), and said,

8    "You walk straight down.  Then go to -- when you get to the

9    end, you take a left, and the bathroom would be right there."

10           I turned to her, and I said, "Thank you very much,"

11   and proceeded to walk in that direction.

12   Q.  Dr. Haysbert, if I may stop you --

13   A.  Sure.

14   Q.  -- just for a second because I want to back up a little

15   bit before we go to what happened after she pointed out the

16   bathroom to you.

17   A.  Okay.

18   Q.  How were you dressed that day?

19   A.  I was dressed in -- I come from work, so I was dressed in

20   my regular suit clothes like the outfit I had on yesterday; a

21   jacket, skirt, shoes.

22   Q.  What kind of shoes were your wearing?

23   A.  The same shoes I'm wearing today, gray heels, dress

24   shoes.

25           MR. HAYSBERT:  Your Honor, if I may, if she can

Haysbert, J. - Direct                                          277

```
 1   take a lap and show us what her heels look like.
 2           MR. McGAVIN:  No objection, Your Honor.
 3           THE COURT:  All right.  Go ahead.
 4   BY MR. HAYSBERT:
 5   Q.  You may head back to the witness stand.
 6           THE COURT:  I can't see from here.
 7           MR. HAYSBERT:  Sure.
 8           THE COURT:  Thank you.
 9   BY MR. HAYSBERT:
10   Q.  You may head back to the witness stand, Dr. Haysbert.
11   Thank you.
12           Do you wear heels like the shoes you have on
13   regularly?
14   A.  Almost every day.
15   Q.  How long have you been wearing heels?
16   A.  Starting as a youngster, trying on my mother's heels,
17   probably about 13 or 14, but as an adult, from the time I
18   started working professionally, 20 years old.
19   Q.  Have you ever had any problems walking in heels?
20   A.  No.
21   Q.  So let's back up to who pointed the restroom out to you
22   at the restaurant?  Could you start from there?
23   A.  Sure.  An African-American woman, young woman, came from
24   around the stand and turned, as I said, and pointed, it will
25   be this way.  She said walk to the end, and when you get to
```

1   the end, the bathroom would be right there on your left.

2   Q.  Did you start walking towards the restroom at that point?

3   A.  I did.

4   Q.  What happened as you made your way to the restroom?

5   A.  I only recall taking one, two steps, and I slipped and

6   slammed my head on the floor, and at that point I was knocked

7   unconscious because I remember when I came to myself, I had

8   glimpses and opened my eyes, and I had glimpses of shoes, a

9   shoe, or a flashback of a shoe or shoes, and I was trying to

10  figure out what happened because I had took no more than two

11  steps (indicating).  And at that point I remember people

12  coming to pick me up, get me up off the floor.  It seemed

13  like a lot of people.  I don't know how many it was, but it

14  seemed like a lot of people.

15          THE COURT:  Let me just ask you one question,

16  Dr. Haysbert.  When you fell did you fall forward,

17  backwards, or sideways?

18          THE WITNESS:  I fell on my left side.

19          THE COURT:  You fell on your left side?

20          THE WITNESS:  Yes, because that's the side that was

21  bruised and in pain with contusions and things like that,

22  yes.

23  BY MR. HAYSBERT:

24  Q.  The whole experience must have been very frightening.

25  Can you explain to the jury how you were feeling at the

1   moment when all those people were coming to you.

2   A.  I felt fearful.  A lot of different words come to mind at

3   this moment; wobbly, in a daze.  My daughter described it

4   later to me as she --

5              MR. McGAVIN:  Objection, Your Honor.

6              THE COURT:  Sustained.

7              THE WITNESS:  Okay.  I apologize.  I felt dazed and

8   wobbly and unsteady and just trying to figure out what

9   happened.

10  BY MR. HAYSBERT:

11  Q.  As you sit here today, do you know why you fell?

12  A.  I fell because the floor was slick.  The floor was slick.

13  Q.  Before you fell, did you look at the floor?

14  A.  No.

15  Q.  Sorry to interrupt.

16  A.  I was looking straight ahead.  The young lady came from

17  behind the stand, and she pointed me to the bathroom like

18  this (indicating), and I was looking at where she was

19  pointing.  And when she pointed and said, "Walk straight down

20  this way, and when you get down, the bathroom will be on your

21  left," so I turned and -- thanked her, turned around and

22  walked.

23  Q.  Is there something -- the feeling of slick, is that

24  something that you could feel under your feet or after you

25  started walking, something you observed physically?

Haysbert, J. - Direct                                          280

1   A.  Something I felt under my feet because before I made
2   those two steps, I was on carpet or rug or something like
3   that.  So I felt a difference.  So it's like stepping from
4   there and stepping up on here.
5   Q.  Did you have any reason before walking on the floor to
6   think the floor was dangerous?
7   A.  No.  None.
8   Q.  Did you think there was anything wrong with the floor
9   before you walked on it?
10  A.  No.
11  Q.  Did anyone tell you or warn you that the floor might be
12  dangerous?
13  A.  No.
14  Q.  Were there any signs warning about a dangerous condition
15  on the floor?
16  A.  No.
17  Q.  Any signs saying, "Watch your step"?
18  A.  No.  I didn't see anything.
19  Q.  Was there a mat by the hostess stand?
20  A.  It was either a mat or carpet.
21  Q.  By the hostess stand or by the front door?
22  A.  I think the front door -- I don't know how close they
23  were together now as I can think of it in my own mind's eye,
24  but there was a mat at one point, and there was carpet, which
25  was which place, was it all together, I don't know.

1   Q.  After you fell did anyone from Outback Steakhouse come

2   and speak with you?

3   A.  Yes.

4   Q.  Have you ever seen or spoken with Ms. Crosby?

5   A.  That's the name that I remember was deposed, and I

6   remember that name Lisa Crosby was the person that came.  She

7   identified herself as assistant manager.

8   Q.  What did she say to you?

9   A.  I don't recall all that she said.  I do remember her

10  asking me, would have been something about, "Are you okay?"

11  something like that, "Would you like me to call an

12  ambulance?" something along those lines.

13  Q.  How did you feel in that moment having her ask you should

14  she call an ambulance?

15  A.  I'm still trying to figure out what happened, to be

16  honest with you.  I'm still trying to figure out what

17  happened.  How you just walk into a place, ask for direction

18  to a bathroom, get them, and then bang your head and wake up

19  in a daze.

20          THE COURT:  Can you turn up the microphone, if you

21  can.  I think we are having a hard time hearing her

22  testimony.

23          THE WITNESS:  I'm sorry.

24          THE COURT:  Speak up, if you can.  I know you have

25  a soft voice.

Haysbert, J. - Direct                                              282

1              THE WITNESS:  I do.  I apologize for that.

2    BY MR. HAYSBERT:

3    Q.  Dr. Haysbert, you were offered medical attention?

4    A.  Say one more time.

5    Q.  You were offered medical attention?

6    A.  Yes.  The medical attention I was offered was, "Would you

7    like me to call an ambulance," or "us to call an ambulance,"

8    something along those lines.

9    Q.  Why did you refuse?

10   A.  I was afraid.  I wasn't thinking about anything other

11   than what happened, just what happened.  I was still thinking

12   one part of my mind, taking two steps.  The other part of my

13   mind is people picking me up, and do you want to go to an

14   ambulance.

15   Q.  Did you think you were injured in that moment?

16   A.  I honestly didn't think so.  I didn't know whether I was

17   injured or not.  I was in a kind of what happened, in a daze.

18   I didn't know.

19   Q.  Did you pay for your takeout order?

20   A.  I don't remember.

21   Q.  Did you leave without getting any food?

22   A.  I honestly don't remember.

23   Q.  Why is that, that you don't remember?

24   A.  I just don't remember.  It had to be because of the slip

25   and fall and the banging on my head.

Haysbert, J. - Direct                                            283

1    Q.   Before you left the restaurant, did you take any photos
2    of the area where you fell?
3    A.   No.
4    Q.   Did your daughter take any photos?
5    A.   None to my knowledge.  You can ask her, but, no photos.
6    I wasn't thinking about photos.
7    Q.   Why not?
8    A.   Because I wasn't thinking about -- just what happened --
9    all I was thinking about is what happened to me, and I need
10   to literally get out of there.
11   Q.   Did Outback Steakhouse take any photos that you recall?
12   A.   I don't know.
13   Q.   Did you ever hear back from Lisa Crosby, that manager who
14   said they would follow up with you?
15   A.   No, they did not.
16   Q.   Did anyone from Outback Steakhouse get back to you after
17   the accident?
18   A.   Eventually, my daughter called -- Lisa had given her
19   card, my daughter.  It was like a three-way conversation
20   between the three of us as we sat at the table.  She gave my
21   daughter a card.  We called the number, Lisa, we called Lisa
22   because we did not hear from her.  Then I got a response, and
23   then we called the other person.  Another person called us.
24   I don't remember her name.  She's from the corporate office.
25   Q.   What kind of conversation did you have with the person

1    from the corporate office?

2              MR. McGAVIN:  Objection, Your Honor, relevance.

3              THE COURT:  Wait.  Repeat the question.

4              MR. HAYSBERT:  What conversation did you have with

5    the person from the corporate office?  She said that someone

6    from the corporate office called her, so I'm asking her what

7    was the conversation that she had with them.

8              THE COURT:  I sustain the objection.

9    BY MR. HAYSBERT:

10   Q.  Dr. Haysbert, walk me through what happened after you got

11   home.

12   A.  Well, by the time I got home, by that point my whole left

13   side was swollen.  I had -- I was hurting from my head on

14   down to my ankle.  The whole side was swollen and in very,

15   very bad pain to the point that my daughter helped me make my

16   way to the bed and iced my whole side down.  That was just in

17   pain and just moaning and groaning because of the pain that I

18   was feeling, as I said, to my entire left side.

19   Q.  Did you think you were really hurt at this point?

20   A.  I knew something was wrong at this point, but I didn't

21   know what.

22             THE COURT:  When was this, Dr. Haysbert?

23             THE WITNESS:  This was at my house when I got in my

24   bed, by the time my daughter helped me to my bed.

25             THE COURT:  This was the same day when you got

Haysbert, J. - Direct                                          285

1   home?

2          THE WITNESS:  Yes.

3   BY MR. HAYSBERT:

4   Q.  What did you do the following day?

5   A.  It was either the following day or the next day, we had

6   planned to go see my mother.  My mother at that time was 90

7   years old.  She is 95 now.  We planned to go see my mother,

8   so my daughter asked me if I thought I could make it on the

9   trip, and it was to see my mother.  The swelling had gone

10  down a bit, the pain and all that was there, but the swelling

11  had gone down a bit, so I told her, "Let's try."  So my

12  daughter drove us to South Carolina.

13  Q.  When you got to your mother's house, how did you feel?

14  A.  It was worse then.  It was like all the swelling that had

15  gone down, and I'll use the word revved up again, and I felt

16  worse than I did before with all the pain and all, that the

17  icing that night helped, it did, but by the time I got to

18  South Carolina, it had revved up again.

19  Q.  Did you see a doctor at that point?

20  A.  Yes.  It was at that point that my daughter and I talked,

21  and we decided I probably ought to see somebody at this

22  point.  So we went into the nearest urgent care -- I don't

23  remember the exact name, Medicare, urgent care, something

24  like that, went into one of those CarePlex places, and I told

25  them what -- that I slip and fallen and that, you know, the

Haysbert, J. - Direct                                                286

```
 1    pain that I had from my head all the way down, and they gave
 2    me a full body x-ray and prescribed some medication, wrote a
 3    prescription for the pain that I was having and said that I
 4    had --
 5             MR. McGAVIN:  Objection, Your Honor, as to what the
 6    doctor may have said.  She's about to tell us what the
 7    doctor said.
 8             THE COURT:  I sustain that.  What kind of
 9    medication did you receive?
10             THE WITNESS:  Pain prescription.  Pain medication.
11    BY MR. HAYSBERT:
12    Q.  Dr. Haysbert, did the pain on your left side eventually
13    subside?
14    A.  Eventually.
15    Q.  How about the bruises?
16    A.  Eventually.  It took a while because bruises take a while
17    to go away, but, yes, they did eventually go away.
18    Q.  How about the swelling?
19    A.  The swelling did eventually go away as well, yes.
20    Q.  What about your headaches?
21    A.  Headaches lasted much, much longer.  I still have
22    headaches now.
23    Q.  Did you see another doctor about your headaches not going
24    away?
25    A.  I went to my permanent physician.
```

Haysbert, J. - Direct                                                287

```
 1   Q.  And did any doctor give you a diagnosis of what the cause
 2   was of your headaches?
 3           MR. McGAVIN:  Objection, Your Honor, hearsay.
 4           THE COURT:  Sustained.
 5   BY MR. HAYSBERT:
 6   Q.  Have you ever had an MRI, Dr. Haysbert?
 7   A.  Yes.  I had more than one.
 8   Q.  Can you tell us what you had an MRI for?
 9   A.  When I had an MRI, I had one because of my -- let's see.
10   I had a -- excuse me.  I'm trying to remember.  I had an MRI
11   because of vertigo, and I had an MRI because of head injury.
12   Q.  Do you still see your primary care physician?
13   A.  I still go to the office.  My primary care physician
14   passed away.  He treated me for COVID, and he died of COVID,
15   and I don't want to talk about that.
16   Q.  So we are talking -- sorry.  We are talking about the
17   vertigo.  Can you talk a little bit more about what, explain
18   to us.
19   A.  Yes.  I had one episode of vertigo, and at that time I
20   remember when it was one morning when I had the episode of
21   vertigo.  I thought we were having an earthquake.  My family
22   and I lived in Oklahoma for a while so I woke up and was
23   holding the bed, and I yelled out to my daughter, I said, "We
24   are having an earthquake.  We are having an earthquake,"
25   because the bed was spinning.  And so she didn't respond.
```

Haysbert, J. - Direct                                                    288

```
 1    But, you know, I thought we were having an earthquake because

 2    the bed spinning, my head was spinning, the bed was spinning,

 3    everything was spinning.  I made my way to my bathroom

 4    because I had to throw up.  I had to regurgitate.

 5              So I made my way to the bathroom and regurgitated,

 6    everything -- I regurgitated.  And then by that time my

 7    daughter then came to my room and said, "Momma, we are not

 8    having an earthquake," and so asked me what was the matter,

 9    and I told her how I felt.  And so I made my way back to the

10    bed, and I called Dr. Chinnry, and he told me, I think two

11    days later, to come in.  And so I described to him what was

12    happening over the phone.  So he told me, well, you shouldn't

13    go to work.  And he asked me to come in a couple of days

14    later, and I went in a couple of days later, and he checked

15    me, prescribed some medicine.  So I was treated.  I had

16    vertigo that one time.  I was treated that one time with

17    prescription medicine that Dr. Chinnry gave me, and I got

18    better.  I've never had vertigo again.

19              THE COURT:  He gave you what?  Can you hear her?

20    She's speaking to you, but on this side of the courtroom we

21    are having more difficulty.

22              THE WITNESS:  Okay.  Is this better?

23              THE COURT:  Yes.

24              THE WITNESS:  I just kind of hold it down.  Where

25    should I start?
```

Haysbert, J. - Direct                                                    289

```
1    BY MR. HAYSBERT:
2    Q.  You can start with the last thing you said.
3    A.  Last thing I said was that I had that one episode of
4    vertigo, was treated by Dr. Chinnry with prescription
5    medicine.  I've never had vertigo again.
6    Q.  Okay.  Is there a way -- take it down.  Let's see if you
7    can just speak like that.  I think you did change it a little
8    bit.
9    A.  Okay.
10   Q.  I want to ask you a question, and then we will see if
11   that works.
12   A.  Okay.
13   Q.  So prior to this accident, how was your health?
14   A.  Very good.  Very good.
15   Q.  Can you explain.
16   A.  Yes.  With the hours that I told you I worked, you had to
17   have, for me, good health.  I had very good health.
18   Q.  Did you ever have vertigo before?
19   A.  Never had vertigo before.  I was just shocked when he
20   told me that I -- he thought it was vertigo, when I got to
21   his office.
22   Q.  You never had that vertigo experience again after that
23   one episode?
24   A.  I never had that vertigo experience from that day to this
25   day.
```

Haysbert, J. - Direct                                                    290

1    Q.  You saw a specialist for that incident?

2    A.  I eventually went to -- he ordered an MRI, and so I went

3    for the MRI.  Dr. Chinniry also sent me at some point in time

4    to an ear, nose, and throat specialist, because he told me in

5    our conversation in his office that sometimes one gets

6    vertigo from something with the ear functioning.  So he sent

7    me to that specialist.  That was ruled out.  It was nothing

8    wrong with -- the ear, nose, and throat specialist sent back

9    nothing wrong.

10   Q.  Did you experience anything like that episode on the day

11   you fell at Outback Steakhouse?

12   A.  No.  As I said before, that bout of vertigo I had, and if

13   you asked me one that I would want anybody else to have

14   again, and I never had it, another bout of vertigo.  I have

15   not had one from that day to this, I have not.

16   Q.  Have you ever fallen due to vertigo?

17   A.  Never fallen due to vertigo.  I had that one time, never

18   had it again.

19   Q.  Prior to the slip and fall accident had you ever fallen,

20   Dr. Haysbert?

21   A.  Ever in my life?

22   Q.  I'm talking about just as you're walking across a floor

23   like --

24   A.  No, I've not fallen.  I'm very careful, when you said

25   ever falling, because, yes, I've fallen when I was a kid

JODY A. STEWART, Official Court Reporter

1    playing basketball, things like that.  So I have fallen

2    before, but I have never fallen from vertigo or walking

3    across a floor.  I think that's what you're asking.

4    Q.  What about falling on the heels that you are --

5    A.  Oh, no.  I have never fallen on -- no.

6    Q.  Would you say your professional lifetime while working,

7    have you ever fallen while at work?

8    A.  I have never fallen while I was at work.  I wear shoes,

9    heels, practically every day, and I said practically because

10   sometimes like they are doing functions, we are allowed

11   dress-down days.  I may not have on heels that day.  I wear

12   heels the other days.

13   Q.  Prior to the accident did you ever have any difficulty

14   doing your work?

15   A.  No.

16   Q.  Any difficulty focusing before?

17   A.  None.

18   Q.  Did you regularly have meetings?

19   A.  Absolutely, yes.

20   Q.  What was your meeting schedule like?

21   A.  As I indicated earlier, the meeting schedules were --

22   there was meetings that were held an hour and sometimes they

23   was shorter.  They were with individual person, multiple

24   individuals, and groups, things of that nature, if I'm

25   understanding the question correctly.

1  Q.  Did you find it easy to concentrate before the accident?

2  A.  Yes, I did, very much so.

3  Q.  Did you ever have any difficulty remembering things?

4  A.  No.

5  Q.  Did you often feel tired before the accident?

6  A.  I felt tired at times when I moved, and I've had an

7  unusually difficult week of multiple things, and, yes, I felt

8  tired before, yes.

9  Q.  Did you get many headaches before the accident?

10  A.  No, not many headaches.

11  Q.  Did you ever frequently take pain medication before the

12  accident?

13  A.  No, not for headaches or anything, no.

14  Q.  Were you active in the church before the accident?

15  A.  Very active in my church.  My community as well.  I kind

16  of look at those two as kind of wrapped together because of

17  the kinds of things one is done in a church, young people, or

18  older people, senior citizens, things like that.

19  Q.  How about on boards of advisory boards you may serve on?

20  A.  I've served on several national boards, college boards,

21  Southern Association of Colleges and Universities, accredited

22  universities, Campus Contact, which is service learning,

23  national organization.  So, yes, I served on quite a few.

24  Q.  Tell us a little bit about your involvement in the

25  community before and how that's changed since the accident.

Haysbert, J. - Direct                                              293

```
 1   A.  My involvement was very -- I had a full schedule of
 2   activities, not only at work but part of working at a
 3   university service.  So part of that service will be to your
 4   community.  So I tend to try and wrap the community and my
 5   service together by serving on the boards that I just
 6   mentioned to you.  That was part of my service to the
 7   community, which was requirement of the university.  I served
 8   on a number of them before the accident.  I think your second
 9   part of your question?
10   Q.  Tell us a little bit about your involvement in the
11   community before and after.
12   A.  Before and after?
13   Q.  And after, yes.
14   A.  The involvement before was I served on many boards, both
15   at the national level, and I named a few of those, state
16   level, as well as City of Hampton.  Since the accident, I
17   have -- those that I can get off, I have gotten off of all of
18   those.  Those that terms ran out, I didn't seek
19   re-appointment as I would have, and I just tried to minimize
20   as many things as I could because I just wasn't able to
21   continue to focus, you know.  This accident happened.  The
22   slip and fall was 2018.  So we are talking about five years.
23           So it's like over the course of time, things have
24   changed in me, and I recognize that.  It is embarrassing for
25   me.  It's humiliating for me to be able to talk about myself
```

Haysbert, J. - Direct                                                    294

1    and what I did before and what I know I can't do now, and
2    I've tried to make adjustments and accommodations and all of
3    that for all of the things that I do every day.
4           I can change and do that because of rolling
5    responsibility I've always had, both at home and in my job.
6    I am a leader.  I'm a responsible person, and if I have
7    something to do, I tend to think more about how to get it
8    done, what I can do and what I can't do.  But realizing what
9    I couldn't do, I had to make changes, and I'm still trying to
10   make those changes.
11          I think I have done a very good job of making those
12   changes, and those changes include bringing other people to
13   do things that I wasn't able to do.  That is humiliating for
14   me now, to know that I can't do what I used to do.  You have
15   to ask your colleague, "What are your thoughts on this?"
16   When you are the one to give thoughts and design and make
17   planning, and I can't do those things like I used to.
18          And I know that so much so and so, I just say it's
19   embarrassing and hurtful.  It's almost -- it's just a hard
20   thing for me, very hard thing for me because all the things
21   I've done, I have worked hard to do them, to earn them.  I
22   did earn them.  People helped me, but it wasn't given to me.
23   And everything has been snatched away from me because I can't
24   do what I used to do because I slipped and fell on somebody's
25   floor that didn't take care of their floor.  I am hurt.  I am

Haysbert, J. - Direct                                                  295

```
 1    embarrassed.  I'm very hurt.  I'm very embarrassed.  This
 2    whole being here is not what I want to be.  I'm here because
 3    I have a right to advocate for myself.
 4           What happened to me shouldn't happen to anybody.  It
 5    just shouldn't.  And that's the most important thing for me,
 6    is advocating for JoAnn Haysbert and my family and anybody
 7    else that falls in the same situation.  It's just not right.
 8    It's not fair.  It's not right.  I'm hurt.  I'm embarrassed.
 9    I'm not me anymore.
10           I know the me that I was, and I know the me that I
11    am, and I'm not the me that I was anymore, and it's hard.
12    I'm fighting trying to make things happen and keep going.
13    It's hard, so hard to, you know -- I know I can't continue to
14    do that.  I'm going to retire.  I'm going to retire five or
15    so years earlier than what I planned.  Everybody in my
16    community, where I work, my age and older, they still
17    continue to work.  That was my plan.
18           My mentor, Dr. Harvey, retired when he was 81, was
19    president of the university 40 some years.  That was my plan.
20    I was supposed to be his successor.  I declined because I
21    know I couldn't do it, and I wasn't going to get into a
22    position to hold myself to failure.
23           THE COURT:  Let me ask you, Dr. Haysbert.  Are you
24    referring to Dr. Harvey who retired?
25           THE WITNESS:  Dr. Harvey retired, and I was to be
```

Haysbert, J. - Direct                                        296

 1   his successor.

 2          THE COURT:  How old was Dr. Harvey when he retired?

 3          THE WITNESS:  81.

 4          THE COURT:  You were how old when he retired?

 5          THE WITNESS:  He retired four years ago now, so I

 6   would have been 73.

 7          THE COURT:  You would have been 73?

 8          THE WITNESS:  Yes.

 9          THE COURT:  Before you go on, sir, are you a

10   witness in the case?  I noticed an individual came in.  Are

11   you scheduled to be a witness?

12          A WITNESS:  Yes, ma'am.

13          THE COURT:  You need to step out because witnesses

14   can't be in here, and we'll call you.  There should be

15   someone to show you.  Thank you.

16          All right.  Go ahead.

17          THE WITNESS:  I'm sorry.

18          THE COURT:  No.  We have a separation of witnesses

19   rule, and I don't know who the witnesses are.  I don't

20   recognize them, so I'm sorry I had to interrupt, but he

21   needed to leave the courtroom.  Go ahead.

22   BY MR. HAYSBERT:

23   Q.  Before the accident, Dr. Haysbert, did you sometimes give

24   interviews and speeches for your job?

25   A.  Yes.  Often.

Haysbert, J. - Direct                                              297

```
 1              MR. HAYSBERT:  If I may, Your Honor, I'd like to
 2   show a short clip of Dr. Haysbert before the accident.
 3              THE COURT:  Is it listed in your exhibits?
 4              MR. HAYSBERT:  Your Honor, this would fall under
 5   the P24 -- I'm sorry, P15, the demonstrative evidence.
 6              THE COURT:  P15?
 7              MR. HAYSBERT:  I believe so, Your Honor.
 8              THE COURT:  P15 says material/guidance regarding
 9   TBI.
10              MR. HAYSBERT:  P16.
11              THE COURT:  16 is other demonstrative and
12   illustrative materials, charts, summaries, evidence and
13   PowerPoint presentations, but those have not been admitted,
14   and they haven't been shown to the Court.
15              MR. HAYSBERT:  Your Honor, we could show them to
16   the Court.  We will just move on.
17              THE COURT:  All right.
18   BY MR. HAYSBERT:
19   Q.  Have you done interviews or speeches since the accident?
20   A.  Yes.
21   Q.  Have those been scripted?
22   A.  Yes.
23   Q.  And even with those scripts, have you had difficulty?
24   A.  I've practiced and practiced to make sure that once I get
25   before the audience or group that I'm able to read what I
```

Haysbert, J. - Direct                                      298

1   have on the paper.

2   Q.  How do you have to compensate at work now?

3   A.  So many things.  One of the things I made mention

4   earlier, I delegate more.  I pull in groups for things I

5   would handle myself.  I make it a group assignment.  This

6   recent, two weeks ago, we are getting ready to revise our

7   handbook.  That's something I usually do.  My supervisor

8   years ago, when I started at Hampton, the two of us wrote the

9   handbook.

10          I know I can't do that anymore, so I put together a

11  committee of faculty members availing to do what I used to do

12  and take it through the process.  So those are -- that's one

13  of the recent examples of what I do to get things done now.

14  I take notes.  I change my schedule.  I have people that --

15  what I know I can commission them, so I can just listen.  I

16  have those meetings where I know that it's going to require

17  some complex thinking, and I'm likely to forget what is said

18  in the middle of that conversation, which happens to me often

19  now.

20          Then what I do is to have someone else there with me

21  taking the notes of the minutes, and I didn't do any of that

22  before.  I didn't need to.  But I know I have to do it now.

23  I have my colleagues to send me, if I get a question from an

24  agency that's difficult, requires a lot of complex thinking,

25  processing and analyzing, I'll send it out and ask my

1    colleagues, "Give me your thoughts on this," something like

2    that, so that then I get their thoughts, which helps me to

3    formulate the best response for the institution, because

4    while I'm in the position I'm in, my colleagues are still

5    professionals, and I respect them as such.

6            So, again, things that I would ordinarily do myself,

7    I rely quite a bit on them, because they are professionals.

8    So my thought is just get the work done, and that's what I've

9    been endeavoring to do, compensate as much as I can by not

10   letting people know.  It is not something you go around and

11   tell people I don't process like I used to.  I don't remember

12   like I used to.  I may forget the words you are telling me

13   that are important.

14           So I don't, you know -- I don't tell people that.  I

15   don't tell anybody that.  That's not voluntary information.

16   What I still try and do is my job, and I try and do it well

17   with the help of my colleagues that are helping me.  As I

18   said, I delegate to them things that I would ordinarily do

19   myself, but I know I can't do it at the same level, and that

20   same level is still required, and as I continue to go on,

21   then it's getting worse.  It's not getting any better, and I

22   know that.

23           There is no magical pill I know about that can make

24   me well again, so I do what I can do, and as I said, I

25   decided to retire.  I don't want anybody to retire me.

Haysbert, J. - Direct                                                    300

```
 1              THE COURT:  When did you make that decision?

 2              THE WITNESS:  I made that decision sometime last

 3    year.

 4              THE COURT:  When are you scheduled to retire?

 5              THE WITNESS:  I've spoke with my president, and

 6    it's difficult to find a person, I want to say -- I'm not

 7    the only person who has worked as hard as I have, but I

 8    served my institution a long time, so I've spoken with him,

 9    and this is my last contract.

10              THE COURT:  Go ahead.

11    BY MR. HAYSBERT:

12    Q.  Dr. Haysbert, why are you putting yourself through all of

13    this?

14    A.  Because as I said earlier -- I do apologize for my lack

15    of compulsion.  As I said earlier, I have a right to advocate

16    for myself, as everybody in here has, and what started out to

17    be a beautiful day changed my life, and I think that Outback

18    Steakhouse ought to be more responsible.

19              MR. McGAVIN:  Objection, Your Honor.  Relevance.

20              THE COURT:  I overrule.  That's her opinion, and

21    fact witnesses can't give opinions, and it ultimately will

22    be the jury's decision as to whether there is liability or

23    not pursuant to the facts in the case and the law as given

24    by the Court.

25              THE WITNESS:  I don't know what all that means but
```

Haysbert, J. - Direct                                                301

1    okay.  I just want to advocate for myself.  That's what I'm

2    trying to do, advocate for me and anybody else that falls in

3    the same situation.  That's what this means to me today.

4    BY MR. HAYSBERT:

5    Q.  Just, if you could state in simple terms, do you feel

6    like the quality of your life has lessened and how so?

7    A.  Yes.  The quality of my life has lessened because I'm

8    always trying to get away from things and people because I

9    don't want anybody to know that I'm not the JoAnn Haysbert

10   that I once was.  I just don't want them to know.  So that

11   was, in itself, is a lessen of quality of one's life.  I used

12   to go to church three times a week.  I go once.  I just -- I

13   guess I don't want to be found out.  And so, yes, it has

14   lessened tremendously.

15   Q.  Just to go back to a point you made earlier about how you

16   prepare for speeches after the fall.  How did you prepare for

17   your speeches and public appearances before the fall?

18   A.  I may have made an outline, because, you know, I don't

19   have to -- when I was a kid, we learned in church to speak as

20   anybody speaks in church when you're a kid, in the Baptist

21   church, anyway, that's how I grew up.

22        And so wasn't -- wasn't anything for me to be able

23   to -- I think in our -- in the classroom because that wasn't

24   difficult for me because I grew up that way.  So before I

25   could just get on the stand and speak.  Now I don't trust

Haysbert, J. - Direct                                                    302

1    myself with doing that, so I script everything.  I read very

2    well.  I still read very well, because I practice enough.  I

3    read it, and I'm convincing, I hope, that maybe somebody

4    thinks I'm not reading, I don't know, but I'm reading.

5            If I'm not reading, I use a Teleprompter, and, you

6    know, the Teleprompter just has all the words and flows and

7    sit there and look like you're in a movie or something, but

8    you are really reading off the Teleprompter.  So that's the

9    way I do it now.

10   Q.  I also want to go back and clarify some testimony.  When

11   you first walked into the Outback Steakhouse, you said there

12   was a mat there?

13   A.  That mat was either there or in front of the -- what you

14   call it? -- I lose my words sometime -- hostess stand.

15   Q.  And were you on the mat at the time that you physically

16   fell?

17   A.  Oh, no.  No.

18   Q.  Thank you, Dr. Haysbert.  There was some testimony

19   earlier, really not testimony, but that you had experienced a

20   car accident at some point.

21   A.  Yes.

22   Q.  Do you recall the year?

23   A.  I don't recall the year, but it was about three years or

24   so -- might have been four -- three or four years after the

25   fall at the Outback Steakhouse.  I was coming --

Haysbert, J. - Direct                                                    303

1   Q.  Without going into the specifics of it?

2   A.  I don't remember specifics.

3   Q.  I wanted to ask you the effects of it.  So let me ask you

4   the question and you can answer the question for me.

5   A.  Okay.

6   Q.  So the deficits that you were discussing throughout your

7   testimony, was this happening before the car accident or did

8   it start after the accident?

9   A.  Before the car accident because the car accident happened

10  about three or four years after the Outback Steakhouse slip

11  and fall.

12  Q.  And did you hit your head in the car accident or

13  anything?  Describe what injuries you suffered as a result of

14  the car accident.

15  A.  I didn't suffer any injuries.  What happened, the police

16  officer was called.  The other person got the ticket, but

17  when the police officer is called, you have to go to the

18  emergency room.  And so my son took me to -- my oldest son

19  was visiting with me, took me to the emergency room, and

20  there I was given -- I don't know what that exam is called, a

21  scan.  I don't know whether it was MRI or CT scan, one of

22  those two.

23          THE COURT:  Again, you need to raise your voice.

24  You were with a friend?

25          THE WITNESS:  No.  My oldest son who lives in

JODY A. STEWART, Official Court Reporter

Haysbert, J. - Direct                                          304

1    Maryland was visiting me the weekend of the accident, of the
2    car accident, and he took me to the emergency room because
3    the police officer said I had to go because there was a car
4    accident.
5    BY MR. HAYSBERT:
6    Q.  Thank you, Dr. Haysbert.  The MRI or CT scan or CAT scan,
7    whatever you received, do you recall what the results were of
8    that?
9    A.  It showed that I had -- it showed that I had a brain
10   aneurysm.
11   Q.  And did you follow up with any doctors regarding the
12   brain aneurisms?
13   A.  I think they are -- went -- always go to my primary
14   physician, but I did go to a doctor, yes.
15           THE COURT:  You went to, again?  Your voice is
16   dropping.
17           THE WITNESS:  I'm sorry.  I went to my primary
18   physician as well as another doctor.  I don't remember that
19   doctor's name right now.
20   BY MR. HAYSBERT:
21   Q.  And did anyone tell you what the cause of your brain
22   aneurisms were?
23   A.  No.
24           MR. McGAVIN:  Objection, Your Honor, hearsay.
25           THE COURT:  Sustained.  But they didn't tell her

Haysbert, J. - Direct                                                    305

```
 1   any causes?
 2          THE WITNESS:  No.
 3   BY MR. HAYSBERT:
 4   Q.  Thank you, Dr. Haysbert.  Dr. Haysbert, you've indicated
 5   a number of things and that you plan to retire because of
 6   these difficulties.  Is there anything else that you would
 7   like to tell the jury that you feel they ought to know about
 8   the slip and fall or anything you want to share with them?
 9   A.  I was more emotional than I ever planned to be.  I think
10   I have answered -- I've tried to answer the questions that
11   you asked, and I tried -- I was as truthful as I can be.  And
12   I just want this to be, as I said before, it's an advocacy
13   for me.  I know there is liability on the table.  I'm not all
14   about money.  That's what I said.  That's not who I am.
15          But I am advocating for me, and every other person
16   that has a right to do so.  When you walk into a restaurant,
17   you ought to be able to go to a bathroom and come out and go
18   home without changing your life.  That's what I mean.
19          MR. HAYSBERT:  No further questions, Dr. Haysbert.
20   Thank you.
21          THE COURT:  We will take a 10-minute recess, and
22   then we will resume with cross-examination.  You can leave
23   your pads in your chairs.  You can just turn them over and
24   leave them in your chairs.
25          (Jury out at 11:10 a.m.)
```

Haysbert, J. - Cross                                                      306

```
 1              THE COURT:  Counsel, we will take a 10-minute
 2    recess and then continue with cross-examination.
 3              (Recess from 11:10 a.m. to 11:28 a.m.)
 4              (Jury in at 11:28 a.m.)
 5              THE COURT:  All the jurors are back from break, and
 6    we are to proceed with cross-examination of Dr. Haysbert.
 7              Mr. McGavin.
 8              MR. McGAVIN:  Thank you, Your Honor.
 9                        CROSS-EXAMINATION
10    BY MR. McGAVIN:
11    Q.  Dr. Haysbert, do you prefer to be addressed as
12    Dr. Haysbert?  Is that how you prefer, based upon your
13    education and your training?
14    A.  In this setting, that would be fine.
15    Q.  Yesterday I spoke of you as Mrs. Haysbert, and I meant no
16    disrespect, and I will address you in that way for the rest
17    of these proceedings.
18    A.  None intended.  That's fine.
19    Q.  Thank you.  Dr. Haysbert, tell us where you obtained your
20    undergraduate degree.
21    A.  Johnson C. Smith, Charlotte, North Carolina.
22    Q.  And when was it that you completed that degree?
23    A.  1969.
24    Q.  Then you pursued additional education, I understand.
25    Would you tell the jury about that education or achievement.
```

1    A.  Certainly.  I did further study at the University of

2    California, San Jose.  Earned a master's and a doctorate

3    degree at Auburn University in Auburn, Alabama.

