```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                   Newport News Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                       )
 5   JOANN WRIGHT HAYSBERT,            )
                                       )
 6          Plaintiff,                 )
                                       )   CIVIL ACTION NO.
 7   v.                                )   4:20cv121
                                       )
 8   BLOOMIN' BRANDS, INC., AND        )
     OUTBACK STEAKHOUSE OF FLORIDA,    )
 9   LLC,                              )
                                       )
10          Defendants.                )
     - - - - - - - - - - - - - - - - - -

11

12

13                  TRANSCRIPT OF PROCEEDINGS

                            DAY 4
14
                       Norfolk, Virginia
15
                      August 11, 2023
16

17

18   BEFORE:  THE HONORABLE REBECCA BEACH SMITH, and a Jury
             United States District Judge
19

20

21   APPEARANCES:

22           CRANDALL & KATT
             By:  David A. McKelvey
23                     And
             HAYSBERT & MOULTRIE LLP
24           By:  Nazareth M. Haysbert
                  Counsel for the Plaintiff
25
```

JODY A. STEWART, Official Court Reporter

```
 1   APPEARANCES CONT'D:

 2
             McGAVIN, BOYCE, BARDOT, THORSEN & KATZ, P.C.
 3           By:  John D. McGavin
                  Emily Blake
 4                Counsel for the Defendants

 5

 6

 7                      I N D E X

 8
     PLAINTIFF'S
 9   WITNESSES            DIRECT   CROSS    REDIRECT    RECROSS

10   NINEVEH HAYSBERT       524     557       582
     DEAJAH CLARK           589     605       613         615
11   ALICIA ELEFTHERION     618     701       704
     NORMAN CHASE, JR.      708     727       728
12   NICHOLAS SEIFERT       765     785       789

13
     DEFENDANT'S
14   WITNESSES            DIRECT   CROSS    REDIRECT    RECROSS

15   CHRISTOPHER ROBINSON   730     741
     NICHOLAS SEIFERT       793
16

17

18

19

20

21

22

23

24

25
```

JODY A. STEWART, Official Court Reporter

1          (Hearing commenced at 2:03 p.m.)

2          MR. McGAVIN:  Your Honor, I wanted to let the Court

3    know that we have been working on this issue of the

4    corporate franchise issue, and in order to facilitate and

5    perhaps save some of the witnesses who are under subpoena,

6    what we will do is, just as the Court suggested, instruct as

7    to the defendants and just leave it at that.  We are not

8    admitting control, but it just makes it easier just to leave

9    it in the instructions in the simplest form.

10          THE COURT:  That's fine.

11          Can we bring the jury in.

12          MR. McGAVIN:  Thank you.

13          (Jury in at 10:30 a.m.)

14          THE COURT:  Good morning, ladies and gentlemen of

15    the jury.  I hope that you had a very nice evening, and we

16    are ready to begin our trial day.  I would ask that the

17    clerk call the case and the roll of the jury, please.

18          THE CLERK:  In case number 4:20cv121, JoAnn Wright

19    Haysbert versus Bloomin' Brands, Inc., and Outback

20    Steakhouse of Florida, LLC.

21          Mr. McKelvey and Mr. Haysbert, is the plaintiff

22    ready to proceed?

23          MR. HAYSBERT:  Yes, Your Honor.

24          THE COURT:  Good morning.

25          MR. HAYSBERT:  Good morning.

```
 1                THE CLERK:  Mr. McGavin, Ms. Blake, are the
 2    defendants ready to proceed?
 3                MR. McGAVIN:  Yes, we are.  Good morning.
 4                THE COURT:  Good morning, counsel, and Mr. Graham
 5    and Dr. Haysbert.
 6                Could you call the roll of the jury.
 7                (Roll call of jury.)
 8                THE CLERK:  All jurors are present, Your Honor.
 9                THE COURT:  That then lets us start.
10                Your first witness, Mr. Haysbert or Mr. McKelvey.
11                MR. HAYSBERT:  Your Honor, plaintiff would like to
12    call Nineveh Haysbert to the witness stand.
13                THE COURT:  Ms. Haysbert, you can come forward and
14    be sworn.
15                (Witness was sworn.)
16                NINEVEH HAYSBERT, called by the Plaintiff, having
17    been first duly sworn, was examined and testified as
18    follows:
19                         DIRECT EXAMINATION
20    BY MR. HAYSBERT:
21    Q.  Thank you for being here, Ms. Haysbert.
22    A.  Thank you for having me.
23    Q.  What do you do for a living?
24    A.  I am a mental health and substance abuse counselor, and I
25    work with all populations; children, adults, and seniors, and
```

1  predominantly my population that I work with is the military.

2  Q.  I'm sorry.  I couldn't understand you.

3  A.  Predominantly who I work with are the population of the

4  military.

5  Q.  And who are your average clients on a daily basis or

6  weekly basis?

7  A.  Majority of them are adults and children of active duty

8  service members of any branch.

9  Q.  And I understand that the mask you are wearing today is

10  for the safety of the children?

11  A.  It's safety for everyone because of the amount of people

12  that I work with.  I'm just taking it down so you all can

13  hear me clearly for the sake of the Court.  But even with all

14  the installations, I keep it on, and they allow me to do so.

15  Q.  Thank you.

16         THE COURT:  They have what?

17         THE WITNESS:  They allow me to do so, keeping my

18  mask on.  I'm just doing it so you all can hear me but I

19  prefer not to be.

20         MR. HAYSBERT:  Your Honor, is it okay if the mask

21  is on?

22         THE COURT:  Although, I think everyone would prefer

23  that it not be on so that we can understand her more

24  clearly, because there's no longer any mask requirement in

25  the court even during COVID, because everything is cleaned,

Haysbert, N. - Direct                                              526

1    the microphones, everything is deep cleaned every evening.

2    Obviously, somebody wouldn't be here if they had COVID, and

3    so the Court would prefer, and did during COVID, because you

4    just can't hear somebody with a mask on, particularly if

5    they don't speak up.

6          MR. HAYSBERT:  Right.  I understand, Your Honor.

7    BY MR. HAYSBERT:

8    Q.  Could you keep it down while you're testifying?

9    A.  Yes, sir.

10   Q.  And if you would do so now, I'd appreciate that so

11   everyone can hear you.

12         Dr. JoAnn Haysbert is your mother?

13   A.  Yes, that's correct.

14   Q.  Why are you here today?

15   A.  I am here to share what my observations were and what was

16   reported to me at the time that my mom slipped and fell at

17   the Outback Steakhouse.

18   Q.  Thank you.  Do you remember the circumstances surrounding

19   your mom's fall at the Chesapeake Outback Steakhouse?

20   A.  Yes.

21   Q.  Can you tell us what you remember about that day.

22   A.  What I remember is a day where I -- myself and my mother

23   actually had just gotten our hair done, and after we got our

24   hair done, we are actually going to get dinner from the

25   Outback Steakhouse through curbside service.  And so we

1   ordered our meal, and my mother --

2   Q.  I'm sorry.  You ordered from the car or inside the

3   restaurant?

4   A.  From the car.  And my mother said she had to go to the

5   restroom, so she got out the car to go to the restroom, and

6   after a while -- well, a moment or, I can't, you know, share

7   with the actual time frame or minutes where someone came out

8   and said that your mom slipped and fell.  You need to come

9   in.

10          So I got out the car, and I rushed to go inside.

11  And when I came inside, automatically I could see when I

12  walked through the door is my mother being picked up by a

13  group of individuals.  Then on the left-hand side here and

14  around was the Robinson family and other patrons.  There were

15  some hostesses and the light stand here, and in that moment

16  they were all sharing with me --

17          MR. McGAVIN:  Objection, Your Honor, hearsay.

18          THE WITNESS:  -- that your --

19          MR. HAYSBERT:  Objection, Your Honor.  This is

20  present sense impression.  This is excited utterance.  This

21  is an exception to the hearsay rule, Your Honor.  He is not

22  about to do this.

23          THE COURT:  He just did it.

24          MR. HAYSBERT:  I know he did.

25          THE COURT:  I'm going to sustain the objection

Haysbert, N. - Direct                                                          528

```
 1   because I don't know who these people are.  It might be an
 2   excited utterance.  She said there are people with the
 3   Outback Steakhouse.  I don't know who any of these people
 4   are.  They have never been identified.  So I don't know what
 5   you're talking about, excited utterance of a crowd of
 6   people.  I sustain the objection.
 7           MR. HAYSBERT:  Sure, but I would like to argue it.
 8           THE COURT:  No, you may not.  The Court rules on
 9   objections, and, in fact, the Court doesn't even have to be
10   correct on the ruling.  I know present sense impression.
11   When a District Judge rules on an evidentiary ruling, even
12   if the reason given is incorrect, if the ruling is correct,
13   it stands.  You've made your objection, you've said what it
14   was on the testimony so far.  I'm not going to let present
15   sense impressions, utterances of a crowd of people come in.
16   They have to be identified.
17           MR. HAYSBERT:  Even though she is rushing to the
18   restaurant to her mother?
19           THE COURT:  I have sustained the objection.
20           MR. HAYSBERT:  The objection is preserved, and
21   thank you, Your Honor.
22   BY MR. HAYSBERT:
23   Q.  Ms. Haysbert, let's back you up for a second.  Have you
24   ever read any online reviews of this particular restaurant?
25   A.  No.
```

1          MR. McGAVIN:  Objection, Your Honor, hearsay.

2          THE COURT:  I'll let her answer that.  It's not

3    being offered, I guess, for the truth of it.  I don't know.

4    She hadn't read any online reviews.

5          THE WITNESS:  No, Your Honor.

6    BY MR. HAYSBERT:

7    Q.  Where were you when your mother fell?

8    A.  I was in the car.

9    Q.  Did you see your mother fall?

10   A.  No.

11   Q.  How did you find out about it?

12   A.  The waitress came out.

13   Q.  Do you remember who came to get you from curbside

14   service?

15   A.  I don't remember the name, no.

16   Q.  When they got you from the car in the curbside service

17   pickup, what happened next?

18   A.  I rushed into the restaurant.

19   Q.  Okay.  And as you walked into the restaurant, you rushed

20   into the restaurant, what did you see?

21   A.  When I came in, I saw people picking up my mother, and

22   then there was an approach from patrons and also the

23   Mr. Robinson family, and they were sharing with me --

24          MR. McGAVIN:  Objection, Your Honor.

25          THE WITNESS:  -- and pointing to --

```
 1          THE COURT:  Wait just a minute.
 2          MR. McGAVIN:  Objection.  This is the same thing
 3  that you just sustained and discussed.
 4          THE COURT:  Sustained.  Just say what you saw and
 5  did, and I believe that Mr. Robinson is going to be a
 6  witness.
 7          MR. HAYSBERT:  That's exactly why she should be
 8  able to testify as to what he said.
 9          THE COURT:  You can bring her back in if she's
10  testified contrary to what he said as impeachment, but he
11  hasn't testified yet.
12          MR. HAYSBERT:  Understood, Your Honor.
13          THE COURT:  So I don't know what he is going to
14  testify to.
15          MR. HAYSBERT:  Thank you, Your Honor.
16  BY MR. HAYSBERT:
17  Q.  Who were the Robinsons?
18  A.  The Robinsons are a family that approached me when I
19  entered the Outback Steakhouse sharing with me --
20          MR. McGAVIN:  Objection, Your Honor.
21          MR. HAYSBERT:  You don't have to say what they
22  shared with you.  I just wanted to know who they were.
23  BY MR. HAYSBERT:
24  Q.  Did you speak with a person named Chris Robinson?
25  A.  Yes.
```

```
 1    Q.  Did you speak with anyone else in his family?

 2    A.  Yes.  They were all talking to me at the time.

 3    Q.  Okay.  And you're not allowed to say what Mr. Robinson

 4    said to you.

 5    A.  Okay.

 6    Q.  But you will be brought in for his portion of the

 7    testimony so you can hear him.

 8            THE COURT:  No.  No.

 9            MR. HAYSBERT:  She will not be able to do that?

10            THE COURT:  That's not the way you do it.  If she

11    testifies contrary to what you know, then you bring her back

12    in, and you ask her questions.  She's not allowed to hear

13    his testimony.  She is not an expert that can sit in, and,

14    in fact, there has been no motion in this case to allow

15    experts to sit in the courtroom.  Sometimes there is.

16            But, no, she may not sit in while another witness

17    testifies and then get on the stand and testify contrary.

18    You have to ask her the questions, and then what her answers

19    will be what they'll be.

20            MR. HAYSBERT:  I apology, Your Honor.  We will do

21    that.  Thank you.

22    BY MR. HAYSBERT:

23    Q.  What is your understanding -- was it your understanding

24    that Mr. Robinson had seen something relevant to your

25    mother's fall that will be helpful to you?
```

1   A.  Yes.

2           MR. McGAVIN:  Objection, Your Honor.

3           THE COURT:  That's fine.  Go ahead.

4   BY MR. HAYSBERT:

5   Q.  Why did you get that impression?

6   A.  Because he stated it.  I'm confused.

7           THE COURT:  You can't say what he told you.  He

8   stated something to her.  That's appropriate.  She is just

9   saying she saw Mr. Robinson, he was part of a family, he

10  stated something directly to her, and then we will hear what

11  he says he stated, and if she says it's different, then we

12  will take it up then.

13  BY MR. HAYSBERT:

14  Q.  You are fine.  You are okay.  In that moment with all the

15  chaos, how did you feel?

16  A.  Scared.

17  Q.  Why did you feel scared?

18  A.  Because someone ran out to me to let me know that my mom

19  had slipped and fall, and what bothered me the most is I

20  wasn't there.  And when I came in with those -- I can't even

21  say that, ma'am?

22  Q.  Don't say what they told you, just say what you observed.

23  A.  I observed people talking to me and talking to me about

24  what they've seen and people picking up my mother.  And in

25  that moment I needed to know what happened.  In that moment I

1    needed to also be strong enough or alert enough to be able to

2    know how to move forward.  So all I have is my -- everything

3    that I saw.

4            THE COURT:  Do you want some water?

5            THE WITNESS:  No.  I'm okay.  I have water here.

6    Thank you.

7            THE COURT:  We've got water.  I'm sorry to

8    interrupt you, but I should have said earlier this morning,

9    the court security officer is different, obviously, than Ms.

10   Etter.  This is Ms. Betty Moses, and she is the backup for

11   Ms. Etter who had a death in her family.  So she is not here

12   today, but Ms. Moses is as experienced and has been with the

13   court any number of years.  I should have told you that when

14   you see somebody different, the jury and the attorneys.  Go

15   ahead.

16           MR. HAYSBERT:  Thank you, Your Honor.

17   BY MR. HAYSBERT:

18   Q.  So you were talking about how you felt?

19   A.  Yes.

20   Q.  Did you want to continue?

21   A.  Yeah.  I was just terrified, and at the same time

22   uncomfortable, at the same time being able to see my mom

23   being picked up, I knew something wrong had happened and

24   something that wasn't good had happened.  And so that's how I

25   felt.

Haysbert, N. - Direct                                                    534

1    Q.  What, if anything, as you walked in, what else did you

2    observe about Mr. Robinson other than seeing Chris Robinson

3    and his family and coming up to you, talking to you, watching

4    people pick your mother up, was there anything else that you

5    saw?

6    A.  I'm trying to respect you, Your Honor.  I'm, you know --

7    what I saw was individuals, a patron.

8    Q.  Don't talk about anything you heard anyone say.

9    A.  I'm just saying what I saw.

10             THE COURT:  You are fine.  What you saw is fine.

11             THE WITNESS:  Okay.  So I saw patrons pointing.

12   BY MR. HAYSBERT:

13   Q.  What were they pointing at?

14   A.  The floor.

15   Q.  Why were they pointing at the floor?

16             MR. McGAVIN:  Objection, Your Honor.  That would be

17   hearsay.

18             THE COURT:  Well, she can't testify why they were

19   pointing at the floor.

20             MR. HAYSBERT:  That's okay, Your Honor.

21   BY MR. HAYSBERT:

22   Q.  They were pointing at the floor, and did you hear them

23   say anything?

24   A.  Yes.

25             MR. McGAVIN:  Objection, Your Honor.  Excuse me.

JODY A. STEWART, Official Court Reporter

1          MR. HAYSBERT:  I'm not asking for what they said.

2     I'm only asking if she heard them say anything.

3          THE COURT:  She can say what she saw --

4          MR. HAYSBERT:  Right.

5          THE COURT:  -- on the floor, if she saw anything,

6     and she can say they were pointing at the floor, but she

7     doesn't know, and she can't say why.  You'd have to have

8     those people in here to say why.

9          MR. HAYSBERT:  Understood.  But she can also say,

10    if I'm not mistaken, Your Honor, not only that she saw them

11    pointing but that she heard them speaking things, not what

12    they said but they were speaking.

13         THE COURT:  They are speaking things --

14         THE WITNESS:  Yes, they are.

15         THE COURT:  -- and pointing at the floor?

16         THE WITNESS:  Yes.

17         THE COURT:  Okay.  Go ahead.

18    BY MR. HAYSBERT:

19    Q.  What else did you see, Ms. Haysbert?

20    A.  I also saw -- can I say who -- I saw a lady also dry

21    mopping.  They seemed to be dry mopping the floor in the area

22    that they were pointing at.  I also saw individual at the

23    hostess stand.  They were all looking, and for me -- I don't

24    know if I can say that part.

25    Q.  Yes, you can.

Haysbert, N. - Direct                                                            536

1    A.  For me it was as if everyone was in shock, as if they

2    didn't know what to do.  They were all, like, at a pause.

3    There was also a mop and a bucket right there as well, and

4    that's what I saw.

5    Q.  Okay.  Thank you.  Which Outback Steakhouse employees do

6    you remember speaking with?  Not what they said, but just who

7    do you remember speaking with?

8    A.  Lisa Crosby.

9    Q.  Okay.  What did Lisa Crosby say to you?

10   A.  What she shared was that she could not assist with

11   anything any further and that -- and can I say the name

12   that --

13   Q.  Yes, you can.  You can say the name.

14   A.  She shared that she was giving me Chip Chase's card.

15   Q.  Who is Chip Chase?

16   A.  He was the manager, and she said that she would give us a

17   call back, or they would give us a call.  And -- am I to go

18   further?

19   Q.  Yes, you can.

20   A.  They did not give us a call at all.

21        MR. McGAVIN:  Objection, Your Honor.  Excuse me.

22   Objection, relevance.

23        MR. HAYSBERT:  Your Honor, it goes to the fact

24   that, as I mentioned --

25        THE COURT:  Wait just a minute.  The only thing you

Haysbert, N. - Direct                                           537

```
 1   have to establish is that she said they would give us a
 2   call.  They didn't call you.
 3              THE WITNESS:  They didn't call my mother.
 4              THE COURT:  Were you there the whole time with your
 5   mother?
 6              THE WITNESS:  Yes.
 7              THE COURT:  Go ahead.
 8              MR. HAYSBERT:  Thank you, Your Honor.
 9              MR. McGAVIN:  Still, I object on relevance, Your
10   Honor.  It's not -- excuse me, sir.
11              THE COURT:  That's fine.  Lisa Crosby gave you Chip
12   Chase's card and said they'd call you in a couple of days.
13              THE WITNESS:  She didn't say a couple of days,
14   ma'am, but she did say she would call.
15              THE COURT:  All right.  Just go ahead.
16              MR. HAYSBERT:  Thank you.
17   BY MR. HAYSBERT:
18   Q.  Did she tell you someone would be in touch with further
19   information?
20   A.  Yes.
21   Q.  Did you ever receive a call from Lisa Crosby or Chip
22   Chase?
23   A.  No.
24   Q.  Did you ever get your takeout food?
25   A.  No.
```

Haysbert, N. - Direct                                                    538

1   Q.  Did you pay for it?

2   A.  I'm sure I did.

3   Q.  Did it seem to you, while you were in the restaurant

4   until you walked out, that they were more focused on avoiding

5   a lawsuit than giving you --

6           MR. McGAVIN:  Your Honor.

7           THE COURT:  Wait a minute.  That's an improper

8   question.

9           MR. HAYSBERT:  I'll withdraw the question.

10  BY MR. HAYSBERT:

11  Q.  When you first --

12          MR. McGAVIN:  Your Honor, I must object to this

13  entire direct.  It is intentionally attempting to bring

14  hearsay into the case, improper questioning.  This is just a

15  deliberate attempt to avoid what are the basic rules of

16  evidence.  This is wrong.  It's not fair.

17          THE COURT:  Let me just say this.  When you

18  withdrew the question, and that was a totally improper

19  question, and you know that.

20          MR. HAYSBERT:  Your Honor --

21          THE COURT:  You don't interject that kind of

22  opinion evidence.  That's opinion evidence, and unless there

23  is some grounds for her to say that.  You withdrew the

24  question; is that correct?

25          MR. HAYSBERT:  Yes, because what the lawyer says is

1    not evidence.  You said that at the beginning of the trial.

2            THE COURT:  In any event, did you withdraw that

3    question?

4            MR. HAYSBERT:  I did, yes, Your Honor.

5            THE COURT:  Any answer that may have been or

6    started to be is stricken from the record.

7            MR. HAYSBERT:  Yes, Your Honor.  My apologies to

8    you and to the jury as well.

9    BY MR. HAYSBERT:

10   Q.  When you first saw your mom, where was she?

11   A.  Being picked up by a group of people.

12   Q.  What did she look like?

13   A.  All I saw was them picking her up, and then I begin to

14   talk with the people that were talking to me.

15   Q.  Did you think she needed to go to the hospital at that

16   point?

17   A.  Because the people I was talking to, I wasn't able in

18   that moment, that first moment to assess that.

19   Q.  At what point were you able to actually interact with

20   your mother in the restaurant?

21   A.  After they shared with me what they did, Mr. Robinson --

22   can I say that?

23   Q.  Yes, you can.

24   A.  Mr. Robinson giving me his number.

25   Q.  I'm sorry.  When you say he gave you his number, what did

```
 1    he do?  Did he write his number down and give it to you or
 2    did he tell you his number?
 3    A.  What I recall is he gave me his number.  And then -- do I
 4    go to the next?
 5    Q.  Did he tell you why he gave you his number?
 6    A.  Yes.
 7           THE COURT:  He gave you his number?
 8           THE WITNESS:  Yes, ma'am.
 9           MR. HAYSBERT:  There was an objection, Your Honor.
10           THE COURT:  Pardon?
11           MR. HAYSBERT:  There was an objection to the
12    question.
13           THE COURT:  I know.  I'll let her testify what she
14    did, but, again, why, you could ask Mr. Robinson that.
15           MR. HAYSBERT:  Of course.
16           THE COURT:  If the reason is different from what
17    you have anticipated Ms. Haysbert will say, you can bring
18    her back in for impeachment.
19           MR. HAYSBERT:  Yes, Your Honor.
20           THE COURT:  Mr. Robinson can say why he gave her
21    the number or card or whatever he gave her.
22           MR. HAYSBERT:  Understood, yeah.  I'm not going to
23    ask her to go further to saying why he gave it to you or
24    what he said.  Just did he give you his card.
25           THE COURT:  Her answer was she doesn't know whether
```

Haysbert, N. - Direct                                              541

```
 1    he gave her a card or a number.
 2            MR. HAYSBERT:  No, she answered that he did
 3    give her -- he gave her his number, is what she said.
 4            THE COURT:  Yeah.  But she said she didn't know
 5    whether it was a card or just the number; is that correct?
 6            THE WITNESS:  I didn't say that it was in a card.
 7    It was -- he gave me his number.  It wasn't his card that he
 8    gave me, but he gave me his number.
 9    BY MR. HAYSBERT:
10    Q.  Was his number written on a card?
11    A.  Yes.  That was on the back of --
12    Q.  That's all.  His number was written on the card.  Okay.
13    And he told you, without telling me what he said, he told you
14    why he was giving you his number?
15    A.  Yes.
16    Q.  That's all.  Thank you.
17    A.  Okay.
18    Q.  Did your mother go to the hospital that night?
19    A.  No.
20    Q.  Why?  Why didn't she go to the hospital?
21    A.  My mom felt uncomfortable and unsafe at that moment and
22    just wanted to go home.
23    Q.  Did you see any bruises or physical injuries on your
24    mother at that time?
25    A.  There were bruises and -- there were bruises on her arm.
```

Haysbert, N. - Direct                                    542

1    Q.  When you say there were bruises on her arm, you saw those

2    bruises at the restaurant?

3    A.  Oh, no, not at the restaurant.

4    Q.  You didn't see any bruises on her at the time at the

5    restaurant?

6    A.  No.

7    Q.  Why did you go home as opposed to take her to the

8    hospital?

9    A.  Because my mom was uncomfortable and feeling unsafe at

10   that moment, and she wanted to go home.

11   Q.  And you took her home?

12   A.  Yes.

13   Q.  Did you drive the car?

14   A.  I did.  I also helped her out of the restaurant.

15   Q.  Okay.  Let's go back to that.  So when you say you helped

16   her out of the restaurant, what do you mean by that?

17   A.  I assisted her, making sure that she was safe coming out

18   the restaurant, putting her in the car and me driving off.

19   Q.  Was anyone else assisting you?

20   A.  No.

21   Q.  Were you going at a regular rate of speed going out of

22   the restaurant or were you in assisting her walking more

23   slowly than regular?

24   A.  I probably was walking more slowly because given what was

25   shared with me.

JODY A. STEWART, Official Court Reporter

1    Q.   Go ahead.

2    A.   And what she reported, as well, because that's --

3    Q.   Because you talked to your mother?

4    A.   At that point, yes, and so I knew I had to handle her

5    with care.

6    Q.   Okay.  Thank you.  Were you living together at the time?

7    A.   Yes.

8    Q.   When you got home, did you see any physical injuries on

9    your mother?

10   A.   Yes.

11   Q.   What did you see?

12   A.   There were bruising, you know, from here all the way down

13   (indicating).  She was expressing severe pain and moaning.

14   She still seemed a little disoriented as well.

15   Q.   Why at that point did you not take her to the hospital?

16   A.   Because in that moment it was more about helping my mom

17   to feel comfortable, you know.  She seemed just disoriented

18   and just in a lot of pain.  She was moaning, and she was

19   expressing all that was happening.  I did in that moment, had

20   to get ice packs, you know, putting on her.

21          She was in between trying to lay down.  So in that

22   moment I was also trying to get pillows and stuff, trying to

23   situate it in a way to help her to be comfortable, you know.

24   That's what was happening in that moment.  It was just trying

25   to help put her -- feel comfortable, and at the same time

Haysbert, N. - Direct                                                          544

1   feel safe at the same time, you know.  So that's what my

2   focus was in that moment.

3   Q.  Do you remember what happened after that?

4   A.  Yes.  I mean, she continued with the pain and everything.

5   We were expecting a call that we didn't get.  We then went on

6   and called the number.  We called Lisa Crosby, and we called

7   the number.

8   Q.  I'm sorry.  Can you back up for a second.

9   A.  Yeah.

10  Q.  Did Lisa Crosby give you her number?

11  A.  Yes, she did.

12  Q.  And did she write it down on a card?

13  A.  She gave me her number.

14  Q.  On a card?

15  A.  Yes.

16  Q.  As opposed to giving it to you physically?

17  A.  Yes, on the back of the card.

18  Q.  And you called that number?

19  A.  Yes.

20  Q.  Did anyone respond to that number?

21  A.  No.

22  Q.  Did anyone ever respond from that number?

23          MR. McGAVIN:  Objection, Your Honor.  Excuse me.  I

24  object to this.  This is not relevant, and there are many

25  pieces of this that I can't discuss.

1           MR. HAYSBERT:  His objection is to form.  He needs

2     to keep his objection to form.  All this narrative is

3     inappropriate.

4           THE COURT:  Well, you do narrative all the time.

5     You both do.  So, you know, you can't have it both ways,

6     either one of you.  So did you call the number?

7           THE WITNESS:  Yes, ma'am.

8           THE COURT:  You know exactly how many times you

9     called?

10          THE WITNESS:  I called Lisa -- can I speak to you

11    now?

12          THE COURT:  You can.

13          THE WITNESS:  I called Lisa Crosby, and I also

14    called -- and we called, because we were together, Mr. Chip

15    Chase on the number that she had given us.

16          THE COURT:  When did you make that call?

17          THE WITNESS:  It was later that day or either the

18    next day because we did not receive any call back from them.

19          THE COURT:  Go ahead.

20          MR. HAYSBERT:  Thank you, Your Honor.

21          THE COURT:  Approximately what time did this occur?

22    Were you getting lunch, dinner?  What were you there to get?

23          THE WITNESS:  I believe it was dinner that we got.

24          THE COURT:  Then after the incident you then went

25    home?

1          THE WITNESS:  Yes.

2          THE COURT:  So it would be some time later that you

3    called those numbers?

4          THE WITNESS:  Yes.  Or the next day, is what I want

5    to say.

6          THE COURT:  Go ahead.

7          MR. HAYSBERT:  Thank you, Your Honor.

8    BY MR. HAYSBERT:

9    Q.  I understand that you, from Dr. Haysbert's testimony,

10   that you went to South Carolina after the fall?

11   A.  Yes.

12   Q.  Okay.  Can you tell me why you went to South Carolina

13   after the fall?

14   A.  Well, prior to this incident, my grandmother had

15   requested my mom to come and visit, and even though my mom

16   had the incident, when I asked her, you know, whether -- how

17   she felt, you know, about what we would share with my

18   grandmother, she still wanted to try to honor, you know,

19   going to visit my grandmother.

20          My grandmother at that time was turning 90 years

21   old, and so part of that, if I can even share more about

22   that, is just that my mom didn't want to kind of worry my

23   grandmother either with just telling her all that happened.

24   And so she just wanted to try, you know, just to, you know,

25   be following what she had promised her to do.

Haysbert, N. - Direct                                                547

Q.  And she did try?

A.  Yes, she did.

Q.  How was your mother feeling after you arrived at your grandmother's house?

A.  Her pain got worse.  It became more severe.  And at this point with more headaches, the pain, it was just -- she was experiencing pain all over her body, but predominantly on this side (indicating).  And she was sharing about that.  And at that point I pretty much more insisted that we need to just go get it checked out at this point.

Q.  And did you go get her checked out?

A.  Yes.

Q.  Where did you go?

A.  It was like a CarePlex, urgent care like a -- I guess similar to like a Patient First.

Q.  And this was the next day after the accident?

A.  No, the same day.

Q.  No, I'm talking about after the slip and fall, was it the next day after the slip and fall or the following day?

A.  I would say maybe one or two days from there.  I'm not looking at a calendar to be exact.

Q.  And she told you that things had gotten worse or did you physically see that?

A.  I can see her in pain by expressing that, and she also shared --

1          MR. McGAVIN:  Your Honor.  Pardon me.  I do object

2     to her offering the statements of her mother under, I

3     believe it's 801, because they are hearsay by nature.

4     They're not an admission against interest, and so they don't

5     come in under an exception, and, therefore, I do object to

6     her recounting what her mother was saying.  She can testify

7     to what she observed but not what was said.

8          THE COURT:  I sustain the objection.  She can

9     testify about what she observed and what she did.

10          MR. HAYSBERT:  Absolutely.  Thank you, Your Honor.

11     I appreciate that.

12     BY MR. HAYSBERT:

13     Q.  Talking about what you observed and what you did, let's

14     first talk about what you observed.  How has your mother

15     changed since this fall?

16     A.  Um, considerably, and I would say mentally, emotionally,

17     and physically.

18     Q.  Can you break those down for us.

19     A.  Yes.  When it comes to her mentally, it's her processing

20     information.  There seems to be a lot of delays as well with

21     her processing information, especially in conversations or

22     when she is asking us to -- and I can speak for myself, but

23     it also includes, too, but if she is asking for a task to be

24     completed or in a conversation, she will say one thing, and

25     me repeating it back to her, she will then say, as an

Haysbert, N. - Direct                                                549

```
 1    example, "No, I didn't say that."  And so -- and me as her
 2    daughter, I then, for me, have to make a decision how much do
 3    I say to her to help her get back or to avoid her becoming
 4    frustrated or agitated or irritated.
 5    Q.  So she becomes agitated?
 6    A.  She has.  And very -- sorry, Mother, but very fussy, you
 7    know.
 8    Q.  I'm sorry.  When you say fussy, why is she fussy?
 9    A.  Because she's not getting the details in the way that I'm
10    sharing it, or either she feels I'm not understanding what
11    she's sharing.  Okay.  So a lot of times there is some
12    confusion there.
13            Emotionally, like I just said, she gets agitated or
14    irritated.  It could be if she asks me to do something, and
15    I'm not moving quickly enough, and me sharing with her,
16    "Well, mom, you just stated that."  I have to be able to do
17    this first before that, you know.  That's another.
18    Q.  So seems like she may have forgotten one of the things
19    that she told you --
20    A.  Right.  As another example --
21    Q.  -- or on the order of priority?
22    A.  Okay.  She does suffer from memory loss, if that's what
23    you're sharing.  She does forget a lot as well.  Is that what
24    you were asking?
25    Q.  No, I was just wondering if -- if she would tell you two
```

JODY A. STEWART, Official Court Reporter

1    things to do --

2    A.  Right.

3    Q.  -- and maybe the first thing was more important than the

4    second thing, what she came back was the second thing more

5    important than the first?

6    A.  Yeah.  It became a confusion like that, and so I have to

7    remind her that, Well, Mom, you did tell me this.  And that's

8    why I have to do this before this.  Or, Mom, what you just

9    said was this.  Yes, you also said this, but you said this.

10          Then it becomes a contention there.  So a lot of

11   times what I would do is come up with the way to resolve it

12   where I'm not going back over here with it over and over, and

13   then -- and/or I will switch the conversation or change the

14   topic.  So that's the other thing I would do as well.

15   Q.  So you said that she changed mentally, physically, and

16   emotionally?

17   A.  Yes.  So in regards to -- some other things that has

18   happened is sounds or lighting.  Her --

19   Q.  -- tolerance?

20          THE COURT:  Don't fill in words.

21   BY MR. HAYSBERT:

22   Q.  Sorry.

23   A.  When it comes to her hearing any sound, if she's in a

24   conversation with me, if she hears another sound, it will

25   stop her.  It will distract her.  She will go, "Did you hear

```
 1    that?  What's that?  Well, stop making that noise."  Like if
 2    I'm shaking like this, "Nineveh, stop shaking," you know.
 3    Anything like that, it will distract her, it will irritate
 4    her.  If I'm on the phone with her, and she hears a
 5    background noise, "What's that?"  With the lighting, which is
 6    a big thing.  Now that I'm back at the house due to my
 7    assignment here, my life is several -- is across the hallway,
 8    I mean, across set.
 9            If my light is on, it bothers her even from that
10    distance.  "Well, can you turn off the light, please," you
11    know.  So just the sensitivity to light and anything like
12    that is a problem for her.
13            Let's see.  Oh, and in conversation, when she's
14    talking, if she starts off with what she wants to say, she
15    can start off with it, but then she will pause as if she's
16    trying to gather more of the information.  And then she'll
17    go, "What was it?  What was it that you were just saying,"
18    you know, like that as well.  There is just so many different
19    things that can be said here.
20            Physically, at times she walks a little slower.
21    Also, with her physically as well, she becomes more fatigued,
22    you know.  It's like, as she is -- with doing things or
23    processing things, even with socially.  At church just
24    recently, we were in a van, and there were a lot of people
25    talking.  They weren't all directing their conversation to
```

1    her, but she was in the car, and my sister was there, and I

2    was here (indicating), and we were having a conversation.

3    But after a few moments, she was just like, "Okay.  I'm ready

4    to go."  And so, "Are you all ready to go?"  I said, "Okay,

5    Mom.  Yeah, we will be ready to go."  "Yes, ma'am," whatever,

6    that they call her.  So when that happened, we weren't just

7    ending it, you know, the conversation, we were still

8    continuing to talk.  And so she said, "Well, are you all

9    ready to go?  I'm ready to go."  I said, "Well, Mom, you

10   ready to go?"  "Yes, I'm ready to go."  And when we finally

11   went on and moved everybody off away, she then said --

12         MR. McGAVIN:  Objection, Your Honor.

13         THE WITNESS:  "It was too" --

14         MR. McGAVIN:  Object.

15         MR. HAYSBERT:  Don't say what she said.  It's okay.

16   You're not a professional witness, and we both know that.

17   So just don't say what she said, but just talk about your

18   observations of what it all mean to you.

19         MR. McGAVIN:  Your Honor, I must object to this.

20   This is improper questioning, leading and discussion.  It's

21   improper.

22         THE COURT:  Just go forward and try not to make

23   observations about witnesses.

24         MR. HAYSBERT:  I will do that.  My apologies.

25         THE WITNESS:  In that moment -- I'm sorry, can I

1   continue?

2            THE COURT:  You're fine.

3            THE WITNESS:  In that moment I felt it was too much

4   for my mom at that point with all the conversations.  It was

5   not allowing her to keep up with everything or to just

6   process everything that was going -- it was too much going

7   on at one time, and I've noticed that with her.

8            So even when -- and I noticed immediately with the

9   fatigue and everything, and then there is sometimes when she

10  is talking where she is trying to get stuff out, and it even

11  gets slurred, you know.  So these are a lot of the things

12  that I'm experiencing, among others.  That's just some of it

13  of what she experienced -- of, you know, what I've

14  experienced with her, just so that you all can understand

15  that.

16  BY MR. HAYSBERT:

17  Q.  Does your mother drink alcohol?

18  A.  No.

19  Q.  Does she smoke anything?

20  A.  No.

21  Q.  As someone who works with people relating to health

22  issues, is it hard for you to see your mother going through

23  this?

24  A.  Yes.

25            MR. McGAVIN:  Objection, Your Honor.  She is not

1    qualified as an expert in this case nor designated.  I

2    object.

3              THE COURT:  Also, it's not her distress that's at

4    issue here.

5              MR. HAYSBERT:  Yes, Your Honor.

6              THE COURT:  All right.

7              MR. HAYSBERT:  I understand.

8    BY MR. HAYSBERT:

9    Q.  Tell me what your mother was like before the fall.

10   A.  Before the fall, my mom was more energetic.  She was more

11   bubbly.  My mom was more eager to go places and to do things.

12   With my mom now, she refrains from wanting to do a lot of

13   things active outside of just her immediate family.  And then

14   I just noticed, you know, just her -- sometimes when she's

15   not saying anything, just looking afar out as if -- how her

16   life is changing.  And -- and I can't report on what she

17   says?

18   Q.  No, you cannot.

19   A.  And I have to say, Your Honor, I'm not the expert witness

20   here, but I have to be true to what I know and what I've

21   observed, and I do see my mother declining.  I do see that.

22   And different things that other people may not see, I can

23   observe it with her, in conversations, in my talks with her,

24   and just movement that she makes.  And what's so

25   mind-boggling about it all is my mom is used to being --

1   well, my mom is, has always been, like this strong force.

2          She's the one that likes to have control of all

3   things, and she knows what to do and knows what to say and

4   how it needs to be operated.  And now I see where my

5   assistance or being near her gives her more comfort and

6   ability to kind of continue moving to do things.  I hope

7   that's understood.  I don't know any other way to kind of put

8   it.

9   Q.  Okay.  All right.  Appreciate that.  And I know that we

10  don't really -- I was going to ask you how this whole

11  experience has felt for you, but what I'll instead say is,

12  are you -- is it your testimony that the things that you

13  describe were, in terms of her mental, emotional, and

14  physical changes, were they -- happen after the fall or

15  before the fall?

16  A.  This is after.  You know, I wish I can explain or give a

17  bigger picture of how my mom is.  She's just always as

18  energetic and bubbly, and just youthful.  I mean, I don't

19  even know how else to say it, you know.  How far can I go?

20          THE COURT:  Well, how old is your mother?

21          THE WITNESS:  How old is she?  Well, she is 74.

22          THE COURT:  When is her birthday?

23          THE WITNESS:  Next month.

24          THE COURT:  She will be 75?

25          THE WITNESS:  Yes, ma'am.

```
 1              THE COURT:  How old was she when she fell?
 2              THE WITNESS:  This would be about five years ago,
 3   so we are looking at possibly 69, what is that, I would say.
 4   BY MR. HAYSBERT:
 5   Q.  How old is your mother's -- your mother's mother, your
 6   grandmother?
 7   A.  She is now 95.
 8   Q.  How is she doing?
 9   A.  She's doing --
10              MR. McGAVIN:  Objection, Your Honor.  Asking about
11   how the grandmother is.  Objection, relevance.
12              THE COURT:  Sustained.  We've heard some of that
13   from Dr. Haysbert.
14              MR. HAYSBERT:  Thank you, Your Honor.
15   BY MR. HAYSBERT:
16   Q.  Is there anything else that you would like to say,
17   Ms. Haysbert, that you were not able to cover?
18              MR. McGAVIN:  Objection, Your Honor, form.
19              THE COURT:  The form is objectionable.
20              MR. HAYSBERT:  Sure.  Okay.
21   BY MR. HAYSBERT:
22   Q.  Is there anything else you would like to say about your
23   mother in terms of her physical, mental, or emotional
24   changes?
25   A.  I mean, I shared about the sensitivity to sounds and -- I
```

1    mean, that's a big one.  A lot of times in those

2    situations --

3              THE COURT:  That you haven't already said.  In

4    other words, is there something you feel that you've left

5    out that you haven't already said?

6              MR. HAYSBERT:  That's the better question.  Thank

7    you, Your Honor.

8              THE WITNESS:  I can't think of that in the moment,

9    no.

10             MR. HAYSBERT:  I have no further questions for you.

11   Thank you very much for your time.

12             THE WITNESS:  Okay.  May I take this with me?

13             THE COURT:  No, there is cross-examination now.

14             MR. HAYSBERT:  Stay on the stand until the other

15   side.

16             THE WITNESS:  Okay.

17             THE COURT:  Mr. McGavin.

18             MR. McGAVIN:  Thank you, Your Honor.

19                       CROSS-EXAMINATION

20   BY MR. McGAVIN:

21   Q.  Do you recall the date of the incident that we are here

22   about?

23   A.  It was in May 2018.

24   Q.  Do you recall the specific date?

25   A.  Was it the 23rd?  I'm not sure.  I don't want to say the

1    wrong thing, but I know it was in May 2018.

2    Q.  What day of the week was it?

3    A.  Without looking at a calendar, sir, I can't state to you

4    the exact day.

5    Q.  What were the weather conditions like that day?

6    A.  I thought it was a nice day.

7    Q.  Did it rain that day?

8    A.  I don't recall it raining that day.

9    Q.  And on that particular day, were you working that day or

10   was it a day off?

11   A.  Oh, no.  I was working.

12   Q.  What time do you get off work?

13   A.  What time do I normally get off work or what time did I

14   get off that day?

15   Q.  That day?

16   A.  It probably was about 5:00, I would say, or a little bit

17   before that.

18   Q.  And where do you work?

19   A.  Where do I work currently or then?

20   Q.  No, at the time.

21   A.  At the time I was working at -- let's see, that was

22   2018 -- I was working at Hampton University, actually.

23   Q.  I'm sorry?

24   A.  I was working at Hampton University.

25   Q.  In what capacity?

Haysbert, N. - Cross                                                        559

```
 1   A.  As a -- well, I had several hats, but the major one was a
 2   project coordinator for the --
 3   Q.  For what?
 4          THE COURT:  I'm sorry.  A project coordinator for
 5   what?
 6          THE WITNESS:  The violence prevention program.
 7   BY MR. McGAVIN:
 8   Q.  I'm sorry.  I didn't understand that word, the "balance"?
 9   A.  Yes, it's a violence prevention program.
10   Q.  Violence.  I'm sorry.  I misunderstood.  I apologize.
11   A.  Okay, uh-huh.
12   Q.  A violence prevention program?
13   A.  Yes.
14   Q.  How long were you so employed?
15   A.  Then during that time at Hampton University, is that what
16   you're referring to or are you referring to now?
17          MR. HAYSBERT:  Your Honor, the continuing objection
18   to this line of questioning.  It's not relevant.
19          THE COURT:  Overruled.
20          THE WITNESS:  Can you rephrase the question, sir?
21   BY MR. McGAVIN:
22   Q.  Sure.  When did you start at Hampton University?
23   A.  I started with them, I believe it was the summer of 2013.
24   Q.  When did you stop working at Hampton University?
25   A.  That was in August, I believe, of 2019.
```

1   Q.   Who was your supervisor?

2   A.   Who was my supervisor when?

3           MR. HAYSBERT:  Again, objection, irrelevant.

4           THE COURT:  Overruled.  It goes to the factors that

5   I mentioned earlier in judging the credibility of the

6   witness.

7           MR. HAYSBERT:  Thank you, Your Honor.

8           THE WITNESS:  Okay.

9   BY MR. McGAVIN:

10  Q.   Who was your supervisor while you were an employee of

11  Hampton University?

12  A.   Dr. Malone-Colon.

13  Q.   Spell it for the court reporter, if you wouldn't mind.

14  A.   M-a-l-o-n-e - C-o-l-o-n.

15  Q.   Thank you.  Who was her supervisor?

16  A.   Who was her supervisor?  Well, I mean, if you look at the

17  whole university, I guess that would be Dr. Harvey.

18  Q.   Well, did she report to Dr. Haysbert?

19  A.   I'm not sure if she reported to Dr. Haysbert.

20  Q.   Did you report to Dr. Haysbert at work during the time

21  frame of 2013 through August of 2019?

22  A.   No, sir.

23  Q.   Did you interact with Dr. Haysbert during the time frame

24  that you were working at Hampton University on a professional

25  basis?

1    A.  Oh, no.

2    Q.  You did not see her in her employment situation at work,

3    did you, in other words, in meetings or conferences or

4    working with staff?

5    A.  No.  I don't recall having any meetings with her, unless

6    it was a university-wide event where all departments had to

7    be present.  The department that I was under was a department

8    of liberal arts, so -- and there is several different

9    departments, but that is a separate department.  So there is

10   no -- there are a lot of things that we would do that we

11   won't interact with.

12          THE COURT:  You don't report to the provost of the

13   university?

14          MR. HAYSBERT:  Objection, sorry.

15          THE COURT:  I mean, I'm not saying there was a

16   direct reporting, but the way that she's described, I just

17   want to know, in the chain of command, do you report to the

18   provost?

19          THE WITNESS:  I report to Dr. -- during that time,

20   I reported to Dr. Malone-Colon.  My boss was not

21   Dr. Haysbert.

22          THE COURT:  All right.

23          MR. HAYSBERT:  If I may be explanatory, the provost

24   is the chief academic officer of the university.  If you're

25   not in the academic programs, you would most likely not

1    report to the Provost.

2              THE COURT:  I understand.  I asked it when she said

3    it was liberal arts department.  In any event, she said who

4    she reported to, and she didn't report to Dr. Haysbert, by

5    her testimony.

6    BY MR. McGAVIN:

7    Q.  Did you ever report to Dr. Haysbert during your tenure at

8    Hampton University?

9    A.  No, sir.  That would be against protocol.

10   Q.  All right.  And other than this time frame of September

11   2013 through August 2019, did you ever work at Hampton

12   University?

13             MR. HAYSBERT:  Objection, asked and answered.

14             THE COURT:  Sustained.  She said she worked there.

15             THE WITNESS:  I don't understand.

16             MR. McGAVIN:  Pardon me, Your Honor.  What I was

17   asking other than that time frame.

18             THE COURT:  Other than that time frame.

19             MR. McGAVIN:  Yes.

20             MR. HAYSBERT:  She specifically gave dates.

21             THE COURT:  Sustained.  I thought he was repeating

22   his question.  It's either yes or no.

23             THE WITNESS:  Okay.  Can you repeat the question,

24   sir, because now I'm confused?

25             MR. HAYSBERT:  You actually don't have to repeat

Haysbert, N. - Cross                                          563

```
 1   the question because she sustained my objection.
 2          THE COURT:  I sustained the earlier objection
 3   because I thought he was asking about the same time period.
 4   He's clarified his question and said he was asking about any
 5   other time period other than 2013 to 2019, I think you said;
 6   is that correct?
 7          THE WITNESS:  Your Honor, yes, I was at Hampton
 8   University as an employee 2013 to 2019.
 9          THE COURT:  Now you can ask your question.
10          MR. McGAVIN:  Thank you.
11          THE COURT:  He said asked and answered, and I
12   agreed with him because I thought that's what your question
13   was, too, but you've rephrased it.  Ask it again, and it's a
14   yes or no question.
15   BY MR. McGAVIN:
16   Q.  Did you work at Hampton University any other time other
17   than 2013 through August 2019?
18   A.  No, sir.
19   Q.  And where did you go to work next?
20   A.  I work for the Department of Defense.
21   Q.  Where, physically?
22   A.  I cannot disclose that.
23   Q.  You didn't work at home, in other words?
24   A.  No.
25   Q.  You went to an office?
```

JODY A. STEWART, Official Court Reporter

1  A.  Yes, sir.

2  Q.  And you've not worked at home between the time frame of

3  2019 through the present; is that correct?

4  A.  That's correct.

5  Q.  So in terms of your interaction with your mom at the

6  university, you did not interact with her or observe her

7  activities between May 23, 2018, and the present; is that

8  correct?

9           MR. HAYSBERT:  Objection, mischaracterizes.

10          THE WITNESS:  Can you rephrase your question, sir?

11          THE COURT:  Overrule the objection.  Go ahead and

12  answer the question.  Re-ask it.  Your question was

13  appropriate.  Just ask the question again.

14  BY MR. McGAVIN:

15  Q.  Sorry, Your Honor.  I lost the question.

16          THE COURT:  The court reporter can read it back.

17          THE REPORTER:  "So in terms of your interaction

18  with your mom at the university, you did not interact with

19  her or observe her activities between May 23, 2018, and the

20  present; is that correct?"

21          THE WITNESS:  Sir, are you asking whether I

22  observed the activities of my mother --

23          THE COURT:  I'm sorry.  You can't ask him a

24  question.  You can say -- I mean, it's a straightforward

25  question.

Haysbert, N. - Cross                                              565

```
 1            THE WITNESS:  Okay.
 2            THE COURT:  You can qualify your answer, but it's a
 3    straightforward question, and then you can qualify your
 4    answer if you feel you need to.
 5            THE WITNESS:  Okay.  Am I able to say what I'm
 6    confused at or no?
 7            THE COURT:  Yes.
 8            THE WITNESS:  What I'm confused at, sir, is whether
 9    you are referencing the activities of my mother as an
10    employee at Hampton University?  Is that what you're
11    referring to?
12    BY MR. McGAVIN:
13    Q.  Sure.
14    A.  Okay.  So, no, sir, with me not being at Hampton
15    University during that time period, I could not observe my
16    mother as an employee there.
17    Q.  Between May 23, 2018, and August 2019, when you left
18    Hampton University, isn't it true that you never observed
19    your mother interacting with employees in a professional
20    capacity?
21    A.  That's correct.
22    Q.  I understand you were recently married; is that right?
23    A.  That's correct.
24    Q.  When were you married?
25    A.  May 8th, 2021.
```

Haysbert, N. - Cross                                                      566

```
 1   Q.  And where do you and your husband reside?
 2   A.  Florida.
 3           MR. HAYSBERT:  Objection.  Compound question, but
 4   you can answer.  You can answer the question.
 5           THE WITNESS:  One question at a time, sir, so I
 6   won't miss anything.
 7           THE COURT:  I don't understand why it was a
 8   compound question.  Go ahead and ask the question.  You
 9   asked where they reside.
10           MR. McGAVIN:  Yes.
11           THE COURT:  I don't see anything compound about
12   that, but go ahead.
13           THE WITNESS:  Okay.  We are in Florida, and I'm
14   back and forth due to my assignment that I have here.
15   BY MR. McGAVIN:
16   Q.  When you say you're back and forth, how much time since
17   May of 2021 do you spend in Hampton?
18   A.  Well, as of last year, more.  So how many times are you
19   saying?  I would say at least half of the year.  Is that how
20   you would answer that?
21           THE COURT:  You answer it how you answer it.  Don't
22   ask how he would answer it.
23           THE WITNESS:  I guess can you rephrase the
24   question, sir?  Are you looking for a number?  That's kind
25   of -- do you want to know -- I guess I'm kind of confused.
```

1   Can you rephrase the question?

2   BY MR. McGAVIN:

3   Q.  When you come back to Hampton, where do you stay?

4   A.  I stay with my mother.

5   Q.  Does your husband?

6   A.  When he's visiting with me, yes.

7   Q.  Does he work here?

8   A.  No, he does not.

9   Q.  When you come back to Hampton from Florida, do you report

10  to an office or do you work at home?

11  A.  I report to an office.

12  Q.  In regard to the status of your residence, are you a

13  Florida resident or a Virginia resident?

14  A.  I guess -- I don't know how to answer that because I'm in

15  both places.

16  Q.  Do you have a Florida driver's license?

17  A.  No.  I have a Virginia's driver's license.

18  Q.  So where do you pay taxes?

19  A.  Well, with me being back here, I would have to pay

20  Virginia taxes.

21  Q.  I'm not asking you what you would have to do.  Which do

22  you pay, Virginia or Florida?

23  A.  It would be Virginia.

24  Q.  Now, directing your attention to May 23, 2018, when you

25  entered the Outback Steakhouse restaurant, you mentioned that

Haysbert, N. - Cross                                              568

1  you saw a mop and a bucket; is that right?

2  A.  Yes.

3  Q.  How far was the mop and bucket from your mother?

4  A.  When I came in, they were picking her up there

5  (indicating).  The mop and the bucket would have been on this

6  side (indicating) near the hostess stand.

7  Q.  Well, I'm asking you how far away it was?

8  A.  I can't measure the kilometers or whatever it is you

9  would use to measure.

10         THE COURT:  From where you are sitting, how far?

11  Use a measurement approximately in the courtroom, as far as

12  the counsel table, as far as the first row.  In other words,

13  you can use an approximation by relating it to something in

14  the courtroom.

15         THE WITNESS:  Okay.  Your Honor, I think that would

16  be kind of hard to do without me being there physically.

17         THE COURT:  Excuse me.  I think he said when you

18  got in there, and they were picking up your mother, and then

19  you said there was somebody mopping.

20         THE WITNESS:  Right.

21         THE COURT:  His question is the distance between

22  where they were picking up your mother and the person

23  mopping.  That was the question.

24         THE WITNESS:  Okay.  I hate to say with the bucket,

25  but, okay, but it was with the dry mop that was in the

```
 1   center.  Is that what we were to --

 2          THE COURT:  You indicated in your direct testimony

 3   that you went in, somebody came out from the restaurant and

 4   got you from the car, and you came in, and that when you

 5   entered, you observed people picking up your mother, and you

 6   observed someone, you've mentioned a bucket and you've

 7   mentioned a mop.

 8          THE WITNESS:  Right.

 9          THE COURT:  The question is the distance between

10   where they were picking up your mother and where you saw the

11   person with the mop.  That's the question.

12          THE WITNESS:  Okay.  Um, and where can I be

13   positioned, where I saw it?

14          THE COURT:  From where you are now.  Say you are

15   walking into the restaurant, and you are right there, and

16   you observed it.  That's the question.

17          THE WITNESS:  This is hard to do, but I can

18   estimate that it would probably be where --

19          MR. HAYSBERT:  If I may, Your Honor.

20          THE COURT:  No, you may not.  She's been asked a

21   proper question, and you're not going to coach her.

22          MR. HAYSBERT:  I'm not coaching her.  I'm just

23   saying if we could orient her to the restaurant, I think

24   further, it would be helpful.

25          THE COURT:  First let her answer the question
```

```
 1   that's been asked, and on redirect you can orient her to the
 2   restaurant if you want.
 3             MR. HAYSBERT:  Thank you, Your Honor.
 4             THE WITNESS:  So if we are talking about the mop in
 5   the area that they were pointing, they were pointing
 6   (indicating).  So this would be the area that they are
 7   pointing (indicating).  Me seeing my mother would be beyond
 8   that.
 9   BY MR. McGAVIN:
10   Q.  Did you look at the floor?
11   A.  Um, I believe -- well, I looked at what they were
12   pointing at, yes, absolutely.
13   Q.  What was the floor made of?
14   A.  It wasn't carpeted.  What it was actually made of, I
15   couldn't give that answer.
16   Q.  Was it marble?  Was it stone?  Was it tile?  Was it wood?
17   Do you know?
18             MR. HAYSBERT:  Objection, asked and answered.
19             THE COURT:  It has not been answered.  It has not
20   been asked.
21             THE WITNESS:  It was not carpeted, sir.
22   BY MR. McGAVIN:
23   Q.  Do you know anything else?
24   A.  I would just say it wasn't carpeted.  I don't want to say
25   whether it's wood or not, and I didn't test it to determine
```

Haysbert, N. - Cross                                              571

1    whether it was wood or not, but it was not carpeted.

2    Q.  Thank you.  Was the floor wet?

3    A.  They -- um, can you rephrase the question?

4    Q.  No.

5    A.  Okay.  I can't determine whether it was wet.

6    Q.  You don't know?

7    A.  Okay.  I don't know.

8          MR. HAYSBERT:  Objection, Your Honor.  He's

9    testifying.

10         THE COURT:  Overruled.  He asked her a question,

11   and she said she didn't know.

12   BY MR. McGAVIN:

13   Q.  What was the lighting like in the restaurant?

14   A.  I mean, to me it was fine.

15   Q.  When you entered the restaurant, did you have any

16   difficulty walking on the area that was not carpeted?

17   A.  No.

18   Q.  Was it slippery?

19   A.  No.

20   Q.  When you went to your mother, did you notice whether or

21   not she had any foreign substance on her clothing that day?

22   A.  I don't recall seeing any foreign substances.

23   Q.  Like, were her clothes wet?

24   A.  I don't recall and wouldn't know that, I don't think,

25   sir.

Haysbert, N. - Cross                                                    572

Q.  Weren't you --

A.  I wasn't focused on her clothing items at that moment.

Q.  Well, weren't you checking her to see if she had any visible sign of injury?

A.  What I was doing at that time was responding to what was being shared with me and the people talking to me.

Q.  What I mean is you did speak to your mother at the scene, didn't you?

A.  Majority of my conversation was with the people that were talking to me.

Q.  I'm not asking you the majority.  I'm asking you did you speak to your mother and take a look at her and see --

A.  I did --

Q.  Excuse me a second.  And did you look and say, "Are your clothes wet?"

A.  No, I didn't ask her any questions about whether her clothes were wet or any of that.

Q.  I'm not asking you about questions.  Did you observe, when you looked at her, to see if she was injured or had a visible sign of injury because you are a concerned daughter --

A.  Yes.

Q.  -- did you happen to notice whether her clothes were wet?  Were they soiled?  Was there something on them such as a Bloomin' onion?  Did you see anything about her clothing that

1  was different than when she entered?

2          MR. HAYSBERT:  Your Honor, this is harassing, and

3  also she's been asked this question three times at least and

4  she's answered.

5          THE COURT:  It's not harassing.  It's a key point.

6          MR. HAYSBERT:  A Bloomin' onion?

7          THE COURT:  It's not harassing.  You said the whole

8  question was harassing.  There is nothing harassing about

9  that question.  Go ahead and answer it.

10         THE WITNESS:  Sir, I was not focused on her

11  clothing, so I can't say what was on her clothing or whether

12  it was -- whatever the words you mentioned, Bloomin' onion

13  or whether it had any things on it.  I was focused on what

14  the individual sharing with me and how my mother was

15  feeling.  So that's what my questions were in regards to

16  her.

17  BY MR. McGAVIN:

18  Q.  Okay.  I would like to display to the witness an exhibit,

19  and I don't have my exhibit book up there, but I'm going to

20  do this from the document camera, if I may?

21         THE COURT:  Do you have the exhibit number?

22         MR. McGAVIN:  Yes, I do, Your Honor.  It's

23  Defendant's Exhibit 1, and it is premarked.

24         THE COURT:  Okay.

25         MR. McGAVIN:  Thank you.  It's on our list.  May I

Haysbert, N. - Cross                                                    574

```
 1   display this to the witness?
 2           THE COURT:  Yes.
 3           MR. McGAVIN:  Thank you, Your Honor.
 4   BY MR. McGAVIN:
 5   Q.  I'm showing you what's been marked as Defendant's Exhibit
 6   Number 1.  Do you recognize what's shown in Defendant's
 7   Exhibit Number 1?
 8   A.  Do I recognize what's shown in Exhibit Number 1, is that
 9   what you said, sir?
10           THE COURT:  Is it being displayed to the jury?
11           MR. McGAVIN:  Not yet, Your Honor.
12           THE CLERK:  No, Your Honor.
13           THE WITNESS:  I do see a picture here, sir, yes.
14   BY MR. McGAVIN:
15   Q.  Do you recognize what it is?
16   A.  It looks like a floor, sir.
17   Q.  I'm sorry.  I didn't hear you.
18   A.  It looks like a floor, sir.
19   Q.  Do you recognize this as the floor at the Outback
20   restaurant?
21   A.  I can't verify whether this is the floor of the
22   restaurant, but I can see that it is a floor.
23   Q.  I understand that, but is it fair to say, then, that you
24   cannot identify this as the conditions and appearance of the
25   floor at the Outback Steakhouse in Chesapeake, Virginia, as
```

1  it appeared on May 23, 2018?

2  A.  What I can say is, sir, that I see this as a floor, and I

3  can't verify whether this is the floor at Outback.

4         MR. McGAVIN:  Thank you.  I would like to display

5  to the witness Defendant's Exhibit Number 2 for

6  identification.

7         THE COURT:  All right.

8  BY MR. McGAVIN:

9  Q.  Do you have in front of you on your screen Defendant's

10 Exhibit 2?

11 A.  Uh-huh.

12 Q.  Pardon me?

13 A.  I said, yes, sir.

14 Q.  Thank you.  Do you recognize what's shown in Defendant's

15 Exhibit Number 2?

16 A.  Yes, sir.

17 Q.  Have you seen this before?

18 A.  Yes.  I've seen -- it looks like my mother's shoes.

19 Q.  Well, I mean, have you seen the photograph before?

20 A.  No, I have not seen the photograph before.

21 Q.  All right.  Is Exhibit 2 a fair and accurate depiction of

22 what your mother was wearing on the day in question?

23 A.  Yes.  Those are her shoes, and it looks like her skirt,

24 yes.

25 Q.  All right.  Thank you.  Now, in regards to your mother's

1    health, you've talked about it.  Did she ever have a problem

2    with dizziness or vertigo prior to May 23, 2018?

3    A.  She had vertigo one instance.

4    Q.  Just one?

5    A.  Yes.

6    Q.  And when was that?

7    A.  The exact date, I can't recall at the moment, but she had

8    it once where my mother basically --

9    Q.  I'm just asking you when.  Just the once?

10   A.  Just the once.

11   Q.  Not what happened but timeline, just what year?

12   A.  I believe it was the same year.

13   Q.  Same year as what?

14   A.  2018.

15   Q.  All right.  And do you know whether or not she sought any

16   medical treatment?  In other words, did you ever attend with

17   her any of her medical visits?

18   A.  Are you talking about during the duration of 2018, sir,

19   or are you just talking about -- can you rephrase the

20   question?

21   Q.  Have you ever been to a doctor with your mother?

22   A.  I have attended some of her doctors' appointments.

23   Q.  Did you ever go to a doctor with her prior to May 23,

24   2018?

25   A.  I believe I have at least once or so.

Haysbert, N. - Cross                                                        577

1    Q.  And were you in the examining room when the doctor was

2    there?

3    A.  I think that would just depend.  It depends on the doctor

4    that you're referring to.

5    Q.  All right.  When you traveled to South Carolina a couple

6    of days after the incident, did you take your mother to the

7    urgent care?

8    A.  Yes.  It was like an urgent care, CarePlex, yeah.

9    Q.  And did you go in with the doctor?

10   A.  No, not in with the doctor.

11   Q.  All right.  Do you know -- so you weren't in the

12   conversation between Dr. Haysbert and whoever the care

13   provider was?

14   A.  No.

15   Q.  In regards to medication, do you have any information

16   about what medication your mother regularly took?

17   A.  I don't have the information on what it was, but I know

18   she was prescribed medication.

19   Q.  For what?

20   A.  She was --

21        MR. HAYSBERT:  Objection, asked and answered.

22        THE COURT:  Do you know for what?  She was in South

23   Carolina, and I know she was prescribed medication, and he's

24   asking her does she know for what.  There is nothing wrong

25   with that.  It hasn't been asked and answered.

1          MR. HAYSBERT:  There is nothing wrong with it

2    except that she told him already that she didn't know what

3    her medication was.

4          THE COURT:  He's asking her about the trip in South

5    Carolina.  Do we have to belabor everything here?  Just do

6    you know or you don't know?  You said she was prescribed

7    something.  Did you fill the prescription?

8          THE WITNESS:  I did not fill the prescription.

9          THE COURT:  Well, then who did if you didn't?

10          THE WITNESS:  What I'm saying is -- when you asked

11    who filled the prescription, what I am saying with that

12    question is a prescription was given to her.  We went to the

13    CarePlex together, as I shared with the attorney.  When she

14    went in to be examined by the doctor, I did not go in.  He

15    did ask what was she -- was she prescribed medications.  I

16    said yes.  What the name of the prescription is, I don't

17    recall what the name of the prescription is.

18    BY MR. McGAVIN:

19    Q.  How much time elapsed from the time Dr. Haysbert left the

20    car to go into the Outback restaurant until the incident

21    occurred?

22    A.  Repeat that question again.  Can you do one at a time,

23    please.  One question at a time.

24          THE COURT:  It was only one question.  How much

25    time elapsed between when she was in the Outback restaurant

```
 1    and you took her to the car?  That was the question.  It's

 2    one question.

 3              THE WITNESS:  Okay.  I'm not sure how much time

 4    that was.  I know it was a while.  For me to -- when I was

 5    called to go in, went in, and everything that took place,

 6    Lisa saying what she saying, then us walking back, I knew

 7    there was -- it was more than like five or ten minutes.  It

 8    was some time there, but I just don't recall the exact

 9    amount of time.

10    BY MR. McGAVIN:

11    Q.  In regard to preparing for today's meeting, did you ever

12    speak to Dr. Filler?

13    A.  Oh, no.

14    Q.  And do you know what Dr. Filler said in court yesterday?

15    A.  No.

16    Q.  And has anyone relayed to you any of the information of

17    the proceedings inside the courtroom?

18    A.  No.

19    Q.  In regard to this issue of light sensitivity, tell me

20    what lights you say cause sensitivity, that you've observed

21    causing sensitivity to Dr. Haysbert.

22    A.  Just, I guess, a regular light bulb.

23    Q.  You mean like in this courtroom?

24    A.  Me referencing it -- well, it could be any lights, but

25    what I was speaking of is my observation in our home.
```

1    Q.  You are saying any lights she experiences cause her

2    discomfort, in your observation?

3    A.  In my observation, lighting or too much light can cause

4    her that, yes.

5    Q.  You said lighting and too much light.  So lighting

6    meaning any lighting?

7    A.  I would say that any lighting that is too much lighting

8    would be that.

9    Q.  And how much is too much?

10   A.  Based on whatever she would exclaim that was too much.

11   Q.  All right.

12   A.  Or if you --

13   Q.  Now, you mentioned bruises, and you said you saw some

14   bruises on Dr. Haysbert's left arm; is that right?

15   A.  Yes.  And that side, yes.

16   Q.  Pardon me?

17   A.  I said yes.

18   Q.  And you're indicating on the left arm and left elbow; is

19   that correct?

20   A.  I'm indicating this whole from this side all the way down

21   (indicating).

22   Q.  I'm trying to get into the record.  You're starting at

23   the top of your left shoulder and going down the side.  Did

24   she also have bruises on her hip?

25   A.  No.  It was more on the leg, I thought, and the arms here

1  (indicating).

2  Q.  When you say "here," you mean the left side?

3  A.  Yes.

4  Q.  Anywhere else?

5  A.  No, not that I can recall.  That's where I focused or

6  concentrated with the ice packs and things like that.

7  Q.  Does she have any scarring from this incident?

8  A.  There was a scar initially here that was on her forehead.

9  Q.  On the right side?

10  A.  I believe it was on the right side or the left side --

11  no, it was on the left side.

12  Q.  Is the scar still there?

13  A.  I think it is.  I know it was on the side here

14  (indicating).  I think it is, and it's probably further, you

15  know, going into her hairline because it was from there and

16  to here (indicating).

17  Q.  Did she have any cuts?

18  A.  I don't recall her having any cuts.  It was more like a

19  bruising.

20        MR. McGAVIN:  I don't have any other questions for

21  you.  Thank you.

22        THE COURT:  Are you going to be long?

23        MR. HAYSBERT:  No, I'm not going to be long at all.

24        THE COURT:  Then go ahead.

25        MR. HAYSBERT:  I promise everyone.

<pre>
  1                    REDIRECT EXAMINATION

  2   BY MR. HAYSBERT:

  3   Q.  She can come off the witness stand?

  4           THE COURT:  You don't have any redirect?

  5           MR. HAYSBERT:  I just have a few questions.

  6   BY MR. HAYSBERT:

  7   Q.  When you went into the restaurant once you were told that

  8   something had happened to your mother, did you see any "wet

  9   floor" signs?

 10   A.  No.

 11   Q.  Did you see any signs up for any -- did you see any signs

 12   that said, "Be careful.  Watch your step"?

 13   A.  No.

 14   Q.  You said that you saw Outback employees pointing to the

 15   area where your mother fell?

 16   A.  Yes, and patrons.

 17   Q.  And you saw employees inspect the area where your mother

 18   fell?

 19   A.  Yes.  With the -- can I continue?

 20   Q.  Sure.

 21   A.  With the mop.

 22   Q.  And you say you saw them dry mop that area?

 23   A.  Yeah.

 24   Q.  Okay.  You said that Christopher Robinson gave you his

 25   number, correct?
</pre>

Haysbert, N. - Redirect                                          583

1    A.  Yes.
2           MR. McGAVIN:  This is just repeating previous
3    testimony.
4           THE COURT:  The previous questions were fine.  This
5    one is just a repeat.  I don't think that's at issue.
6           MR. HAYSBERT:  I'll withdraw it, Your Honor.  Then
7    I have a question about the defense exhibit.  Could you
8    bring that up?
9           THE COURT:  Which exhibit?
10          MR. HAYSBERT:  I'm going to start with Exhibit
11   Number 1, Your Honor.
12          THE COURT:  Okay.  It's not being shown to the
13   jury.
14   BY MR. HAYSBERT:
15   Q.  How do I publish this one here?  Okay.  Can you reduce it
16   a little bit.  Do you see that picture?
17   A.  Uh-huh.
18   Q.  Do you know when this picture was taken?
19   A.  No.
20   Q.  Do you have any metadata for this picture?
21   A.  Do I have any what?
22   Q.  Do you have any meta data?
23          MR. McGAVIN:  Objection, Your Honor.
24          THE COURT:  What do you mean meta?
25          MR. HAYSBERT:  Metadata.  Pictures have metadata.

Haysbert, N. - Redirect                                              584

```
 1              THE COURT:  She said she hasn't seen it, and she

 2    doesn't recognize it, so how would she have metadata for it?

 3              MR. HAYSBERT:  I only asked the question when was

 4    the picture taken.  She said she doesn't know.

 5              THE COURT:  On direct testimony she said she

 6    didn't -- it could be she didn't recognize it.  I don't

 7    understand.

 8    BY MR. HAYSBERT:

 9    Q.  Do you have any information at all on this picture

10    whatsoever?

11    A.  No.

12    Q.  Thank you.  I'm going to go to Defense Exhibit Number 2.

13    Do you see the picture on the screen?

14    A.  Yes.

15    Q.  Do you know when this picture was taken?

16    A.  No.

17    Q.  Do you know who took this picture?

18    A.  No.

19    Q.  Is there a time stamp on the picture?

20    A.  No.

21    Q.  Any metadata from this picture that you have?

22              MR. McGAVIN:  Objection, Your Honor.

23    BY MR. McGAVIN:

24    Q.  Do you have any information --

25              MR. McGAVIN:  Excuse me, sir.  I'm objecting.  I
```

1    object to the form of the question.  I object that we are

2    inquiring of a witness regarding the background, and the

3    sole issue is whether or not it fairly and accurately

4    depicts what it shows, and she's identified it.

5             THE COURT:  She's identified the picture.  She

6    didn't take the picture.  You didn't take the picture, did

7    you?

8             THE WITNESS:  No, ma'am.

9             THE COURT:  You don't have any information about

10   the picture being taken?

11            THE WITNESS:  No, ma'am.

12            THE COURT:  You've identified those as your

13   mother's shoes?

14            THE WITNESS:  Yes, ma'am.

15            THE COURT:  You've identified the bottom part, the

16   skirt as what she was wearing that day?

17            THE WITNESS:  Yes, ma'am.

18            THE COURT:  That's the testimony.  Now, she doesn't

19   have any, quote, metadata on the picture.

20            MR. HAYSBERT:  Understand, Your Honor.  I just

21   don't understand why defense counsel has such a problem.  It

22   was his exhibit.  He showed it to her first.  I'm simply

23   raising questions about it.

24            THE COURT:  He is entitled to show it.  It was not

25   admitted to the jury.  He is going to admit it through

1    another witness or the jury won't be able to see these.

2              MR. HAYSBERT:  Sure.

3              THE COURT:  Okay.  The jury won't see these

4    pictures if they're not admitted.  He can ask questions

5    about them.  He did not move to admit them yet.  There is

6    nothing improper about the question.  It was a listed

7    exhibit.  It's been available to everybody, and he can ask

8    questions.  He can establish foundation.  It's not admitted

9    yet.

10             MR. HAYSBERT:  I understand, Your Honor.  Thank

11   you.  I was just asking questions about it, but I will only

12   have one more.

13             THE COURT:  You can ask any questions you want

14   about it that are appropriate questions.  But she's saying

15   what she said in direct, and I'm not going to repeat that

16   again, and that she didn't take the picture, and she doesn't

17   have any information on the picture being taken.

18             MR. HAYSBERT:  She said she doesn't know who took

19   the picture.

20             THE COURT:  Exactly.

21             MR. HAYSBERT:  That was all my questions then.

22             Thank you, Ms. Haysbert.

23             THE COURT:  Then, Ms. Haysbert, you are excused for

24   now.  You may not discuss your testimony with anyone.

25             THE WITNESS:  Okay.

1          THE COURT:  You may not be in the courtroom because

2     in case you're needed further.  Again, thank you for coming

3     to testify and for being here for a couple of days.  The

4     Court wishes you well, and we will call you if you're needed

5     further.

6          THE WITNESS:  Okay.  Is this my water to take?

7          THE COURT:  You can take the water.

8          THE WITNESS:  Okay.  Thank you.

9          (Witness excused.)

10          THE COURT:  Ladies and gentlemen of the jury, this

11     will be a good time, and counsel, for all of us to take a

12     15-minute recess, and then we will resume and move forward

13     with the case.  The Court stands in recess for 15 minutes.

14          (Recess from 11:57 a.m. to 12:22 p.m.)

15          THE COURT:  Are you going to examine the next

16     witness?

17          MR. McKELVEY:  No, Your Honor.  We are moving in a

18     piece of evidence that the defense has reserved an objection

19     on.  So I wanted to get up here before we call the jury in,

20     because you may just be sending them back out.  I wanted to

21     try to save the Court some time by doing it this way, if

22     possible.

23          THE COURT:  What piece of evidence?

24          MR. McKELVEY:  Your Honor, the plaintiff moves the

25     admission of P14, which is in the last pretrial order.  I've

1    got it on the projector here for the Court to look at.  It
2    was agreed to by the defense, that it's a business record.
3    So it's not a hearsay issue.  I think the objection, and I
4    don't want to speak for counsel, but I think it's an issue
5    of relevancy.  I can either argue that point now and let you
6    hear the objection, however the Court wants to proceed.
7                THE COURT:  Who's your next witness?
8                MR. McKELVEY:  Our next witness is going to be
9    Deajah Clark, Your Honor, but we are moving this in based on
10   the testimony that's previously been received by the Court.
11               THE COURT:  No, I'm not getting it in on the
12   testimony previously received by the Court.  I'm not saying
13   I'm not going to let it in, but you've got to lay a
14   foundation for this by somebody who knows about this work
15   order request.  Who is Deajah Clark on your list?
16               MR. McKELVEY:  She is not a --
17               THE COURT:  Deajah Clark?
18               MR. McKELVEY:  Deajah Clark, yeah, Your Honor.
19   That would not be the person we would do that with.
20               THE COURT:  No.  We are going to go to Deajah
21   Clark, then, because I've got the jury.  Lunch has been
22   ordered, and if you're not moving this in through Deajah
23   Clark, we are not taking the time now to talk about it.
24               MR. McKELVEY:  Understood.
25               MR. HAYSBERT:  Moving it in with Deajah Clark.

1          MR. McKELVEY:  We will wait.

2          THE COURT:  We will take some of the lunchtime to

3     do this, if we need to.  But if it's not coming in through

4     this witness, we've got to keep it moving.

5          MR. McKELVEY:  Understood.

6          THE COURT:  This trial is moving more slowly than

7     any I can remember in a long time.

8          All right.  Let's bring the jury in.

9          You can go ahead and get the witness.  Thank you.

10         (Jury in at 12:24 p.m.)

11         THE COURT:  All the jurors are back from break.  I

12    hope you had a nice break, and we are ready for our next

13    witness.  I believe it is going to be Deajah Clark.

14         MR. HAYSBERT:  Thank you, Your Honor.

15         THE COURT:  Ms. Clark, if you would please come

16    forward and be sworn.

17         (Witness was sworn.)

18         DEAJAH CLARK, called by the Plaintiff, having been

19    first duly sworn, was examined and testified as follows:

20                        DIRECT EXAMINATION

21    BY MR. HAYSBERT:

22    Q.  Good morning, Ms. Clark.

23    A.  Good morning.

24    Q.  We are definitely going to get you out of here as quickly

25    as possible.  Thank you so much for being here today with us.

Clark, D. - Direct                                                        590

```
 1   A.  You're welcome.
 2   Q.  When did you start working for Chesapeake Outback?
 3   A.  January 18, 2020 -- 2017.
 4           THE COURT:  I'm sorry, when?
 5           THE WITNESS:  January 18, 2017.
 6           MR. HAYSBERT:  If I may, Your Honor, may I use the
 7   easel?
 8           THE COURT:  What do you want to do with the easel?
 9           MR. HAYSBERT:  I want to put the date and the
10   timeline.
11           THE COURT:  All right.  Go ahead.
12           MR. HAYSBERT:  Thank you, Your Honor.
13           THE COURT:  So the question is, you are no longer
14   with them, is that what you said?
15           THE WITNESS:  (Nods head.)
16           THE COURT:  When did you leave?
17           THE WITNESS:  In August of 2022.
18           THE COURT:  What was the January date?
19           THE WITNESS:  The 18th.
20           THE COURT:  January 18th, 2017, is when you
21   started?
22           THE WITNESS:  Yes.
23           THE COURT:  I think this is just going to take
24   time.  The jury has a notepad.  They can write these dates
25   down.
```

Clark, D. - Direct                                                    591

```
 1              MR. HAYSBERT:  Okay.

 2              THE COURT:  I don't understand why we are going

 3     over and writing on the notepad when the jury has the

 4     notepads, and all you are doing is putting dates.

 5              MR. HAYSBERT:  Your Honor, I'm not just putting

 6     dates, but I think if we go into the direct testimony, it

 7     will make more sense.

 8              THE COURT:  Okay.

 9              MR. HAYSBERT:  Thank you.

10     BY MR. HAYSBERT:

11     Q.  So you stopped working for Outback Steakhouse in August

12     of 2022, correct?

13     A.  Yes.

14     Q.  Okay.  During your time at Outback Steakhouse, did your

15     job require you to interact with customers?

16     A.  Yes.

17     Q.  How about managers?

18     A.  Yes.

19     Q.  How about other servers?

20     A.  Yes.

21     Q.  Were you working on the day of Dr. Haysbert's fall, May

22     23rd, 2018?

23     A.  Yes.

24     Q.  This is many years ago.  Is there reason that fall stands

25     out to you?
```

Clark, D. - Direct                                                      592

1   A.  Yes.

2   Q.  Can you tell us why?

3   A.  Because back then the floors were slippery right there,

4   were different.

5   Q.  How would you describe the flooring?  Is that how you

6   described it, slippery?

7   A.  Yes, there.

8   Q.  How many slips and falls on that floor did you personally

9   witness?

10  A.  About one slip -- no, one fall and like three slips.

11  Q.  One fall and three slips?

12  A.  Uh-huh.

13  Q.  Okay.  And were these women or men?

14  A.  Women.

15  Q.  And of the women that slipped, how many were wearing

16  heels?

17  A.  Three out of the five.

18  Q.  So you said five falls -- sorry, five slip and falls or

19  four slip and falls?

20  A.  Five.

21  Q.  Okay.  And of the slip and falls that happened, how many

22  were just slips and how many were falls?

23  A.  Three slips, one fall.

24  Q.  Three slips and two falls?

25  A.  Yes, I'm sorry.

1   Q.  No problem.

2           THE COURT:  You said five, and you've got three

3   slips.  Then you said one fall.  That would be four?

4           THE WITNESS:  Yes.

5   BY MR. HAYSBERT:

6   Q.  So you're saying five slips and falls or four slips and

7   falls?

8   A.  Four, I'm sorry.

9   Q.  So four slip and falls?

10          MR. McGAVIN:  Object.  I think she said two slip

11  and falls and three slips.  It's different.

12          MR. HAYSBERT:  No, that's not what she said.

13          We will start over.

14          THE COURT:  No, we are not going to start over.

15  This is what the Court heard, and if it's incorrect, please

16  speak into the microphone and tell us.  I heard you say that

17  there were four, what he called slips and falls, and you

18  said three slips, one fall?

19          THE WITNESS:  Yes, just four.

20          THE COURT:  Is that correct, three slips and one

21  fall?

22          THE WITNESS:  Yes.

23          THE COURT:  All right.

24  BY MR. HAYSBERT:

25  Q.  And just to clarify, all the people that either slipped

Clark, D. - Direct                                                          594

1    or fell were women, correct?

2    A.  Yes.

3    Q.  Other people that slipped and did not fall, how many were

4    wearing heels?

5    A.  All of them wearing heels.

6    Q.  And other people that fell, the person that fell, was

7    that person wearing heels?

8    A.  No, she wasn't wearing heels.

9           THE COURT:  So all of the slips had heels?

10          THE WITNESS:  Uh-huh.

11          THE COURT:  The fall was no heels?

12          THE WITNESS:  Right.

13   BY MR. HAYSBERT:

14   Q.  Do you know who Lisa Crosby is?

15   A.  Yes.

16   Q.  Who was she at the time?

17   A.  She was my manager.

18   Q.  Did you ever see --

19   A.  One of the managers.

20   Q.  Did you ever see Lisa Crosby fall?

21   A.  Yes.

22   Q.  How many times?

23   A.  Just once.

24          THE COURT:  Was she the one fall you witnessed,

25   then?

```
 1              THE WITNESS:  Yes.
 2   BY MR. HAYSBERT:
 3   Q.  How many of these slip and falls occurred just past the
 4   hostess stand?
 5              MR. McGAVIN:  Objection, Your Honor.  There is only
 6   one slip and fall, three slips.
 7              THE COURT:  Rephrase your question to comport with
 8   her testimony.
 9              MR. HAYSBERT:  Sure.
10   BY MR. HAYSBERT:
11   Q.  How many slips occurred past the hostess stand, just past
12   the hostess stand?
13   A.  All of them that I mentioned.
14   Q.  One more question, Deajah, Ms. Clark.  Did you see
15   Dr. Haysbert slip and fall?
16   A.  No, I didn't see that.
17   Q.  When Lisa Crosby, in your testimony, fell, she had no
18   heels on.  Do you know what shoes she was wearing?
19   A.  Yes.  She was wearing -- probably that non-slip that she
20   wears to work every day.
21   Q.  You said those are non-slip shoes?
22   A.  Yes.
23   Q.  Are you required to wear non-slip shoes at work?
24   A.  Yes.
25   Q.  Non-slip shoes are designed to keep you from falling,
```

Clark, D. - Direct                                                    596

1    correct?

2    A.  Yes.

3    Q.  But despite this Lisa Crosby fell, correct?

4    A.  Yes.

5    Q.  And Lisa Crosby fell past the hostess stand, correct?

6    A.  Yes.

7    Q.  Did you ever see, during the time you were working for

8    Outback Steakhouse at the Chesapeake Outback, any signs

9    asking customers in heels to walk carefully?

10   A.  No.

11   Q.  Did any manager ever tell you to verbally inform

12   customers that the floors were, in your words, slippery?

13           MR. McGAVIN:  Objection, Your Honor, form.  Any

14   manager identified at any time.

15           THE COURT:  Sustained.

16   BY MR. HAYSBERT:

17   Q.  How many managers did you have that you worked for,

18   Ms. Clark, during the time at Chesapeake Outback?

19   A.  About -- it was about four or five of them.

20   Q.  Four of five of them.  Did any of the four or five

21   managers that you work for ever inform customers --

22           THE COURT:  Ask her who the four or five were,

23   first.  Establish who they are, and then you can ask,

24   because nobody knows what people you are talking about, at

25   least I don't, and the jury doesn't at this juncture.

```
 1              MR. HAYSBERT:  Sure.

 2      BY MR. HAYSBERT:

 3      Q.  Ms. Clark, was Lisa Crosby one of your managers?

 4      A.  Yes.

 5      Q.  Was Chip Chase one of your managers?

 6      A.  Yes.

 7      Q.  Was Alicia Eleftherion one of your managers?

 8      A.  Yes.

 9      Q.  Was Marcus Wilson one of your managers?

10      A.  Yes.

11      Q.  Are there any other managers I'm missing?

12      A.  No.

13      Q.  Okay.  So there were four managers, and you've named

14      them?

15      A.  (Witness nods head.)

16      Q.  Other than the managers I've named, did any of them warn

17      you to verbally inform customers that the floors were

18      slippery?

19      A.  No.

20      Q.  Did any managers that you've named do anything to warn

21      customers about the slipperiness of the floor?

22      A.  I don't remember, no.

23      Q.  Was the floor at the restaurant redone at some point

24      before you stopped working there?

25      A.  Yes.
```

1          MR. McGAVIN:  Objection, Your Honor, relevance.

2          MR. HAYSBERT:  Your Honor, it doesn't go to --

3          THE COURT:  I'll overrule the objection.  It can be

4   established time periods.

5          MR. HAYSBERT:  Thank you, Your Honor.

6          THE COURT:  At the appropriate time.

7          MR. HAYSBERT:  Yes, Your Honor.  Thank you.

8   BY MR. HAYSBERT:

9   Q.  Just to clarify your testimony, Ms. Clark, if you could

10  take your attention to the easel.  You left Chesapeake

11  Outback in August of 2022?

12  A.  Yes.

13  Q.  The floors were redone sometime before that?

14  A.  Yes.

15  Q.  Okay.  Do you recall the month and year?

16  A.  Not a month.  I don't remember the month, but the year

17  was in 2018.

18  Q.  Do you know if it was later in 2018?

19  A.  It was like middle/beginning.

20         THE COURT:  What?  I can't hear you.

21         THE WITNESS:  Middle/beginning.

22         THE COURT:  Middle or beginning of 2018?

23         THE WITNESS:  The middle.

24  BY MR. HAYSBERT:

25  Q.  So what you're saying is July --

Clark, D. - Direct                                                    599

```
 1              THE COURT:  Now, wait just a minute.  You're
 2   testifying for her now.
 3              MR. HAYSBERT:  Sure.
 4              THE COURT:  You cannot lead her that way.
 5              MR. HAYSBERT:  I apologize.
 6              THE COURT:  You can ask her if she knows when.
 7   BY MR. HAYSBERT:
 8   Q.  Do you know when the floors were changed exactly?
 9   A.  No.
10   Q.  But you just know that after the floors were changed, you
11   didn't see anyone slip and fall, correct?
12   A.  Correct.
13              THE COURT:  But you didn't see Dr. Haysbert fall,
14   did you?
15              MR. HAYSBERT:  She did not see Dr. Haysbert fall.
16              THE WITNESS:  No.
17              THE COURT:  I want to ask you one question, though.
18   You said three slips and one fall, and you were there from
19   2017 to 2022.  When did these occur?  Do you know when they
20   occurred over this time period?
21              THE WITNESS:  It was in my beginnings.
22              THE COURT:  What?
23              THE WITNESS:  It was in the beginning years of me
24   working there.
25   BY MR. HAYSBERT:
```

Clark, D. - Direct                                                          600

1    Q.  So you would say 2017?

2    A.  Yeah, 2017.

3            THE COURT:  Please don't put answers to the

4    witness.  Ask her the follow-up question, please.

5            MR. HAYSBERT:  My apologies, Your Honor.  I will do

6    so.

7            THE COURT:  Because you should say, when in the

8    beginning years, not you would say.

9            MR. HAYSBERT:  Understood.

10           THE COURT:  It's improper.

11   BY MR. HAYSBERT:

12   Q.  Ms. Clark, if you could turn your attention to the easel.

13   When in the beginning of the year of your work at Outback

14   Steakhouse in Chesapeake did these falls happen, did these

15   slip and falls happen?

16           MR. McGAVIN:  Objection, Your Honor.  There is

17   only one slip and fall.  There is three slips.

18           THE COURT:  Ms. Crosby can testify.  Do you know

19   when Ms. Crosby slipped and fell?  You said that was the

20   only one.

21           THE WITNESS:  No, I don't know the date and time of

22   when she fell, but I did remember her fall.

23           THE COURT:  Well, Ms. Crosby is going to be here to

24   testify.

25   BY MR. HAYSBERT:

Clark, D. - Direct                                                    601

1    Q.  You said it was during the beginning of your time at work

2    at Chesapeake Outback.  Could you clarify whether that time

3    period was the year 2017?

4           MR. McGAVIN:  Objection, Your Honor, asked and

5    answered.  She said it was 2017.

6           THE COURT:  Sustained.

7    BY MR. HAYSBERT:

8    Q.  So just to clarify, you saw three slips and one fall

9    happened in the year 2017, correct?

10   A.  2017.

11   Q.  Thank you.  I will apologize for my marker, but I'm just

12   trying to be careful here to mark this as 2018.  So the three

13   slips that you saw occurred between January 18 of 2017 and

14   January 1st of 2018, correct?

15   A.  Yes.

16   Q.  Did at any point in the year 2017, was the floor changed?

17   A.  In 2017, no.

18   Q.  Okay.  Do you know the exact date when the floor was

19   changed?

20   A.  No.

21   Q.  You remember the floor being changed how?  How do you

22   remember that?

23   A.  Because I came in one day and new floors, I seen the new

24   floors.

25   Q.  You saw that there were new floors?

Clark, D. - Direct                                                    602

1    A.  Uh-huh.

2    Q.  Did you see anyone slip or fall after the new floors were

3    installed?

4    A.  No.

5    Q.  I want to go back one more question regarding before the

6    floor changed.  Did any customers complain about the floor --

7               MR. McGAVIN:  Objection.

8               MR. HAYSBERT:  -- from the time it happened?  I'm

9    not done with my question.

10              THE COURT:  Sustained.  You'd have to lay a

11   foundation.

12              MR. HAYSBERT:  Sure.

13              THE COURT:  Again, it would be hearsay.

14              MR. HAYSBERT:  Understood.  I'm not asking her to

15   tell me what the customer said, I'm just asking you from

16   your own experience any customers complained to you about

17   the condition of the floor before the floor was changed?

18              THE COURT:  Complained to her?

19              MR. HAYSBERT:  Correct.  Complained to you

20   specifically, Deajah Clark, about the floors being slippery?

21              THE COURT:  So, again, when you say any customers,

22   we've got to narrow that down.

23              MR. HAYSBERT:  Understood.

24              THE WITNESS:  I can't remember.

25   BY MR. HAYSBERT:

1    Q.  You can't remember.  Okay.  Do you remember any managers

2    complaining about the floor before the floor was changed?

3            THE COURT:  To you?

4    BY MR. HAYSBERT:

5    Q.  To you?

6    A.  No.

7    Q.  Did you hear any employees complain to you about the

8    slipperiness of the floors before the floor was changed?

9            MR. McGAVIN:  Objection, Your Honor, hearsay,

10   foundation.

11           MR. HAYSBERT:  Your ruling on it?

12           THE COURT:  Why is it not hearsay?

13           MR. HAYSBERT:  I'm not asking for her to tell me

14   what they said.

15           THE COURT:  Well, you are asking for the truth of

16   it.  Did anybody complain about the floors, and you're

17   talking about employees, and depending upon who the employee

18   is, they're not in a position to bind the company.

19           MR. HAYSBERT:  Understood.

20           THE COURT:  So it would be hearsay.

21           MR. HAYSBERT:  Understood.  Thank you very much.

22   BY MR. HAYSBERT:

23   Q.  Ms. Clark, did you wear slip resistant shoes when you

24   were working at the Chesapeake Outback?

25   A.  Yes.

Clark, D. - Direct                                                        604

1    Q.  Did you wear the slippery shoes the entire time you were

2    working there?

3    A.  Yes.

4    Q.  Why were you wearing them?

5    A.  So that I wouldn't fall or slip.

6            THE COURT:  Were they required of all employees?

7            THE WITNESS:  Yes.

8    BY MR. HAYSBERT:

9    Q.  Why were they required?

10           THE COURT:  Unless she knows, and remember the

11   rulings that have been made on certain matters.

12           MR. HAYSBERT:  Understood, Your Honor.

13   BY MR. HAYSBERT:

14   Q.  I just want to know what you know, okay.  In your

15   personal experience, do you know why you were required to

16   wear slip resistant shoes?

17   A.  So that I wouldn't fall and slip.

18   Q.  One more question for you, Ms. Clark, and thank you very

19   much for your time.  Before the floors were changed, did you

20   personally consider, in your own mind, the floors to be slick

21   or slippery?

22   A.  Yes.

23           MR. HAYSBERT:  Thank you.  No further questions.

24           THE COURT:  Could you clarify that answer.  You say

25   yes, in general, in a specific location, when?

```
 1              THE WITNESS:  When I first started working there, I
 2     noticed and I felt that the floor was real slippery.
 3              THE COURT:  So that would have been in 2017?
 4              THE WITNESS:  Yes.
 5              THE COURT:  Is that the time period you're talking
 6     about again?
 7              THE WITNESS:  Yes.
 8              THE COURT:  All right.
 9              MR. HAYSBERT:  Your Honor, the question about the
10     location, you asked the question about any specific
11     location.
12              THE COURT:  He can follow up on it if he wants.  It
13     was just a general answer on her part, and I wanted to limit
14     it to what she was talking about.  She's talking about 2017,
15     she says.
16              MR. HAYSBERT:  Thank you, Your Honor.
17                          CROSS-EXAMINATION
18     BY MR. McGAVIN:
19     Q.  Ms. Clark, how long have you worked in food service in
20     restaurants?
21     A.  Eight years now.
22     Q.  Where do you work now?
23     A.  Texas Roadhouse.
24     Q.  Is that a steakhouse?
25     A.  Yes.
```

1    Q.  And do you wear slip resistant shoes there?

2    A.  Yes.

3    Q.  Is that because the servers have to go back into the

4    kitchen area?

5    A.  Yes.

6    Q.  And is the kitchen area at the rear of the Chesapeake

7    Outback?

8    A.  Yes.

9    Q.  So you would have to go all the way to the back to go

10   into the kitchen where the French fries or other food is

11   being cooked; is that right?

12   A.  Correct.

13   Q.  And that area in the back near the kitchen is an area

14   where you could have some grease come out onto the floor; is

15   that right?

16   A.  Yes.

17   Q.  And that would be the area that you were referencing that

18   would be a little slippery; isn't that right?

19   A.  Yes.

20   Q.  So where we are talking about is at the front of the

21   store, isn't it?

22   A.  Right.

23   Q.  Now, in the front of the store, you understand that there

24   is --

25              MR. HAYSBERT:  Objection, Your Honor.  This is

```
 1    confusing.  She is in the back, but yet she is talking about
 2    the front of the store.  I don't understand that.
 3              THE COURT:  The kitchen is in the back?
 4              THE WITNESS:  Correct.
 5              THE COURT:  That's where you said you noticed the
 6    slips and falls, or the falls.
 7              MR. HAYSBERT:  Mischaracterizing her prior
 8    testimony.
 9              THE COURT:  Well, I cleared it up.  Now, can you
10    clarify why you're asking about the front of the store?
11    That was his objection.
12              Let's get this all straightened out.  You are
13    asking her about how long she has been a server, whether she
14    had to wear these slip resistant shoes somewhere else.
15              MR. McGAVIN:  Yes.
16              THE COURT:  She said yes.  Then you went into
17    servers go into the kitchen and the area there, and then you
18    turned around and said we are talking about the front of the
19    store.  That is what he is objecting to as confusing, and I
20    find it confusing, too.
21              MR. McGAVIN:  Let me try it again.
22              THE COURT:  All right.
23              MR. McGAVIN:  Thank you, Your Honor.
24    BY MR. McGAVIN:
25    Q.  So I asked you previously about the area back by the
```

1    kitchen.  Do you understand that?

2    A.  Yes.

3    Q.  And then at the Outback in Chesapeake, do you recall that

4    the front of the store, there is an area, back in 2017 and

5    2018, where you could have condensation at the front of the

6    store?

7    A.  Yes.

8    Q.  And that would be sometimes when the weather would

9    change, it would be at the front of the store; is that right?

10   A.  Yes.

11   Q.  And did you see occasionally there would be, of these

12   three slips you mentioned in 2017, were any of those at the

13   front entrance area or were they back by the kitchen?

14          MR. HAYSBERT:  Objection, asked and answered, Your

15   Honor.  She indicated that all the slips happened when women

16   in heels, and that all of them occurred just past the

17   hostess stand.

18          THE COURT:  She's on cross-examination.  Go ahead.

19          THE WITNESS:  They had been close to the entrance.

20   BY MR. McGAVIN:

21   Q.  Close to the entrance, is that what you said?

22   A.  Yes.

23   Q.  Okay.  And so that would be in the area up front where,

24   if you had rain outside or condensation, that might be wet?

25   A.  Yes.

1   Q.  All right.  But there is also carpet and a mat in that

2   lobby area, isn't there?

3   A.  Yes.

4   Q.  And that collects any water?

5   A.  Yes.

6   Q.  Now, you've talked a little bit about Lisa Crosby.  Do

7   you know Lisa Crosby or have you stayed in touch with Lisa

8   Crosby since you've left Outback?

9   A.  Yes.

10  Q.  She's a friend of yours?

11  A.  Yes.

12  Q.  And this incident where she slipped and fell, isn't it

13  true that she slipped and fell where a customer had just

14  spilled a Coke?

15  A.  Yes.

16  Q.  And so she was carrying a tray, and she came upon an area

17  that where a customer had spilled a soft drink, stepped in

18  that and slipped and fell; isn't that right?

19  A.  Yes.

20  Q.  So to suggest that Lisa Crosby's slip and fall was

21  somehow related to the floor, you're talking about an

22  incident where a customer had just spilled, she was carrying

23  a heavy tray and slipped and fell; is that right?

24  A.  Yes.

25  Q.  Now, you mentioned three slips, and a slip is not the

1   same as a slip and fall, is it?

2   A.   No.

3   Q.   Okay.  Now, you mentioned that there were these incidents

4   in 2017.  Are you able to be more precise when in 2017 they

5   were, early on when you started or any -- with any more

6   precision than that?

7   A.   No, I can't remember.

8   Q.   All right.  And then in regard to the time frame of

9   January 1, 2018, until May 23, 2018, is it correct that you

10  do not recall anyone slipping or falling at that restaurant?

11  A.   Correct.

12  Q.   So for a period of at least five months, there were no

13  slips, no falls that you know of at the Outback restaurant in

14  Chesapeake, Virginia; is that right?

15  A.   Yes.

16  Q.   Now, in regard to the incident in question involving

17  Dr. Haysbert, did you say you were actually on duty that day?

18  A.   Yes.

19  Q.   Where were you stationed?

20  A.   To go.

21  Q.   I'm sorry?

22  A.   Takeout.  I was in takeout.

23  Q.   Is that in a different area of the restaurant?

24  A.   Yes.

25  Q.   And in regard to the takeout area, how did you become

```
 1   aware, if you're in a different section, that Dr. Haysbert

 2   had an incident?

 3            MR. HAYSBERT:  Objection.  She indicated in her

 4   prior testimony she was not aware of Dr. Haysbert's fall.

 5            THE COURT:  She said she didn't see it.  I wrote

 6   down, "Did not see her fall."

 7            MR. HAYSBERT:  My apologies, Your Honor.  I took it

 8   to mean the same thing, but I withdraw the objection.

 9   BY MR. McGAVIN:

10   Q.  Okay.  Thank you.  Do you recall the question?

11   A.  No.  Can you repeat that?

12   Q.  Yes, I will.  You say that you were on duty on the day

13   that Dr. Haysbert fell.  How did you become aware of her

14   incident?

15   A.  Someone had told me -- yeah, my manager Lisa had told me

16   what happened.

17   Q.  You mean that same night or some other time?

18   A.  Some other time.

19   Q.  And did you even go into the dining room area at the time

20   Dr. Haysbert fell to see what the condition of the floor was?

21   A.  No, I didn't.

22   Q.  Is it fair to say that you have no knowledge of whether

23   or not the floor in the area -- or do you even know where

24   Dr. Haysbert fell?

25   A.  No.
```

Clark, D. - Cross                                                    612

1    Q.   You have no idea?

2    A.   No.

3    Q.   Pardon me?

4    A.   No.

5    Q.   All right.  In regard to the condition of the floor in

6    the place where Dr. Haysbert fell, is it correct that you

7    have no personal knowledge whether or not a customer had just

8    spilled something or whether there was a problem in the area

9    of the floor; is that correct?

10   A.   Yes.

11   Q.   So what you're offering is testimony that, in a period of

12   about a year, you became aware of three incidents where there

13   were slips at the front door; is that right?

14        MR. HAYSBERT:  Objection, Your Honor,

15   mischaracterizes her prior testimony.

16        THE COURT:  Overruled.

17        MR. HAYSBERT:  Sure.

18        THE COURT:  She just testified to that.

19   BY MR. McGAVIN:

20   Q.   And then one slip and fall where Ms. Crosby was carrying

21   a heavy tray and a customer had just spilled a soft drink; is

22   that correct?

23   A.   Yes.

24        MR. McGAVIN:  I have no further questions for you.

25   Thank you.

```
 1              THE COURT:  Redirect?

 2              MR. HAYSBERT:  Yes, Your Honor.

 3                      REDIRECT EXAMINATION

 4    BY MR. HAYSBERT:

 5    Q.  I want to clarify, Ms. Clark.  You indicated in your

 6    prior testimony that from January 1st of 2018 until May 23rd

 7    of 2018, you did not personally see anyone slip or fall on

 8    the floors?

 9    A.  Correct.

10    Q.  All right.  Okay.  Just to clarify your testimony, I

11    heard you say, because I wrote it down, that there were three

12    slips by a woman with heels just past the hostess stand.  Was

13    that your prior testimony?

14    A.  Yes.

15    Q.  Okay.  Do you still conform to that testimony?  Is that

16    still your testimony?

17    A.  Yes.

18    Q.  You provided an affidavit in this case, didn't you?

19              MR. McGAVIN:  Objection, Your Honor.

20              THE COURT:  Sustained.

21    BY MR. HAYSBERT:

22    Q.  Is it your personal belief, Ms. Clark, that all of the

23    slips and falls that you state happened, that you personally

24    observed, happened because of the slipperiness of the floor?

25              MR. McGAVIN:  Objection.
```

```
 1              THE COURT:  Wait just a minute.  She can testify as
 2    to what she saw or what she did, but she cannot testify as
 3    to her opinion.
 4              MR. HAYSBERT:  Sure.
 5              THE COURT:  She can testify as to what she saw,
 6    what she did, where she saw it, where the people were, but
 7    not her opinion.
 8              MR. HAYSBERT:  Thank you, Your Honor.
 9    BY MR. HAYSBERT:
10    Q.  Ms. Clark, the three slips just past the hostess stand,
11    did they happen, the ones that you personally observed them,
12    did they happen because of slipperiness of the floor?
13              MR. McGAVIN:  Objection, Your Honor, her opinion.
14              MR. HAYSBERT:  No, it's not an opinion.
15              THE COURT:  She can testify as to what she saw on
16    the floor, what she saw in the fall.  She's just not
17    qualified to give that opinion, and the testimony has been,
18    frankly, all over the place.
19              MR. HAYSBERT:  I withdraw the question.
20              I have another question for you, Ms. Clark.
21    BY MR. HAYSBERT:
22    Q.  The slips that you saw happened past the hostess stand,
23    that you personally observed, did you see anything on the
24    floor when those happened?
25    A.  Yes.
```

1   Q.  What did you see?

2   A.  Just like water, wet, like a drink, a Coke was on the

3   floor.

4           THE COURT:  I'm sorry.  I can't hear you,

5   Ms. Clark.

6           THE WITNESS:  A Coke was on the floor, that a Coke

7   actually spilled on the floor.

8   BY MR. HAYSBERT:

9   Q.  So the three slips that you saw each time that these

10  three slips happened in between January 1st of 2017 and the

11  end of December, you saw a Coke had slipped on the floor for

12  each one of these slips?

13  A.  Oh, no.  For Lisa.

14  Q.  For Lisa?

15  A.  Yes.

16  Q.  But for the three slips with the women in heels past the

17  hostess stand, those, did you see anything on the floor?

18  A.  No.

19          MR. HAYSBERT:  Thank you.  No further questions.

20          MR. McGAVIN:  May I ask a follow-up to that?

21          THE COURT:  Yes.

22          MR. McGAVIN:  Thank you.

23                      RECROSS-EXAMINATION

24  BY MR. McGAVIN:

25  Q.  In regard to these three incidents that you're talking

1  about, did you inspect the floor to see if something had been

2  spilled recently?

3  A.  No.

4  Q.  So you don't know if something had just been spilled a

5  very short time before, right?

6  A.  No.

7  Q.  You weren't called upon to do any cleanup in those areas,

8  were you?

9  A.  No.

10  Q.  And so whether or not there was something which had been

11  spilled or dropped in that area just a few seconds before,

12  you don't know, do you?

13  A.  No.

14        MR. McGAVIN:  Thank you.  I have nothing further,

15  Your Honor.

16        THE COURT:  Anything further, Mr. Haysbert?  It

17  would have to be limited to the questions that he just

18  asked.

19        MR. HAYSBERT:  Of course, Your Honor.

20                    REDIRECT EXAMINATION

21  BY MR. HAYSBERT:

22  Q.  Just one follow-up, Ms. Clark.  Three slips past the

23  hostess stand, you saw nothing on the floor, correct?

24  A.  Correct.

25        MR. McGAVIN:  That was asked and answered.

```
 1              MR. HAYSBERT:  I have a follow-up because that's
 2   redirect based on your questioning of her.
 3   BY MR. HAYSBERT:
 4   Q.  Did you see anything on the floor right before or after
 5   those three slips happened?
 6   A.  No.
 7              MR. HAYSBERT:  Thank you.  No further questions.
 8              THE COURT:  I'm going to ask you one question.
 9   Where is the hostess stand?  You were there for a number of
10   years.  Where is it?
11              THE WITNESS:  Right at the entrance.
12              THE COURT:  So when you talk about in part of your
13   testimony being at the entrance and part of it being at the
14   hostess stand, is that the same area?
15              THE WITNESS:  Yes.
16              THE COURT:  Thank you, Ms. Clark, for testifying.
17   As far as the Court knows, you are excused, and you may not
18   discuss your testimony with anyone until this case is
19   concluded.  Thank you very much.  I'm sorry you had to wait
20   a couple of days, but as you know from yesterday, the Court
21   wasn't aware that you were sitting there.  Thank you.
22              THE WITNESS:  You're welcome.
23              (Witness excused.)
24              THE COURT:  Your next witness.
25              MR. HAYSBERT:  Your Honor, we would like to call
```

1    Marcus Wilson to the witness stand.

2              THE COURT:  All right.  Marcus Wilson.

3              UNKNOWN GENTLEMAN:  Your Honor, there is no Marcus

4    Wilson in the witness room.  I just don't know who he is so

5    I wouldn't be able to identify him in the hall.

6              THE COURT:  Call another witness, then, and we will

7    talk about Marcus Wilson later.  In any event, there is no

8    Marcus Wilson present, and so call your next witness.

9              MR. HAYSBERT:  Your Honor, I'm calling Alicia

10   Eleftherion, who is the current Chesapeake Outback managing

11   partner and was the person most knowledgeable for this case

12   regarding Chesapeake Outback.

13             THE COURT:  See if there is an Alicia Eleftherion

14   in the witness room.

15             MR. HAYSBERT:  And just for the record, Marcus

16   Wilson --

17             THE COURT:  We are not doing anything for the

18   record in front of the jury about the witnesses that aren't

19   here.

20             You may come forward.

21             (Witness was sworn.)

22             ALICIA ELEFTHERION, called by the Plaintiff, having

23   been first duly sworn, was examined and testified as

24   follows:

25                        DIRECT EXAMINATION

Eleftherion, A. - Direct                                            619

```
1   BY MR. HAYSBERT:
2   Q.  I don't see the time anywhere, so I don't know if I'm
3   supposed to say good morning or good afternoon, but either
4   one.  Thank you very much.
5             THE COURT:  Trust me, it's the afternoon.
6             MR. HAYSBERT:  I trust you, Your Honor.
7   BY MR. HAYSBERT:
8   Q.  Thank you for being here this afternoon, Ms. Eleftherion.
9   A.  Okay.
10  Q.  Appreciate it very much.  You've worked at restaurants
11  for most of your adult life, correct?
12  A.  Yes, sir.
13  Q.  Having worked at various restaurants with over 20 years
14  of experience, correct?
15  A.  Correct.
16  Q.  Those restaurants include Outback Steakhouse, correct?
17  A.  Yes.
18  Q.  And you're currently the managing partner at the
19  Chesapeake Outback?
20  A.  Correct.
21            THE COURT:  Managing partner?
22            MR. HAYSBERT:  Managing partner.
23            THE COURT:  Is that your title?
24            THE WITNESS:  Yes, ma'am.
25  BY MR. HAYSBERT:
```

Eleftherion, A. - Direct                                              620

1    Q.  Meaning that you are the --

2           THE COURT:  Ask her what she does as managing

3    partner.  You don't testify as to what she does.

4           MR. HAYSBERT:  I was going to --

5           THE COURT:  Ask her what she does as managing

6    partner.

7           MR. HAYSBERT:  Certainly.  Of course, I can.

8    BY MR. HAYSBERT:

9    Q.  What do you do as managing partner?

10   A.  Yes, sir.  I have direct oversight of operations, similar

11   to a general manager function, but it's a little different.

12   So everything from budgets to, you know, cost control of the

13   operations, just a lot under that umbrella.

14   Q.  And that includes safety, correct?

15   A.  Sure.

16   Q.  Well, there is no one above you at that restaurant,

17   correct?

18   A.  Correct.

19   Q.  So everyone at the restaurant who works at the restaurant

20   reports to you?

21   A.  Correct.

22           THE COURT:  Can you do a time period, how long

23   she's been managing partner, and get a time period?

24           MR. HAYSBERT:  Okay.  It's on my list, but I can do

25   it right now.

Eleftherion, A. - Direct                                        621

1              THE COURT:  It's important.

2              MR. HAYSBERT:  Of course, Your Honor.  It's on my

3       list.

4       BY MR. HAYSBERT:

5       Q.  So could you tell us how long you have been the managing

6       partner at the Chesapeake Outback Steakhouse?

7       A.  From February of 2019 to present.

8              THE COURT:  February 2019 to when?

9              THE WITNESS:  To currently, to present day, Your

10      Honor.

11             THE COURT:  Currently.

12      BY MR. HAYSBERT:

13      Q.  And before February '19 -- before, excuse me, February of

14      2019, what was your title at the Chesapeake Outback

15      Steakhouse?

16      A.  Manager.

17      Q.  And you were the manager for how long at that Chesapeake

18      Outback?

19      A.  I was manager there from July of 2017 until I was

20      promoted in February of 2019.

21             MR. HAYSBERT:  Your Honor, if I may use the easel.

22             THE COURT:  Can you establish what she does as

23      manager?

24             MR. HAYSBERT:  I think we already have.

25             THE COURT:  No, that was managing partner.

Eleftherion, A. - Direct                                    622

1              MR. HAYSBERT:  Sure.  I can do that.

2    BY MR. HAYSBERT:

3    Q.  Can you establish what your responsibilities were as the

4    manager at Chesapeake Outback?

5    A.  Yes.  As a manager, I was predominantly in charge of the

6    front of the house, which would include servers, bartenders,

7    hosts, overseeing their everyday duties and responsibilities

8    that includes training, coaching, schedule writing, managing

9    the dining room.  I was often assigned to the kitchen, as

10   well, because I had experience in both arenas of management.

11   So pretty much the -- take care of the guests, and, of

12   course, obviously director of the front of the house staff at

13   that time.

14             THE COURT:  The front what?

15             THE WITNESS:  The front of the house.  That

16   includes servers, bartenders.

17             THE COURT:  The front of the house, that's what you

18   all call it?

19             THE WITNESS:  Yes, ma'am.

20             MR. HAYSBERT:  I was going to ask that question

21   next.

22   BY MR. HAYSBERT:

23   Q.  Front of the house, meaning everything in the dining

24   room?

25   A.  Correct.

Eleftherion, A. - Direct                                                    623

```
1   Q.  Thank you.
2           MR. HAYSBERT:  Now that that's been established,
3   may I please approach the easel?
4           THE COURT:  Yes.
5   BY MR. HAYSBERT:
6   Q.  Can everybody see that?
7           I want to talk about your duties as managing partner.
8   You oversee safety, as you said?
9   A.  Correct.
10  Q.  You oversee cleaning of the restaurant as part of safety?
11  A.  Yes.
12          MR. McGAVIN:  Your Honor, she -- that's 2019 after
13  the time of the incident.  I object to relevance.
14          THE COURT:  Sustained.
15          MR. HAYSBERT:  Okay.
16  BY MR. HAYSBERT:
17  Q.  We will talk about your duties as manager.  At the time
18  you were the manager for the front of the house, correct?
19  A.  Correct.
20  Q.  Okay.  So would you oversee safety as a manager at
21  Chesapeake Outback?
22  A.  Correct, yes.
23  Q.  And you would oversee safety in the front of the house,
24  correct?
25  A.  Correct.
```

Eleftherion, A. - Direct                                              624

```
 1    Q.  That would be the dining room?
 2    A.  Yes.
 3    Q.  Okay.  And would you oversee cleaning?
 4    A.  Yes.
 5    Q.  And that would be part of safety?
 6    A.  Correct.
 7    Q.  And that would be front of the house?
 8    A.  Correct.
 9    Q.  Which is the dining room?
10    A.  Yes, sir.
11    Q.  You were to oversee ensuring there were no safety hazards
12    in the front of the house?
13    A.  Yes.
14    Q.  That would be the dining room?
15    A.  Yes.
16    Q.  Okay.  You were to ensure there was no grease, cleaning
17    solution, water, soda, Coke left on the floors unattended in
18    the dining room, correct?
19          MR. McGAVIN:  Objection, Your Honor.  The use of
20    the term "ensure."  There is no -- the law does not
21    require --
22          MR. HAYSBERT:  Oversee.  Oversee.  I was saying
23    oversee.
24          MR. McGAVIN:  May I just --
25          MR. HAYSBERT:  Sure.  Of course.
```

Eleftherion, A. - Direct                                    625

1           MR. McGAVIN:  Thank you.  I object to the use of

2    "ensure."  It's not the law.

3           THE COURT:  Rephrase your question, please.

4           MR. HAYSBERT:  Will do, Your Honor.

5    BY MR. HAYSBERT:

6    Q.  It's your responsibility was to make sure that wet floor

7    signs were put out when needed, correct?

8    A.  Yes.  I had direct oversight of all those things.

9    Q.  And your job was to ensure that mats were put down when

10   needed, correct?

11          THE COURT:  Do not use the word "ensure."

12          MR. HAYSBERT:  I will never use the word "ensure"

13   again.

14   BY MR. HAYSBERT:

15   Q.  You have responsibilities to put mats down when needed,

16   correct?

17   A.  Correct.

18   Q.  And you have the responsibility to investigate any

19   accidents that happen in front of the house and the dining

20   room?

21   A.  The word "investigate," that can mean more than one

22   thing.  I was responsible for overseeing the general area and

23   safety and cleanliness sanitation, yes.

24   Q.  What do you think the word "investigate" means?

25   A.  Well, I mean, clearly, if there was an issue, you know,

Eleftherion, A. - Direct                                             626

 1   we would need to find cause and correct it immediately.
 2   Q.  You would be the person responsible for determining the
 3   issue and finding a way to correct it, correct?
 4   A.  Typically, yes.
 5   Q.  Because you managed the front of the house?
 6   A.  Correct.
 7   Q.  Which is the dining room?
 8   A.  Correct.
 9   Q.  So would part of that overseeing responsibility include
10   following up an injured person who had slipped and fallen on
11   the floors?
12   A.  It was not, no.
13   Q.  I'm sorry?
14   A.  No, that was not part of my responsibilities at the time.
15   Q.  Whose responsibility was it at the time that you were the
16   manager of the Outback Steakhouse in Chesapeake to follow up
17   with an injured person who had slipped and fallen?
18   A.  Correct.  If our insurance provider at that time was
19   involved, we had an insurance liaison who would follow up
20   with that person.
21          MR. McGAVIN:  Objection, Your Honor.
22          THE COURT:  Sustained.
23          MR. HAYSBERT:  It's only been said.  I don't have a
24   question pending.
25          THE COURT:  Insurance is not an issue at all in

Eleftherion, A. - Direct                                                    627

1    this case.

2    BY MR. HAYSBERT:

3    Q.  So I'm only asking you what you would do in your personal

4    knowledge.  Okay.  So let's leave insurance out of it.  And

5    although insurance is within your personal knowledge, we are

6    leaving insurance out of it.

7            THE COURT:  Mr. Haysbert, please, follow the

8    Court's rulings.

9            MR. HAYSBERT:  Yes, ma'am.

10           MR. McGAVIN:  Your Honor, I have a motion.

11           THE COURT:  Well, let's do things this way.  I

12   think it's a good time for the jury to take a luncheon

13   recess, because it's after 1:00 now, and I think lunch is

14   being brought in for you.  So we will be in a luncheon

15   recess until 2:00, and I would ask that you, Mrs. -- how do

16   you say your last name?

17           THE WITNESS:  Eleftherion.

18           THE COURT:  Ms. Eleftherion, you are in the middle

19   of your testimony, so you cannot discuss it with anyone, and

20   you can take a break, but you'll need to be back here at

21   2:00.  Do not discuss your testimony with anyone.  Do you

22   understand?

23           THE WITNESS:  Yes, Your Honor.

24           THE COURT:  All right.  You can go ahead, and the

25   jury can go ahead to their lunch.

Eleftherion, A. - Direct                                              628

1              (Jury out at 1:11 p.m.)

2              MR. HAYSBERT:  Your Honor.

3              THE COURT:  Wait just a minute.  Before you say

4    anything, it's his motion, so I'm going to listen to his

5    motion.  But this is something I do want to say.  You had

6    witnesses in that witness room for two days, and I didn't

7    know it, that they had been in there for two days.  I was

8    informed last night, and I told them to come back today.

9              Now, this is a witness that apparently was not in

10   that room, because she was not one of the individuals who

11   came in here last night, and I expect you to call the

12   witnesses that have been sitting back there for two days,

13   and I recognized them to come today.

14             So, consequently, you have not called Mr. Chase,

15   and you have not called Mr. Seifert.  When you started the

16   case, you said you were calling -- I'm not holding you to

17   it, if they were on your witness list, and they are here,

18   but you said you were going to call Dr. Haysbert, Nineveh

19   Haysbert, Dr. Filler, Deajah Clark.  We can go back at the

20   record because I marked it when you said it.  Nicholas

21   Seifert, Norman Chip Chase.  There was seven.

22             Now, I'm not saying you can't call Marcus Wilson

23   and you can't call Ms. Eleftherion, but, number one, they

24   weren't somebody you said you were going to call at the

25   beginning of the case.  I'm not holding you to that.  If

Eleftherion, A. - Direct                                         629

1    they're here, I'm going to let them testify.  But we have
2    gone through the subpoena issues before, and I'm not going
3    through those again, unless you have a valid subpoena and
4    somebody didn't show up.
5         But I recognized everybody who had shown up, and
6    now you're not even calling them, and you're not having, in
7    my opinion -- a lot of these people, at least Mr. Chase and
8    Mr. Seifert, work, and I denied his motion to quash, and I
9    would expect you call people who have been sitting in a
10   witness room for two days and the Court's recognized them
11   for today.  Do you understand?
12        MR. HAYSBERT:  I do, Your Honor.
13        THE COURT:  So we are going to finish this witness,
14   and we are going, whatever other witnesses you are going to
15   call, we are going to get Mr. Seifert in here and Mr. Chase
16   in here.  I told them yesterday and gave them my word that
17   we would get to them today, and we are going to.
18        MR. HAYSBERT:  Yes, Your Honor.
19        THE COURT:  Now let me hear your motion.
20        MR. McGAVIN:  Your Honor, the issue is
21   post-accident investigation and discussion.  This issue is,
22   number one, not relevant.  I previously asserted that.
23   Because what happens, and Mr. Haysbert knows this, it gets
24   turned over to risk management and the insurance people.  So
25   after the initial call, or the initial report is made, this

Eleftherion, A. - Direct                                          630

1    gets sent to Tampa, Florida, where risk management is

2    involved, and they are insurance people.

3           So by inquiring about this issue and making this an

4    issue about whether there was a post-fall contact, we are

5    inevitably, for me to respond to it, we have to talk about

6    the insurance team and risk management, precisely as

7    Mr. Eleftherion did.  Then after I objected to injecting

8    insurance into this case, Mr. Haysbert then talked about

9    insurance four more times.

10          THE COURT:  Well, not only that, you couldn't hear

11   the record, but the way he said, "I'll never mention the

12   word insurance again," that was certainly in a very mocking

13   tone.  But, in any event, I don't understand why any lawyer

14   would mention that in a case, because it's Torts 101 that

15   you don't talk about insurance, particularly if it's been

16   ruled out.

17          MR. McGAVIN:  So I don't want a mistrial.

18          THE COURT:  There may be one here.

19          MR. McGAVIN:  I must make that motion because this

20   is intentional.  This is deliberate.  He knows that this

21   went to risk management because he submitted his notice of

22   representation, and he was contacted by risk management.  So

23   he's been involved in this since very shortly thereafter.

24   Obviously, he knew about his mother's incident.  So to then

25   inject this into the case --

Eleftherion, A. - Direct                                      631

1            MR. HAYSBERT:  Objection, motion *in limine*.

2            THE COURT:  Wait just a minute.  Please sit down.

3    Only one attorney speaks to the Court at a time, and they

4    speak from behind the podium.  You can't object to what he's

5    saying.  You may respond to what he's saying and put any

6    objection in there.  But stop this interrupting all the

7    time, Mr. Haysbert.

8            Go ahead.

9            MR. McGAVIN:  We are seeking a fair trial here, but

10   that is a deliberate effort to inject insurance into the

11   case.  I didn't hear the comment, but apparently the record

12   will reflect, this mocking of it -- I won't mention it

13   again -- after knowing, as you say, Tort 101 Virginia law is

14   absolutely clear, in a tort case, you're not allowed to

15   inject insurance into the case.  That was so obvious and so

16   wrong, and I strenuously object, and I move the Court to

17   grant a mistrial.

18           THE COURT:  Well, I'm going to mention two things

19   that have been on the Court's mind.  I'm not addressing the

20   motion to strike Dr. Filler, but I will mention two things

21   that have been on the Court's mind since yesterday.  The

22   Court was totally taken aback by the animation.  It had been

23   represented to the Court that this was an animation, a

24   demonstrative exhibit, certainly been implied for Dr. Haider

25   and also for Dr. Filler.

Eleftherion, A. - Direct                                                    632

1          We have gone, I don't even know the hours and the

2     time it's taken to sort out who said what, when and where,

3     and you asked him about the animation.  You told the Court

4     it was a demonstrative exhibit that he was going to testify.

5     He hadn't seen it, he didn't prepare it, and you knew that.

6          As far as I'm concerned, that's a backdoor way of

7     trying to get in Dr. Haider's demonstrative exhibit.

8     Apparently, Dr. Filler didn't know about it.  He hadn't seen

9     it.  He didn't prepare it.  So I understood, and maybe I'm

10    wrong to have understood, but I understood it was a joint

11    demonstrative exhibit.

12         Then when he's asked about it, he doesn't know

13    anything about an animation.  I can't imagine that an

14    attorney preparing an expert witness, and using that as a

15    demonstrative exhibit, wouldn't know that this doctor hadn't

16    seen it or prepared it.  He didn't know anything about it,

17    and you are going to show it to him and start asking

18    questions?  It's a backdoor way of trying to get in a

19    witness that the Court had not denied you.  You had asked to

20    do Dr. Haider by zoom.  I made my rulings.  I'm not

21    repeating them.  Then you withdrew her reports and her

22    exhibits, and you withdrew her as a witness.  Then you jump

23    up, and you start implying that the Court is violating the

24    rules under Rule 703.  You can make your objection, and the

25    Court rules.  Again, the ruling is correct.  That ruling was

Eleftherion, A. - Direct                                      633

1    correct, and I'll tell you why.  I tried to tell you it

2    yesterday, and I probably said all this, but I'll repeat it

3    again.

4              You haven't been called to the podium,

5    Mr. Haysbert.  I'm just telling you other things that bother

6    me about Dr. Filler that had been mentioned, that he said

7    that he still wants his motion to strike.

8              Number one, Dr. Haider's report, that you were

9    trying to get in information about, was not disclosed in

10   this expert's report, or at least he never said he relied

11   upon it.  He never indicated that he relied upon her in his

12   report.  That's number one.

13             Number two, you withdrew her exhibit and her

14   report, so that had been withdrawn, so it's not considered.

15   If it is admissible evidence, you had withdrawn it from even

16   offering it for admissibility, and that most likely was

17   because you couldn't get the declaration from Dr. Haider.  I

18   don't know.  But you came in here the next day, and you

19   withdrew Dr. Haider's expert report, and you withdrew her as

20   a witness.

21             Then when it's withdrawn, it's not admissible

22   evidence because it's been withdrawn.  Even if it is

23   admissible evidence, under that rule, you have to weigh the

24   probative value versus the prejudice.  Well, certainly it's

25   highly prejudicial.  The probative value of keeping on

Eleftherion, A. - Direct                                          634

1    mentioning Dr. Haider is certainly outweighed by the

2    prejudice when the other side has not had an opportunity to

3    examine Dr. Haider, she's not coming in as a witness, and

4    you are making these references to her.

5            It's still within the Court's discretion to

6    evaluate that, and I would certainly find that the

7    prejudicial effect of mentioning another expert and what she

8    did and her reports and her demonstrative exhibits, would

9    certainly be so highly prejudicial that it has little to no

10   probative value, because nobody had heard anything from her.

11   That's one thing.  It's a weighing test.

12           Finally, that rule, if you look at it, when it

13   says, even if it's not admissible, basically what it is

14   referring to is the expert's reports, which everybody knows

15   is not admissible, but you asked him questions about it.

16   It's referring to treatises, which wouldn't be admissible,

17   but the other side has notice, and you can ask them

18   questions about it.

19           So when you say something isn't admissible with an

20   expert, the report is not admissible, treatises aren't

21   admissible, but they are certainly okay to come before the

22   Court in the expert's report.  Then the expert is examined

23   on the report and examined on what he relied on.  This

24   expert never mentioned relying on Dr. Haider, and she was

25   not listed in his report.

Eleftherion, A. - Direct                                        635

1          So, basically, the references there are to matters

2     that are in an expert's report.  He can testify, or she can

3     testify about it, but the report doesn't come in.  What he

4     relied upon, which would include treatises, they wouldn't

5     come in, and also whatever else he relied on that may not be

6     admissible.

7          He never even indicated he relied on Dr. Haider in

8     his report, and so consequently he did not indicate that he

9     relied on it.  It's not a treatise.  It wasn't in his

10    report.  She had been withdrawn, and that is highly

11    prejudicial.  You kept trying to backdoor it in, even after

12    the Court had ruled.

13         I'm very concerned and most concerned, because I'm

14    comfortable with the ruling.  But I'm concerned about how it

15    kept trying to be pushed through the backdoor when it wasn't

16    in his report, and it wasn't anything that he said he relied

17    on in his report or listed in his report, and it was

18    something that had been completely withdrawn, the witness

19    and the report from this case.

20         Then the pushing and the pushing on the

21    admissibility of that thumb drive that everybody spent a lot

22    of time worrying about what was on it, and he hadn't even

23    seen it.  So I'm concerned about certain things that

24    happened with Dr. Filler yesterday in that regard.

25         I'm also concerned about this interjection of

Eleftherion, A. - Direct                                              636

1    "insurance" in this witness.  This has just gone on

2    throughout this trial; last minute, not advising the Court,

3    not advising the other side, subpoenas that don't get served

4    properly.  The case has been pending and set since March 1.

5    You can respond, if you want, Mr. Haysbert.

6           MR. HAYSBERT:  Thank you very much, Your Honor.

7    I'll start with the word "insurance."  That came up through

8    Alicia Eleftherion, who was the person most knowledgeable

9    for Outback Steakhouse.  The person most knowledgeable for

10   Outback Steakhouse is on the stand, and she is the one that

11   mentioned insurance.  What I said I would never mention

12   again in this courtroom was the word "ensuring," which he

13   objected to, and you sustained the objection, and I said I

14   will never say the word "ensuring" again.

15          But insurance never came out of my mouth.  That

16   came out of the person most knowledgeable for Outback

17   Steakhouse.  In any event, it came out of Outback

18   Steakhouse's mouth.

19          When it came to Dr. Haider's expert report, I never

20   sought to withdraw that.  I have only sought to withdraw --

21          THE COURT:  You did withdraw it.

22          MR. HAYSBERT:  No, only Dr. Haider as a witness, is

23   the only thing.

24          THE COURT:  No, you did not.  You withdrew her

25   report.  You can't get in her report without her.  You

JODY A. STEWART, Official Court Reporter

Eleftherion, A. - Direct                                              637

 1    couldn't get in her report to begin with.  You'd have to

 2    have her testimony.  He didn't say he relied on it, did he?

 3           MR. HAYSBERT:  You never allowed him to rely on it.

 4    You specifically denied him the ability.

 5           THE COURT:  Mr. Haysbert, it's not in his report

 6    that he relied on it.

 7           MR. HAYSBERT:  Her report is not supposed to be in

 8    his report.  That's not how it works.  Her report is not

 9    supposed to be in his report.  He can rely on it, and he was

10    trying to rely on it, and you would not allow him to rely on

11    it.

12           THE COURT:  Let me say something, because I'm not

13    going to keep repeating it.  Number one, an expert gives a

14    report, and in that report the expert gives their opinions,

15    and they also have to indicate what they've relied on.

16           MR. HAYSBERT:  You would not allow him to rely on

17    Dr. Haider's report.

18           THE COURT:  It isn't in his report that that is

19    what he relied on.  I'm not going to argue with you anymore.

20    You cannot get in Dr. Haider's report through her, and also

21    you cannot get in something that the expert has not listed

22    they relied on.  The other side is entitled to know what the

23    expert relied on, and I am not going to argue that rule with

24    you.  That is what the law says, and he never, in his expert

25    report, he never updated it.  He did it in 2020.  He never

JODY A. STEWART, Official Court Reporter

Eleftherion, A. - Direct                                        638

1    updated it, and he never said or mentioned Dr. Haider in

2    that report.

3              MR. HAYSBERT:  That's not correct.

4              THE COURT:  Then you show me where.

5              MR. HAYSBERT:  I will tell you exactly what

6    happened.

7              THE COURT:  You show me where.  Show me in his

8    report.

9              MR. HAYSBERT:  It's in the very first line.  He

10   said he got indications for his report came from Dr. Haider.

11   He didn't do that himself.  He directed her to get the

12   information to him that he could use to create his images,

13   and that's what he did.  He had to talk to Dr. Haider and

14   get information from Dr. Haider before he could put the

15   brain scans together.  In order for that animation to come

16   together, Your Honor, he had to print the brain scans.  The

17   animation is simply animating his brain scans.  He saw every

18   image of the brain animation because he created it.

19             THE COURT:  We let him testify to that over their

20   objection.  I let him testify.

21             MR. HAYSBERT:  The brain animation actually never

22   came in at all.

23             THE COURT:  I know, but you tried to offer it.

24   That was sneaky.  You tried to offer it.  The record will

25   reflect you've tried to offer it, and when he was asked, he

Eleftherion, A. - Direct                                        639

1   said I don't know anything about an animation.  I will rely

2   on the record.  I don't want to hear any more about that.

3           MR. HAYSBERT:  Your Honor, I get to respond, and my

4   response is he has actually seen the brain animation.  It

5   was sent to his office.  He approved it.

6           THE COURT:  He said he hadn't.

7           MR. HAYSBERT:  He didn't need to use it.  The

8   distinction is, he is saying, Nazareth Haysbert, I know

9   you're the attorney, I would rather use the brain scan

10  image --

11          THE COURT:  That's not what I heard.  If I'm wrong,

12  I'm wrong, and I'll go back and check.  I know you've

13  ordered Dr. Filler's testimony, so we will go back, and we

14  will see.

15          MR. HAYSBERT:  The brain image is what he wanted to

16  use, because it says there is only one image I really want

17  to focus on, that's the fornix.  I don't need you to show me

18  a complete animation going through all the images I've

19  created for Dr. Haysbert's brain.  I looked at those.  This

20  whole animation came because I created these images.  All

21  right.  The brain animation cannot be --

22          THE COURT:  Wait just a minute.  I want to hear

23  from Mr. McGavin.  You were local counsel.  You were here.

24  I want you to come up to the stand and tell the Court what

25  you understood Dr. Filler to say in that regard, and

1    remember there is a transcript being prepared.

2            MR. McKELVEY:  I understand, Your Honor.

3            THE COURT:  So we are not playing games.  Be

4    forthright with the Court.

5            MR. McKELVEY:  I understand, and Your Honor, I'm

6    doing my best.  I honestly don't remember specifically what

7    the man said.  I know he went to the imaging.  Whether he

8    said he could see the -- whether he could say he was

9    familiar with the scan or not, I honestly don't recall.  I

10   don't remember.  I'd need to see the transcript.  I don't

11   remember that process taking a significant amount of time to

12   get to.  That's what I can say.

13           THE COURT:  I'm not talking about the testimony

14   taking a significant amount of time.  What I am talking

15   about is that what we went through over this animation, the

16   FedEx, who sent what, when, where, how, and the thumb drive

17   the Court had didn't have the same thing apparently as the

18   thumb drive that the defendants have.

19           We went through all of this about a thumb drive and

20   an animation.  Consequently, as it turns out, this doctor,

21   he said he didn't prepare it.  He said he didn't see it.  He

22   didn't know about it.  He didn't prepare it.  It wasn't a

23   demonstrative exhibit that he came prepared to testify

24   about, and he said that on the record.  I don't know if I've

25   got his exact words, but I know it's there.  That's

Eleftherion, A. - Direct                                        641

```
 1    when Mr. Haysbert said, oh, okay, then I won't offer that,
 2    but that was definitely on this record.  That's not the way
 3    you practice in Federal Court, by ambush and by trying to
 4    get something in that the expert had not prepared as a
 5    demonstrative exhibit.  We were told, and was implied and
 6    was being offered, this thumb drive.  He said I don't know
 7    about any thumb drive.  I don't know about any animation.
 8    That's the tone that I heard.  But you didn't hear that?
 9            MR. McKELVEY:  Your Honor, I honestly don't
10    remember.  If I remembered, I would tell you.
11            THE COURT:  Then maybe you need to be listening a
12    little bit better.
13            MR. McKELVEY:  I'm doing my best, Your Honor.
14    There is a lot of moving parts in this trial, and I'm doing
15    the best I can as far as trying to -- I don't have a perfect
16    memory.  I apologize for that, but, I mean, I'll be happy to
17    read the transcript for the Court.  I'll do whatever you
18    want me to, but I can't tell you something I don't know, to
19    be honest.
20            THE COURT:  Thank you.
21            MR. McKELVEY:  All right.
22            THE COURT:  Anything else, Mr. Haysbert?
23            MR. HAYSBERT:  Yes, Your Honor.  The person most
24    knowledgeable deposition that we are proceeding with now
25    will be followed by Nick Seifert, and will be followed by
```

Eleftherion, A. - Direct                                              642

1    Chip Chase.  Want to confirm with Your Honor that those will
2    be the two next witnesses that we call.  So we are intent on
3    doing what the Court issued yesterday, and that is all the
4    witnesses that came in, that stood up and said that they
5    were being recognized, we intend to get through them today,
6    Your Honor, just as you wished.
7             THE COURT:  Anything else you want to say,
8    Mr. McGavin?
9             MR. McGAVIN:  Nothing further, Your Honor, other
10   than there is no response on the insurance issue, and it's
11   clear that this went directly to risk management, and
12   they're the insurance people, and that's why I was objecting
13   previously about relevance, because I knew that's where this
14   would lead as to the follow-up with Dr. Haysbert and her
15   daughter.  We all knew that.  There was extensive discovery
16   about it.
17             There was a request to take the deposition of the
18   insurance person, which was denied by Judge Miller, and
19   that's why this whole issue of follow-up after the fall is
20   so irrelevant.  It inevitably leads to insurance.  It's not
21   proper, and then it was emphasized, and it is grounds for a
22   mistrial.
23             Regarding scheduling, Your Honor, I have
24   Ms. Crosby, Mr. Robinson, and two doctors, and they're here.
25   I would like to put them on, but if we will not make them

Eleftherion, A. - Direct                                            643

1    today, I will release them to come back Monday.

2          THE COURT:  I think you need to release them to

3    come back on Monday.

4          MR. McGAVIN:  Thank you, Your Honor.

5          THE COURT:  You might keep Ms. Crosby here, but

6    then I assume you're going to have motions, and we haven't

7    heard those yet.  So I think the best thing to do is to have

8    them all come back Monday, and if for some reason we are not

9    in trial on Monday, you can notify them over the weekend.

10         MR. McGAVIN:  Your Honor, I will need to have them

11   recognized.  They are under subpoena.  The subpoenas ran

12   through today, so I would have to recognize them to return

13   Monday.

14         THE COURT:  We are going to take a recess for

15   lunch, and I'll look at the schedule, and I will decide

16   whether to bring them in to recognize them before we bring

17   the jury back in.

18         MR. McGAVIN:  Of particular concern is

19   Mr. Robinson, who is the independent witness who works for

20   Newport News Shipbuilding.  Thank you, Your Honor.

21         THE COURT:  Then we should try to get to

22   Mr. Robinson today.

23         MR. McGAVIN:  Yes, Your Honor.  I would appreciate

24   it.

25         THE COURT:  Because he's got an employer that he's

Eleftherion, A. - Direct                                             644

1  had to say he's under subpoena, so we need to try to get to

2  him today.

3          MR. McGAVIN:  That's correct, Your Honor.  I would

4  appreciate that.  Thank you.

5          THE COURT:  The Court stands in luncheon recess for

6  45 minutes.  Court stands in recess.

7          (Luncheon recess from 1:36 p.m. to 2:27 p.m.)

8          THE COURT:  Counsel, this is where we are.  I'm not

9  going to spend any more time trying to go back through my

10 notes over the luncheon recess because I want to proceed and

11 not hold up witnesses that don't need to be here for days

12 and days.  Just go ahead with the evidence.

13         The only thing, I will take the two motions under

14 advisement; the motion for a mistrial, and the motion to

15 strike Dr. Filler's testimony.  Those are the two motions

16 that I'll take under advisement, and if necessary, we will

17 discuss them more later.

18         In the meantime, I did go back through my notes.

19 This is just a summary, and in terms of the last witness,

20 who we are still calling her in, what occurred, under my

21 notes, is there were questions from Mr. Haysbert that said,

22 do you make sure, do you ensure, and Mr. McGavin objected

23 and said that's not the law.  I sustained the objection.  I

24 don't have this word for word because it's from my notes.  I

25 sustained the objection, and I'm listening to the witness,

JODY A. STEWART, Official Court Reporter

 1   and I'm taking notes, and I'm listening to you all's

 2   objections.

 3          But after, I think you used the word do you make

 4   sure, do you ensure, and he objected, and said it wasn't the

 5   law of the case.  I sustained his objection.  Then you came

 6   back up, and I think it was used again, and that's the point

 7   at which you said, and you were correct, you said it on

 8   ensure, "I'll never use the word 'ensure' again," something

 9   to that effect.

10          Then on this witness, when she mentioned insurance,

11   what he objected to was that in two follow-ups with her, you

12   said, now, I want you to understand that insurance is not

13   part of the case, and then you rephrased it again before you

14   asked her the question.  So you used the word twice, the

15   word "insurance," after I had sustained his objection, which

16   was clear to everybody, insurance was not an issue.  That's

17   when he said he needed to take the matter up with the Court.

18          That's a summary chronology, is the best I can do

19   from my notes.  I'll have to go back through.  Then,

20   likewise, I didn't have time to go back through

21   Dr. Filler's.

22          The excerpts, P3 from Dr. Haider, were withdrawn.

23   The animation, the Court had not ruled on that.  The

24   animation had been reserved, and the defendants objected.

25   They objected to the animation and his demonstrative, and

Eleftherion, A. - Direct                                                    646

1    the only thing that was mentioned, when he was proffering

2    the testimony, was his demonstrative.  I let him do his

3    demonstrative, but leave out certain things.

4            So the Haider demonstratives, images of the brain

5    map and animation, including brain cortex localization map

6    that had been objected to on the grounds of relevance,

7    speculation, foundation, and unfair prejudice under Federal

8    Rules of Evidence 802, 402, 403, and the ruling on that had

9    been that was reserved.  The Court ordered that these be

10   provided to defendants' counsel, the Court and defendants'

11   counsel in advance of trial.

12           Then the Court never ruled on the animation.

13   That's when it was offered in front of the jury.  But the P1

14   was listed, but it was objected to, and that objection had

15   not been ruled upon.  P2 was his demonstrative, and we went

16   through that.  The jury got to see that.  Then P3 was

17   withdrawn.  That was Haider's report, and she was withdrawn

18   as a witness.

19           So that's the best I can do on those right now, is

20   to go back through the notes on the withdrawals, but the

21   animation, there was still outstanding objections on P1, and

22   then P2, the substituted exhibit, which I then let go before

23   the jury as part of his demonstrative testimony.

24           So that's where we are on Dr. Filler, and that's

25   the best I can do with my notes on insurance, and I'll take

1   both motions under advisement.

2          We will now continue with this witness.  Can you

3   bring the witness in.

4          MR. HAYSBERT:  Your Honor, if I may.

5          THE COURT:  Bring the witness in, please.

6          MR. HAYSBERT:  Your Honor, if I may.  Because we

7   are putting the person most knowledgeable of Outback

8   Steakhouse on the stand, we'd like to get in the work order,

9   the initial work order that we want to talk about with

10  Outback Steakhouse.  So is this the proper opportunity?

11         THE COURT:  If she knows about it.  If she dealt

12  with it.

13         MR. HAYSBERT:  Well, this is the person most

14  knowledgeable, so they actually provided us with a response

15  to request for production of documents that included the

16  work order, which is P14.  So we'd like to move it in.

17         THE COURT:  Let me just look at what it says on

18  that.  I'm looking at my orders.

19         MR. HAYSBERT:  Sure.

20         THE COURT:  Where we went through this.

21         MR. HAYSBERT:  Your Honor, if I may.

22         THE COURT:  Wait.  Reserved as to admissibility.

23  They agree it's an authentic business record, but you have

24  to establish that she has knowledge of it.  So let me hear

25  from Mr. McGavin.  It's to the person that you listed that

Eleftherion, A. - Direct                                               648

1   would have knowledge of this work order?  I haven't seen
2   anything like that.  The work order is dated March 7, 2018,
3   and at that time she was the manager.  She was the manager,
4   and she was not the managing partner.  That didn't occur
5   until February 2019.  Did you list her as the person who
6   would have knowledge?

7            MR. McGAVIN:  She provided a deposition for that
8   purpose, Your Honor, broadly, but the person who wrote that
9   work order is Marcus Wilson.  So he is the one that wrote it
10  and submitted it, but Ms. Eleftherion is aware of it, as is
11  Ms. Crosby, a former employee.  They were aware of what
12  Mr. Wilson was concerned about.

13           But in terms of its admissibility, because the
14  evidence will be, as plaintiff knows, it was the front
15  entrance, at the junction between the front door and where
16  the door opens into that lobby area, and that was the area
17  that Marcus Wilson was referring to.  That's what the
18  evidence will be, based upon the testimony and the
19  preparation that we have done.

20           THE COURT:  What you would need to do,
21  Mr. Haysbert, is do what you did before, put it on the
22  screen, do not show it to the jury, and establish, number
23  one, that she's aware of it and what it was for and the area
24  that it was for, and if you can't lay that foundation, then
25  I can't let it in.  We'll have to have Ms. Crosby testify

Eleftherion, A. - Direct                                                    649

1    about it, if she can.

2            MR. HAYSBERT:  Your Honor, if I may respond?  We

3    actually have Outback Steakhouse's response to request to

4    production of documents, which includes the work order.

5    That request for production of documents had to be signed by

6    Alicia Eleftherion because she was the managing partner at

7    the time the request for production was produced, and she's

8    also the person most knowledgeable at the deposition earlier

9    this year.  She was also listed as the person most

10   knowledgeable in the witness list as well.

11           THE COURT:  Knowledge, that is all part of

12   discovery.  You need to establish.  That request is

13   something you have to establish through the witness on the

14   stand.  I know about signing documents in discovery.

15   Discovery is not admitted before the Court.  It's not

16   introduced to the Court.  You have somebody saying that you

17   are aware of it doesn't mean that you know everything it was

18   for.  I don't know what she said in her deposition.  If she

19   said something differently, you can impeach her with her

20   deposition, if you want to try to impeach your own witness.

21   But let's get her in here.  No harm, no foul, if you just

22   show it on the screen and put in the record what you need

23   to.  There is nothing wrong after that.  It's got to be done

24   properly, and that's all I'm saying.  You can show it on the

25   screen and ask her about it and establish that she knows

Eleftherion, A. - Direct                                          650

 1    about it, and she knows what it was for.

 2            MR. HAYSBERT:  Thank you, Your Honor.

 3            THE COURT:  In any event, it doesn't do you any

 4    good if it's projected to be for one thing, and it turns out

 5    it was for another.  That only hurts your case when

 6    something comes in, and it turns out to be another.  In any

 7    event, let's proceed with her right now.

 8            Ms. Eleftherion, if you would please come up.

 9    You're still under oath.  You can resume your testimony.

10    Mr. Haysbert is still on direct examination.

11            Mr. Eleftherion is back on the stand.  She is still

12    under oath.  Mr. Haysbert.

13            MR. McKELVEY:  Your Honor, the jury.

14            THE COURT:  Thank you.  We do need the jury.  Can

15    you bring the jury in.

16            (Jury in at 2:39 p.m.)

17            THE COURT:  The jury is back from an extended

18    lunch.  I hope it was enjoyable, and we will resume the

19    examination of Ms. Eleftherion.  That is the way you say it?

20            THE WITNESS:  Eleftherion, yes, ma'am.

21    BY MR. HAYSBERT:

22    Q.  So I wanted to go back to your testimony about your

23    responsibilities as a managing partner of Outback Steakhouse,

24    and one of the things that you mentioned is that you reviewed

25    incident reports as part of being a managing partner of

Eleftherion, A. - Direct                                                651

1    Outback Steakhouse for that particular Chesapeake Outback?

2    A.  That's correct.

3    Q.  You were responsible as managing partner for safety at

4    the Outback, correct?

5    A.  Correct.

6    Q.  I want to go back to your role as manager of the Outback

7    Steakhouse.  This is during the period of time we were

8    referring to earlier.  Could you tell us what period of time

9    you were manager of the Outback Steakhouse?

10   A.  Yes.  The location in Chesapeake?

11   Q.  Yes, ma'am.

12   A.  Yes, sir.  I was manager from July of 2017 up until

13   February of 2019.

14          MR. HAYSBERT:  Your Honor, if I may put that on the

15   easel.

16          THE COURT:  I think she's already testified to

17   that.

18          MR. HAYSBERT:  Would you mind if I establish the

19   timeline on the easel?

20          THE COURT:  Let's just move it along.  You can do

21   it but it just takes extra time.  I think they've heard

22   that.

23   BY MR. HAYSBERT:

24   Q.  Now, Ms. Eleftherion, you were the front of the house

25   manager during this entire period of time, correct, July

Eleftherion, A. - Direct                                              652

1    2017?

2    A.  Yes.  From July to February, yes.

3    Q.  And, again, I just want to establish, front of the house

4    manager means everything in the dining room is under your

5    responsibility, correct?

6    A.  Correct.

7    Q.  Okay.  If a person was injured in the dining room through

8    a slip and fall, whose responsibility is it to follow up with

9    that person at Chesapeake Outback Steakhouse, at the

10   Chesapeake Outback Steakhouse, if anyone?

11          MR. McGAVIN:  Objection, Your Honor.  Object to the

12   form, relevance.

13          THE COURT:  Let's see.  I hope this doesn't go

14   astray.

15          MR. HAYSBERT:  It won't.  I promise you.

16          THE WITNESS:  There is protocol to follow, any type

17   of incident, whether it's slip and fall or different

18   incident regarding to a guest or somebody who works there,

19   we have to call that into our insurance group.

20          MR. McGAVIN:  Objection, Your Honor.

21          THE COURT:  You'd asked that question before, and

22   that's the answer you got.  There has been an objection to

23   it, and the Court specifically said there is no insurance in

24   this case, should be no mention of it and no insurance

25   issue.  That's the question you asked before that got the

1    same answer.

2          MR. HAYSBERT:  I said at the Chesapeake Outback

3    Steakhouse, is what I said.

4          THE COURT:  Whatever.  It elicited it.  It is along

5    the same lines, and it has now elicited the same response.

6          MR. McGAVIN:  Your Honor, I renew the motion I

7    previously made.

8          THE COURT:  I completely strike that question and

9    that answer at this juncture because it's not part of the

10   case.  It's improper under the law for it to even be

11   mentioned.

12         I thought you heard that, too, but you didn't as a

13   witness hear that?

14         THE WITNESS:  Yes, ma'am, I heard you.

15         MR. HAYSBERT:  If I move on.  Thank you, Your

16   Honor, and thank you, Mr. Eleftherion.

17   BY MR. HAYSBERT:

18   Q.  Are you responsible for addressing customer complaints

19   about conditions in the dining room of the Outback Steakhouse

20   as a manager of the Outback Steakhouse?

21   A.  Yes.

22   Q.  Would that responsibility extend to addressing the online

23   complaints as they are negative, Yelp or Trip Advisory

24   review?

25   A.  It's typically the managing partner's responsibility to

Eleftherion, A. - Direct                                            654

```
 1   address anything that comes in through a third party type of
 2   social media format, so to speak.
 3   Q.  Okay.  And because you are a managing partner now, can
 4   you explain what the managing partner is supposed to do, what
 5   those responsibilities are when there is an online review?
 6           THE COURT:  She wasn't managing partner then; is
 7   that correct?
 8           THE WITNESS:  That's correct.
 9           THE COURT:  At the time of the incident.  So who
10   was the managing partner then?
11           THE WITNESS:  His name was Chip Chase.
12   BY MR. HAYSBERT:
13   Q.  Norman Chip Chase?
14   A.  Correct.  I apologize.  Norman Chase.
15           THE COURT:  So Chip Chase was the managing partner?
16           THE WITNESS:  At the time.
17           THE COURT:  At the time?
18           THE WITNESS:  Yes, ma'am.
19           THE COURT:  Then that's the appropriate person to
20   ask the question to.
21           MR. HAYSBERT:  Thank you, Your Honor.
22   BY MR. HAYSBERT:
23   Q.  Right underneath the managing partner at the time was
24   you, right, Ms. Eleftherion?
25   A.  There were three of us, that we were all equal in -- use
```

Eleftherion, A. - Direct                                              655

```
 1   the word rank, we were all equally management salaried,
 2   managers.  There were three of us, yes.
 3   Q.  So I'd like to clarify, there was managing partner at the
 4   top and then three managers report to him, correct?
 5   A.  Correct.
 6   Q.  And you were one of those three managers?
 7   A.  Correct.
 8   Q.  And your specific responsibility was for the front of the
 9   house, meaning the dining room?
10   A.  Correct.
11   Q.  Thank you.  When there are spills at the restaurant in
12   the dining room, was there any protocol in place to make sure
13   the effective location was monitored while someone is
14   notified and things can be cleaned up?
15   A.  Yes, sir.
16   Q.  Could you explain?
17   A.  Yes.  In the event of a spill or --
18              THE COURT:  You need to speak up a little bit.
19              THE WITNESS:  I'm so sorry.  I have weak vocal
20   cords.  I apologize.  In the event of a spill or something
21   was even dripped on the dining room floor, whoever notices
22   it first, they are to stay with the spill or the drip and
23   notify someone close by to go and get both the wet floor
24   sign and dry mop, if available, or just dry towels, until
25   that spill can be completely resolved and dried condition to
```

Eleftherion, A. - Direct                                      656

```
 1   where the floor can be walked on without any kind of issue.
 2              MR. HAYSBERT:  Thank you very much.
 3   BY MR. HAYSBERT:
 4   Q.  Employees are required to wear non-slip shoes, correct?
 5   A.  Correct.
 6   Q.  Were you working the day of the incident?
 7   A.  I was in the building that day, yes.
 8   Q.  Were you wearing non-slip shoes?
 9   A.  Yes.
10   Q.  Is it correct that every employee that works at
11   Chesapeake Outback is required to wear non-slip shoes?
12   A.  That's correct.
13   Q.  Is it true that between the time that you were there in
14   July 2017/February 2019 as manager, every employee who has
15   worked in the front of the house, the dining room, has to
16   wear non-slip shoes, correct?
17   A.  Correct.
18   Q.  And that would include Lisa Crosby, correct?
19   A.  Correct.
20   Q.  You indicated earlier that you were working the day of
21   the incident.  Where were you?
22   A.  I was actually in the kitchen that day.  There was a
23   need, and I was filling in.
24   Q.  Okay.  So even though your normal responsibility is to
25   manage the front of the house, there was a need for you to be
```

1    in the back of the house, correct?

2    A.   Correct.

3    Q.   And that's where you were that day?

4    A.   Correct.

5    Q.   In your personal experience, looking back at that day,

6    where was Chip Chase, Norman Chase?

7    A.   I do not believe he was there that day at all.

8    Q.   Okay.  Do you believe Lisa Crosby was there?

9    A.   Yes.  Lisa Crosby was working that day.

10   Q.   So Lisa Crosby was there that day?

11   A.   Yes.

12   Q.   And she was a floor manager on duty that day?

13   A.   Yes.

14   Q.   Can you tell the jury what a floor manager is.

15   A.   A floor manager is just a little bit different than a

16   salaried manager.  We have a lot of salaried employees, a lot

17   of different responsibilities.  A floor manager is

18   essentially a guest advocate, and they're required to move

19   throughout the dining room, speaking to guests, ensuring

20   guest satisfaction, that they are happy with their food,

21   their service, and speaking to people and just filling any

22   needs they should come across.

23   Q.   That's what Lisa Crosby was?

24   A.   Correct, yes.

25   Q.   Because you were the manager of the front of the house,

Eleftherion, A. - Direct                                        658

1    although you were in the kitchen, did you know whether Joi

2    Myrick was at the hostess stand in the dining room at the

3    time that you were working there?

4    A.  In the morning, I would always pull roster, so I was

5    aware of who was working that day.  I believe Joi was working

6    that day.

7    Q.  And Joi is an African-American lady?

8    A.  Yes, I believe she is.

9            THE COURT:  You talk very quickly.

10           THE WITNESS:  I'm sorry.

11           THE COURT:  You said she was there in the morning.

12   Was she there for the whole day?

13           THE WITNESS:  I don't know what time Joi left that

14   day.  I believe Joi was there at some point in time for her

15   shift.

16   BY MR. HAYSBERT:

17   Q.  Her job was to be the hostess and be stationed at the

18   hostess stand, correct?

19   A.  Correct.

20           THE COURT:  For a certain number of hours?

21           THE WITNESS:  Yes, that is correct.

22   BY MR. HAYSBERT:

23   Q.  Was it Joi Myrick's responsibility as the hostess

24   standing at the hostess stand to maintain floor conditions at

25   the restaurant?

Eleftherion, A. - Direct                                            659

1   A.  It is the responsibility of everyone working in the

2   front.

3   Q.  Thank you.  You didn't see Mr. Haysbert fall, did you?

4   A.  No, I did not.

5   Q.  You don't know exactly what caused her to fall?

6   A.  I don't know.

7   Q.  Do you know where she fell?

8   A.  I'm aware of the area, yes.

9   Q.  How are you aware of the area?

10  A.  Lisa Crosby, the next day, made me aware that there was a

11  slip and fall in the dining room, and I asked her where, to

12  show me, and so she showed me the table where it occurred,

13  and so I just -- was trying to inspect things, as I routinely

14  did, so that is how I know.

15  Q.  Did she show you where the fall happened through a

16  picture or photograph?

17  A.  She had taken a picture of the floor, I believe, but she

18  showed me exactly which table it was.

19  Q.  She also showed you a picture of it as well?

20  A.  Yes.

21  Q.  Why did she show you a picture of it?

22  A.  I don't know.

23  Q.  If I may, I'm going to go to Defendant's Exhibit Number

24  1.  Can you see the picture?  Can we publish?

25          THE COURT:  Doesn't get posted to the jury.

 1           MR. HAYSBERT:  Only to the witness.

 2           THE COURT:  To the witness and counsel and the

 3   Court.  I don't see it on my screen.

 4           MR. HAYSBERT:  Thank you.

 5           THE COURT:  Now I see it.  The Court doesn't mind

 6   you asking these questions, but we are asking the same

 7   question over and over, and you know there is a witness

 8   coming who can testify about this, and I'm not sure where

 9   you're going with asking her about this picture, but you can

10   do so.

11           You didn't take this picture, did you.

12           THE WITNESS:  No, Your Honor.

13           THE COURT:  Go ahead.

14   BY MR. HAYSBERT:

15   Q.  You testified that you saw this picture.  Is this the

16   picture you saw?

17   A.  I believe that to be the same picture, yes.

18           MR. HAYSBERT:  Your Honor.

19           THE COURT:  Just keep on.  In the Court's opinion,

20   there are quicker and easier ways to get these exhibits in

21   without asking the same question of the same witnesses, but

22   just to facilitate things, just go ahead.

23           MR. HAYSBERT:  Thank you, Your Honor.  She is here

24   testifying on behalf of Outback.

25           MR. McGAVIN:  Excuse me, Your Honor.  I object to

Eleftherion, A. - Direct                                                661

1    that.  She was not designated to appear today as an employee

2    of Outback.  She's testifying through her personal

3    knowledge.  That's a discovery matter she was produced for,

4    not for Outback Steakhouse.

5              MR. HAYSBERT:  Your Honor, I would object to that.

6              THE COURT:  You all just stop it.  You don't need

7    to object.  She is listed as a witness.  Whether or not

8    she's been properly processed, I don't know at this point.

9    She is listed as a witness, and I'm not getting into this

10   anymore at this point.  I'm tired of one person objecting

11   and then you objecting to him objecting.

12             MR. HAYSBERT:  Okay.

13   BY MR. HAYSBERT:

14   Q.  Ms. Eleftherion, if you could turn your attention to the

15   picture.  Do you recognize this picture, correct?

16   A.  Yes.

17             MR. HAYSBERT:  Your Honor, if I may publish this

18   for the jury.

19             THE COURT:  How do you recognize it?  Establish the

20   foundation and the basis upon which you recognize the

21   picture.

22             THE WITNESS:  Yes, Your Honor.  I believe it's the

23   same -- it looks like the floor at the time, and I believe

24   it's the same picture.  I believe that it is.  It could be a

25   different picture.

Eleftherion, A. - Direct                                                    662

```
1              THE COURT:  The one Ms. Crosby showed you?

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  Then anything further you want to say

4    on that, Mr. McGavin?  I'm going to let them see it.

5              MR. McGAVIN:  Of course, Your Honor.  No objection.

6              THE COURT:  Now you get to see the picture.

7    BY MR. HAYSBERT:

8    Q.  This was the picture that Ms. Crosby showed you of the

9    floor, correct?

10   A.  I believe it is, yes.

11   Q.  Do you know when this picture was taken?

12   A.  Ms. Crosby told me she took the picture at the time of

13   the incident or immediately thereafter.

14   Q.  Okay.  Did you verify with her that the photo was

15   correct?

16   A.  Did I verify the photo was correct?  I recognize that

17   space of floor, the area she showed me.  It looks like about

18   the exact same.

19   Q.  Did she give you a time stamp for when the photo was

20   taken?

21   A.  She did not give me a time stamp.

22   Q.  Do you know when the photo was taken, through some

23   objective evidence?

24             THE COURT:  When did she show it to you?

25             THE WITNESS:  I was made aware of this the next
```

1    day.  So she showed me the following day.

2              THE COURT:  The following day?

3              THE WITNESS:  Yes, Your Honor.

4    BY MR. HAYSBERT:

5    Q.  You have no way of knowing whether or not this picture

6    was taken the moment after the incident happened or the

7    following day, correct?

8    A.  That is correct.  I have no way.

9    Q.  So still safe to say that you still don't know exactly

10   when and where this photo was taken, correct?

11   A.  I do not know the time it was taken, no.  That is the

12   area of the flooring that -- the shading was very unique, put

13   it that way, on the floor.

14   Q.  So it's possible that this photo could have been taken

15   after the floor had been cleaned after the slip and fall?

16             THE COURT:  Establish a basis for that.  Anything's

17   possible.  Just ask her the question.  She says she doesn't

18   know.  She knows Ms. Crosby took it, what Ms. Crosby said,

19   and she saw it the next day.  Now you can argue from that

20   what you want to argue.  You can certainly argue to the jury

21   inferences that can be drawn.

22             MR. HAYSBERT:  Thank you, Your Honor.

23   BY MR. HAYSBERT:

24   Q.  Wasn't it Norman Chip Chase's job to look into this

25   incident more closely as managing partner of the Chesapeake

1    Outback Steakhouse?

2    A.  As managing partner, he should have been responsible,

3    yes, to see things through to fruition, yes.

4    Q.  And that would include following up with the plaintiff,

5    if necessary?

6    A.  My understanding is the managing partner, which I am

7    currently, once we call in the incident, they take over from

8    there.

9            MR. HAYSBERT:  I'm going to take this off the

10   screen, Your Honor.

11           THE COURT:  All right.

12   BY MR. HAYSBERT:

13   Q.  I'm going to turn to Defense Exhibit Number 2.  Show this

14   to the witness.  Do you see the picture on your screen?

15   A.  Yes, sir.

16   Q.  Do you know what this picture is?

17   A.  I believe it is a picture of Ms. Haysbert's shoes.

18   Q.  Thank you.

19           MR. HAYSBERT:  Your Honor, may I publish this for

20   the jury, this picture?

21           MR. McGAVIN:  No objection.

22           THE COURT:  Publish it to the jury.

23   BY MR. HAYSBERT:

24   Q.  This is Defense Exhibit Number 2.

25           It is your understanding that Lisa Crosby took this

Eleftherion, A. - Direct                                            665

1   picture?

2   A.  That is my understanding, yes.

3   Q.  Do you know when she took this picture?

4   A.  I believe she took the picture the same day as this

5   incident occurred.

6   Q.  Do you know whether she took the picture before or after

7   the plaintiff fell?

8   A.  I do not know.

9   Q.  There is a video camera set up outside of the front of

10  the restaurant, correct?

11  A.  Cameras are inside.

12  Q.  So there are no cameras on the outside of the restaurant?

13  A.  There is a camera positioned -- yes, by the to go area,

14  there is a camera positioned there, yes.

15  Q.  That camera faces the front door, correct, so anyone

16  walking in, that camera would see them?

17  A.  The camera is inside the building, and the camera is

18  positioned at the front door, yes.  Positioned at the hostess

19  stand up to a small threshold beyond the front door.

20  Q.  So the camera is positioned above the hostess stand?

21  A.  Correct.

22  Q.  And then the camera looks at -- let's assume this is the

23  hostess stand, and that's the front door (indicating).

24  A.  Yes.

25  Q.  The camera looks down and towards the door?

```
 1   A.   Yes.  It doesn't cover any area past the front doors.

 2   Q.   The cameras are working that day, correct?

 3   A.   Correct.

 4            THE COURT:  This is the entrance?

 5            THE WITNESS:  Yes, Your Honor.

 6            THE COURT:  Not inside?

 7            THE WITNESS:  The camera is inside the building.

 8            THE COURT:  The camera is inside, but the picture,

 9   you said, stops at the door?

10            THE WITNESS:  Correct, Your Honor.

11            THE COURT:  So the picture is taken from the

12   inside, but this portrays the outside?

13            THE WITNESS:  Once you would open those front doors

14   to the outside, there would be nothing past that portion,

15   correct.

16   BY MR. HAYSBERT:

17   Q.   Is there a camera -- just to establish this, is there a

18   camera outside the restaurant that captures anything

19   happening outside of the restaurant?

20            THE COURT:  Well, as I understand your testimony,

21   this captures the outside entrance, does it not?

22            THE WITNESS:  In a very limited way.  If I were to

23   prop the front door open, it would cover a small part of the

24   porch.

25   BY MR. HAYSBERT:
```

Eleftherion, A. - Direct                                         667

1    Q.  Thank you.  So this picture that you see here, could this

2    picture have been captured by the Outback Steakhouse camera?

3    A.  It's a video -- it's a video camera.

4    Q.  Well, you can still take a still from a video camera as a

5    picture, right?

6    A.  I personally do not know how to do that.

7    Q.  I'm not asking you how to do that.  Excuse me.  Sorry to

8    interrupt you.  I'm not asking you if you know how.  It can

9    be done, though, correct?

10   A.  I believe so.

11   Q.  So it's possible that this photo was taken by a camera

12   situated outside of the Outback Steakhouse, correct?

13   A.  I do not believe that it was.

14   Q.  Well, on what basis do you not believe that it was?

15   A.  Lisa showed me the picture that she has taken of the

16   floor, and she showed me the picture -- she showed me this

17   picture.  It was on her cell phone.

18   Q.  Okay.  So the picture of these shoes were on Lisa

19   Crosby's cell phone?

20   A.  If I recall correctly, yes.

21   Q.  How did the pictures get on Lisa's cell phone?

22   A.  She said she took a picture of the floor.  It made sense

23   to me, she had taken a picture of the shoes at the same time.

24   Q.  Did she tell you that she took a picture of plaintiff's

25   shoes?

JODY A. STEWART, Official Court Reporter

Eleftherion, A. - Direct                                        668

1   A.  She did, yes.

2   Q.  Did she tell you why?

3   A.  She did not tell me, no.

4   Q.  So she took a picture of plaintiff's shoes at some point

5   before or after the incident, you don't know, correct?

6   A.  Correct.

7   Q.  Because you don't have a time stamp, correct?

8   A.  Correct.

9   Q.  You don't have any metadata for the picture, correct?

10  A.  Correct.

11  Q.  And because the picture was taken on the cell phone, you

12  don't have that cell phone, it wasn't yours, right?

13          THE COURT:  You don't know whether the picture was

14  taken on the cell phone.  It was shown to you from a cell

15  phone?

16          THE WITNESS:  Correct.

17          MR. HAYSBERT:  Understood.  That's fine.

18  BY MR. HAYSBERT:

19  Q.  So let's go back to the camera situated inside the store.

20  Okay.  This is the camera above the hostess stand that

21  extends towards the front door, correct?

22  A.  Correct.

23  Q.  Was the camera working on the date of the incident?

24  A.  Yes, it was.

25  Q.  Thank you.  So that camera would have shown you anyone

Eleftherion, A. - Direct                                          669

1    coming into the door of the front door and would also show

2    you anyone going out the front door, correct?

3    A.  Correct.

4    Q.  Okay.  Did you capture any footage of just before the

5    incident happened when Dr. Haysbert walked into the floor --

6    I'm sorry, into the Outback Steakhouse?

7    A.  I don't know.

8    Q.  When you say you don't know, what do you mean?  You don't

9    know if you captured any footage?

10   A.  Correct.

11          THE COURT:  It didn't capture any of it, she said.

12   You didn't capture any of this?  You weren't running the

13   video camera?  These were things shown to you by Ms. Crosby?

14          THE WITNESS:  Correct.

15          THE COURT:  That's mischaracterizing her testimony.

16   She did not capture any of this.

17          MR. HAYSBERT:  Your Honor, I'm basing my line of

18   questioning on the fact that she shared with the jury and

19   all of us that she was responsible for the front of the

20   house floors.

21          THE COURT:  She's testified about these, and she

22   says it's a running video.  Just ask her if she captured

23   any.  Then you can follow up, if she did.  It's the form of

24   your question.

25          MR. HAYSBERT:  Okay.  Then I will redirect the

Eleftherion, A. - Direct                                                    670

1   witness, but I would still like to get the same information
2   from the witness that I started with.
3   BY MR. HAYSBERT:
4   Q.   Which is, you are responsible for the front of the house,
5   which is the area in the dining room, correct?
6   A.   Correct.
7   Q.   You were not in the dining room at the time of the
8   incident, correct?
9   A.   Correct.
10  Q.   So if you needed to be assured of what happened in the
11  front of the house, you would need to check the video,
12  correct?
13  A.   Correct.
14  Q.   Okay.  And so my question is, did you check the cameras
15  for -- just because you just indicated they were working that
16  day, did you check the cameras for just before Dr. Haysbert
17  walked in the door and also right as Dr. Haysbert was walking
18  out?  Did you check the cameras for that information?
19  A.   I did not.
20  Q.   Why not?
21  A.   At that time I did not have access to the camera codes to
22  go back and play that video.
23  Q.   Who had access?
24  A.   The managing partner would have had access.
25  Q.   But as the manager of the Outback Steakhouse at that

Eleftherion, A. - Direct                                                 671

1    time, could you not have asked, because you were responsible

2    for the front of the house, to check the cameras to see

3    whether or not what had happened right before Dr. Haysbert

4    walked in and right around the time she was leaving?

5    A.  It was something at that time that was exclusively

6    controlled by the managing partner.

7    Q.  Again, you could have asked the managing partner, who

8    controlled the cameras, you, as the manager and the

9    responsible person for the front of the house, could have

10   asked the managing partner to check the cameras because you

11   were responsible for that area, correct, but you didn't?

12   A.  Correct.

13   Q.  That video, the one above the hostess stand, only would

14   have shown to the front area of the floor.  Would that video

15   have showed you who was at the hostess stand at the time that

16   Dr. Haysbert approached the hostess stand?

17   A.  Yes.

18   Q.  And it would have showed you who came out from behind the

19   hostess stand and pointed, if anyone pointed to the restroom,

20   that camera would have shown you that?

21   A.  I didn't quite understand your question.

22   Q.  That camera could have showed you who came out from

23   behind the hostess stand and pointed out the restroom to

24   Dr. Haysbert?

25   A.  Yes.  Unless they went off camera, yes.

Eleftherion, A. - Direct                                          672

```
1   Q.  Understood.  Okay.  You never asked Mr. Chase to check
2   the cameras, correct?
3   A.  I did ask Mr. Chase about the incident.
4   Q.  I'm asking a very specific question.  I'm talking about
5   the camera above the hostess stand.  Did you ask Mr. Chase to
6   check the camera?
7   A.  I did not, no.
8   Q.  You were responsible for the front of the house at that
9   time, correct?
10  A.  I was the front of the house manager at that time, yes.
11  Q.  And you were in the kitchen at that time, correct?
12  A.  Yes.  It was the end of my shift, and, yes, I was in the
13  kitchen.
14  Q.  You were at the Outback Steakhouse at that time, correct?
15  A.  Yes.  Correct.
16  Q.  And Mr. Chase wasn't there, correct?
17  A.  Correct.
18  Q.  And so the person who would have been in control of the
19  front of the house and the back of the house would have been
20  you, correct?
21  A.  Correct.
22  Q.  And that person was you, correct?
23  A.  Correct.
24  Q.  On that day, correct?
25  A.  Yes.
```

Eleftherion, A. - Direct                                              673

1   Q.   When Dr. Haysbert slipped and fell, correct?

2   A.   Correct.

3   Q.   Did you ever see a video of the -- just before the

4   incident occurred, or right after the incident occurred, when

5   Dr. Haysbert was leaving the Outback Steakhouse?

6   A.   No, I did not.

7   Q.   You never saw any sort of video?

8   A.   Video, no.

9   Q.   And you never asked anyone for video?

10  A.   I did not ask for video, no.

11  Q.   Did you not care to see the video to see what happened?

12          MR. McGAVIN:  Objection, argumentative.  This is

13  also repetitive.

14          THE COURT:  Sustained.

15          MR. HAYSBERT:  I'll withdraw the question.

16  BY MR. HAYSBERT:

17  Q.   That video that was right above the hostess stand that

18  was pointing out towards the front door, if anyone were

19  escorting Dr. Haysbert to the door, it would have shown that

20  person escorting her to the door, correct?

21  A.   Correct.

22  Q.   So if Ms. Haysbert was escorting her mother to the door,

23  it could have shown her escorting her mother to the door,

24  correct?

25  A.   Correct.

Eleftherion, A. - Direct                                        674

1    Q.  It would have been able to capture how quickly they were

2    moving or whether they were moving very slowly or barely at

3    all, correct?

4    A.  Correct.

5    Q.  It, likewise, would have also shown anyone else in the

6    restaurant who was taking or escorting Dr. Haysbert to the

7    door, correct?

8    A.  Correct.

9    Q.  Someone like Lisa Crosby, who you said in your testimony

10   was a guest advocate and there to help customers, it would

11   have shown her taking or escorting Dr. Haysbert to the door,

12   if she'd actually done that?

13   A.  Correct.

14   Q.  But you never saw any camera footage?

15   A.  The camera footage would not have --

16   Q.  I'm asking you a very specific question.  You never saw

17   the camera footage?

18   A.  Correct.

19   Q.  You never asked for it?

20   A.  Correct.

21   Q.  So you wouldn't know one way or the other whether -- how

22   Dr. Haysbert got to the door or whether she was escorted by

23   her daughter or by Lisa Crosby or anyone else, correct?

24            THE COURT:  Wait just a minute.

25            MR. McGAVIN:  Objection, asked and answered.  This

Eleftherion, A. - Direct                                                      675

1    is very repetitive.

2            THE COURT:  I agree.

3    BY MR. HAYSBERT:

4    Q.  The camera where the hostess stand, looking towards the

5    front door, would it not have showed Dr. Haysbert if she were

6    coming inside the door, whether or not she was showing signs

7    of dizziness or unsteadiness?

8    A.  It would have showed anyone coming out of the door, yes.

9    Q.  And would have shown Dr. Haysbert if she was showing any

10   signs of dizziness or unsteadiness, correct?

11   A.  If dizziness is something you can visually pick up on,

12   yes.

13   Q.  Can you pick up dizziness from a camera, Ms. Eleftherion?

14           MR. McGAVIN:  Excuse me, Your Honor.  I must

15   object.  This is speculative.

16           THE COURT:  It's beyond this particular witness's

17   knowledge of facts and expertise.  You'd have to show that

18   she has experience in judging how you determine somebody's

19   dizzy when you are looking at a camera.

20   BY MR. HAYSBERT:

21   Q.  Ms. Eleftherion, would it have been safe to say, as

22   managing -- as manager of the front of the house, which means

23   the dining room, on the day of the incident, and from July

24   2017 until February 2019, that customers come to Outback

25   Steakhouse wearing heels?

Eleftherion, A. - Direct                                      676

1   A.   That there were customers wearing heels, yes.
2   Q.   All the time, right, between July 2017 and February 2019,
3   wouldn't you say that there were a number of customers that
4   would come in wearing heels?
5   A.   Yes.
6   Q.   In fact, you invite anyone to come into your restaurant,
7   including people with heels on, correct?
8   A.   Yeah.
9   Q.   Women are allowed into the restaurant?
10  A.   Yes.
11  Q.   Men?
12  A.   Yes.
13  Q.   Whether they are wearing non-slip shoes or not, heels,
14  whatever kind of heels --
15  A.   There is no restrictions on shoes for guests.
16  Q.   Thank you.  Now, the floor of the Chesapeake Outback
17  Steakhouse was replaced, wasn't it, Ms. Eleftherion?
18  A.   It was replaced, yes.
19  Q.   And you were the manager at the time it was replaced,
20  correct?
21  A.   Correct.
22  Q.   And it was replaced in February of 2019, wasn't it?
23  A.   My notes I have is December of 2018.
24  Q.   So we will go with your notes.  December 2018, correct?
25  A.   Yes.

JODY A. STEWART, Official Court Reporter

1          MR. HAYSBERT:  If I may approach, Your Honor.

2    BY MR. HAYSBERT:

3    Q.  It is your testimony, Mr. Eleftherion, that between July

4    2017 until December of 2018, that the floors were in a

5    condition that was different from what the floors were in

6    after December of 2018?

7    A.  The floors were replaced in that time frame, yes.

8    Q.  The floors were different after December 2018 than they

9    were before December 2018?

10   A.  Correct.

11   Q.  If you could pull up Page 159 of Alicia Eleftherion's

12   deposition, the deposition she gave on behalf of person most

13   knowledgeable.

14          THE COURT:  You can't pull it up on the screen.

15          MR. HAYSBERT:  I'm talking to the trial tech.

16          THE COURT:  But I have to see a copy.  I have to

17   know what you're asking, and I need to see it, and you

18   cannot put it up on the screen for the witness.  You're

19   trying to impeach your own witness with a deposition, is

20   that what you're doing?

21          MR. HAYSBERT:  No, Your Honor, just want him to

22   pull it up.  I'm asking the trial tech.

23          THE COURT:  You've got to have a purpose to pull it

24   up.  Tell me what you are pulling it up for and please give

25   me the deposition.

1          MR. HAYSBERT:  I'm so sorry.  I'm telling him to

2     pull it up on his computer.  I'm not ready to publish it yet

3     to the jury or to Ms. Eleftherion.

4          THE COURT:  I don't know that you even can.  But I

5     don't know what purpose you're using it for.  I have to know

6     the purpose.

7          MR. HAYSBERT:  Understood.

8          THE COURT:  Before I can rule under the rules.

9          MR. HAYSBERT:  Yes, ma'am.  I will give you that

10    right now, Your Honor.

11         THE COURT:  You have to show me what it is and what

12    you are using it for.  I cannot see it.  I do not have it.

13    You must give me the page or whatever you're referring to.

14         MR. HAYSBERT:  I won't use it yet, Your Honor.  I'm

15    going to ask her a question first.

16         THE COURT:  But you are going to read from it.

17         MR. HAYSBERT:  Not yet, no.  I wouldn't do it

18    without asking your permission first, but I'm going to do

19    this first and then ask your permission.

20         THE COURT:  You told him to pull up the page on the

21    deposition.

22         MR. HAYSBERT:  That's correct, only for us.

23         THE COURT:  He's got a paper page, so you don't

24    need to pull it up.

25         MR. McKELVEY:  That is unrelated.

Eleftherion, A. - Direct                                          679

1          MR. HAYSBERT:  Is it for me?

2          THE COURT:  They say that's unrelated.  You're

3    going to have to show opposing counsel what you are pulling

4    up, and you've got to show the Court what you're pulling up.

5    I just don't know what you're doing.

6          MR. HAYSBERT:  I have a question.  I just want to

7    ask her a question, and then depending on her answer, I may

8    pull up the deposition or not.

9          THE COURT:  Ask her the question.

10         MR. HAYSBERT:  Thank you.

11   BY MR. HAYSBERT:

12   Q.  Ms. Eleftherion, at your deposition --

13         THE COURT:  You can't say "at your deposition."

14   That is opposite to the rules.  That's a violation of the

15   rules.

16         MR. HAYSBERT:  I'll withdraw the question, Your

17   Honor.

18         THE COURT:  Ask her the question today.

19   BY MR. HAYSBERT:

20   Q.  The floor was replaced for aesthetic purposes?  Is that

21   your testimony, that the floor was replaced for aesthetic

22   reasons?

23         THE COURT:  Ask her if she knows why the floor was

24   replaced.

25   BY MR. HAYSBERT:

Eleftherion, A. - Direct                                              680

1   Q.  Why was the floor replaced?

2   A.  I don't know.

3   Q.  Your testimony, Ms. Eleftherion --

4           THE COURT:  Wait.  Still not the proper way to do

5   it.

6           MR. HAYSBERT:  I understand.

7           THE COURT:  Do you want me to send the jury out and

8   tell you how to do it?

9           MR. HAYSBERT:  No, I'll do it.  Thank you very

10  much, Your Honor.

11  BY MR. HAYSBERT:

12  Q.  Ms. Eleftherion, when we talked earlier than today --

13          THE COURT:  You can't go back to conversations that

14  you had with her that weren't under oath.

15          MR. HAYSBERT:  It was under oath.  We had a

16  conversation.

17          THE COURT:  Today under oath?

18          MR. HAYSBERT:  We had a conversation about the

19  floors, Your Honor, when she was under oath at her

20  deposition.

21          THE COURT:  Ladies and gentlemen, you will need to

22  step out.  I've got to straighten this out because I don't

23  know what's going to happen here and what's going on.

24          (Jury out at 3:14 p.m.)

25          THE COURT:  Are you now moving to try to impeach

1    the witness with testimony at a deposition that you claim is

2    different from now?

3            MR. HAYSBERT:  That's correct.

4            THE COURT:  The way you do that is you get her

5    testimony under oath here at trial.

6            MR. HAYSBERT:  Which we just did.

7            THE COURT:  Which you just did.  Then you say, Did

8    you give a deposition on such and such a day?  Did you

9    testify to the same at your deposition?  You show her the

10   deposition and ask her if that refreshes her recollection.

11           MR. HAYSBERT:  Thank you, Your Honor.

12           THE COURT:  You have to refer to the line and the

13   page.  She gets a chance to read it.

14           MR. HAYSBERT:  Thank you, Your Honor.

15           THE COURT:  So you have to give opposing counsel a

16   copy; you have to give the Court a copy.  We have to see

17   what you're referring to.  In other words, you have to let

18   everybody know you are referring to a deposition on such and

19   such a date by her, and it's line this and this.  So you

20   first have to give it to the Court, because I have to

21   determine whether it's even proper to try to impeach

22   somebody with that.  So where is it?  Can somebody please

23   just give me this deposition that we are talking about.

24           MR. HAYSBERT:  Yes, Your Honor.

25           THE COURT:  So what line?

Eleftherion, A. - Direct                                          682

 1            MR. HAYSBERT:  Your Honor, it's underlined.

 2            THE COURT:  So it is Page 159, lines 17 to 24.

 3            Mr. McGavin, have you pulled that up?

 4            MR. McGAVIN:  Yes, I have.

 5            THE COURT:  Is there anything you want to say?

 6            MR. McGAVIN:  This is his witness.  She's a fact

 7    witness.  He hasn't proved her adverse, so he's impeaching

 8    his own witness.  So I object to this process.  He is

 9    impeaching his own witness.

10            MR. HAYSBERT:  I don't have to prove she's adverse.

11    She is here on behalf of Outback Steakhouse, and she gave a

12    deposition.

13            THE COURT:  She is your witness.

14            MR. HAYSBERT:  The rules support me.  She's an

15    adverse witness because she is here on behalf of the party.

16    She testifies as the party.

17            THE COURT:  Please don't argue anymore about that.

18    I said I'm not going to do that.  I'm not going to say you

19    can't impeach your own witness.  I'm not going to say that,

20    regardless whether she's adverse or not adverse.

21            Then the way to do it, is when the jury comes back

22    in, you ask her if she gave a deposition on such and such a

23    date and refer her to the page and the line and ask her if

24    she remembers the deposition, and refer her to the page and

25    line, and then ask her if she thinks she said anything

Eleftherion, A. - Direct                                        683

1    differently there.  If not, then we will proceed from there,

2    or I'll let you read it and let the jury make its own

3    decision, or I'll read it and let the jury make its own

4    decision.  Does that suit you?

5              MR. HAYSBERT:  Yes, Your Honor.

6              THE COURT:  Then bring the jury back in, please.

7              (Jury in at 3:18 p.m.)

8              THE COURT:  Is this your only copy?  Do you need

9    the copy you have given the Court?

10             MR. HAYSBERT:  Your Honor, no.  I can take it back

11   from Your Honor.  We have it up here.  I'll take it.

12             THE COURT:  I need it.

13             MR. HAYSBERT:  Okay.

14             THE COURT:  I mean, I need it at some point.

15             MR. HAYSBERT:  That's okay.

16             THE COURT:  Go ahead.

17   BY MR. HAYSBERT:

18   Q.  Ms. Eleftherion, your testimony just a few minutes ago

19   was that you didn't know why the floor was replaced?

20   A.  Not specifically, no.

21   Q.  Do you have a general idea why the floor was replaced?

22   A.  Yes.  We have been hoping for a remodel, like a full

23   remodel, and when that was not available to us, we saw an

24   opportunity to where we could potentially have the floors

25   replaced.

Eleftherion, A. - Direct                                              684

1  Q.  And why -- why did you find the opportunity that the

2  floor needed to be replaced?

3  A.  Well, the age of the floor, it was original to the

4  building, and building looked very dated.  So we were trying

5  to find whether it was the booths or something that would be

6  impactful to make it look fresh.

7  Q.  So are you stating on the record that the floors were

8  aging?

9  A.  They were original to that building, yes.

10  Q.  I'm asking a specific question.

11        THE COURT:  She just said that.

12  BY MR. HAYSBERT:

13  Q.  So the floors were aging?

14  A.  They were older floors, yes.

15  Q.  And you indicated that the floors were terrible, correct?

16  A.  I thought they looked terrible, yes.

17  Q.  And you indicated that when you testified before in your

18  deposition, indicated they were terrible, didn't you?

19  A.  I did not like the way they looked at all, no.

20  Q.  This is before the floor was changed, correct?

21  A.  Correct.

22  Q.  So at some point between July 2017 and December 2018,

23  when the floors were changed, you thought those floors were

24  terrible?

25        MR. McGAVIN:  Objection, Your Honor,

Eleftherion, A. - Direct                                          685

```
 1    mischaracterizes the testimony.  She said looked terrible.
 2              THE COURT:  Sustained.
 3    BY MR. HAYSBERT:
 4    Q.  Ms. Eleftherion, is there a difference between looked
 5    terrible and were terrible?
 6    A.  I believe there is.
 7    Q.  What's the difference?
 8    A.  One is appearance and the other is something that has no
 9    use whatsoever.
10              THE COURT:  This is being belabored.  Just get to
11    your point.
12    BY MR. HAYSBERT:
13    Q.  You claim that the floors were replaced because they
14    looked terrible; isn't that correct?
15    A.  I think that was a big part of it, yes.
16    Q.  What else was a part of it?
17    A.  Again, we were just trying to get something new in a
18    restaurant that had opened in 1996.
19    Q.  That goes back to aesthetics.  We already discussed that.
20    A.  Okay.
21    Q.  You already told us that you thought the floors were
22    replaced because they looked terrible, and then you said
23    there was another reason.  What other reason was there?
24    A.  Again, I was the manager at the time.  I wasn't linked in
25    on every conversation regarding --
```

Eleftherion, A. - Direct                                          686

 1   Q.  I'm not talking about the conversation.  I'm talking
 2   about your own personal knowledge.
 3          THE COURT:  This is what I'm going to do.  You
 4   brought up this deposition.  You asked her.  We are going to
 5   have her read these lines.  The jury can hear it, and they
 6   can determine whether her testimony is the same today as it
 7   was in her deposition.  So we are going to do this properly,
 8   and you've already brought it up, and we are beating around
 9   the bush.  Do you remember giving a deposition?
10          THE WITNESS:  Yes, ma'am.
11          THE COURT:  What date was the deposition,
12   Mr. Haysbert?
13          MR. HAYSBERT:  May 13th, 2021.
14          THE COURT:  You should focus on line 17 on Page
15   159, and we are going to do the whole testimony, not just
16   out of context, through line 7 on Page 160.  I'm going to
17   hand you this and ask you if this refreshes your
18   recollection or if this is different than what you've said
19   today in your mind.
20          THE WITNESS:  Yes, Your Honor.
21          THE COURT:  Then we will read it to the jury and
22   let the jury determine whether it's different or not.
23          THE WITNESS:  Yes, Your Honor.  Am I to read it out
24   loud or to myself?
25          THE COURT:  No, you read it to yourself.  Start on

Eleftherion, A. - Direct                                              687

1    the page that's underlined and go through where the red mark

2    is on the next page.

3            THE WITNESS:  Yes, Your Honor.  I remember this in

4    the deposition.

5            THE COURT:  Pardon?

6            THE WITNESS:  Yes, I remember making this

7    deposition, yes.

8            THE COURT:  The next question is, do you stand by

9    that testimony today?

10           THE WITNESS:  Yes, I do.  Yes.

11           THE COURT:  Can you give it back to the Court?

12           THE WITNESS:  Yes.

13           THE COURT:  Mr. Haysbert, do you want to read these

14   lines, or do you want the Court to read them to the jury?

15   The jury's heard her testimony today, they've heard what her

16   testimony is at the deposition, and they can decide whether

17   it's different or the same.

18           MR. HAYSBERT:  Your Honor, you may read it, if you

19   like.

20           THE COURT:  All right.  I'm reading her deposition

21   on Page 159, line 17 to Page 160, line 1 through 7.

22   Mr. Haysbert is the person doing the questioning, and

23   Ms. Eleftherion is the witness who's answered:

24                    "Question:  You replaced the floor, you

25           said, for aesthetic purposes, not for safety

1          reasons?
2                          "Answer:  The floor was definitely aging
3           and it -- it needed to be replaced.  It looked
4           terrible.
5                          "Question:  The question was, did you
6           replace the floor for aesthetic reasons and not
7           safety reasons?
8                          "MR. McGAVIN:  Objection, asked and
9           answered.
10                         "THE WITNESS:  I would say, yes, yes.
11                         BY MR. HAYSBERT:
12                         "Question:  So there was no safety
13          component to the change in the flooring?
14                         "MR. McGAVIN:  Objection.  Asked and
15          answered."
16                         The witness answer is no.
17          So that's the testimony at her deposition, and
18   you've heard her testimony today, and you can decide for
19   purposes of credibility whether this testimony is different
20   under oath than her testimony today.
21   BY MR. HAYSBERT:
22   Q.  So your testimony from your deposition is still the
23   testimony you have today, Ms. Eleftherion?
24   A.  Yes.
25   Q.  Is your number (757)292-8965?

1    A.   Yes.

2    Q.   That is your number, right, your personal number?

3    A.   Cell phone number, yes.

4             MR. HAYSBERT:  Thank you.  Could you please?  Your

5    Honor, if I may?

6             THE COURT:  No.  The court security officer handles

7    the exhibits.  What exhibit is this?

8             MR. HAYSBERT:  Your Honor, this is not an exhibit.

9    This is impeachment evidence of Ms. Alicia Eleftherion.  Her

10   number is on this document.

11            THE COURT:  Okay.  You'll have to argue that to me

12   outside the presence of the jury, and you are going to have

13   to be prepared to stay here.  I'm sorry.  We've got two

14   local witnesses, one who works at the shipyard and has been

15   here for days, and so if you need to make a telephone call

16   to your family, you should let the court security officer

17   know because the rate we are going, hopefully, we will be

18   over by 6:00, but it could be as long as 7:00.  I'm very

19   sorry, but I just can't have these witnesses sitting back in

20   a witness room for hours and hours and hours waiting to come

21   in to testify.  I'm very sorry.  Can you please take the

22   jury out for a minute while I resolve this issue because I

23   haven't seen this document.

24            (Jury out at 3:28 p.m.)

25            THE COURT:  If you would step out, because we will

Eleftherion, A. - Direct                                                    690

1  be discussing the document.  I prefer that you step out,

2  Ms. Eleftherion.

3          THE WITNESS:  Yes, Your Honor.

4          (Witness excused.)

5          THE COURT:  First of all, where is the phone number

6  on here?  Let's focus the document to the phone number

7  first.

8          MR. HAYSBERT:  Sure.  Under "problem description"

9  on the second line near the right end of the page.  There is

10 a number.

11         THE COURT:  "Problem description."  ███████████?

12         MR. HAYSBERT:  That's correct, Your Honor.

13         THE COURT:  Is that the number that she just gave?

14 I wasn't paying attention.

15         MR. HAYSBERT:  That is the number she confirmed was

16 her number.

17         THE COURT:  Madam court reporter, is that her

18 number?  Can you look and see if she said (757)292-8965?

19         THE REPORTER:  Yes, ma'am.

20         THE COURT:  So how does it impeach her?  You have

21 established that her phone number is here, it says,

22 "Overtime approved, no/additional contact number other than

23 restaurant's phone," and it gives her number.  So now what

24 impeaches?  You have to get all this on the record.

25         MR. HAYSBERT:  Sure.  What impeaches, Your Honor,

Eleftherion, A. - Direct                                        691

1   is on the third line, it says, "People are tripping."  In

2   her testimony today, she made it seem as if the entire

3   reason for the change in the floor was aesthetic.  It needed

4   to be refaced.  It's old.  It's aging.  We have, I thought

5   it was terrible.

6           But, Your Honor, what was really going on, in

7   Alicia's mind, and what she was saying through her very own

8   phone, was that people were tripping on this floor.  That is

9   another reason why this floor had to be replaced, and she

10  didn't share it today.  That is why she is being impeached.

11          THE COURT:  The slash is here.  No additional

12  contact, slash, and then however, thank you.  I just don't

13  know.

14          MR. HAYSBERT:  Well, sorry.  My apologies.

15          THE COURT:  It has a different number at the top.

16  It says, "John Mesher and Nick Seifert" at the top, and then

17  down here it has, "Managing partner," and it has

18  "███████████."

19          MR. HAYSBERT:  That number is the number to the

20  store, Your Honor.

21          THE COURT:  That's what I would think.  Then this

22  says, "Other than restaurant's phone," and they are giving a

23  phone number.  I don't know if she knew her phone number had

24  been given, and if this is what she reported.

25          MR. HAYSBERT:  In order for this report to be given

JODY A. STEWART, Official Court Reporter

Eleftherion, A. - Direct                                              692

1    the problem description, she would have had to report it.

2            THE COURT:  How?

3            MR. HAYSBERT:  According to Marcus Wilson, who I

4    deposed, you are supposed to provide the information service

5    channel through your phone.  He had it on his personnel

6    phone, and that's how you provide the information to service

7    channel in order for a work order like this to be created.

8            THE COURT:  How does that tie to her phone?

9            MR. HAYSBERT:  She would have -- in order for her

10   number to be on here, she would have had to have been the

11   person that put this information in this description.

12           THE COURT:  Let me hear from Mr. McGavin on this,

13   because I'm not understanding the document.  We may have to

14   call her back in and give a proffer of testimony, and if

15   you're correct, then I'll let you use it, even though it

16   hasn't been listed.  You didn't have to take everything

17   away.

18           Go ahead, Mr. McGavin.  I'm just asking for his

19   response.

20           MR. McGAVIN:  Your Honor, this indicates that there

21   was warping on the floor.  What happened is, before the

22   floor was replaced, there was a spill when the soda machine

23   burst, and there was warping, and that was a contributing

24   factor.  But this is all after the soda machine failed, and

25   it's irrelevant to notice to the defendant.  We are

Eleftherion, A. - Direct                                    693

1    attempting to impeach with a subsequent flood that damaged
2    an extensive part of the floor when the soda machine burst,
3    and that's when the warping occurred.  Mr. Haysbert knows
4    that is.
5              THE COURT:  Well, two things need to be done.
6    Number one, I will let you use it, but I also let you find
7    out who wrote this problem description, whether she wrote it
8    or not, because I don't think she wrote it; and, secondly,
9    about the soda machine, I'll certainly let you ask her if
10   she is aware that the soda machine exploded.  This was
11   February 19, 2019.  It was when this was updated.  So all I
12   can look is that it was a proposal, and it was updated on
13   February 19, 2019.
14             MR. McGAVIN:  Yes.  That's when they had problems
15   with tripping because the floor warped.
16             MR. HAYSBERT:  No, Your Honor.
17             MR. McGAVIN:  Excuse me.  I mean, one of the things
18   that's unfair, is that when I start to speak, he always
19   wants to talk over me, and it's unfair.
20             THE COURT:  He does the same thing to the Court.
21   It's frustrating, I understand.  He shouldn't be standing
22   up.  He shouldn't be speaking over you.  He shouldn't be
23   doing that to the Court.  He shouldn't be doing that to
24   witnesses.  I don't know what to do other than to take some
25   draconian action that I don't want to take.

Eleftherion, A. - Direct                                              694

1          MR. McGAVIN:  He is here on *pro hac vice* motion,

2    and certainly that is something that can be taken away.

3          THE COURT:  I understand.

4          MR. McGAVIN:  So, Your Honor, I will go into that

5    with Ms. Eleftherion, but we are, in my view, impeaching on

6    a subsequent, remedial change that is related to the soda

7    machine failure, and we are getting very far afield.  So I

8    object on relevance and this subsequent change following the

9    soda machine failure.

10         THE COURT:  I do have a question about remedial

11   action, and this is pretty far removed.  I do have questions

12   about that.  I need to look at that.  I need some law on the

13   remedial action before I can rule on this document.  We will

14   just have to put her on notice to come back, because this is

15   definitely a remedial action.

16         MR. HAYSBERT:  Your Honor, if I may.

17         THE COURT:  Yes, but I'm going to require some

18   legal briefing on this.

19         MR. HAYSBERT:  Under subsequent remedial measures,

20   Federal Rules of Evidence 407, this information is not being

21   offered to prove admissibility -- I'm sorry, to prove

22   negligence, culpable conduct, or a defect.  It cannot be

23   excluded when it is being used to prove ownership, control,

24   feasibility, or precautionary measures or impeachment, and

25   this is impeachment.

Eleftherion, A. - Direct                                                    695

1          THE COURT:  Well, we can bring her in and get her

2    testimony, and then we can just stop, and I'll tell her to

3    come back, because I'm not sure.  Remedial actions are

4    something that there is a lot of law out there, and there is

5    a lot of law in Virginia on it.

6          MR. HAYSBERT:  Correct, including --

7          THE COURT:  Let me read the rule.

8          MR. HAYSBERT:  Sure.  Federal Rules of Evidence

9    407, subsequent remedial measures.

10         THE COURT:  Let me take a look at it quickly.

11         MR. HAYSBERT:  Sure.  Your Honor, according to

12   local counsel, as well, the fact that the floor has been

13   replaced has already been raised and has been brought up.

14         THE COURT:  I understand.  You're using it to prove

15   negligence, culpable conduct, a defect in the product or

16   design, or a need for a warning or instruction.  You are

17   definitely using it --

18         MR. HAYSBERT:  No, only for impeachment.

19         THE COURT:  Do you want me to tell them that this

20   is not being used for the truth of the matter, it's only

21   being used for impeachment, because if that's what you're

22   using it for, then you get a limiting instruction.

23         In other words, you say that the Court may admit.

24   It doesn't say I have to admit.  It says the Court may admit

25   for another purpose, such as impeachment.  There has been no

Eleftherion, A. - Direct                                          696

1    denial of ownership, control, or the feasibility of the

2    precautionary measures.  In other words, first of all, it is

3    within my discretion to admit it.  Secondly, if it is

4    admitted, it's going to have to have a cautionary

5    instruction.

6          MR. HAYSBERT:  Well, it also is a party admission.

7          THE COURT:  I'm not looking at it as that.  I'm

8    going to tell you all to prepare law on it and look at Rule

9    407, look at the discretion of the Court under Rule 407, and

10   I'm really getting weary of you saying a rule and saying it

11   requires because there are very few rules that require.

12   Most of the rules of evidence have a measure of discretion

13   in them.

14         So you've given me your basis.  We are not going to

15   discuss it anymore.  You have given me your basis, Rule 407.

16   It is a subsequent remedial measure, and I don't know if it

17   impeaches her or not.  She may not have written this.  She

18   may not have known about it.  I just don't know.  But before

19   I'm going to allow testimony before the jury on this, you

20   are going to brief it and have the briefs in here by 5:00

21   Sunday night.

22         MR. HAYSBERT:  Your Honor, I can't.  The witness is

23   going to be able to talk to Mr. McGavin.

24         THE COURT:  She is not going to be able to talk to

25   Mr. McGavin because I'm going to tell her she can't discuss

JODY A. STEWART, Official Court Reporter

Eleftherion, A. - Direct                                           697

1    her testimony.  Ms. Nineveh Haysbert could talk to her

2    mother.  They are living together.  I'm assuming that

3    witnesses follow the Court's instructions.  I'm not going to

4    have Mr. McGavin talking to her, and he wouldn't do that.

5    If he did, I'll find out when the witness is under oath, and

6    you can ask her if she's talked to Mr. McGavin.  She can't

7    talk to anybody about her testimony.

8            Let's just move off of this for now, and let's

9    bring the jury in.

10           MR. HAYSBERT:  I'm not allowed to use it?

11           THE COURT:  Not for now.  I've reserved ruling on

12   this.  We'll bring her back if necessary.

13           Bring the witness in, please.

14           (Jury in at 3:41 p.m.)

15           THE COURT:  All the jurors are back.  Can we please

16   get the witness back.

17           Ms. Eleftherion, you are still under oath, and

18   you're going back on the witness stand.  We have resolved

19   the matter we were looking to.

20           THE WITNESS:  Yes, Your Honor.

21           THE COURT:  Go ahead.  It's been asked and

22   answered.  Do not repeat it.

23           MR. HAYSBERT:  Understood, Your Honor.  Thank you.

24   BY MR. HAYSBERT:

25   Q.  Welcome back, Ms. Eleftherion.  So just going back to our

Eleftherion, A. - Direct                                          698

1   easel here where it says you were, from July 2017 until

2   December 2018, the front of the house manager responsible for

3   safety in the dining room.

4           Ms. Eleftherion, how many people tripped in the

5   dining room from the time that you began serving as the

6   house -- front of the house manager in July of 2017 until

7   December of 2018?

8   A.  I'm aware of one or two.

9   Q.  One or two?

10  A.  (Nods head.)

11  Q.  When did those one or two trips occur?

12  A.  I don't have an established timeline to give you.

13  Q.  Do you see Dr. Haysbert in this room, the plaintiff?

14  A.  I do.

15  Q.  Okay.  Do you recall hearing about her slip and fall the

16  day after the incident?

17  A.  Yes.

18  Q.  Do you recall the date?

19  A.  Right -- I want to say -- I may have the date wrong.  May

20  24th, maybe.

21  Q.  May 24th of what year?

22  A.  2018.

23  Q.  So that would have been during the time that you were

24  front of the house manager, correct?

25  A.  Correct.

Eleftherion, A. - Direct                                      699

1    Q.  The notation for the record, Ms. Eleftherion, that you

2    learned about this particular slip and fall on May 24th of

3    2018?

4            THE COURT:  This is slip and fall.  The earlier

5    question was slip.

6            MR. HAYSBERT:  Tripping.

7            THE COURT:  Tripping.

8            MR. HAYSBERT:  Yes.

9            THE WITNESS:  I was made aware the day after it

10   occurred, correct.

11   BY MR. HAYSBERT:

12   Q.  Okay.  Is this one of the tripping incidents that you

13   were made aware of?

14   A.  Yes.

15   Q.  Okay.  You said that there were one or two.  Can you

16   confirm whether there was just this one or whether there were

17   any other trips at this time?

18   A.  Not at that time.

19   Q.  What about during the time period in which you were front

20   of the house manager from July 2017 until December of 2018?

21   A.  I was front of the house manager until February of 2019.

22   Q.  I'm sorry.  When the floors were changed.

23            THE COURT:  That was so quick, nobody could

24   understand that.

25            THE WITNESS:  I will slow down.  I apologize, Your

Eleftherion, A. - Direct                                                700

1    Honor.  No, there may be one or two after that time frame as
2    well.
3    BY MR. HAYSBERT:
4    Q.   One or two after what time frame?
5    A.   After the floors were switched out, there were one or two
6    after that time frame as well.
7    Q.   I'm not talking about the tripping that happened after
8    the floors were changed.  I'm talking about the tripping that
9    happened before the floors were changed.  So between July
10   2017 and December of 2018, you've already confirmed for us
11   there was one tripping incident that you are aware of, and
12   that one involved Dr. Haysbert.  You indicated that there
13   were one or two.  I'm just simply trying to confirm your
14   testimony.  Was it just one or was there one more or more
15   than what happened to Dr. Haysbert?
16   A.   I do recall hearing of one other incident, yes.
17   Q.   And when did that incident occur?
18   A.   It was during that time frame.  I don't remember exactly
19   when.
20   Q.   When you say during that time frame, what are you
21   specifically saying?
22   A.   Between July and December of 2018.
23   Q.   Okay.  And can you give me any idea of the month and year
24   when that tripping incident happened?
25   A.   It was in the summertime.  I had been away, and I learned

Eleftherion, A. - Cross                                              701

1    of it when I returned.

2    Q.  When you say summertime, was this July, August?

3    A.  It would have been probably August time frame.

4    Q.  Okay.  August of 2017 or August of 2018?

5    A.  That would have been August of 2017.

6    Q.  August of 2017.  So it's your testimony today that one

7    month after you became the front of the house manager at the

8    Chesapeake Outback Steakhouse, you became aware of a tripping

9    incident?

10   A.  Are you referring to a tripping incident with

11   Dr. Haysbert?

12   Q.  No.  I'm talking about the one you said happened in

13   August of 2017.

14   A.  That was not a tripping incident.  I was not made aware

15   of a tripping incident, no.

16   Q.  So is it your testimony today that the only tripping

17   incident that you're aware of, from the time you became the

18   front of the house manager in July 2017 until the floor was

19   replaced in December of 2018, the only one tripping incident

20   that you're aware of is the one involving Dr. Haysbert?

21   A.  That's the only one that I recall.

22            MR. HAYSBERT:  Okay.  No further questions.

23            THE COURT:  All right.  Cross-examination.

24                        CROSS-EXAMINATION

25   BY MR. McGAVIN:

JODY A. STEWART, Official Court Reporter

Eleftherion, A. - Cross                                              702

1    Q.  Ms. Eleftherion, since you worked in the restaurant in

2    Chesapeake, did you ever walk the floors in the main dining

3    room?

4    A.  Yes.

5    Q.  And when you weren't in the kitchen, how often did you

6    walk the floors in the main dining room?

7    A.  Every day.

8    Q.  And when you were doing that, what were you looking for?

9    A.  Looking for everything from cleanliness to safety, pretty

10   much just observing everything, the condition of the

11   building.

12   Q.  During that time, were the floors slippery?

13   A.  They were not, no.

14   Q.  And are you aware that Lisa Crosby had an incident where

15   a Coke was spilled and she was carrying a tray and slipped

16   and fell?

17   A.  Yes, I'm aware of that incident.

18   Q.  Now, in regard to the condition of the floors after

19   Ms. or Dr. Haysbert had her fall, which we understand to be

20   May 23, 2018, that next day, did you check the condition of

21   the floor in the main dining room?

22   A.  Yes, I did.

23   Q.  Was it slippery?

24   A.  It was not, no.

25   Q.  And did you have -- during the course of the previous

Eleftherion, A. - Cross                                          703

1   day, the day that Dr. Haysbert fell, did you have the

2   opportunity to walk the floor and check the floors?

3   A.  Yes, I did.

4   Q.  And did you find anything unusual about the condition of

5   the floors that caused you concern for guests who might be in

6   the restaurant?

7   A.  No.

8   Q.  Was the floor slippery in the area that Dr. Haysbert fell

9   on May 23, 2018, when you did your inspections and

10  walk-throughs?

11  A.  No, they were not.

12          THE COURT:  Excuse me.  You had said earlier you

13  went at the end of your shift to the kitchen.  Do you know

14  approximately what time you went to the kitchen?

15          THE WITNESS:  Yes, Your Honor.  Right around shift

16  change, which would have been around 4:00.

17          THE COURT:  So up until 4:00, you didn't observe

18  anything?

19          THE WITNESS:  That is correct, Your Honor.

20  BY MR. McGAVIN:

21  Q.  And in regard to your investigation of this incident, did

22  you discover whether or not there was any spill or water on

23  the floor which would have required use of a mop or a dry mop

24  in the area where Dr. Haysbert fell?

25  A.  At the time I was inspecting the dining room, there was

Eleftherion, A. - Redirect                                      704

1    not.

2    Q.  I didn't hear you.

3    A.  At the time that I was -- throughout the day, as I

4    inspected the dining room, there was not, no.

5    Q.  Did you learn from Lisa Crosby or anyone else that there

6    was mopping or cleaning going on at the time that

7    Dr. Haysbert had her fall?

8    A.  Lisa Crosby told me that there was not.

9    Q.  There was not?

10   A.  There was not any mopping or any spill at that time.

11          MR. McGAVIN:  Thank you.  I don't have any other

12   questions for you.

13          THE COURT:  All right.  Redirect.

14          MR. HAYSBERT:  Thank you, Your Honor.

15                   REDIRECT EXAMINATION

16   BY MR. HAYSBERT:

17   Q.  When you were walking the floors of the Outback

18   Steakhouse where you were the front of the house manager,

19   were you wearing non-slip shoes?

20   A.  Yes, I was.

21   Q.  Did you ever wear heels at the time you were walking the

22   floors of the Outback Steakhouse at Chesapeake?

23   A.  Not while I was working, no.

24   Q.  I want to go back to the video, the camera that was above

25   the hostess stand.

Eleftherion, A. - Redirect                                              705

```
 1              THE COURT:  He didn't ask any questions about that.
 2              MR. HAYSBERT:  What he did do, Your Honor, was open
 3    the door.
 4              THE COURT:  How?
 5              MR. HAYSBERT:  Because.
 6              THE COURT:  He's standing up to object.  Let the
 7    record reflect, I know his objection because it goes beyond
 8    the scope of your cross-examination.
 9              MR. McGAVIN:  Yes, Your Honor.
10              MR. HAYSBERT:  He indicated, got testimony from her
11    that she didn't hear about any mopping or anybody, with the
12    floor mop or anybody mopping the floor, and the reason I
13    brought that up is because if there was any commotion or any
14    mopping happening anywhere in the vicinity of the front
15    door, you would have seen it from the video, if you had
16    checked it, correct?
17              THE WITNESS:  It would have shown that area by the
18    front door, yes.
19    BY MR. HAYSBERT:
20    Q.  And it would have shown mopping if there was mopping
21    going on at the front door, correct?
22    A.  Correct.
23    Q.  It would have shown if any commotion was happening at the
24    front door, near the front door, if there had been an
25    incident that occurred in the restaurant, correct?
```

```
 1            THE COURT:  I believe that you asked and all that
 2    was answered on your direct.  Just please don't repeat
 3    yourself.  The jury will remember whether you asked those.
 4    I think we did ad nauseam with the camera above the door and
 5    what it picked up and couldn't pick up.
 6            MR. HAYSBERT:  Thank you, Your Honor.  No further
 7    questions.
 8            THE COURT:  Ms. Eleftherion, you are excused from
 9    service today.  I need to tell you three things.
10            THE WITNESS:  Yes, ma'am.
11            THE COURT:  Number one, you may not discuss your
12    testimony with anyone, and that would be a fellow employee
13    or someone at Outback or anyone.
14            THE WITNESS:  Yes, Your Honor.
15            THE COURT:  Not with your family, friends, whoever.
16    Obviously, not with any of the attorneys.  They can't
17    contact the witnesses.  I excuse you with that as your first
18    caveat.
19            Your second caveat, if for some reason you are
20    needed further, you will be contacted by the deputy clerk
21    here.  Her name is Tammy Armstrong.  I still call her Tammy
22    Armstrong.  She just got married so her name is Tammy
23    Armstrong Eubanks, but she understands that she's referred
24    to by both at this point.
25            So, in any event, that's who will be contacting you
```

1    if you're needed further, and if you could leave your number

2    with the jury clerk.  I think we already have it.  Didn't

3    you say it on the record?  Is that still your number?

4            THE WITNESS:  Yes, Your Honor.

5            THE COURT:  Then we've got your number so we will

6    get in touch with you if you're needed further.

7            THE WITNESS:  Thank you.

8            (Witness excused.)

9            THE COURT:  Then your next witness, as I understand

10   it, is going to be Mr. Chase?

11           MR. HAYSBERT:  That is correct, Your Honor.

12           MR. McGAVIN:  Your Honor, I was just going to say

13   for the record, Lisa Crosby is outside just waiting, and I

14   released her as we discussed.

15           THE COURT:  That's fine.

16           MR. McGAVIN:  She was going to convey that.

17           THE COURT:  That's fine.  In fact, I overlooked

18   that.  I think I told you I would get back to you, and I

19   didn't, so she should be released.

20           MR. McGAVIN:  Thank you, Your Honor.

21           MR. HAYSBERT:  Your Honor, may I have permission to

22   treat Mr. Chase, a former Outback Steakhouse employee,

23   former managing partner, as an adverse witness?

24           THE COURT:  You shouldn't be asking that in front

25   of the jury, A; and, B, we just went through that

Chase, N. - Direct                                                    708

```
 1  distinction isn't in the rules anymore about declaring
 2  somebody an adverse witness.
 3        The rules tell you how to treat an adverse witness,
 4  and you can't have an adverse witness until they turn
 5  adverse.  Then there is little distinction other than you
 6  can use a different kind of examination, and the approval
 7  all comes from the Court.  You shouldn't be asking approval
 8  for it in front of the jury --
 9        MR. HAYSBERT:  My apologies, Your Honor.
10        THE COURT:  -- before he's even testified, come in
11  and turned adverse, if he does.
12        Bring him in.
13        Mr. Chase, if you would please come forward and be
14  sworn.  Before you are even sworn and do your testimony, I
15  again am sorry that you had to wait.  I didn't know you were
16  there, as I told you, for a couple of days.  I'm very sorry.
17        THE WITNESS:  Thanks.
18        (Witness was sworn.)
19        NORMAN CHASE, JR., called by the Plaintiff, having
20  been first duly sworn, was examined and testified as
21  follows!
22                       DIRECT EXAMINATION
23  BY MR. HAYSBERT:
24  Q.  Good afternoon, Mr. Chase.
25  A.  How are you doing?
```

Chase, N. - Direct                                                          709

1   Q.  Thank you very much for being with us today.

2          Now, just for the record, your name is Norman Chip

3   Chase?

4   A.  Norman Chadwick Chase, Jr.

5   Q.  And where did the name Chip come from?

6   A.  Nickname.

7   Q.  Okay.  So is it okay if I call you Norman Chase?

8   A.  Yeah.  That's fine.

9          THE COURT:  How about just Mr. Chase?

10  BY MR. HAYSBERT:

11  Q.  Or Mr. Chase?

12  A.  That's fine, too.

13  Q.  I can do that, too.

14         Mr. Chase, on May 23rd, 2018, were you the managing

15  partner of the Outback Steakhouse in Chesapeake where

16  Dr. Haysbert's fall happened?

17  A.  I was.

18  Q.  How long had you been the managing partner at the Outback

19  Steakhouse at that time?

20  A.  Seven months.

21  Q.  So you would say between July 2017 and -- somewhere

22  around July 2017?

23  A.  June or July, yes, sir.

24  Q.  June or July.  Okay.

25         Your Honor, if I may.

Chase, N. - Direct                                                    710

1           Is it safe to say that you became managing partner
2    around the same time that Alicia Eleftherion became manager
3    of the front of the house at Chesapeake Outback?
4    A.  Approximately the same time, yes.
5    Q.  Okay.  And as managing partner of the Outback Steakhouse
6    in Chesapeake, you were responsible for the front of the
7    house floors as well as the back of the house, correct?
8    A.  The overall restaurant, yes.
9    Q.  Overall restaurant.  So you were the number one person at
10   the restaurant at that time, correct?
11   A.  Yes.
12   Q.  And the responsibility for safety ultimately rested on
13   your shoulders, correct?
14   A.  Correct.
15   Q.  You were the one that, for example, were responsible for
16   the video system in the restaurant, correct?
17   A.  Yes, ultimately.
18   Q.  You were hesitating.
19   A.  Well, it's more of a maintenance, you know, maintaining,
20   but, yeah, I mean, I was responsible for the four walls.
21   Q.  And for the videos, correct?
22   A.  Yes.
23   Q.  Or any cameras at the Chesapeake Outback?
24   A.  Yes.
25   Q.  So if something needed to be checked, then you ultimately

Chase, N. - Direct                                                        711

 1  were responsible for making sure that camera system created
 2  the video that allowed you to see what you needed to see?
 3  A.  I never had to check anything that I was involved in when
 4  I was there, but we usually brought the security company in,
 5  I believe, to pull the actual videos.
 6  Q.  Okay.  So you would bring the security company in for any
 7  safety-related incidents that required that you look at the
 8  video?
 9  A.  Again, I never had any safety issues there that involved
10  me having to contact someone.  It was usually done through
11  our risk management, if it was a safety issue.
12  Q.  Okay.  Mr. Chase, you were the number one person at
13  Outback Steakhouse, and so you're responsible for everything
14  that happens at your restaurant, correct?
15  A.  Correct.
16          MR. McGAVIN:  Objection, Your Honor.
17          THE COURT:  It's the form of the question.
18  Rephrase it.
19          MR. HAYSBERT:  Sure.
20          THE COURT:  You haven't established that he is
21  responsible for everything at the restaurant, and that's
22  what you just asked him.
23          MR. HAYSBERT:  Absolutely, Your Honor.
24  BY MR. HAYSBERT:
25  Q.  As managing partner of the Outback Steakhouse, were you

Chase, N. - Direct                                                    712

 1    responsible for everything, including safety, at that
 2    restaurant?
 3            MR. McGAVIN:  Objection, Your Honor, form, overly
 4    broad.
 5            THE COURT:  Sustained.
 6    BY MR. HAYSBERT:
 7    Q.  Were you responsible for safety at that restaurant?
 8            THE COURT:  Why don't you ask him what he was
 9    responsible for first.
10            MR. HAYSBERT:  Sure.
11    BY MR. HAYSBERT:
12    Q.  Mr. Chase, what were you responsible for as the number
13    one person and managing partner at the Chesapeake Outback
14    during your tenure?
15    A.  Operations of the front and back of the house, staffing,
16    confirming scheduling, hiring, maintaining the facility.
17    Q.  And that would include restaurant safety, correct?
18    A.  Yes.
19    Q.  That would also include overseeing guest liability,
20    correct?
21            MR. McGAVIN:  Objection, Your Honor.
22            MR. HAYSBERT:  When I say that I mean --
23            MR. McGAVIN:  Excuse me.  I must object.  We are
24    going down the same road that I had previously brought up
25    regarding guest liability.  I object.

Chase, N. - Direct                                                    713

1          MR. HAYSBERT:  I withdraw the question.

2    BY MR. HAYSBERT:

3    Q.  You were responsible for making sure incident reports, if

4    there were incidents happening at the facility, were created

5    and that incident was documented, correct?

6    A.  Me -- if I wasn't involved in it, I didn't submit it.

7    It's done through the risk management.  So if I wasn't there,

8    I didn't do it, and I didn't submit it.

9    Q.  Whenever there was, for example, a slip and fall incident

10   that happened at the restaurant that you were the managing

11   partner for, what was the protocol within the restaurant?

12   Let me just make it more specific.  Was a protocol for the

13   restaurant that an incident report be filled out for whoever

14   was involved in that incident?

15   A.  Yes, whoever was involved filled it out.

16   Q.  And what I'm talking about involved, the incident report

17   was created for whoever may have been -- may have fell in the

18   restaurant, correct?

19   A.  I don't understand what you're asking.

20   Q.  Okay.  I'll withdraw the question.

21   A.  Are you asking they filled it out?  No.

22   Q.  No.  So someone at the restaurant would fill out the

23   incident report, okay, correct?

24   A.  Correct.

25   Q.  Okay.  And you were responsible for making sure that for

Chase, N. - Direct                                                  714

1    any incident, like a slip and fall that occurred at the

2    restaurant while you were the managing partner, that an

3    incident report was created for that incident, correct?

4    A.  Yes.  They were done online.

5    Q.  Even though you may not necessarily have done the

6    incident report yourself, your responsibility was to ensure

7    that they were created?

8    A.  Yes.

9    Q.  Were you at the restaurant on May 23rd, 2018?

10   A.  Yes.

11   Q.  Where were you when the incident happened?

12   A.  I was in the back of the house.

13   Q.  Is that the same thing as the kitchen?

14   A.  Yes, the kitchen.

15           MR. HAYSBERT:  Your Honor, if I may.

16   BY MR. HAYSBERT:

17   Q.  Did you come out to see what happened in the front of the

18   house on the day of May 23rd, 2018, when the slip and fall

19   happened?

20   A.  I did not.

21   Q.  Did you know anything about what happened that day?

22   A.  Yes.  I mean, I was aware there was an incident but --

23   Q.  You were aware at the time that there had been an

24   incident?

25   A.  Yeah, right after it happened.

JODY A. STEWART, Official Court Reporter

Chase, N. - Direct                                          715

```
 1              THE COURT:  What?  I'm sorry.  I just didn't hear
 2    you.  It was right after what?
 3              THE WITNESS:  Shortly after it had happened, I was
 4    aware of it.
 5    BY MR. HAYSBERT:
 6    Q.  Did you check the cameras?
 7    A.  No, I didn't.
 8    Q.  Did you talk with anyone about the incident that day?
 9    A.  Yes.
10    Q.  Who did you talk to?
11    A.  I believe it was Lisa.
12    Q.  Lisa?
13    A.  Yes.
14    Q.  Is that Lisa Crosby?
15    A.  Yes.
16    Q.  Okay.  And what did Lisa tell you?
17    A.  I mean, from what I remember, was that a guest had
18    slipped and fallen, and that she had filled out an incident
19    report, and it started the process of getting -- getting the
20    process rolling.
21    Q.  Did you review this incident report?
22    A.  No.
23    Q.  Never reviewed the incident report?
24    A.  No.
25    Q.  Were you required to sign the incident report?
```

Chase, N. - Direct                                                      716

1   A.  No.

2   Q.  Another employee could sign the incident report?

3   A.  Yeah.  Whoever was managing or in that area of

4   responsibility, who was involved in it, did the actual

5   incident report.

6   Q.  Is it your understanding that Lisa Crosby filled out the

7   incident report?

8   A.  That's from what I remember, yes.

9   Q.  Did you check the security cameras to see what happened

10  or what may have happened right before or after the incident?

11  A.  No.

12  Q.  Did anyone come to you and ask that you check those

13  security cameras?

14  A.  No, I don't believe so.

15  Q.  Did you know at the time where the cameras on the

16  property were located?

17  A.  I'm sorry?

18  Q.  Did you know at the time where the cameras on the

19  property were located?

20  A.  Yeah.  I'm sure I -- yes.

21  Q.  So you were aware that there was a camera above the

22  hostess stand, correct?

23  A.  Yeah, in the entranceway, correct.

24  Q.  And you were aware that the camera by the hostess stand

25  could look from the hostess stand towards the front door,

Chase, N. - Direct                                                    717

1    correct?

2    A.   Yes.

3    Q.   And you were aware that it could tell who was coming in

4    the door from the front door and also who was leaving out of

5    the front door, correct?

6    A.   Yes.

7    Q.   The cameras on May 23rd, 2018, were working, correct?

8    A.   To the best of my knowledge, yes.

9    Q.   Well, there was no footage of what happened, that you are

10   aware of or that you personally saw, correct?

11   A.   Correct.

12   Q.   Is there anyone other than you, that worked at the

13   restaurant at that time, that could have gained access to the

14   camera system to review any footage?

15   A.   Yes.

16   Q.   Who else?

17   A.   Any leader that had access to the office.

18   Q.   Would that include Alicia Eleftherion?

19   A.   Yes.

20   Q.   She was the manager at the time, correct?

21   A.   Correct.

22   Q.   And she was the front of the house manager at the time,

23   correct?

24   A.   Yes.

25   Q.   So she could have reviewed the cameras on her own,

Chase, N. - Direct                                                      718

1   correct?

2   A.  Yes.

3   Q.  And have you ever known her to review the cameras on her

4   own, in your personal knowledge?

5   A.  I can't remember off the top of my head of her doing

6   that, no.

7          THE COURT:  How do you review the cameras?  I mean,

8   how do you do it?

9          THE WITNESS:  There is a monitor, and there is a --

10  it looks like a DVD player that holds the information based

11  on the screen.  You pick what screen or what camera you want

12  to look at, and you can rewind it to a specific date.

13         THE COURT:  Can that be done in your office, then?

14         THE WITNESS:  Yeah, but we don't have the ability

15  to, like --

16  BY MR. HAYSBERT:

17  Q.  Take it out?

18  A.  -- save it, whatever.  It has to be done by an outside

19  source.

20  Q.  But you do have the ability to go back a couple of days

21  and review the footage for what may have happened a couple of

22  days ago?

23  A.  I don't know how long the memory is.

24  Q.  You never knew how long the memory lasts?

25  A.  How long it lasts.

Chase, N. - Direct                                                    719

1    Q.  You never knew how long the memory lasted on the cameras?

2    A.  No.

3    Q.  Did you ever ask anyone regarding how long the video

4    lasts on the cameras?

5    A.  No.

6    Q.  So you didn't know if the memory lasted for six months or

7    two months, correct?

8    A.  No.

9    Q.  Or one month, correct?

10   A.  No.  I mean --

11   Q.  Or three days?

12   A.  No.

13   Q.  Okay.  So you just didn't know how long the camera

14   footage elapsed?

15   A.  No.

16   Q.  What you do know is that you never checked the camera

17   footage for this incident?

18   A.  Do what now?

19   Q.  You never checked the camera footage for this incident?

20   A.  No.

21   Q.  And no one ever came to you and asked you to check it for

22   them?

23   A.  No.

24   Q.  Okay.  Mr. Chase, you have worked at Ruby Tuesdays,

25   before you became managing partner, for approximately 13

Chase, N. - Direct                                                          720

1    years, correct?

2    A.   Yes.

3    Q.   And you worked as the manager of the Outback at Hampton

4    before Chesapeake, correct?

5    A.   Yes.  I was the kitchen manager.

6    Q.   And you've worked at Outback in total about seven years?

7    A.   No.

8    Q.   How long?

9    A.   2016 to the middle of 2018, so a year and 11 months, I

10   think it was.

11   Q.   Let me just establish that.  Say that one more time,

12   Mr. Chase.

13   A.   I believe it was a year and 11 months.

14   Q.   From what month to what month?

15   A.   It was the middle of 2016 to the middle of 2018.

16   Q.   So June 2016 to about June of 2018?

17   A.   Yes.  It may have been July of 2018.

18   Q.   And this is when you were the managing partner at the

19   Outback Steakhouse in Chesapeake?

20   A.   Not that entire time, no.

21   Q.   Okay.  So there was a part of the time when you were not

22   the managing partner, but that was from June 2016 until

23   around July/August of 2017?

24   A.   Yeah.

25   Q.   What was your role or position between June 2016 and till

Chase, N. - Direct                                                      721

1  about July/August 2017?

2  A.  I was the manager in training first, and then I was the

3  kitchen manager.

4  Q.  During the time period in which you were -- sorry,

5  withdraw the question.

6         You worked at the Chesapeake Outback between June of

7  2016 and July of 2018?

8  A.  No.

9  Q.  Okay.  If you could tell me when you started working at

10 the Chesapeake Outback.

11 A.  I believe it was in November of 2017.

12 Q.  Okay.

13         If I may, Your Honor.

14         So you say from November of 2017 until July of 2018

15 you were the managing partner at Chesapeake Outback?

16 A.  Yes.

17 Q.  During that period of time how many slip and falls did

18 you become aware of?

19 A.  Two, I believe.

20 Q.  Do those slip and falls include Dr. Haysbert's slip and

21 fall?

22 A.  Yes.

23 Q.  So two total?

24 A.  Yes.

25 Q.  Do you recall anything specific about the other slip and

Chase, N. - Direct                                              722

1  fall that occurred?

2  A.  Not specifically, no.

3  Q.  Did you check any video camera footage with respect to

4  that other slip and fall?

5  A.  I did not.  I wasn't in the building, and I didn't do the

6  guest incident report, no.  I didn't check.

7  Q.  Do you know the approximate time between November 2017

8  and July 2018 when that incident happened?

9  A.  I have no idea off the top of my head.  I mean, I could

10 guess.

11         THE COURT:  Don't guess.

12         MR. HAYSBERT:  I was going to say don't guess but

13 give me your best estimate.

14         THE WITNESS:  March-ish.  I'm not sure.

15 BY MR. HAYSBERT:

16 Q.  March of 2018?

17 A.  (Nods head.)

18 Q.  So your best estimate is March of 2018 when the other

19 incident of a slip and fall occurred, correct?

20 A.  Yes.

21 Q.  As the managing partner of Chesapeake Outback Steakhouse,

22 are you responsible for reviewing any work orders that are

23 created for that restaurant?

24 A.  No.

25 Q.  Who is responsible for reviewing any work orders that are

JODY A. STEWART, Official Court Reporter

Chase, N. - Direct                                            723

1    created for that restaurant?

2    A.  Well, it's all done through the computer system.  So it's

3    assigned with the company that we used for all maintenance

4    orders.

5    Q.  When you say, "It's all done through the computer

6    system," you can go on your cell phone and create a work

7    order?

8    A.  No.  Well, yes, I believe you could, but it was done

9    through our office in the restaurant.

10   Q.  Okay.

11   A.  We had a website that we went to.

12   Q.  So there is a website you can go to on your computer or

13   on your phone?

14   A.  Computer.

15   Q.  Okay.  So the website you go to on the computer, it

16   allows you to upload a work order that you want to create?

17   A.  Yes.

18   Q.  And you can do the same thing on your phone, correct?

19   A.  I never used my phone.  I always -- if I did a repair, it

20   was done through the computer in the office.

21   Q.  Okay.  So when you submitted a work order repair, you did

22   it through the computer at the office?

23   A.  Correct.

24   Q.  But it is possible to do a work order through the phone?

25   A.  I don't know.  I've never done it.  I'm not sure if it's

Chase, N. - Direct                                          724

1    capable of doing that --

2    Q.  Understood.

3    A.  -- or not.

4    Q.  I appreciate it.  Thank you so much.  Do you know if the

5    other slip and fall incident that occurred around March of

6    2018 involved a woman?

7    A.  I believe it was.

8    Q.  And could you further clarify whether or not that woman

9    was wearing heels at the time?

10   A.  I can't confirm that.

11   Q.  Just give me your best testimony.

12   A.  I don't know.

13          MR. McGAVIN:  Objection, Your Honor, speculation.

14   BY MR. HAYSBERT:

15   Q.  So you don't know?

16   A.  No.

17   Q.  But you know it was a woman?

18   A.  I believe it was a female, yes.

19   Q.  Did you fill out an incident report for that slip and

20   fall?

21   A.  No.

22   Q.  Do you know who did?

23   A.  I don't remember.

24   Q.  You don't remember who did?

25   A.  No.

Chase, N. - Direct                                                    725

```
 1   Q.  Is it possible that Marcus Wilson did?

 2            MR. McGAVIN:  Objection, Your Honor.

 3            THE COURT:  He doesn't know.  It's probably

 4   possible that any number of people, because he's testified

 5   that anybody that could fill out an incident report, if they

 6   were there when it occurred, or were responsible for doing

 7   that, so it could be any number of people.

 8            THE WITNESS:  If they were a key carrier, they

 9   could fill out an incident report, if they were responsible

10   for that shift.

11   BY MR. HAYSBERT:

12   Q.  Say that one more time.

13   A.  If they were a key carrier, if they were the level of

14   having a key responsible for a shift, they could fill out a

15   report.

16   Q.  Well, let's end on that note.

17            THE COURT:  Why do we have to put that on a flip

18   chart?  Isn't his testimony sufficient, anybody who was a

19   key carrier.  Why are we writing all the testimony?

20            MR. HAYSBERT:  To establish who the individuals

21   were.

22   BY MR. HAYSBERT:

23   Q.  Who were they, Mr. Chase?  If you would tell me who the

24   people were that had keys.

25   A.  When?
```

JODY A. STEWART, Official Court Reporter

Chase, N. - Direct                                                            726

1    Q.  During the time period you were managing partner between

2    November of 2017 and July of 2018.

3    A.  Gentleman named Brandon, Alicia, Lisa, Marcus.

4    Q.  Is that it?

5            THE COURT:  He's thinking.

6            THE WITNESS:  Yeah.  There was a gentleman at the

7    beginning when I first got there, but I don't even remember

8    who he was.

9    BY MR. HAYSBERT:

10   Q.  Was the name you can't remember a Marcus?  Would that be

11   Marcus Wilson?

12   A.  Yes.

13   Q.  Alicia, would that be Alicia Eleftherion?

14   A.  Yes, sir.

15   Q.  You said Brandon.  Do you know his last name?

16   A.  I don't remember it.

17   Q.  And you said Lisa.  You mean Lisa Crosby, correct?

18   A.  Correct.

19   Q.  So Lisa Crosby, Alicia Eleftherion, and Marcus Wilson?

20   A.  Correct.

21   Q.  They all had key access and had the ability to put work

22   orders at that particular location, correct?

23   A.  Correct.

24           MR. HAYSBERT:  I won't need to use the board.

25   Thank you, Your Honor.

Chase, N. - Cross                                                    727

```
 1            THE COURT:  You had the authority?
 2            THE WITNESS:  And myself.
 3  BY MR. HAYSBERT:
 4  Q.  And you?
 5  A.  Yes.
 6  Q.  So in total five people at that restaurant had the
 7  authority to put in a work order.  That was you, that was
 8  Brandon, that was Marcus Wilson, that was Alicia Eleftherion,
 9  and that was Lisa Crosby?
10  A.  Correct.
11  Q.  Okay.  Did you put in any work orders during the time
12  that you were the managing partner at that location?
13  A.  Yes.
14  Q.  Did you put any work orders in for anyone that was
15  slipping or tripping on the floors?
16  A.  No.
17            MR. HAYSBERT:  Okay.  Thank you very much.  No
18  further questions.
19            THE COURT:  Cross-examination.
20                      CROSS-EXAMINATION
21  BY MR. McGAVIN:
22  Q.  Do you agree that the floors were not slippery at the
23  Chesapeake Outback?
24  A.  Yes.
25  Q.  And they were kept clean and dry?
```

Chase, N. - Redirect                                                          728

1    A.  Yes.

2            MR. McGAVIN:  No further questions.

3                        REDIRECT EXAMINATION

4    BY MR. HAYSBERT:

5    Q.  Mr. Chase, I'm sorry to have to ask the question.  Have

6    you ever worn heels at Outback Steakhouse?

7    A.  I have not.

8    Q.  And you were required as the managing partner at Outback

9    Steakhouse to wear nonslip shoes, correct?

10   A.  Absolutely.

11           MR. McGAVIN:  Objection.

12           MR. HAYSBERT:  No further questions.

13           THE COURT:  It's fine.  We know he's wearing

14   non-slip shoes.

15           THE WITNESS:  Not heels.  I'm sorry.

16           THE COURT:  Not heels.  It's part of your

17   employment?

18           THE WITNESS:  Yes, ma'am.

19           THE COURT:  I'm going to excuse Mr. Chase, and,

20   again, thank you on behalf of the Court and the jurors and

21   the parties to the case, Mr. Chase, and you are excused with

22   one caveat.

23           THE WITNESS:  Yes, ma'am.

24           THE COURT:  You can't discuss your testimony with

25   anyone until the case is completed.

```
1              THE WITNESS:  My pleasure.

2              (Witness excused.)

3              THE COURT:  You have one witness left; is that

4       correct?

5              MR. HAYSBERT:  Your Honor, I have Alicia

6       Eleftherion coming back --

7              THE COURT:  No, I didn't say she was coming back.

8       She may be back.

9              MR. HAYSBERT:  Sorry.  I apologize.

10             THE COURT:  She wouldn't be back today.  You heard

11      me excuse her for the day.

12             MR. HAYSBERT:  Sure.  Nicholas Seifert would be

13      next.

14             THE COURT:  I'll instruct the jury that we've had

15      somebody waiting that was brought to the Court's attention

16      that has been waiting, and it's not an employee or anyone

17      associated with Outback or the plaintiff, and that person

18      needs to be called out of order.  I'm going to allow that.

19             This is the defendant's witness, but the person has

20      been here.  We were expecting to be on the defendants' case,

21      which we are not.  I'm not going to have this person having

22      to come back Monday.  So you need to understand that this

23      person is not being called by the plaintiff, the person is

24      being called by the defendant.  Then we will go back to your

25      case, we will take a break, and we will go back to your case
```

Robinson, C. - Direct                                              730

1    and finish it then.

2              MR. HAYSBERT:  Would you mind if we take a break

3    now, Your Honor?

4              THE COURT:  Yes, I do, because I want to call this

5    witness.

6              MR. McGAVIN:  Your Honor, I thank you, and at this

7    time I call Chris Robinson.

8              THE COURT:  Mr. Robinson, if you would please come

9    forward and be sworn.

10             (Witness was sworn.)

11             CHRISTOPHER ROBINSON, called by the Defendant,

12   having been first duly sworn, was examined and testified as

13   follows:

14                        DIRECT EXAMINATION

15   BY MR. McGAVIN:

16   Q.  Sir, please state your name.

17   A.  Christopher Scott Robinson, Sr.

18   Q.  Where do you live, sir?

19   A.  Chesapeake, Virginia.

20   Q.  May we have the street address?

21   A.  Yeah.  ███████████████, Chesapeake, Virginia, 23321.

22   Q.  How long have you resided at that address?

23   A.  Be three years in October.

24   Q.  Before that where did you live?

25   A.  Portsmouth.  It's ████████████████, Portsmouth,

Robinson, C. - Direct                                                   731

1    Virginia, 23701.

2    Q.   What is your occupation?

3    A.   Electrical designer, Newport News Shipyard.

4    Q.   How long have you been so employed?

5    A.   Combined, 15 years.

6    Q.   Do you also have service in the United States Navy?

7    A.   Yes.

8    Q.   And how long?

9    A.   Six years total.

10   Q.   Thank you.  Are you married?

11   A.   Yes.

12   Q.   What is your wife's name?

13   A.   Nannette Carol Robinson; Nannette, N-a-n-n-e-t-t-e.

14   Q.   Do you have children?

15   A.   Yes.  Two; my son, who is a Jr., and my step-son ███.

16   Q.   On or about May 23, 2018, were you a guest, a diner at

17   the Chesapeake Outback?

18   A.   I was, my family and I.

19   Q.   Pardon me?

20   A.   My family and I, yes.

21   Q.   When you say your family, was that --

22   A.   All four of us; Nanette, █████ and ██, █████████

23   Q.   What was the occasion?

24   A.   Either one of two things.  Either ██ just graduated high

25   school or was close to his birthday because his birthday was

JODY A. STEWART, Official Court Reporter

Robinson, C. - Direct                                                    732

1    two days after that.  I don't remember which one it was for.

2    Q.  Did you work that day?

3    A.  Yes.

4    Q.  And where did you report to work typically?

5    A.  Same place I am now, Newport News at the shipyard.

6    Q.  When you went to the restaurant, did you all drive

7    together?

8    A.  Yes.

9    Q.  And approximately what time did you arrive?

10   A.  I don't remember about what time.  It was dark.  It was

11   evening.  I usually get off at 4:00, so it was probably after

12   that.

13   Q.  Had you been to the restaurant before?

14   A.  Yes.

15   Q.  About how many times?

16   A.  Maybe two.

17   Q.  On your previous visits, did you have any difficulty with

18   the flooring in the dining room?

19   A.  None whatsoever.

20   Q.  Did you find that the floors were slippery or cause you

21   any concern?

22   A.  No.

23   Q.  What about your wife, Nanette, did she have any

24   difficulties with the floor?

25   A.  No.

Robinson, C. - Direct                                                733

1   Q.  Did either of your boys, ███████ or ██ have any

2   difficulties with the floor?

3   A.  No, not that I recall, no.

4   Q.  On this particular occasion, when you arrived, did you go

5   in through the main entrance?

6   A.  Correct, yes.

7   Q.  And did you go past the hostess stand?

8   A.  Yes.

9   Q.  Where were you seated?

10  A.  Actually right behind the hostess stand, at the booth

11  right behind it.

12  Q.  And when you say there is a booth, there is a booth and a

13  table and there is a back, it's not movable chairs?

14  A.  Correct, yes.

15  Q.  Where were you seated?

16  A.  With my back to the door, and I was facing the kitchen.

17  I was on the outside.

18  Q.  Pull that microphone just a bit closer, if you wouldn't

19  mind.  Would you say that again.

20  A.  I was sitting on the end with my back to the door facing

21  towards the kitchen area.

22  Q.  So where was Nanette?

23  A.  To my left.

24  Q.  Where were the boys?

25  A.  Across from me.  ███████ was in front me.  ██ was to his

JODY A. STEWART, Official Court Reporter

Robinson, C. - Direct                                              734

1    right.
2    Q.  After you arrived, were you greeted by a waiter or
3    waitress to take your order or drink orders?
4    A.  When we arrived there, greeted by the hostess, and then
5    sat, and then the waitress came after and took our beverage
6    order, yes.
7            THE COURT:  Let me ask you something.  Were you
8    facing the hostess, then?
9            THE WITNESS:  No.
10           THE COURT:  So your back was to the door?
11           THE WITNESS:  Correct.
12           THE COURT:  Your wife was beside you?
13           THE WITNESS:  Both our backs.  Yeah, she was to my
14   left.  Both of our backs were facing the door.
15           THE COURT:  Facing the door, and your back was to
16   the hostess stand?
17           THE WITNESS:  Correct.
18           THE COURT:  Go ahead.
19   BY MR. McGAVIN:
20   Q.  Do you recall if you had already been served by the time
21   the incident occurred involving Dr. Haysbert?
22   A.  Honestly, I don't remember.  I don't know if we had our
23   food or just our beverages, to be honest with you.
24   Q.  Had you seen anyone walking in the area of the main
25   walkway have any difficulty with the floors?

Robinson, C. - Direct                                                    735

1    A.  No, none whatsoever.

2    Q.  Did you or your sons or your wife spill anything on the

3    floor?

4    A.  Uh-uh.

5    Q.  Is that no?

6    A.  No, sorry.

7    Q.  We have to get that for the court reporter.

8    A.  Understood.

9    Q.  Thank you, sir.  While you were waiting, did you see if

10   there was anyone mopping in the area of that walkway?

11   A.  No, nobody that I saw doing any of that.

12   Q.  And did you happen to see a bucket and a mop at the

13   hostess stand?

14   A.  No, uh-uh.

15   Q.  Did you observe the fall involving Dr. Haysbert?

16   A.  I did, yes.

17   Q.  Tell us what you saw.

18   A.  She just walked in, she was walking, had passed us, and

19   she just went down.  And first thing I looked was to see if,

20   you know, maybe the floor was wet, but I didn't see anything.

21   Q.  The floor was not wet?

22   A.  Uh-uh.  No.

23   Q.  All right.

24           THE COURT:  She's walking down past the booth?

25           THE WITNESS:  Yeah, she has walked past me.

Robinson, C. - Direct                                              736

 1             THE COURT:  Towards the kitchen?

 2             THE WITNESS:  Yes, ma'am.

 3   BY MR. McGAVIN:

 4   Q.  Is it correct to say that she passed you past your right

 5   shoulder?

 6   A.  Correct.  Yes.

 7   Q.  About how far away was she from your right shoulder to

 8   that walkway?

 9   A.  Probably -- I'd say, probably from here to roughly where

10   that table is sitting right there, approximately.

11   Q.  15 --

12   A.  Maybe 15, 20 feet.

13   Q.  And how far did she go -- I'm asking laterally from your

14   right shoulder to your right, about how far away?

15   A.  More straight.  Probably about 1:00, if I'm at 6:00.

16   Q.  I'm trying to ask distance.  Maybe -- let me try it a

17   different way.  How far did Dr. Haysbert go past you towards

18   the back of the house when you saw her fall?

19   A.  About 15 to 20 feet.

20   Q.  I see.

21   A.  Roughly.

22   Q.  As you watched her go past you, did you see her have any

23   difficulty with her footing before she fell?

24   A.  None that I noticed, no.

25   Q.  Did you see Lisa Crosby go past in front of Dr. Haysbert?

JODY A. STEWART, Official Court Reporter

Robinson, C. - Direct                                                737

1    A.  I don't remember anybody went -- they may have, I don't

2    recall, no.

3    Q.  Once you saw Dr. Haysbert fall, what did you do?

4    A.  I attempted to get up to go see to make sure she was

5    okay, but I think somebody had got there before me, but I

6    don't recall.  I think somebody did.  I don't know if it was,

7    you know, an employee or another patron at the restaurant.

8    Q.  After her fall did you look to see if there was anything

9    on the floor?

10   A.  Yes, because that was my main -- maybe there was

11   something that she slipped on, but I didn't -- nothing that

12   stood out to me that she could have.

13   Q.  After the incident where she fell, did you speak to

14   Dr. Haysbert?

15   A.  To her, no.

16   Q.  Did you go to give her assistance?

17   A.  I attempted to get up and go but somebody -- if I recall,

18   somebody got there before I did.

19   Q.  Did you notice whether she was unconscious?

20   A.  No, she was not.

21   Q.  Eventually, did you get up out of your booth and speak to

22   either Dr. Haysbert or to her daughter?

23   A.  We talked to somebody.  May have been her daughter, yes.

24   Q.  And what did you tell her?

25   A.  I told her that she may -- they may want to check to make

Robinson, C. - Direct                                              738

1    sure she didn't hit her head.  I didn't see if she did, but
2    just in case to make sure she didn't hit her head.
3    Q.  Did you make any statement or make any observation about
4    the condition of the floor?
5    A.  No, not that I recall, no.
6    Q.  In other words, you didn't report to this woman that
7    there was a problem with the floor?
8    A.  Uh-uh.  Not that I recall, no.
9    Q.  After the incident did you see anyone mopping or dry
10   mopping or cleaning the floor?
11   A.  No.
12   Q.  Did you see anyone put up a "wet floor" sign afterwards?
13   A.  No.
14   Q.  Did you take any photographs of the location after
15   Dr. Haysbert had her fall?
16   A.  I did not.
17   Q.  After she had her fall, did you notice whether any of the
18   store employees inspected the floor for any defects?
19   A.  Well, they did.  I think they did look.  I think they
20   looked to see if there was anything wet, but nothing -- if
21   there would have been, I thought they would have, you know,
22   got a mop, would dry mop or whatever or a towel or something,
23   but I didn't see anybody do that.
24   Q.  When you entered the restaurant, did you -- and you were
25   walking on the wooden portion of the floor, did it feel

Robinson, C. - Direct                                                    739

1    slippery under foot?

2    A.  No.

3    Q.  The other individuals who came to assist Dr. Haysbert,

4    did you notice whether or not any of them had any

5    difficulties with the floor?

6    A.  No.

7            THE COURT:  Is the no, you didn't observe anybody

8    or, no, they didn't?

9            THE WITNESS:  No, I didn't see anybody have --

10   notice anybody have any problems walking.

11           THE COURT:  All right.

12   BY MR. McGAVIN:

13   Q.  I'm going to show you what's previously been marked as

14   Defendant's Exhibit 1, which is now in evidence, and I'll

15   display that on the camera with the assistance of the clerk.

16           THE COURT:  All right.

17           MR. McGAVIN:  So, Your Honor, I ask that this be

18   published to the jury.

19           THE COURT:  Yes, it can be published.  It's been

20   admitted.

21           MR. McGAVIN:  Thank you.

22           MR. HAYSBERT:  I would actually object.  There's no

23   foundation laid.

24           THE COURT:  There is a foundation laid.  Go ahead.

25           MR. McGAVIN:  I believe --

Robinson, C. - Direct                                                          740

1              THE COURT:  The foundation is it's an admitted

2    exhibit, and it's been testified as to what -- what it was

3    taken of, and you admitted it through a witness, and now

4    he's entitled to ask questions about it.  It's already been

5    identified what it is and the approximate time period.  You

6    can cross if you want, but the foundation is there for it.

7    BY MR. McGAVIN:

8    Q.  I'm going to show you what's been marked and is in

9    evidence, which is Defendant's Exhibit Number 1.  Can you

10   tell me whether or not this appears to fairly and accurately

11   depict the condition of the floor at the Outback Steakhouse

12   in Chesapeake as it appeared on or about May 23, 2018?

13   A.  Yes.

14   Q.  Did you happen to notice what shoes Dr. Haysbert was

15   wearing?

16   A.  I know they were high heels.  As far as type of high

17   heels, I wasn't -- I didn't recall whether or not they were

18   wedge-type, but I know they were high heels.

19   Q.  I'm going to show you what plaintiff has placed in

20   evidence, which is Defendant's Exhibit Number 2, and I will

21   ask you, and I ask you, do you recognize what's shown in

22   Defendant's Exhibit Number 2 as the shoes and attire that

23   Dr. Haysbert was wearing on or about May 23, 2018?

24   A.  As far as them being high heels and she had a dress on

25   that I recall, but as far as the type of shoes, I cannot

JODY A. STEWART, Official Court Reporter

1    confirm those are the type that I recall seeing.  I just know

2    they were high heels.

3    Q.  Thank you, sir.

4    A.  You're welcome.

5    Q.  Did you end up staying for dinner?

6    A.  Yes, we did.

7    Q.  And during the time that you were there and had your

8    dinner, did you see any servers, guests, patrons have any

9    difficulty with their footing on the floor?

10   A.  No.

11   Q.  On your way out of the restaurant, did you, your wife,

12   Nanette or your two children, have any difficulty with the

13   floor being slippery?

14   A.  No, none.

15   Q.  At any time while you were there for dinner and before

16   you left, did you see anyone mopping the floor in the area of

17   where Dr. Haysbert had her fall?

18   A.  No.

19          MR. McGAVIN:  Thank you.

20          THE WITNESS:  I have no further questions.

21          THE COURT:  Cross-examination.

22          MR. HAYSBERT:  Thank you, Your Honor.

23                          CROSS-EXAMINATION

24   BY MR. HAYSBERT:

25   Q.  I want to confirm, Mr. Robinson, how many times have you

Robinson, C. - Cross                                                    742

1   been to that Outback Steakhouse?

2   A.  That was probably the third time I have been there.

3   Q.  Let me get my question out first as well.  Thank you very

4   much.  The third time at that time, that's when you saw the

5   slip and fall?

6   A.  Correct, yes.

7   Q.  And you said it happened about 15 to 20 feet ahead of

8   you?

9   A.  Yes.

10  Q.  And you also said that you never got out of your seat

11  because there were other people that were going to assist

12  with her, correct?

13  A.  Correct, yes.

14  Q.  So from where you were standing 15 to 20 feet away, you

15  could tell exactly where Dr. Haysbert fell?

16  A.  Yes.

17  Q.  All right.  How long was she on the ground?

18  A.  Probably maybe 10, 15 minutes maybe, roughly.

19  Q.  Before anyone lifted --

20  A.  Before she got up, yes.  Somebody helped her up, yes.

21  But she was there roughly 10, 15 minutes, if I remember

22  correctly, yes.

23  Q.  So you got up at some point?

24  A.  Uh-huh.

25  Q.  After that?

Robinson, C. - Cross                                                    743

1   A.  I got up to look to see if, you know, the floor looked
2   wet, but somebody was there.
3   Q.  So you didn't actually go to that area of the floor?
4   A.  Correct.
5   Q.  And so you never actually saw what was under Dr. Haysbert
6   when she was able to be picked up, correct?
7   A.  No, uh-uh.
8   Q.  When you got to the restaurant, you walked in the front
9   door?
10  A.  Yes.
11  Q.  You also walked out the same way you came in?
12  A.  Yes.
13  Q.  And now at one point you said that you told someone to
14  check to make sure she didn't hit her head?
15  A.  Correct.
16  Q.  Why did you say that?
17  A.  Just the way because it looked like she may -- because
18  she went backwards, so I wasn't sure if she, you know, did,
19  because I didn't -- I mean, I saw her fall, but I couldn't
20  see if she hit her head or not because she went, you know,
21  went backwards.
22  Q.  And so why didn't you check to make sure she --
23  A.  In case, because in case she did, you know, in case she
24  had some sort of, you know, injury, you know, I wanted to
25  make sure that, you know, not being medical experience but

Robinson, C. - Cross                                                    744

1    seen enough, you know, on T.V. as far as, you know, her case,
2    she maybe had a concussion or something like that, and I've
3    had family members that are in the medical field, so they
4    always say watch for stuff like that.  So that was why,
5    just -- you know, just in case she hit her head.
6    Q.  It's serious, right?  If you hit your head, a very
7    serious thing?
8    A.  Yes.
9    Q.  You said that you saw no one mopping or cleaning the
10   floor?
11   A.  No, I didn't see anybody.
12   Q.  You never took any photographs yourself?
13   A.  No.
14   Q.  Did you actually see Dr. Haysbert walk out of the
15   restaurant?
16   A.  I don't remember if she did or not.  I don't remember
17   seeing her leave.  I'm not saying she didn't leave before we
18   did, but I don't recall seeing her leave.
19   Q.  Do you remember giving Nineveh Haysbert your name and
20   number?
21   A.  I gave somebody, yes.  I don't remember who it was, but I
22   know I did give somebody my name and number.
23   Q.  And did you write that name and number down on a piece of
24   paper?
25   A.  I can't remember if I did or if I read it off, gave it to

Robinson, C. - Cross                                                    745

1    them, and they wrote it down themselves.  I don't remember

2    which.

3    Q.  Okay.  So you don't remember whether or not you put it on

4    a card and put your name on it?

5    A.  I may have.  I don't remember.  It's been five years so.

6    Q.  Do you recall the deposition that I took with you?

7    A.  Yes.

8    Q.  So in your deposition, I'm going to try and refresh your

9    prior recollection of your testimony, okay.  So give me one

10   moment.

11   A.  Okay.

12           THE COURT:  Have to show it to me first.

13           MR. HAYSBERT:  Of course, Your Honor.  Bear with

14   us.

15           Your Honor, if we may.

16           THE COURT:  I haven't seen it.

17           MR. HAYSBERT:  We are going to bring it up.

18           THE COURT:  I need a copy of it.

19           MR. HAYSBERT:  Your Honor, because I can't find

20   anything on paper, would you mind if I provide you the

21   laptop with the information?

22           THE COURT:  I'll read it from the screen, but I

23   have to see the full context of it, that's why I'm asking,

24   because you have to put the questions in context, and you

25   can't leave off the end of a question here.

Robinson, C. - Cross                                                746

```
 1              MR. HAYSBERT:  I understand.
 2              THE COURT:  Hand it up.
 3              MR. McGAVIN:  Your Honor, I have a copy, if that
 4   will help.
 5              THE COURT:  It will help.
 6              MR. McGAVIN:  It's in the condensed version.
 7              THE COURT:  I'll do my best.  I'll put on my
 8   reading glasses.
 9              MR. HAYSBERT:  Thank you, Your Honor.  My apologies
10   for everyone for the inconvenience.
11              THE COURT:  So would you please tell me the page
12   and the lines.
13              MR. HAYSBERT:  Page 41, Your Honor.  And if you
14   would start at the top because that will give you the
15   context.
16              THE COURT:  Okay.  Hold on.
17              MR. HAYSBERT:  Sure.
18              THE COURT:  Page 41.  We would be looking at Page
19   41, line 1 through 25 over through Page 42, line 1 through
20   23.  I will give you this.  What you need to do,
21   Mr. Robinson, is read it.
22              THE WITNESS:  Okay.
23              THE COURT:  Say does it refresh your recollection,
24   and is this testimony the same as today or correct.  Then
25   give it back to the Court, and I'll let Mr. Haysbert ask you
```

1    a question.  Then I'll read whatever it is you read, and

2    they would have seen that you read it, and then you answer

3    the questions for Mr. Haysbert.  Then I'll read it to them

4    so then they can make the decision about whether it is

5    different or not.

6            THE WITNESS:  Yes, Your Honor.

7    BY MR. HAYSBERT:

8    Q.  You may read it, Mr. Robinson.

9    A.  41, 1 through 25?

10   Q.  That's correct.  23.

11   A.  Okay.

12           "So do you see what's on your screen, Mr. Robinson?

13           "Yes.

14           "Let me see if I can turn it around.  All right.

15           "Do you know whose finger this is or hand?

16           "No.

17           "Anything recognizable about the fingers?

18           "No.  It's not my wife, that's for sure.  She does

19   not have fingernails.

20           "No problem.  Do you see your name on this card?

21           "Yes.

22           "Is that card your handwriting?

23           "That is.

24           "And this is the number that you provided at the

25   time?

Robinson, C. - Cross                                                    748

1              "Correct.

2              "Do you still have this number?

3              "I do.

4              "And is -- and it says here witness, and you listed

5      your --

6              "That is not -- that is not my handwriting."

7              MR. HAYSBERT:  Okay.  You can stop there.  Can I

8      ask him some questions, Your Honor?

9              THE COURT:  Yes.  Pass it back to me.  I want to

10     see.  Go ahead and ask him some questions.

11     BY MR. HAYSBERT:

12     Q.  Has it refreshed your recollection, Mr. Robinson, about

13     what you indicated was on that card?

14     A.  Yes.

15     Q.  So your name was on that card, correct?

16     A.  It was.

17     Q.  And your number was on that card, correct?

18     A.  Right.  Yes.

19     Q.  You put it there, correct?

20     A.  It's possible.  As I said I don't -- didn't recognize the

21     handwriting.

22     Q.  Well, you didn't write the handwriting for witness?

23     A.  Witness, okay.  Then, yeah, the witness -- the witness

24     was mine.  The name and number probably as -- then I don't --

25     I probably wrote it, but I didn't -- reading from that I

Robinson, C. - Cross                                                    749

1    don't remember if it was referring to the witness or witness

2    and then my name and number.  That's what I mean.

3    Q.  So is it your testimony today that you put your name and

4    your number on that card?

5    A.  I'd have to see the picture of the card that you showed

6    me during the deposition to verify if it was my handwriting

7    or not.

8    Q.  Didn't you state, though, on the testimony that that was

9    your handwriting?

10   A.  Because you showed me the picture at the time of the

11   deposition, so I had it in my possession or in visual that I

12   can verify if it's mine, but I'm not going to say yes, it was

13   if I don't see the picture.

14          THE COURT:  Let me ask you this.

15          THE WITNESS:  Yes.

16          THE COURT:  Did you volunteer the information?

17          THE WITNESS:  Yes.  The information was given was

18   voluntarily.  Whether or not I actually wrote it myself, the

19   name and number, or whoever was taking it wrote witness and

20   then my name and number.  But if I can see the card, I can

21   tell you if it was my handwriting for name and number.

22          THE COURT:  My question is a little bit different.

23          THE WITNESS:  Okay.

24          THE COURT:  Did you approach the individual that

25   asked you to give this information or did they approach you?

Robinson, C. - Cross                                                    750

1              THE WITNESS:  I think I went up and -- if I

2     remember correctly, I went up and gave them my name and

3     number.

4              THE COURT:  Go ahead.

5     BY MR. HAYSBERT:

6     Q.  So now that we've established that you gave Nineveh or

7     someone the name and number?

8     A.  Right.

9              THE COURT:  He didn't say who.

10             MR. HAYSBERT:  I'm sorry.  I apologize.

11    BY MR. HAYSBERT:

12    Q.  You gave someone your name and number?

13    A.  Yes.

14    Q.  On a piece of paper?

15    A.  Correct.

16    Q.  All right.  And it is your testimony today that the

17    restaurant was darkly lit, isn't it?

18    A.  Not any different than normal when I have been in there.

19             MR. HAYSBERT:  Your Honor --

20             THE COURT:  His testimony today has not been that

21    it was darkly lit.  He said it was -- he thought it would be

22    dark outside, but he didn't say anything on direct

23    examination about being darkly lit.

24             MR. HAYSBERT:  I'll withdraw the question.

25    BY MR. HAYSBERT:

1    Q.  The lighting in the restaurant, what was the lighting

2    like in the restaurant?

3    A.  Any other time it's normal that it would be in an evening

4    setting with the lights on.  I can't say if it was dimly lit.

5    Based on the different time frames, whether or not it was any

6    different than any other time, it was darker than when we

7    went.  I mean, it was -- like I said, it was nighttime.  Like

8    I said, it was nighttime so the lights may have been a

9    little -- seemed a little brighter in there during the

10   evening than they would during the day when there is sunlight

11   coming in the windows.

12   Q.  Because this happened at night, is your testimony?

13   A.  Yeah, because I get off work at 4:00, so it was

14   definitely after work.

15       MR. HAYSBERT:  Your Honor, again, I would like to

16   refresh his recollection regarding the lighting inside the

17   restaurant based on his testimony here today.

18       THE COURT:  The first thing is, the full testimony

19   wasn't read where I had marked it down.  So I'm going to

20   read to put the rest of it in context.  I'll start with

21   where he was and go through where he did.

22       "And it says here witness, and you listed your" --

23   that's question.

24       "Answer:  That is not -- that is not my

25   handwriting."

Robinson, C. - Cross                                                  752

```
 1              "Question:  Okay.  All right.  So just Chris
 2    Robinson and the number?
 3              "Answer:  Correct.
 4              "Question:  Do you know whose handwriting this is
 5    here?"
 6              "Answer:  I -- I do not.
 7              "Question:  Okay.  All right.  Who gave you this to
 8    write your name and number on?
 9              "Answer:  I don't recall.  It may have been her
10    daughter or it may have been an employee there at the
11    restaurant.  I do not recall.
12              "Question:  Okay.  And were you ever contacted by
13    anyone?
14              "Answer:  No.  You were the first, first one that
15    showed up at my door.
16              "Question:  Okay.  So no one else attempted to
17    contact you by phone?
18              "Answer:  Not me, no.
19              "Question:  Okay.  When you say not you, did they
20    attempt to contact someone else?
21              "Answer:  My wife and that somebody -- and I think
22    my son and that somebody had called.
23              THE COURT:  Okay.  Would that still be your
24    testimony or not?
25              THE WITNESS:  Yes.
```

Robinson, C. - Cross                                                    753

```
 1          THE COURT:  So I was trying to establish that you
 2     had mentioned a name and he, under this testimony, says he
 3     doesn't recall.  He says he volunteered the information, and
 4     he said he wrote the information.  He didn't write
 5     "witness," but he doesn't know who he gave that to.  Now, I
 6     don't know if that's correct today or not.
 7          THE WITNESS:  I'd have to -- like I said, I would
 8     have to see to verify if that was my handwriting.  To
 9     refresh my memory whether or not I wrote it or the person I
10     was, you know, giving the information to wrote it.  That's
11     why if I can see the card.  I mean, you had it during the
12     deposition and showed it to me, so if I can have that
13     picture, I can verify, confirm whether or not that was
14     my -- if I actually physically wrote it or just gave it to
15     somebody.
16          THE COURT:  Is there anything more you want to do
17     on this point?
18          MR. HAYSBERT:  No, Your Honor.  I'm going to move
19     on to the restaurant lighting.
20          THE COURT:  Can you refer me to where you're going
21     now?
22          MR. HAYSBERT:  Yes.  This is Page 64, line 7
23     through 10.
24          THE COURT:  Read line 7 to 10 to yourself, and then
25     ask him if it refreshes his recollection or if it's
```

1    different, and then we will read it.

2            THE WITNESS:  What pages?

3            THE COURT:  It's marked.  It's only three lines.

4    So you read it to yourself and tell us when you're done.

5    Have you read it?

6            THE WITNESS:  Yes, ma'am.

7            THE COURT:  Mr. Haysbert, he's read it, so ask your

8    question.

9    BY MR. HAYSBERT:

10   Q.  So I wanted to confirm your testimony.  Was it that the

11   restaurant was darkly lit or that it was lit up?

12   A.  It was lit up.

13   Q.  Thank you.

14           THE COURT:  Then can you give that back to the

15   Court.  So this was the testimony that he gave at his

16   deposition, and you've heard his testimony today.  The

17   deposition was:

18           "Answer:  There would have been various lighting

19   there.  So it's not like it was in a, you know, darkly lit

20   area.  So it was definitely lit up, you know, to some

21   aspects."

22           That was the answer to a question that had been

23   asked about the lighting, and that's the answer.

24           MR. HAYSBERT:  Thank you, Your Honor.

25   BY MR. HAYSBERT:

Robinson, C. - Cross                                                    755

1    Q.   Now, Mr. Robinson, you indicated in your prior testimony
2    that Lisa Crosby was walking in front of Dr. Haysbert?
3    A.   As far as what her name was, I have no idea, but there
4    was an employee, yes.
5    Q.   Okay.  Can you describe the employee that you saw walking
6    in front?
7    A.   That, I don't remember, no.
8    Q.   You don't remember?
9    A.   I don't remember what she looked like or even if it was a
10   female.  I don't recall.  I know the hostess was female, but
11   I don't know who walked her, if it was the hostess or who it
12   was.
13   Q.   So the person who greeted you at the front desk, the
14   hostess stand?
15   A.   Yes.
16   Q.   She was a female?
17   A.   There is a female there, but I don't remember, as far as
18   for Mrs. Haysbert who walked her back.  I don't remember
19   seeing who it was or what she looked like.
20   Q.   Okay.  And the person that you saw at the hostess stand,
21   can you describe her, other than being female?  Was she
22   African-American?
23   A.   I think she was, yes, if I recall.
24   Q.   And the person that you said was walking in front of
25   Dr. Haysbert before she slipped and fell --

JODY A. STEWART, Official Court Reporter

Robinson, C. - Cross                                                    756

1  A.  Right.

2  Q.  -- do you recall whether she was African-American?

3  A.  No, I do not recall.

4          MR. HAYSBERT:  Your Honor, I would like to refresh

5  his recollections.  This page would be 37, lines 5 through

6  16.

7          THE COURT:  It first has to be impeaching.

8          MR. HAYSBERT:  It is impeaching.

9          THE COURT:  The last one wasn't.  I'm going to make

10 a comment on the evidence.  He said it wasn't dark lit, it

11 was lit up.  I don't understand why we read that, but we are

12 going to move on.  The jury's heard it, and they can make

13 their own determination about it.

14         MR. HAYSBERT:  Okay.  He said regular lighting,

15 that's why.

16         THE COURT:  Regular lighting, yes.  Okay.  Just

17 tell me where you're going because, you know, if there is

18 really something in here, then let's get to it.

19         MR. HAYSBERT:  37, lines 5 through 16, Your Honor.

20         THE COURT:  Read lines 5 through 16.  To save time,

21 if you don't object, Mr. Haysbert, I'll just let him read

22 the lines so we can save some time here.

23         MR. HAYSBERT:  Sure.

24         THE COURT:  5 through 16.

25         THE WITNESS:  Okay, Your Honor.

Robinson, C. - Cross                                                    757

1    BY MR. HAYSBERT:

2    Q.  So is it your testimony today that you don't know --

3    recall whether the person who was walking in front of

4    Dr. Haysbert was African-American or not?

5    A.  This is like it may have been her daughter, but I didn't

6    recognize if it was an employee or who it was at the time

7    but --

8    Q.  The person that you saw walking in front of Dr. Haysbert

9    before she fell, in your testimony, she was an

10   African-American, correct?

11   A.  Yes.

12   Q.  That's what you said at the deposition?

13   A.  Yes.  But you have to remember this was three years ago

14   when he had this deposition, so that's why I didn't remember.

15   So I'm reading it, I understand but, yes, that's what I said

16   before.  But I didn't recall whether it was an employee or

17   whether female today.

18   Q.  You indicated in your earlier testimony that she had been

19   left on the floor for about 15 to 20 minutes?

20   A.  Roughly.  I mean, I didn't look at my watch and time it

21   so I can't -- that's just a guesstimate.

22   Q.  Well, I don't want you to guess.  I want you to give us

23   your best estimate.  So is it your best estimate --

24   A.  Best estimate, 10, 15 minutes.

25          MR. HAYSBERT:  Okay.  So if you could go with me,

Robinson, C. - Cross                                                    758

1    Your Honor, to page --

2              THE COURT:  Let me see this again.

3              MR. HAYSBERT:  36, lines 16 through 19.

4              THE COURT:  Let me read this to the jury so you'll

5    know what he looked at.

6              "Question:  Did you notice anyone walking in front

7    of her before she fell or just her?

8              "Answer:  I want to say -- I want to say based on

9    my recollection -- I want to say her daughter or family

10   member was in front of her, and she was behind, if I

11   remember correctly.

12             "Question:  Okay.  Did you notice that she was

13   African-American?

14             "Answer:  Yes, she was.

15             "Question:  And the person in front of her was

16   African-American, same?

17             "Yes?"  Then to put more context to it.

18             "Question:  Do you recall a manager coming out to

19   check on the elderly?

20             "Answer:  Somebody, yes.  Somebody did come out and

21   talk to them, and I remember somebody -- I don't remember if

22   it was a hostess or a manager or a waitress or whatever had

23   come over, and, you know, got my information from me, name

24   and phone number and whatnot, but I don't recall who --

25   exactly who it was, if it was the store.

1              Now where do you want me to go?

2              MR. HAYSBERT:  Like you to go, Your Honor, to Page

3    36, lines 16 through 19.

4              THE COURT:  Read this.

5              Have you finished?

6              THE WITNESS:  Yes, ma'am.

7              THE COURT:  You can bring it back to me and ask

8    your questions.

9    BY MR. HAYSBERT:

10   Q.  So is it your recollection now, Mr. Robinson, that she

11   was on the floor for about five minutes?

12   A.  It could have been, yes.  Like I said, it was an

13   estimate.  I even said estimated five minutes.

14   Q.  That's what you said in your deposition, five minutes?

15   A.  Yes.

16   Q.  There's not 10, 15 minutes, that's not 15 minutes,

17   correct?

18   A.  Right.

19   Q.  It's certainly not 20 minutes?

20   A.  Correct.  Well, yes.

21             MR. HAYSBERT:  Thank you.

22             THE COURT:  These are the lines.

23             "Question:  No worries.  Sorry to interrupt you.

24   How long was she on the floor, if you recall?

25             "Answer:  Estimated maybe five minutes."

Robinson, C. - Cross                                                    760

1              MR. HAYSBERT:  Thank you, Your Honor.

2              Your Honor, if I could bring up Defense Exhibit 1,

3       please.

4              THE COURT:  All right.  Are you through with the

5       deposition for now?

6              MR. HAYSBERT:  I'm through with the deposition for

7       now.

8              THE COURT:  Can you give this back to Mr. McGavin?

9              MR. HAYSBERT:  You need to keep it.  I'm not

10      through.

11             THE COURT:  I think Mr. McGavin gave this to me.

12             MR. HAYSBERT:  I've got one more.

13             THE COURT:  Because he may --

14             MR. HAYSBERT:  Sure.  Understand.

15             THE COURT:  He may need to use it.

16             MR. McGAVIN:  I have it on my computer, Your Honor,

17      so I'm able to pull it up and read it on the computer.

18      Thank you.

19      BY MR. HAYSBERT:

20      Q.  You testified earlier as to this image, right,

21      Mr. Robinson?

22      A.   Right.

23      Q.  When you indicated that this was the floor where the

24      plaintiff fell?

25      A.  The type of flooring.  I don't know exactly where that

JODY A. STEWART, Official Court Reporter

Robinson, C. - Cross                                                    761

1    picture was taken so I can't say if that's the exact spot

2    where she fell, but that's the type of floor in the

3    restaurant, yes.

4    Q.  Okay.  Thank you, Mr. Robinson.

5            MR. HAYSBERT:  Your Honor, if you could move to

6    Page 35, lines 11 through 17.  I would like to refresh the

7    witness's prior testimony, refresh his recollection with his

8    prior testimony under oath.

9            THE COURT:  I should have put on the record that

10   this is a deposition on Monday, June 28th, 2021, with

11   Mr. Robinson.  I have to identify that for the record.  I

12   should have done that earlier, or Mr. Haysbert, one of the

13   two of us.

14           THE WITNESS:  Page 35, Your Honor?

15           THE COURT:  Yes, sir.  I think I've put --

16           THE WITNESS:  You did.

17           THE COURT:  -- two hash marks on there.

18   BY MR. HAYSBERT:

19   Q.  Mr. Robinson, you finished reading?

20   A.  Yes.

21   Q.  Has it refreshed your recollection that you indicated in

22   your sworn testimony at your deposition that you believe the

23   floor was tiled?

24   A.  Well, tile is not necessarily square.  I mean, tile can

25   still be -- you can still have wood-looking tiles, so they

Robinson, C. - Cross                                                      762

1    can still be the same, looking in that same pattern can be

2    tile.  Doesn't necessarily mean it has to be squared.  They

3    can be elongated as well.

4    Q.  So your testimony is that what you saw in that photo I

5    showed you looked like wood, correct?

6    A.  Yes.

7    Q.  But in your sworn testimony at your deposition that you

8    took under oath, you said that the floor was tile, didn't

9    you?

10   A.  Tile can be wood, wood tiles.

11   Q.  I want you to answer my question.

12        THE COURT:  He can answer and then you can follow

13   up.  Tile.

14        THE WITNESS:  Tile is -- yes, tile.  You can have

15   wood looking tiles that are still tile.  That doesn't

16   necessarily mean they have to be square.  They can be

17   rectangle to make it look like wood.  I worked in the

18   flooring at Lowe's and sold flooring, so, yes, you can get

19   wood that looks like tile.  It's still called tile.  It's in

20   the tile section, and it looks like wood.  So, yes, tile,

21   and I worked there for five years.

22   BY MR. HAYSBERT:

23   Q.  Worked with?

24   A.  Lowe's.

25   Q.  Lowe's?

```
 1   A.  Uh-huh.

 2   Q.  And you dealt with flooring at Lowe's?

 3   A.  Yes, I did.

 4   Q.  So you would know what a floor looked like versus a tile

 5   floor, correct?

 6   A.  It's wood doesn't necessarily mean it's hardwood, it's

 7   still wood look.  It is still a wood look.  So I didn't --

 8   when I say tile, it still could be a wood looking tile.  So,

 9   yes, not a hardwood floor.  It is a wood grain, so it's wood

10   grain tile.  So, yes, you can have wood grain tile.

11   Q.  Anything else you want to say?

12   A.  No.

13          MR. HAYSBERT:  No further questions.

14          THE COURT:  So this testimony was:

15          "Question:  And you said you saw that the floors

16   made of tile; is that what you --

17          "Answer:  If I remember correctly.  Like I said,

18   because I've only been in there -- been in there twice, so I

19   can't say a hundred percent, but based approximated on my

20   recollection, it's a tile floor."

21          That was the testimony.

22          Mr. McGavin.

23          MR. McGAVIN:  Nothing further.  Thank you, Your

24   Honor.

25          THE COURT:  Well, Mr. Robinson, you are released
```

1    from service in the case.  I want to thank you for your

2    patience, and I know you've waited with other witnesses, and

3    you're now released.  The only caveat is you cannot discuss

4    your testimony with anyone until the case is over.

5            THE WITNESS:  Yes, Your Honor.

6            THE COURT:  All right.  Thank you.

7            THE WITNESS:  Thank you.

8            (Witness excused.)

9            THE COURT:  We have one more witness left in the

10   plaintiff's case, and we are going to try to finish that

11   this evening because that individual has also been here

12   since what date was it?

13           MR. McGAVIN:  Tuesday.

14           THE COURT:  Tuesday.  So, in any event, we will

15   take a 10-minute recess, and then we will take that witness

16   and, hopefully, get you out of here not as late as I thought

17   we would.

18           (Jury out at 5:11 p.m.)

19           THE COURT:  The Court's in recess for 10 minutes.

20           (Recess from 5:11 p.m. to 5:25 p.m.)

21           THE COURT:  Can you get Mr. Seifert.

22           (Jury in at 5:25 p.m.)

23           MR. McGAVIN:  Your Honor, when you get a second,

24   may I have that transcript back?

25           THE COURT:  Yes.  I've marked on the pertinent

Seifert, N. - Direct                                               765

1  pages, but you may have it back.

2        Mr. Seifert, if you would please come forward and

3  be sworn.

4        (Witness was sworn.)

5        THE COURT:  Plaintiff has called Mr. Seifert.  Go

6  ahead.

7        MR. HAYSBERT:  Thank you, Your Honor.

8        NICHOLAS SEIFERT, called by the Plaintiff, having

9  been first duly sworn, was examined and testified as

10 follows:

11                     DIRECT EXAMINATION

12 BY MR. HAYSBERT:

13 Q.  Thank you for being with us today, Mr. Seifert.  We

14 apologize holding you so long.  I'm going to try and get you

15 out of here as quickly as possible.

16 A.  Okay.

17       MR. HAYSBERT:  Your Honor, may I have permission to

18 treat Mr. Seifert, a current Outback Steakhouse employee, as

19 an adverse witness?

20       THE COURT:  We just went through that a moment ago.

21 You can't declare someone an adverse witness until they turn

22 adverse, and the last person you wanted didn't -- never even

23 turned adverse.  You have to then approach the Court and get

24 the Court's permission to do so.  Then really little

25 distinction under the law anymore as to that except for a

Seifert, N. - Direct                                                    766

1    form of the questioning.  That's it.  No, he's not an

2    adverse.  I'm not going to declare him an adverse witness

3    just because he is an employee.

4                MR. HAYSBERT:  Thank you, Your Honor.

5    BY MR. HAYSBERT:

6    Q.  Mr. Seifert, has anyone from Outback Steakhouse or

7    Bloomin' Brands met with you to discuss in advance your

8    answers to questions you will be giving us today?

9    A.  No.  I mean, I met -- I talked to the attorney briefly,

10   and that's it, I believe.

11   Q.  Thank you, Mr. Seifert.  You are the regional head and

12   joint venture partner for Outback Steakhouse?

13   A.  Correct.

14   Q.  And you were on May 23rd, 2018, the regional head and

15   joint venture partner at Outback Steakhouse?

16   A.  Correct.

17   Q.  As regional head in a joint venture partner at Outback

18   Steakhouse, you covered 12 Outback stores in 2018, correct?

19   A.  No.  I had eight stores and 28 teams.

20   Q.  Eight stores.  My apologies.  You had eight Outback

21   stores that you covered in 2018, including Chesapeake

22   Outback?

23   A.  Correct.

24   Q.  You heard about Dr. Haysbert's fall at the Chesapeake

25   Outback Steakhouse, correct?

Seifert, N. - Direct                                                    767

1   A.  I heard about it sometime after the fact.

2   Q.  Okay.  When did you hear about it?

3   A.  I honestly don't know.

4   Q.  Do you recall when she fell?

5   A.  No.  Not exactly.  In reviewing this, I believe in May.

6   Q.  May of 2018?

7   A.  I believe so.

8           MR. HAYSBERT:  Your Honor, if I may, one more time.

9           THE COURT:  What's your current association?

10          THE WITNESS:  I'm currently employed with Outback

11  Steakhouse, same role.

12  BY MR. HAYSBERT:

13  Q.  May 23, 2018, the date of the incident, correct, and you

14  indicated that you don't recall when you found out about

15  Dr. Haysbert's fall?

16  A.  I don't.

17          MR. HAYSBERT:  If I may refresh the witness's

18  recollection, Your Honor.

19          THE COURT:  All right.

20          MR. HAYSBERT:  This is on Page 240.

21          THE COURT:  If you've got a document that refreshes

22  his recollection, give it to him, and if it does, it does;

23  if it doesn't, it doesn't.

24          MR. HAYSBERT:  Thank you, Your Honor.

25          THE COURT:  You are being handed a document,

1    Mr. Seifert, refreshing recollection alone.  Just look at

2    the document, and then you answer the question he's going to

3    ask you, does it refresh your recollection, yes or no, and

4    if it does, then you can ask for the refresh.  If it

5    doesn't, you can't.

6              MR. McGAVIN:  May we have the page and line, Your

7    Honor?

8              MR. HAYSBERT:  Page 240, lines 1 through 7.

9              MR. McGAVIN:  Thank you.

10   BY MR. HAYSBERT:

11   Q.  Mr. Seifert, have you read it?

12   A.  Line 1 through 7?

13   Q.  That's correct.

14             THE COURT:  Just let us know when you have read it.

15             THE WITNESS:  Okay.

16   BY MR. HAYSBERT:

17   Q.  Is that it?

18   A.  Yes.

19   Q.  Does it refresh your recollection?

20   A.  No.  It refreshes my recollection of having this

21   conversation, but -- I mean, I do remember the conversation.

22   Q.  You were under oath at the time we had that conversation,

23   do you recall, Mr. Seifert?

24   A.  Sure, being under oath?

25   Q.  You were under oath?

Seifert, N. - Direct                                              769

1   A.  Yes, I do remember that.

2           THE COURT:  Can you tell us the date?  Is this the

3   deposition?

4           THE WITNESS:  Yes.

5           MR. HAYSBERT:  Yes, it was.

6           THE COURT:  Can you please give us the date on the

7   front of that.

8           MR. HAYSBERT:  The first page.

9           THE WITNESS:  Tuesday, July 6, 2021.

10  BY MR. HAYSBERT:

11  Q.  This is Tuesday, July 6, 2021, when I took your

12  deposition, correct, and you were under oath, swear to tell

13  the truth, nothing but the truth, so help you God, correct?

14  A.  Yes.

15  Q.  If you go back to 240.  Can you see it refreshes your

16  recollection, Mr. Seifert?

17          MR. McGAVIN:  Asked and answered, Your Honor.

18          MR. HAYSBERT:  He said yes.

19          THE COURT:  Just answer the question, Mr. Seifert,

20  so we can move along.  I think you've answered it.  Answer

21  it again.

22          THE WITNESS:  I remember discussing this in the

23  deposition, yes.

24  BY MR. HAYSBERT:

25  Q.  And in the deposition what you discussed was that you

Seifert, N. - Direct                                                    770

1  heard about Dr. Haysbert's fall around June of 2018, correct?

2  A.  That's what it does say here.

3  Q.  That's what it says there, right?

4  A.  That is correct.

5  Q.  So it is your testimony, Mr. Seifert, that you heard

6  about Dr. Haysbert's fall around June of 2018.  Did you take

7  any action, specifically you, in response to her fall?

8  A.  I remember reaching out to the partner -- well, actually

9  I believe, if I remember correctly from our conversation, I

10  heard the name Haysbert in this time, but I don't remember

11  what action I took at the time.

12  Q.  You don't remember what actions you took, if any, at the

13  time?

14  A.  Correct.

15  Q.  So you may not have taken any action at all, correct?

16  A.  I don't remember.

17  Q.  So you may not have taken any action at all, correct?

18  A.  That is possible.

19  Q.  Mr. Seifert, wasn't it around August when it came to your

20  attention that there was a problem with the floors of the

21  Chesapeake Outback?

22        MR. McGAVIN:  Objection, Your Honor.  We are

23  getting into the subsequent remedial measures issue.

24        MR. HAYSBERT:  I haven't asked him anything about

25  any document.  What are you talking about?  I asked him a

JODY A. STEWART, Official Court Reporter

Seifert, N. - Direct                                                    771

1    very simple question.

2            THE COURT:  Well, I thought about it differently.

3    Tell me the question again.

4            MR. McGAVIN:  It's all right, Your Honor, just go

5    ahead.

6            THE COURT:  I think there is a problem with it in

7    addition to that, but go ahead.

8    BY MR. HAYSBERT:

9    Q.  You started to look to find out what was wrong with the

10   floors at the Chesapeake Outback Steakhouse in August of

11   2018, correct?

12   A.  I believe so.

13   Q.  If I may, Your Honor.

14           Mr. Seifert, is it your testimony today that you knew

15   that there was something wrong with the floors of the Outback

16   Steakhouse in Chesapeake in August of 2018, correct?

17   A.  I believe so.

18   Q.  And is it your testimony the date that the floor was

19   changed, repaired, in December of 2018?

20   A.  I don't know the exact date, but approximately maybe.

21           THE COURT:  I would tell the jury that all of this

22   testimony about repairing and replacing the floors is still

23   under legal consideration.  So I'm letting you listen to it

24   to just facilitate this and move it along, but it may end up

25   being stricken.  I don't know.

1    BY MR. HAYSBERT:

2    Q.  So the floor was changed in approximately December 2018.

3    Dr. Haysbert fell in approximately May 23rd, 2018.  You found

4    out about her fall in approximately June of 2018, and you

5    knew something was wrong with the floors in August of 2018.

6    My question is this:  Why didn't you know about

7    the conditions -- I'll withdraw the question.

8            Did you have any reason to believe that there was a

9    problem with the floor before August 2018?

10            THE COURT:  Let's look at this rule for a minute.

11            MR. HAYSBERT:  Sure.  What were we talking about?

12            THE COURT:  The rule that you quoted to the Court

13    before.  I'll find it.

14            MR. HAYSBERT:  Are we going to talk about it in

15    front of the jury?

16            THE COURT:  I don't know.  Let's look at it.  I may

17    call your attention.  What was it where we were arguing

18    before?  I can look in the index.

19            MR. HAYSBERT:  407, Your Honor.

20            THE COURT:  Look at the exceptions in the rule and

21    be careful how you're doing this.

22            MR. HAYSBERT:  I understand.

23            THE COURT:  I'm going to ask the jury to step out,

24    please.

25            (Jury out at 5:37 p.m.)

1            THE COURT:  Mr. Seifert, if you would step out just

2    for a minute, please.

3            THE WITNESS:  Sure.

4            THE COURT:  Thank you.

5            (Mr. Seifert left the courtroom.)

6            THE COURT:  This is frankly getting worse and

7    worse.  You went through the remedial measures.  You cited

8    the rule, and then I read the rule, and I went through the

9    whole rule with you.  If you're not offering this for

10   negligence or culpable conduct or a defect in the product or

11   its design or a need for a warning or instruction, I don't

12   know what you're offering it for.

13           You have not admitted it for another purpose.

14   You're not impeaching this witness.  He hasn't said anything

15   to be impeached, or if disputed, you're not proving

16   ownership, control, or feasibility of precautionary

17   measures.  You're just not doing that.  You are offering

18   this evidence, and even if you do, remember it's within my

19   discretion.  You are offering this evidence to show

20   negligence and culpable conduct, and are you going to stand

21   there and tell me otherwise?

22           MR. HAYSBERT:  Your Honor, what evidence are you

23   referring to?

24           THE COURT:  This evidence that you just asked him

25   about the remedial evidence.  You cited the rule to me

Seifert, N. - Direct                                                      774

1   before.  We sat here and went through this rule.  That was

2   when you were trying to impeach the witness that I've

3   excused for now, and we went through the reasons you could

4   use it.

5            MR. HAYSBERT:  Your Honor, this goes directly to

6   the feasibility of precautionary measures.

7            THE COURT:  What?

8            MR. HAYSBERT:  Mr. Seifert was the JPP for the

9   Chesapeake Outback.  He was responsible for the Chesapeake

10  Outback.

11           THE COURT:  I know but I --

12           MR. HAYSBERT:  Precaution measures is exactly what

13  this is -- not only that.

14           THE COURT:  Wait just a minute.  I have not

15  approved it coming in.  I didn't approve it with the last

16  witness.  I told her she was subject to being called back,

17  and you started going into it again.  If your whole

18  testimony is going to be the depth of this, I've got to look

19  at this.  You all are going to be filing briefs on this.  So

20  I don't know what else you have from Mr. Seifert, but if

21  this is what it's going to be about, then he can be excused

22  and can come back next week, if I allow this to go forward.

23           MR. HAYSBERT:  No, Your Honor.  I'll move into a

24  different direction.

25           THE COURT:  Let's finish everything else with these

Seifert, N. - Direct                                                    775

```
 1    remedial measures, and while I'm thinking about it, I expect
 2    legal briefs on the remedial measures by 3:00 p.m. on Sunday
 3    because I'm going to be prepared for it before Monday, and I
 4    also want a brief on the mistrial and the insurance issue by
 5    3:00 p.m. on Sunday.  You file your brief.  You file them
 6    simultaneously.  It's not filing and responding.  The motion
 7    has been made, and the grounds have been put on the record
 8    about the insurance issue.  The motion has been made, and
 9    the grounds put on the record about remedial issues.
10            So we still have the mistrial motion outstanding,
11    and we still have this remedial measures outstanding.  I'm
12    just not going to keep letting this testimony go forward.
13    One other thing I want to say is, I am tired of when you ask
14    a question, I'm just going to say it, Mr. Haysbert, I didn't
15    call you down in front of Mr. Robinson, but you tweak the
16    information.  You suddenly said 20 minutes instead of 15.
17    Now, I could be wrong, but I recall him saying never going
18    past 15 minutes.  I just was weary to keep calling you down,
19    but I'm just tired of this little tweaking of the evidence.
20    I don't recall one iota of 20 minutes, but when you asked
21    that question, you turned it around to be 20 minutes.
22    You're smarter than that, and I know it.
23            MR. HAYSBERT:  I'm sorry, Your Honor.
24            THE COURT:  You know you did it.
25            Bring Mr. Seifert back in.
```

Seifert, N. - Direct                                                776

1        MR. McGAVIN:  Before he returns, Your Honor, the

2   entire problem of this subsequent remedial measures is, this

3   is after the soda flood, and that's when the floor was

4   replaced, and that's going to be the evidence, and

5   Mr. Haysbert knows that, and then he is talking to this

6   gentleman as if the problem that the floor was replaced

7   related to Dr. Haysbert's fall.  The floor was replaced

8   after the soda machine burst and the floor warped.  That's

9   the evidence, and there is no dispute about that.  The floor

10  was ruined by the soda machine failure.

11        So this is so misleading.  I strenuously object.  I

12  was going to let him put it in and cross on it, but that is

13  absolutely the evidence, and so this is completely

14  misleading.  I object to it, and we will put on that

15  evidence if we have to.

16        THE COURT:  What we are going to do is we are going

17  to finish this witness along the lines that have been ruled.

18  Then we are going to excuse the jury, and we are going to

19  take a proffer, and you can proffer what you have to offer

20  about the soda machine, because this is just going on and on

21  and on, and it's repetition.  There is asked and answered,

22  repeated questions.  I almost felt like we were in the movie

23  "Grease" with, you know, is it this light, is it this light,

24  is it this light, with the arms and the hands going up when

25  we were talking about the cameras or this camera that

1    camera, this camera, that camera.  I mean, it just went on.

2    If you look at the record, I can't imagine how long that

3    questioning went on over and over.

4            So, in any event, let's go ahead and get

5    Mr. Seifert done for the evening on the things that aren't

6    remedial, and then we will take a proffer, and we will stay

7    here however long we need to stay here to get that proffer,

8    and then you all can get your briefs done, and I will

9    consider it.

10           MR. HAYSBERT:  Thank you, Your Honor.

11           THE COURT:  When I mentioned the movie "Grease," I

12    did take my finger and point to the ceiling, point out into

13    the audience, because that is what was being done the whole

14    time in the testimony.  So I will put that on the record

15    that I was pointing to the ceiling and pointing out to the

16    audience.

17           Mr. Seifert, you are still under oath, and we are

18    going to resume the questioning along another line.

19           You can bring the jury in.

20           (Jury in at 5:44 p.m.)

21           THE WITNESS:  Can I ask for a water?

22           THE COURT:  You can't reach behind the bench, but

23    she will give you some water.  Go ahead.

24           MR. HAYSBERT:  Your Honor, I'd like to show the

25    witness a document.

Seifert, N. - Direct                                                778

```
 1              THE COURT:  All right.  Can you identify it for the
 2    record?
 3              MR. HAYSBERT:  It is Exhibit P14.
 4              THE COURT:  Exhibit P14.  Just be careful with your
 5    questions.
 6              MR. HAYSBERT:  Thank you, Your Honor.
 7    BY MR. HAYSBERT:
 8    Q.  Mr. Seifert, do you recognize this document?
 9    A.  I do.
10    Q.  What is it?
11    A.  It's the work order you showed me at the -- or I became
12    aware of when I was subpoenaed for the deposition.
13    Q.  Okay.
14              MR. HAYSBERT:  Your Honor, permission to publish?
15              THE COURT:  No.
16              MR. McGAVIN:  Objection.
17              THE COURT:  He said he became aware of it at his
18    deposition.  No, you may not publish it.
19              MR. HAYSBERT:  Thank you, Your Honor.
20              THE COURT:  Also, pursuant to the Court's ruling
21    that we just went through.
22              MR. HAYSBERT:  Your Honor, this work order --
23              THE COURT:  No, you may not publish this to the
24    jury at this time.  He said he didn't become aware of it
25    until the deposition, and that was two years ago, and three
```

Seifert, N. - Direct                                                    779

```
 1  years after the accident.
 2          MR. HAYSBERT:  Your Honor, if I may -- leave it up.
 3  Your Honor, if I may, his name is on the document.
 4          MR. McGAVIN:  Excuse me, Your Honor.  I strenuously
 5  object to this.
 6          MR. HAYSBERT:  His name is on the document.
 7          THE COURT:  So his name is on the document.
 8          MR. HAYSBERT:  How would he not know a document
 9  that his name is on?
10          THE COURT:  Is it signed?  Put it up here, and
11  let's look at it.  So his name is on the document.
12          MR. HAYSBERT:  It's an authenticated document.
13          THE COURT:  Mr. Haysbert, you must abide by the
14  Court's ruling.  Okay.  I'm not going to let you put this
15  up.  We are not going into it tonight.  His testimony is
16  that he did not know about this document.  I don't know why
17  his name was there, and you can ask him if his name is on
18  the document, if he knows why it's there, and that's it.
19  BY MR. HAYSBERT:
20  Q.  Do you know, is your name on this document, Mr. Seifert?
21  A.  My name is on the document.
22  Q.  Why is your name on this document?
23          THE COURT:  If you know.  Do you know why your name
24  is on the document?
25          THE WITNESS:  I don't know.
```

Seifert, N. - Direct                                          780

```
 1   BY MR. HAYSBERT:
 2   Q.  You don't know why your name is on this document?
 3           THE COURT:  I said do you know why?
 4           THE WITNESS:  Not with any certainty.
 5           THE COURT:  You need to speak up, please.
 6           THE WITNESS:  Sorry.  Not with any certainty.  I
 7   don't know why my name is on the document.
 8   BY MR. HAYSBERT:
 9   Q.  You don't know why your name is on the document?
10           THE COURT:  Did you prepare the document?
11           THE WITNESS:  No.
12           THE COURT:  You didn't prepare it, and you were
13   first made aware of it at your deposition in 2021?
14           THE WITNESS:  Just prior to the deposition.
15           THE COURT:  All right.
16           MR. HAYSBERT:  Your Honor.
17           THE COURT:  You may not pursue it further, and it's
18   not admitted.
19           MR. HAYSBERT:  Your Honor, if I may pull up Page 98
20   of his deposition.  Starting on Page 98, line 15.
21           THE COURT:  Just to the witness and to the
22   attorneys, not to the jury.  Page 98, line 22 through line
23   24.  It's not on my screen.  Wait.  I thought it was on the
24   document we were looking at that had his name on it.
25           MR. HAYSBERT:  No, Your Honor.  I wanted to impeach
```

Seifert, N. - Direct                                                    781

1    his testimony by going back to his deposition testimony.

2              THE COURT:  Why didn't you say that?

3              MR. HAYSBERT:  I did.

4              THE COURT:  No, you did not.

5              MR. HAYSBERT:  I didn't say the word impeachment.

6              THE COURT:  You didn't say it was a deposition.

7    You didn't say it was impeachment.  You just said I want to

8    show you a document, and you said it was Page 98.  You said

9    of this document.  It's got to stop, Mr. Haysbert.  It's

10   just got to stop.  You've got to know the rules, and you've

11   got to follow the rules.

12             MR. HAYSBERT:  I would like to go to Page 98.

13             THE COURT:  Let me see what's on Page 98.  What

14   line?

15             MR. HAYSBERT:  Lines 22 through 24.

16             THE COURT:  I'd like to see the rest of it.

17             MR. HAYSBERT:  Can you read the entire page?

18             THE COURT:  I want to see where it goes from this.

19   In other words, he's just said he saw it right before his

20   deposition.

21             MR. HAYSBERT:  Your Honor, the answer to the

22   question --

23             THE COURT:  Just a minute.

24             MR. HAYSBERT:  Page 99, lines 12 through 14.

25             THE COURT:  We wouldn't break up the testimony.

```
 1              There is nothing here.  I'm going to tell you that
 2      there is nothing here impeaching on what you have said.  He
 3      says, and I'm going to make my ruling right now because I'm
 4      looking at it.
 5              He says he had seen the document, and you said,
 6      "What is it?
 7              "A copy of the work order that somebody put in, it
 8      looks like.
 9              "Have you seen the document before?"
10              He said, "Correct.  Correct."  I don't know what he
11      said at his deposition.  I'm assuming he said he saw it
12      before his deposition, but you haven't put that on.  You
13      haven't put that in.
14              So you go back to that and say you are referring
15      back to something, "Have you seen this document before?" you
16      said.
17              "Correct.  Correct.
18              "Did you prepare this document?
19              "I'm sorry, did you ask if I prepared this
20      document?
21              "That's correct.
22              "No.  Or, I'm sorry, I don't know what you mean by
23      prepared, but...
24              "Did you assist in creating this document?
25              "No.
```

Seifert, N. - Direct                                                      783

1          "Okay.  Do you see your name here?

2          "I do.

3          "Question:  Okay.  Why is your name there?

4          "Because I am the joint venture partner for that

5   store."

6          MR. HAYSBERT:  That was the impeachment.

7          THE COURT:  Wait just a minute.

8          MR. HAYSBERT:  That was it.

9          THE COURT:  That doesn't mean when he saw it.  His

10  name is on the document.

11         MR. HAYSBERT:  The specific response was, "I don't

12  know why my name is not on that document."  Isn't that what

13  you said, Mr. Seifert?  And you knew why your name was on

14  that document because you swore under oath that your name

15  was on that document because you were the joint venture

16  partner for Outback Steakhouse.

17         THE COURT:  I think that's what you just said.

18         MR. HAYSBERT:  No, he didn't say that.  He said he

19  didn't know, and he had sworn testimony from years ago where

20  you said that you -- this is why my name is here, because

21  I'm the joint venture partner for Outback Steakhouse.  Isn't

22  that what you said in your deposition, Mr. Seifert?

23         THE WITNESS:  That is what it says.

24         MR. HAYSBERT:  No further questions.

25         THE COURT:  Are you going to slam your paper again,

Seifert, N. - Direct                                              784

1   as you did, on the podium?

2          MR. HAYSBERT:  No, Your Honor.  I just put it down

3   lightly.

4          THE COURT:  You put it down on the table lightly

5   but not on the podium.

6          I want to ask you if at your deposition, when did

7   you say to your knowledge that you had first seen the

8   document?

9          THE WITNESS:  I don't remember, but maybe a few

10  days prior when I was subpoenaed for the deposition, and I

11  reached out to someone, I'm not sure who, and they showed me

12  the document.

13         THE COURT:  So your testimony today is that you had

14  seen it before, and you saw it before -- just before your

15  deposition?

16         THE WITNESS:  Maybe a few days prior.

17         THE COURT:  That's what I mean.

18         THE WITNESS:  Yeah.

19         THE COURT:  In 2021?

20         THE WITNESS:  Correct.

21         THE COURT:  And that your name was on the document

22  because you were a joint venture partner for that store?

23         THE WITNESS:  That is an assumption.  I believe I

24  said up here that with -- I can't tell with certainty, but

25  that does make sense.

1            THE COURT:  Go ahead.

2            MR. McGAVIN:  Thank you.

3                        CROSS-EXAMINATION

4    BY MR. McGAVIN:

5    Q.  Mr. Seifert, when did you start your relationship with

6    Outback Steakhouse?

7    A.  I believe in February of 2018.

8    Q.  And what was the start-up, the -- where did you start?

9    A.  I started in training, I believe in February.  I started

10   at -- went down to Tampa for a meeting.  After that I did my

11   training in a couple of different stores in the

12   Massachusetts, Boston area.

13   Q.  Could you pull that microphone a bit closer?

14   A.  Couple of different stores in the Boston area, and then

15   after that I trained in Frederick, Maryland.

16   Q.  So when did you finally come down to this area in

17   Tidewater, in Norfolk, Hampton, that area?

18   A.  I believe May of 2018.

19   Q.  So prior to May 2018, you were not actively involved in

20   the Chesapeake store and were not the joint venture partner;

21   isn't that right?

22   A.  That's correct.

23   Q.  And you were new to the company, right?

24   A.  Correct.

25   Q.  And you became aware of the incident involving

1   Dr. Haysbert sometime in June; is that right?

2   A.   I believe so.

3   Q.   And but before that, you didn't know anything about it?

4   A.   No.

5          MR. McGAVIN:  All right.  Thank you, sir.  I don't

6   have any other questions for you.

7          THE COURT:  Can I see the deposition of

8   Mr. Seifert?  Does somebody have a copy of it other than

9   putting it on the screen?  I can't see a whole deposition.

10         Well, where in this deposition do you ask the

11  questions about had he seen it before?  I'm looking at the

12  index on the box, and it's got work and a number of pages.

13  So a question that you just wanted him asked, that he'd seen

14  it before, I want to see.  Those was the lines you included

15  that were on the screen.  I want to see what he said when he

16  said he had seen it before.  So where is it in here?

17         MR. HAYSBERT:  Sure.  Your Honor, it's Page 98 down

18  near the end of the page where it starts and then when he

19  says he is the joint venture partner is on Page 90.

20         THE COURT:  So what line does it start on, and what

21  line did you just designate?

22         MR. HAYSBERT:  Your Honor, I designated lines 22 to

23  24, and on Page 99, I believe it was lines --

24         THE COURT:  It's on Page 98 right in front of that.

25         MR. HAYSBERT:  Right.  99, line 22 to 24, and then

JODY A. STEWART, Official Court Reporter

Seifert, N. - Cross                                                      787

1    the other portion that I designated was lines 12 through 14

2    on Page 99.

3            THE COURT:  I understand, but when you said here

4    before that testimony.

5            MR. HAYSBERT:  I'm not sure I understand what

6    you're asking me, Your Honor.

7            THE COURT:  It says, if you start back on line 12,

8    "Okay."  This is your question, "Okay.  All right.  So take

9    a few minutes and then I'll have some questions for you.  Do

10   you know what this is, this document?"

11           And then he says, "Yes, I've seen this document

12   recently.

13           "Question:  What is it?

14           Answer:  It is a copy of a work order that somebody

15   put in, it looks like."

16           So the few lines above that were omitted from your

17   designation that you were trying to use to impeach, and it

18   does not impeach that he had just seen it recently.  The

19   only thing is he says, "Okay.  Why is your name there?

20           "Because I am the joint venture partner for that

21   store."  But he didn't say he had seen it as a joint venture

22   partner.  You asked him why he thought his name was on it.

23           MR. HAYSBERT:  He still is a joint venture partner,

24   Your Honor.

25           THE COURT:  I know he's still a joint venture

Seifert, N. - Cross                                                    788

1    partner, but what I'm saying is you were implying that as a

2    joint venture partner and suggesting an inference that he

3    had seen this a long time ago, and now the testimony shows

4    he hasn't been there.  Moreover, it is showing his

5    testimony, what was read to the jury left out, and my

6    ruling, left out the few lines above it.

7         MR. HAYSBERT:  I don't mind the few lines above it.

8    I was taking you specifically to what I designated.  Have

9    put in line 8, whatever it was that you started from, I'm

10   happy to add that to it.  It doesn't change anything about

11   what I'm asking for.  He gave me the answer yes, and then he

12   told me I just saw that recently.  I'm not supposed to know

13   that he only saw the work order a week ago.  I'm thinking he

14   is saying the term, yes, I have seen that work order before,

15   and last time I saw it, I saw it recently.  I could say

16   that.  I saw this transcript recently.  That's all I'm

17   saying.

18        THE COURT:  It is what it is.  You've heard the

19   deposition testimony, and you can make your own conclusions

20   about what recently is, and you've heard his testimony and

21   what joint venture partner is and how or why his name got on

22   the document.  So you've heard all of that testimony, and

23   you've heard the deposition testimony, so you can draw your

24   own conclusions.

25        MR. HAYSBERT:  I do have one redirect question,

Seifert, N. - Redirect                                                        789

```
 1   Your Honor.
 2              THE COURT:  Pardon?
 3              MR. HAYSBERT:  I do have one redirect question.
 4              THE COURT:  All right.
 5                          REDIRECT EXAMINATION
 6   BY MR. HAYSBERT:
 7   Q.  If your name shows up in a document on March 8th, 2018,
 8   and yet you don't know about Dr. Haysbert's fall until June
 9   of 2018, your name appears on a document, is there any reason
10   why your name appears on a document that you're not aware of
11   at that date?
12              MR. McGAVIN:  Objection, asked and answered.
13              MR. HAYSBERT:  I've never asked that question.
14              THE COURT:  Just answer it.
15   BY MR. HAYSBERT:
16   Q.  On that date when that work order that you indicated was
17   a work order, dated March 8th, 2018, I'm asking your name
18   appears on that work order.  I'm asking you why would your
19   name appear on a work order that you don't know about?
20   A.  I don't know with any certainty.
21              THE COURT:  What?
22              THE WITNESS:  I don't know.
23   BY MR. HAYSBERT:
24   Q.  So you don't know why your name would appear on a work
25   order that you don't -- you've never seen?
```

1    A.  I don't know.

2            MR. HAYSBERT:  No further questions.

3            (Witness excused.)

4            THE COURT:  Do you rest at this point,

5    Mr. Haysbert?

6            MR. HAYSBERT:  No, I do not rest, Your Honor.

7            THE COURT:  Are you planning to call any other

8    witnesses?

9            MR. HAYSBERT:  I am, yes, Your Honor.

10           THE COURT:  Then call them.

11           MR. HAYSBERT:  We would re-call Alicia Eleftherion.

12           THE COURT:  You know that you can't recall her

13   today.  She's coming back, if appropriate, next week.  I

14   have already ruled on that.  So we are not re-calling her

15   today.

16           Do you have any other witnesses other than her?

17           MR. HAYSBERT:  Your Honor, we will not rest without

18   having Alicia Eleftherion's testimony, if you should decide

19   to provide it.

20           THE COURT:  Well, let's put it this way.  I'm going

21   to ask you are you offering any other evidence -- we are at

22   the end of the first week of trial -- other than the re-call

23   that I said may occur?  I will consider that as part of your

24   case, if I allow her re-called.  Do you have any other

25   evidence that you're going to present?

```
1              MR. HAYSBERT:  Yes, Your Honor.
2              THE COURT:  What?
3              MR. HAYSBERT:  The work order.
4              THE COURT:  All right.  But that's contingent upon
5    my ruling.
6              MR. HAYSBERT:  No, there are two of them.  The one
7    of them is contingent upon your ruling.  We have another
8    one.
9              THE COURT:  They are contingent upon my ruling, one
10   for Ms. Eleftherion.
11             MR. HAYSBERT:  For Eleftherion work order 2.
12             THE COURT:  I understand.  We have also got this
13   other that we are talking about that we are going to stay
14   this evening.
15             MR. HAYSBERT:  That's correct.  We are going to
16   stay it, Your Honor.
17             THE COURT:  So other than two work orders that have
18   not been ruled admissible yet, and Ms. Eleftherion, are you
19   planning to present any other evidence?
20             MR. HAYSBERT:  Your Honor, I am not aware of any
21   other, but I would have to confirm that with my team before
22   I could give you a final answer on that.
23             THE COURT:  I'm going to take a final answer
24   tonight.  We will stay until you get your final answer
25   because I want to know where we are at the start of the
```

```
 1    week.  We are not going to start it after a weekend and then
 2    reopening a lot of things.  I'm just telling everybody that
 3    we are going to know where we are tonight before we leave.
 4    I wanted the jury to hear that.  So we are going to stay
 5    tonight, and we will know where we are tonight before you
 6    come in on Monday morning.
 7            So I do excuse you for this evening and for the
 8    weekend.  I'm going to tell you what I tell you at the end
 9    of every day.  You have a safe weekend.  Put this case out
10    of your mind and go home and enjoy your family and your
11    friends, or whatever activity you have planned, and come
12    back on Monday morning at 10:00 a.m., but you should check
13    with the jury clerk, the telephone, the telephone number
14    that you've called.  Don't you call it by 6:00?
15            THE JURY:  6:30.
16            THE COURT:  I don't keep up with that.  Call it
17    before 6:30 on Sunday evening to just be sure we are still
18    on the same page for Monday morning.
19            So call it by 6:30 to get if there is any change.
20    There may not be.  If there is no message on there for you,
21    there is no change, so I would expect you here at 10:00.
22            Again, as I told you, don't discuss the case with
23    anyone, your family, your friends, don't read any media
24    accounts about it, either television, radio, newspaper or
25    blogs or anything else, if there are any.  Don't do any
```

1    research on your own, and don't do any electronic activity

2    in communicating with anybody about the case or do any

3    research.  With that I wish you a wonderful, safe weekend.

4              (Jury out at 6:08 p.m.)

5              THE COURT:  You can be seated, Mr. Haysbert.

6              MR. HAYSBERT:  Thank you, Your Honor.

7              THE COURT:  I think the first thing that we are

8    going to do is get the evidence that you are going to

9    proffer so I can make some rulings.

10             MR. McGAVIN:  Thank you, Your Honor.

11             THE COURT:  I'm hoping this won't take long, but

12   I'm giving -- Mr. McGavin is calling you as his witness now.

13             THE WITNESS:  Okay.

14             THE COURT:  In terms of some information that has

15   been given to the Court, and the Court has to make some

16   rulings this weekend, or by Monday, and I want this proffer

17   on the record the same as I got the proffer from Dr. Filler

18   before I allowed his testimony to go forward.

19             NICHOLAS SEIFERT, called by the Defendant, having

20   been first duly sworn, was examined and testified as

21   follows:

22                      DIRECT EXAMINATION

23   BY MR. McGAVIN:

24   Q.  Mr. Seifert, do you recall that there was a water leak at

25   the Chesapeake store?

Seifer, N. - Direct                                                    794

1    A.  Yes.

2    Q.  And as a result of the water leak -- when did that occur,

3    do you recall?

4    A.  Approximately August, I believe.

5                THE COURT:  You need to speak up.

6                THE WITNESS:  August, I believe.

7    BY MR. McGAVIN:

8    Q.  2018?

9    A.  Correct.

10   Q.  And did that -- is that what led to the replacement of

11   the floor?

12   A.  That is correct, what led to the replacement of the

13   floor.

14   Q.  Say again.  The door closed.

15   A.  Yes.

16   Q.  And do you recall that in your deposition at Page 150,

17   lines 13 through Page 151, line 6, you testified as follows:

18               MR. HAYSBERT:  Your Honor, if I may.  I feel as if

19   Mr. Seifert is in a position where he could perjure himself,

20   and I would --

21               THE COURT:  Come on, Mr. Haysbert.  You don't need

22   to warn Mr. Seifert.

23               MR. HAYSBERT:  Your Honor, we have a work order,

24   with all due respect.  He is on it.

25               THE COURT:  Do not try to intimidate witnesses this

1    way.  This is not up to you to give that kind of advice.

2    This is not your witness.  He is now being called for a

3    proffer by Mr. McGavin as the defendant.  He is not your

4    witness for you to stand up and make a dramatic statement

5    like that.  So let's proceed this way.  What I thought he

6    was going to stand up is, again, I need to see what you're

7    referring to.  I don't have his deposition.

8            MR. McGAVIN:  I don't have a paper copy.  I'll have

9    to submit it, but what I will do, then, is just make my

10   proffer, and we will submit the deposition.

11           THE COURT:  That's fine.  That's fine.

12           MR. McGAVIN:  Thank you.

13           THE COURT:  So then that's what I would suggest.

14   In fact, I have thought that maybe that would be the best

15   way, attaching an exhibit to your brief.

16           MR. McGAVIN:  I'll do it that way, Your Honor.

17           THE COURT:  As part of your proffer.

18           MR. McGAVIN:  Yes.  Thank you.

19   BY MR. McGAVIN:

20   Q.  So perhaps I'll just do it in writing, but, Mr. Seifert,

21   at the Chesapeake Outback, was there a water leak and was it

22   associated with the soda machine?

23   A.  Yes.

24   Q.  Is that why the floor was replaced in the winter,

25   December 2018 time frame?

Seifer, N. - Direct                                              796

1    A.  Yes.

2    Q.  And was that floor replaced because of any concern over a

3    slip and fall by Dr. Haysbert?

4    A.  No.

5            MR. McGAVIN:  That's my proffer.  We will make it

6    more fulsome with the page references, which are testimony,

7    Your Honor, but that goes to the issue that we were

8    discussing with this timeline about the work order to

9    replace the floor in August of 2018.

10           THE COURT:  I want to ask you two questions:  One,

11   was there any slip and fall that caused the replacement of

12   the floor, to your knowledge, with this work order or

13   whatever in December of 2018?

14           THE WITNESS:  No.

15           THE COURT:  You said no?

16           THE WITNESS:  Correct, no.

17           THE COURT:  To your recall, when did the soda

18   machine explode or the water leak from it or whatever

19   happened?

20           THE WITNESS:  I believe I became aware of it in

21   August of 2018.

22           THE COURT:  In August of 2018.  All right.  Were

23   there any slips and falls on it between August of 2018 and

24   when you replaced it?

25           THE WITNESS:  I don't believe so.

JODY A. STEWART, Official Court Reporter

Seifer, N. - Direct                                                    797

```
 1              THE COURT:  That's all I'm asking.  The other thing
 2    is, where is the soda machine?
 3              THE WITNESS:  In the kitchen.
 4              THE COURT:  All right.  The kitchen is towards the
 5    back of the dining area?
 6              THE WITNESS:  Correct.
 7              THE COURT:  Did it go out from the kitchen into the
 8    dining area?
 9              THE WITNESS:  It -- the water -- it shares a wall
10    with the dining area, so the damage was right there in the
11    back of the restaurant.
12              THE COURT:  Anything else, Mr. McGavin?
13              MR. McGAVIN:  No.  I'll just add to my proffer,
14    Your Honor, that Lisa Crosby will confirm in her testimony
15    on Monday that the soda machine failed and give us the
16    timeline on that, as well, and the floor buckled and became
17    warped because the water damage was so significant, it came
18    out into the dining area, and that that was what led to
19    the -- when the floor warped and bubbled, as Lisa Crosby
20    described it, that's when the floor was replaced.
21              THE COURT:  Do you have the deposition from
22    Ms. Crosby saying that?
23              MR. McGAVIN:  Yes, I do.
24              THE COURT:  If that's in the deposition under oath,
25    you should attach that to your motion.
```

1          MR. McGAVIN:  I will, Your Honor.  Thank you.

2          THE COURT:  Mr. Haysbert, is there anything?

3          MR. HAYSBERT:  No, Your Honor.  Thank you very

4   much.

5          THE COURT:  Then, Mr. Seifert, you are excused for

6   today, but you are subject to be called in this case by

7   Mr. McGavin.  So I'm not completely releasing you.  I'm

8   releasing you from whatever subpoena or whatever you got

9   from the plaintiff that you moved to quash and the Court did

10  not quash it, but you are subject to recall under whatever

11  circumstances you have agreed with Mr. McGavin and the

12  defendants.

13         When I say recall, as the witness for the defense,

14  you may not discuss your testimony with anyone, anyone at

15  Outback, anyone in Bloomin' Brands, any of the attorneys in

16  this case until we have resolved the issue at hand, and then

17  you would be, obviously, as any attorney can talk to their

18  client before they start their testimony there, because

19  you've listed him as a witness?

20         MR. McGAVIN:  Yes.

21         THE COURT:  I don't know if you're going to call

22  him or not?  In any event, he can't discuss anything about

23  what has occurred today.  Do you understand?

24         THE WITNESS:  So just to be clear, I cannot discuss

25  it with Mr. McGavin before Monday?

799

```
 1            THE COURT:  Not before Monday, no.

 2            THE WITNESS:  I understand.

 3            THE COURT:  Then if appropriate, I'll set the

 4   parameters then, but no discussions with him before Monday.

 5            THE WITNESS:  Understood.

 6            MR. McGAVIN:  Your Honor, would you clarify for

 7   Mr. Seifert how he will receive notification, whether to

 8   come or not.

 9            THE COURT:  You can get notification.

10            THE WITNESS:  Through Mr. McGavin?

11            THE COURT:  Yes.  That's fine.  You can get the

12   notification to come and testify, but you can't discuss the

13   substance of anything.

14            MR. McGAVIN:  Thank you, Your Honor.

15            THE COURT:  You are released.

16            THE WITNESS:  Thank you.

17            (Witness excused.)

18            THE COURT:  Counsel, as I mentioned earlier, the

19   briefs are due in on both of the issues by 3:00 p.m. on

20   Sunday, one on the motion for a mistrial on the insurance

21   issue, and another on this issue of the work orders and

22   remedial action.  You need to get those into the court.  We

23   have discussed, the motion is fine.  I still know we have to

24   decide your motion to strike Dr. Filler, but that will be

25   done at the appropriate time.
```

1          MR. McGAVIN:  Your Honor, as to the record, as

2    plaintiff has conditionally rested, we will be presenting a

3    Rule 50 motion, as well, when those issues are resolved.

4          THE COURT:  That's fine.  He's only conditionally

5    rested, but I'm going to clarify tonight what he's going to

6    do further.  Also, that motion can also be filed orally at

7    the conclusion of the plaintiff's evidence.

8          The Court will accept those motions orally, if

9    appropriate, and sometimes the Court withholds ruling on it

10   till the end of all the evidence.  Depends upon where we are

11   procedurally and substantively with this case on Monday.

12         MR. McGAVIN:  Thank you, Your Honor.

13         MS. BLAKE:  Your Honor, I have a quick question.

14         THE COURT:  Wait a minute.  I'm thinking about

15   whether I want to take up anything with you all on Monday

16   morning and have the jury come in at 11:00.  That's what I'm

17   deciding now.  I'd like to focus on that for a minute.

18   That's what I'm going to do.  You all need to be here at

19   10:00 on Monday, and I'm going to ask that the jury clerk

20   for now, unless the jury clerk receives or the docket

21   calendar clerk receives further information from the Court,

22   to tell the jury not to report.

23         So basically right now you all will be reporting at

24   10:00 a.m. so that if I need to rule orally on the motions,

25   I will, and then reserve the option to reduce them to a

1    written opinion, as I do on any matter where there is an

2    issue such as this.  I will call the jury in at 11:00 right

3    now on Monday and so just want to tell the courtroom deputy

4    to let the jury clerk know to program for now, and I will be

5    in over the weekend and on Sunday, and if anything develops,

6    I'll have you call the jury clerk.

7              THE CLERK:  Yes, Your Honor.

8              THE COURT:  Mr. Haysbert, we are not going to take

9    the weekend.  You are supposed to be prepared with your

10   case, and you've presented, and I've said you don't have to

11   rest, you've conditionally rested, but you've still got the

12   witness and the exhibits that you want to present.  Is there

13   anything else?

14             MR. HAYSBERT:  Yes, Your Honor.  We would like to

15   call Marcus Wilson to the stand.

16             THE COURT:  You don't have a subpoena for him.

17             MR. HAYSBERT:  I believe we do.

18             THE COURT:  Where is it?

19             MR. HAYSBERT:  I have to go back to my computer,

20   but I believe we served him at this point.

21             THE COURT:  What days did you serve him for?

22             MR. HAYSBERT:  Would have been for today and

23   Monday.

24             THE COURT:  I don't know if he's going to show or

25   not.  If he's got a properly served subpoenaed, then you

1    need to let the Court know, but I want to see it.

2            MR. HAYSBERT:  Sure.

3            THE COURT:  Now.

4            MR. HAYSBERT:  I have to go back to my vehicle and

5    pull up my phone.

6            THE COURT:  We've waited for that before.  So why

7    don't you go back to your vehicle and get your subpoena, and

8    we will take a recess, and I'll have the clerk let me know

9    when you come back with your properly served subpoena.  I

10   think that Mr. McGavin needs to see it too.

11           MR. HAYSBERT:  Okay.

12           THE COURT:  You called him today, he wasn't here.

13   So I don't know whether he is going to be here Monday, if it

14   says both days.  I have to look at it.

15           MR. HAYSBERT:  Okay.  Thank you.

16           THE COURT:  The Court stands in recess.  You don't

17   have an hour to do this or 45 minutes.

18           MR. HAYSBERT:  Yes, ma'am.

19           THE COURT:  The Court stands in a brief recess for

20   the reasons stated.

21           (Recess from 6:22 p.m. to 6:43 p.m.)

22           THE COURT:  It's 6:45.  Mr. Haysbert isn't back

23   yet?

24           MR. McKELVEY:  Correct, Your Honor.  He's not back

25   yet.  He's going down the road to get it printed at that

1    same place.

2              THE COURT:  He didn't say he had to get it printed.

3              MR. McKELVEY:  He only had it on his phone.

4              THE COURT:  He only has it on his phone?

5              MR. McKELVEY:  Correct.  As of when I just now

6    talked to him.  Whether he's got it printed yet or not, I

7    don't know.

8              THE COURT:  Where is Mr. Bingham?

9              MR. McKELVEY:  He doesn't have a printer.

10             THE COURT:  Where is he?  Is he just gone?

11             MR. McKELVEY:  Yeah, he's gone for the day.

12             THE COURT:  Where is the plaintiff?

13             MR. McKELVEY:  With him, I think.

14             THE COURT:  With Mr. Haysbert?

15             MR. McKELVEY:  Yes.

16             THE COURT:  Well, why would she go with him?

17             MR. McKELVEY:  I don't know.  I mean, she might be

18   just right outside.  I'm not sure.

19             THE COURT:  Where is Ms. Kinney?

20             MR. KINNEY:  Ms. Kinney went out to get her phone.

21   She has to check in on some stuff.

22             THE COURT:  That's fine.  I didn't know if we had

23   taken an entourage with Mr. Haysbert because the plaintiff

24   isn't here, the IT tech isn't here, Ms. Kinney isn't here.

25   I understand she had to.  I don't see Mr. Thomas here.  So

JODY A. STEWART, Official Court Reporter

1    it looks like we are just waiting on Mr. Haysbert now.

2            MR. McKELVEY:  Yes, ma'am.

3            THE COURT:  All right.

4            MR. KINNEY:  I think we mentioned the question how

5    many people does it take to go get a subpoena off of a

6    phone.

7            THE COURT:  I will make no comment.

8            MR. McGAVIN:  Your Honor, Ms. Blake and I both have

9    three and a half hour drives from here.

10           THE COURT:  I understand.

11           MR. McGAVIN:  So I'm headed up to Rehobeth.

12   Ms. Blake is returning to Fairfax.  So we will stay as long

13   as the court is in session.

14           THE COURT:  I understand.

15           MR. McGAVIN:  Thank you.

16           MS. BLAKE:  Your Honor, may I pose a question?

17           THE COURT:  Come up.  I'm sorry.  We have local

18   counsel here, so I will.

19           MS. BLAKE:  Mr. McKelvey can convey.  So the

20   request that we submit trial briefs related to Rule 407, the

21   exceptions that were noted by Mr. Haysbert in his argument

22   today, were for any other purpose such as impeachment and

23   feasibility of precautionary measures?  Those were the two

24   reasons that he cited.  The impeachment was for Eleftherion

25   and feasibility of precautionary measures for Mr. Seifert.

JODY A. STEWART, Official Court Reporter

1   So I just wanted to make sure that the Court's ruling or the
2   request that we submit trial briefs was limited to your
3   discretion to admit evidence as to either of those
4   exceptions and not any of the other exceptions?
5           THE COURT:  We've been through this rule so much.
6   I think those are the only two.  My memory is those were the
7   only two that were cited.  I believe that's it.  We will ask
8   Mr. McKelvey that.
9           MR. McKELVEY:  Your Honor, I think those are the
10  two cited in the rule, but we want to be able to include
11  some arguments on waiver and also -- and we just now started
12  talking about this, don't hold me to it, but scope of the
13  exhibit as far as redactions that might cure the substantive
14  remedial measure issue, and then the scope of the curative
15  instruction also.
16          It's beyond that rule, and the evidence to be for a
17  few different things.  But we will cover it in the brief,
18  Your Honor.  It isn't anything -- we are interested in the
19  statement contained in the document, not so much the entire
20  document.  There are ways to redact it, get rid of the
21  substantive issue, and we will put it all in our brief and
22  talk about those options as well with the Court, you know,
23  for filing on that issue.
24          THE COURT:  All right.
25          MRS. KINNEY:  Would you like an update on the

1    subpoena?

2          THE COURT:  Just a second.  I want to check

3    something.

4          MR. McKELVEY:  Your Honor, don't hold me to this.

5    I'm telling you what we just initially in the moment

6    discussed.

7          MS. BLAKE:  It's Rule 407, Your Honor.

8          THE COURT:  I'm checking something else.  I'm

9    checking an annotation.  By the way, for the record, the

10   adverse witness rule was removed from the Federal Rules of

11   Evidence years ago.  It's not there.  It's just case law.

12   So there is no Federal Rule of Evidence on adverse

13   witnesses.

14         You can give me your update, and then I'll address

15   your question.

16         MRS. KINNEY:  Sure.  Good evening, Your Honor.

17         THE COURT:  Good evening.

18         MRS. KINNEY:  So last I heard subpoena was properly

19   served on Marcus Wilson, I believe is his name.  Apologies

20   if I got the name wrong.  I did not see it.  He has an

21   electronic copy that had to be sent from whoever the process

22   server was along with the proof of service.  It's being

23   printed by the trial tech right now at his hotel because the

24   print shop down the street was closed.  I have suggested

25   they e-mail it to Tammy to expedite things.  I don't know if

1   that's been done yet.  I don't even know which one is Tammy,

2   but it's possible that we might have an electronic copy to

3   expedite things, and if that's not okay, it is being

4   printed, and they are trying to hurry.  I haven't seen it.

5   I'm just trying to rush things along for them.

6          THE COURT:  Basically.

7          MRS. KINNEY:  It was represented to me as having

8   been served for Monday.

9          THE COURT:  He didn't have it from the process

10  server?

11         MRS. KINNEY:  So the process server at least did

12  e-mail him already with the subpoena and the proof of

13  service showing service.  He ran to the printer down the

14  street, they were closed, so he sent it to the trial tech

15  who was at the hotel, Courtyard Marriott.  He is printing it

16  now with a portable printer that they have and then running

17  back.  But I believe he e-mailed it from his phone, and I

18  don't know if Tammy has that yet or at all.  I can run out

19  and yell at them to do that.

20         THE COURT:  Again, the only thing I would say is

21  all of this is so untimely in terms of service from a

22  witness's standpoint.  If he had it, I don't know why he

23  didn't say something.  Mr. McKelvey is here and can relay

24  all this as local counsel.  I don't know why something

25  wasn't said when Marcus Wilson wasn't here at some point.

1    Everybody just sat here.  I said, okay, move to your next
2    witness.  Nobody said he'd been served or that there was
3    process.  We have had breaks.  We had not a long luncheon
4    break, but it turned out to be longer than we thought.
5            I just don't understand this, and you should relay
6    that, Mr. McKelvey.  I have never had an experience such as
7    this with somebody being so unprepared, so last minute, and
8    so unfamiliar with the rules.  I've had to go through
9    adverse witness two times, at least today, and go back to
10   the remedial measures at least two times.  I don't
11   understand why I have to keep repeating how to do things.
12   All I'm trying to do is see that the case is tried properly
13   under the law and the rules.  It's very disturbing to the
14   Court.  You understand?
15           MR. McKELVEY:  Yes, ma'am.
16           THE COURT:  Well, please convey all this.
17           MR. McKELVEY:  I will.
18           MRS. KINNEY:  You need anything else from me?
19           THE COURT:  No.  I don't know that you can do
20   anything, but thank you, Mrs. Kinney.
21           MR. McGAVIN:  Your Honor, just to be clear, this
22   subpoena, I believe, was signed by Mr. Haysbert, which he
23   cannot do.  It must have been issued today when Mr. Wilson
24   wasn't here, and we strenuously object to it being enforced,
25   strenuously.  This is too late, and it's not fair.

1          THE COURT:  Well, first of all, let's see what the

2     date is on it and when the process server served it.  If the

3     process server just served it today, then he wasn't expected

4     to be here today.  I'm going to ask Mr. Haysbert to put on

5     the record when he did this.  Do you know when he did it,

6     Mr. McKelvey?

7          MR. McKELVEY:  I do not.

8          THE COURT:  Do you know when he did it,

9     Mrs. Kinney?

10          MRS. KINNEY:  I don't know.

11          MR. McKELVEY:  She was e-mailing us back, I mean,

12     just as he was e-mailing it, calling, went outside, that's

13     all I know.

14          THE COURT:  So nobody knows.

15          MR. McGAVIN:  Your Honor, I spoke to Mr. Wilson

16     today around lunchtime.  He had not been served by anybody

17     else.

18          THE COURT:  Well, you can file a motion to quash if

19     it has been served.  I just don't even know anymore.  I

20     don't know what to believe, what's going on.  I just don't

21     know.  I mean, I just don't want to talk about it anymore.

22     First switching up the testimony to 20 minutes today.  The

23     wait time with Mr. Seifert is now 20 minutes on the record.

24     I can assure you of that.  It was 15 was the highest

25     estimate.  It's the little constant slip-ins with witnesses

810

```
 1   and so forth.  So I don't know.  I know that when Marcus
 2   Wilson was called, nobody brought it to the Court's
 3   attention that he had been properly served.
 4         MR. McGAVIN:  We had subpoenaed him, and we
 5   released him.  It was our subpoena, and we released him.  We
 6   didn't need him.
 7         THE COURT:  Well, anyway, that you had subpoenaed
 8   him, and you released him, then all right.  You represent
 9   that you have a subpoena and you released him from the
10   subpoena?
11         MR. McGAVIN:  That's correct, Your Honor.
12         THE COURT:  Put that in your motion to quash.
13         MR. McGAVIN:  We will.
14         THE COURT:  I don't know what they're going to
15   present, but in my ruling earlier on this remedial measures,
16   in regard to Mr. Seifert, I specifically stated it had not
17   been offered for impeachment, the remedial measures, and
18   that he was not offering it for any dispute proving
19   ownership, control, because that's it's been admitted, you
20   know.  They've accepted the fact the verdict is against both
21   defendants, and it's one verdict, one recovery, is against
22   both defendants, and the ownership and control, it's in the
23   testimony.  It's just not disputed.
24         So I don't know exactly what Mr. McKelvey is
25   talking about because the only thing I heard is that there
```

1    is feasibility of precautionary measures for Mr. Seifert.

2    The only thing I heard on Ms. Eleftherion -- it's a very

3    difficult name to pronounce because it's got so many vowels.

4    I like to pronounce people's names appropriately, but that's

5    who I'm talking about.  That was strictly on the remedial,

6    and what he was offering it for, impeachment.  So that's

7    what I heard.

8          You can use your discretion in your brief, but

9    those were the two reasons that were offered that I

10   remember, and I'm going off of my memory and my notes that I

11   remember were offered for impeachment for the first witness,

12   Ms. Eleftherion, and then it was feasibility of

13   precautionary measures for Mr. Seifert.

14         I don't know what else they will come up with, but

15   you can always, if appropriate, if you haven't, you can

16   argue it.  Don't have to put it in your brief, you can

17   always make an argument to the Court.  I'm going to convene

18   with you all at 10:00 on Monday.

19         It's now 7:00.  Ms. Armstrong is going to go get

20   her computer to see if there is any e-mail on it.  That's

21   why she's leaving the courtroom.  She doesn't have that here

22   in the courtroom with her.

23         The courtroom deputy is back.  She doesn't have it.

24   If he sent it into my chambers, which he should be

25   communicating through the courtroom deputy, there is nobody

 1   in my chambers.  My judicial assistant is gone.  My other

 2   law clerk is gone.  I don't know if he did, but I don't know

 3   how he would.  But if he did, I'm not going in and access

 4   her e-mails.

 5         MR. McKELVEY:  I don't know that we have anyone's

 6   e-mail but hers.  If I communicated with anybody else, I

 7   don't remember.

 8         THE COURT:  You haven't.

 9         MR. McGAVIN:  Your Honor, I think the Court should

10   just issue an order and quash it.  It's 7:00, it's not been

11   produced.

12         THE COURT:  I want to see it because if the case

13   goes on, I don't know what the status is, I want to see

14   whether I should direct him to show cause for this conduct.

15   I want to see when it was served.  I want to know tonight.

16   I want to see it.

17         MR. McGAVIN:  Your Honor, I also make an oral

18   motion to revoke his *pro hac vice*.

19         THE COURT:  You might put that in.  I know I'm

20   giving you a lot to do this weekend, but I think there needs

21   to be a full record here, and particularly if it's a

22   possibility, and Mr. McKelvey is going to have to take over.

23   So that's what the rule says.  That's what local counsel has

24   to do.  They have to be ready to try the case at any time

25   and be completely prepared.  I know you don't have to detail

813

```
 1   it all, but you can just do a brief motion or you can do an
 2   oral motion Monday morning, if you want, if it's too much.
 3   I have to have briefs on the remedial action and the motion
 4   for a mistrial.  You can always do an oral motion on the
 5   motion to quash, and you can always do an oral motion on
 6   the revocation of the pro hac vice status.
 7           Mr. McKelvey, you need to relay to Mr. Haysbert
 8   that two oral motions have been filed in his absence.
 9           MR. THOMAS:  May I approach this gentleman, Your
10   Honor?
11           MR. McKELVEY:  May I talk to him, Your Honor?
12           THE COURT:  Do you have information about the
13   subpoena?
14           MR. THOMAS:  Yes, Your Honor.
15           THE COURT:  This is Mr. Thomas, who I believe is a
16   member of the bar of this Court, are you not, Mr. Thomas?
17           MR. THOMAS:  Yes, I am, Your Honor.
18           THE COURT:  You can approach.  You're not counsel
19   in the case?
20           MR. THOMAS:  No.
21           THE COURT:  But approach Mr. McKelvey.
22           MR. THOMAS:  Thank you, Your Honor.
23           MR. McKELVEY:  Judge, he was served today.  The
24   group service apparently isn't ready, but they have
25   documentation he was served today.  That's what I was just
```

1    told.  But they are trying to get a hard copy, whatever it

2    is they have.

3              THE COURT:  You need to relay this to Mr. Haysbert.

4    I'm going to wait for it, though.  You need to relay to

5    Mr. Haysbert, Mr. McKelvey, number one, that there was

6    already an oral motion to quash because Mr. McGavin said, to

7    his knowledge, if it was served at all, it wouldn't have

8    been until today because he had a subpoena out for

9    Mr. Wilson and had released him from that service.

10             Mr. Wilson did not indicate any other subpoena at

11   the time when Mr. McGavin talked with him.  So he served a

12   subpoena today, and he must have served it after when Marcus

13   Wilson didn't show.  Now he is claiming he noticed him for

14   today, and he doesn't even have a proof of service yet.

15   That's a problem.  You don't serve a subpoena on somebody to

16   be at court, and it's 7:10, and he hasn't even gotten the

17   subpoena with proof of service to court.  So he couldn't

18   have done it for today.

19             Then Monday, what kind of notice does that give a

20   person to be here, and Mr. McGavin has filed a motion to

21   quash that subpoena, an oral motion.  He's also filed an

22   oral motion to revoke the *pro hac vice* status of

23   Mr. Haysbert.  I've already told you to relay both of those

24   things to Mr. Haysbert.

25             MR. McKELVEY:  I have them written down, Your

1    Honor.

2              THE COURT:  Okay.  What do we know about the

3    subpoena, just that it was served today?  He still doesn't

4    have a proof of service on the process server.

5              MR. McKELVEY:  Yeah, that's what I was just told.

6              THE COURT:  Is there any reason why you think I

7    shouldn't hold you in contempt as local counsel together

8    with Mr. Haysbert?

9              MR. McKELVEY:  Your Honor, I didn't know it was

10   issued.  I heard -- the first I heard about it was when you

11   heard about it.

12             THE COURT:  Okay.

13             MR. McKELVEY:  I had no information on anything.

14   This is my first knowledge of it this afternoon.

15             THE COURT:  These misrepresentations can't keep

16   coming to the Court.  Literally, it is 10 minutes after 7:00

17   in the evening, and Marcus Wilson was called, I think he was

18   the second one that was called today.  I think there was

19   Ms. Nineveh Haysbert.  I'd have to look back at my notes.

20   Then I think there was a call for Marcus Wilson, and he

21   wasn't here, and then there was a call for Alicia

22   Eleftherion.  Yes.  No, Deajah Clark was second.  Nineveh

23   Haysbert was first, Deajah Clark was second, and then Marcus

24   Wilson was called.

25             Mr. Haysbert, have you got the hard copy of this?

1          MR. HAYSBERT:  Your Honor, my trial tech Kevin

2     Bingham is on his way.  I also e-mailed it to Tammy in case

3     you would like to see it.

4          THE COURT:  We already checked, and she hadn't

5     gotten the e-mail as of about, I don't know, seven minutes

6     ago.

7          MR. HAYSBERT:  I believe it was sent about seven

8     minutes ago, Your Honor.

9          THE COURT:  Would you check and see if you've

10    gotten it?

11          In the meantime, Mr. Haysbert, Mr. McKelvey has

12    been here the entire time.  The Court recessed, but when you

13    weren't back by quarter to 7:00, the Court came in, and

14    Mr. McKelvey has been here the entire time.

15          Mrs. Kinney made a representation to the Court

16    about what she knew about what was going on, the status, and

17    Mr. Thomas talked to Mr. McKelvey.  In the meantime,

18    Mr. McKelvey will review with you, there have been two

19    motions filed.  One is a motion to quash the subpoena

20    because it was not served until today after he was called,

21    and Mr. McGavin had had a conversation with him, and he

22    hadn't been served a subpoena.  You said it had been served

23    for today.  You don't even have it to the Court yet at 7:15.

24    There has been a motion to quash that subpoena, oral motion.

25    There has also been an oral motion to revoke your *pro hac*

1    *vice* status.  Mr. McGavin has made both of those motions

2    before the Court.

3              MR. HAYSBERT:  Thank you, Your Honor, for giving me

4    the information.  I appreciate it.

5              THE COURT:  Mr. McKelvey has been here the whole

6    time, and he will give you any further update that you need

7    in that regard.

8              MR. HAYSBERT:  Thank you.

9              THE COURT:  Ms. Armstrong can't get logged back in.

10   I believe the administrative office, I don't know if this is

11   the reason, I know that they're doing work on our computer

12   systems all across the country this weekend.  So I don't

13   know when they're going to start and when they're going to

14   end.  I thought they would get here on Sunday, but I don't

15   know.  I have not been able to, obviously, stay updated

16   today, but she's not able to log back in from here now.

17             MS. BLAKE:  That does remind me, I did receive that

18   same notice and that might affect, even on Sunday, I

19   believe, sometime on Sunday.  That might affect the ability

20   to file by 3:00.  I'm not sure.

21             THE COURT:  I think it will be over by then.

22             MS. BLAKE:  Okay.

23             THE COURT:  I know it will be over by 4:00.  If

24   not, I'll be on the phone with the AO because we have been

25   assured that they would have it done by 4:00, and it's going

1    to be intermittent, in any event.

2              MS. BLAKE:  Okay.

3              THE COURT:  One other thing I thought about, and I

4    made a note.  When one of the witnesses, I think

5    Mr. Robinson was asked his address, his full address, under

6    the E-Government Act, that will need to be under seal or

7    redacted from the record.  We don't put people's addresses.

8    They can state their name and the city, but we don't put

9    their actual addresses on the record.

10             So I wanted to mention that, that if the record is

11   written up on his testimony, that would have to be redacted,

12   and obviously the court reporter knows about the

13   E-Government Act.

14             MR. HAYSBERT:  Your Honor, if you could give me a

15   moment to check if Mr. Bingham is here.

16             THE COURT:  Doesn't he know to come in the

17   courtroom?

18             MR. HAYSBERT:  He knows to come in.

19             THE COURT:  I assume he can get in.  I saw the

20   marshal here.  Can he even get in the front?

21             THE MARSHAL:  Yes, ma'am, he can.

22             THE COURT:  Thank you.  It's 7:20.  Mr. Bingham has

23   just walked in the courtroom.  Mr. Haysbert, if you have the

24   paperwork, could you please present it to the Court and

25   Mr. McGavin.  Do you have a copy for the Court?

1          MR. HAYSBERT:  He only printed out one copy.  I
2    don't know why.
3          THE COURT:  Then pass it up to the Court, please.
4    We need other copies, I'll have the clerk make a copy, and
5    since you filed the motion to quash, so you will have all
6    the information, Mr. McGavin.  You can have it.
7          MR. HAYSBERT:  Your Honor, if I may, in the body of
8    the e-mail that hopefully Tammy receives soon, that
9    Mr. Bingham was going to print out, it actually indicates my
10   proof of service provider, the time that it was served, and
11   who was served.  So letting you know.  And the proof of
12   service usually takes about a day to process and have the
13   server sign.
14         THE COURT:  You don't wait until today to issue it.
15   You issued this today after he didn't show up, didn't you?
16         MR. HAYSBERT:  No, I didn't.
17         THE COURT:  When did you do it?
18         MR. HAYSBERT:  I issued it earlier this morning
19   before like 6:00 in the morning.
20         THE COURT:  We will have to have the process server
21   here, too.
22         MR. HAYSBERT:  That's fine, Your Honor.  The
23   process server can be called in.
24         THE COURT:  Because Mr. McKelvey has said the first
25   he heard of it was when you represented to the Court.  No

1    one else had heard anything about this, and it's contrary to

2    a conversation that Mr. McGavin had with Mr. Wilson, and

3    that's going to be in an affidavit under oath.  So you

4    better be really careful right now, Mr. Haysbert.

5            You better be really careful right now.  That's all

6    I'm going to tell you because you are giving me a subpoena,

7    and I'll put the process server under oath.

8            MR. HAYSBERT:  That's fine, Your Honor.

9            THE COURT:  This says that it was issued -- this is

10   to Alicia.  This isn't even to Mr. Wilson.

11           MR. HAYSBERT:  They were both issued the subpoena,

12   Your Honor.  Alicia happened to come today.

13           THE COURT:  But why are you giving me this?  This

14   wasn't at issue.  She came.

15           MR. HAYSBERT:  Sure.  I understand that.

16           THE COURT:  I'm just putting it in the trash can

17   because --

18           MR. HAYSBERT:  Thank you, Your Honor.

19           THE COURT:  -- it's irrelevant at this point.

20   Ms. Eleftherion came, she testified.  She's been recognized

21   by the Court, and she's told to be back here.  So that's

22   irrelevant.  I didn't ask for that.

23           MR. HAYSBERT:  Thank you, Your Honor.

24           THE COURT:  You say that you asked for this on

25   August 9th?

1          MR. HAYSBERT:  Your Honor, that was when it was

2   printed and sent to the process server this morning.

3          THE COURT:  So you're saying that it was printed on

4   August 9th, but it didn't go to the process server until

5   this morning?

6          MR. HAYSBERT:  It went to the process server this

7   morning.

8          THE COURT:  All right.  When did it go to the

9   process server?

10          MR. HAYSBERT:  This morning.

11          THE COURT:  Do you have an e-mail sending it to

12   them?

13          MR. HAYSBERT:  I do.

14          THE COURT:  You're going to have to produce it and

15   now.

16          MR. HAYSBERT:  Okay.  I'll have to get Mr. Bingham

17   back and have him print it.  Your Honor, we also have --

18          THE COURT:  I'm just telling you, you did not serve

19   him.  I think there is going to be an affidavit that you did

20   not, regardless of when you sent this to the process server,

21   if you sent it at 6:00 a.m., it is still today.  So at 6:00

22   a.m. before business hours, you send something to a process

23   server, and the process server doesn't serve the person

24   until today.  Did you include the fees with it?

25          MR. HAYSBERT:  That's correct, yes, I did, Your

JODY A. STEWART, Official Court Reporter

1    Honor.

2            THE COURT:  There still is not a signed or filed by

3    the process server.  So it's not a legitimate subpoena

4    before the Court until there is proof of service.  There is

5    no proof of service on here.

6            MR. HAYSBERT:  Your Honor, what happens with my

7    process server, I can't speak for anyone else.

8            THE COURT:  I don't want to hear what happens.

9            MR. HAYSBERT:  It usually takes about a week to do.

10   It takes about a day to provide a proof of service, but I've

11   asked them to provide proof of service.  What they have done

12   in the meantime is they sent an e-mail to me, and they

13   provided the specific time that each person was served.

14           THE COURT:  Why don't you have these things to the

15   Court?  I'm not going to debate this anymore with you this

16   evening.  The bottom line is that earlier today for this day

17   there was no subpoena served on this individual.  You have

18   served the individual to be here on August 11th and August

19   14th between 10:00 a.m. and 6:00 p.m., and regardless, you

20   didn't get it to your process server until this morning, and

21   there is going to be a motion to quash with an affidavit.

22           MR. HAYSBERT:  I understand, Your Honor.

23           THE COURT:  So where is the proof of service?

24   There is no proof of service.  Couldn't he e-mail that to

25   you?

823

1          MR. HAYSBERT:  They will e-mail it to me.

2          THE COURT:  Why didn't you get it when you left?

3          MR. HAYSBERT:  Your Honor, the process -- the way

4    the process works is they send you a status.  What I

5    received was a status.  We have served Mr. Wilson with this

6    amount of money as advance fees.

7          THE COURT:  Why didn't you bring that e-mail to the

8    Court?  Why didn't you bring -- if he can e-mail you back,

9    why can't he e-mail the completed piece of paper?  What I

10   don't understand is, if he has served it, and he has served

11   it at a certain time, why don't you have that?  When you

12   went out doing all this other stuff, why didn't you get the

13   e-mail?

14         MR. HAYSBERT:  We have an e-mail, Your Honor.

15         THE COURT:  But you didn't bring it to the Court,

16   and it's on your phone, and we have been through this how

17   many times in this trial?

18         MR. HAYSBERT:  I have sent it to Tammy.

19         THE COURT:  Can you go see what you've got?  Can

20   you see if you can log back on.  You can leave the courtroom

21   if you need to.

22         MR. HAYSBERT:  Thank you.  Your Honor, Mr. McKelvey

23   asked me to clarify for the Court that what I received was a

24   status of service e-mail, not the actual proof of service.

25   That usually takes about a day to turn around.  So I wanted

824

1   to confirm that with the Court.

2       THE COURT:  I don't know why it would take a day if

3   he served it and printed his title and his address.  All he

4   has to do is fill out this proof of service.  If he can

5   e-mail the status to you, he can't e-mail a proof of service

6   to you?

7       MR. HAYSBERT:  The problem, Your Honor, from what I

8   heard from the legal process server, is that the person who

9   served it is still in the field.  So when they get to their

10   office, they could be serving someone else, is what was

11   represented to me.

12       THE COURT:  Excuse me.  You haven't talked to the

13   actual person who served this process?

14       MR. HAYSBERT:  The actual person who serves the

15   process sends it to the company, and the company sends

16   everything to me.  The process server is apparently on

17   another job, but as soon as that person gets to the

18   computer, they have been informed that they need to send me

19   the proof of service.  Once I have that, I will get it to

20   the Court.

21       THE COURT:  Who is your process server?

22       MR. HAYSBERT:  Your Honor, I can't think of the

23   name.  Oh, you're talking about the company?  I'm sorry.

24   BFRM Legal.  It's BFRM Legal.  And in the e-mail that Tammy

25   is going to print out for you, you will see the information

1    and the name of the person who runs the department.

2         THE COURT:  Where is it located?

3         MR. HAYSBERT:  It's located in California, Your

4    Honor, but they have operations all over the nation, and

5    they have someone here in the local area that serves the

6    process.

7         THE COURT:  Well, I think you better be prepared

8    for two things on Monday morning.  Number one, you need to

9    have whoever served this process here to verify.

10        MR. HAYSBERT:  Yes, Your Honor.

11        THE COURT:  The Court wants to hear from the

12   process server to verify because apparently then you issued

13   the request at 6:00 a.m. in the morning at California.

14        MR. HAYSBERT:  I sent them the e-mail this morning,

15   yes.

16        THE COURT:  That's three hours behind.  So if it's

17   6:00 a.m. in the morning here, it's 3:00 a.m. in the morning

18   there; is that correct?

19        MR. HAYSBERT:  I don't recall the exact time I sent

20   it, Your Honor, but regardless, they would have sent it to

21   whoever was here to have them effectuate the service.

22        THE COURT:  Is there somebody just sitting there

23   waiting for your e-mail at 3:00 a.m. in the morning?

24        MR. HAYSBERT:  I don't know.  I can only tell you

25   that they have served, and they know who that person will

1    provide proof of service, and I sent them the information,

2    and they responded already.

3            THE COURT:  Well, you are going to need to get as

4    much information as you can from that process server

5    locally.  The Court wants to know when the request got to

6    him, because you're telling me now that you have a process

7    serving group out in California.

8            MR. HAYSBERT:  Yes.

9            THE COURT:  That you sent an e-mail at

10   approximately 6:00 a.m. Eastern Time to request a subpoena

11   for today, and that would have been 3:00 a.m. in Pacific

12   Time out there?

13           MR. HAYSBERT:  Yes, Your Honor.

14           THE COURT:  Then I don't know what time the process

15   server here was told to serve the process.  I want to know

16   that.  Then I want to see your e-mail where you sent this

17   out at approximately 6:00 a.m.  So I want to see your

18   e-mail, and I want to know from the process server when he

19   or she received direction to serve this process.  Then I

20   want to hear from the process server about when it was

21   served and how it was served, and so forth, with a proof of

22   service signed and given to the Court.  So there is three

23   things:  Number one, your e-mail where you request this

24   company in California at 3:00 a.m. in the morning,

25   approximately.  Then I want to know when they sent out the

1   request here.

2           MR. HAYSBERT:  I wouldn't know that, Your Honor,

3   when they sent it out here.

4           THE COURT:  Well, we will ask the process server

5   when he or she received notice that they needed to serve

6   this process.  The process server ought to know.  How did

7   they get it?  They had to get it by e-mail.

8           MR. HAYSBERT:  Again, the process server is here on

9   the ground here, and they will provide a proof of service.

10          THE COURT:  I know, but I want to know when they

11  got the request.

12          MR. HAYSBERT:  Okay.  I wouldn't know that

13  information.

14          THE COURT:  Well, the process server should.  If

15  you e-mailed it to California, and there is no way they

16  could have gotten it here today, even Federal Express

17  overnight doesn't do that.  They would have had to e-mail it

18  to somebody here.  So I want to understand how this process

19  server gets the request and what time he or she received it

20  and what time he or she served it.

21          MR. HAYSBERT:  Understood.

22          THE COURT:  That's three things.  Your e-mail, the

23  e-mail that went to this process server, whoever sent it to

24  the process server, what time they got it, and then their

25  proof of service.

828

1           MR. HAYSBERT:  Understood, Your Honor.  The only

2     part that I don't know if I can help the Court with, but I

3     will try, is the part where they e-mail whoever they work

4     with.

5           THE COURT:  He receives e-mails.  The process

6     server received notice somehow to serve it, and the key is

7     whatever the bureaucratic chain is, if there is one, you've

8     got a time when you sent it, you've got a time when the

9     process server got it.

10          MR. HAYSBERT:  Which is with Tammy now, I'm sure.

11          THE COURT:  Then you've got a time when you sent

12    it, you've got a time when the process server, whoever it

13    is, received it, and then you've got a proof of service.

14    It's now almost 7:35, and Mr. Bingham has come back in with

15    something, and so let me take a look at that.  We've got a

16    copy for defense counsel.

17          MR. HAYSBERT:  Yes.  I provided that.

18          THE COURT:  I'm talking about what Ms. Armstrong

19    printed off.  Let's see what I've got here.  First thing it

20    was just handed up to the Court is an e-mail on Friday,

21    8-11-2023 at 7:23 p.m. going to the Norfolk, Virginia,

22    Courtyard Marriott, trial subpoenas, looks like to

23    Mr. Bingham.  Then there is a message below that was

24    received August 11, 2023, at 7:08:47 p.m. to Ms. Armstrong,

25    and you've got something about, "See below the attached to

829

1  Ms. Eleftherion," and she was able to respond to her

2  subpoena.

3          I don't know if she was responding to her subpoena

4  or not.  That wasn't of concern once she appeared.  Marcus

5  Wilson was served later this afternoon and will appear on

6  Monday if the Judge allows.  You may confirm with Bree

7  Weathers.  I have no idea who Bree Weathers is.  Proof of

8  service will also be forwarded but that initially takes a

9  day or so.

10         MR. HAYSBERT:  From Tammy, Your Honor.

11         THE COURT:  I will tell you that Ms. Eleftherion

12  was not served until 1:55 p.m.  So she may have testified by

13  then.  I don't know.  I'll just have to go back and look.  I

14  don't know if she came to a subpoena or came on her own or

15  whatever, but it looks like she wasn't even served until

16  1:55 p.m., and that's what this says from somebody Thomas

17  Bird, manager, best regards, process department manager,

18  BFRM Legal Support Services.  These are the first two pages

19  that the Court has received.

20         MR. HAYSBERT:  Did you see the section from Marcus

21  Wilson, Your Honor?  I didn't want to skip that.

22         THE COURT:  I'm going through what I have, and then

23  you can ask me questions.

24         MR. HAYSBERT:  Sure.

25         THE COURT:  The first pages of this e-mail that I

1  have shows the service of Marcus Wilson at 5:25 p.m. today.

2  That's after business hours.  So this is what the e-mails

3  show as the service times for those two witnesses.  It was

4  attached with a blank subpoena that, again, is not filled

5  out by the process server to Marcus Wilson, and you've dated

6  it.  You've dated it August 9th, and you are saying that you

7  didn't send it out to the process server until this morning.

8  The subpoena that is attached with this e-mail, or what you

9  just gave to the Court, did you get a copy of all that,

10 Mr. McGavin?

11        MR. McGAVIN:  Yes, Your Honor.

12        THE COURT:  So there is an e-mail that comes in at

13 7:23, and it follows the trail.  Mr. Wilson wasn't served

14 until 5:25 p.m., which comports with the representations

15 that Mr. McGavin made earlier to the Court that when he

16 talked to him earlier today he had not been served with any

17 subpoena.  So this will be an exhibit for this hearing,

18 Court Exhibit Number 1 for this particular hearing on this

19 date about the service of the subpoena to Marcus Wilson.

20        (Court Exhibit 1 received in evidence.)

21        THE COURT:  Then there is, it looks like the same

22 thing.  This again is about Ms. Eleftherion, and there is

23 another subpoena here to Marcus Wilson.  It looks like it is

24 a duplicate.  I'll just put the whole package together.

25        It appears, according to Ms. Armstrong, that the

831

1    7:08:47 p.m. is what you sent to Ms. Armstrong and that you

2    then forwarded that to Mr. Bingham, and then the attachment

3    to it is what Mr. Bingham just brought in.

4             MR. HAYSBERT:  Correct, without the body of the

5    e-mail, Your Honor.

6             THE COURT:  What?

7             MR. HAYSBERT:  Without the body of the e-mail that

8    shows what times they were served.

9             THE COURT:  Here is the first e-mail that came in

10   to Ms. Armstrong.  Court Exhibit Number 1 is going to be

11   what came in to Ms. Armstrong at 7:09 p.m. for this hearing.

12   The Court Exhibit Number 2 for this hearing is what came in

13   with Mr. Bingham, I think was about 7:30, 35, whatever time

14   I said on the record at the time, and he sent this at 7:23

15   p.m., and then he walked in at some time after that and

16   brought this to the Court.  So that will be Court Exhibit

17   Number 2.

18             (Court Exhibit 2 received in evidence.)

19             THE COURT:  That still leaves Monday morning, I

20   would still want the three things.  I want to know when you

21   sent the request to California, want verification of what

22   you say you sent around 6:00 a.m. this morning, because the

23   record shows that this was requested on August back earlier

24   in the week.  That date is not when it was actually sent to

25   the server.  So I want to see whatever you sent to your

JODY A. STEWART, Official Court Reporter

1    service agency in California, I want to know when it was

2    received here by the process server that actually served

3    Marcus Wilson, and I want the proof of service here with the

4    process server on Monday, and that's at 10:00 a.m., and

5    there shall be no excuses.  If there is, I'm going to issue

6    a show cause order for contempt, because you've got to get

7    this straightened out.  I'm not going to take a date that

8    you signed on August 9th and the record before the Court

9    shows that all this was going on sometime today.  Actually,

10   I'm not going to consider contempt.  It would just be

11   removing your *pro hac vice* status.  That would be part of

12   the removal.

13          MR. HAYSBERT:  Thank you, Your Honor.

14          THE COURT:  At this point I don't know how I'm

15   going to rule on any of this.  I think you ought to not

16   count on having Marcus Wilson here.  That's what I can tell

17   you at this point, with somebody being served at 5:25 on a

18   Friday evening.

19          MR. HAYSBERT:  Either way, Your Honor, I appreciate

20   you very much.  Thank you.

21          THE COURT:  Well, I hope everybody has safe travels

22   home.  I apologize to all of the court staff for keeping

23   everybody here into almost quarter to 8:00 on a Friday

24   night.  I hope everybody has safe travels and a safe

25   weekend, and the Court stands in recess until 10:00 a.m. on

```
 1   Monday morning.

 2           (Hearing adjourned at 7:42 p.m.)

 3                      CERTIFICATION

 4

 5       I certify that the foregoing is a correct transcript

 6   from the record of proceedings in the above-entitled matter.

 7

 8

 9           X_____/s/_____x

10                   Jody A. Stewart

11                   X_____8-30-2023 _____x

12                       Date

13

14

15

16

17

18

19

20

21

22

23

24

25
```