4    Q.  And when did you obtain your doctorate degree?

5    A.  Year, 1978.

6    Q.  Since 1978, have you always worked in the education

7    field?

8    A.  Yes.

9    Q.  When did you first begin -- well, let me lay the

10   foundation first.  I apologize.  Are you currently employed

11   at Hampton University?

12   A.  Yes, I am.

13   Q.  What is your position?

14   A.  I am the executive vice president and provost.

15   Q.  And how long have you served in that capacity?

16   A.  This is a new title change.  I've been at Hampton since

17   1980.  I've had various capacities or served in various

18   capacities there.  I think the last time I took this provost

19   position was probably 2014.

20           THE COURT:  So the provost was 2014, approximately?

21           THE WITNESS:  It's a double, dual title.

22           THE COURT:  Pardon?

23           THE WITNESS:  It's a dual title.

24           THE COURT:  And it is?

25           THE WITNESS:  Executive vice president and provost.

Haysbert, J. - Cross                                                    308

1              THE COURT:  You got that title in 2014?

2              THE WITNESS:  The provost title in 2014.  It's

3    always been provost.  At one time it was chancellor and

4    provost.  Then it -- it's a lot of titles, executive vice

5    president at one point, executive vice president/provost at

6    one point.

7              THE COURT:  I just can't hear you.  You have to

8    speak up.

9              THE WITNESS:  Executive vice president and provost

10   at one point, chancellor and provost at one point, and

11   executive vice president and provost at this point.

12   BY MR. McGAVIN:

13   Q.  Are your job duties different today?

14   A.  Some of them are, from when I started, if that's what you

15   mean.

16   Q.  Well, there is a new president at the university, isn't

17   there?

18   A.  Yes, there is a new president.

19   Q.  What is his name?

20   A.  His name is lieutenant retired -- Lieutenant General

21   retired Darrell K. Williams.

22   Q.  And when did General Williams come to work at the

23   university or at Hampton University as the president?

24   A.  About a year ago.

25   Q.  Did he succeed Dr. Harvey?

1    A.  Yes, he did.

2    Q.  Now, in your job duties that you have under the new

3    president, have your job duties been reassigned to anyone

4    else?

5    A.  No.  My job duties have not been reassigned.  My title

6    has changed.

7    Q.  Is it correct that since you assumed the role of either

8    chancellor or provost and executive vice president in

9    approximately 2014, through the present, 2023, your job

10   duties and responsibilities are unchanged?

11   A.  The title has changed, and there has been some change

12   with the duties and responsibilities.  As the chancellor,

13   that person was considered to be the chief operating officer.

14   Under the new president, there is no chancellor title, and

15   hence no chief operating officer.

16          THE COURT:  But how long have you been the provost?

17          THE WITNESS:  The provost has been a title

18   consistent from 2014, has been a dual title, that's changed

19   back and forth, chancellor.

20          THE COURT:  I understand there's been job titles.

21   But you've been provost since 2014, and you're still

22   provost?

23          THE WITNESS:  That is correct.

24          THE COURT:  In addition to that, you are an

25   executive vice president?

| | |
|---|---|
| 1 | THE WITNESS:  That is correct. |
| 2 | THE COURT:  How long have you been executive vice |
| 3 | president? |
| 4 | THE WITNESS:  I've held that title more than once. |
| 5 | The last time is currently as of July 1. |
| 6 | THE COURT:  As of July 1 this year? |
| 7 | THE WITNESS:  Uh-huh. |
| 8 | THE COURT:  Executive vice president? |
| 9 | THE WITNESS:  Uh-huh. |
| 10 | THE COURT:  And provost? |
| 11 | THE WITNESS:  That is correct. |
| 12 | THE COURT:  All right. |
| 13 | BY MR. McGAVIN: |
| 14 | Q.  Was there a period of time where you served as the |
| 15 | president of a college or university? |
| 16 | A.  Yes. |
| 17 | Q.  What college or university? |
| 18 | A.  Langston University in Langston, Oklahoma. |
| 19 | Q.  What was the term of your assignment there or your |
| 20 | presidency at Langston University? |
| 21 | A.  The -- what was -- would you rephrase the question?  What |
| 22 | was the what? |
| 23 | Q.  I was trying to understand when, what years? |
| 24 | A.  The year? |
| 25 | Q.  Yes. |

Haysbert, J. - Cross                                                    311

1   A.   2005 through 2011 or '10.

2   Q.   Why did you leave there?

3   A.   I was invited back to Hampton by Dr. Harvey and desired

4   to come back at the time that I did.

5   Q.   Thank you.  In regard to the incident in question at the

6   Outback Steakhouse in Chesapeake, had you ever been to that

7   restaurant before?

8   A.   I don't recall.  I've been to an Outback Steakhouse

9   before, yes, but I've been to that particular one, I honestly

10  don't know.

11  Q.   Have you been there since?

12  A.   No.

13  Q.   What did you notice in your previous visits to Outback

14  Steakhouse about the condition?

15          MR. HAYSBERT:  Objection, Your Honor.  Calls for

16  speculation.

17          THE COURT:  Are you talking about this Outback

18  Steakhouse or other Outback Steakhouses?

19          MR. McGAVIN:  Other Outback Steakhouses.

20          MR. HAYSBERT:  Withdraw the objection.

21          THE COURT:  Go ahead.

22          MR. McGAVIN:  Thank you.

23  BY MR. McGAVIN:

24  Q.   Let me start, just rephrase it for the court reporter.

25  When you went to other Outback Steakhouses, did you recognize

```
 1   what was the composition of the floor?
 2   A.  No.  I don't know what you mean.  I don't understand.
 3   Q.  Do you have hardwood floors at home?
 4   A.  In some parts of my house, I do, yes.
 5   Q.  And do you also have carpet?
 6   A.  Yes, I did.
 7   Q.  So on the day of this incident, was it May 23, 2018?
 8   A.  Okay.
 9   Q.  Is that correct?
10   A.  I think that's correct.
11   Q.  What day of the week was it?
12   A.  I think that's a Friday.  I'm not certain, but I think it
13   was a Friday.
14   Q.  Does that make sense since you've traveled the next day
15   to South Carolina?
16   A.  I don't remember what you mean, does it make sense.
17   Q.  Does that refresh your recollection that since the next
18   day --
19   A.  I think it was on a Friday because we went to get our
20   hair done during the week, yes.
21   Q.  Thank you.
22   A.  Weekday.
23   Q.  What were the weather conditions like that day?
24   A.  Starting that morning, it was a beautiful day.  I think
25   it was a beautiful day.
```

Haysbert, J. - Cross                                                              313

1   Q.  Did it rain?

2   A.  I don't think so.

3   Q.  Was the parking lot wet when you arrived at the Outback

4   Steakhouse?

5   A.  I don't recall.

6   Q.  Do you recall when you drove to the Outback Steakhouse

7   from the salon whether you had to use your windshield wipers?

8   A.  I don't recall using them.

9   Q.  When you exited your car, did you go into the takeout

10  area or did you go into the main entrance?

11  A.  I went into the main entrance to go to the bathroom.

12  Q.  Thank you.  And your daughter went into the takeout

13  entrance?

14  A.  My daughter was in the car when I left.

15  Q.  I see.  Did you place an order?

16  A.  We placed an order.

17  Q.  How?

18  A.  The person came out to us.

19  Q.  I see.  So you were in your car and placed the order from

20  curbside?

21  A.  Correct.

22  Q.  When you came out of your car and walked to the front

23  entrance of the restaurant, did you notice whether the

24  pavement was wet?

25  A.  I do not recall whether the payment was wet or not.

1    Q.  When you reached the front entrance, did you have any

2    difficulty entering the front entrance?

3    A.  No.

4    Q.  And when you opened the front doors, did you notice what

5    the floor was made of in the front entrance?

6    A.  It was either -- I think it was carpet.

7    Q.  Was the carpet wet?

8    A.  Not to my recall.

9    Q.  You say you approached the hostess stand, and there was

10   an African-American woman there that you spoke to; is that

11   correct?

12   A.  That is correct.

13   Q.  Did you see Lisa Crosby at that time?

14   A.  I do not recall seeing anyone but the one person.

15   Q.  Do you recall that person's name?

16   A.  No, I do not.  Didn't ask.

17   Q.  Pardon me?

18   A.  I didn't ask the name, and I do not know it.

19   Q.  Thank you.

20   A.  Uh-huh.

21   Q.  All right.  Once you made your request to use the

22   restroom, and the staff person responded, did you notice

23   anything about the condition of the floor before you stepped

24   past the hostess stand?

25   A.  No, I didn't.

Haysbert, J. - Cross                                                    315

Q.  Did you look?

A.  No.  I wasn't looking at the floor.

Q.  Is it correct you were not looking where you were going when you fell?

A.  I was looking straight ahead to where she pointed me to go, which was to go to the bathroom.  So when she said this way (indicating), that's where my eyes went, this way (indicating).

Q.  Is there any reason you couldn't have looked at the floor that you stepped on before you fell?

MR. HAYSBERT:  Objection.  This is confusing.

THE COURT:  Go ahead.  Overruled.

THE WITNESS:  I don't know what that means.

THE COURT:  Repeat your question.

MR. McGAVIN:  I will.

BY MR. McGAVIN:

Q.  Is there any reason you couldn't have looked at the floor before you proceeded?

A.  My question to the hostess was I need to go to the bathroom.  So would that be my intent, that's where my focus was.

Q.  Do you wear glasses?

A.  I do not.

Q.  Do you wear contacts?

A.  I do not.

1  Q.  How was the lighting in the restaurant when you entered?

2  A.  Visible.

3  Q.  You don't have any complaints about the lighting, do you?

4  A.  No, I didn't have any complaints about the lighting.

5  Q.  Was there anything in front of you before you stepped

6  into the main dining room?

7  A.  No.

8  Q.  Was there anything that obstructed your vision?

9  A.  No.

10  Q.  You've indicated you took a step or two forward and fell;

11  is that correct?

12  A.  That's correct.

13          MR. HAYSBERT:  Objection.  This is confusing, Your

14  Honor.

15          THE COURT:  I do not find it confusing.  They are

16  straightforward questions.  I overrule the objection.

17          MR. HAYSBERT:  Your Honor, we have no idea what he

18  is talking about one or two steps after the hostess stand or

19  after she reached the front entrance.

20          THE COURT:  Overruled.

21          MR. HAYSBERT:  It's confusing and it's not

22  specific.

23          THE COURT:  Overruled.  If it is confusing, then

24  the jury can decide it's confusing and put whatever weight

25  they want on the testimony.  The Court doesn't find it

```
 1    confusing.  Go ahead.  I don't know where you were at this
 2    point, but go ahead.
 3              MR. McGAVIN:  Thank you, Your Honor.
 4    BY MR. McGAVIN:
 5    Q.  You recall that you had -- you felt some carpet under
 6    your foot; is that right?
 7    A.  Yes.
 8    Q.  And then you --
 9    A.  Before the fall.
10    Q.  Yes, ma'am.  And then you say that you moved into the
11    main dining room; is that right?
12    A.  I took one or two steps in the direction the lady told me
13    the bathroom was, yes.
14    Q.  Was that into the main dining room?
15    A.  Yes.
16    Q.  Had -- pardon me?
17    A.  Yes.
18    Q.  I'm sorry.  Thank you.
19              And when you took those steps, did you happen to feel
20    what was underfoot?
21    A.  I felt a slick floor.
22    Q.  Well, was it carpeted?
23    A.  No, it wasn't carpeted when I took the steps.
24    Q.  Did you happen to notice whether it was wood or tile or
25    marble?  Did you notice?
```

Haysbert, J. - Cross                                              318

1   A.   No.

2   Q.   You never looked?

3   A.   I wasn't looking at the floor.  I was looking the

4   direction I was going to go.

5   Q.   Correct.  And so, therefore, you wouldn't know if

6   anything was on the floor or had been spilled or if there was

7   a Bloomin' onion on the floor since you didn't look?

8   A.   No, I wouldn't know.

9   Q.   And when you fell, you say you fell on your left side; is

10  that correct?

11  A.   That's correct.

12  Q.   And you say you slammed your head against the floor?

13  A.   That's correct.

14  Q.   And that, I take it, you fell against something that was

15  not carpeted?

16  A.   I slammed my head on the floor.  The floor was not carpet

17  that I fell on.

18  Q.   That's what I'm getting at, yes.  Thank you.

19  A.   Okay.

20  Q.   When you did, were you wearing a hat that day as you are

21  today?

22  A.   I wear a hat every day, yes.

23  Q.   And you do that for religious reasons, I understand?

24  A.   That is correct.

25  Q.   And what about your hat?  Was it still perched upon your

```
 1   head after your fall?

 2   A.  I don't even recall.

 3   Q.  And were you wearing the same hat that you're wearing

 4   today, do you recall?

 5   A.  No.

 6   Q.  Do you recall that Ms. Crosby -- you wanted to say

 7   something?

 8   A.  No, I remember that I should be looking at the jury since

 9   I'm addressing them.  I'm just looking at the jury.

10   Q.  All right.  As you will.  So, Dr. Haysbert, do you recall

11   that Ms. Crosby was the first person to render aid to you?

12   A.  I do recall Ms. Crosby, yes.

13   Q.  And do you recall that she was just a step or two in

14   front of you when you fell?

15   A.  No.

16   Q.  Do you know where she came from?

17   A.  I do not.

18   Q.  And when you got your wits around you, as you say, did

19   you sit up on your rear end, so to speak, or did you lay on

20   your side?

21   A.  I was laying -- when I came to myself, I was on my side.

22   As I said, I slammed my head, and I remember opening my eyes

23   to glimpses of shoes or something.  That's what's in my

24   memory.

25   Q.  I understand, but did you sit up or did you stand up?
```

Haysbert, J. - Cross                                              320

1    A.  People helped me up.  I don't recall any particulars of

2    whether -- how I was seated.  I know I fell down on the left

3    side.

4    Q.  You're indicating and showing us leaning to the left as

5    you did there; is that right?

6    A.  People helped me up.

7    Q.  Thank you.  All right.  And you did not break any bones,

8    did you?

9    A.  No.

10   Q.  Now, in the aftermath did Ms. Crosby help you to your

11   chair or to a chair?

12   A.  Ms. Crosby and some other people helped me to a chair.

13   As I said, I don't remember how many.  It seemed like a lot

14   of people.  It may not have been, but that's the way it

15   appears, yes, she was one of those, as I recall, because I

16   have vision of her sitting at the chair on -- next to me.

17   Q.  All right.  Now, in regard to the dress that you were

18   wearing, I think you said a skirt or a dress?

19   A.  It was a skirt.

20   Q.  And a top; is that right?

21   A.  Uh-huh.

22   Q.  Is that a yes?

23   A.  That's a yes.  I'm sorry.

24   Q.  Thank you.  I'm doing that for the reporter, not to be

25   difficult.

Haysbert, J. - Cross                                                    321

1   A.  Okay.

2   Q.  Thank you.  Were you wearing a sweater?

3   A.  It's a jacket.

4   Q.  Jacket.

5   A.  Suit jacket.

6   Q.  Did you notice whether or not your clothes were wet or

7   soiled or torn or otherwise in disarray?

8   A.  I did not notice, have no memory of that.

9   Q.  You don't recall your left side being wet or greasy or

10  having any foreign substance on it, do you?

11  A.  I don't recall.  I don't -- I didn't even look or think

12  about my clothes, to be honest with you.  I did not.

13  Q.  Well, but in terms of after the fact, when you were

14  assessing what had happened to you, did you notice any --

15  A.  No, I did not.

16  Q.  -- anything on your clothes that had not been there

17  before?

18  A.  I did not notice anything on my clothes.

19  Q.  Were your shoes still on your feet?

20  A.  Yes.

21  Q.  Were you carrying a lady's handbag when you came in?

22  A.  No.

23  Q.  A phone or some kind of a -- I don't know what -- some

24  kind of a bag of some kind?

25  A.  I don't remember carrying anything.

1   Q.  Did you have any cuts on your left arm, on your hand, on

2   your hip, on your leg?

3   A.  I had bruises and contusions all the way here

4   (indicating).

5   Q.  And for the record, I'd like to describe where you have

6   been indicating for the court reporter.  Are you indicating

7   placing your -- let me finish, and I'll let you -- ask you to

8   agree or disagree, if you don't mind.

9   A.  Okay.

10  Q.  Were your indicating that you were touching your left

11  shoulder down your left arm; is that what you're indicating?

12  A.  That's what I'm indicating, yes, sir.

13  Q.  Thank you.  Did you have any visible sign of injury to

14  your head?

15  A.  I said I wasn't looking at my head at the time.  Later on

16  there was a picture of a scar that was on my left side.

17  Q.  And how large was that?

18  A.  Maybe like this (indicating).  I'm guessing -- left me

19  put that into words.  I'm guessing the size of a nickel.

20  Q.  All right.  Did you have any bleeding?

21          THE COURT:  Are you talking about a circular scar

22  or a length?

23          THE WITNESS:  Circular scar.

24          THE COURT:  A scar?

25          THE WITNESS:  What --

1           MR. HAYSBERT:  She said scar.

2           THE COURT:  She said scar, and then she said a size

3    of a nickel, and I'm asking her was it a circular scar.  Was

4    she talking about the length of the scar?

5           MR. HAYSBERT:  She said circular.

6           MR. McGAVIN:  Circular.

7           THE COURT:  That's what she said.

8           THE WITNESS:  Yes, you're correct, Your Honor.

9           THE COURT:  All right.

10   BY MR. McGAVIN:

11   Q.  Did you have any cut or bleeding to your head?

12   A.  Did not have any bleeding to my head, no, sir.

13   Q.  And when you went home that evening or the next day when

14   you were preparing your hair or preparing washing your face

15   or brushing your teeth, did you notice anything on your head?

16   A.  I didn't notice any -- I noticed the scar, but I

17   didn't -- oh, you said my head?

18   Q.  Yes, ma'am.

19          THE COURT:  When you say a scar, I'm confused.

20          THE WITNESS:  I don't know how to describe it.

21          THE COURT:  There was a scar already there on the

22   day of the injury?  Maybe I'm thinking of a scar is

23   something that, for instance, you have surgery, and there's

24   a scar on you in your skin.  Was it a scar or a contusion?

25   A contusion would be a bruise or tissue.

1          THE COURT:  It was not a scar.  I was following his

2     terminology.  It would be more contusion.

3          MR. McGAVIN:  Thank you.  Thank you.

4     BY MR. McGAVIN:

5     Q.  All right.  Now, in your extensive experience, look, as I

6     understand it, you wear heels all the time?

7     A.  Yes.

8     Q.  The heels that you are wearing that you displayed you're

9     wearing today, can you give us an estimate of about how high

10    that heel is?

11    A.  I think it's about two inches.

12    Q.  Are these shoes you've worn previously, in other words,

13    before that day?

14    A.  Yes.

15    Q.  How frequently?

16    A.  Well, I can't tell you how frequently.  I wear them

17    fairly frequently.

18    Q.  Have they been re-soled since that time five years ago?

19    A.  No, they have not.

20    Q.  And have they -- have you worn them since the day of this

21    incident?

22    A.  Yes, I have.

23    Q.  I want to display to you an exhibit that's been

24    premarked, and I would ask with the assistance of the team

25    here, I'd like to display this to you but not to the jury.

Haysbert, J. - Cross                                                        325

1           All right.  At this time.  So this is for

2    identification only, Defendant's Exhibit Number 2.  Do you

3    recognize what is shown in Defendant's Exhibit Number 2?

4    A.   My shoes that I have on today.

5    Q.   And those are the same shoes, are they not?

6    A.   Absolutely.

7    Q.   And did you know that Ms. Crosby took a picture of those

8    shoes on the day of your incident on May 23, 2018?

9    A.   I did not know she took a picture.

10   Q.   All right.  So when you got yourself up and exited the

11   restaurant, did you walk over the same area where you had

12   fallen on the way in?

13   A.   I walked out of the restaurant.

14   Q.   Yes.

15   A.   Whether it was the very same area -- I went out the same

16   door, as I recall.

17   Q.   Well, did you recall any assistance, anyone hold you as

18   you exited out of the restaurant?

19   A.   My daughter and I walked out together, so I don't know --

20   I recognize these are my shoes.  I don't know anybody took

21   them.  I don't know when they took the picture.  I just

22   recognize they are my shoes, yes.  I recognize the piece of

23   the --

24   Q.   I'm going a bit past that, though, Dr. Haysbert.  Once

25   you got up --

Haysbert, J. - Cross                                              326

1  A.  Uh-huh.

2  Q.  -- and stood up to leave, did you have any difficulty

3  with the floor?

4  A.  I don't recall having difficulty with the floor, so

5  someone walking with me.  My daughter helped me out.  My

6  daughter walked out with me.

7  Q.  I understand she walked out with you, but was she holding

8  you to make sure that you would not fall again?

9  A.  Holding me, she was close to me.  Yes, she was very close

10  to me.  Whether she had her arms around me or not, I don't

11  recall.

12  Q.  Thank you.

13          MR. McGAVIN:  So, Your Honor, at this time

14  Defendant's Exhibit 2 is for identification only, and I will

15  reserve the right to offer it into evidence in my case at

16  the appropriate time.

17          THE COURT:  Let me ask Dr. Haysbert one question.

18  Is that the skirt that you had on that day?

19          THE WITNESS:  Yes, it is.  Same one I had on

20  yesterday.

21          THE COURT:  Pardon?

22          THE WITNESS:  Yes, ma'am.  It is the same skirt

23  that I had on that day.

24          THE COURT:  Go ahead.

25          MR. McGAVIN:  Thank you, Your Honor.

1    BY MR. McGAVIN:

2    Q.  I'm going to ask you to take a look, and I'm keeping my

3    voice up for the court reporter as I move, so I'm not

4    yelling, Your Honor.  I'm trying to make sure that we hear.

5          I'm going to show you what's been marked as

6    Defendant's Exhibit Number 1 for identification.  I'd ask the

7    clerk to make that available to the witness and the Court and

8    counsel, of course.  Do you have that displayed for you,

9    Dr. Haysbert?

10   A.  Yes.

11   Q.  Do you recognize Defendant's Exhibit Number 1 as a

12   photograph of the floor in the area where you fell on May 23,

13   2018?

14   A.  I can't say that that's the floor where I fell or not.

15   Q.  Well, even after you fell, did you happen to inspect the

16   floor to see either was it marble, was it wood, was it

17   linoleum, was it tile?

18   A.  Sir, I did not inspect the floor after I fell.

19   Q.  You didn't -- I'm sorry, were you finished?

20   A.  Yes.  I said, no, sir, I did not inspect the floor after

21   I fell.

22   Q.  Let me ask that a slightly different way.

23   A.  Okay.

24   Q.  Did you look at the floor after you fell to try to

25   understand if there was something wrong with the floor that

Haysbert, J. - Cross                                                        328

1   caused your fall?

2   A.  No, I did not inspect the floor.  My thought was what

3   happened, and didn't turn to the floor and say -- no, I

4   didn't.

5   Q.  So then in regard to Defendant's Exhibit Number 1, is it

6   correct to say that you are not able to identify whether or

7   not that floor is -- that photograph is a fair and accurate

8   depiction of the floor as it appeared on May 23, 2018?

9   A.  That is correct.  I cannot identify that as what the

10  floor looked like that day.

11          MR. McGAVIN:  Thank you.  Tammy, that's what I need

12  for now.  Thank you.

13  BY MR. McGAVIN:

14  Q.  On the evening that this occurred, could you tell me

15  approximately what time it was?

16  A.  It had to be somewhere between 5:00 and 6:00, because

17  assuming our appointments were in the late afternoon about

18  3:00, something like that.

19  Q.  How far were you from your residence at that time?

20  A.  Hampton from Chesapeake, as I said earlier, I believe I

21  did, it is about a 20- or 30-minute drive, depending on the

22  traffic.

23  Q.  And where is it that you live?  Do you live in Hampton?

24  A.  I live in Hampton.

25  Q.  And how long have you lived there?

Haysbert, J. - Cross                                                          329

1  A.  Since 1980, except for the years I lived in Oklahoma.

2  Q.  Okay.  Let's talk about what happened, then, the next

3  day, which would be Saturday.  Is that the day that you and

4  your daughter traveled to South Carolina?

5  A.  I believe it was that next day or the next -- either the

6  next day or the day after, one or the other.  I can't be

7  absolutely sure, but that day or the following day, so it

8  would have been that Saturday or that Sunday.

9  Q.  Who drove to South Carolina?

10 A.  My daughter did.

11 Q.  How long a drive is it to your mother's residence?

12 A.  Five hours.  It's about five hours.

13 Q.  What town is that?

14 A.  Kingstree.

15 Q.  Say again, please.

16 A.  Kingstree, K-i-n-g-s-t-r-e-e.

17 Q.  Is that where you were born and raised?

18 A.  That's where I was born and raised, yes.

19 Q.  And did you say your mother is still living?

20 A.  My mother is 95 years old.

21 Q.  And at the time of this visit was there an emergency that

22 you were attending to or was it a visit to visit a loved one?

23 A.  It was a planned visit to visit a loved one, yes.

24 Q.  In other words, I may have said that she was in poor

25 health and needed your help in opening, and I think I stand

Haysbert, J. - Cross                                                        330

```
 1   corrected.  This was just a visit to see your mom who you
 2   care for deeply, a planned visit?
 3   A.  Yes.
 4   Q.  Is there any reason you couldn't have postponed that
 5   visit?
 6   A.  Not for me because my mother at 90, there are only three
 7   of us.  When I made the commitment to her, I try and make
 8   sure that happens, try and get there.  So, no, I guess you
 9   can always, in retrospect or afterwards, think you could have
10   done it differently, but at that time, I'm thinking my mother
11   is waiting for me, expecting me, so, as I said, my daughter
12   said, "Do you think you can make it?"  I said, "Let's try."
13   Q.  You didn't want to disappoint her?
14   A.  I did not.
15   Q.  All right.  And what did you do on your visit to South
16   Carolina with your mother?
17   A.  Well, most of the same thing we always do.  Sit, chat,
18   eat.
19   Q.  When you arrived in South Carolina in Kingstree, other
20   than visiting at the home, did you go anywhere?
21   A.  Well, we went to -- we went -- where else did we go?  I
22   don't recall where else we went on that visit because it was
23   a primary thing.  I know we went to the urgent care place.
24   Q.  Right.  I'll ask you about that in just a minute, but did
25   you go anywhere else?  For example, did you go to the grocery
```

Haysbert, J. - Cross                                                331

```
 1   store and buy groceries for your mom or was there a
 2   restaurant that she liked that you went to?
 3   A.   No.  We didn't do either of those things.
 4   Q.   Did you have other family there in South Carolina?
 5   A.   At that time, I wouldn't say family.  My mother has
 6   distance relatives that lives in the area, yes.  I have one
 7   sister, one brother, and they did not live in that area.
 8   Q.   Thank you.  You mentioned that you went to the urgent
 9   care.  When you went to the urgent care, isn't it true that
10   you did not report any loss of consciousness or any head
11   injury?
12   A.   I don't think that that's correct when you said head
13   injury.  I reported what happened to me, and, yes, from loss
14   of consciousness.  I told them what happened to me.
15   Q.   Let me see if I can refresh your recollection about that
16   visit.
17   A.   Okay.
18   Q.   So I would ask, with the assistance of the court officer,
19   to show this to the witness and not display this to the jury
20   at this time.
21            MR. HAYSBERT:  Your Honor, before he displays that,
22   he has not established that she has seen this document
23   before.  We don't know what this is.
24            THE COURT:  We talked about the records before.
25   It's her medical record, and he's entitled to examine her.
```

Haysbert, J. - Cross                                                332

```
 1   She said she went to the clinic, and this is the medical

 2   record, as I understand it, that was subpoenaed.  So I

 3   overrule the objection.

 4           MR. HAYSBERT:  Your Honor, if I may, he doesn't

 5   actually -- there is a difference between having a medical

 6   record from that and what she talked to the doctors about.

 7           THE COURT:  Well, he's asking to refresh her

 8   recollection.

 9           MR. HAYSBERT:  Of what she talked to the doctors

10   about or the medical record itself?

11           THE COURT:  Overrule your objection.  Go ahead.

12   BY MR. McGAVIN:

13   Q.  Dr. Haysbert, do you have displayed in front of you a

14   record from -- I'm going to zoom out on this -- a record from

15   Medcare dated May 25, 2018?

16   A.  Yes.

17   Q.  Does this refresh your recollection that you went to

18   Medcare in South Carolina on May 25, 2018?

19   A.  Yes.  Remind me of the exact name of the place, yes.

20   Q.  Just to talk about it a little bit.  Is it correct that

21   you're 5'6" tall?

22   A.  Yes.

23   Q.  And weigh about 150 pounds at the time?

24   A.  Yes.  I still do.

25   Q.  All right.  You say still maintain that same weight, of
```

Haysbert, J. - Cross                                    333

1  course?

2  A.  Uh-huh.

3  Q.  And do you recall that when you were there you talked

4  about left wrist pain, shoulder pain, a contusion to the

5  shoulder, and contusion of the wrist?

6  A.  I see that that's what their diagnosis included, that's

7  what it reads there, but I did tell them all about what

8  happened to me.

9  Q.  All right.  So you're saying that they failed to

10 record --

11 A.  Everything that I said.

12 Q.  -- including you told the folks at Medcare that you had a

13 loss of consciousness?

14 A.  I just told them what happened to me.  I may have said

15 that.  I don't recall all the words.  But I did tell them

16 that I fell and slammed my head.  That's what I remember.  I

17 did tell them all that happened.

18            THE COURT:  Let her finish.

19            MR. McGAVIN:  I'm sorry, Your Honor.

20            THE COURT:  Can you repeat the last.

21            THE WITNESS:  Yes.  I said that I did tell them

22 what happened to me at Outback Steakhouse to include the

23 fact that I fell and slammed my head on the floor, yes.

24            MR. HAYSBERT:  Your Honor, if I may, the entire

25 exhibit is not showing.

Haysbert, J. - Cross                                                    334

1          THE COURT:  He's moving it down.  You've seen the

2    exhibit.  You know what is.  The jury is not looking at it.

3    It's just us.  Go ahead.

4          MR. McGAVIN:  Thank you.

5    BY MR. McGAVIN:

6    Q.  Did you have any diagnostic studies done on your head

7    like a CAT scan or an MRI done of your brain?

8    A.  Not at that place, no, did not.

9    Q.  And did you complain that you had a contusion to your

10   head?

11   A.  I didn't know I had a contusion, what you talking about

12   the slamming together thing.  They would have -- no, they

13   wouldn't have seen it.  They didn't ask me to take off my

14   hat.

15   Q.  I'm sorry.  I didn't hear you.

16   A.  I actually did not.  I was trying to think, to try and

17   remember.  I don't remember all that I said to them.  The

18   details, I did tell them what had happened to me, that I

19   slipped and fell and slammed my head.  I did tell them that.

20   Q.  Is it correct, Dr. Haysbert, that you have full memory up

21   until the time of falling, in other words, of the events?

22   A.  I had --

23          MR. HAYSBERT:  Objection.  This is calling for a

24   narrative, and it's open and speculative.

25          THE COURT:  Overruled.  Go ahead.

JODY A. STEWART, Official Court Reporter

1           THE WITNESS:  Would you rephrase your question?

2    BY MR. McGAVIN:

3    Q.  I'll try.  In terms of the events just before you fell,

4    is it correct that you do not have a gap in your memory?

5    A.  Of events before I fell, that's correct.

6    Q.  And then you say there was some period of time where you

7    were dazed and you believe that you lost consciousness?

8    A.  I know I lost consciousness because when I came to myself

9    and opened my eyes.

10   Q.  Is it also correct that once you opened your eyes, you

11   have a memory of the events which follow, including speaking

12   to Ms. Crosby, being moved to a chair, people coming to your

13   aid, and then eventually leaving the restaurant?

14   A.  I do have memories of what I shared with you --

15   Q.  Thank you.

16   A.  -- today, yes.

17   Q.  Thank you.

18           THE COURT:  Let me ask you one question.  Go back

19   to where you had it.

20           MR. McGAVIN:  Yes, Your Honor.

21           THE COURT:  So you complained about your left wrist

22   pain, your left shoulder pain, your contusion on your left

23   shoulder, and the contusion of your left wrist.  Was there

24   any mention of a contusion you said you saw that night after

25   the fall on your head?

Haysbert, J. - Cross                                              336

```
1          THE WITNESS:  I told them all.  What they wrote
2     down, I didn't remember.  I do remember this now that I'm
3     seeing it, but I explained that to the lady that was the
4     intake person, that I -- again, I didn't explain to her in
5     the description of I had a contusion on my head.  I
6     explained to her that I fell, slammed, hit my head.  That's
7     how I explained it.
8          THE COURT:  All right.
9          MR. McGAVIN:  Thank you.  Your Honor, with the
10    Court's permission, I'm going to keep my voice up because I
11    need to move through three or four exhibits at the document
12    camera.
13         THE COURT:  That's fine.
14         MR. McGAVIN:  Thank you.
15    BY MR. McGAVIN:
16    Q.  Dr. Haysbert, I want to try to refresh your recollection
17    about this issue of dizziness.  Isn't it true that the
18    vertigo and dizziness first appeared on or about February 3,
19    2017, approximately 16 months before this incident?
20    A.  I don't remember the date it first appeared.  It was
21    before.  I did have vertigo before this incident.  When that
22    was, I don't remember.
23    Q.  I'd like to try to refresh your recollection about that,
24    and I'm going to display to you a record from Divine Health
25    Care, LLC.  Do you recognize that?
```

Haysbert, J. - Cross                                              337

```
 1   A.  I recognize my name, Divine Health Care, yes.
 2   Q.  Is Devine Health Care the same facility where
 3   Dr. Chinniry worked before his death?
 4   A.  Yes.
 5   Q.  And do you see that in the highlighted section on
 6   February 3, 2017, that you were -- you visited Divine Health
 7   Care, LLC?
 8   A.  Uh-huh.  Yes.
 9   Q.  Thank you.  And if I scroll down a bit further, you will
10   see -- and I'm asking you, does this refresh your
11   recollection that on February 3, 2017, you were awakened from
12   sleeping with a feeling that the bed was swimming and you had
13   difficulty with fatigue and dizziness and felt nausea?
14   A.  Yes.
15   Q.  So does this now refresh your recollection that the
16   dizziness came on about 16 months before?
17             MR. HAYSBERT:  Objection, that is not her
18   testimony.  He mischaracterized her testimony.
19             THE COURT:  He asked her does it refresh her
20   recollection.  Go ahead.
21             MR. McGAVIN:  Thank you.
22   BY MR. McGAVIN:
23   Q.  Does that refresh your recollection?
24   A.  I see that it states here that I said to Dr. Chinniry, on
25   the date that you gave, that I awoke from sleeping feeling --
```

Haysbert, J. - Cross                                                    338

1    with my head swimming, yes.

2    Q.  All right.  And does this also refresh your recollection

3    that the dizziness had been persisting, and you were having a

4    problem with vertigo with fast movement?

5    A.  I see as that's written there, yes.

6    Q.  So when you reported to Dr. Chinniry that the dizziness

7    was persisting, were you reporting that it had been ongoing

8    for a while?

9    A.  No.  I was reporting that if he asked me are you having

10   this more than once, you know, like -- in two or three days,

11   the bout of vertigo that I had, as I recall, that I shared

12   with you earlier, I did have it, and he had me to stay home

13   for a couple of days.  I think it lasted -- he had me out of

14   work for three or four days.  So once that bout of vertigo

15   ended, I didn't have it anymore.

16            THE COURT:  So but this is before your fall?

17            THE WITNESS:  Yes.  I had the vertigo before the

18   fall.

19            THE COURT:  So you had the vertigo before the fall,

20   and this visit --

21            THE WITNESS:  -- is before the fall.

22            THE COURT:  This visit where you related that you

23   awakened from sleeping with a feeling that your bed was

24   swimming, and you were having the dizziness persisting and

25   the problem with vertigo with fast moment, this was in

JODY A. STEWART, Official Court Reporter

Haysbert, J. - Cross                                           339

```
 1    February of what year?  February of 2017?
 2           THE WITNESS:  That's what this says, yes.  It was
 3    before the fall at Outback Steakhouse, yes.
 4           THE COURT:  Let me ask you one other thing.  I'm
 5    recalling.  I didn't make a note of it, and if I'm wrong,
 6    you can certainly tell me.  Did you say you'd only had this
 7    one incident?
 8           THE WITNESS:  Uh-huh.
 9           THE COURT:  Of vertigo?
10           THE WITNESS:  Yes.
11           THE COURT:  So this one incident, then, was before
12    the fall, not after the fall?
13           THE WITNESS:  That's correct.
14           THE COURT:  All right.
15           THE WITNESS:  That is correct.
16    BY MR. McGAVIN:
17    Q.  Do you say that the vertigo that you reported to
18    Dr. Chinniry went away within a day or two?
19    A.  I said that he put me out of work for a day or two, and,
20    yes, it did.  I don't think that vertigo last any more than
21    when I went back to work, and I think he had me out of work
22    for three or four days.  I don't know if that's on here.  It
23    might be.  Scroll up.
24    Q.  Do you make a distinction between vertigo and dizziness?
25    A.  Vertigo and dizziness kind of works together.  But for me
```

Haysbert, J. - Cross                                                    340

1    I also was nauseated and regurgitated a lot.

2    Q.  I appreciate that, and I'm sorry you had that, but when

3    you used the term "vertigo" and say it went away, did you

4    continue having dizziness?

5    A.  No.

6    Q.  You did not?

7    A.  No.  Dizziness to the extent that this was.

8    Q.  Well, that's not what I'm asking you, to the extent.  Did

9    you persist to have dizziness with fast movement after

10   February 2017?

11   A.  No, sir.

12   Q.  Thank you.  Let me see if I can refresh your

13   recollection.  Do you recall going back to Dr. Chinniry on or

14   about February 13, 2017, about ten days later?

15   A.  I may have.

16   Q.  All right.  I'm going to show you a record from February

17   13, 2017, from Divine Health Care.  Do you see that?

18   A.  I see it.

19   Q.  And this is a record for you, Dr. Haysbert, yes?

20   A.  Yes.

21   Q.  Thank you.  And do you see -- take a minute and read the

22   highlighted section, if you would, please, to yourself.

23   A.  Okay.

24   Q.  Do you see that you reported back to Dr. Chinniry, and

25   the dizziness was persisting with fast movement, but you had

```
 1   been feeling much better but still had slight

 2   lightheadedness?  Did you report that or does this refresh

 3   your recollection that you reported that?

 4   A.  Now, I accept what is written there because if

 5   Dr. Chinniry said it, I reported it at the time.  And do I

 6   remember all this, no.

 7             MR. HAYSBERT:  Objection, Your Honor.

 8             THE COURT:  What did you say, neurologist?

 9             THE WITNESS:  I said Dr. Chinniry.

10             THE COURT:  Your voice trailed down.  I just didn't

11   hear the end of your answer.

12             THE WITNESS:  Okay.  The question again then so I

13   can try to figure out what the end was.

14   BY MR. McGAVIN:

15   Q.  Sure.  I believe that you were saying, correct me if I'm

16   wrong, and counsel will correct me, but I believe you were

17   saying if Dr. Chinniry wrote it, it would be something that

18   you would accept, and then you were saying something about

19   Dr. Chinniry, and with the objection, I'm sorry I did not

20   quite hear what you said.

21   A.  I'm trying to read what he said, too.

22   Q.  All right.

23   A.  I read here, I don't know what he meant when he said the

24   dizziness is all blood resolved.

25   Q.  I suggest that's a typo, that he was saying all but
```

Haysbert, J. - Cross                                                    342

1    resolved.

2    A.  I don't know.

3         MR. HAYSBERT:  Objection.  I would object to the

4    suggestion.  The doctor is not here.

5         THE COURT:  The doctor is not here, but she was

6    there.

7         THE WITNESS:  And that's what I'm saying, he wrote

8    this.

9         THE COURT:  Overrule the objection.  If she recalls

10   or if she doesn't recall.

11        THE WITNESS:  I do not.

12        THE COURT:  She was there, and this is to refresh

13   her recollection.  In any event, then, Dr. Chinniry would be

14   unable if he is deceased.  In any event, all this is, is to

15   refresh her recollections at this point.  So you did go back

16   to Dr. Chinniry about ten days later?

17        THE WITNESS:  I do not recall that, but if it's

18   written there, I went back to him, yes.  I don't remember

19   every time I visited him.  But I did go to him.  If he

20   requested that I come back, I went back to see, yes.

21   BY MR. McGAVIN:

22   Q.  I'm showing you a record from March 13, 2017, from the

23   Divine Health Care for purposes of refreshing your

24   recollection, Dr. Haysbert.

25   A.  Uh-huh.  It seems like a continuation of a record to me,

Haysbert, J. - Cross                                        343

1  that it talks about the same thing every time.

2  Q.  Do you recall that you reported, as I've noted with my

3  parenthesis there, to feeling much better but continuing with

4  lightheadedness but the dizziness was all but resolved?

5          MR. HAYSBERT:  That is not what the medical records

6  says.  It does not say all but resolved.

7          THE COURT:  It says, "All blood resolved."

8          MR. HAYSBERT:  The doctor is not here to determine

9  what he meant by it at all, and he can't give a suggestion.

10          THE COURT:  I overrule your objection.  The jury

11  can make whatever assessment they want.  He is showing her a

12  medical record, and she did go back again, and regardless,

13  let's just say this says, You have slight lightheadedness.

14  She reported the dizziness is resolved.

15          THE WITNESS:  And that's what I'm saying, it's no

16  headaches, no vertigo, no injury.

17  BY MR. McGAVIN:

18  Q.  Correct.  Does that refresh your recollection at that

19  time?

20  A.  No.  I'm just reading what I see here.

21  Q.  Thank you.

22  A.  Uh-huh.

23  Q.  So do you recall that the vertigo returned shortly before

24  the incident in question?

25  A.  No, I do not.

1    Q.  Let me see if I can refresh your recollection on that

2    point.  I'm going to show you a record from March 28th, 2018,

3    from Divine Health Care, and I ask you whether or not this

4    refreshes your recollections at that time?

5            MR. HAYSBERT:  Your Honor, the complete document is

6    not being shown.  There is a portion of it that is not being

7    shown that's extremely important to this record for her to

8    be able to review in order to properly answer this question.

9            THE COURT:  Three things.  Number one, you've seen

10   the record, the full record.  It's on the screen, and

11   oftentimes you can't get the full record on the screen.  To

12   the extent you want to show and ask something about this

13   record, you can in redirect.  So if there is something not

14   being shown that the defense attorney chooses not to and to

15   ask about, then you show it and ask about it.  That's the

16   way it's done.

17           MR. HAYSBERT:  Thank you, Your Honor.

18   BY MR. McGAVIN:

19   Q.  The question for you, Dr. Haysbert --

20   A.  Yes.

21   Q.  -- do you recall that you came back on March 28th, 2018,

22   about a year later with dizziness persisting?

23           MR. HAYSBERT:  Objection, Your Honor.  Same

24   objection.  This record does not reflect that that's what

25   she was doing, and she was going back with another -- yet

Haysbert, J. - Cross                                                       345

1    another incident of dizziness.  This appears to be a

2    continuing record that keeps going forward.

3         THE COURT:  The dizziness isn't here.  Ask if she

4    remembers that.

5         MR. McGAVIN:  I will get to that, Your Honor.  I

6    was first just trying to identify the date before I moved to

7    the substance.  So that's why I was just displaying the

8    date.  I'm ready to move on.

9         THE COURT:  Then move to the substance.  Now you've

10   moved down to the substance.  Okay.

11        MR. McGAVIN:  Thank you, Your Honor.

12   BY MR. McGAVIN:

13   Q.  Do you recall that you reported to Dr. Chinniry on or

14   about March 28th, 2018, that the dizziness was persisting and

15   you had problem with vertigo with fast movement?

16   A.  In all honesty, no.  I remember going to Dr. Chinniry

17   whenever he told me to come back from my regular visit.  I

18   did not have recall.  Dr. Chinniry and I talking about I'm

19   having persistent vertigo, persistent vertigo, no, I don't.

20   I was going to work every day.  Vertigo is not something you

21   can work with.

22   Q.  How about -- I'm sorry, were you done?  I apologize.

23   A.  No problem.  I was done.

24   Q.  Thank you.  How about slight dizziness with fast

25   movement?  Was that something you could go to work with?

```
 1    A.  Slight dizziness with fast movement was something you
 2    probably could, but I wouldn't do that.
 3    Q.  Dr. Haysbert, do you recall going back to see
 4    Dr. Chinniry on April 11, 2018, with continued difficulty
 5    with early a.m. vertigo?
 6    A.  No, I do not.
 7    Q.  I'm going to show you a document and ask you if this
 8    refreshes your recollection that on April 11, 2018, about six
 9    weeks before the subject incident, that you were having
10    difficulties -- that you reported to Dr. Chinniry concerning
11    vertigo?
12    A.  This looks like the very same sheet.  It's showing has
13    the same thing on it, and I did not just go back to the
14    doctor repeatedly saying the same thing to him.  I really
15    didn't do that.
16          THE COURT:  There is a different date.  Would you
17    please go to the date.
18          THE WITNESS:  And that's what I'm pointing out,
19    that each of these reports that he shows me, it shows the
20    same thing written on them, different dates, but the same
21    things written on them, and I honestly don't recall going to
22    Dr. Chinniry five or six times reporting vertigo, no, sir, I
23    don't.
24    BY MR. McGAVIN:
25    Q.  Well, actually, isn't it correct, Dr. Haysbert, that the
```

Haysbert, J. - Cross                                                    347

1    record on April 11, 2018, is different because, "The patient
2    has had difficulty with respect to continued early a.m.
3    vertigo and has had difficulty with respect to the vertigo
4    being positional and changing with movement"?  Isn't that
5    different language than we discussed earlier?
6    A.  Maybe he had to put something there for his insurance.  I
7    don't know, sir.  But the difference in the language, this is
8    the first time I've seen a.m. written here.  But other than
9    that, everything that I see is like just picked up what was
10   written the last time and changed the date and he put it on
11   there.  That's the way it seems to me, but I don't know.
12   I've not read my medical records.  This is good.  I have not
13   read them.
14   Q.  Do you agree that on April 11th, for the first time,
15   April 11, 2018, just six weeks before our incident, that you
16   reported to Dr. Chinniry that you had been, "Hampered by the
17   vertigo," which was not something previously reported?
18   A.  No, I don't recall.
19   Q.  Do you recall that on April 11, 2018, as a result of your
20   complaints, that Dr. Chinniry ordered you to have or gave you
21   an order to have an MRI scan of your brain?
22   A.  He'd given me -- he'd asked me to go have one done a long
23   time before.  He actually wrote it so I could go do it.
24   Q.  Well, let's just talk about what this chronology is.  I'm
25   showing you an order request summary from April 2018, which

1   includes a request for an MRI of the brain.  Do you recall

2   receiving that order on or about April 11 or shortly

3   thereafter from Dr. Chinnry?

4   A.  I recall Dr. Chinnry having told me at the onset, when I

5   first went to him, that he was going to order a number of

6   other diagnoses, if you would.  One was an MRI.  One was go

7   to the ear, nose, throat specialist.  He was trying to rule

8   out the initial bout of vertigo that I had.  And I do recall

9   that this was later than the discussion that I been having,

10  yes.

11  Q.  Does this now refresh your recollection, Dr. Haysbert,

12  that your bouts of vertigo and lightheadedness were ongoing

13  more than just one incident but had been ongoing for about 16

14  months or -- yeah, about 16 months before this incident?

15          MR. HAYSBERT:  Objection, mischaracterizes her

16  testimony.

17          THE COURT:  Does it refresh your recollection or

18  not?

19          THE WITNESS:  I did not have bouts of vertigo for

20  16 months.

21  BY MR. McGAVIN:

22  Q.  Is it correct, Dr. Haysbert, that you actually did have

23  the MRI scan of the brain on or about June 4, 2018 as

24  requested by Dr. Chinnry?

25  A.  I remember having it at his request.  The date, I don't

```
 1    recall, because he told me about it much earlier than when it
 2    was actually scheduled because there were reasons why he
 3    didn't write it earlier, and I couldn't get in.  And then
 4    when I did get in, there was -- the insurance company wanted
 5    me to have a different place, all those kind of things.  I do
 6    recall some sessions of that.
 7    Q.  Just trying to get the chronology.  Do you recall the MRI
 8    of your brain ordered by Dr. Chinniry before May 23, 2018,
 9    occurred on or about June 4, 2018, as reflected in the
10    document that I'm displaying to you now?
11    A.  I do recall it being ordered.  I do recall taking it.  I
12    do not recall exactly what date it was.  But he ordered it,
13    and I did take it, yes.
14    Q.  And does this document refresh your recollection?
15    A.  This document refreshed the fact that I confirm I did
16    have it, yes.
17    Q.  Thank you.  Now, isn't it true, Dr. Haysbert, that you
18    never once complained to Dr. Chinniry after the incident of
19    May 23, 2018, of a loss of consciousness?
20    A.  No, that's not true.  Dr. Chinniry and I talked many
21    times about a number of things.  I don't know that he put
22    everything we discussed in his medical records.  I can't
23    attest to that.  But, yes, he knows what happened because I
24    explained it to him.  He was even scheduled to come to the
25    first time that the hearing was set.
```

Haysbert, J. - Cross                                                        350

1    Q.  Did you or did you not tell him that you suffered a loss
2    of consciousness?
3    A.  I'm saying yes.  I explained all of that to him.  He was
4    even scheduled to come the first time this case was set.
5    Q.  All right.  I'm going to show you a record from
6    Dr. Chinniry, July 9, 2018.  Does this refresh your
7    recollection that this was the first time you went to see
8    Dr. Chinniry after the incident?
9    A.  I can't see what it says on the bottom.  Scroll it up
10   some.
11   Q.  I will.  I was just trying to confirm the date first.
12   A.  I see the date that's written there is July, yes.
13   Q.  Thank you.
14   A.  Or happened then.
15   Q.  Thank you.  I have -- because of the size of the screen,
16   I have to do part first and then move down.  Thank you.  On
17   or about July 9, 2018, isn't it true you reported to
18   Dr. Chinniry you had your fall?
19   A.  I reported it to him before July.
20   Q.  All right.  And on July 9, 2018, did you report to him
21   that you have vertigo?
22   A.  No.  I didn't go there for that at that time.
23   Q.  All right.
24          MR. HAYSBERT:  Objection, Your Honor.  It actually
25   says in the record vertigo was resolved.  So where is this

JODY A. STEWART, Official Court Reporter

1    question coming from?

2         THE COURT:  You can ask if that refreshes her

3    recollection.  She answered and said she didn't have

4    vertigo.  Isn't that what she said?

5         THE WITNESS:  Yeah.

6    BY MR. McGAVIN:

7    Q.  All right.  So if you look at the review of symptoms or

8    systems, do you see that it, as you've pointed out correctly,

9    it says, "No headaches, complain of vertigo, no injury."  Do

10   you see that, "CO vertigo"?

11   A.  I see that.  Now, what he was talking about to what we

12   talked about, I don't know.  Was he saying that I was

13   reporting no headache dealing with vertigo, no injury, what?

14   I don't know.

15   Q.  Well, you see at the top, Dr. Haysbert, it says you were

16   having -- "Still having some problems with lightheadedness

17   and dull headache."  Do you see that, the first paragraph?

18   A.  Uh-huh.  I see that's written.

19   Q.  Is that what you were having, some lightheadedness and

20   dull headache?

21   A.  When was this?

22   Q.  July 9, 2018.

23   A.  Dull headaches?  I was having bad headaches.

24   Q.  I'm sorry?

25   A.  I was having headaches in July.

Haysbert, J. - Cross                                                    352

1    Q.  Thank you.  Isn't it true that those headaches resolved

2    very shortly, very quickly?

3         MR. HAYSBERT:  Objection, mischaracterizes her

4    testimony.

5         THE WITNESS:  No.

6         THE COURT:  Overruled.  She's answered.  She said

7    no.

8         THE WITNESS:  I said no.  Headaches -- you are

9    confusing me in the sense of whether you are talking about

10   headaches associated with what you said vertigo or headaches

11   associated with the injury and the fall.  Which are you

12   talking about, because the headaches I have with the fall.

13   BY MR. McGAVIN:

14   Q.  Headaches are -- are they different?

15   A.  Yeah, they can be.  Yes.  Headaches, you can have

16   headaches here (indicating).  When I first had the fall, I

17   was having shooting headaches.  I shared that.

18   Q.  Is it correct, Dr. Haysbert, that you next saw

19   Dr. Chinniry a few months later on or about September 10,

20   2018, and at that time you were following up for dizziness?

21   A.  I don't recall the date when I next saw Dr. Chinniry.  I

22   really do not.

23   Q.  All right.  I'm going to ask if this refreshes your

24   recollection that on September 10, 2018, you went back to see

25   Dr. Chinniry?

JODY A. STEWART, Official Court Reporter

Haysbert, J. - Cross                                              353

A.  Okay.  I go to see him whenever he schedules an
appointment, yes.
Q.  Do you see that at that point you had a follow-up on
dizziness, dizziness had subsided, but you were having a
feeling strange in your ear, and you had a suspicion of a UTI
based on intermittent dizziness.  Does that refresh your
recollection?
A.  I see what is written, sir.  I can't tell you that I
remember all the things each time that I went to the doctor
and what he said they were from.  I can only tell you that
they were routine visits, and I did make them.
Q.  Well, at that time did you report you had no headaches?
Did you report that?
A.  I just indicated I don't recall all of the things that I
reported to the doctor at the time that I visited with him.
I just don't recall all the dates I went, nor all the time,
perhaps, if I had time to go all of this.  I would be more
alert to it, but at this time I can't say.
Q.  Did you ever report to Dr. Chinniry that you were having
any cognitive problems?
A.  Dr. Chinniry and I talked about that, yes.  He even
shared some things that I could do in the conversation we
had, yes.
Q.  Do you remember that Dr. Chinniry asked you to undergo a
test called a mini mental status exam?

Haysbert, J. - Cross                                          354

1   A.   No, I don't remember the name of a mini mental whatever,

2   no, I do not recall that.

3   Q.   And were you ever referred out for neuropsychological

4   testing by Dr. Chinniry?

5   A.   I went to a neurologist, Dr. Haider.  I mispronounce the

6   name sometimes.

7   Q.   I'm talking about neuropsychological testing.  You may

8   not be familiar with it, and let me explain.  It is where you

9   go to a psychologist and have a battery of tests to test your

10  memory, cognition.  There are tests -- it takes about eight

11  hours, and you have a test of math and reading and recall.

12  Did you ever have such testing?

13  A.   I don't recall him -- what's the word you used --

14  ordering that for me, no, I do not recall that.

15  Q.   In fact, you've never had that testing, have you?

16  A.   I do not recall him ordering that.

17         MR. HAYSBERT:  Objection.  How is she supposed to

18  know whether she had neuropsychological testing?

19         THE COURT:  She said to her knowledge she hasn't.

20         THE WITNESS:  I don't recall.

21         THE COURT:  Is that what you said?

22         THE WITNESS:  I do not recall him ordering that

23  test.

24         THE COURT:  She doesn't recall him ordering that

25  test.

Haysbert, J. - Cross                                                     355

```
1           MR. McGAVIN:  Thank you.

2    BY MR. McGAVIN:

3    Q.  Now, in regard to your claims here in this case, isn't it

4    true that you are not claiming any medical expenses?

5    A.  That is correct.

6           THE COURT:  What?

7           THE WITNESS:  That is correct.

8    BY MR. McGAVIN:

9    Q.  And none in the past and none in the future?

10   A.  That is correct.

11   Q.  All right.  What medications do you currently take?

12          MR. HAYSBERT:  Objection, Your Honor.  This is

13   going outside the scope.  She is not claiming any past or

14   future medicals, so this is an inappropriate question.

15          THE COURT:  He's asked her if she is claiming any,

16   but he's now asking her what medication she takes.

17          MR. HAYSBERT:  Why would -- that's a follow-up

18   question to the first one.  She's already indicated she's

19   not claiming any medical, past or future, so why would he be

20   asking questions about the medications she would be taking.

21          THE COURT:  Because it goes to if you're taking

22   medication for the condition that you claim that is

23   resulting in the damages that you have claimed.  He is

24   saying you're not making any medical claims, you're not

25   making any medical damages claim, but are you taking any
```

Haysbert, J. - Cross                                                    356

1    medication?  That goes to other issues.  If you want we can

2    reserve this for, if you want her called back on the stand,

3    because you didn't ask her about the medications she was

4    taking, and it goes beyond direct, I will sustain that

5    objection and make her subject to call during the defense's

6    case if you want to do that.

7            MR. HAYSBERT:  Your Honor, it is outside the scope

8    of her direct examination so we object to it, but if he

9    doesn't go into the cost of care, because that's future and

10   past care she's not -- care cost that she is not requesting,

11   then he can proceed, but we are putting objection on the

12   record and reserving that.

13           THE COURT:  You either object or you don't object.

14   In other words, we have already determined that she's not

15   claiming any medical damages from the standpoint of monetary

16   medical bills or care.  That's my understanding.

17           MR. HAYSBERT:  That is correct, Your Honor.

18           THE COURT:  He's asking her, though, what

19   medications she's currently taking.  That goes to, and I'm

20   not going to explain any more in front of the jury.  I rule

21   it goes to the claims that you're making other than for

22   medical bills.

23           MR. HAYSBERT:  Thank you.

24           THE COURT:  But it goes outside.  If you want to

25   torture this, that's fine.  Check with Mr. McKelvey.  It

1    seems like he needs to say something to you.

2              MR. HAYSBERT:  Thank you.

3              MR. McKELVEY:  No objection going outside the scope

4    on this one issue, Your Honor.

5              THE COURT:  So there are no objections to going

6    outside the scope, and she can be asked that question?

7              MR. McKELVEY:  On this limited issue, Your Honor,

8    yes.

9              THE COURT:  Go ahead.

10             MR. McGAVIN:  Thank you.

11   BY MR. McGAVIN:

12   Q.  What medications do you currently take, Dr. Haysbert?

13   A.  I take a hypertension medication, it's a diuretic -- I

14   don't remember the name -- and I take Tirosint.

15   Q.  Pardon me?

16   A.  Tirosint, T-i-r-o-s-i-n-t, I believe.

17   Q.  Is that for too much or too little thyroid?

18   A.  I don't know which one it is, but it's for one of those.

19   It's for a thyroid condition, but I don't know which one.  It

20   is one or the other.

21   Q.  Thank you.  The medication for high blood pressure,

22   you've been taking that for a number of years; isn't that

23   right?

24   A.  Oh, yes.

25   Q.  Have you taken any medication, mood-altering medication

1   such as for depression or anxiety?

2   A.  I've never taken a depression medicine, and I hesitate

3   because sometimes medicines use for more than one thing.  So,

4   no, never taken any for anxiety.

5   Q.  Have you had any evaluation by a psychiatrist or a

6   psychologist of any kind?

7   A.  No.

8   Q.  And you haven't sought any such care in the past five

9   years?

10  A.  Not from a psychologist.

11  Q.  Or psychiatrist?

12  A.  Or psychiatrist.

13  Q.  And you don't feel you need that, do you?

14  A.  No.  Not from the psychiatrist.

15          THE COURT:  What about a psychologist?

16          THE WITNESS:  No.  Psychiatrist has more training

17  than a psychologist so, no, I don't think I need that.

18  BY MR. McGAVIN:

19  Q.  Thank you.  Now, you mentioned that you have a close

20  family.  How many children do you have?

21  A.  I have five.

22  Q.  And you mentioned that you like weekends to get together

23  with your family; is that right?

24  A.  Those that are around, yes.

25  Q.  Logistically, when family is far away, you don't see each

Haysbert, J. - Cross                                            359

 1   other each weekend, so what I'm getting at your daughter, and
 2   her name is Nineveh?  Did I pronounce that correctly?
 3   A.  Nineveh, yes.
 4   Q.  Is she an educator like you?
 5   A.  No, she's not.
 6   Q.  And Nineveh is still local?
 7   A.  She's -- she calls it bi-coastal because she -- her
 8   husband is in Florida, and she's here.  But her job is here
 9   right now.
10   Q.  Her job is where?
11   A.  Here right now, Virginia.
12   Q.  Thank you.  And of your other children, how many are here
13   local in the Hampton/Tidewater area?
14          MR. HAYSBERT:  Your Honor, I'm just going to object
15   to this line of questioning under number 9.
16          MR. McGAVIN:  I'm not going beyond this question,
17   Your Honor.  Goes to the weekends together.
18          THE COURT:  You can ask that.
19          THE WITNESS:  My youngest daughter just relocated
20   back from California here.
21   BY MR. McGAVIN:
22   Q.  So just the two?
23   A.  Yes.
24   Q.  And was it the same distribution, so to speak, of your
25   offspring back in 2018, or your daughter coming back is

Haysbert, J. - Cross                                                    360

1   something new?

2   A.  Daughter coming back is something new.  She had not been

3   here then.

4   Q.  And Nineveh got married or was married, excuse me, when?

5   A.  Oh, gee.  Dates run not close.  Two years ago.  Two years

6   ago.

7   Q.  Do you still visit with Nineveh on a regular basis?

8   A.  Yes.

9   Q.  And do you still visit with your younger daughter on a

10  regular basis, or now that she's back, I guess you do?

11  A.  Yes.  Nineveh lives with me when she's here.

12  Q.  She does.  I see.  All right.  So you had mentioned

13  before on direct that you felt some loss of your relationship

14  with your family, and that's why I'm asking whether they are

15  here local or far away?

16  A.  Yes.

17  Q.  And so they're about the same in terms of closeness; is

18  that wrong?

19  A.  That's wrong.  One of them has been around.  That's

20  Nineveh.  The others have not been as close.  My oldest son

21  is fairly close, I guess, because he lives in Washington.

22  Q.  D.C.?

23  A.  D.C.  My youngest daughter was in California, so we

24  didn't have the family group physically, but you know

25  everybody does zoom now.

Haysbert, J. - Cross                                                    361

```
 1   Q.   During COVID?
 2   A.   So we get together on zoom.
 3           THE COURT:  Get together on what?
 4           THE WITNESS:  Zoom.
 5   BY MR. McGAVIN:
 6   Q.   You mentioned that you're not as active in boards as you
 7   were at one time?
 8   A.   That's correct.
 9   Q.   As of May 23, 2018, will you tell me specifically which
10   boards you were serving on?
11   A.   I'll try to remember all of them or as many of them as I
12   can.  SACS.
13   Q.   Pardon me?
14   A.   SACS, Southern Association of Colleges and Schools.  That
15   is an accreditation board for institutions of higher
16   education in the southeast region.
17   Q.   Is that a board that had a tenure for a board service, in
18   other words, a two-year, three-year, five-year term?
19   A.   I think it's -- I'm not certain, but I think it's a
20   three-year term.  You are up again and up again or you can
21   asked to be -- serve on some other areas.
22   Q.   When was it that you left the SAAC, S-A-A-C board?
23   A.   I left SAACs after two consecutive terms, six years this
24   past December, and could have served in another capacity but
25   chose not to.
```

Haysbert, J. - Cross                                          362

```
1   Q.  So that would be December 2022?

2   A.  Correct.

3   Q.  Thank you.  And what other boards were you on --

4            THE COURT:  Excuse me.  Mr. Bingham, what are you

5   doing on the computer?

6            MR. BINGHAM:  Organizing exhibits for his

7   presentation.

8            THE COURT:  All right.  Because I can see that

9   you're doing something on the computer, and we don't have

10   anything up on the screen.

11            MR. BINGHAM:  No, getting ready for anything he may

12   call.  I'm sorry.

13            THE COURT:  You're just doing exhibits.  There is

14   no note taking allowed on the computer.  We have already

15   made that clear.

16            MR. BINGHAM:  I'm not doing that.

17            THE COURT:  Just want to be sure.

18            MR. BINGHAM:  Yes, ma'am.

19            THE COURT:  I do see you working on the computer.

20   Go ahead.

21            MR. McGAVIN:  Thank you, Your Honor.

22   BY MR. McGAVIN:

23   Q.  Dr. Haysbert, what other boards were you on as of May 23,

24   2018?

25   A.  NIA.
```

Haysbert, J. - Cross                                              363

1    Q.  What does that stand for?

2    A.  National Institute of Aerospace.

3    Q.  Do you need a glass of water perhaps?

4    A.  No, that's okay.  Thank you.

5    Q.  You're welcome.  And how long had you been on that board

6    as of 2018?

7    A.  As of 2018?

8    Q.  Yes, ma'am.  May 23, 2018.

9    A.  Let's see.  I think I got on that board when I came back,

10   2014.

11   Q.  When did you go off?

12   A.  I'm still on that one, but what I've done is assign

13   someone else on the board with me so -- that representative

14   from my school so that that person can attend, and I'm not

15   attending, so the institution would still have

16   representation.

17   Q.  But you're still on that board?

18   A.  I'm still listed, yes.

19   Q.  What other boards were you on on May 23, 2018?

20   A.  I don't remember all of them.  2018.  That's a long ways

21   back.  I think I was still on the advisory board for the City

22   of Hampton City Schools.

23   Q.  When did you -- are you still on that board?

24   A.  I am listed there right now.  I'm not going to continue.

25   Q.  I'm sorry.  I just didn't hear you.

Haysbert, J. - Cross                                              364

```
1   A.  I am listed there right now, and that's one of the ones
2   I'm not going to continue.  I'm going to discontinue that
3   one.
4   Q.  As of today, which is August 10th, 2018, is it correct
5   that you're still on the advisory board for the City of
6   Hampton Public Schools?
7   A.  You said 2018.
8   Q.  I misspoke.  As of today, August 10, 2023.
9   A.  I'm still listed as a member of that board.  I have not
10  written my letter of resignation yet, yes, you're correct.
11          THE COURT:  Were you on the board in 2018?
12          THE WITNESS:  I think so.  I'm not sure.
13          THE COURT:  So you either were on the board or you
14  went on it sometime after May 23rd, 2018?
15          THE WITNESS:  That's been such a long time ago.  I
16  was probably on it in 2018.  I cannot be certain.  I don't
17  want to record something that's inaccurate.
18  BY MR. McGAVIN:
19  Q.  What other boards were you on as of May 23, 2018?
20  A.  Those are the primary ones that I recall.
21          THE COURT:  You said you had gotten off of certain
22  boards?
23          THE WITNESS:  SAACs is one of the ones I had gotten
24  off.  That's the primary one that I have gotten off.  NIA,
25  that's the one that I assigned somebody else to so that the
```

Haysbert, J. - Cross                                              365

```
 1   university still be represented, but it wouldn't be with me.
 2   And the advisory board, the local one that I'm going to
 3   remove myself from.
 4              THE COURT:  Again, your voice trailed off.
 5              THE WITNESS:  And the advisory board for the City
 6   of Hampton, I'm going to -- there is no term limitation, but
 7   I will remove myself from that one.  Those are the decisions
 8   I made when I made the decision to retire.
 9   BY MR. McGAVIN:
10   Q.  Have you written a letter to the Hampton University Board
11   of Visitors or to the president indicating that when this
12   current contract expires, you intend to retire?
13   A.  I have not, but my president and I have talked about it.
14   Q.  Is it correct that your contracts with Hampton University
15   are two-year contracts?
16   A.  That's incorrect.
17   Q.  Have they been two-year contracts in the past?
18   A.  No, they haven't.  There was one written once that was a
19   mistake for two years, and it was rewritten for one year.
20   And that mistake happened, I think, with all the
21   administrative industry, if I remember correctly.
22   Q.  I'm sorry, just --
23   A.  My contracts as -- I'm sorry, contracts are annual
24   contracts.  There was one year a mistake was made, two years,
25   it was corrected to reflect a one-year contract.  All
```

Haysbert, J. - Cross                                                    366

1    contracts are annual, and increments are annually.  This
2    president gave everybody an increment this past year.  Had
3    nothing to do with anything other than if you worked there
4    last year, you got same incremental across the board raise.
5    Everybody did.
6    Q.  Okay.
7            THE COURT:  I'm a little bit confused because of
8    earlier mentions.  Your current contract is for how long?
9            THE WITNESS:  One year.
10           THE COURT:  When was it renewed?
11           THE WITNESS:  July 1, 2023.
12           THE COURT:  It goes through July 1, 2024?
13           THE WITNESS:  June 30th, 2024.
14           THE COURT:  All right.
15   BY MR. McGAVIN:
16   Q.  Is it correct that you have to sign your contract and
17   represent to the university that your employment is subject
18   to excellence in personal conduct and in performance of your
19   duties?
20   A.  Yes.
21   Q.  And I'm showing you what we have as the contract for June
22   23, 2021.  Do you see that?
23   A.  I do.
24   Q.  And do you see that on this contract it ended June 30,
25   2023?

Haysbert, J. - Cross                                          367

1    A.  And that's the one I told you that was written by the

2    outgoing president that was re-issued because it was issued

3    as a two-year, and it was re-issued as a one year.

4    Q.  All right.  And is this your signature there on June 30,

5    2021?

6    A.  That is correct.

7    Q.  And you would not have signed this on June 30, 2021, if

8    you did not believe that you could provide excellent service

9    to Hampton University; isn't that true?

10   A.  That is correct.

11   Q.  And, in fact, you have?

12   A.  By my judgment, yes.

13   Q.  Now, in terms of your colleagues at work, are any of

14   those colleagues, either the General or Dr. Harvey or any of

15   your colleagues, are they going to be here to testify about

16   any limitations or changes that you claim?

17   A.  Not to my knowledge.

18   Q.  Is it correct, Dr. Haysbert, that you have not lost a day

19   of work since May 23, 2018, that you attribute to this

20   incident?

21   A.  I can't say that, sir, because if I were not at work for

22   a day, I wouldn't have to report why I wasn't there, if

23   that's what you mean.

24   Q.  Well, how many days have you missed from work that you

25   attribute to this incident?

Haysbert, J. - Cross                                                    368

1    A.  I couldn't tell you.

2    Q.  In fact, isn't it correct that you make no claim for any

3    lost income in the past or in the future?

4    A.  That is correct.  I make no claim, but that doesn't mean

5    I wasn't at work because of what may have happened at a

6    particular time.

7            THE COURT:  But you didn't lose any income because

8    of it?

9            THE WITNESS:  I did not lose any income, no,

10   because I had -- I have built up leave time.  Having been

11   there as long as I worked, I have leave.  All I would need

12   to do is take leave.

13           MR. HAYSBERT:  I'm going to object and have

14   continuing objection to this line of questioning.

15           THE COURT:  Well, what is your objection, because

16   she said that that didn't mean that her -- if we go back and

17   look at her answer, she had days, and that didn't mean that

18   she hadn't been there, but the point is, you're not claiming

19   lost wages; is that correct?

20           MR. HAYSBERT:  We are not claiming lost wages.

21           THE COURT:  You are not claiming them because she

22   didn't lose any; is that correct?

23           MR. HAYSBERT:  Again, we are preserving the

24   objection.

25           THE COURT:  I've ruled that has been represented to

Haysbert, J. - Cross                                                    369

1   the Court, and it's not part of the case that's being

2   presented.  It's been totally represented to the Court on a

3   number of occasions.  There is no claim at this juncture for

4   lost wages, and the reason being is you have not lost any

5   wages, have you?

6           THE WITNESS:  I've not lost any wages.  I have

7   built in leave time for the number of years I've been there,

8   so if ever I'm not at work, I just take leave.  No one asks

9   why you take leave.  That's what you've earned.

10          MR. HAYSBERT:  Same objection to the question.

11          THE COURT:  Go ahead.

12          MR. McGAVIN:  Thank you, Your Honor.

13  BY MR. McGAVIN:

14  Q.  You mentioned that you're very involved in your church.

15  Which church is that?

16  A.  The Holy Temple Church of the Lord Jesus Christ of the

17  Apostolic Faith.

18  Q.  Slower.

19  A.  The Holy Temple Church of the Lord Jesus Christ of the

20  Apostolic Faith, Incorporated.

21  Q.  Thank you.  Where is the -- do you call the temple the

22  building?

23  A.  It is called church.

24  Q.  Where is it?

25  A.  There's one in Gloucester, Virginia.  The headquarters is

Haysbert, J. - Cross                                          370

 1   in New York.  The one that I attend mostly is in Gloucester,

 2   Virginia.

 3   Q.  How far is that from your house?

 4   A.  I think it's 30 minutes, maybe 30 minutes' drive, I'm

 5   thinking.

 6   Q.  During the time of COVID, did you still attend church

 7   regularly?

 8   A.  We had church.

 9   Q.  In person?

10   A.  Uh-huh.

11   Q.  Is that a yes?

12   A.  I'm sorry, yes, our church had service in person.  There

13   was a period of time, I think, they closed the doors for two

14   or three weeks, yes, but other than that...

15   Q.  Did you reduce the frequency that you attended church

16   during COVID?

17   A.  I went to church when church was available when I could.

18   I reduced the frequency, not because of doors were closed.  I

19   reduced the frequency because of my election to do so.  I did

20   not want to be around people that could tell easily that I

21   was not my social self.

22   Q.  I'm asking you about COVID.  Did you reduce the frequency

23   of attending church due to fears of getting COVID?

24   A.  No, I didn't.  I've had COVID twice, but I didn't reduce

25   going to church because I thought -- I did not reduce going

Haysbert, J. - Cross                                          371

```
 1   to church because I thought I was going to get COVID, no, I
 2   didn't.
 3   Q.  Your pastor or your preacher at church, who is that?
 4   A.  He's Elder Robert Williams.
 5   Q.  And Pastor Williams, do you know him well?
 6   A.  Oh, yes.  I've been going to that location for quite some
 7   time.
 8   Q.  Many, many years?
 9   A.  Uh-huh.
10   Q.  Is that a yes?
11   A.  Yes.  I'm sorry.
12   Q.  That's okay.  I'm just trying to make the court
13   reporter --
14   A.  I'm sorry.  Yes.
15   Q.  Thank you very much.  Is Pastor Williams going to be here
16   to testify?
17   A.  Not to my knowledge.
18   Q.  Are any of your friends or colleagues or parishioners or
19   congregants coming to this trial to testify about you?
20   A.  No.
21   Q.  Where did you live and -- in the house where you've lived
22   many years, do you have neighbors who are friends?
23   A.  Yes.
24   Q.  And are they coming to testify about any changes in you?
25   A.  No.
```

Haysbert, J. - Cross                                                    372

1    Q.  Do you have an administrative assistant?

2    A.  Yes.

3    Q.  What is his or her name?

4    A.  She is new.  In fact, she hasn't been with the university

5    a year yet.

6    Q.  Prior to that, did you have a longstanding administrative

7    assistant?

8    A.  That individual, wouldn't say longstanding.  That

9    individual is no longer with the university.

10   Q.  How long was that person there?

11   A.  In my office or at the university?

12   Q.  With you, working with you?

13   A.  Less than three years.

14   Q.  And is that person going to be coming to testify

15   regarding your schedule?

16   A.  No.

17   Q.  Have you produced a written schedule that shows the

18   number of meetings that you had 2018, 2017, versus 2023 or

19   2022?

20   A.  I have not produced a written schedule of my meetings.

21   Q.  So you have no record that you can show us that shows how

22   many meetings you would have per week before May 23, 2018,

23   compared to after May 23, 2018?

24   A.  I have records.  I've not produced any to you, but I have

25   records.  But I have no reason to lie.

Haysbert, J. - Cross                                            373

1    Q.  In regard to your performance at the university, did you

2    have performance evaluations?

3    A.  No.  Don't have any performance evaluations that were

4    written by my supervisor.

5    Q.  All right.  I would like for you to review two exhibits

6    that we have which are videos where you spoke on behalf of

7    the university after the incident.  They have been premarked

8    and identified as exhibits, and I'd ask you to confirm -- I'd

9    like to display these to the jury, Your Honor.  I'd like to

10   play them.  They are short videos.

11          MR. HAYSBERT:  Your Honor, I would have no

12   objection if we are also allowed to play a short video

13   responding everybody to those videos.  If we are not allowed

14   to do so, then we would object.

15          THE COURT:  On redirect if it's responsive, you

16   would be able to do that.  I don't know.  We would have to

17   look at the video, but I know the video's here, and if it's

18   responsive, yes, you can show any responsive video to what

19   he's showing on redirect.

20          MR. HAYSBERT:  Thank you, Your Honor.

21          THE COURT:  Then I think before we go into the

22   videos, this is a good time for a luncheon recess.  So it's

23   about five minutes after 1:00.  We will be on a luncheon

24   recess until 2:00.

25          I would tell you, Dr. Haysbert, that you are in the

Haysbert, J. - Cross                                      374

```
 1   middle of your testimony, and as such you may not discuss it
 2   with anyone.  That includes your counsel, that includes
 3   anyone whatsoever, because that is a rule of court.  Once a
 4   witness testifies, and they're in their testimony, that
 5   witness cannot discuss the testimony with anyone until the
 6   case is over, and that would mean your daughter, too.
 7             THE WITNESS:  Yes, Your Honor.
 8             THE COURT:  I will tell that to each witness that
 9   comes in.  The Court is in recess until 2:00.
10             (Luncheon recess from 1:05 p.m. to 2:02 p.m.)
11             THE COURT:  Ladies and gentlemen, they are all
12   back, and I hope you had a nice luncheon recess, whatever it
13   was.  I can assure you it beats the snack bar upstairs.  So
14   I hope that you had a nice lunch and have now gotten rested,
15   and we will continue with the cross-examination of
16   Dr. Haysbert.
17             MR. McGAVIN:  Your Honor, I do want to pass up a
18   filing that we've made related to the *Vilseck* matter, which
19   I have a copy for counsel.
20             THE COURT:  The what matter?
21             MR. McGAVIN:  The *Vilseck*, the matter I passed up
22   to you earlier this morning.
23             THE COURT:  Okay.
24             MR. McGAVIN:  Further amplifying.  I want to
25   provide a copy to the Court and to the law clerk.  Thank
```

Haysbert, J. - Cross                                              375

1    you.

2              THE COURT:  You've given it to Mr. Haysbert and the

3    Court.

4              MR. McGAVIN:  Yes, Your Honor.

5              Your Honor, at this time I would like to display to

6    the jury Defendant's Exhibit Number 9, which is a Hampton

7    University fund-raising video from 2020.  It's on our

8    exhibit list, and I would like to first qualify the

9    foundation for it with a question or two with Dr. Haysbert,

10   if I may proceed that way.

11             THE COURT:  All right.

12             MR. McGAVIN:  I believe there were objections to

13   it.

14             THE COURT:  Well, you're offering it for what the

15   Court said it could be offered for, as I recall.

16             MR. McGAVIN:  Yes.

17             THE COURT:  Mr. Haysbert has agreed.  He said he

18   wants to reserve an option in redirect to show something in

19   response.

20             MR. McGAVIN:  I understand that, Your Honor.

21             THE COURT:  You can go ahead.  I know what it is,

22   and I know why it's being offered.

23             MR. McGAVIN:  Thank you, Your Honor.  May I

24   introduce it as to what it is?

25             THE COURT:  Yes.  Is there any objection?  It's a

Haysbert, J. - Cross                                                    376

1   video for Hampton University featuring the plaintiff.

2   That's the way it's been labeled on the exhibit list.

3           MR. McGAVIN:  Yes.  June 29, 2020, Your Honor.

4           THE COURT:  All right.

5           MR. McGAVIN:  Thank you.

6           (Video playing at this time.)

7   BY MR. McGAVIN:

8   Q.  Dr. Haysbert, would you agree that was you presenting

9   that fund-raising video?

10  A.  That was me reading from -- what do you call it?

11  Q.  Teleprompter?

12  A.  Teleprompter, reading from the Teleprompter.

13  Q.  And how often were you called upon to present

14  fund-raising appeals on behalf of the university?

15  A.  That was one that I did in probably the last four or five

16  years.

17  Q.  And before 2018, did you do any?

18  A.  Not like this.

19  Q.  That's the only one you've done by video?

20  A.  That I can recall on video.  The only -- yeah.  Okay.

21  That I can recall, yes.

22  Q.  Is it correct, Dr. Haysbert, that you regularly stand at

23  graduation ceremonies and introduce the graduating class or

24  serve next to the president in that role?

25  A.  I do, and I am reading from a script.

1   Q.  Did you read from a script before 2018, May 23, 2018?

2   A.  Some occasions and some not.  One time I would do it

3   without it, and then after 2018, with the script.

4   Q.  Do you have any video that shows you presenting in 2017,

5   perhaps, without a script?

6   A.  I didn't keep any of those videos, but the university

7   does.

8   Q.  Yes.  And then you spoke at -- you spoke at the occasion

9   of Dr. Harvey's retirement in 2022, did you not?

10  A.  I did so, again, reading from the script.

11  Q.  And who wrote that script?

12  A.  People in my office.

13          MR. McGAVIN:  I have no further questions for you.

14  Thank you, Doctor.

15          THE COURT:  Is that all you want to present?

16          MR. McGAVIN:  Yes, it is, Your Honor.

17          THE COURT:  All right.  Redirect?

18          MR. HAYSBERT:  Yes, Your Honor.  I would like to

19  publish a rebuttal video to the videos that were just

20  published by defense counsel.

21          THE COURT:  Where is it in the exhibit list?

22          MR. HAYSBERT:  It would not be in the exhibit list,

23  Your Honor.  This is rebuttal to the impeachment.  The

24  videos, there were several videos of impeachment evidence

25  were not provided on the exhibit list.  So this is to rebut

Haysbert, J. - Cross                                                    378

1    the information that's been presented to the jury.

2              THE COURT:  Ladies and gentlemen of the jury, you

3    will need to step out for a minute, please.

4              (Jury out at 2:12 p.m.)

5              THE COURT:  This exhibit that was just presented is

6    admitted.  I assume you were moving to admit it?

7              MR. McGAVIN:  Yes.

8              THE COURT:  Then it would be D9, I believe.

9              MR. McGAVIN:  Yes, Your Honor.

10             (Defendant's Exhibit 9 received in evidence.)

11             THE COURT:  It was specifically said on here

12   offered for impeachment.  So you knew that this video had

13   the potential to be offered for impeachment.  Where is it in

14   the rules, and particularly in the way we do our final

15   pretrial conferences, that you need to list all exhibits and

16   produce all exhibits that you may use.

17             In other words, you don't have to use an exhibit,

18   you don't have to call a witness, but you do have to let the

19   Court know and the parties know what it is that you plan to

20   present.  Have you produced this?

21             MR. HAYSBERT:  I have produced it, Your Honor.

22             THE COURT:  And you never listed it?

23             MR. HAYSBERT:  Your Honor, it wasn't something that

24   we needed to list, in my estimation, because it was to serve

25   as impeachment evidence on Dr. Haysbert's behalf against

Haysbert, J. - Cross                                                    379

1    whatever impeachment evidence was being offered by the other

2    side.  Again, this is impeachment evidence.  It just

3    happened to be put on the exhibit list, and only some of it

4    is.  We received four videos from opposing counsel, two of

5    which are not on the exhibit list.

6         THE COURT:  Because they didn't choose to use them.

7    Why didn't you put them on yours, then?

8         MR. HAYSBERT:  Your Honor, from what I was told --

9         THE COURT:  You've got local counsel, and I don't

10   know who told you, but local counsel is responsible, and you

11   know local counsel, if he doesn't, he should know the rules

12   of this court.  We don't have trial by ambush.  Everything's

13   on the record in advance.

14        MR. HAYSBERT:  This isn't trial by ambush.  They

15   have received a copy of it.

16        THE COURT:  They've received a copy, but it's not

17   listed as being at trial.

18        MR. HAYSBERT:  In addition to that, defense counsel

19   had no argument against our use of it because I conditioned

20   the use of his impeachment video on our ability to rebut it

21   with another video.

22        THE COURT:  That doesn't get it in.  You didn't say

23   conditioned on that.  You didn't say before it.  I assumed

24   it was on your exhibit list.  So you're doing the things

25   that you were doing before.  Don't diverge the question with

Haysbert, J. - Cross                                                    380

1    a red herring.  Yes, I said you could show another video to

2    rebut that, but I didn't know you didn't have it on your

3    exhibit list.

4            I haven't reviewed every one of these exhibits,

5    only the ones that there were objections to and that the

6    Court had to rule on them.  It's not in either one of these

7    books.  It's not available.  Let me just see.  There may not

8    be an objection to it.  If it's not, then I'll waive the

9    rules and let it in.  Is there any objection to it?

10           MR. McGAVIN:  Yes, Your Honor.  I'm not sure which

11   video it is.  If it's the day-in-the-life video of

12   Dr. Haysbert, that was ruled on previously.  It was offered,

13   but I don't know if that's what it is.

14           THE COURT:  Let's go to the final pretrial and

15   look.  I'm just looking at the final list now.  So let's go

16   to the pretrial, and if it's been ruled on, and now you're

17   trying to get in an exhibit.

18           MR. HAYSBERT:  It has not been ruled on, Your

19   Honor.  This is not the day-in-the-life video that we have.

20   That's a six-minute video.  This is a five-second video

21   that's explicit to rehabilitate the plaintiff.

22           THE COURT:  What is it?

23           MR. HAYSBERT:  It's a video of her where she is

24   speaking off the cuff without a script or anything, and she

25   is in front of a crowd, and she's essentially showing the

JODY A. STEWART, Official Court Reporter

Haysbert, J. - Cross                                           381

1    deficits that she's discussed today.

2          THE COURT:  She's showing what?

3          MR. HAYSBERT:  She's showing the deficits that

4    she's discussed with the Court today.  It's indicative of

5    what she's suffered.

6          THE COURT:  So let's look at the final pretrial

7    order.  That's the first one that was entered by Judge

8    Krask.  We spent a whole day last week going through these

9    orders and consolidating them into one.

10         So let's look at when we go to the exhibits.

11         MR. McGAVIN:  Your Honor, the one I was referring

12   to is Exhibit 33, which was the day-in-the-life video.  I

13   had not received a different video, to my knowledge.

14         THE COURT:  Let's see.  This is a day in the life.

15   Is it on the original as 33?

16         MR. McGAVIN:  Yes, Your Honor.  The objection to

17   that was sustained.  There is an S.

18         THE COURT:  That is correct.  Excerpts from the

19   day-in-the-life video, and that was sustained, and that is a

20   ruling of the Court.  It was sustained back on the first

21   final pretrial conference you had.

22         All right.  So where is it on here?

23         MR. HAYSBERT:  Your Honor, the video is being

24   introduced as rehabilitation for Dr. Haysbert.  That was the

25   express purpose of the video, and that is what we explained

Haysbert, J. - Cross                                                    382

1    earlier.  We were going to allow impeachment evidence in.

2         THE COURT:  You didn't have any choice to allow

3    impeachment evidence in.  The ruling had been made either

4    then or I said they can recall her.  In other words, they

5    are entitled to cross-examine.  They're entitled to impeach

6    the witness.  Your objection was that their examination was

7    going beyond the scope of the direct, and I said if that's

8    your objection, and you persist in that objection, that's

9    fine.  I will then have them call her in their case, and

10   they can then offer any impeachment through her in defense.

11   Mr. McKelvey, with whom you agreed, said we are not going to

12   just do this as an exercise whereby she has to be recalled.

13        So my ruling is that this was impeachment evidence.

14   It was proper cross-examination of her, and the only thing

15   was some of the cross-examination went past the scope.  You

16   didn't want to go into those areas, apparently, but that's

17   okay.  But they are then entitled to impeach when she's

18   making statements that she's had persistent problems, and so

19   forth.  So you have not listed this exhibit, and you

20   apparently have not produced it to the other side even.

21        MR. HAYSBERT:  I have produced it to the other

22   side, Your Honor.  It was in the document and in the flash

23   drive that we provided to opposing counsel in overnight

24   mail.

25        THE COURT:  Wait.  The flash drive was an

Haysbert, J. - Cross                                            383

```
 1    animation.  Are we talking about the most recent overnight?
 2           MR. HAYSBERT:  It wasn't just an animation.  It
 3    also included the five-second video as well, and we produced
 4    that to them.  So we provided everything that we intend to
 5    show to the jury to Mr. McGavin already.  He's had it for a
 6    very long time.
 7           THE COURT:  He couldn't have had it for a very long
 8    time because he didn't have the exhibits and the Federal
 9    Express package the day that trial was supposed to start.
10    So he couldn't have had it for a very long time because what
11    we went through earlier in the week is that the Federal
12    Express package arrived the day of trial in his Fairfax
13    office.  Then his Fairfax office had to re-send it down
14    here.  In that package were your exhibits and the animation
15    thumb drive.  That is what is on the record of this case.
16           Now you're saying they've had it for a long time.
17    A long time would not be -- today is Thursday.  A long time
18    wouldn't be Tuesday when we had already started the case and
19    had to spend all day straightening out things that should
20    have been straightened out.  So you want to show a video
21    that was not produced in discovery.
22           MR. HAYSBERT:  It was produced during the discovery
23    period, Your Honor.  They had the video for a very long
24    time.  In the exhibits that we provided on Saturday was just
25    an update based on the Court's final status conference order
```

Haysbert, J. - Cross                                                        384

1   that came out on August 7th.  They already had our exhibits

2   originally.  They had our exhibits twice.

3           THE COURT:  I don't know even what you are talking

4   about.  So I tell you what.  Let's look at this video, and I

5   will ask them if it was produced and if it was produced

6   during discovery because you don't have it listed anywhere.

7   That still doesn't mean it can come in.  There are specific

8   rules of this court in terms of doing final pretrial orders.

9           You are to list all exhibits that you may use.  You

10  can list them in two ways.  You can list them definite use,

11  may use.  You can say the reason, and they did when there

12  was an objection here.  The ruling on the one that you had,

13  and it was ruled on, we have gone through that.  Which one

14  was it, 30?

15          MR. McGAVIN:  33, Your Honor.

16          THE COURT:  33 and it was ruled on.  Everybody has

17  known for a long time about that.  But what I'm saying is

18  nowhere on these exhibit lists has the Court been advised,

19  and the party is now saying they didn't get it, they didn't

20  know about it, and nobody seems to know what you're talking

21  about.  So why don't you put it on and let's see it.

22          Dr. Haysbert, if you would please step out.  Well,

23  you can just step down from the stand, if you'd like.  You

24  don't have to step out.

25          MR. McGAVIN:  Your Honor, may I suggest, if it's

Haysbert, J. - Cross                                                    385

1    what was sent to us, we have the previously produced -- what

2    I recognize the previous day-in-the-life video.  That's what

3    we received on Tuesday, which the Court ruled on.  So I

4    think the Court should see what it was that was provided.

5            THE COURT:  Well, first of all, you look at this,

6    and if you haven't been provided it, you haven't been

7    provided it.  Then if you want to completely confirm that,

8    this is going to be serious, Mr. Haysbert.  If you represent

9    to me as an officer of the Court that you provided it, and

10   it's not in that package, because we have that.  It wasn't

11   on the thumb drive you sent the Court that I'm aware of.

12           MR. HAYSBERT:  No, Your Honor.  The impeachment

13   evidence that we received from opposing counsel was not

14   provided to the Court as well.

15           THE COURT:  Wait.  We are talking about the video.

16   Again, stop putting in red herrings.  Stop chasing off the

17   issue.  You claim you have a video.  Let's see it.  Let's

18   see if you produced it.  If you haven't produced it, you're

19   not going to be able to use it at all.  If you have produced

20   it, I'll think about it because you haven't listed it

21   properly under the rules.  I've told you repeatedly, I'm a

22   referee.  I call balls and strikes.  I call under the rules.

23   The rules consist of the Federal Rules of Civil Procedure,

24   the Federal Rules of Evidence, and the local rules of this

25   Court, and the orders of this Court, when you're ordered in

Haysbert, J. - Cross                                                    386

```
 1   a final pretrial conference and how to do the final pretrial
 2   orders.  So let's see what it is you are claiming you have
 3   produced.  Go ahead and show it.  Everyone look carefully.
 4           Why are you consulting with another attorney that
 5   is not in this case?  I recognize Mr. Thomas.  He's sitting
 6   out there.  Nice to see you, Mr. Thomas.
 7           MR. HAYSBERT:  I had a question on the evidence
 8   rules to Mr. Thomas, Your Honor.
 9           THE COURT:  You have to know the evidence rules.
10           MR. HAYSBERT:  I know the evidence rules, but I had
11   a question.
12           THE COURT:  If you know them, go forward.
13   Mr. Thomas is not admitted in this case in any way.  Go
14   ahead.
15           MR. HAYSBERT:  Thank you.
16           THE COURT:  You've got Mr. McKelvey, if you need to
17   contact the rules.  You've got Mr. McKelvey as local
18   counsel.
19           MR. BINGHAM:  It's not recognizing the system.
20   It's been working all morning, and now it's not recognizing
21   it.
22           THE COURT:  Turn the volume down just a little bit.
23   I don't know.  Maybe you can.
24           MR. BINGHAM:  Yes, ma'am.
25           THE COURT:  Was that it?
```

Haysbert, J. - Cross                                                387

1            MR. BINGHAM:  That was it.

2            MR. HAYSBERT:  That was the whole video.

3            THE COURT:  There is no foundation for when it was,

4    for what purpose, and then the word in the end is "setback."

5    Whose setback?  She is introducing Miss Hampton University,

6    if that's what I heard.  It was very loud.

7            MR. HAYSBERT:  Your Honor, we can lay a proper

8    foundation through the witness herself.

9            THE COURT:  What's the date?  Now she is going to

10   remember the date.  There is no date on there.  There is

11   something about introducing Miss Hampton University, or at

12   least that's what I have, and then and I don't know if she

13   is meaning despite Miss Hampton University setbacks.  There

14   is an implication there that she's talking about her own

15   setbacks or somebody is.  Who said that?  Where is the rest

16   of the video?  It's completely out of context.  Where is the

17   whole video?

18           MR. HAYSBERT:  It's not completely out of context.

19           THE COURT:  It is completely out of context.  Where

20   is the whole video?

21           MR. HAYSBERT:  So the issue here is that the other

22   side is attacking her credibility with this impeachment

23   evidence showing that she's not -- nothing is wrong with

24   her, and we have evidence to suggest the opposite.

25           THE COURT:  I didn't see anything wrong with her in

Haysbert, J. - Cross                                              388

 1    that video, but I don't understand.  You don't have a date.

 2    You don't have an occasion.  She's introducing Miss Hampton

 3    University.  Does Miss Hampton University come up there?  In

 4    the end there is just this word setback."  It is completely

 5    out of context.  The other video was an entire video, the

 6    date was on it, the purpose was on it.  We don't know when

 7    this was.  All I can tell you is where is the whole video?

 8              MR. HAYSBERT:  Your Honor, we can obtain the whole

 9    video.  Here is the other thing --

10              THE COURT:  I don't even know.  You keep

11    interjecting, and the point being that I don't even know if

12    you've even produced this snippet.  So this is what I'm

13    going to ask.  Has defense counsel seen this snippet of a

14    video?

15              MR. McGAVIN:  Your Honor, not to my knowledge.  I

16    must say we received many, many things over the last week,

17    but not to my knowledge.

18              THE COURT:  Was it ever listed in any type of

19    exhibits that were going to be introduced as evidence?

20              MR. McGAVIN:  Not to my knowledge.  I believe this

21    is the first I've seen of it.  To be clear, this five or six

22    seconds is not on what I received on -- that was FedExed

23    back from my office on the morning -- I guess I got it on --

24    I guess I received it on the second day of trial.  I'm

25    confused on the timeline.  Nonetheless, in the box that I

Haysbert, J. - Cross                                                    389

1   got from counsel, there is an orange thumb drive.  It has

2   the-day-in-the-life video that the Court already ruled on as

3   well as the exhibits -- or the animation.

4           THE COURT:  So he's saying that it has the day in

5   the life and the animation.  You are saying that this is on

6   the thumb drive, yes or no?

7           MR. HAYSBERT:  Yes, Your Honor.  There were four

8   videos.

9           THE COURT:  Let's see your thumb drive.  Let's see

10  what's on it.

11          MR. McGAVIN:  You want me to play it, Your Honor?

12          THE COURT:  Yes.  I'm going to let you go ahead and

13  play it.  I'm going to ask you one more time.  We have gone

14  through the whole scenario of Federal Express.  I'm not

15  going to go back through it.

16          MS. BLAKE:  I apologize, just for the record, I

17  started utilizing the USB to start saving our documents on

18  it, and we were transitioning.

19          THE COURT:  Well, we have the same thumb drive.  Is

20  it the same thumb drive you sent the Court?

21          MR. HAYSBERT:  Your Honor, this was impeachment

22  rehabilitation evidence we were sending to Mr. McGavin.  So,

23  no, the Court would not have received this.  Again, we have

24  been exchanging video throughout this whole process.  The

25  Court has not received it.

Haysbert, J. - Cross                                          390

1              THE COURT:  Then I'm going to ask Mr. Bingham,

2    where did you get it from?  Was it on a thumb drive with the

3    animation?

4              MR. BINGHAM:  I didn't receive the thumb drive.  We

5    exchange files through a share file application, so I get it

6    from a link, and I download them myself.  I'm sorry.  I

7    download them myself.

8              THE COURT:  All right.  That's fine.  I know you

9    are here just to work it.

10             Now, Mr. Haysbert, you are an officer of the Court,

11   and I consider this very important, and I'm going to ask you

12   some direct questions.

13             MR. HAYSBERT:  Yes, Your Honor.

14             THE COURT:  There could be some direct consequences

15   here because enough becomes enough at some point.  Now, are

16   you talking about the Federal Express package that we were

17   dealing with earlier this week where it arrives in defense

18   counsel's office on the morning of trial by FedEx, and then

19   it had to be FedExed from his office down here, and then he

20   represented that he did get it down here -- I'm not going

21   back through the whole timeline -- and that there was a

22   thumb drive in there, and the thumb drive contained the

23   brain animation we were talking about for Dr. Filler, and

24   that they oppose that, or Dr. Haider and Filler at the time,

25   and they oppose that.  They are saying that the only video

Haysbert, J. - Cross                                               391

1    on it, I guess this is the day in the life?

2              MR. McGAVIN:  That's what I believe it is, Your

3    Honor.

4              THE COURT:  This is a day in the life that has been

5    already ruled upon.  You are saying to the Court that on

6    that thumb drive, there was also this snippet, but without

7    any context?

8              MR. HAYSBERT:  Your Honor, I put -- there are three

9    videos that were put in that thumb drive and one image.  On

10   video was the-day-in-the-life video, one image, and there

11   were two excerpts.  One was before the accident excerpt.  It

12   was like a five-second excerpt, and there was an

13   after-the-incident excerpt that was like a five-second

14   excerpt.

15             The one I'm specifically talking about with the

16   Court that I want to publish to the jury, to contradict what

17   the other side has put on regarding her credibility and her

18   veracity for the truth, is a five-second excerpt of her

19   after the incident.  That excerpt is on this thumb drive.

20   If it wasn't, even assuming that it wasn't excerpted from

21   the-day-in-the-life video, it is actually in

22   the-day-of-the-life video as a five-second excerpt.  So it's

23   got to be there, and he's already told me the

24   day-in-the-life video is there.  I know there were three

25   videos put in there.

Haysbert, J. - Cross                                                    392

1           THE COURT:  She's dressed totally differently than
2    she was in the day-in-the-life video.  She's dressed in a
3    white suit with a black collar and she's dressed differently
4    than she was in the other video.  So I don't see how it
5    could have been part.  She is dressed in a blue outfit, and
6    she's dressed differently.
7           MR. HAYSBERT:  Same exact outfit.
8           THE COURT:  It is not the same exact outfit.  Go
9    back to the day in the life.
10          MR. HAYSBERT:  This is the day in the life.  This
11   is the excerpt that I was going to use.  We just put this on
12   the screen.
13          THE COURT:  What was her sitting there in the white
14   suit and dark?
15          MR. HAYSBERT:  That was another portion that we
16   weren't using at all.  We've excerpted this section, which
17   is a five-second section.  It's the same video that you just
18   saw.  She's wearing the same hat.  She's got the same white
19   mask on.
20          THE COURT:  This is not the same video that I just
21   saw.
22          MR. HAYSBERT:  Yes, it is, Your Honor.
23          THE COURT:  Are you talking about the one that he
24   presented?
25          MR. HAYSBERT:  No, I'm not.  I'm talking about the

Haysbert, J. - Cross                                      393

```
 1   one that I just presented to say that you are saying lacked
 2   context.
 3            THE COURT:  No.  The one that just popped up on the
 4   screen was somebody in a white suit and a black outfit.
 5   Yes, this is what you want me to admit that you put back up.
 6   But that's a different outfit than a day in the life.  Then
 7   you represented to the Court that this was part of the day
 8   in the life.
 9            My comment was, well, a day-in-the-life video, she
10   had on one outfit, and the excerpt that you said that you
11   say is a day in the life is another outfit.  Yes, this is
12   the same outfit of the excerpt that didn't make any sense
13   that you showed that was five seconds that had no context.
14   But it's not what was then flashed up as the day in the
15   life.  Flash up, please, for me what is called the day in
16   the life.
17            MR. HAYSBERT:  Your Honor, what you saw is a
18   picture that began the day-in-the-life video, and I'll go
19   back to it.  That's a picture.  That's not a video.  This is
20   a picture.  There is no video playing in this image.  I
21   understand that you want to catch me in something, but you
22   can't.  I'm not sitting here trying to lie to the Court.  I
23   would never do that.
24            THE COURT:  I'm not trying to catch you in
25   something, Mr. Haysbert.
```

Haysbert, J. - Cross                                              394

1          MR. HAYSBERT:  Might feel like it sometimes.

2          THE COURT:  You will have to get over that because

3   what I'm trying to do is to see that the evidence is being

4   presented properly.  That's all I'm trying to do, and this

5   video that you've just played, number one, she has on a

6   different outfit than the beginning of the one in the day in

7   the life.

8          Then you said that this, that you've just presented

9   to the Court, was part of the day in the life, or I may not

10  have understood you.  Then they are saying they have never

11  seen this, that they have only seen the day in the life.

12  What I'm trying to find out is where this video is and how

13  it was produced and to whom.

14         MR. HAYSBERT:  Your Honor, the portion of the video

15  that I showed you earlier is part of the overall

16  day-in-the-life video, which is six minutes long.

17         We excerpted it from the-day-in-the-life video and

18  put it separately in the thumb drive.  We also put the

19  before-the-incident happened five-second video as a separate

20  excerpt in the thumb drive.

21         Now, I don't know what happened to those two

22  excerpts, but they were there when I sent them.  How long

23  with the entire six minutes -- sorry, the day-in-the-life

24  video and the brain animation.  There were four things on

25  that file.  I know that they were there, and I'm

Haysbert, J. - Cross                                                    395

1    representing to the Court as an officer of the Court that I

2    know that they were there, and I sent that FedEx package on

3    Saturday of August 5th.

4              THE COURT:  We have been through it.  We have been

5    through the receipts.  The receipt says that it is going to

6    arrive on the 8th.  So regardless of where it originated in

7    Malibu with the label and when you took it in, we let all

8    that go.  We went with the receipts that specifically said

9    it left on Monday the 8th to arrive on the 9th.  There is an

10   actual Federal Express and a tracking number there.  So that

11   is past history.

12             The relevant thing here, let's assume for a minute

13   you sent all of it.  The question becomes, has it been

14   properly listed as an exhibit, and I would rule that it has

15   not, and you cannot now use something that nobody has seen

16   before that you just happened to Federal Express in a

17   package -- let's assume you did that -- to the other side.

18   So somebody doesn't have it straight with the Court.  They

19   claim they've never seen it.

20             Now, I would like for Ms. Haysbert to take the

21   stand and at least as a proffer put this in context as to

22   what we are seeing because it's not understandable to the

23   Court as to what we are seeing.

24             Mr. McKelvey, can you offer any illumination on

25   this issue?  Are you aware of this video and it being

Haysbert, J. - Cross                                                        396

1    produced?

2           MR. McKELVEY:  I wasn't involved in that aspect of

3    it, Your Honor.  It does appear to me -- the-day-in-the-life

4    video had multiple sections, multiple excerpts.  It appeared

5    to me when I heard it that that last little you heard, when

6    it was played the first time, I thought was the narration of

7    the-day-in-the-life video picking back up after the excerpt

8    was shown.  So it was -- the only thing I would say is that

9    even though the context of the entire day-in-the-life video

10   was ruled upon, this was listed as a component, these are

11   the entire day-in-the-life video in the exhibit list.

12          So in a different form it was listed because it's

13   part of what -- a broader group of paperwork that was filed,

14   but I understand the Court's thinking.  It wasn't listed as

15   an excerpt.  I understand that.  I think that's where the

16   confusion is coming from.

17          THE COURT:  If this is a part of the

18   day-in-the-life video, the Court has ruled on that.  So if

19   this is a continuum, and you are trying to show overcoming

20   this to that, the Court has ruled on that.  That ruling is

21   final for the Court.  But let's establish at least what this

22   is.

23          Over a year ago the video on the day in the life

24   was ruled out.  The excerpts, whatever they are, the day in

25   the life was not anything the Court expected as an exhibit

1    or the defendants expected as an exhibit.  To the extent it

2    was sent this week, that doesn't then make it become

3    evidence.  You're trying to rehabilitate your own witness,

4    and I understand it.  But the problem is, you've got to do

5    it with exhibits that are known.  Go ahead and establish

6    with Dr. Haysbert when this was.

7            MR. HAYSBERT:  Sure.  Your Honor, if I just may, we

8    talked about this extensively with Judge Krask.  What he

9    ruled then was the entire day-in-the-life video could not be

10   included.  But he did not rule out excerpts of that video

11   from coming in.  That was what we discussed with him at the

12   final status conference, and I believe the transcript is

13   somewhere.

14   BY MR. HAYSBERT:

15   Q.  So, Dr. Haysbert, can you tell us what this is?  Can you

16   orient us as to time and place and location and what you're

17   doing here?

18   A.  I was introducing -- as the portion of it that we heard

19   faded, I was introducing Miss Hampton, which is a student who

20   has been selected by the university to represent the

21   university as Miss Hampton.  We introduce that person during

22   homecoming.  I was asked to step in for the president to

23   introduce her.

24           As I introduced her, it was a matter of my just

25   being able to say her name, what department she represented,

Haysbert, J. - Cross                                          398

 1   and her classification, and I forgot, which is what typically

 2   has begun to happen to me.  I forgot what department she was

 3   from.  There was a young lady sitting up front, Barbara.  She

 4   told me, School of Education -- School of Business, and

 5   that's when I paused, look, she said, and I then said School

 6   of Business.

 7   Q.  What year and month?

 8   A.  That was homecoming of last year.  Homecoming was either

 9   in October or November.

10        THE COURT:  Can I see the video again?  Because it

11   just stops.

12        MR. HAYSBERT:  Yes, Your Honor.  The reason it

13   stops is because we only included the portion of the video

14   and nothing more for purposes of objections to only to what

15   was said in the video.  I showed you that particular portion

16   she was describing.  Can you turn up the volume.

17        (Video playing.)

18        MR. HAYSBERT:  Would you like me to repeat it, Your

19   Honor?

20        THE WITNESS:  I had totally forgotten what

21   department the student was from.

22        THE COURT:  I'm not going to admit the video.  I

23   can't find it anywhere in the list.  If you're going to

24   continue the whole thing, I mean, you are taking it out of

25   context.  It has to be put into context, and I don't know

Haysbert, J. - Cross                                                      399

```
 1    what happens after that, and you've got this, what Judge
 2    Krask ruled was out, was this commentary where I believe
 3    you're commenting on the day in the life, and you've got
 4    some commentator back there saying, "And this is."  You've
 5    made the video trying to illustrate her deficits, but it
 6    just stops, and I don't know where it continues, if Miss
 7    Hampton came up there or what.
 8             Number one, it's just an excerpt, and we will enter
 9    it into as a rejected exhibit.  It does not make any sense
10    when you look at it, and I accept that she can testify as to
11    the date and what it was, but it just starts and it clips
12    off at the end, and you don't know what happens, and then
13    you have somebody's voice coming in there saying, basically,
14    making a commentary.
15             That's the way I'm determining it, but the problem
16    is a day in the life has been ruled out; and, number two, if
17    it is part of the day in the life, it's ruled out, and if it
18    isn't, it hasn't been listed in any exhibits anywhere that
19    were going to be used in this trial.  So, no, you may not
20    use it.
21             MR. HAYSBERT:  Thank you, Your Honor.
22             THE COURT:  Bring the jury back in.
23             (Jury in at 2:49 p.m.)
24             THE COURT:  I do need to make a comment for the
25    record, but I'll reserve that to our next break.
```

1          Mr. Haysbert, you can resume the redirect of

2    Dr. Haysbert.

3          MR. HAYSBERT:  Thank you, Your Honor.

4                    REDIRECT EXAMINATION

5    BY MR. HAYSBERT:

6    Q.  Dr. Haysbert, just wanted to clarify a couple of things

7    with you that may have gotten lost here.  So it is your

8    testimony today that you've only ever had one bout of

9    vertigo, correct?

10   A.  That's correct.

11   Q.  And this bout of vertigo happened sometime in 2017,

12   correct?

13   A.  That is correct.

14   Q.  Okay.  And, Dr. Haysbert, regarding the headaches that

15   you experienced that were shown in the medical records, did

16   those headaches begin before you fell at the Outback

17   Steakhouse or after?

18   A.  After I fell.

19   Q.  Okay.  Thank you very much.  Now, the other thing I

20   wanted to focus on is the dizziness that are replete

21   throughout the records.  Can you explain what that is talking

22   about, what Dr. Chinniry is talking about with that?

23   A.  I honestly cannot explain to my full understanding.  The

24   dizziness, I don't know whether his records are talking about

25   dizziness associated with vertigo or just -- I can't fully

Haysbert, J. - Redirect                                         401

1    explain that.

2    Q.  So let me ask the question.  When you have vertigo, what

3    were you experiencing with the vertigo?

4    A.  The time that I had vertigo, I threw up, regurgitated.

5    That's what connected vertigo for me.

6    Q.  And you described the room as spinning, as if it was an

7    earthquake?

8    A.  That's what happened.

9    Q.  Now, let's bring you up to the Outback Steakhouse

10   incident.  When you walked in, were you experiencing

11   dizziness at the time?

12   A.  Absolutely not.

13   Q.  Did you have a headache at the time?

14   A.  No, I did not.

15   Q.  Did you have vertigo at the time?

16   A.  No, I did not.

17   Q.  When you walked -- as you were walking one to two steps

18   past the hostess stand, did you have any feeling of nausea?

19   A.  None.

20   Q.  Any dizziness?

21   A.  None.

22   Q.  Any headaches?

23   A.  None.

24   Q.  Any vertigo?

25   A.  No.

1          MR. HAYSBERT:  No further questions.

2          THE COURT:  Then, thank you, Dr. Haysbert.  You may

3     step down.

4          THE WITNESS:  Thank you very much.

5          (Witness excused.)

6          THE COURT:  Mr. McKelvey or Mr. Haysbert, your next

7     witness.

8          MR. HAYSBERT:  Thank you, Your Honor.  We would

9     like to call Dr. Filler to the stand.

10          THE COURT:  I think there are a number of issues

11     that remain.  Do you have another witness you can call?

12          MR. HAYSBERT:  Your Honor, we would like to call

13     Dr. Filler at this time.

14          THE COURT:  I know, but there are some legal issues

15     that remain.

16          MR. HAYSBERT:  The concern with him is that he is

17     coming from out of state and is on a very limited time

18     schedule, and this is the only time that we can put him on

19     the stand.  There is no other time.

20          THE COURT:  I understand.  But we've got to resolve

21     certain matters before he can testify because he won't be

22     able to complete his testimony unless we resolve those

23     matters.  So, ladies and gentlemen of the jury, you'll have

24     to step back out.  I'm sorry.

25          (Jury out at 2:53 p.m.)

1          THE COURT:  I just wanted to add two matters to the

2     record, and I'm not expecting any response.  I'm just adding

3     the matters to the record so that it's clear.  To the extent

4     that the day-in-the-life video is at issue, that was not

5     admitted, and it has not been admitted.  It's been on a

6     final pretrial order for a year now.  So to the extent that

7     this was some excerpt in it, then it's not admitted because

8     this video, as I understand it, shows a before and after and

9     has a narrator.

10          So to the extent it is an excerpt of that video, it

11     has not been produced or listed that that excerpt was going

12     to be used, and I would further note that on the Court's

13     thumb drive, which I did view, the only thing on there was

14     the animation.  There were no excerpts on the thumb drive.

15     I expected from the other day that the same thumb drive the

16     Court had been sent was going to the defense counsel.

17          I personally viewed the thumb drive, as did my law

18     clerk, and there was nothing on the thumb drive but the

19     animation.  So I don't know what was on the thumb drive that

20     was sent, but, in any event, if it was a day in the life

21     that had not been admitted, if it was an excerpt from the

22     day in the life that has not been admitted, nor had it been

23     produced, and so, consequently, it has either been ruled as

24     inadmissible and/or not produced.  It certainly wasn't

25     produced to the Court in the thumb drive that the Court

1    received and personally viewed.

2          So let's now go to Dr. Filler.  So let's talk about

3    Dr. Filler.  As I understand it, you all have passed up so

4    many different briefings and things to the Court during the

5    course of this trial, I want to be sure that I have in front

6    of me what you are talking about.  No, these were through, I

7    believe, Mr. McGavin.

8          MR. HAYSBERT:  Sure.  My understanding is that you

9    also wanted to speak with Dr. Filler.

10         THE COURT:  I do, but we are not there yet.  Just

11   trying to get things sorted so that we are not all over the

12   place when Dr. Filler comes in.  I want to be sure we are on

13   the same page with the objections.  So you need to give me a

14   minute to sort all of these papers that have been passed up

15   to me.

16         The first thing that I want you to do, Mr. McGavin.

17   Mr. Haysbert, if you would please be seated.

18         Mr. McGavin, you are at the podium, and if you

19   would please repeat the objection that you have as well as

20   the authority that you have cited in your trial brief, which

21   just came in.  I didn't receive it until lunchtime and late

22   at lunchtime.

23         MR. McGAVIN:  Thank you, Your Honor.  Your Honor,

24   we have a number of reasons why Dr. Filler should not be

25   permitted to testify in this case now that Dr. Haider is not

1    testifying.  I would ask that the plaintiff's Rule 26(a)

2    disclosure of Dr. Filler and his report be made an exhibit

3    for this record, and I have a copy to tender so it can be

4    properly marked as an exhibit.

5            THE COURT:  Can you please tender it.

6            MR. McGAVIN:  Thank you.

7            THE COURT:  This is the 26(a) disclosure.  I also,

8    if you remember, I had last week all of the expert -- I know

9    the reports can't come in, and I had ruled that, but I still

10   wanted to read the report to be sure when they testified

11   they were in the parameters of what they had reported and

12   now to be in the parameters of the expert disclosure.

13           So you say it's not within the parameters of the

14   26(a)(2) disclosure?

15           MR. McGAVIN:  What I'm saying is, Your Honor, that

16   Dr. Filler's opinion does not, first of all, have adequate

17   foundation.  The designation, the pleading merely

18   incorporates the report.  On the first page of the report,

19   the entire history, record view, interview with the

20   plaintiff, none of that occurred.

21           THE COURT:  I realize that.

22           MR. McGAVIN:  There is one paragraph.  It says,

23   "Indication," which I'll read into the record.  "This is a

24   71-year-old woman, who on 5-23-2018, was at a restaurant,

25   and when she got up from the table, she slipped and fell on

 1    what was described as a slippery floor, impacting her head,

 2    with some loss of consciousness and the onset of neurologic

 3    symptoms, a number of which have persisted."

 4           He does not say which ones.  He doesn't even have

 5    the facts correct.  She was not at a table.  He references

 6    no medical records which he has reviewed.  So all he does is

 7    essentially perform a diagnostic study, a DTI, and based

 8    upon the DTI, he talks about statistically possible

 9    conditions which may be present.  Those are summarized at

10    the second to the last page of the report under,

11    "Impression," and "overall impression."

12           THE COURT:  What page?

13           MR. McGAVIN:  It's not numbered, Your Honor.

14           THE COURT:  I see it.  I've got it.

15           MR. McGAVIN:  And as you read through this, it's

16    clear that it violates *Vilseck v. Campbell*, among many other

17    cases, which require experts to talk about diagnosis and

18    causal relationship to a reasonable degree of medical

19    certainty.

20           So in that impression and overall impression,

21    Dr. Filler, first of all, points out that this is generally

22    normal routine brain imaging which some expansion of the

23    left occipital horn of the lateral ventricle which may

24    reflect, may reflect some prior volume loss.  He also says

25    extensive flare abnormalities of unclear clinical

1    significance not specifically related in location to the

2    areas of the fractional anisotropy losses.

3         As he continues through his report, he talks about

4    "expected effects."  Those are a theory, not confirmed by

5    physical examination or interview of the patient or review

6    of any other healthcare providers' records.  If that was

7    done, it is not in his report.  And if he comes to court

8    today to talk about reviewing all the records, we

9    strenuously object.

10        THE COURT:  Well, I think then the best way to

11   proceed, to maximize our time, is your objection, you made

12   one I think yesterday morning, and you've made it again

13   today.  I think the best thing is for Mr. Haysbert or

14   Mr. McKelvey to call Dr. Filler to put him under direct

15   examination, and when he goes outside of these things -- he

16   first has to establish that he's qualified, and he has to

17   establish what he reviewed and what opinions he formed and

18   the basis of those opinions.

19        So that would be the first thing, and then,

20   obviously, you can object, and we can hear this, but I think

21   we need to move along and get him in to at least hear what's

22   going to be -- what is proffered at this juncture.

23        MR. McGAVIN:  Will that be in the presence of the

24   jury or outside the presence?

25        THE COURT:  No, outside the presence of the jury.

1              MR. McGAVIN:  Thank you, Your Honor.

2              MR. HAYSBERT:  Thank you, Your Honor.

3              THE COURT:  Dr. Filler, if you'd please come

4    forward and be sworn.

5              (Out of the presence of the jury.)

6              (Witness was sworn.)

7              AARON FILLER, PH.D., called by the Plaintiff,

8    having been first duly sworn, was examined and testified as

9    follows:

10                        DIRECT EXAMINATION

11   BY MR. HAYSBERT:

12   Q.  Dr. Filler, thank you for being with us today.

13   A.  You're welcome.

14             MR. HAYSBERT:  Your Honor, if I may proceed.

15             THE COURT:  Certainly.

16   BY MR. HAYSBERT:

17   Q.  Dr. Filler, what is your profession?

18   A.  I'm a neurosurgeon.

19   Q.  Do you have a medical specialty in the work that you do?

20   A.  Well, I specialize both in -- well, nerve, spine, and

21   then also brain imaging.

22   Q.  In addition to being a medical doctor, in what field do

23   you have a Ph.D.?

24   A.  The Ph.D. is in biological anthropology.

25   Q.  And you also have a JD, correct?

Filler, A. - Direct                                                    409

1    A.   Yes.

2    Q.   What is an FRCS?

3    A.   It's a Fellow of the Royal College of Surgeons.  So in

4    England, after becoming a physician, there is an actual

5    qualification to become a surgeon, and so tests and training,

6    you can become a Fellow of the Royal College.  Very few

7    Americans have that, because you have to go through the

8    British training, and I had enough that I was able to -- and

9    I was invited to be in that college of surgeons.

10   Q.   And an FRCS is the Fellowship of Royal College of

11   Surgeons?

12   A.   Yes.

13   Q.   Were you retained by my office to share with the jury

14   your medical opinions on certain matters related to

15   Dr. Haysbert's brain and the fall at Outback Steakhouse?

16   A.   Yes.

17   Q.   Have you completed your work?

18   A.   Yes, I have.

19   Q.   And have you formed your opinions?

20   A.   Yes, I have.

21   Q.   Are you prepared to give them to the jury?

22   A.   I am.

23   Q.   Before I ask you what those opinions are, can you please

24   share your education and experience with the Judge so that

25   she knows what weight to give to the opinions you intend to

Filler, A. - Direct                                                410

1    express today.

2    A.  So as you indicated, I have the M.D. degree.  The Ph.D.

3    was done at Harvard, and out of that work came the invention

4    of diffusion tensor imaging, the method that we will be using

5    today, and that goes back to sort of 1980, 1982.

6           And then my training includes also an eight-year

7    neurosurgical residency down in Seattle, and also a year of

8    complex spine fellowship at UCLA, and a fellowship in complex

9    peripheral nerve surgery, and also a year of neuroimaging

10   fellowship.  And then from that point I joined the faculty at

11   UCLA in neurosurgery.

12   Q.  The faculty of UCLA in neurosurgery?

13   A.  Yes.

14   Q.  And how long have you been on the faculty?

15   A.  I was there for five years, and then I left UCLA to be in

16   private practice and joined the -- it's not a regular faculty

17   but Cedars-Sinai as a similar structure.

18   Q.  Please tell the Judge what you did to gather information

19   to perform research or study, whatever you needed to, in

20   order to form your opinions here today.

21          THE COURT:  Basically, I think what we need to do

22   is what you relied upon.  He said his qualifications but

23   what he relied upon to express any opinions regarding

24   Dr. Haysbert.

25          THE WITNESS:  So in this particular case, my

Filler, A. - Direct                                                    411

1    clinical information came from Dr. Huma Haider and her team

2    at the National Brain Injury Institute, and I should say

3    that the way which they prepared their reports are something

4    I had set forth, so I showed them how to work more like

5    how -- to do the things I require and how to ask the

6    questions I like to see so that in a part they were acting

7    in my path in collecting information.  I relied on that for

8    the clinical information rather than seeing the patient

9    myself, which I more typically do.

10           In addition, I carried out a brain MRI, which

11   included the diffusion tensor imaging or DTI methodology

12   that I developed, and I evaluated the DTI results in light

13   of the clinical information to reach my opinions.

14   BY MR. HAYSBERT:

15   Q.  And what were those opinions in this case, Dr. Filler?

16   A.  The history suggested what I called persistent

17   post-concussive syndrome, meaning somebody has fallen, they

18   have hit or abruptly accelerated their head or been subject

19   to some force, shockwave, for instance, in this case the

20   impact, and that there are abnormalities seen in the image

21   which are typical of a -- what I call a mild traumatic brain

22   injury, and the patient has ongoing symptoms that are typical

23   of a post-concussive pattern.

24   Q.  Thank you.  How did you test traumatic brain injury in

25   this case specifically, and how is that different from what

Filler, A. - Direct                                                    412

1    other doctors do?

2    A.  So increasingly now the DTI is used to evaluate traumatic

3    brain injury, and I should say, you know, I write -- I'm an

4    editor for a major textbook in neurosurgery and write the

5    textbook chapter about how to approach this so that 50,000

6    neurosurgeons around the world, we -- what I set forth as how

7    to approach this, and I put questions on the board

8    certification exam and the review book for the board

9    certification exam.

10          So in a sense I create the technology.  I have vast

11   experience.  I have a paper coming out with a thousand

12   patients where we compare their images to their findings

13   where I've examined, assessed the patients, examined the

14   images, and taken these together, and out of that knowledge,

15   you know, I provide guidance to other doctors on how to

16   approach these problems.

17   Q.  Thank you.

18          MR. HAYSBERT:  So your report -- if we could bring

19   up Dr. Filler's report, Your Honor.  Would that be okay?

20   Would you just like him to proffer?

21          THE COURT:  No, just let him testify.

22          MR. HAYSBERT:  Sure.  Okay.

23   BY MR. HAYSBERT:

24   Q.  We are going to let you testify, Dr. Filler, if you

25   wouldn't mind.  If you need your report, let me know.

Filler, A. - Direct                                                    413

```
 1            THE COURT:  When you talk about his report, what
 2    are you talking about?  Because you know the excerpt reports
 3    don't come in.  So what do you want to show?  Is it the
 4    animation?
 5            MR. HAYSBERT:  Yes.  If you want to see the
 6    animation, I would be happy.  I think what the issue is, is
 7    he can show us what his opinions are through the use of the
 8    brain animation as well as your report, if necessary.
 9            THE COURT:  He can't use his expert report.
10            MR. HAYSBERT:  Not in front of the jury.  This is
11    for you, Your Honor.
12            THE COURT:  Just go ahead, and you can ask him what
13    he relied on and what opinions he formed and how he formed
14    them.
15            MR. HAYSBERT:  Okay.  Sure.
16    BY MR. HAYSBERT:
17    Q.  What did you rely on, and what opinions did you form, and
18    how did you form them, Dr. Filler?
19    A.  In this case the task that I had, in evaluating
20    Dr. Haysbert, was as an imaging physician that is not as an
21    expert report.  So I prepared a report of her image findings
22    and my impressions of those as a neurosurgical imaging
23    physician.  And to clarify that, unlike a lot of other types
24    of doctors, neurosurgeons read their own images and have a
25    higher duty in interpreting the medical image than a
```

Filler, A. - Direct                                                      414

1    radiologist.

2          An example I like to give is if a neuroradiologist

3    says there is a herniated disk at C5/6, but it's actually

4    C6/7, and I go and operate at the wrong level, because I

5    can't get to say the neuroradiologist told me to, I'm

6    responsible for looking at the image and getting it right.

7          So the report that I'm specifically referring to

8    is the dictated report that I prepared, having seen the

9    clinical work from the initial evaluation from NBII,

10   Dr. Haider, and my work on the image.  I spent about three to

11   four hours processing and evaluating the images and preparing

12   that report.

13         So that is my -- that was the output in this case.

14   And sometimes I'm asked to write an expert report or a --

15   respond to a motion *in limine*, write an actual response or

16   even a -- something close to a pleading.  But in this case it

17   was truly a medical imaging report from -- incorporating my

18   role as a neurosurgeon, meaning that I'm looking at symptoms

19   as well as findings.

20   Q.  What were your findings?

21         THE COURT:  I'm sorry, Dr. Filler.  When you say a

22   medical imaging report, what are your talking about?  What

23   medical imaging report were you looking at?

24         THE WITNESS:  So we have a single document, which I

25   think is available as evidence.

Filler, A. - Direct                                                    415

1            MR. HAYSBERT:  Yes.  Well, it is available to the

2     Court, but I don't think that's something that comes in as

3     evidence for the jury.

4            THE WITNESS:  I see.

5     BY MR. HAYSBERT:

6     Q.  The report is available for you to review and track

7     along?

8     A.  So, yes.  Then I did -- there was also a -- there was a

9     PowerPoint where I incorporated some images from her -- that

10    I looked at that I think illustrate the key findings.

11    Q.  We have that as an exhibit.

12    A.  That exhibit will show.  So I want to focus on one

13    particular finding that I state very affirmatively is there,

14    and it is a finding, which the good medical word here is

15    pathognomonic, p-a-t-h-o-g-n-o-m-i-c (sic), meaning that you

16    see that, it must be a certain type of cause and effect.

17           And that injury is an injury in a structure called

18    the crus of the fornix, f-o-r-n-i-x.  And when that is

19    injured, it impairs the ability to form new memories, and she

20    had that injury, and that impacted her ability to do her

21    work, in my opinion, subsequently, and based on, I did look

22    at her deposition.

23           THE COURT:  Well, that's what I want to know.  You

24    are forming these opinions.  What did you look at?  You did

25    not examine her, did you?

Filler, A. - Direct                                                    416

1          THE WITNESS:  I examined her brain.

2          THE COURT:  What did you use to examine her brain?

3          THE WITNESS:  So we obtained, under my direction, a

4    DTI/MRI.  So that's an MRI with the additional advanced

5    view.  What does the DTI show that a regular MRI doesn't

6    show?  What it shows --

7          THE COURT:  You didn't examine her.  What were you

8    using?  Was it her brain scan?  What was it?  That's not

9    clear.  That's what I'm trying to clear.  You have to be

10   clear to the jury.  Do you see what I'm asking?

11         THE WITNESS:  I do, yes, Your Honor.  Thank you.

12   Yes, I examined her brain image.  I processed and examined

13   her brain image.

14         THE COURT:  Where did you get that from?

15         THE WITNESS:  I had her go to an image center, I

16   think most likely Houston Medical Imaging, I think is the

17   location.  Several we use around the country.  And they have

18   a set of directions from me.  It's like -- it's a page of

19   numbers and parameters that show them exactly how to run the

20   image, and we work with image centers where I've trained the

21   technologist, my people, in quality assurance.

22         So you follow those protocols, and it generates a

23   set of what would amount to usually about maybe 2,000 image

24   frames, looking at the brain in various ways, and that is

25   what I look at.  So that image gets loaded into software,

Filler, A. - Direct                                           417

```
 1   based in part on technology I developed, that allows us to
 2   see the internal structure, the brain.  So I'm looking at
 3   cross-sectional slices through the brain of various type of
 4   MRI sequences.
 5           I am looking at a type or a quality of brain health
 6   called FA, or fractional anisotropy, a-n-i-s-o-t-r-o-p-y,
 7   which is a component of the DTI methodology, and I am
 8   looking at the tracts of the brain through in tractography,
 9   which are visible images of the connections of the brain.
10   So I'm looking at image cross-sections of various types, T1,
11   T2, flair, SWI, which bring out different contrasts and
12   features of injury, and I am looking at a set of images
13   wherein the fractional anisotropy, the FA, right when it's
14   very healthy, darker, when white matter is less healthy, and
15   measuring the exact fractional anisotropy in a set of
16   standard location to assess the health based on a comparison
17   to normals based on what I've published in textbooks as to
18   normals, and I am looking at the tracts of the brain to see
19   if there is any breach or interruption in the connection
20   between two separate points in the brain wherein the breach
21   and the connection is in such a location and such a pattern
22   that it appears to me to be traumatic, based on my
23   experience and knowledge.
24   BY MR. HAYSBERT:
25   Q.  And, Dr. Filler, if you could tell us, what did you
```

Filler, A. - Direct                                                        418

1    specifically see in Dr. Haysbert's brain that you were about
2    to start talking about, and can you render your opinions or
3    based on what you examined her brain?
4    A.   So there is a number of findings, but I'm going to
5    concentrate on one, which is perhaps most exemplary, and as I
6    mentioned, it's to do with the fornix.  What this does is --
7    so normally, of course, all the time, a tremendous amount of
8    sensory information is pouring into the brain, but we don't
9    report all of it.  And the constant basis, this structure is
10   involved in saying, well, isn't that interesting?  Let's save
11   that.  I want to remember that, remember that.  And the way
12   it works is there is a -- in the campus and fornix of the
13   temporal lobes, it's always thinking of things in the past,
14   what's interesting, and every time it decides to form a
15   memory to save something, it sends a signal back up in the
16   fornix around in this curve, and then it turns forward and
17   reaches the anterior subthalamic nucleus, which is the
18   shutter button of the brain attaches the image.
19          That pathway is partially fractured in
20   Dr. Haysbert's brain.  Now, I will say that that pathway is
21   narrow and thin.  It travels the back and upward parts
22   surrounded by the full mass of the brain, and then it emerges
23   out of the solid brain to where it is surrounded by fluid,
24   it's in the ventricles, and then it goes back into the solid
25   brain at the anterior subthalamic nucleus.

JODY A. STEWART, Official Court Reporter

Filler, A. - Direct                                                          419

```
1              And what happens in the trauma, particularly

2    lateral, is the part of the fornix, that is surrounded by

3    fluid, whips around while the part in solid does not, and

4    they get a breach or a bruise, what I call a fractional

5    anisotropy bruise right at the point where it emerges from

6    solid to liquid.

7              So that is why I say it is pathognomonic because the

8    tissue is the same on either side, but the break or the

9    damage occurs at a point where there is a mechanical

10   transition surrounded by fluid versus by the full mass of the

11   brain, and she has that.  She has a breach in the crus of the

12   fornix at the point of transition from a solid surrounding to

13   liquid surrounding, and that breach causes her to fail to

14   form memories as normally as she would.

15             THE COURT:  Let me stop you just for a minute.  Do

16   you know how that fracture got there?

17             THE WITNESS:  I believe I do.

18             THE COURT:  You believe you do?  Tell me how you

19   believe you do.

20             THE WITNESS:  I believe that having that fracture

21   would be incompatible with the type of employment that she

22   had, which was a high position administration in the

23   university, and that after the injury, this particular

24   problem -- and she describes it in the deposition.  She says

25   people will come to me and ask a question, and I start
```

Filler, A. - Direct                                                    420

1    answering, and I realize I can't remember what they ask, and

2    I try to trick them into asking the question again because

3    she can't remember.

4          And eventually -- when people have this also, it

5    will combine with some of the other effects of trauma, one

6    of the typical effects from the particular area of the

7    frontal lobe that she had injury, so people get excessive

8    anger.  Some get increased anxiety, depending upon the

9    associated other injuries, and some get depression.

10         So the people with anger, for instance, patients

11   that try to go back to work, the -- one guy tried to go to

12   work in the truck stop, and check-out guy at a counter, and

13   the customer would say I'd like, you know, a bag of chips

14   and cigarettes, some gum and come back with --

15         THE COURT:  Okay.  I'm not trying to interrupt you,

16   but I'm trying to move this along.  What I'm basically

17   asking you is, how do you know it came from any fall at

18   Outback Steakhouse?

19         In other words, did you look at brain images before

20   the fall and after the fall?  Do you know of any other

21   accidents that she had?  In other words, your opinion, I

22   know you say there is this condition there, and this is what

23   this condition results in.  What did you review to be able

24   to testify about the causation, that she has this?  There's

25   got to be causation that it resulted from the fall at

Filler, A. - Direct                                                            421

1    Outback Steakhouse.

2          I don't know if you studied her previous medical

3    history, her history subsequent to or before this scan that

4    you looked at.  I mean, do you have before and after?  What

5    is your basis for knowing this is how this occurred?

6          THE WITNESS:  So, obviously -- thank you, Your

7    Honor.  That does frame pretty well.  So, obviously, the

8    standard would not be that we have to watch the football

9    player hit by the car in front of the stadium and see his

10   leg bend as he falls in order to be able to say, well, if he

11   was playing football before he got hit by a car, and he's

12   got a fractured femur, I believe -- even though I wasn't

13   there -- that's what they told me -- that he broke his

14   femur, and the reason he's not running is because his femur

15   is broken, and it was caused by the car hitting him.  So I

16   don't have to be there, but what's a fair inference in

17   developing the cause here?

18         And my standard is, particularly in someone with a

19   high performance type of work or any other, would have the

20   background from the history, if they have a finding in the

21   brain which will definitely cause a particular symptom, and,

22   one I sometimes rely, just as the Court has to do on the

23   patient saying it started that day, and they actually -- I

24   usually have them sign a kind of an affirmation of that.  Is

25   this true?  That's what they say.

Filler, A. - Direct                                              422

1              But I also rely on, is this something that could
2     have been going on prior, given the patient's occupation?
3     So I guess that in this case I would rely on the assertion
4     that I've seen in, I think in the Haider reports and
5     certainly in her testimony, in Dr. Haysbert's testimony,
6     that her ability to remember things and do -- as imparting
7     her work, deteriorated after the fall, and the fall was a
8     key point in the onset of these symptoms.
9              So I always look at the patient's stated the
10    symptoms begin at that time, and doctors have to do that,
11    because we don't always get to investigate.  It's fair
12    enough to determine the cause, and particularly in this
13    case, I'm acting as a physician, not a forensic
14    investigator.
15             THE COURT:  So your opinions, are they
16    possibilities?  Are they given with a reasonable degree of
17    medical certainty?  Dr. Haider's report is not coming in at
18    this trial, and she's not testifying.  So can you base your
19    opinion not on what Dr. Haider did?
20             THE WITNESS:  Sure.  So when I'm preparing a
21    medical document that's intended for use in a legal
22    proceeding, I will use the words "reasonable degree of
23    medical certainty or probability."  In a normal medical
24    report, you don't use those words.  We just say, "It's my
25    impression," or this is.  In this case I use that sort of

Filler, A. - Direct                                                      423

 1    language.  Sometimes we just use the word "could," it could
 2    have happened, and that means it's a possibility, it could
 3    happen.
 4            In this case, in several of the findings, I say
 5    this would be expected to be due to, so essentially I'm
 6    asking should I treat.  The person has something, is this
 7    condition, is this image finding causing that symptom, would
 8    be expected to sufficient greater than not, more likely than
 9    not.  So I have would, and then the fornix injury, I say
10    with greater confidence that this -- I have to see the words
11    in front of me, but it's on Page 3 of the report, that this
12    is caused by this injury, and it will cause -- will result
13    in this memory impairment.
14            THE COURT:  It's on Page 3 of your report?
15            THE WITNESS:  Yes, the imaging report.
16            THE COURT:  Can somebody hand him the report?  So
17    in this case you formed your opinions, and to which one of
18    these that you refer, possibility, would, or will?  What
19    degree of certainty have you formed these opinions about
20    Dr. Haysbert from looking at a brain scan that was done?
21    Because you did not examine her herself, and you didn't take
22    any history or any of that.  You relied on some records, and
23    then you looked at the brain scan.  So I just want to know
24    to what degree of certainty?  That's very important.
25            THE WITNESS:  Yes.  And I have to say, if we could

Filler, A. - Direct                                                    424

1    project it.  There is -- because it's small to begin with

2    and small here.  Is that possible, Your Honor?

3              THE COURT:  Sure.

4              THE WITNESS:  Thank you.

5              THE COURT:  What page are you on?

6              THE WITNESS:  It will be Page 3 of the report.

7              MR. HAYSBERT:  Your Honor, if I may, you keep

8    saying, you know, you didn't examine.  He did mention

9    several times that he examined the brain.

10             THE COURT:  Right, the brain scan that was taken in

11   Houston.

12             MR. HAYSBERT:  He did an examination.

13             THE WITNESS:  If I could answer that particularly

14   because Your Honor has raised it, that obviously classically

15   before we had imaging, like we do now, you'd examine the

16   external publication of skin.  When I image a patient, I am

17   examining them.  I'm just able to see the brain to the body.

18             THE COURT:  I understand.  You examine the imaging

19   of the brain that was taken in Houston.  I understand that

20   completely.

21             THE WITNESS:  Can we project that?

22             MR. HAYSBERT:  Yes.

23             THE COURT:  You can put it on the projector here.

24   Show this to the witness.  Pass over what page he's looking

25   at.

Filler, A. - Direct                                                425

1              THE WITNESS:  It's going to be the third page of

2      this report.  If you have it in full-size format -- as you

3      have it in the book there, I could read it.

4              THE COURT:  I don't think it's the same.

5              THE WITNESS:  It's literally Page 3 of that report.

6              THE COURT:  Is it the one that starts with the

7      heading "Tractographic Impression."

8              THE WITNESS:  Tractographic finding.  Yeah, about

9      halfway down the page, I'm talking about the fornix.

10             THE COURT:  But that's the page you're on?

11             THE WITNESS:  Yes.

12             THE COURT:  That's the page I'm on, too.

13             THE WITNESS:  If you brought up that one page

14     there, this is one of these.

15             THE COURT:  Yes.

16             THE WITNESS:  It's shrunk down to size.

17             THE COURT:  It's the expert report, and it's the

18     page that looks like this (indicating).

19             THE WITNESS:  Tractographic impressions, yes, Page

20     3.

21             MR. McGAVIN:  I can put it up there, if we just

22     turn on the docket camera.

23             THE COURT:  We can put it on the projector.

24             MR. McGAVIN:  It has my notes, but that's okay.

25             THE COURT:  I can give my page.

Filler, A. - Direct                                            426

1          MR. McGAVIN:  That's okay.  It's highlighted.
2     There you go.
3          THE COURT:  So what are you referring to,
4     Dr. Filler?
5          THE WITNESS:  Right.  So the line is 12, "Losses
6     appreciated," the last two words in that line.  It says,
7     "Losses appreciated in the right crus of the fornix and the
8     left pillar of the fornix on detailed formal tractographic
9     evaluation of the fornix, and the limbic system reveal
10    abnormalities which will have the expected effects of
11    impairment of new memory formation.  Overall, these findings
12    demonstrate multiple abnormalities with expected effects on
13    cognition, emotional behavior, and neurologic functions are
14    as identified above."
15         So and, "The degree of injury appreciated would be
16    expected to result in clinically significant symptoms.  And
17    the locations and types of injury are consistent with the
18    mechanics of the trauma as described."
19         So in particular, though, with regard to the fornix
20    injury, I say it will have the expected effects of
21    impairment of the memory formation.  And in -- the way I
22    would write in different formats, that medically is as
23    strong or stronger than saying reasonable degree of medical
24    probability, not an extreme degree of medical probability or
25    absolute, but that's my use of words.

Filler, A. - Direct                                             427

1              MR. HAYSBERT:  Certainty, not probability.

2              THE WITNESS:  Yes.

3              THE COURT:  So what is it?  With a reasonable

4    degree of probability, with a reasonable degree of medical

5    certainty?

6              THE WITNESS:  Certainty.  Expected effects.

7    BY MR. HAYSBERT:

8    Q.  And you found those effects in Dr. Haysbert, correct?

9    A.  Right.  I'm saying these injuries, just like you see a

10   femur fracture, expected effect would be pain and difficulty

11   walking.  Calcaneal fracture, same thing.  But here you have,

12   I'm saying with this image finding, and it's pretty striking

13   when you see the image, the disruption, in my view, it would

14   have the expected effect of impairing new memory formation,

15   which, again, I agree that the weakness in it is only what if

16   she they developed memory failure before, but it's a

17   particular type of memory.

18             So people get global memory loss, like in

19   Alzheimer's disease.  This is not that.  It's this new memory

20   formation issue, which is not absolute; it is relative.  It's

21   part of the fornix is still intact, and so that is typical of

22   trauma, particularly with much of the rest of the brain

23   intact.

24             And as I testified earlier, I rely on the fact of

25   the type of work she was doing before and that I don't think

Filler, A. - Direct                                               428

1    this would be compatible with her having reached her level of

2    responsibility and a skill in her field with that impairment,

3    and she complains of it affecting her ability to work

4    subsequently, and that kind -- those kind of failures, when a

5    person has increased anxiety after trauma, that creates

6    episodes of anxiety, just like people with the excess anger

7    when they make these errors.

8            THE COURT:  So when did you make this report?  What

9    is the date of it?  It looks like it was 2020.

10           THE WITNESS:  2020, yeah.  September 2020, yes.

11           THE COURT:  With this injury that you are

12   describing and her position, then would you expect her to

13   continue on in this position, in the same position?

14           THE WITNESS:  Yeah.  So I have many professional

15   patients that try to continue in their jobs and are having a

16   hard time of it.  I think one of the things that you sort of

17   get from Dr. Haysbert's deposition, I see this in some

18   patients, some people, maybe they're an artist or writer,

19   they're not doing as well.  Other people have other people's

20   lives in their hands, and they get to worrying, will their

21   impairment make them fail to adequately serve the people

22   that they are responsible for helping?

23           So this -- often they will seek medical care, and

24   we do treat this, and the technology, with this level of

25   certainty in 2020, now today we have some dramatic

Filler, A. - Direct                                                 429

```
 1    improvements in the ability to go in and repair these things
 2    that's happened over the last year.  So, you know, it's been
 3    very useful to do this work.  And I do think, because now I
 4    have patients who are able to treat and repair and see not
 5    only the expected effect when you fix that spot, that
 6    symptom goes away.
 7              THE COURT:  So then it's potentially not permanent?
 8              THE WITNESS:  That is correct.  It's not always
 9    fixable, but the main thing coming out of that work is that
10    we do highly targeted treatments and are able to cause
11    neural repair in damaged circuits, and you see the patients
12    improve and report improvement and get back to their jobs,
13    and hence, of course, life satisfaction.
14              THE COURT:  Anything else, Mr. Haysbert?
15    BY MR. HAYSBERT:
16    Q.  How many times have your DTI studies been permitted in
17    courts, Dr. Filler?
18    A.  Well, I think they are pretty much universally being
19    accepted.  I mean, myself, in terms of Daubert challenges,
20    there have been two or three, California, Montana, State of
21    Washington, California, Texas.
22    Q.  How many times have you been qualified in courts?
23    A.  As a witness, so I've probably testified in trials about
24    80 times.
25              THE COURT:  State, Federal Court, both?
```

Filler, A. - Direct                                                      430

            THE WITNESS:  A mix.  A number of Federal Court

testimonies.

BY MR. HAYSBERT:

Q.  Is it your opinion, to a reasonable degree of medical

certainty that Dr. Haysbert suffered a traumatic brain injury

in this case?

A.  Yes.

Q.  Is it also your opinion that Dr. Haysbert suffered this

traumatic brain injury from a sudden impact consistent with

the fall?

A.  Yes.  As I said, the type of fornix injury she has, if

you look at the picture, you may form the same opinion, but

you're not used to looking at these, is what I call, as I

said before, pathognomonic, meaning this comes from a lateral

impact trauma, and there is nothing else that will cause

exactly that, why that spot.

Q.  So it couldn't come from old age?

A.  It did not come from old age.

Q.  And it couldn't have come from some type of just gradual

process over time?

A.  No, because it's so focal, and the fornix looks great on

either side of it.

Q.  So it was like a shearing process, like something --

A.  Abrupt lateral movement of the fornix in the ventricle so

that it causes this traumatic bruising injury at the point

Filler, A. - Direct                                                    431

1    where it's, fixated by the whole mass of the brain, so right

2    at that transition point.

3    Q.  You said you reviewed Dr. Haider's report, correct?

4    A.  Yes.

5    Q.  Is her report consistent with your findings here?

6    A.  Yes.  And, as I said, I indicated questions that you

7    should ask, and the questions they ask include the questions

8    of how memory formation and that it was a new onset problem.

9          THE COURT:  Mr. Haysbert, I wouldn't let you, in

10   front of the jury, go into Dr. Haider's report or her

11   findings, because she was listed as a witness, you were

12   given every opportunity for her to be here, and you withdrew

13   her as a witness in the case.  So her opinions and her

14   report are not coming in, so he can't say that he relied

15   upon Dr. Haider because the jury won't know anything about a

16   Dr. Haider.

17         MR. HAYSBERT:  Understood.

18   BY MR. HAYSBERT:

19   Q.  I have one more question for you, Doctor.  So do you

20   compare the injured brain areas to the complaints that were

21   made by Dr. Haysbert, and you found them consistent with the

22   trauma event, in this case a slip and fall?

23   A.  Yes.

24         MR. HAYSBERT:  No further questions.

25         THE COURT:  I have one question.  You said this

JODY A. STEWART, Official Court Reporter

Filler, A. - Cross                                                    432

1    fracture.  Where is the fracture?

2            THE WITNESS:  This is in the area of the crus of

3    the fornix.  I said it's -- it's best described as a

4    fractional anisotropy bruise.  That picture is in there.

5            THE COURT:  I just want to know where is it?  Is it

6    on the left side, the right side, the mid-side inside the

7    brain?  Where is it?

8            THE WITNESS:  Center of the brain on the left.

9            THE COURT:  The center of the brain on the left?

10           THE WITNESS:  Yes.

11           MR. HAYSBERT:  I was going to say, we can also

12   provide the brain animation.

13           THE WITNESS:  Well, that picture has a arrow on it.

14           THE COURT:  I'm trying to move this along to get to

15   the jury because I know that Dr. Filler is on a schedule.

16           Any inquiry, Mr. McGavin?

17           MR. McGAVIN:  Yes, Your Honor.

18           THE COURT:  Okay.

19                         CROSS-EXAMINATION

20   BY MR. McGAVIN:

21   Q.  Dr. Haider, in your report --

22           THE COURT:  Dr. Filler.

23           MR. McGAVIN:  Excuse me.  Thank you, Your Honor.

24   BY MR. McGAVIN:

25   Q.  Dr. Filler, in your report you indicated the following:

Filler, A. - Cross                                                    433

1           "This is a 71-year-old woman, who on 5-23-18 was at a

2    restaurant, and when she got up from the table, she slipped

3    and fell on what was described as a slippery floor, impacting

4    her head with some loss of consciousness and the onset of

5    neurologic symptoms, a number of which have persisted."

6           Is that correct?

7    A.   That's what that says, yes.

8    Q.   In your report you did not reference reviewing

9    Dr. Haysbert's deposition; is that correct?

10   A.   That's correct.

11   Q.   And so you didn't do a supplement, did you?

12   A.   No.

13           THE COURT:  Wait just a minute.  Then you will not

14   be able to mention that in your testimony.

15           THE WITNESS:  Yes, Your Honor.

16   BY MR. McGAVIN:

17   Q.   You relied upon her testimony in the deposition in making

18   the causal connection link, didn't you?

19   A.   No.  I just pointed out -- wasn't sure if I was allowed

20   to comment on that, but I pointed out that it confirms and

21   reinforces that opinion.

22   Q.   On the last page of your report, you say -- well, first

23   of all, you said you do a different report for a radiology

24   exam, medical exam than you would for court; is that right?

25   A.   If I'm asked to prepare a document for court, I will add

Filler, A. - Cross                                                    434

1    additional language.

2    Q.  This report that you did that was in the designation was

3    not a report for court, was it?

4    A.  It was a report -- yeah, that's right.  It's prepared as

5    a medical report.

6    Q.  And in that report you did not use the words "reasonable

7    degree of medical certainty" anywhere, did you?

8    A.  That's correct.

9    Q.  And instead, you talk about expected effects, correct?

10   A.  Right.  I should clarify my answer to you in that medical

11   reports are always and often used in courts.  It's the

12   difference between preparing a document for a legal audience,

13   and you can even -- as opposed to a traditional medical

14   doctor, not that traditional medical documents cannot be used

15   in court.  Right?

16   Q.  Thank you.  But you used the term "expected effects of

17   impairment," which indicates it's expected but requires

18   clinical correlation, correct?

19   A.  No.  I'm saying that this is expected to cause it in the

20   information that I have.  So a doctor is allowed to rely on

21   the reports of other doctors for medical as well as legal

22   use, so you know that when Dr. Haider's people ask the

23   question, I would have expected to be able to rely on their

24   clinical information.  Now, maybe that's excluded, but that's

25   what you have to think about.

Filler, A. - Cross                                                     435

1    Q.  Dr. Haider's report is excluded.  She didn't testify.

2    Her deposition, you did not rely upon.  And, in fact, in your

3    report you made no reference to Dr. Haider's report, did you?

4    A.  Well, it's in her stationery, so basically I'm preparing

5    a supplement to her report, that I'm given a medical role.

6    I'm just saying that a physician generally doesn't have to

7    get every aspect of history by inspecting themselves.  We

8    read reports from other doctors.

9         In this case I reasonably read Dr. Haider's report,

10   and it would be reasonable for me to use the information from

11   the doctor who would normally -- someone like a neurologist

12   or brain injury specialist who sends the patient to me, so

13   particularly in this case, because I've instructed her staff

14   and herself on helpful questions for them to ask, so I'm

15   allowed to -- I rely on that as a doctor and --

16   Q.  Are you offering a legal opinion here?

17   A.  What's that?

18   Q.  Are you offering a legal opinion on what you are allowed

19   to rely upon in court?

20   A.  No, I'm saying I'm offering an opinion about what a

21   doctor relies on, and you are telling me what I can rely on

22   in court.

23   Q.  I'm not telling you anything.  I'm asking you questions,

24   sir.

25         Is it correct, sir, that there is nowhere in your

Filler, A. - Cross                                                    436

1   report any history of past, present, or current complaints

2   for Dr. Haysbert?

3   A.   Right.  I'm relying on Dr. Haider's associated report.

4           MR. HAYSBERT:  Your Honor, this is not required

5   under the Federal Rules.  What is he talking about?  Why is

6   he doing this to my witness?  This is not required under the

7   Federal Rules.

8           THE COURT:  What is not required?  He gets to

9   inquire because he can object to him qualifying as an

10  expert.  It's done all the time where the expert is examined

11  outside of the presence of the jury to determine whether the

12  expert's opinion is properly supported and the expert is

13  qualified.

14          MR. HAYSBERT:  I understand that, Your Honor, but

15  in this case he is actually saying in front of you, and I'm

16  listening to this record being made that he can't rely on

17  Dr. Haider's opinions, assessment, and evaluation to render

18  his own opinion, and that is simply not true under the

19  Federal Rules, and we all know that.

20          THE COURT:  Well, how can he rely on Dr. Haider

21  when nobody is going to know what Dr. Haider said or did?

22          MR. HAYSBERT:  Under Rule 703, Your Honor, Bases of

23  Opinion Testimony By Experts, "The facts or data in the

24  particular case upon which an expert bases an opinion or

25  inference may be those perceived by or made known to the

Filler, A. - Cross                                              437

1    expert at or before the hearing.  If of a type reasonably

2    relied upon by experts in the particular field in forming

3    opinions or inferences upon the subject..."

4           He has just said repeatedly that he took -- told

5    Dr. Haider these are the sort of things I want you to ask

6    questions about when you are performing your examination.

7    She is essentially working for him.  He is pulling from that

8    information and rendering his opinions.  That is allowed

9    under Federal Rules of Evidence 703.

10          THE COURT:  Well, we may disagree on some of that

11   interpretation, but I heard his testimony when he said that

12   he used Houston, and he gave certain people directions, and

13   they followed him, and that's how he got the image.

14   Certainly, that's going to come in.

15          He used the image, and that's what you used, was

16   the image that was taken.  You did not rely, or if you did,

17   on Dr. Haider's report or opinion, that's not coming into

18   evidence.  You can rely on treatises that everybody can look

19   at.  You can say the treatise that you relied upon.  You can

20   say your experience that you relied upon.  He's going to

21   have to establish how he got the image that he looked at,

22   because he didn't take the image, he didn't examine

23   Dr. Haysbert, and he --

24          MR. HAYSBERT:  That is incorrect, Your Honor.  He

25   indicated repeatedly that he's examined Dr. Haysbert's

Filler, A. - Cross                                                  438

```
1    brain.  What other examination would a neurosurgeon need?
2          THE COURT:  Can I finish, or are you going to
3    interrupt me again?
4          MR. HAYSBERT:  Yes, of course, Your Honor.  My
5    apologies.
6          THE COURT:  He has said that he ordered this
7    imaging, or he got this imaging from Houston, and that he
8    had trained the people, and he told them what he wanted, and
9    he got that.  He examined that imaging.  He did not
10   personally examine the physical Mrs. Haysbert or take any of
11   the imaging or any other medical records.  He got the
12   imaging.
13         You can, again, mince words, but everybody accepts,
14   or at least the Court accepts that he got this imaging, he
15   got it at his direction, and that's what he used.
16         So nobody is saying that he didn't have her come to
17   California, didn't meet her in Texas.  He didn't personally
18   observe her.  He observed imaging, and that's what I'm going
19   to let him testify to, if he does.  That's what he observed.
20         He said how he got that imaging through a place he
21   uses in Texas.  He instructs the people.  He got the
22   imaging.  It was his expertise.  He looked at that imaging,
23   and this is what he concluded.
24         I don't understand what is the problem, because you
25   had an opportunity to call Dr. Haider.  She was listed as an
```

Filler, A. - Cross                                                    439

```
 1   expert.  She is not being called as an expert.  Her report
 2   is not coming in.  The only thing that's coming in is the
 3   imaging, and that's what he used.
 4           MR. HAYSBERT:  And any opinions that he relied
 5   upon, including Dr. Haider's report, according to the
 6   Federal Rules.  We can't get around that.
 7           THE COURT:  You cannot rely on a report that is not
 8   in evidence and is not generally accepted.  Well, I've ruled
 9   on it, and we are not going to go through it anymore.
10           MR. HAYSBERT:  That's actually not correct,
11   Your Honor.
12           THE COURT:  Dr. Haider is not here.  You have
13   withdrawn her and her report.  Both have been withdrawn.
14   You have withdrawn Dr. Haider.  You've withdrawn
15   Dr. Haider's report.  Dr. Haider is not a treatise that is
16   relied upon.
17           Yes, if they could hear her testimony, and he said
18   he relied on it, but they can't because it then becomes
19   you're getting in Dr. Haider's expert opinion when you
20   couldn't get it in otherwise.  That is my ruling.  It's
21   final.
22           MR. McGAVIN:  Your Honor, may I also clarify that
23   the nature of my objection here is that Dr. Filler's report
24   has no history.  He doesn't put me on notice that he's
25   relying upon Dr. Haider's report.  He has no reference in
```

Filler, A. - Cross                                                    440

1    his report to ever reading the deposition.

2            So what he has given us, and what they have

3    designated two years ago, is these things would be expected,

4    could be expected, but they all require clinical correlation

5    to prove causation.  That is what I was trying to -- that is

6    what is missing from the designation and putting us on

7    notice.

8            THE COURT:  I agree with you.  That is missing.

9    But, also, had Dr. Haider come and testified, and the jury

10   had heard it and heard her report, I may let him mention

11   that.  I understand that he does not mention, there has been

12   no supplementation.  We have been through this.  You have to

13   supplement the reports, and that's why I asked for it last

14   week, of all the experts.

15           The expert report does not come into evidence, just

16   the testimony of the experts, the opinions that were formed,

17   and all of those and what they relied upon.  This isn't an

18   exclusive list; what the expert relied upon to form the

19   opinion and what they examined, what the opinion is.

20           But they have to have given you notice in advance,

21   even if it's a treatise.  You have to give the other side

22   notice in advance so they can look at that treatise.

23   Experts are examined probably every day in this country;

24   "You said you relied on such and such a treatise, section

25   whatever."

JODY A. STEWART, Official Court Reporter

Filler, A. - Cross                                                          441

1          You can show that to the expert and say, "You say
2     you relied upon it.  Well, what does the treatise say?  What
3     does it mean?"  Then you can put an expert on that says
4     something else.
5          So this is just a red herring, stirring the pot,
6     because at a threshold level, none of this has been
7     mentioned.  There are no treatises mentioned.  He's relying
8     on his background, his expertise, and an imaging that he
9     asked to be done.
10         So the ruling is twofold.  I just don't want there
11    to be a slippage in front of the jury.  He can't rely if he
12    hasn't indicated.  He did not indicate any depositions that
13    he relied upon.  He did not indicate any other expert
14    reports that he relied upon.  If he hasn't indicated that in
15    his report, and unless he's supplemented it, he can't now
16    come into court and add it.
17         In addition to that, you can't cross-examine
18    Dr. Haider's report, and you have to be able to
19    cross-examine an expert on what they used and examined, such
20    as a treatise.  So that's my ruling.  I feel very
21    comfortable in that ruling, because it's almost hornbook
22    law.  You've got to, at a threshold level, tell the other
23    side what you used to form your opinions.  If you use
24    additional things, or you form additional opinions, you have
25    to supplement.  That's reason one.

Filler, A. - Cross                                                442

1           Reason two is that you can't rely on something not

2    only that you haven't listed but that the other side can't

3    test.  So that he relied on something that Dr. Haider did, I

4    understand under the Rule there is a lot you can rely on;

5    treatises.  That's always a big issue, and you can rely on a

6    treatise, but you've got to say what you relied on.  You've

7    got to subject that expert to cross-examination of that

8    document, and that document is not in evidence, and it's not

9    a public document.

10          So that's my ruling.  Is there anything else?

11          MR. McGAVIN:  Just a last point, Your Honor.  Since

12   he is bound by what's in the report, which he admits does

13   not meet the legal standard, only a medical standard --

14          MR. HAYSBERT:  Objection.

15          MR. McGAVIN:  Mr. Haysbert is objecting.

16          THE COURT:  Just keep on.  It was not in front of

17   the jury.  Just make your argument to me, and I'll tell you

18   how I'm going to resolve all this.

19          MR. McGAVIN:  Thank you, Your Honor.

20          In this report, which Dr. Filler admits is written

21   for medical purposes, not legal purposes, he is a practicing

22   lawyer.  He has a law firm, which is identified.

23          THE COURT:  Well, he is not going to give legal

24   opinions because he's not certified as a legal expert.

25   Besides, in a case like this, you're not going to have

Filler, A. - Cross                                                    443

1     another lawyer getting on the stand telling the jury what

2     the law is.  So I don't think that should be of concern to

3     you, Mr. McGavin.

4              MR. McGAVIN:  Thank you, Your Honor.  But my point

5     is, this is written for medical purposes, not legal

6     purposes.  He knows the standard for admissibility of

7     medical opinions, and what he has given us, and what we have

8     relied upon is, that his opinions are possibilities without

9     clinical correlation, and he has not indicated any clinical

10    correlation in his report and not taken these opinions

11    beyond possibilities.  And so under the case of *Vilseck*,

12    another case authority we've cited, he should be excluded.

13             I would also point out he is not a treating

14    physician but a forensic physician, and as Mr. Haysbert

15    started his examination, he pointed out, "Were you retained

16    by us," meaning on behalf of the plaintiff, "to do this

17    review?"  So he is held to a different standard than just a

18    treating physician, and this report and designation fails

19    that test.  Thank you.

20             THE WITNESS:  If I could suggest comparison --

21             THE COURT:  No.  No, sir.

22             My ruling is that you are certainly able, as I said

23    earlier, to cross-examine Dr. Filler, and you can bring up

24    all of these points on cross-examination.  I think the

25    biggest issue here, in my mind, is whether you can lay a

Filler, A. - Cross                                                    444

```
 1    proper foundation for causation, because I don't know that
 2    there is going to be a proper foundation, just an
 3    assumption, without knowing a full history of somebody.  So
 4    I think your biggest problem ultimately with this witness is
 5    causation.  That's number one.
 6            Number two, the things that you raised,
 7    Mr. McGavin, you can certainly cross-examine on this point,
 8    and then when the testimony is there, there can be a motion
 9    to strike, and if the Court decides to strike the expert's
10    testimony, then I will do so, inform the jury that it is
11    stricken.  Then if the elements of proof aren't there, then
12    we go from there.
13            We are belaboring things now and holding up the
14    jury, and we've got an expert witness that has a schedule
15    and a plane, and we are going to go ahead and get this in
16    front of the jury.  If it needs to be stricken, and if
17    Mr. Haysbert wants to appeal, then he'll have an appellate
18    record of what the testimony is that he can pursue.  But we
19    are going to get the testimony on the record, because this
20    is not a case that anybody should want to try again.
21            So as far as I'm concerned, we need to get this
22    record going and get it there and not waste hours of
23    everybody's time talking about things that can be remedied
24    at the appropriate time by the Court if necessary.
25            We are going to take a 10-minute recess, and we're
```

Filler, A. - Direct                                                     445

```
 1    going to come back and do Dr. Filler's testimony.

 2              (Recess from 4:01 p.m. to 4:15 p.m.)

 3              (Jury in at 4:15 p.m.)

 4              THE COURT:  All the jurors are back from the break.

 5    I will tell you that we were able to resolve any matters for

 6    continuing to proceed today, but then we had a computer

 7    problem.  So we had to have the IT people down to work with

 8    the monitors, and it was the court's system, not the

 9    attorney's, so it was a problem with the court's system.

10              So we are now ready to proceed, and Mr. Haysbert is

11    calling as his next witness Dr. Filler.

12              MR. HAYSBERT:  Yes, I am, Your Honor.  And thank

13    you very much.

14              AARON FILLER, PH.D., called by the Plaintiff,

15    having been first duly sworn, was examined and testified as

16    follows:

17                         DIRECT EXAMINATION

18    BY MR. HAYSBERT:

19    Q.  Good afternoon, Dr. Filler.

20    A.  Good afternoon.

21    Q.  What is your profession?

22    A.  I'm a neurosurgeon.

23    Q.  What is that?

24    A.  So there are a number of types of doctors that are

25    involved in the nervous system; brain, spinal cord, and
```

Filler, A. - Direct                                                    446

 1    nerves.  And the neuroradiologists will do imaging, who have

 2    seen the patient, and neurologists will see people for

 3    seizures, for instance, and provide medications, but not

 4    necessarily to look at the images themselves.

 5              And neurosurgeons, such as myself, will see and

 6    examine patients, review images, and then actually do

 7    treatments, such as surgeries or other types of treatments to

 8    repair problems in the neurological tissues.

 9              THE COURT:  Can you just pull the microphone up.

10    You were going to say the same thing.

11              MR. HAYSBERT:  I was going to say the same thing.

12    I appreciate it.

13    BY MR. HAYSBERT:

14    Q.  In addition to being a medical doctor, in what field do

15    you have a Ph.D.?

16    A.  The Ph.D. is in biological anthropology.

17    Q.  What is an FRCS, or a Fellowship of the Royal College of

18    Surgeons?

19    A.  So in England you have a qualification to be a doctor,

20    and there's an extra qualification to be a surgeon.  I spent

21    a lot of time in the UK, enough that I was able to be

22    qualified to get that certification as a surgeon in the UK

23    with a Fellow of the Royal College of Surgeons.

24    Q.  Were you retained by my office to share with the jury

25    your medical opinion on certain matters related to this case?

Filler, A. - Direct                                                447

1   A.   Yes.

2   Q.   Okay.  Have you completed your work?

3   A.   Yes, I have.

4   Q.   Have you formulated your opinions?

5   A.   Yes.

6   Q.   Are you prepared to give them to the jury?

7   A.   Yes, I am.

8   Q.   Okay.  Before I ask you what those opinions are, can you

9   please share a little bit more about your education,

10  background, and experience with the jurors so they know what

11  weight to give the opinions you are going to be offering

12  today.

13  A.   So I did a bachelor's degree at the University of

14  Chicago, double major, biology and what they call human

15  behavior and institution, sort of, sociology.  And then I

16  started medical school at the University of Chicago and, at

17  the same time, started a master's degree in biological

18  anthropology, also at the University of Chicago.

19        Two years in, I got the master's degree, took a

20  break from medical school for five years, went to Harvard to

21  do the Ph.D. work, which led to some of the technologies that

22  were used -- we're reviewing in the courtroom today.

23        I then went back to the University of Chicago,

24  finished the M.D. and the Ph.D. two years later, all at the

25  same time, and then went on and did an eight-year

Filler, A. - Direct                                                          448

1    neurosurgery residency training program, which included, also

2    afterwards, one year doing complex spine fellowship training,

3    a year of special neuro -- advanced neuroimaging training,

4    and also a three-month fellowship for peripheral nerve,

5    complex nerve disorders, and in the course of all that,

6    developed new imaging technologies that I then used in my

7    regular medical practice.

8    Q.   Thank you.  Do you charge for your time, Dr. Filler?

9    A.   Yes.

10   Q.   How much do you charge per hour?

11   A.   For a deposition, it's at $2,000 an hour, and then for a

12   trial like this, the full day would be $15,000.

13   Q.   You don't work on contingency, correct?

14   A.   That's correct.

15   Q.   So whatever the jury does has no impact on whether you

16   get paid or not?

17   A.   That's correct.

18   Q.   And you have no personal interest in the outcome of this

19   case?

20   A.   That's correct.

21   Q.   Is there anything about your background, anything else

22   you'd like to share with the jury so they know how to judge

23   the credibility and weight of your testimony today?

24   A.   Yeah, I also have a JD degree that --

25              THE COURT:  I'm going to interrupt you there.  You

Filler, A. - Direct                                                    449

1    do have that degree, but he is not here testifying as a

2    lawyer or on any legal matters.  So that needs to be

3    clarified, particularly in light of your question, what

4    weight to give his opinions, because any opinions are not

5    based on, or should not be based on any legal opinions.

6                MR. HAYSBERT:  Absolutely.  Thank you very much,

7    Your Honor, for clarifying that.

8    BY MR. HAYSBERT:

9    Q.  You're here to testify in your capacity as a

10   neurosurgeon, correct?

11   A.  That's correct.

12   Q.  You are an M.D., medical doctor; is that correct?

13   A.  Yes.  And in further answer to your question, I would

14   say, in terms of weight on the medical side, is that I'm an

15   editor for our major textbook in neurosurgery, and so I

16   write -- edit, like, 25 or 30 of these chapters.  I write

17   seven or eight chapters.  And this is the 8,000-page textbook

18   that all the neurosurgeons use around the world.

19               So for the technology that we are talking about

20   here, I actually write the chapters that they learn from and

21   the questions on the board certification exam and give

22   lectures to neurosurgeons at various meetings.

23   Q.  So it's safe to say that you teach other neurosurgeons?

24   A.  Yes.

25   Q.  And could you tell us a little bit more about your

Filler, A. - Direct                                              450

1   background in terms of the sort of academic relationships
2   you've had in the past as a neurosurgeon.
3   A.  Well, I've been on the faculty at UCLA for a number of
4   years, on the faculty in neurosurgery at the Cedars-Sinai,
5   and also on the faculty at the University of London for a
6   couple of years.
7   Q.  In your medical specialty, are you able to test for
8   traumatic brain injury?
9   A.  Yes.
10  Q.  How do you specifically test for traumatic brain injury?
11  A.  Well, aside from, you know, examining the patients, such
12  as looking for abnormal eye movements and questioning them
13  about patterns of thoughts and behavior reflecting
14  concussion, I particularly have advanced the use of this
15  advanced type of MRI called a DTI, diffusion tensor imaging,
16  because it allows us to actually see the signs of concussion
17  in the brain which are invisible in all other methods; for
18  instance, invisible in a routine MRI.
19          So now we can actually see the signs of concussion
20  and match them to the patient's symptoms and then use that to
21  go treat the damaged location and do repair of concussive
22  injuries.
23  Q.  Thank you.  So would you consider this type of testing to
24  be objective testing of abnormalities in the brain?
25  A.  Yes.  It is a big advance in objectivity for this because

Filler, A. - Direct                                                    451

1    with concussions, people could say, well, I can't remember,

2    or I'm anxious.  And how do you really know if that is true?

3              But now we can say, oh, there's the part of the

4    brain which, when injured, results in anxiety, and it's got a

5    break in it, and say it looks traumatic, so, therefore, you

6    have a traumatic injury in a location that when they have

7    that injury, it will cause anxiety, just like having a broken

8    femur will give you trouble walking.

9    Q.  So you could physically see, from a brain scan that you

10   created through DTI testing, an image of the brain, correct?

11   A.  Yes.

12   Q.  And you can also see with the image of the brain any

13   abnormalities, any sort of breaks or shearing in that brain,

14   and that can tell you what's going on with that brain,

15   correct?

16   A.  Yes.  Different parts of the brain do different things.

17   It's quite different from a computer that has a vast array of

18   transistors, and they all can be deployed in different ways.

19   Certain parts of the brain have specific functions, and to

20   the degree that now we can see each of these little spots and

21   see when they're injured, it allows us much more precision.

22   And, as I said, the upside of that, in the last year, is

23   being able to go treat and repair concussive injuries.

24   Q.  How does DTI, diffusion tensor imaging, differ from an

25   MRI or a CT scan or CAT scan?

Filler, A. - Direct                                              452

1    A.  It's an advanced type of MRI.  I would say it has, what I

2    would describe as, maybe, some hundreds of times more

3    information in it than a regular MRI.  And we can use that

4    information to see the more subtle injuries in the brain.

5    Q.  Please tell the jury, if you don't mind, what you did to

6    gather information to perform the research or a study,

7    whatever you needed to do, in order to form your opinions in

8    this case.

9              THE COURT:  What he relied upon.

10             MR. HAYSBERT:  Essentially.

11   BY MR. HAYSBERT:

12   Q.  The Judge said it best.  What have you relied upon to

13   make your opinions in this case?

14   A.  So my method of evaluating brain injury patients involves

15   either I see the patient and examine them with a classic

16   neurologic exam, have them fill out forms --

17             MR. McGAVIN:  I object to this.  The question is

18   what did he actually do, and that's part of what we

19   discussed previously, not what he normally does, but what he

20   does.

21             THE COURT:  Did you do what you just said?  Let's

22   just move this along.  You mentioned eye movements and

23   seeing the patient and having them fill out things.  Did you

24   actually do that in this case?

25             THE WITNESS:  No.  Alternately, for a number of

Filler, A. - Direct                                                    453

1    patients, if another doctor has done all of that --

2              MR. McGAVIN:  Objection, Your Honor.

3              THE COURT:  Sustained.

4    BY MR. HAYSBERT:

5    Q.  Okay.  So, Dr. Filler, if I can just ask you to tell me

6    what you specifically did in this case to formulate your

7    opinions.  What did you do?

8    A.  So, yeah, I reviewed -- well, I mean, I reviewed the

9    indications for the study, that is, why another doctor

10   ordered it, and then examined the brain images and made my

11   report of what I found as given context by the indications,

12   which is the section of my report that says why did some

13   doctor order the test.

14   Q.  And the brain images that you scanned and reviewed can be

15   animated into a demonstrative, correct?

16   A.  Yes.

17             MR. HAYSBERT:  Your Honor, permission to publish

18   the brain map for the jury so they can follow along?

19             THE COURT:  Go ahead.

20   BY MR. HAYSBERT:

21   Q.  As the demonstrative is playing, if you wouldn't mind

22   sharing with us what is going on, as if we were in a class.

23             THE COURT:  Is this imaging of the plaintiff's

24   brain or just your methodology?

25             THE WITNESS:  Well, I have -- there is the

Filler, A. - Direct                                                      454

1    PowerPoint, right, that's all -- includes some of the

2    patient's images, and I think they use some of those images

3    in this report as well.

4              MR. HAYSBERT:  Would you prefer to use the images?

5              THE COURT:  Let's start with the one you were doing

6    the animation.  I just want it to be clear, you need to

7    clarify whether the images are all or any of Ms. Haysbert's.

8    You said you had an imaging that you looked at, or are these

9    just explaining to the jury your methodology for doing these

10   things?

11             THE WITNESS:  Right.  And I didn't prepare this

12   video.  I prepared the PowerPoint.

13             MR. HAYSBERT:  Understood.

14   BY MR. HAYSBERT:

15   Q.  So the animation is based on the brain scans that you

16   provided --

17             MR. McGAVIN:  Objection, Your Honor.

18             THE COURT:  Let's go to what he prepared.

19   BY MR. HAYSBERT:

20   Q.  What you prepared.  We can go to the image that you

21   prepared.  Do you see what's on the screen, Doctor?

22   A.  Yes.  I want to go through this because I think it's

23   going to be helpful to help understand what it is I do and

24   what we are looking at, comparing their -- actually, the

25   first -- the DTI images I did in 1992, the very first one,

Filler, A. - Direct                                                    455

```
 1   and then a more modern DTI image that shows the internal

 2   connections and tracts of the brain.

 3              See the next.

 4              And this is making this point about neurologists and

 5   neuroradiologists and neurosurgeons, as we discussed earlier.

 6              We can move on.

 7              And this is comparing a regular MRI, their routine

 8   MRI, which doesn't show all these individual internal tracts

 9   in the brain versus a DTI tractogram where you can see

10   hundreds and thousands of individual strands that are all

11   merged together into a mass in the regular brain MRI.

12              THE COURT:  Just so that we don't have to interrupt

13   you, when you show these images, if any of them are of

14   Ms. Haysbert's imaging, you need to let us know.  Otherwise,

15   we are going to assume that these are ones that you have and

16   you're showing your methodology.

17              THE WITNESS:  Yes.  I will make that clear, Your

18   Honor.

19              THE COURT:  Thank you.

20              THE WITNESS:  So this shows a paper from one of my

21   colleagues from 1799 --

22              MR. McGAVIN:  Objection, Your Honor.

23              THE COURT:  Wait just a minute.

24              MR. McGAVIN:  We never did go through this

25   PowerPoint, but it's filled with things.
```

Filler, A. - Direct                                                    456

1          THE COURT:  You didn't indicate in your report that

2    you relied on this in forming your opinions.

3          THE WITNESS:  Well, it's an explanation of -- well,

4    some of it just shows images to the brain, which we can just

5    skip to those.  This is just explaining some background

6    about what I do and the terminology.  For instance, this

7    slide says, "Concussion is an old term that goes back 200

8    years."

9          THE COURT:  Just move on to the next slides.

10          MR. HAYSBERT:  Okay.

11          THE COURT:  I understand your objection, but we are

12    going to move it along, Mr. McGavin.

13          MR. McGAVIN:  Thank you, Your Honor.

14          THE WITNESS:  This is just explaining that I did

15    this research -- there I am -- and doing some of the imaging

16    and joining the College of Surgeons in England.

17          Going forward, next slide.

18          And that this DTI is not something that's just

19    personal that I use.  It has been in wide use around the

20    world.  It's used to guide brain surgery and saves tens of

21    thousands of lives every year.  It's a real highly precise

22    life-and-death technology used in every single hospital in

23    the world where neurosurgery is done.

24          Next.  And next.

25          This compares for a patient a head CT, a brain MRI,

Filler, A. - Direct                                              457

1    and the brain DTI.  You can see subtle things, like the

2    arrows pointing to the green structure at the top of the

3    right there, you can see the right and left one is a little

4    thinner than the one on the other side, and yet you can't

5    appreciate that at all in a really nice brain MRI.  You

6    can't see that.  This is the idea that we can have more

7    detail.  We can see things we couldn't see without it.

8         Next.

9    BY MR. HAYSBERT:

10   Q.  So before we move on, I just want to be clear about this.

11        Are you making a distinction between CT scans and

12   MRIs and DTI testing?

13   A.  Yes.

14   Q.  In what sense are you making that distinction?

15   A.  To show that we have -- that it's accepted detail

16   technology that gives more information than a regular MRI.

17   Q.  So are you saying, just for the record, that you could

18   see things in a DTI scan that you cannot pick up on an MRI or

19   a CAT scan?

20   A.  Yes, absolutely.

21   Q.  Okay.  So you could see on a DTI scan, for example,

22   traumatic brain injuries that may not be picked up on a CT

23   scan or an MRI; is that correct?

24   A.  Yes.

25   Q.  Continue.

Filler, A. - Direct                                              458

1    A.  This shows, additionally, the three-dimensional assembly

2    into tracts or connecting pathways in the brain.

3            Next.

4            This is just about the invention of CT scanning.

5    That's at the same hospital I worked at in England, again,

6    having to be able to see inside the brain.  You are examining

7    the interior of the brain, the first scan, the first time we

8    saw a tumor inside the brain, the very first one, in the

9    bottom, in the middle there.  We are examining the inside,

10   just as physicians for thousands of years have examined the

11   exterior of a patient.

12           Next, please.

13           And the first tractogram, 1992.

14           Next.

15           The patent.

16           Next.

17   Q.  Am I to understand from these, the last few slides, that

18   you invented DTI testing?

19   A.  Yes.

20   Q.  Can you take us through a few moments of --

21           MR. McGAVIN:  Your Honor, there's a screen showing

22   that directly is contradictory to what we've objected to.

23   It's being displayed.  We haven't gotten there.  I know

24   we're free -- I know what we are doing here but...

25           THE COURT:  I know.  I sustain the objection.

1    Let's get to what his testimony is.

2    BY MR. HAYSBERT:

3    Q.  Let's move on to the brain scan.

4    A.  This is just showing that we can show -- because of this,

5    we also analyze structural injury to the brain in terms of

6    the fact the brain is not just a solid piece of Jell-O; there

7    are some parts that are tough and stiff.  There are stiff

8    membranes that descend down into the brain.  There are sharp

9    edges of the skull on the inside.

10          And so now, with all that detailed information about

11   injury, we are very concerned with how the brain deforms and

12   how it moves and twists and why certain -- when it's impacted

13   or accelerated, and why certain parts of the brain get

14   injured.  Just like when people start to have a stroke, we

15   expect their arm to get weak and their face to droop.  That

16   doesn't happen in head injury.  Instead, people get problems

17   with memory or problems with excess anger.

18          So it's because of the way trauma happens, the brain

19   deforms a certain way that would, hence, the study of now,

20   that explain why certain parts of the brain, as we will see,

21   for instance, in Dr. Haysbert's frame, get injured.

22          MR. McGAVIN:  Objection, Your Honor.

23          THE COURT:  What?

24          MR. McGAVIN:  He's making a causation opinion.  I

25   object.

Filler, A. - Direct                                                460

1             THE COURT:  Okay.  Sustained.

2    BY MR. HAYSBERT:

3    Q.  Okay.  So, Doctor, let me just back up for a second

4    because you just said a whole lot, and I want to make sure

5    the jury understands you.

6             So are you saying that you can understand a person's

7    sort of -- some of the descriptions that they have of the

8    deficit they are facing, such as, you know, I'm losing

9    memory, and you can go back and physically see on a brain

10   image the abnormality in the brain that would suggest or

11   indicate that sort of memory loss?

12   A.  Yeah.  Just as I said, if someone is having trouble

13   walking, and the x-ray shows they have a broken femur, I can

14   understand why they are having trouble walking.  We can see a

15   tract that's broken, part of the brain in that tract is not

16   working properly.  It's that level of detail.

17            THE COURT:  You mentioned earlier you could tell

18   when something happened.  Can you tell when something

19   happened if you haven't looked at the before and then the

20   after?

21            THE WITNESS:  Well, if a person has clearly a new

22   symptom, and the new symptom correlates with a new finding,

23   just like, again, developing in your arm, and I get an MRI,

24   and there's a tumor there.  I can say, well, the tumor is

25   probably causing your pain, even though I didn't have an MRI

Filler, A. - Direct                                                461

1    before that showed they didn't have the tumor before.  We

2    have to make a reasonable medical inference.

3    BY MR. HAYSBERT:

4    Q.  What data did you create, or that you had a hand in

5    creating or developing, in order to put together brain images

6    of Dr. Haysbert's brain?

7    A.  The information I had was the indications.  That is the

8    description that I require before I -- I either do it myself,

9    or I have a neurologist see the patient first, or a

10   specialist, head injury specialist, and then I have

11   indications; that is, why do they need the scan, why do we

12   suspect they have a concussion, why are we doing this, what

13   are we looking for?

14           And then I do the analysis of the parts of the brain

15   and see which are injured.  And depending on the patient's

16   background, what type of work they do or history of it that I

17   know, is this something that clearly is a new onset from the

18   date of injury?  That is, they must have not had the injury

19   before, given the kind of work they did before.

20           Like someone who has a fracture in their leg, and

21   they used to work on ladders putting in HVAC systems, they

22   can't have had the broken leg while they were still putting

23   in HVAC systems.  Similarly, if someone had a part of the

24   brain involved in math, they could not have been teaching

25   math in university with this injury, so, if they suddenly

Filler, A. - Direct                                                    462

1    lost it afterwards.
2              So we really match the onset of symptoms, like
3    anything in medicine, to a finding.
4    Q.  So what you are saying essentially is, if you physically
5    injure yourself by falling on your head, you could possibly
6    sustain a contusion, right?
7              THE COURT:  You are testifying.  Ask him a
8    question.
9              MR. HAYSBERT:  Sure.
10   BY MR. HAYSBERT:
11   Q.  So the question I have for you is, does that work when
12   you're doing a diagnostic or an examination of the brain and
13   you're detecting physical injuries to that brain?  Can you
14   see physical injuries to the brain by looking at a person?
15   A.  Not without doing a DTI.
16   Q.  Then how are you able to determine that a person has an
17   injury in their brain if you're not able to look at them and
18   you're not a DTI tester that has scans?
19   A.  The standard in medicine does not require us to have a
20   prior image in order to interpret a current image.  It is
21   true, if you want to track, for instance, football players or
22   other sports players, it is great to get a scan -- and we do
23   this for high school kids sometimes -- get a scan every year
24   before they hit their head, and then if they hit their head,
25   you can compare.

Filler, A. - Direct                                                              463

```
 1            But in medicine, we do not say -- we are not allowed
 2    to interpret anything unless we had a prior preinjury because
 3    we'd have to go around and image everyone in the world in
 4    case they have an injury sometime.
 5            Certain findings, like I say, the fracture is an
 6    example of one -- the patient was running around playing
 7    football, and now they say they can't, they can't move their
 8    leg, and they have a fracture.  So I'm going to say, well,
 9    they probably got the fracture after that last football game.
10            So, similarly, when we see a brain injury not
11    compatible with the person's work, I would say it's my
12    opinion that this injury is from -- it matches this symptom.
13            THE COURT:  Let's get on to what he did.  In other
14    words, let's get on to the case at hand.  This is not a case
15    involving football players.  He said that he got an image, a
16    DTI image, if that's what you got, of Ms. Haysbert's brain,
17    and you got that at what location?
18            You got the brain imaging, and it was sent to you;
19    is that correct?
20            THE WITNESS:  Right.  It's basically obtained --
21    it's just an electronic set, and then the electronic dataset
22    gets transported to me.
23            THE COURT:  So it was done, and then it was
24    electronically sent to you, and that's what you made your
25    evacuation on?
```

Filler, A. - Direct                                              464

1            THE WITNESS:  That's correct.

2   BY MR. HAYSBERT:

3   Q.  So you examined her brain through the scans that you

4   received that you evaluated, correct?

5   A.  Yes.

6   Q.  Can we go to the images?

7   A.  Yes.  Let's move through -- we'll move to hers.  Let's

8   move ahead.

9            Next.  Little further.  Little further.  One

10  further.  Further.  Okay.  One more, I'm sorry.  One more.

11           So this is part of the analysis of Dr. Haysbert's,

12  Dr. JoAnn Haysbert's brain.  One of the things that we do

13  here is to do measurements called fractional anisotropy, or

14  FA measurements of numerous locations in the brain.

15           What you see on the right is a table that shows

16  for -- I think it's 33 locations that were measured, and the

17  little colored dots are locations in the brain.  Some of them

18  are standard locations used as reference.  Some of them are

19  selected because they're suspected of being injured.

20           So the little picture on the left shows, in

21  Ms. Haysbert's frame, this FA, or fractional anisotropy

22  property of DTI, where the bright yellow is particularly

23  healthy tracts of the brain, and then the little dots, the

24  colored dots placed will measure what is the quality of the

25  brain tissue at that location, and we can compare those

Filler, A. - Direct                                                        465

1    measurements, regions of interest, volumes of interest, as we

2    call them, to normals and say is it below normal.

3           So in the table, the list of the different parts of

4    the brain measured, we show these FA, or fractional

5    anisotropy, measurements, and they can be made by any doctor.

6    They can be done on various scanners, and they'll come out

7    the same.

8           Then the standard deviation or the variability, so I

9    can compare them to normal and say, is it abnormal?  Is this

10   part of the brain injured or not?

11   Q.  Next.

12   A.  Now, this is part of the image for Dr. Haysbert's brain,

13   and what we are looking at are her tracts.

14          Let's see the next image.

15          Okay.  So the kind of thing we look for, in the

16   center of the image, running vertically, are these green

17   stripes called a supracallosal cingulum and, when injured,

18   can result in anxiety and depression.  And she does have a

19   problem with anxiety.

20          MR. McGAVIN:  Objection, Your Honor.  Move to

21   strike.  That's not the claim.  That is absolutely denied by

22   Dr. Haysbert.

23          THE COURT:  Sustained.

24   BY MR. HAYSBERT:

25   Q.  You may continue.

Filler, A. - Direct                                                    466

1    A.  So the next image.

2           MR. McGAVIN:  Your Honor, I just want to be clear.

3    He's offered a causation opinion.  There is no foundation

4    for it.

5           THE COURT:  Sustained.  He is not yet qualified to

6    offer a causation opinion, based upon his testimony.

7           MR. HAYSBERT:  Understood.

8    BY MR. HAYSBERT:

9    Q.  So we'll go to the next slide.

10   A.  So this shows, again, additional images where there are

11   regions of the brain that are affected, which we point out by

12   the arrows.

13          And move to the next.

14          MR. McGAVIN:  Excuse me, Your Honor.  That says

15   "anger and irritability."  There is no evidence of that, and

16   I move to strike it.  He is offering opinions on injuries

17   that Dr. Haysbert has not endorsed in her evidence.  I

18   object and move to strike.

19          MR. HAYSBERT:  Dr. Haysbert doesn't have to endorse

20   all the injuries.  She is not a computer who is able to spit

21   out exactly everything that you want to know about what's

22   wrong with her.  What the doctor is showing are objective

23   images that show abnormalities in her brain that are

24   consistent with certain problems, such as irritability and

25   so on.

Filler, A. - Direct                                                    467

1          Now, if you want to get her back on the stand so

2     she can talk about this stuff.

3          THE COURT:  No.

4          MR. HAYSBERT:  Well, then, we would have to take

5     Dr. Filler's expert opinion about what's going on with her

6     brain based on his examination and the fact that he is a

7     qualified neurosurgeon.

8          THE COURT:  They do not have to accept his opinion.

9     I instructed them in preliminary instructions that an expert

10    is qualified if the Court allows to give an opinion, but the

11    expert's opinion is no more controlling on them than any

12    other evidence in the case, and ultimately is up to them to

13    evaluate the expert's opinion based upon all the factors

14    that I listed.  In addition, they can consider his

15    experience and training.  So the jury has already been

16    preliminarily instructed.

17         As far as I'm concerned, to use your words,

18    Mr. Haysbert, this would go to his credibility and the

19    weight of his testimony, if he's testifying about things

20    that he says are indicated and she hasn't indicated them.

21    So that's argument.

22         He can testify to it, but it may go to the weight

23    and credibility that the jury would give his testimony when

24    they look at it with all of the evidence.  That's the

25    preliminary instruction that the Court gave.

Filler, A. - Direct                                                    468

1            MR. HAYSBERT:  Thank you, Your Honor.

2            THE WITNESS:  This also shows the images were done

3    in Santa Monica -- well, Beverly -- Medical Imaging Center

4    in Beverly Hills rather than Houston.  There's different

5    locations we use.

6            Next image.

7            THE COURT:  Where was this one?

8            THE WITNESS:  In Beverly Hills, California.

9            Next.  Next.  Next.  Okay.

10           So this is the one injury that is the most at

11   issue, in my perception here, and what I understand about

12   many concussive injuries.  It is the particular injury that

13   affects formation of new memories.

14   BY MR. HAYSBERT:

15   Q.  So just to be clear, we are looking at Dr. Haysbert's

16   brain here, correct?

17   A.  Yes.

18           THE COURT:  Where did you get this image from?

19           THE WITNESS:  This is from the images that I

20   analyzed.

21           THE COURT:  How did Beverly Hills come up?

22           THE WITNESS:  I can see from the label on it that

23   that's where the imaging was done.  I sometimes do imaging

24   in Houston, sometimes in Santa Monica.

25           THE COURT:  This was earlier when you were

Filler, A. - Direct                                                  469

1    discussing this with the Court, I thought you said it was

2    done in Houston.

3              THE WITNESS:  Well, it was only because Dr. Haider

4    usually imaged there, but it looks like this one was done in

5    Beverly Hills.

6              THE COURT:  So this one was not done in Houston?

7              THE WITNESS:  That's correct.

8              THE COURT:  So some were done in Houston and some

9    were done in Beverly Hills?

10             THE WITNESS:  For her imaging, only Beverly Hills.

11   I was in error.

12             MR. HAYSBERT:  There are different imaging centers

13   around the country, is all he's saying.

14             THE COURT:  I know, but it's different than what

15   the Court understood where this had occurred, but go ahead.

16   I was surprised to hear Beverly Hills.  I have to say that.

17             MR. HAYSBERT:  There are head imaging companies all

18   over the country.

19   BY MR. HAYSBERT:

20   Q.  So, Dr. Filler --

21             THE COURT:  But...

22             MR. HAYSBERT:  Yes, Your Honor?

23             THE COURT:  Well, I'll ask you about it later, but

24   I'm confused because of the foundation, improper, that was

25   given to the Court, because the Court understood that this

Filler, A. - Direct                                                      470

1    was an actual imaging of Dr. Haysbert's brain.

2            MR. HAYSBERT:  It is.

3            THE COURT:  That that was done not in Beverly

4    Hills, and if it was done in Beverly Hills, it was not

5    mentioned to the Court.  That's my concern.

6            MR. HAYSBERT:  Okay.  I understand your concern.  I

7    think he was just clarifying that he sends it out for images

8    to be brought to him for evaluation, examination, and that

9    those images are -- can be done at an imaging center in

10   anywhere in the country.  He thought it was in Houston, but

11   it actually was done in Beverly Hills, I think was his

12   testimony.  I don't think it's relevant.

13           THE COURT:  The Court thinks it is relevant because

14   what he is basing his opinion on, he said he didn't

15   personally examine the plaintiff, and when I say "personally

16   examine," I mean one on one, the eye movements, all of that.

17           His examination was of a brain imaging, and the

18   brain imaging was of Dr. Haysbert's brain.  That is what the

19   Court understands.  Dr. Haysbert is shaking her head yes.

20   But the imaging, that the Court was aware of, of her brain,

21   that he relied upon, was done in Houston, and we went

22   through all of that.  Now I am very confused.

23           MR. HAYSBERT:  Your Honor, the doctor is a

24   neurosurgeon who examines the brain through images, and he

25   conducts an examination, and as part of his examination, he

Filler, A. - Direct                                                      471

1    looks at images of the brain such as this one.

2            THE COURT:  I understand.  But, Doctor, the image

3    that you took, that you based your examination on, where did

4    it occur, of her, with her there?

5            THE WITNESS:  In Beverly Hills.  I just didn't have

6    the forming paper in front of me at the time the question

7    was asked.  There's different locations for people I use,

8    particularly when they are not local to -- not necessarily

9    local to California.

10           THE COURT:  So it was out in Beverly Hills?

11           THE WITNESS:  Yes.  This is, again, it's

12   Dr. Haider --

13           THE COURT:  I'm just trying to clarify.  I'm not

14   asking you about who and what because that's not a witness

15   in the case.  This was done in Beverly Hills, not in

16   Houston?

17           THE WITNESS:  Yes.

18           THE COURT:  All of these images were in Beverly

19   Hills?

20           THE WITNESS:  Yes.

21           THE COURT:  The images done in Beverly Hills at

22   whoever's direction were of Dr. Haysbert's brain?

23           THE WITNESS:  Done at my direction, yes.

24           THE COURT:  Go ahead.

25           MR. HAYSBERT:  Thank you, Your Honor.

Filler, A. - Direct                                                        472

1    BY MR. HAYSBERT:

2    Q.  So this is one image of her brain that was done at your

3    direction, correct, Doctor?

4    A.  Yes.

5    Q.  Tell us what we are looking at.

6    A.  So what we are looking at, the arrows in the center point

7    to a breach, or break, in the structure that is involved in

8    new memory formation.

9          And what's going on here is that, we always have a

10   tremendous amount of sensory information pouring in for eyes

11   and ears, and we don't record all of it.  The brain is always

12   going, that would be interesting, let's save that, hmm, that

13   would be interesting, or something triggers the recollection

14   or interest, and we save it.

15         How does that happen?  So the way this works

16   involves this structure, kind of from the back, and there

17   are -- the part of the brain called hippocampus, then the

18   fornix, develops an interest, recognizes something, and it

19   sends a signal back up in this structure called the fornix,

20   that goes back, and then it curves around forward, and the

21   two parts of it come together at the anterior cephalo

22   nucleus, which is the shutter button, and it forms a memory.

23   That goes on all the time.

24         And one of the things that can happen in concussion,

25   and it did happen in her case, I believe --

JODY A. STEWART, Official Court Reporter

Filler, A. - Direct                                              473

```
 1              MR. McGAVIN:  Objection, Your Honor.

 2              THE COURT:  Sustained.

 3              THE WITNESS:  -- is that --

 4              THE COURT:  Sustained.

 5              MR. HAYSBERT:  Okay, Your Honor.

 6   BY MR. HAYSBERT:

 7   Q.  What I would like to do is redirect you, Dr. Filler.  So

 8   if you could go back to what you were saying about the brain

 9   in general, and then if you could focus on the image that you

10   see here and explain what's happening in this image.

11   A.  Yes.  So the fornix, when it starts to curve forward, is

12   surrounded by solid brain tissue, and then it passes into a

13   part of the brain that just has fluid in it, cerebral spinal

14   fluid, so it's surrounded by liquid.

15              When there is an impact on the side of the head, the

16   fornix can whip around, and what we see very commonly is,

17   right at the point where it crosses from solid surrounding

18   into liquid, you get a bruise in that little fornix.

19              And that's what's happened here.  It's a bruise that

20   affects the DTI tracting, tract imaging, and it reflects a

21   real impairment in function.  And that type of injury, which

22   is at the location called the crus of the fornix, right where

23   it emerges from solid into liquid, in my practice and

24   understanding of medicine, indicates that it's a result of a

25   trauma injury, because the fornix itself is the same on
```

Filler, A. - Direct                                                        474

```
 1   either side.  It is only damaged right there because of the
 2   mechanical difference, and that's why I think it's a
 3   mechanical impact.  And very common -- everybody I've seen
 4   that has that image complains of problem with new memory
 5   formation.
 6               MR. McGAVIN:  Objection, Your Honor, foundation.
 7               THE COURT:  Go ahead.
 8   BY MR. HAYSBERT:
 9   Q.  Going back to the fornix, you said on both sides it
10   appears to be stable.  Is that what you --
11   A.  Yeah.  Coming into that area of breach and going out of
12   it, it seems okay, but right at the point of transition, it's
13   got this breach in it there that we're pointing out with the
14   arrow.
15   Q.  Let me ask you specific questions about this breach
16   that's pointing out at the arrow.  Is this kind of breach
17   something that someone would have because of old age?
18   A.  No.
19   Q.  Is this kind of breach someone would have because they
20   have dizziness?
21   A.  No.
22   Q.  Vertigo?
23   A.  No.
24   Q.  Headaches?
25   A.  No.
```

Filler, A. - Direct                                                     475

1    Q.  This type of injury is a physical injury to the brain,

2    correct?

3    A.  Yes.

4    Q.  So it's actually there; it's real?

5    A.  Yes.

6    Q.  Can you see it from the outside?

7    A.  No.

8    Q.  But it's real?

9    A.  Yes.

10   Q.  And what you're saying is, Doctor, that this kind of

11   image can only happen if there is a sudden traumatic event,

12   correct?

13   A.  Yes.

14   Q.  And could that sudden traumatic event be a fall?

15   A.  Yes.

16           THE COURT:  Could it be a car accident?

17           THE WITNESS:  Yes.

18           THE COURT:  Could it be a bicycle accident?

19           THE WITNESS:  Yes.

20           THE COURT:  So it could be any number of things.

21   It could be any type of injury that could occur from a fall

22   or a hit or something like that?

23           THE WITNESS:  Yes.

24   BY MR. HAYSBERT:

25   Q.  Do you recall when you completed these images and

Filler, A. - Direct                                                      476

1    examined Dr. Haysbert's brain?

2    A.   So this image is dated September 18, 2020.

3    Q.   Okay.

4    A.   That's the day it was taken.

5    Q.   Thank you very much.

6         In looking at this image, you can clearly come to a

7    conclusion regarding what could have possibly happened to

8    this person's brain, no matter who it is, correct?

9         THE COURT:  Wait just a minute.  We don't deal in

10   possibilities.

11        MR. HAYSBERT:  Understood.

12   BY MR. HAYSBERT:

13   Q.   But you could look at this image, and, regardless of who

14   the person is, it's going to say the same thing to you; there

15   is an injury here, correct?

16        MR. McGAVIN:  Objection, form, Your Honor.

17   BY MR. HAYSBERT:

18   Q.   There is an injury here, correct?

19   A.   As I say, to me, it is like seeing a femur fracture.

20   There's damage there.  I'm going to read it and say, if there

21   is damage there, and I will say, as I did here, that it

22   indicates trauma, and that it would be expected to result in

23   impairment of new memory formation.

24        MR. McGAVIN:  Excuse me, Your Honor.

25        THE COURT:  Wait just a minute.  What's your

Filler, A. - Direct                                               477

1    objection?

2          MR. McGAVIN:  Objection.  What would be expected is

3    not a causation opinion, does not meet the standard for

4    admissible expert opinion.

5          THE COURT:  Sustained.

6    BY MR. HAYSBERT:

7    Q.  So what we are looking at here, Doctor, and thank you

8    very much for explaining this to us and making it clear for

9    the jury, so a person whose image is sheared off in this area

10   between the fornix, this is something that can only happen

11   with a traumatic event, such as a fall?

12   A.  Yes.

13   Q.  Can we go to another slide?

14   A.  Next.  Next.  Next.  Do you have any more?  Next.  Next.

15   I think that's all the images we have.

16   Q.  Let's go back to the image.  I have a couple more

17   questions on it.

18         THE COURT:  So this fornix injury to the crus of

19   the fornix, that just results in new memory formation?

20         THE WITNESS:  That impairs new memory formation,

21   yes.

22   BY MR. HAYSBERT:

23   Q.  Which, for someone who has an advanced degree, is

24   significant, correct?

25   A.  By --

Filler, A. - Direct                                              478

```
 1              THE COURT:  You can argue that.  That's not
 2    something for him to form an expert opinion on.  You can
 3    argue that to the jury.
 4              MR. HAYSBERT:  I'll move on.
 5    BY MR. HAYSBERT:
 6    Q.  So, Doctor, for an image like this, where there is
 7    objective finding of some type of impact, can you look at
 8    another image showing a different part of the brain that has
 9    an impairment and be able to tell us what that means in the
10    common layperson's terms?
11              Could you tell us there is an abnormality there, and
12    that means that person's going to be more irritable or not?
13              MR. McGAVIN:  Objection, Your Honor.  Speculation.
14    Beyond the scope of the designation.
15              MR. HAYSBERT:  He is a neurosurgeon.  He examines
16    brains all the time.  He examined Dr. Haysbert's brain.
17              THE COURT:  Rephrase your question.
18              MR. HAYSBERT:  Okay.
19              THE COURT:  I'm not sure what you were asking,
20    honestly.
21              MR. HAYSBERT:  Sure.
22    BY MR. HAYSBERT:
23    Q.  So what I'm asking is, as a neurosurgeon, you can look at
24    abnormalities in the brain, in different parts of the brain,
25    and be able to come to a conclusion, based on a reasonable
```

Filler, A. - Direct                                                    479

1    degree of medical certainty, what is happening in that

2    person's physical life?

3              MR. McGAVIN:  Objection, Your Honor.  It's

4    non-specific.  It's not talking about Dr. Haysbert, and it's

5    a causation question.

6              THE COURT:  It goes outside of his report.  You

7    can't just talk about people in general now.  You need to

8    talk about the specific imaging and his conclusions, any

9    conclusions with a reasonable degree of medical certainty

10   from his examination of Dr. Haysbert's imaging.

11   BY MR. HAYSBERT:

12   Q.  Is it traumatic brain injury that's shown in this slide

13   consistent with a patient falling onto her left side and

14   smacking her head on the floor?

15             MR. McGAVIN:  Objection, Your Honor.  Foundation,

16   "a patient."

17             THE COURT:  You've got to establish a foundation

18   that he knows how this got fractured.

19             MR. HAYSBERT:  Okay.

20             THE COURT:  "Consistent with"?  I may let you do

21   that, but it still doesn't --

22             MR. HAYSBERT:  I'll ask the question again.

23   BY MR. HAYSBERT:

24   Q.  Dr. Filler, is this sort of image for Dr. Haysbert's

25   brain consistent with a slip-and-fall accident?

Filler, A. - Direct                                                 480

```
 1              MR. McGAVIN:  Objection, Your Honor, foundation.
 2    It's not consistent.  That's not the test for admissibility
 3    of expert testimony.
 4              THE COURT:  I understand.  All I'm going to let him
 5    say is "is it consistent with," and then I'm going to
 6    require some follow-up questions.
 7              THE WITNESS:  Yes.
 8              THE COURT:  When you say it's consistent with, it's
 9    consistent with all those other things that I mentioned,
10    too.
11              THE WITNESS:  Yes.
12              THE COURT:  In other words, bicycle falls, car
13    accidents, whatever.  So it's consistent with falls, is what
14    you testified to before, or a certain kind of fall that then
15    would cause this injury?
16              THE WITNESS:  Right.  And this is why doctors like
17    to have an indication in their report, and just as this
18    report has indication, "Patient reporting symptoms after a
19    fall."  This is all through the imaging doctor, yes.
20    BY MR. HAYSBERT:
21    Q.  And you received the indication requirement in this case,
22    correct?
23    A.  From the referring doctor, who's listed on the report as
24    Dr. Haider.
25    Q.  What was the indication that you received?
```

Filler, A. - Direct                                                481

1          THE COURT:  Sustain the objection.  Dr. Haider is

2    not testifying, and Dr. Haider's report is not coming in.

3          MR. HAYSBERT:  He is not relying on Dr. Haider's

4    report or to her examination.  He said that he asked

5    Dr. Haider to provide him with a clinical indication that

6    you could use to test whether or not something was wrong

7    with the brain.

8    BY MR. HAYSBERT:

9    Q.  And you asked for that information, and you obtained it.

10   What would that indication be?

11         MR. McGAVIN:  Excuse me, Your Honor.  I move to

12   strike this entire testimony by counsel.  He's testifying to

13   all of this.

14         MR. HAYSBERT:  I'm not testifying to anything.  He

15   indicated in his own report that he received indication.

16         THE COURT:  Let Mr. McGavin finish.

17         MR. McGAVIN:  He's testifying to all of these

18   things.  We have a causation issue, which has not been

19   satisfied.  He has not qualified that there's an adequate

20   foundation to offer this, and I persist in the objection.

21   Thank you.

22         THE COURT:  Do you know how this fracture occurred?

23         THE WITNESS:  Just an indication for the imaging

24   test was provided to me, and I stated in the report -- it's

25   part of my report -- the indication for which I performed.

Filler, A. - Direct                                                    482

1    And the indication states that, "She's had a fall, slip and

2    fall, and has onset of concussive symptoms."  That's my

3    indication.  So that's why I'm asked, when I see this with

4    that indication, I'm going to say, well, I think, as I say

5    in there --

6    BY MR. HAYSBERT:

7    Q.  Can we state to a reasonable degree of medical

8    certainty --

9         THE COURT:  Let him finish his answer, please.

10        MR. HAYSBERT:  Sure.

11        THE WITNESS:  -- that it would -- this would cause

12   a typical concussive symptom, impairment of new memory

13   formation, and would be consistent with the history given,

14   "Patient with symptoms after a fall," how all imaging is

15   done.

16        Patient comes to the emergency room, has a symptom.

17   We order a test for that symptom.  The imaging doctor says,

18   oh, patient complaining of this, I did the test, here's my

19   finding, yeah, we all agree this explains the symptom in the

20   light of what happened.

21   BY MR. HAYSBERT:

22   Q.  What we can also understand from this image is we can

23   rule some things out, Doctor.  You are a neurosurgeon,

24   correct?

25   A.  Yes.

Filler, A. - Direct                                                      483

1    Q.  You can rule out vertigo from this image?

2    A.  This doesn't show vertigo.  It doesn't show a brain

3    hemorrhage.  There is no emergency surgery needed.  I can

4    tell what's likely to happen, maybe what medicines might

5    help, what treatments we now have, and also say it looks

6    traumatic, that it doesn't look like someone is getting

7    memory problems or diffuse brain problems from old age.

8           This looks like trauma, and if this started with

9    that fall, and the indication for which this test was

10   ordered, then it's my opinion that this indication that

11   caused this concussive syndrome to get an MRI matches this

12   image finding.  And that's how doctors will do.  That's how

13   we do it.

14   Q.  Do you make that opinion to a reasonable degree of

15   medical certainty?

16          MR. McGAVIN:  Objection, Your Honor.

17   BY MR. HAYSBERT:

18   Q.  You can make that opinion to a reasonable degree of

19   medical certainty.  You're a doctor, right?  I'm sorry?

20          THE COURT:  Go ahead and ask it.  I'll let you

21   cross-examine on the report.

22          MR. HAYSBERT:  Thank you.

23   BY MR. HAYSBERT:

24   Q.  Do you make that opinion to a reasonable degree of

25   medical certainty in this case?

Filler, A. - Direct                                                                 484

A.  Yes.  In my experience and training, which I should rely

on, is that with that history given to me by the doctor who

ordered the test, this finding that, to a reasonable degree

of medical certainty, that fall caused the image or

concussion, is the cause of this damage, and this will

explain the concussive symptom.

Q.  This is objective evidence of damage, correct?

A.  Yes.  It's an objective finding that links history to

symptom and the image finding.

Q.  And this type of evidence is something that may not ever

be picked up on a CT scan or MRI scan, correct?

A.  Right.  And it is how doctors do.  You don't send a

patient down to the radiologist saying, I'm not going to tell

you what's wrong with him, image the whole body and see what

you find.  We don't do that because it won't result in useful

information.

Q.  And you can tell by the exact physical injury that you

see in that brain, that you cannot detect with the visible

eye, you can tell that that exact physical impairment goes

directly to memory loss, correct?

A.  Yes.  And just like putting on glasses might help me --

          MR. McGAVIN:  I object.

          THE COURT:  Mr. Haysbert --

          MR. HAYSBERT:  No further questions.

          THE COURT:  Mr. Haysbert, I'm going to put on the

Filler, A. - Direct                                                485

1    record your conduct.  You just took a piece of paper and

2    slammed it down hard on a table so that it crackled in the

3    courtroom and then yelled "no further questions."  That

4    conduct will not be tolerated.  Do you understand?

5           MR. HAYSBERT:  Yes, Your Honor.  But that's

6    objective evidence.  I have no further questions.

7           THE COURT:  Well, the way you conducted yourself, I

8    couldn't even hear the answer.  So let the court reporter

9    read it back.  I couldn't even hear the question or the

10   answer --

11          MR. HAYSBERT:  I'm very sorry, Your Honor.

12          THE COURT:  There was so much commotion.

13          Madam Court Reporter, what was the question?

14          (Record read as requested.)

15          THE WITNESS:  What I was trying to say, just like

16   putting on glasses to inspect the patient's exterior of the

17   cut, maybe a little more closely, I'm using the DTI to

18   examine different parts of the brain to see if she has an

19   injury that we associate with concussion that would come

20   from a fall as an indication by the ordering doctor.

21          THE COURT:  Strike from the record Mr. Haysbert's

22   yelling out "that's objective," because that's his opinion,

23   and he's making a conclusion that he's not allowed to make.

24   He can argue that to you, but he is not allowed to make that

25   as an attorney and to yell it out to the jury.

Filler, A. - Cross                                                        486

1          MR. HAYSBERT:  Thank you, Your Honor.  My

2    apologies.  And no further questions.

3          THE COURT:  Cross-examination.

4          MR. McGAVIN:  May I use the document camera?

5          THE COURT:  Yes, you may.

6                    CROSS-EXAMINATION

7    BY MR. McGAVIN:

8    Q.  So you showed the jury a slide that says you've

9    determined by reviewing the brain studies that Mrs. Haysbert

10   has vertigo, haven't you?

11   A.  No, no.  I showed -- there's a lot of slides here.  The

12   whole presentation shows a number of different things one can

13   find.  And then that's not her image.  Her image would

14   have -- would state her name on it.

15   Q.  Whose image is this, and why would you show the jury

16   vertigo and photophobia in your deck?

17   A.  Well, it's just -- I go through saying all these are the

18   kinds of things one can see, but in particular this patient

19   has this.  That is how I do the presentation.

20   Q.  So you've put in all these slides about possibilities

21   that have no clinical correlation to Dr. Haysbert; is that

22   right?

23   A.  But as we've shown here, we've tried to show just the

24   images relevant.

25   Q.  Well, then you put this image in and wanted the jury to

Filler, A. - Cross                                                        487

```
 1   believe that was relevant, didn't you?
 2   A.  Well, the slides were prepared for a deposition, which I
 3   think was canceled.  That would have been the time to go
 4   through.  The context usually is.
 5   Q.  This isn't a deposition, sir, this is trial, and you've
 6   just showed the jury a piece of a deck, and you're saying it
 7   does or does not potentially apply to Dr. Haysbert.  Does it
 8   or does it not?
 9   A.  Does not.
10   Q.  Well, did she have symptoms of vertigo?
11   A.  No, as I said --
12   Q.  Excuse me.  Yes or no?
13   A.  I said no.
14           THE COURT:  Let him answer.
15           THE WITNESS:  If I can testify.
16           THE COURT:  Everybody stop talking over each other.
17           MR. McGAVIN:  I will, Your Honor.
18           THE COURT:  The question is, as I understood your
19   testimony, you did not conclude vertigo or headaches or
20   dizziness or any of these symptoms.  What you concluded was
21   that last slide that we saw, that the fracture could lead to
22   memory loss; is that correct?
23           THE WITNESS:  Yes.
24           MR. McGAVIN:  Thank you, Your Honor.
25   BY MR. McGAVIN:
```

Filler, A. - Cross                                                    488

 1   Q.  Now, in regard to Ms. Haysbert, did you -- were you
 2   provided her records about her situation before the incident
 3   we are here about?
 4   A.  I don't have extensive records.  I know she had a car
 5   accident later, but I don't know about the prior detail.  I
 6   don't have a full set of records, no.
 7          THE COURT:  Was the car accident before or after
 8   this imaging?
 9          THE WITNESS:  After.
10   BY MR. McGAVIN:
11   Q.  Now, in --
12          MR. McGAVIN:  I'm sorry, Your Honor.  Were you
13   done?
14          THE COURT:  Yes.
15          MR. McGAVIN:  Thank you.
16   BY MR. McGAVIN:
17   Q.  Now, in regard to Ms. Haysbert, have you reviewed an MRI
18   scan of June 4, 2018?
19   A.  No.  I only have the DTI.
20   Q.  Are you aware why she had an MRI scan of her brain done
21   on June 4, 2018?
22   A.  No.
23          MR. HAYSBERT:  Objection, Your Honor.  This goes
24   outside the scope of direct examination.  And how does this
25   doctor know anything about a brain scan or MRI that he never

Filler, A. - Cross                                                          489

1    saw?

2              THE COURT:  Overruled.

3    BY MR. McGAVIN:

4    Q.  So the foundation of your opinion that you provided in

5    your report isn't even accurate, is it?

6    A.  I'm not sure what you mean.

7              MR. HAYSBERT:  Objection, argumentative.

8              THE COURT:  It's not admitted, but you and

9    everybody here knows that for an expert to testify, they

10   have to give an expert report.  There is something called

11   Rule 26 and expert disclosures, and you give an expert

12   report, and the expert has to say what he or she relied upon

13   in forming and writing the report.

14             Then when you go before a jury, reports are not

15   admissible, and the expert has to testify.  What you have

16   been looking at is what's called a demonstrative exhibit.

17   It does not come into evidence.  It's just a demonstrative

18   exhibit for the witness's testimony.  Frankly, I don't know

19   when it was prepared, but it was not produced to the Court

20   and counsel until recently.  That's all I'm going to say.

21             It's a demonstrative exhibit.  It is not evidence

22   in the case.  His testimony is the evidence, and this is

23   just to help you understand complicated testimony.

24   BY MR. McGAVIN:

25   Q.  When did you first meet Ms. Haysbert?

1    A.  Only in this courtroom.

2    Q.  You mean today?

3    A.  Yes.  I didn't meet her, but I see her present.

4    Q.  You've never spoken to her?

5    A.  No.

6    Q.  Did you take a history from Dr. Haysbert?

7    A.  No.  The history was taken --

8              THE COURT:  No.  You know the rules here.

9              THE WITNESS:  No.

10   BY MR. McGAVIN:

11   Q.  Did you have a zoom call with her?

12   A.  No.

13   Q.  In regard to this, the history that you had for her,

14   you've indicated that she was at a restaurant and got up from

15   a table and had a fall; is that right?

16   A.  That's just what was provided to me as the indication,

17   yes.

18   Q.  You don't know if that's true or not, do you?

19   A.  That's correct.

20   Q.  How many different causes are there for momentary

21   forgetfulness?

22             MR. HAYSBERT:  Objection.  That is

23   mischaracterizing the witness's testimony.

24             THE WITNESS:  I don't think that is what she has.

25   BY MR. McGAVIN:

Filler, A. - Cross                                                    491

```
 1   Q.  How would you know if you haven't examined her and tested
 2   her memory?
 3          MR. HAYSBERT:  Objection.  He has examined her.
 4   So, again, mischaracterizes the witness's prior testimony.
 5          THE COURT:  From his examination, how would he
 6   know?
 7          MR. McGAVIN:  Yes.
 8   BY MR. McGAVIN:
 9   Q.  How would you know whether she has memory problems other
10   than looking at a study?
11          MR. HAYSBERT:  Because a brain examination is --
12   DTI testing is objective evidence of a person's
13   abnormalities in their brain, as he had previously
14   testified.  So, again, mischaracterizes the witness's
15   testimony.
16          THE COURT:  You can argue that to the jury, and
17   he's explained how he does the DTI testing.  Mr. McGavin is
18   entitled to cross-examine so they will know how much weight
19   and credibility to give to his expert opinion.  He's in a
20   proper round of cross-examination right now.
21   BY MR. McGAVIN:
22   Q.  How many different causes are there to momentary
23   forgetfulness?
24   A.  Well, it could be -- an infinite theoretical number of
25   causes, but that's not -- I don't think she has that.
```

Filler, A. - Cross                                                    492

1    Q.  I understand that, but if you could just stick to my

2    questions.  How many different --

3            THE COURT:  Just ask the question and get the

4    answer.

5            THE WITNESS:  I think I already answered.  Can you

6    read it back?

7            THE COURT:  So you don't think she has momentary

8    forgetfulness?

9            THE WITNESS:  Yes.

10   BY MR. McGAVIN:

11   Q.  And how do you test memory?

12   A.  Well, you have to --

13   Q.  Let me ask it a different way.  I withdraw the question.

14            Do you know what neuropsychological testing is?

15   A.  Yes.

16   Q.  Neuropsychological testing is an eight-hour battery where

17   a person's cognitive abilities are tested by psychologists;

18   isn't that right?

19   A.  Yes.

20   Q.  You're not a psychologist?

21   A.  No.

22   Q.  You don't administer neuropsychological testing?

23   A.  No.

24   Q.  Neuropsychological testing also includes validity

25   measures that test effort; isn't that right?

Filler, A. - Cross                                                    493

```
 1   A.   Yes.  But here we are looking at objective images that
 2   are broken or not.
 3   Q.   Excuse me, sir.
 4            THE COURT:  Let him finish.
 5   BY MR. McGAVIN:
 6   Q.   All right.  Well --
 7            THE COURT:  I said let him finish.
 8            "Here we are looking at..."  Go ahead.
 9            THE WITNESS:  Here -- our validity in an image is
10   do they have an image finding or not.  I'm not being a
11   psychologist and the imaging physician here, so asking about
12   my performance of psychology is interesting, but I don't see
13   how I could be testifying about that if I'm here having
14   examined her image.
15   BY MR. McGAVIN:
16   Q.   You're objecting to the relevance.  Are you wearing your
17   attorney hat or your doctor hat?
18            THE COURT:  Wait.  Do not argue with the witness.
19            He's wearing his doctor hat as a neurologist.  He
20   is not wearing his doctor hat as a psychologist.  He
21   answered the question.  To his knowledge, there was none of
22   the nine-hour testing, and that is his knowledge, and he's
23   not testifying as a psychologist.
24            MR. McGAVIN:  Thank you, Your Honor.
25            THE COURT:  If he tried to testify to that, the
```

Filler, A. - Cross                                                              494

1    Court would stop him.

2              MR. McGAVIN:   Thank you, Your Honor.

3    BY MR. McGAVIN:

4    Q.   How many different causes are there to headaches?

5    A.   Many.

6    Q.   And have you attempted to take a history directly from

7    Mrs. Haysbert regarding the potential causes of

8    forgetfulness, memory loss, or headaches?

9    A.   As I testified --

10             THE COURT:   That's a yes or no question.

11             THE WITNESS:   I just interpreted her imaging.

12             THE COURT:   What?

13             THE WITNESS:   I just interpreted her image.  I did

14   not examine or interview her.

15   BY MR. McGAVIN:

16   Q.   Now, in the report that you prepared, you did not offer

17   any clinical correlation, did you?

18   A.   No.  I go through and say what would be expected from

19   this, other than a -- other than the degree it correlates

20   with the indication that there was concussion after a fall.

21   Q.   Well, you don't have the records from the clinic where

22   she went two days after the incident, do you?

23   A.   I was working with just the indication as given.

24   Q.   So it would be fair to say, then, that you don't have any

25   knowledge and no foundation to understand that two days after

Filler, A. - Cross                                                      495

1    this incident, Dr. Haysbert did not report loss of

2    consciousness or a head injury.  You don't have that, do you?

3    A.  No, I don't have that.

4    Q.  And you don't have the records from Dr. Chinniry starting

5    on or about July 2018 when Mrs. Haysbert did not report loss

6    of consciousness?

7    A.  Right.  The loss of consciousness, if you ask me -- and

8    you can cut that out of the presentation -- is not -- when

9    you have injury in the base of the brain, you can get loss of

10   consciousness, but you can have very severe concussion with

11   no loss of consciousness.

12         It's just an old-fashioned measure of head injury

13   that goes back 200 years.  That article I was trying to show

14   from 1799, that's what he said, it's concussion because there

15   was loss of consciousness.  They didn't have much more they

16   could look at.  It's much more advanced now.  We can say, oh,

17   concussion -- what happened was the damage to the memory

18   circuit; that's why they have this concussive symptom.

19   Q.  Well, your report actually -- I'm sorry, were you done?

20   A.  No, I wasn't.  I was still talking.

21   Q.  I apologize.

22         THE COURT:  Go ahead.

23         THE WITNESS:  I was just saying that if the image

24   showed something that would result in a concussion that is

25   not related to loss of consciousness.  Loss of consciousness

Filler, A. - Cross                                                    496

```
 1    is an index, a sign of the degree of severity of a head
 2    impact, but it doesn't correlate exactly with the locations
 3    of injury and the types and severity of concussion symptoms
 4    afterwards.
 5    BY MR. McGAVIN:
 6    Q.  Now, you write here in your note, "with some loss of
 7    consciousness."  You don't know whether that's true or not,
 8    do you?
 9    A.  You mean in the indication?
10    Q.  Yes.
11    A.  That was given to me, yes.
12    Q.  But you don't know if that's correct, do you?
13    A.  I don't have an independent -- I was not doing a forensic
14    investigation of the doctor who provided the indication to
15    me, but I do look -- nothing in the images that I found
16    relate to the presence or absence of loss of consciousness.
17    Q.  And then you say neurologic symptoms, "the onset of
18    neurologic symptoms," but you don't even say in your report
19    which ones they are, and "a number of which have persisted."
20    You don't even say that, do you?
21    A.  But remember I'm looking at that large report we don't
22    allow me to talk about, but it's a detailed report with a lot
23    of information.  You keep asking -- the answer is, yes, I had
24    that report.  It's a medical --
25              THE COURT:  Wait just a minute.  You need to strike
```

Filler, A. - Cross                                                    497

1    that.  We went through that before.  It's not listed as

2    something that was relied upon.  It's not being offered in

3    evidence here, and so we're not going into that.

4           MR. HAYSBERT:  I'll renew my objection and make it

5    a continuing objection.

6           THE COURT:  I don't know what your objection is,

7    but whatever it was, it is, but it's not a new objection.

8           We have gone through this *ad nauseam*, and the point

9    being is that you have to stick to what you have listed in

10   your expert report, or what you have told the other side and

11   the Court what you relied upon.  That then has to be, under

12   Rule 703, it says what it is, and if it isn't admissible,

13   and there is a ruling that it's not admissible, and there's

14   a balancing test there.  I'm not going to repeat all the

15   words.

16          The ruling's been made, and we are not going to

17   keep going back over this, or I'm going to tell the jury why

18   that information isn't here.

19   BY MR. McGAVIN:

20   Q.  Now, you also talk about the statistical significance in

21   your report, do you not?

22   A.  Yes.

23   Q.  And then you talk about how that may reflect problems,

24   right?

25   A.  Yes.

Filler, A. - Cross                                                      498

1   Q.  And so when you write a report just off of a study,

2   without meeting a patient and doing a clinical correlation or

3   reading her records from before or after, you're just talking

4   about statistical probabilities, aren't you?

5   A.  Yes.  I mean, for fractional anisotropy, you know, what

6   we're saying there is that it's statistically significant,

7   meaning that this structure has an abnormal measurement

8   which, as I use the phrase in there, "would be expected to

9   cause a particular symptom."  So --

10  Q.  So -- I'm sorry.  So when you talk about statistical

11  probabilities, they still require clinical correlation?

12  A.  Not this.  This is statistical significance.  So we have

13  a normal standard:  What should the fractional anisotropy be,

14  the FA?  What should it be for this particular brain

15  structure?  What did I measure?  Is it abnormal or not, the

16  measurement?

17          And the way you determine is, if it's two standard

18  deviations below the value expected for normal -- so you can

19  state I'm not saying that likelihood of a bigger symptom, I'm

20  saying is that an abnormality?  Is it a statistically

21  significant abnormality?  So that is just more of a

22  measurement issue.

23  Q.  We're talking about different things.  You can say it's a

24  statistically significant measurement, but whether or not

25  there is clinical correlation to actual symptoms, you're not

Filler, A. - Cross                                                          499

1    doing that in this report.  You are providing the statistical
2    analysis of the deviation from the anticipated normal; isn't
3    that right?
4    A.  No, I'm doing both.  I first say -- I'm saying the FAs
5    are definitely low, and/or I'm looking at a breach in the
6    tract.  And in some cases, I say this would be expected,
7    which is "likely" as opposed to "could be."
8    Q.  This case?
9    A.  I say in this case, in this exact -- repeatedly I say
10   "would be," and if I thought it's just a possibility, I would
11   say "could be."
12          So it's just medical words as opposed to, if you're
13   writing for a courtroom -- this is written as a medical
14   report -- you might say the same thing with different words,
15   which is to a reasonable degree of medical certainty, which
16   to me means the same as "would be expected" in a medical
17   report.
18   Q.  To be clear, sir, not once in your report do you say "to
19   a reasonable degree of medical certainty"; isn't that true?
20   A.  Right.  That's true.  I say it "would be."  I say "would
21   be expected," is the language I used.  I just said that.
22   Q.  "Would be expected" means to be verified, correct?
23   A.  Not necessarily.  Just "would be expected."
24   Q.  So you expect it, but you can't guarantee it?
25   A.  Well, not a hundred percent.  I think you can say -- if

Filler, A. - Cross                                                          500

1    you have a severed aorta --

2    Q.  We are not talking about a severed aorta.

3    A.  -- we expect that you would be dead.  I mean...

4    Q.  We're not talking about a severed aorta, sir.  We're

5    talking about cognitive deficits.  Don't you agree?

6    A.  Well, we are talking about cognitive brain function

7    deficits, yes, and we are talking about, when I see an

8    abnormality in this type of report, then, if I believe it's

9    certain or more likely than not, I will say it "would be

10   expected."  If I think it's just a possibility, I would say

11   "could be."

12   Q.  Now, have you published -- strike that.

13        In regard to the work that you did here, you were

14   asked whether or not you were retained by the attorney for

15   Dr. Haysbert.  Mr. Haysbert retained you; isn't that right?

16   A.  Right.  And I think -- I don't know because it's to my

17   office, but sometimes we would -- I would just get an image

18   study and an indication and a neurologist report and read it,

19   yet sometime later I might have been retained.  I know I was

20   retained eventually, but I don't know if I was retained at

21   the time I prepared the report.  That's what I was saying.

22   Q.  Did you hear him ask you with his first question whether

23   you were retained by him?

24   A.  I am retained now, yes.  He asked me am I presently

25   retained, and yes, I am.  I'm not sure if I was retained at

JODY A. STEWART, Official Court Reporter

Filler, A. - Cross                                                    501

1    the time I wrote the report.

2    Q.  And in terms of your fee, is it $15,000 per day?

3    A.  Yes.

4    Q.  How many days have you been here?

5    A.  Just today.  I came in -- I arrived at 9:30 this morning.

6    Q.  When are you leaving?

7    A.  I have a 7:30 flight back right now.

8    Q.  And what -- do you fly first class?

9    A.  I did in this case, yes.

10   Q.  And that's a charge, right?

11   A.  Yes.

12   Q.  How much income do you make going around the country

13   testifying in these cases?

14   A.  Oh, I'm on a fixed salary, so whether I'm doing

15   surgeries, injections, testimonies, we have -- I -- it's not

16   like I'm an academic who's on a fixed salary and then you

17   have extra money for testimony.  We have an operation of

18   employees, scanners, rents, insurances.  So money just comes

19   in, I work every day and try to -- I try to make -- it really

20   takes that much, $15,000 a day, to pay all the employees and

21   the rents and the leases and all this.

22   Q.  What is your salary?

23   A.  My salary is, I think, about 550,000 a year.

24   Q.  What bonus do you take at the end of the year?

25   A.  There's no bonuses.

Filler, A. - Cross                                                      502

```
 1   Q.  How many different companies do you have?
 2   A.  Well, there is -- I'm involved with a medical imaging
 3   practice.  I'm involved --
 4   Q.  How much do you make from that?
 5   A.  Well, I just -- they basically -- whatever is going on
 6   with the different companies, it goes into a medical service
 7   organization, and then I -- and then I get paid a salary from
 8   that.  It's just the standard way to organize.
 9   Q.  How much do you get paid?
10   A.  That's my salary.
11   Q.  That's all you make every year?
12   A.  Yes.
13   Q.  And so you charge $15,000 for today, and you don't take
14   out a bonus or some cut of that in your forensic work?
15   A.  No.
16   Q.  How much of your gross income comes from forensic work?
17   A.  Well, it varies from year to year.  So prior to the
18   pandemic, I would say it's about -- grossing across all the
19   businesses, medical business areas, would be about 15
20   percent.
21        During the pandemic era, because patients used to
22   travel from all over the country for some of the special
23   imaging and treatments I do, but with the pandemic, we had a
24   big drop-off in travel, of course, and at the same time, say,
25   an increase in the use of DTI scanning, so that -- for
```

Filler, A. - Cross                                                          503

```
 1   traumatic injury legal cases.  So it shifted to the income
 2   being more substantially there.
 3           But remember, I'm not just being a medical expert
 4   that reviews papers.  I am seeing people and imaging them,
 5   and we're treating and repairing these damages now with the
 6   new systems over the past year, which is a huge advance.  And
 7   it's come out of this work.  Without this, we would not be
 8   able to -- not be able to do brain repair now.
 9           So I'm very committed to it.  I write about it for
10   other neurosurgeons.  It's advancing the field, so this is
11   what I do.
12   Q.  I'm just asking you how much money you make.
13   A.  I already said it three times, and I said it's the same
14   each time.  550- a year, 550,000.
15           THE COURT:  You don't get any portion of the money
16   that you make for testimony?
17           THE WITNESS:  No, I don't.
18   BY MR. McGAVIN:
19   Q.  What about your --
20   A.  Because I'm away from something else, this money -- I
21   would be working doing medical work today, so from my medical
22   practice point of view, I took the day off, and there is no
23   income yet for all the employees, rents.  Everything still
24   goes on.  So this is pretty much -- it's maintenance.  That's
25   why it is --
```

Filler, A. - Cross                                                        504

1    Q.  Managing partner, Tensor Law, from July '15 through the

2    present.

3    A.  Yes.

4    Q.  Is that you?

5    A.  Yes.

6    Q.  How many lawyers do you have?

7    A.  Well, at maximum, we had four.

8            MR. HAYSBERT:  Objection.  This is outside the

9    scope of the doctor's medical --

10           THE COURT:  He is asking him about his income, not

11   asking a legal opinion.  He's asking about all these places

12   that he says that he works, I guess simultaneously.

13   BY MR. McGAVIN:

14   Q.  So what kind of law do you do?

15   A.  Well, most of it is patents.  So, for instance, I do a

16   lot of appellate patent -- Court of Appeals, the Federal

17   Circuit, Supreme Court, you know, so I do -- I'm interested

18   in sovereign patent infringement, so basically states that

19   are infringing patients, like California, United Kingdom,

20   United Sates, things like that.

21   Q.  How much income do you make from that?

22   A.  I would say little or none.

23   Q.  Now, in regard to working with Mr. Haysbert, how many

24   different times have you worked with him?

25   A.  Only this time.

Filler, A. - Cross                                                    505

1    Q.  Only this time.

2         Now, in regard to the various opinions that you've

3    rendered here, you also indicated that they may reflect

4    impairments associated with the mid-brain.  You wrote that?

5    A.  Yes.

6    Q.  So when you say something may result in impairment, that

7    requires clinical correlation?

8    A.  That would be not as certain as "would be expected."  It

9    would be "higher certainty," "could be," "may."  It means

10   that there is a lower correlation of the presence of a

11   particular image finding and the correlated symptom.

12   Q.  All right.

13        THE COURT:  I'm looking at your report under

14   "Impression" and "Overall Impression."  What you've said

15   here, something would be expected to have the effect, and

16   then you've used here "demonstrates problems," and then

17   you've used here "which may reflect impairments."

18        THE WITNESS:  Right.  The highest expectation would

19   be the "would be."  Particularly on the plaintiff's injury,

20   I say "is expected."

21        THE COURT:  So there's a difference between "is

22   expected," "would be expected," and just "demonstrates

23   problems," and "may reflect impairment"?

24        THE WITNESS:  Yes.

25

Filler, A. - Cross                                                      506

1              MR. McGAVIN:  Excuse me, Your Honor.

2     BY MR. McGAVIN:

3     Q.  You don't say "is expected."  It says "would be" in your

4     report.  Are you changing your report?

5     A.  At that Page 3?

6     Q.  It says "would be."  It does not say "is."

7              THE COURT:  There is no "is" there.  It is all

8     "would be."

9     BY MR. McGAVIN:

10    Q.  So you've misstated your report?

11    A.  Let me see that one again.  I thought it was stated more

12    emphatically than that particular finding.  I have the

13    condensed version.  It is really small.

14             THE COURT:  You can pass up the page.  You can have

15    the page on my report.

16             MR. McGAVIN:  I can show it to him.

17             THE COURT:  I may have marked and underlined some

18    things, Dr. Filler.  I see "would be" and "may."

19             THE WITNESS:  Yeah, "would be expected to have the

20    effect of impairment."  Yes, so "would be expected," that's

21    my sort of higher level expectation.  Sorry.

22             THE COURT:  Beneath "is expected"?

23             THE WITNESS:  Right.

24             THE COURT:  Okay.  So it's "is expected," "would

25    be," and then "may."

Filler, A. - Cross                                                      507

```
 1              THE WITNESS:  And then if you have -- if you've
 2     seen -- if I've seen and examined the patient, I might say
 3     "is."
 4     BY MR. McGAVIN:
 5     Q.  Now, I want to show you this slide that you showed to the
 6     jury.  Now, this one is for Dr. Haysbert.  You see that?
 7     A.  Yeah.  Those are -- could be, yeah, that locations, yes.
 8     Q.  Well, did you know she doesn't have depression and
 9     anxiety?
10              MR. HAYSBERT:  Objection, mischaracterizing the
11     witness's testimony, and it assumes facts that are not in
12     evidence.
13              THE COURT:  Overruled.  You can argue that if you
14     want.
15              THE WITNESS:  Well, I don't have information on
16     that.
17     BY MR. McGAVIN:
18     Q.  So you put a slide in here and showed the jury that you
19     think this study shows that she might, would, could have had
20     anxiety and depression, but if the evidence were to show that
21     she doesn't and testified she's had no psychiatric or
22     psychological care, no medication for anxiety or depression,
23     hasn't seen a psychologist or psychiatrist --
24     A.  Well --
25     Q.  Wouldn't that tell you that this slide is incorrect?
```

Filler, A. - Cross                                                    508

1    A.  No.  The slide, when shown, I say an injury here, these

2    are all possible.  And then what we do is we get -- I'm

3    showing these are different findings, or I go through what

4    does DTI show.  And so does it show this or does it show

5    that?

6           Then, as I said, I come to this particular finding,

7    which, when I explain it, I say, now, this is the key finding

8    that is important, so I explain it.  So I agree that without

9    explanation, just looking at, you know, you don't get that

10   difference that I'm just going through and showing the

11   different types of things that can happen.

12   Q.  This one is for Dr. Haysbert also; anger, irritability

13   and poor multi-tasking, isn't it?

14   A.  Now, these are symptoms that can occur with these

15   findings, yes.

16   Q.  But you put a slide in this deck to show the jury that

17   she had it, it causes it, and she doesn't have those things

18   either, does she?

19           MR. HAYSBERT:  Objection, mischaracterizing the

20   witness's testimony.  Also assumes facts that are not in

21   evidence.

22           THE WITNESS:  I think it's worthy --

23           THE COURT:  Overruled.  Well, that's the point he

24   is trying to make.  Overruled.

25           THE WITNESS:  I'm just saying that I go, yeah,

JODY A. STEWART, Official Court Reporter

Filler, A. - Cross                                                    509

1   through and say these are things that can happen, and it may

2   all -- depending on how -- if I present the whole thing, I

3   wasn't able to present it, it is supposed to make the point,

4   these are things that one could find, but of these, this one

5   is the one that was -- is clarifying and is --

6   BY MR. McGAVIN:

7   Q.  Look what it says.  It says right here, "Injury to

8   the" -- that section of the brain -- "causes decreased

9   interest in interacting with others."

10          MR. HAYSBERT:  Your Honor, that's what she

11  testified to earlier today.

12          THE COURT:  Well, that's for the jury to recall,

13  for you to argue.

14  BY MR. McGAVIN:

15  Q.  Then, "Injury to the frontal lobe results in

16  anger/irritability and poor multi-tasking."

17  A.  Right.  I'm not -- remember, as you've pointed out, I'm

18  not allowed to discuss the clinical information that I have,

19  but what I'm showing is these are the patterns that are

20  medical findings.  If someone, you know, has a particular

21  condition, then they were finding in an image that correlates

22  with this symptom, this correlates with this, this correlates

23  with this.

24          THE COURT:  These are the images that you examined?

25          THE WITNESS:  Yes.

JODY A. STEWART, Official Court Reporter

Filler, A. - Cross                                                    510

1              THE COURT:  This is her brain imaging that you

2       examined and put that on the slide?

3              THE WITNESS:  Yeah.  And very often, you know, the

4       way I would put it often is that, you know, she's done well.

5       She's not complaining of a lot of things, and,

6       unfortunately, there is one -- this one very problematic

7       issue in memory formation, she is not able to beat that, so

8       it's not that she is complaining of everything imaginable,

9       you know.  She has a specific problem, which is demonstrated

10      on the image, and that's -- because if I didn't show those

11      slides, we didn't flip through some of them, I didn't --

12      that's how I use them, is to say these are all the kind of

13      findings that we look -- we see.  But I think it shows that,

14      you know, she is not excessively complaining, but she has a

15      particular problem which is found in the image, which is an

16      impediment.

17      BY MR. McGAVIN:

18      Q.  How do you know she is excessively complaining or --

19      A.  -- that she is not.

20      Q.  Well, how do you know?

21      A.  Well, you are asking me about my knowledge of the

22      symptoms, and you're telling me right now, you're testifying

23      to me as to what she has or doesn't have.

24              MR. McGAVIN:  Nothing further, Your Honor.  Thank

25      you.

JODY A. STEWART, Official Court Reporter

Filler, A. - Redirect                                                    511

1              THE COURT:  Redirect?

2              MR. HAYSBERT:  Yes.

3                      REDIRECT EXAMINATION

4    BY MR. HAYSBERT:

5    Q.  Dr. Filler, your brain scans examine a person's brain,

6    correct?

7    A.  Yes.

8    Q.  And your brain scans can detect the presence or absence

9    of physical injury to the brain, correct?

10   A.  Yes.

11   Q.  And you chose one image to show us what you saw in

12   Dr. Haysbert's objective findings of brain injury, correct?

13             MR. McGAVIN:  Objection, Your Honor.  This is

14   purely leading.

15             THE COURT:  Overruled.  Go ahead.

16   BY MR. HAYSBERT:

17   Q.  Correct?

18   A.  Yes.

19   Q.  Okay.  Doctor, the image that you showed or any other

20   images of Dr. Haysbert's brains that you examined, did any of

21   them --

22             THE COURT:  Are there things that you examined that

23   you haven't told us?

24             THE WITNESS:  No.

25             MR. HAYSBERT:  No further questions.

```
 1            THE COURT:  Then, Dr. Filler, I thank you for

 2   coming, and coming all this way.  I don't envy you, but I

 3   wish you a safe and long flight.  Remember that you can't

 4   discuss your testimony in the case until it is completed,

 5   and you can't discuss it with any other witness or any other

 6   parties until the case is over.  I don't think you will be

 7   called back, but if you were needed further, we would let

 8   you know, and that would come through Mr. Haysbert.

 9            I think you might be able to make it.  What time is

10   your plane?

11            THE WITNESS:  Might just make it.

12            THE COURT:  You might.  Airport is not far.  We are

13   not L.A., so I wish you well, and thank you again for

14   testifying.

15            THE WITNESS:  Okay.  Thank you, Your Honor.

16            (Witness excused.)

17            THE COURT:  Counsel, that brings us to the end of

18   our trial day.  I do have another matter I need to take care

19   of in the morning, so I don't want to waste your time.  I

20   know you feel like some of it has been, but we really have

21   been cognizant of your time.  If you could be here at 10:30

22   tomorrow morning, because there is something that the Court

23   needs to take care of.  I should be able to take care of it

24   by 10:30.  It's a matter that needs to be taken care of.

25            But remember what I told you, don't discuss the
```

1    case with your family or your friends or anyone or listen to

2    any media accounts or read any news stories, if there are

3    any.  Don't do any investigation of your own, and just put

4    the case out of your mind and have a pleasant evening with

5    your family and friends, and have a safe evening.  We will

6    see you tomorrow morning at 10:30.

7            (Jury out at 5:41 p.m.)

8            THE COURT:  Mr. Haysbert, who do you anticipate

9    calling tomorrow?  I'm trying to get some planning, because,

10   frankly, in the Court's schedule, I'd only planned the four

11   days, and we didn't get started until Wednesday because of

12   our matters on Tuesday.  So I'm trying to plan other matters

13   and scheduling.  So who do you plan to call tomorrow?

14           MR. HAYSBERT:  Your Honor, I plan to call the

15   remaining witnesses.  That would be Nineveh Haysbert, Deajah

16   Clark, Nick Seifert, Norman Chase, and I believe that's all.

17   If I'm not mistaken, I don't think there is anyone else,

18   Your Honor.  I did subpoena Norman Chase and Nick Seifert

19   and Deajah Clark for August 9th and 10th.  So I would ask

20   Your Honor to provide some feedback as to what can be done

21   about that.

22           THE COURT:  The way the rules operate is that

23   unless you told them not to be here, they should have been

24   here on the 9th, and then you would have asked to have them

25   recognized by the Court to come back when they were needed

1    so that you don't have them sit there and sit outside.  The

2    way that it would be done would be to have them appear,

3    unless you've got an agreement from them, and you trust them

4    to be here, have them appear.  The Court recognizes them,

5    recognizes their subpoena, and directs them to be present

6    either at a specific time or direct them to be present at

7    the direction of the attorney that subpoenaed them at a

8    specific time.  So there is nothing that I can do about it

9    now.  I don't know what contact you've had with them.

10          MR. HAYSBERT:  They are all here in the witness

11   room.

12          THE COURT:  Well, then you can.

13          MRS. KINNEY:  Get them, Your Honor?

14          THE COURT:  If they are here, then I'll be glad to

15   recognize them and tell them to be here tomorrow.

16          MR. HAYSBERT:  Appreciate that.

17          THE COURT:  Mr. McGavin, you should be ready to

18   start your defense tomorrow.  These may go quickly, and we

19   need to maximize our time because the schedule is running

20   over.

21          MR. McGAVIN:  Yes, Your Honor.  I've made

22   arrangements.  I'm just trying to figure out if we can get

23   all the evidence in tomorrow.

24          THE COURT:  I don't know how long these witnesses

25   are going to be or what they have to say.  I don't think

515

```
 1    they will be very long.  Maybe Nineveh Haysbert may be, but
 2    I don't know if the others.  Pretty quick witnesses, I would
 3    think.  They are coming in.
 4              You can come forward, if you would, please.  If you
 5    will just stand there and identify your name, and then I'm
 6    going to recognize you because you've been subpoenaed, and I
 7    didn't know you were sitting in the witness room, but if you
 8    can tell me your name.
 9              MS. CLARK:  Deajah Clark.
10              THE COURT:  Okay.  Ms. Clark.
11              MS. HAYSBERT:  Nineveh Haysbert.
12              THE COURT:  Ms. Haysbert.
13              MR. SEIFERT:  Nick Seifert.
14              THE COURT:  Mr. Seifert.
15              MR. CHASE:  Norman Chase.
16              THE COURT:  Mr. Chase.  The Court recognizes you.
17    Apparently, you were subpoenaed for the 8th and the 9th, but
18    the case is moving more slowly than what they anticipated,
19    so you'll need to be back here tomorrow morning.  Who are
20    you going to call first?
21              MR. HAYSBERT:  Your Honor, Nineveh Haysbert.
22              THE COURT:  Ms. Haysbert, you will need to be back
23    here tomorrow morning by 10:30, and the other witnesses by
24    11:00 a.m., so that you will need to be back tomorrow,
25    because it's quarter to 6:00, and we have finished for the
```

1    evening.  I'm sorry.  I didn't know you were in the witness

2    room.  I would have recognized you sooner, but I just

3    learned that you were here.

4           So you are excused for the evening, and don't

5    discuss your testimony with any witness who has testified,

6    and have a safe evening, and we will see you tomorrow

7    morning.  We will get through you tomorrow because we will

8    stay until we have to.  I will give you that assurance.  So

9    you're excused for this evening.  Have a nice evening.

10          MR. HAYSBERT:  Thank you very much, Your Honor.

11          THE COURT:  I assume there is nothing further to

12   take care of this evening, and we can adjourn.  You will

13   need to be here by 10:30 tomorrow morning.  I have a matter

14   to handle, but I feel 99.9 percent sure that I can get it

15   done by 10:00, but I didn't want, again, anybody sitting

16   around and wasting their time.  So I'm making it 10:30.

17          MR. HAYSBERT:  Your Honor, there is one matter.

18   It's procedural.  So we have a motion -- actually, it's more

19   of a trial brief on the calendar with the Court, I assume

20   the calendar, but we filed it, and it's regarding Bloomin'

21   Brands and the level of control over the instrumentality of

22   Outback Steakhouse and its floors.  So we were wondering if

23   that is something that Your Honor would be ruling on before

24   the testimony of Nick Seifert.  Potentially he may not need

25   to testify if that ruling is favorable.

1              THE COURT:  Maybe Mr. McGavin can enlighten me.

2     I'm somewhat surprised over what this issue really is.  As

3     far as I'm concerned, they can present evidence on what the

4     relationship is, and then after they present evidence on

5     what the relationship is, you can propose a legal

6     instruction.  Then the jury can decide whether there is

7     sufficient relationship, and you all can clarify this for me

8     because it's been a little confusing.  There is only one

9     recovery.  It would seem to me that Outback and Bloomin'

10    Brands can decide who's going to take care of it.  They must

11    have some agreement.  I don't know why it has to be an issue

12    in this case, but I'm not going to give two sets of

13    instructions, the same instructions for two defendants.  I'm

14    just going to do the instructions plaintiff and defendants,

15    and I can put a parenthetical around them or just

16    defendants.

17             I mean, Bloomin' Brands and Outback Steakhouse

18    ought to know what their relationship is and who is

19    responsible for what.  So I have been a little confused by

20    it all along.  I'm just planning to let the testimony go

21    forward.  You can ask Mr. Seifert who he works for, what his

22    relationship is with Bloomin' Brands, and Mr. McGavin can

23    call his witnesses.  Then you all can argue for a legal

24    instruction.  In any event, what difference does it make?

25    Sometimes we have to look at things from a practical

1   standpoint and say there is only one recovery.  It's not

2   like you get to recover twice against both defendants.

3          The form of verdict would just be the plaintiff

4   versus whatever defendants, and it would say, we, the jury,

5   find for the plaintiff or we, the jury, find, however it's

6   worded, I'm not obligating myself, for the defendants.  You

7   can always put a paren around the S.  All this procedural,

8   substantive, but let me hear from Mr. McGavin.  I don't know

9   why we are making an issue out of this.

10          MR. McGAVIN:  Your Honor, I'm not sure it's a huge

11  issue.  It is one recovery.  Outback is the responsible

12  party, and they run, they manage it.  It's their shop.

13  Bloomin' Brands is the national franchisor, but the

14  responsible party is Outback.

15          THE COURT:  As far as I'm concerned, they can work

16  that out, Outback and Bloomin' Brands, according to, as I

17  mentioned earlier, whatever kind of agreement they have.  If

18  you hadn't sued them, then defendants' modis operandi would

19  be to come up and say, but our parent company is.  So as far

20  as I'm concerned, plaintiff acted properly in bringing the

21  case against both Bloomin' Brands and Outback.

22          MR. McGAVIN:  We have admitted throughout, Your

23  Honor, that the store is operated by Outback.  Outback is

24  the responsible party.  The employees work for Outback.  So

25  it's pretty straightforward in our mind.  We don't think the

519

 1    plaintiff needs Bloomin' Brands in the case.

 2            THE COURT:  Why take them out now?  It doesn't make

 3    any sense to me.  There is one recovery, and the two

 4    defendants can decide who is liable for that.  They can

 5    split it 50/50.  They can put it all on one or all on the

 6    other.  If you put evidence on, and you argue to me that

 7    it's a legal issue based upon the facts that you've

 8    presented, then you can give me an instruction.

 9            MR. McGAVIN:  Okay.

10            THE COURT:  So that's the way I look at it.  It's

11    not something that you do now and run the risk of having the

12    wrong party.

13            MR. McGAVIN:  I don't think there is an issue

14    there, Your Honor.

15            We do still have our -- just for the -- I know the

16    Court's heard me on this, but we still do have our motion to

17    strike the testimony of Dr. Filler on causation, and I

18    believe that's still under advisement, and I renew that now

19    that he has concluded his testimony and left the courtroom.

20            THE COURT:  I accept your renewed motion.  I don't

21    rule on it.  We are going to continue on with the case and

22    get to that at the appropriate time.  In any event, we will

23    see.  I'm going to rule on it tonight.  What I am going to

24    rule on is I'm going to rule that Mr. Haysbert's motion

25    about Bloomin' Brands and Outback is moot because what's

1    procedural, what's substantive, what's factually based,

2    what's legally based, I'm just letting it go forward with

3    both of them.  If an instruction is justified to separate

4    them out, Mr. McGavin can present it.

5         MR. HAYSBERT:  Thank you, Your Honor.

6         THE COURT:  So basically I rule for you, but I

7    don't rule for you necessarily the reasons that you put.

8    That's why I'm afraid to say that, because I don't know that

9    I agree because federal procedure controls.  I believe that

10   one of the rules you might have cited might be a Virginia

11   procedural rule.  Virginia procedure doesn't control.  So I

12   grant your motion but for different reasons.  How is that?

13        MR. HAYSBERT:  Thank you very much, Your Honor.

14        THE COURT:  Just on the docket, just put for the

15   reasons stated on the record.

16        Then the Court stands in recess on this case until

17   tomorrow at 10:30.

18        (Hearing adjourned at 5:54 p.m.)

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3          I certify that the foregoing is a correct transcript

4      from the record of proceedings in the above-entitled matter.

5

6

7              X_____/s/_____x

8                      Jody A. Stewart

9                      X_____8-30-2023 _____x

10                           Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JODY A. STEWART, Official Court Reporter