```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Newport News Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                        )
 5   JOANN WRIGHT HAYSBERT,             )
                                        )
 6          Plaintiff,                  )
                                        )   CIVIL ACTION NO.
 7   v.                                 )   4:20cv121
                                        )
 8   BLOOMIN' BRANDS, INC., AND         )
     OUTBACK STEAKHOUSE OF FLORIDA,     )
 9   LLC,                               )
                                        )
10          Defendants.                 )
     - - - - - - - - - - - - - - - - - -

11

12

13                   TRANSCRIPT OF PROCEEDINGS

14                              DAY 5

15                       Norfolk, Virginia

16                        August 14, 2023

17

18   BEFORE:  THE HONORABLE REBECCA BEACH SMITH
              United States District Judge

19

20

21   APPEARANCES:

22           CRANDALL & KATT
             By:  David A. McKelvey
23                     And
             HAYSBERT & MOULTRIE LLP
24           By:  Nazareth M. Haysbert
                  Counsel for the Plaintiff

25
```

```
1    APPEARANCES CONT'D:

2
             McGAVIN, BOYCE, BARDOT, THORSEN & KATZ, P.C.
3            By:  John D. McGavin
                  Emily Blake
4                 Counsel for the Defendants

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Hearing commenced at 11:00 a.m.)

 2          THE CLERK:  In case number 4:20cv121, JoAnn Wright

 3   Haysbert versus Bloomin' Brands, Inc., and Outback

 4   Steakhouse of Florida, LLC.

 5          Mr. McKelvey, Mr. Haysbert, is the plaintiff ready

 6   to proceed?

 7          MR. HAYSBERT:  Yes, Your Honor.

 8          THE COURT:  Good morning.

 9          MR. HAYSBERT:  Good morning.

10          THE CLERK:  Mr. McGavin, is the defendant ready to

11   proceed?

12          MR. McGAVIN:  Yes.

13          Good morning, Your Honor.  John McGavin and Emily

14   Blake on behalf of the defendants.  Ray Graham of Outback

15   Steakhouse is seated at counsel table.  Thank you.

16          THE COURT:  Good morning to counsel and Mr. Graham.

17          Good morning, Dr. Haysbert.

18          Counsel, before we proceed into the first matter

19   before the Court, let me mention a couple of things or ask a

20   question.  When I got the new forms, because the case was

21   scheduled to only go through Friday, and we were going over

22   into this week, there were new electronic equipment

23   authorization forms, basically for the same equipment as we

24   had before.

25          But I noticed, Mr. Haysbert, that there was yet
```

1    another trial tech, that Mr. Bingham is now gone, so this

2    would be the third we had or been listed.  Now there is a

3    Brian D. Coleman.  Could you please introduce him to the

4    Court.

5          MR. HAYSBERT:  Yes, Your Honor.  Mr. Coleman.  This

6    is the owner of N2 Trial, the company that Kevin Bingham was

7    working for.  He is a local person, and he will be working

8    with us, if the Court would allow.

9          THE COURT:  The Court will allow.  I don't know

10    that you're going to need a computer right now, but he's

11    welcome to sit at the counsel table with you as did

12    Mr. Bingham.

13          MR. HAYSBERT:  Thank you very much, Your Honor.

14          THE COURT:  The next matter that I would mention to

15    you is that the jury was instructed last night on their

16    recording by the jury clerk that they would not need to

17    report today, but they should report, unless they heard

18    otherwise, at 11:00 a.m. tomorrow morning, so we are not

19    holding up a jury.

20          I looked at all of these issues, and we've worked

21    on them all weekend the best we can with there being

22    hundreds and hundreds and hundreds of pages that we tried to

23    go through of materials and notes.  But it's just not fair

24    to keep holding up a jury.  So they were instructed not to

25    come today, and they were instructed to call in tonight and

1    expect to come, if they are instructed, or they have been
2    instructed to come at 11:00 a.m. tomorrow morning unless
3    otherwise told this evening.
4          But, in any event, the jury is not here today, but
5    they are still instructed to be here, unless otherwise
6    noticed, at 11:00 a.m. tomorrow morning.
7          MR. McGAVIN:  Your Honor, may Ms. Blake be allowed
8    to step out and notify our witnesses?  I'm not sure if they
9    are here yet, but we have two witnesses that were scheduled
10   to be here.
11         THE COURT:  Yes, she may notify them.  We are going
12   to take these issues one by one, and we have at least first
13   the issue of process service that occurred on Friday.  Then
14   we have the issue of mistrial, the issue of the motion to
15   revoke Mr. Haysbert's *pro hac vice* status, then we have
16   admissibility of work orders, and we have Dr. Filler's
17   testimony and remedial measures.  There is just so many
18   things that we have to discuss, and by judging how we've
19   proceeded so far, the Court believes it will take most of
20   the day, if not all of today, to go through these matters.
21         MR. McGAVIN:  Thank you.  She will step out at the
22   appropriate time, and thank you for the permission.
23         THE COURT:  She can do it now if you want her to.
24         MR. McGAVIN:  I think I had told them to get here a
25   bit later because we were expecting -- so I think they are

1    not scheduled until about noon, so we will look at the clock

2    and step out then.  Thank you.

3          THE COURT:  It's five after 11:00.

4          MR. McGAVIN:  Thank you, Your Honor.

5          THE COURT:  Let's start with the motion to quash

6    the witness subpoenas.  I did receive the motion, the

7    written motion, and have reviewed it, and I received your

8    affidavit, Mr. Haysbert.  I don't understand, at a threshold

9    level, something that you put now under oath in your

10   affidavit, which is contrary, in the Court's opinion, to

11   what was represented to the Court on Friday evening.

12         In your affidavit you're now saying that you didn't

13   start the process until 9:00 a.m. Eastern Daylight Time, and

14   specifically on Friday night you said 6:05, and you said

15   Eastern Daylight Time, or at least I know I responded, well,

16   you said you sent it to California, and I responded, that

17   would be 3:00 in the morning Pacific Time, and you said yes.

18         So I would like for you to explain that.  This is

19   yet another time when it's very muddy.  I can't imagine

20   somebody telling the Court they did it at 6:05 when they did

21   it at 9:00 a.m., because there is a lot of difference

22   between being up at 6:05 and doing something and doing it at

23   9:00 a.m.  So would you please explain.

24         MR. HAYSBERT:  Yes, Your Honor.  My apologies for

25   inadvertent mistake.

1          THE COURT:  An inadvertent mistake?  When you look

2     at that transcript and see how many times we went over 6:05

3     and 3:00 a.m. and direct questions, but go ahead and explain

4     how it was an inadvertent mistake.

5          MR. HAYSBERT:  Sure.  So what I meant, Your Honor,

6     was 6:00 a.m. Pacific Standard Time, which would be 9:00

7     a.m. here.  So I just got a little confused about the

8     timing.  But, no, 6:00 a.m. Pacific Standard Time, 9:00 a.m.

9     here, and that information is also reflected in the e-mail

10    that I sent, and the declaration I forwarded to the Court

11    yesterday.

12         THE COURT:  It is, but you did specifically

13    represent to the Court, because this was of great concern to

14    the Court that subpoenas were going out on the same day

15    after we had been through the subpoena issue before, and it

16    was clear that you had to do it 14 days in advance, and we

17    went through all of that.  We went through all of that at

18    the conference on August 1st, if not certainly when I did

19    not quash Mr. Seifert's subpoena on a motion to quash

20    because it wasn't timely.

21         So you knew the time, did you not?  You are aware

22    now of the 14-day time limit, and you were when you asked

23    those subpoenas to be served on Friday; is that correct?

24         MR. HAYSBERT:  Your Honor --

25         THE COURT:  Is that correct?

JODY A. STEWART, Official Court Reporter

1              MR. HAYSBERT:  Well, it needs explanation.

2              THE COURT:  I said, "Is that correct?"

3              MR. HAYSBERT:  Your Honor, I would like to get on

4        the record, please.

5              THE COURT:  Sir, I want you to answer is that

6        correct, and then you can explain.

7              MR. HAYSBERT:  I spoke with counsel, Norman Thomas,

8        and according to counsel Norman Thomas, you can serve a

9        subpoena within the 14-day period, and it is still an

10       operative, active subpoena.  It is up to the Judge to decide

11       whether the Judge wants to waive or not the 14-day rule.

12       But there is no requirement that an attorney cannot under

13       any circumstances serve a subpoena within the 14-day rule.

14       They can.  It is simply up to the Judge to decide from there

15       whether the Judge will either allow it or not.  And you did

16       so with Nick Seifert, and we attempted it again.

17             THE COURT:  Well, Mr. Thomas is not an attorney in

18       this case.

19             MR. HAYSBERT:  He is my consultant, Your Honor.

20             THE COURT:  Mr. Thomas is not an attorney in this

21       case, and you should be seeking advice from your local

22       counsel, as far as the Court is concerned.  If you seek

23       advice from other counsel, you still had been told by the

24       Court that it was 14 days.  We will find out how this all

25       evolved when we have this hearing today.

1              So if I'm understanding, you just inadvertently

2      told the Court 6:05 when you really meant 9:00 a.m., and

3      Mr. Thomas advised you that you could serve a subpoena at

4      any time, and then it was up to the Court to decide whether

5      the Court should allow it to go forward; is that correct?

6              MR. HAYSBERT:  My understanding, yes, is that you

7      could serve it within the 14-day period, and it's up to the

8      Court to waive it for good cause.

9              THE COURT:  But I want you to know two things that

10     are of concern to the Court.  When you serve a subpoena, the

11     judge's name is on that subpoena, and the Court's name is on

12     that subpoena.  As you mentioned earlier, you even served

13     one on your expert witness because you thought, well, she's

14     not a lawyer, she won't know.

15             MR. HAYSBERT:  That is not correct, Your Honor.

16             THE COURT:  I'm going from my memory of what we

17     went through there.  So all I'm telling you is that my

18     recall with Dr. Haider was that you served a subpoena on

19     her, you represented it to the Court, and you said, well,

20     she's not a lawyer, she might have come anyway.  That's my

21     recall, and we went through that.

22             The concern with the Court is the Court's name, the

23     Judge's name and the court is on that subpoena, and a lot of

24     lay people don't understand that it's not coming from the

25     Court.  They just don't understand.  You admitted that

1    yourself on the record, and the record will reflect that.

2    So let's go forward.  I'm telling you it's a concern of the

3    Court that we had gone through a number of times the 14-day

4    requirement of this court and this court's local rules.

5         Mr. Thomas may be speaking from -- I don't know

6    what he is speaking from, but there was no asking for a

7    waiver of our local rules.  Our local rules specifically say

8    that, and you, as a *pro hac vice* attorney, have to follow

9    our local rules, as does Mr. McKelvey as a member of the bar

10   of this court.

11        Our local rules specifically say it.  The Court had

12   reiterated it to you on numerous occasions.  We already went

13   through it with Mr. Seifert, and because you said it was

14   crucial to your case, I went ahead and said he's local and

15   we will let him in.  In the meantime, you made a

16   representation to the Court about Dr. Haider that, well, you

17   went ahead and subpoenaed her because she wasn't a lawyer

18   and maybe she would come anyway.  So it may not be word for

19   word, but that is what occurred in this court.

20        MR. HAYSBERT:  Your Honor, she was never served

21   with the subpoena.

22        THE COURT:  You said you sent her one.  You said

23   you mailed her a subpoena.  We knew she couldn't be served,

24   because she was more than a hundred miles away.  I'm not

25   going to debate it anymore.  This just keeps happening

1    repeatedly, Mr. Haysbert.

2         Now, we will call the process server now unless

3    there is something anybody wants to say.  Do you want to

4    argue your motion to quash or do you want to hear the

5    process server first?

6         MR. McGAVIN:  Your Honor, I'd prefer to hear the

7    process server, and then any additional legal argument in

8    addition to what we've already submitted, we'll present.

9         THE COURT:  Then, is there anything you want to add

10   other than your affidavit?

11        MR. HAYSBERT:  Not at this time, Your Honor.

12        THE COURT:  We will hear the process server, and

13   then we will go from there.  I think the process server is

14   outside.  Can you see that he or she, whoever it is, is in.

15        Ma'am, if you would please come forward and be

16   sworn and take the witness stand.

17        (Witness was sworn.)

18        CAROL DONALDSON, called by the Plaintiff, having

19   been first duly sworn, was examined and testified as

20   follows:

21                    DIRECT EXAMINATION

22   BY THE COURT:

23   Q.  The Court is going to ask you some questions, and the

24   attorneys will have the option also.  So if you could please

25   state your name to the Court.

 1   A.  Carol Donaldson.

 2   Q.  Ms. Donaldson, did you serve a subpoena on a Mr. Wilson

 3   on Friday?

 4   A.  Yes.  Not personally, no.

 5   Q.  Who did?

 6   A.  No, I mean I didn't serve him personally, I served it on

 7   the manager.

 8   Q.  Well, let me go to that.  I saw that.  What was the

 9   person's name?  It was a Devon Stansel?

10   A.  Devon Stansel.

11   Q.  And did you ask for Mr. Wilson?

12   A.  Yes.  He wasn't there.  I think he was here.  I don't

13   know.  But he wasn't there.

14   Q.  You thought he was here?

15   A.  Well, I think the manager might have told me that he had

16   been in court.  I'm not sure, but he wasn't there, so -- and

17   we didn't have another address for him, so our only option

18   was to serve the manager.

19   Q.  All right.  So when you went to the address that you had,

20   was it an Outback Steakhouse?

21   A.  Yes, ma'am.

22   Q.  And you served a Devon Stansel, the manager?

23   A.  Yes.

24   Q.  And Mr. Wilson wasn't there?

25   A.  Yes.

1  Q.  And you understood that he was in court anyway?

2  A.  That's what I think the manager told me, that he was

3  aware of the trial, aware that Mr. Wilson was having to deal

4  with this, and he thought he had been in court.  But this was

5  later.  I served it 5:25 p.m., so it was later.  So if he

6  would have had a shift, I went there later.  If he had a

7  shift that night, he would be there, but he wasn't.

8  Q.  When did you receive the request to serve Mr. Wilson?

9  A.  On Friday.

10  Q.  Pardon?

11  A.  On Friday, that same day.

12  Q.  Approximately what time?

13  A.  Around 2:00, 1:00 or 2:00.

14  Q.  So around 1:00 or 2:00 on Friday you received the request

15  to serve the subpoena?

16  A.  Yes, ma'am.

17  Q.  And who gave you that request?

18  A.  The company that I was working with, BFRM Legal Support

19  Services.

20  Q.  All right.  And so you got the request around 2:00?

21  A.  Maybe 1:00.  You know, it was early afternoon.  If I had

22  my phone, I could tell you exactly, but I don't have my

23  phone.

24  Q.  That's all right.  It was after 12 noon?

25  A.  I believe so.

Donaldson, C. - Direct                                                847

```
 1   Q.  I believe is not going to do.
 2   A.  Pardon?
 3   Q.  Believe is not going to do.  You need to have at least
 4   some idea of when you got this.
 5   A.  It was afternoon.  I'm just looking for like -- see if I
 6   got an e-mail or something.  I printed out the e-mail so I
 7   can tell you exactly.  Okay.  It was around noontime because
 8   I went to Office Max and printed this stuff up because I
 9   couldn't go back to my office.  So -- and I did that at
10   12:32.  So it was around noontime that she called me and
11   asked me to serve him.
12   Q.  Who is "she"?
13   A.  Her name is Bree, and she's the contact person I have at
14   BFRMS Legal Support Services.
15   Q.  So you said you went to Office Max at 12:32.  So it was
16   12:32 when you picked up all this paperwork?
17   A.  When I printed them.
18   Q.  When you did what?
19   A.  When I printed the subpoena so I could serve them,
20   because my office is all the way back in Ocean View, so to
21   save time, I went to Office Max and printed everything so I
22   didn't have to go back to my office.
23   Q.  How did you get the fees that --
24   A.  I work with this company.  I advanced the fees for them.
25   Is that what you mean?
```

Donaldson, C. - Direct                                              848

1    Q.  Yes.  You gave I believe 104 -- what was it, $142.40?

2    A.  Yeah.  That was the check that I wrote out of my business

3    account.  I advanced this company, BFRM, the fees, the

4    witness fees.

5    Q.  And that included attendance and mileage?

6    A.  Yeah.  That's what my understanding is, that it includes

7    a $40 witness fee plus mileage.  Every check is different.

8    Q.  I understand, but how do you calculate the mileage?

9    A.  I think -- well, Bree calculated it for me, show me

10   exactly what to pay them, and I think she goes by $0.65 a

11   mile from the distance of the courthouse to --

12   Q.  I'm just asking you.  So she told you what mileage to

13   put?

14   A.  Right.  Yes, ma'am.  She told me exactly how much to

15   write the check for.

16   Q.  When did you provide Mr. Haysbert with the proof of

17   service?

18   A.  Well, see, I haven't really dealt with him except for him

19   asking me to come today.  All my dealings have been with

20   Bree, you know, with BFRM Legal Solutions.  So she sent me a

21   proof to sign, and I e-mailed it back to her.  So she is like

22   the middle person between me and the attorney.

23   Q.  So what time did you e-mail it back to Bree?

24   A.  Well, it was after I got home, which was probably 7 or

25   8:00, because I was doing all this up until then.  So I had

1    them here, but as far as the time --

2    Q.  Well, you were out in the field, is what you're saying?

3    A.  Yes, ma'am.  So I'd say it was probably around 7:00 Bree

4    sent me these proofs to sign -- to review and sign, which I

5    did, and then I e-mailed them back to her.  And I assume at

6    that point she e-mailed them to the attorney.

7    Q.  All right.  So we'll make the proof of service that you

8    have with you Court Exhibit Number 1 for this hearing.

9    A.  Okay.  I have one for Mr. Wilson.

10            THE COURT:  Let's just stick with Mr. Wilson now.

11            (Court Exhibit 1 received in evidence.)

12            THE COURT:  We will go to Ms. Eleftherion in a

13   moment.

14   BY THE COURT:

15   Q.  I am saying for now, we will get these later before you

16   leave, but the completed proof of service that you have

17   executed, I know there's a copy on record, but I want the one

18   that she has -- copy that came, I believe on Sunday, to the

19   Court with some filings.  But I want the one that

20   Ms. Donaldson actually did.

21   A.  I have the original one right here.

22   Q.  All right.  Now, can you please provide the Court with a

23   timeline of Ms. Eleftherion's subpoena.  When did you get

24   that request, and when did you serve it?

25   A.  Okay.  I got the request on Thursday.

Donaldson, C. - Direct                                                    850

1    Q.  On Thursday.

2    A.  And served it on Friday.

3    Q.  You served it on Friday.  So the request was Thursday,

4    and you served it on Friday.  What time did you serve it on

5    Friday?

6    A.  I believe it was 1:55 p.m.

7    Q.  All right.  And where did you serve it?

8    A.  I served it at Outback Steakhouse, too, and it's -- the

9    address --

10   Q.  Who did you serve it to?

11   A.  I served it to her manager, Thomas Bird.  Now, he did

12   tell me that she was in court.

13   Q.  So she was in court because she was in court at that

14   time?

15   A.  Yeah.

16   Q.  She was at court at that time?

17   A.  That's what Mr. Bird told me.

18   Q.  So you served that one on Mr. Bird, the manager at an

19   Outback Steakhouse?

20   A.  Yes, ma'am.

21   Q.  When did you provide Mr. Haysbert with proof of that

22   service?

23   A.  Well, I sent the proof when I got back to the office, you

24   know, and Bree sent me -- she filled it out, and I signed it

25   and sent it at the same time I sent Mr. Wilson's, probably

Donaldson, C. - Cross                                              851

```
1    around 7:00 or 8:00.
2    Q.  So, again, you would have sent Mr. Wilson's and
3    Mr. Eleftherion's served subpoenas at the same time?
4    A.  Yes, ma'am.
5    Q.  Back to the individual named Bree?
6    A.  Right.  I scanned them and e-mailed them together.
7            THE COURT:  That served subpoena will be marked as
8    Court Exhibit 2 for this hearing.
9            (Court Exhibit 2 received in evidence.)
10           THE COURT:  Mr. Haysbert, do you have any questions
11   of Ms. Donaldson?
12           MR. HAYSBERT:  Yes, I do.
13                       CROSS-EXAMINATION
14   BY MR. HAYSBERT:
15   Q.  Just one classifying question for you, Ms. Donaldson.
16   First of all, thank you for coming and taking time out of
17   your schedule.  I appreciate that very much.  So with respect
18   to Alicia Eleftherion, I heard you say earlier that you
19   served -- you received a trial subpoena for her on Thursday
20   of last week?
21   A.  Yeah.
22   Q.  Did you receive the subpoena for her the same time that
23   you received the one for Marcus?
24   A.  No.  It was sent to me last minute on Friday, Marcus'.
25   Q.  Okay.  All right.  And you received the one for Alicia
```

1    earlier in time?

2    A.  Right.

3    Q.  Okay.  Who did you receive that from?

4    A.  You know what -- okay.  I'm sorry.  Ask that question

5    again.

6    Q.  Who did you receive Alicia Eleftherion's subpoena from?

7    A.  Bree at BFRM Legal Support Services.  And I'm sorry.  I

8    was incorrect.  It was another person that I served, too, and

9    I got her paperwork on Thursday.  I got the paperwork for

10   Marcus Wilson and Alicia Eleftherion at the same time on

11   Friday, I apologize.

12        MR. HAYSBERT:  No problem.  No further questions,

13   Your Honor.

14        THE COURT:  So you got them both from Bree around

15   12:32, I think you said --

16        THE WITNESS:  Yes.  On Friday.

17        THE COURT:  This is very important.  These dates

18   and times are extremely important.

19        THE WITNESS:  That's right.  I went to Office Max,

20   and I printed up hers and his.

21        THE COURT:  Any questions you have, Mr. McGavin?

22        MR. McGAVIN:  Yes, Your Honor.

23                    CROSS-EXAMINATION

24   BY MR. McGAVIN:

25   Q.  Who did you serve on Thursday, whose paperwork?

Donaldson, C. - Cross                                                853

1   A.  The paperwork that I got for service on Thursday was for

2   a Deajah Clark.

3   Q.  All right.  And when did you serve her?

4   A.  Friday.  But I got the paperwork on Thursday.

5   Q.  But what time on Friday?

6   A.  I served her at her restaurant.  It was another Outback

7   Steakhouse -- or Roadhouse restaurant.  I served her around

8   the same time, around 12:30 or around noontime, and I served

9   a manager as well for her.  I think she was in court too.

10  Q.  And for what days to appear?

11  A.  I don't -- maybe I do have those.  I think it was like 9

12  through 14 or 11 through 14.

13  Q.  Is it correct that you served a subpoena on Marcus

14  Wilson's manager on Friday after close of business to appear

15  on Friday, August 11th?

16  A.  I don't think so.  I'm not sure because I don't have the

17  subpoena in front of me, but -- well, actually -- I can tell

18  you exactly what it says.  Just give me a minute.  Date and

19  time, August 11th and August 14th, 2023, 10:00 a.m. to 6:00

20  p.m.

21  Q.  As a process server, are you in the habit of serving

22  people after close of business to appear in court after the

23  court closes?

24  A.  Well, as a process server, I do what the attorneys ask me

25  to do unless -- I guess I would know it was really against

Donaldson, C. - Cross                                                    854

1   the rules.  But it said 11 through 14.  A lot of times I have

2   to serve people after close of business.  I mean, most of the

3   time I have to serve people in the evenings and on Saturdays.

4           THE COURT:  We are not talking about that.  We are

5   talking about business hours for court operations, for

6   normal court operations.

7           THE WITNESS:  So I don't usually let that -- I

8   don't understand your question.

9   BY MR. McGAVIN:

10  Q.  Well, isn't it true that you were -- that if you see a

11  subpoena that is unenforceable, you won't serve it?

12  A.  Well, it didn't just have the 11th.  It had the 14th as

13  well, the 11th through the 14th.

14  Q.  Do you know that court starts at 10:00, ends at 5:00 or

15  6:00?  Do you have any knowledge of these types of things?

16  A.  Yes.  Of course, I do.

17  Q.  So you had no problem taking a subpoena to the manager

18  for Mr. Wilson, knowing he wasn't there, and serving him --

19  A.  I didn't know --

20  Q.  Let me finish, if you don't mind -- and then serving him

21  after close of business for court?

22  A.  Like I said, the dates were of the 11th through the 14th,

23  so I assumed it was for Monday, today.  You know, I wasn't

24  privy to all the details.  I didn't get to communicate with

25  the attorney.  I just -- it seemed like to me that it was for

Donaldson, C. - Cross                                                    855

1    an extension for the court time, that the trial had been

2    extended, and that they needed to give him an additional

3    subpoena.

4    Q.  Where did you get that information?

5    A.  Like I said, it was an assumption on my part.

6    Q.  Did you ever speak to Mr. Haysbert?

7    A.  This weekend.

8    Q.  What did he tell you?

9    A.  He asked me to come today.

10   Q.  What else?

11   A.  We didn't talk about anything else.

12   Q.  Well, did you ask him why he wanted you to serve a

13   subpoena after close of business on a court day on Friday,

14   August 11th?  Did you ask him about that?

15   A.  No.

16   Q.  And in regard to serving a subpoena, does it say August

17   11 through 14 or just August 11 and 14?

18   A.  Well, I read it to you exactly how it appears on the

19   subpoena, which I'm sure you have as well.  It says, "Date

20   and time, August 11th and August 14th."

21   Q.  So "and," not "through," correct?

22   A.  Uh-huh.

23   Q.  Is that a yes?

24   A.  Yes.

25   Q.  Thank you.  And when you receive this, don't you

Donaldson, C. - Cross                                                856

1  customarily check in with the attorney and ask questions?

2  A.  Not necessarily.  I think I wasn't dealing directly with

3  the attorneys, but I was dealing with Bree.

4  Q.  She's in California?

5  A.  She's in California, and she -- we were, you know -- this

6  is all very last minute, and that the attorneys, you know,

7  asked me to go ahead and serve it, and go ahead and serve the

8  managers if I wasn't able to get them individually.

9  Q.  And in regard to any question about what you were doing,

10 do you ever raise questions that you might be issuing a

11 subpoena that violates the local rules of the Federal

12 District Court or the state court?

13 A.  Well, I didn't think this did.

14 Q.  You don't know --

15 A.  Because it has the 14th -- no, I don't know.

16 Q.  You don't know the court rules, that you have to give 14

17 days in advance of trial?

18 A.  Yeah, I know there is dates -- there is limits.  There's

19 so many days before trial and stuff you can serve papers.

20 But, you know, they asked me to do this, and so I did it.

21 Q.  How much do you get paid for doing that?

22 A.  Well, every job is different.

23 Q.  How much did they pay you?

24 A.  They paid me $95 per job.  That's what I charge.

25           THE COURT:  95 per subpoena or --

Donaldson, C. - Redirect                                                857

```
1              THE WITNESS:  Per subpoena.
2              MR. McGAVIN:  Thank you.  Nothing further, Your
3    Honor.
4              THE COURT:  I have a question.
5                       REDIRECT EXAMINATION
6    BY THE COURT:
7    Q.  Do you have Deajah Clark, have you done the proof of
8    service?  Do you have that ready?
9    A.  No.  They haven't sent that to me yet for some reason.
10   Q.  Who hasn't sent it to you?
11   A.  Bree from the BFRM Legal Support Services.
12   Q.  Did you serve it?
13   A.  Yes.
14   Q.  Did you sign it?
15   A.  I haven't signed the actual proof of service for that
16   subpoena, no.
17   Q.  Why?
18   A.  Because it hasn't been requested.  This has all been like
19   very rushed and last minute.
20   Q.  What day did you serve the subpoena on -- Mr. Haysbert
21   has come up to the podium again.  You don't come up to the
22   podium unless it's time to address the Court, and that is in
23   our rules.
24              You mentioned you had gotten confused because you
25   served another subpoena to Deajah Clark, a manager, and her
```

Donaldson, C. - Redirect                                          858

1    manager at Outback Steakhouse.

2    A.  It wasn't Outback.  It was Roadhouse.

3    Q.  Excuse me.  Roadhouse.  When did you do that?

4    A.  Friday.

5    Q.  So on Friday you also served a subpoena to Deajah Clark?

6    A.  Yes, ma'am.

7    Q.  When did that command her to be here?

8    A.  I believe it was the exact same thing, the 11th and the

9    14th, and they told me that she was in court as well, the

10   manager.

11   Q.  We will look into that.  But you need to get the process

12   and signed and with this court.

13   A.  Okay.  I'll hand deliver it, if you want me to.

14   Q.  Yes, we do, because there are a number of questions about

15   appearance of witnesses and why they came.  So, consequently,

16   yes.  What other subpoenas did you serve in this case?  The

17   proof of services need to be filed with the Court forthwith.

18   A.  I will hand deliver the one for --

19   Q.  I'm asking which ones you served.

20   A.  I'm looking.  Norman Chase.

21   Q.  Norman who?

22   A.  Chase.

23   Q.  What date did you serve that?

24   A.  I served him on August 8th.

25   Q.  Is that all that you served of this case?

Donaldson, C. - Recross                                          859

1    A.  Yes.

2    Q.  Well, those proofs of service you may e-mail or contact

3    Bree --

4    A.  I have the original for Mr. Chase as well.

5            THE COURT:  Then that will be Court Exhibit Number

6    3.

7            (Court Exhibit 3 received in evidence.)

8    BY THE COURT:

9    Q.  So you've got them all there except for Deajah Clark?

10   A.  Yes, ma'am.

11   Q.  Well, you need to get in contact with Bree, or whoever

12   sends these and processes them, and tell them to get it to

13   you forthwith because we need to look at this, and we may

14   have to pursue this further with Ms. Clark.  We will see.

15           Anything further for Ms. Donaldson?

16           MR. McGAVIN:  No.  Thank you, Your Honor.

17           MR. HAYSBERT:  Your Honor, I did have one follow-up

18   question for you, Ms. Donaldson.

19                   RECROSS-EXAMINATION

20   BY MR. HAYSBERT:

21   Q.  You indicated that you spoke to a manager at Outback

22   Steakhouse in Chesapeake where you served Alicia Eleftherion?

23   A.  Yes.

24   Q.  And she told you that Alicia was at court, correct?

25   A.  He, yes.

1    Q.   He told you that Alicia was at court?

2    A.   Uh-huh.

3    Q.   Then when you served the manager at the Outback

4    Steakhouse on Laskin Road for Marcus Wilson, did she tell you

5    that Marcus Wilson was at court?

6    A.   Well, it was a he, and this was later in the day, so he

7    wouldn't have been here.  Court could have been closed.

8    Q.   What did he tell you?

9    A.   He said he knew about the trial and that he would make

10   sure to get this to Mr. Wilson right away.

11   Q.   Did he say anything about thinking, believing that

12   Mr. Wilson was in court at the time?

13   A.   No.  Because it was after court closed.

14           THE COURT:  Asked and answered.  She's already said

15   the circumstances under which she served Mr. Wilson and the

16   manager.

17           MR. HAYSBERT:  Thank you very much.

18           THE COURT:  Or the manager for Mr. Wilson.

19           MR. HAYSBERT:  No further questions.

20           THE COURT:  Anything else, Mr. McGavin?

21           MR. McGAVIN:  No, Your Honor.

22           THE COURT:  Then, if you would give the three

23   completed processes.

24           THE WITNESS:  Okay.  Yeah.  You want me to hand

25   deliver the one?

1          THE COURT:  Yes.  You have given her the completed
2     process of service for Mr. Wilson, Ms. Eleftherion, and
3     Mr. Chase?
4          THE WITNESS:  Yes, ma'am.
5          THE COURT:  Yes, I would appreciate if you would
6     get the proof of service in for Deajah Clark.  If you would
7     contact whoever has it and whatever is going on and ask
8     that -- this is for Norman Chase.  Do you have the other two
9     already?
10          THE WITNESS:  Somebody took them.  I had them here.
11     No?  I put them back in here.  Yeah.
12          THE COURT:  She just handed up Norman Chase, and
13     now we have the proof of service for, I think Marcus Wilson
14     was the first one, we now have that; and Ms. Eleftherion is
15     the second, and we have that; and Mr. Chase was the third,
16     and we have that.  Deajah Clark will be hand-delivered to
17     the Court.
18          THE WITNESS:  Yes, ma'am.
19          THE COURT:  Then the Court, Ms. Donaldson, releases
20     you with the understanding that you will get Deajah Clark's
21     proof of service to the Court, and it would be appreciated
22     if it could get here today.
23          THE WITNESS:  Okay.
24          THE COURT:  Thank you.
25          (Witness excused.)

JODY A. STEWART, Official Court Reporter

1          THE COURT:  The Court had the clerk contact

2   Mr. Eleftherion and have her here today, and if you would

3   please go get her from the witness room.

4          Ms. Eleftherion, you are still under oath, and if

5   you will get on the witness stand.  The Court has some

6   questions for you.

7          ALICIA ELEFTHERION, called by the Plaintiff, having

8   been first duly sworn, was examined and testified as

9   follows:

10                    DIRECT EXAMINATION

11  BY THE COURT:

12  Q.  The questions are limited strictly to what the Court

13  asks, and then the attorneys can ask you other questions.

14          You were contacted by Ms. Armstrong?

15  A.  Yes, ma'am.

16  Q.  And you have not spoken to the Court or any of the

17  attorneys?

18  A.  No, ma'am.

19  Q.  I wanted to ask you, why did you come for testimony on

20  Friday morning?

21  A.  On Friday morning?  I was subpoenaed to come to this

22  court.

23  Q.  When?  The records show that you weren't served until

24  1:55 p.m.

25  A.  I was served a subpoena -- I can't remember the date.

```
 1              THE COURT:  Please speak up.
 2              THE WITNESS:  Yes, ma'am.  I was served a subpoena,
 3    I don't recall the date, but it said to be in court Tuesday,
 4    the 9th, 10th and -- I'm sorry Wednesday the 9th, 10th and
 5    11th.  I have the original subpoena somewhere.  It said to
 6    be in court all those days.
 7    BY THE COURT:
 8    Q.  Did somebody serve it on you?
 9    A.  A few weeks ago, yes, ma'am.  It was Mid-Atlantic
10    Professional Services, I think was the name attached to the
11    check, and I was just trying to be in compliance with the
12    subpoena.
13    Q.  So you were served with a subpoena for your testimony by
14    Mid-Atlantic?
15    A.  I didn't know the lady's name who brought me papers, but
16    it just said, yes, ma'am -- the check said Mid-Atlantic
17    Professional Services.  And, yes, I did receive an additional
18    subpoena on Friday when I was already here in court.  It came
19    to the restaurant that I work at in Chesapeake, and that was
20    a subpoena for today.
21    Q.  So you received a subpoena before court, before the
22    trial, and it said to be here?
23    A.  Correct.  There was four dates -- four days listed on the
24    original subpoena, which were Tuesday, Wednesday, Thursday,
25    and Friday, it was listed on there.  Yes, ma'am.
```

Eleftherion, A. - Direct                                                        864

1   Q.  What days did you come to court?

2   A.  I came to court on Tuesday morning.  I arrived at 9:00

3   a.m. because the subpoena said to arrive at 9:00.  I did have

4   additional interactions after that because I wasn't sure

5   where to go, who to speak with, so I did contact that day

6   John McGavin just to ask, after I sat in Court out front for

7   a couple of hours, I went out to my car just to ask if I was

8   doing the right thing because I was unsure.  He let me know

9   at that time that they would not get to my testimony that

10  day, but he would try to let me know like what day I would be

11  needed.

12  Q.  So it was a subpoena from Mr. McGavin?

13  A.  I believe so, yes, ma'am.  I believe so.

14  Q.  So Mr. McGavin issued a subpoena for you, and you came

15  under his subpoena?

16  A.  I believe that is correct, yes, ma'am.

17  Q.  Was Mr. Haysbert on the subpoena?

18  A.  I'm trying to recall.  I don't think so, but, again, I

19  read through to make sure I was in the right place at the

20  right time.  I wasn't paying attention to which name was on

21  it.  I apologize.

22  Q.  Do you have the subpoena?

23  A.  It is back at the restaurant, I believe.

24  Q.  Well, you will need to get that to the Court.

25  A.  Yes, ma'am.  Yes, Your Honor.

1    Q.  So you were served by Mid-Atlantic.  At the moment we can

2    check with Mr. McGavin if that was his subpoena.  Then that's

3    why you came to court?

4    A.  On Tuesday, yes, Your Honor.

5    Q.  And then you were served again on Friday at 1:55 p.m.

6    after you were already at court?

7    A.  That is correct, yes, Your Honor.

8    Q.  So you wouldn't have gotten that subpoena until after you

9    had left court?

10   A.  That is correct.

11   Q.  Did Mr. Haysbert or anyone on his behalf contact you

12   about your testimony?

13   A.  No, Your Honor.

14           THE COURT:  Any questions, Mr. Haysbert?

15           MR. HAYSBERT:  No, Your Honor.  Thank you.

16           THE COURT:  Any questions, Mr. McGavin?

17                   CROSS-EXAMINATION

18   BY MR. McGAVIN:

19   Q.  Mrs. Eleftherion, do you recall that our office notified

20   you that we would be issuing a subpoena for you at

21   approximately a month prior to trial?

22   A.  Yes, I do recall.  I believe it was through e-mail.

23   Q.  Yes.

24           THE COURT:  You believe it was what?

25           THE WITNESS:  I believe it was through e-mail that

Eleftherion, A. - Cross                                                          866

```
 1    I saw the contact e-mail.  I believe I may have had a missed
 2    call, as well, but I was at work.
 3    BY MR. McGAVIN:
 4    Q.  In other words, when the case was continued in March, my
 5    office, my team, notified you of the new trial date; isn't
 6    that correct?
 7    A.  That is correct.
 8    Q.  Then my team notified you that you would be needed for
 9    trial; is that correct?
10    A.  Yes.
11    Q.  Then approximately a month or so in advance of trial, we
12    issued a subpoena and notified you that the subpoena was
13    coming and the case would be going forward?
14    A.  Yes.
15    Q.  Do you recall that?
16    A.  Yes, I do.
17    Q.  And then that subpoena was the first subpoena that you
18    received, was the one that we had requested, and we had told
19    you it was coming; isn't that true?
20    A.  Yes.
21    Q.  Thereafter, as the trial unfolded, isn't it correct that
22    I called you each day and each morning, couple of times a
23    day, to let you know the schedule and when you might be
24    needed under my subpoena, and if we were still going to need
25    you for trial?
```

1    A.  Yes.  I believe we spoke Monday, Tuesday and Wednesday,

2    yeah, that's right.  Yes, at least three or four days, yes.

3    Q.  And in that process, we kept you advised so that you

4    wouldn't waste time in court, and you could be available,

5    depending upon how things proceeded so that, understanding

6    that we don't go first on the defense, we go second, so we

7    had to slot you in as to when we might need you.  Did you

8    understand all of that?

9    A.  Yes.

10   Q.  And you actually met with me the Monday before trial to

11   prepare for trial, go over your testimony and understand the

12   logistics of what you could do in terms of a cell phone and

13   all those other things; isn't that right?

14   A.  Yes, I believe.  It was Tuesday, but yes.

15   Q.  Trial was scheduled to start on Tuesday.  Do you recall

16   we met at the hotel on the Monday before trial?

17   A.  Yeah.  I thought it was the previous week, but yes, it

18   has been a long week.

19   Q.  Right.  It was the previous week, you are correct, before

20   the August 1 pretrial?

21   A.  Yes.

22        MR. McGAVIN:  Thank you for correcting.

23        I have no further questions for Ms. Eleftherion.

24        THE COURT:  Is there anything further from

25   Ms. Eleftherion?

1        MR. HAYSBERT:  No.  Thank you so much for that.  I
2   appreciate it.
3        THE COURT:  All right.  You're excused for now,
4   again, subject to any call that you may receive from
5   Ms. Armstrong to re-appear.
6        THE WITNESS:  Yes, Your Honor.  Thank you.
7        (Witness excused.)
8        THE COURT:  Did you issue a subpoena for Deajah
9   Clark, Mr. McGavin?
10        MR. McGAVIN:  No, Your Honor.
11        THE COURT:  Then we need to get Ms. Clark here to
12   find out the circumstances under which she came to this
13   court, if she came voluntarily, what was said to her.  I
14   don't know why somebody would just voluntarily show up at
15   court if somebody hadn't talked to them and said something
16   to them about court if they don't get a subpoena until
17   Friday.  So I'm not going to take the representation.  We
18   are going to hear from her first.
19        She has a process that tells her to be here.  So
20   someone should -- when we take a break, she'll be contacted
21   by the Court, because there apparently is a subpoena for her
22   that told her to be here on the 9th and the 14th.
23        MR. HAYSBERT:  Your Honor, I would like to speak to
24   this, if you don't mind.
25        THE COURT:  No, not until we get Ms. Clark in here.

```
 1    I want to know why she was here.  I want to know if there
 2    was anything.  I'm worried about the reputation of the
 3    court, and if representations are being made, because, as I
 4    said before, the Judge's name and the court are on a
 5    subpoena, and a layperson sees that, and they associate that
 6    with the court and the Judge.
 7            As you admitted earlier, lay people don't
 8    understand the process.  I am concerned if she was told she
 9    had to be here.  She certainly wasn't an eager witness.
10    Anyone could have observed her.  You had me recognize her on
11    behalf of the Court, and I thought I was recognizing people
12    who had subpoenas that were scheduled to be here.  You asked
13    me to recognize her, and I did.
14            I didn't have any idea that people were sitting
15    back here this whole time because, again, it's a reflection
16    on the court.  It's a public perception, a public perception
17    that the Court simply doesn't respect people's time, they
18    have them sitting in rooms for days.  I didn't know they
19    were here.  I didn't know these people were here.  I had not
20    recognized Ms. Eleftherion, to my recall.
21            So I had not recognized her, and I did recognize
22    Deajah Clark, and apparently she hadn't been served, so I
23    want to know why she came.  Did somebody tell her she had to
24    be here?  Was it made clear to her that it was voluntary
25    outside of a subpoena, and then a subpoena gets served on
```

1    Friday?  I've asked Mr. McGavin.  He didn't serve her a
2    subpoena because that might have cleared it up.  In any
3    event, we need to get in touch with Ms. Clark, and I would
4    like to see a copy of what you have that you sent to be
5    served to her because that will give a location for her.
6            MR. HAYSBERT:  Sure, Your Honor.  Initially, we
7    couldn't find her because we thought she was still working
8    for Outback.  I brought this to the attention of the Court
9    at final status conference, that we were still looking for
10   her, and if we couldn't find her, we would need to utilize
11   the affidavit, and we provided the evidence on that.  We
12   were able to finally find her, and we served her with a
13   subpoena.
14           THE COURT:  Wait just a minute.  You didn't serve
15   her with a subpoena until Friday.  She's already testified.
16           MR. HAYSBERT:  No, we served her twice with a
17   subpoena.
18           THE COURT:  Where are they?
19           MR. HAYSBERT:  There were two different subpoenas
20   served for Deajah Clark.  The first subpoena only covered
21   through Thursday.  Because she had not testified by
22   Thursday, she told me, in order for me to, you know, not get
23   in trouble at Texas Roadhouse, you need to serve another
24   subpoena for me so that I'm able to appear in court an
25   additional time.  Doesn't matter that you recognized her.

1  She had to deal with her bosses at her place of employment,

2  so we served another subpoena for her at Texas Roadhouse.

3          THE COURT:  Where is the first one that was served?

4          MR. HAYSBERT:  The first one should be with BFRM

5  Legal.  I can provide service for that.

6          THE COURT:  Yes, you are going to have to.

7          MR. HAYSBERT:  Sure.  We finally found her, so I'm

8  happy to provide that.

9          THE COURT:  That's fine.  If she was under

10 subpoena, and I recognized her, I don't have a problem with

11 that.

12         MR. HAYSBERT:  Yes.

13         THE COURT:  But I need to know that she was under

14 subpoena.

15         MR. HAYSBERT:  She was definitely under subpoena,

16 and I'll provide the service to Your Honor.

17         THE COURT:  Who served her?  Do you know?

18         MR. HAYSBERT:  You know, Ms. Donaldson talked about

19 serving her once.

20         THE COURT:  She said she served her Friday.

21         MR. HAYSBERT:  Right.  So then she served her the

22 additional subpoena that was sent out so that she wouldn't

23 get in trouble at work.  There was a person who served her

24 initially with the initial subpoena, which required her

25 presence, and she was here under subpoena starting for

1    Tuesday, Wednesday and Thursday.  So I don't know who

2    specifically did it.  I sent everything to BFRM, and my

3    process server, and they send it out and sub-serve through

4    someone like Ms. Donaldson, just an independent contractor.

5    So what I will do is I will find out from them.  I believe I

6    have the proof of service who actually served it.  I'll

7    provide that to the Court.

8              THE COURT:  I just didn't catch your last word.

9              MR. HAYSBERT:  I can provide that to the Court,

10   yes.

11             THE COURT:  You have it now?

12             MR. HAYSBERT:  I do -- I should have it in my

13   inbox.  If I go to my car, I have a Wi-Fi printer set up

14   right there in the trunk.

15             THE COURT:  On the first break, we are not going to

16   do the prior thing again because each time we have done it,

17   it's been an extremely long time.  But if you've got a proof

18   of service for her, it needs to get here, and if you don't

19   have it, it needs to get here today.

20             MR. HAYSBERT:  I will make sure it gets done, Your

21   Honor, and thank you very much.

22             THE COURT:  I have one more question for you,

23   Mr. Haysbert.

24             MR. HAYSBERT:  Yes, Your Honor.

25             THE COURT:  Can you clarify for the Court how you

1    knew Mr. Wilson had been served on Friday because he was not

2    served until 5:25, and we were in court at that time.  You

3    represented something about his service at that time, and so

4    I don't understand why you made that representation, but

5    perhaps you can enlighten the Court.

6              Because, as I recall, and as times that are before

7    the Court, Mr. Wilson was not served until 5:25 p.m., and

8    the jury was here until after 6:00 or around 6:00 or so, and

9    then we took -- then the Court asked you some questions, and

10    then we took the break for you to go and get whatever you

11    got.  We didn't get out of here until sometime after 7:30.

12              You made that representation to the Court before

13    any break, before you went on your search for the subpoenas.

14    So what was the basis for that?

15              MR. HAYSBERT:  Well, three things.  Number one, I

16    deposed Mr. Wilson.  Number two --

17              THE COURT:  You deposed Mr. Wilson.

18              MR. HAYSBERT:  Sure.

19              THE COURT:  Deposing him has nothing to do with the

20    subpoena being served for court.  So that's not an

21    acceptable reason.

22              MR. HAYSBERT:  It's relevant because I actually

23    know what he looks like, and I thought I saw him that day at

24    court.

25              THE COURT:  You thought you saw Mr. Wilson at court

JODY A. STEWART, Official Court Reporter

1   that day?

2           MR. HAYSBERT:  That's correct.

3           THE COURT:  Where?

4           MR. HAYSBERT:  Here.  That's why I called him.

5           THE COURT:  No.  You called him earlier in the day.

6   Assuming that's correct, you thought you saw Mr. Wilson, you

7   called him earlier in the day.  He wasn't here.

8           MR. HAYSBERT:  I don't know why he wasn't here.  He

9   had been there early in the day because I saw him.

10          THE COURT:  I'm not getting into that

11  representation because you called, you went out and looked,

12  and you said he wasn't here.  That's not my question.  That

13  you took the deposition of him and that you thought you saw

14  him earlier in the day, you called him, he didn't appear.

15  What I'm asking you about is the timing of this.

16          We specifically have proof now that he was served

17  at 5:25 p.m.  You were here in court, and before you went

18  out looking for these subpoenas, and took almost I think

19  about an hour, more than an hour, I don't know, I haven't

20  gone back and looked at the timing, but we were here for a

21  long time.  The Court finally came back in, and we all just

22  sat and ended up not getting out of here until sometime

23  probably close to 8:00 or well after 7:30.

24          What I want to know is you made a representation to

25  the Court, after the jury had been excused for the evening,

1    and we were trying to get straight all of these matters, you

2    said that he'd been served.  I'm trying to find out from you

3    why you made that representation to the Court because you

4    had no proof of service.  Deposition is not service for

5    trial.  Thinking you see somebody in the hall is not service

6    for trial.

7              What were your grounds?  Did you have a subpoena?

8    You knew you had put something out.  What were your grounds

9    for saying that a subpoena -- I mean, how did you know?  Do

10   you have a computer in here or a phone in here or something?

11   How did you know?  What was the basis for that statement at

12   that point in time?

13             MR. HAYSBERT:  Your Honor, I believe I seen him

14   here, and I know that I asked for him to serve the subpoena

15   before noon.  So I thought that that was Mr. Wilson, and

16   Mr. Wilson would be coming in to testify.

17             THE COURT:  You said to the Court Mr. Wilson wasn't

18   here.  Please answer a question.  I'm asking you a direct

19   question.  What was your basis for saying to the Court that

20   he had been served with a subpoena?  Did you have any proof

21   of service?  Did you have anything back showing he had been

22   served?

23             MR. HAYSBERT:  Your Honor, I sent out a subpoena in

24   the morning to him and requesting that BFRM serve him before

25   noon.  So I had a reasonable basis to believe that he had

```
 1   been served.  In addition to that, I saw him here, or

 2   believe that I saw him here, and that's why I called him to

 3   the stand.

 4            THE COURT:  All right.

 5            MR. HAYSBERT:  Thank you, Your Honor.

 6            THE COURT:  Do you have anything further to present

 7   on your motion other than argument, Mr. McGavin?

 8            MR. McGAVIN:  No, Your Honor.

 9            THE COURT:  Do you have anything further,

10   Mr. Haysbert, to present on your motion other than argument?

11            MR. HAYSBERT:  No, Your Honor.

12            THE COURT:  Argument, Mr. McGavin.

13            MR. McGAVIN:  Your Honor, there is a process here

14   for orderly dealing with our citizens and opposing counsel.

15   It requires planning and preparation, and in particular this

16   Court demands it and expects it.  This case has been

17   absolutely, from day one through this trial, marked by these

18   type of tactics.  This subpoena to Marcus Wilson

19   demonstrates the worst of last-minute requests that are

20   consistent with everything else that has happened in this

21   case, and perhaps I'm arguing one of the other motions.

22            THE COURT:  Ultimately probably a lot of it's going

23   to be tied up together.

24            MR. McGAVIN:  It's difficult to separate it, and we

25   dealt with the Nick Seifert subpoena.
```

1          THE COURT:  Excuse me for a minute.  I would agree

2    with that.  I would tell you over the weekend, for which I

3    and my chambers worked, as I assume the court reporter did,

4    too, there are many, many moving parts, and it is very

5    difficult to piece them together.  This is just another

6    example, in the Court's mind, of untimeliness and not

7    following the rules.  You can argue, and Mr. Haysbert can

8    respond, and at some point we will try to put together all

9    these moving parts.

10          MR. McGAVIN:  One of the reasons I believe that

11   these rules are in place is not only can the citizens

12   prepare for it, but opposing counsel can be adequately

13   prepared for the issues that will be presented, and then, of

14   course, there's the Court and the Court's team, including

15   the people that assist the Court in reviewing the case law,

16   because in so many ways this is such a simple,

17   run-of-the-mill case.  It's a slip and fall case.  It's a

18   two-day case.  We couldn't even get a jury picked until the

19   end of the second day because of all of this constellation

20   of constant difficulties complying with the rules.

21          So we are here.  We are trying to prepare, and we

22   get a subpoena for Nick Seifert.  Nick calls me at 10:30.  I

23   hadn't subpoenaed him.  I did not think he would be a

24   necessary witness for us.  I knew he had not been

25   subpoenaed.  I've contacted my witnesses, my people weeks in

1    advance.  They all have my cell number, and I get this phone

2    call from Nick that he's been served.  So now I've got to

3    stop trial preparation and get a motion to quash filed.

4           It's not as if I'm receiving correspondence or

5    indication from Mr. Haysbert, hey, I forgot to issue the

6    subpoena for Nick Seifert, are you calling him, have you

7    subpoenaed him, do you object if I issue it?  So I can

8    prepare at least and know this is coming.  None of that.  It

9    is surreptitious.  It's just done, and then we have to

10   respond.  The Court has to respond.

11          At some level, eventually the Court, as the

12   gatekeeper of this process, has to say no more.  Now, Your

13   Honor listened carefully, I believe, to the reasons why

14   plaintiff thought Mr. Seifert was necessary, and I had

15   informed him, the Court may require it, and so when the

16   Court ordered that he appear, I contacted him and said, be

17   here tomorrow 2:00.  We have agreed to that.  And then he

18   sat.  I had made an agreement and had to stand by it.

19          So what happened with Mr. Wilson is the same thing.

20   I didn't think his testimony was important, but knowing that

21   he might be needed to explain, as I discussed in opening

22   statement, there may be evidence, I'm not sure if it's going

23   to come in, but there may be evidence about a problem at the

24   front door.  That was Mr. Wilson's knowledge about this

25   case.  So I had him under subpoena.

1          But eventually, as the evidence developed, I

2     released him with no expectation that he would be served and

3     certainly not served on Friday.  I must say, Your Honor,

4     just on behalf of Mr. Wilson, Mr. Wilson has been

5     transferred from the Williamsburg Outback to a struggling

6     restaurant in Virginia Beach.  Friday he had made

7     arrangements and had been asked by the Virginia Beach

8     lifeguards to have a beach party for their annual event.

9     It's a great opportunity for him, and he had to be there no

10    later than 3:00.  And so knowing that he had that personal

11    commitment, which was critical to his opportunity to restart

12    this Virginia Beach restaurant, which was struggling, and

13    turns out it was very successful.  I heard from him on my

14    way home Friday evening.  I had no idea this was coming.

15         So we, as attorneys, have a tremendous amount of

16    power, and we pull those levers of power with the threat of

17    incarceration, and they bear the stamp of Your Honor and

18    this court as well as the good name of the attorney who

19    signs these things.

20         In this case, these subpoenas are signed only by

21    Mr. Haysbert.  He's a foreign attorney.  He has, in this

22    subpoena and the other subpoenas, demonstrated no respect

23    for our local rules, didn't come before the Court and say,

24    Mr. Wilson is a critical witness.  I'm requesting leave to

25    subpoena him.  All the things that you do upfront when

1   perhaps there is an oversight by your team or yourself, ways
2   that you can manage these things.  But it's upfront and
3   straightforward, and you accept responsibility if you've
4   made a mistake.  But here, even the simplest question that
5   Your Honor just asked about that subpoena, Mr. Haysbert said
6   there are three things.  He only listed one because he
7   thought he saw Mr. Wilson earlier, and then stood before the
8   Court at 6:00 and says, "I have served him."  And the Court
9   said, "Where's the paper?"  He said, "I'll have to go get
10  it, it's in my car."  An hour and a half later, my team,
11  Mr. Graham, were here, were sitting here, because it was a
12  representation about a subpoena that wasn't even served
13  until 5:25 at his work.  I knew where Mr. Wilson was.  He
14  was out on the beach at Virginia Beach with the lifeguards
15  promoting his store on a matter that was critically
16  important to him.
17          And I think this subpoena has kind of been
18  indicative of what had happened over the past five days.
19  Simply stated, Your Honor, it doesn't comply with the rules.
20  It should be quashed.  There is no exceptional circumstances
21  of good cause, why it wasn't issued, and there was a
22  representation made in this court that counsel knew -- I had
23  no idea that a subpoena had been issued or that he had been
24  served at 5:25.  I would have no way, although my phone was
25  certainly filled with messages when I finally left here

1   around 8:00.

2          THE COURT:  I think you did represent to the Court

3   that you talked to him earlier in the day and that he had

4   not been subpoenaed.

5          MR. McGAVIN:  That is correct, Your Honor.  I

6   released him.  I said your evidence, I don't believe, will

7   be helpful.  We have covered it with Nick Seifert and with

8   Alicia Eleftherion, and I was prepared, and I'm still

9   prepared to call Lisa Crosby to explain about the problem at

10  the front door.

11         So it was irrelevant and not pertinent, in my mind,

12  depending upon the Court's testimony, to keep him here.  So,

13  Your Honor, simply stated, just on its face, this subpoena

14  should be quashed, but more significantly, it needs to be

15  considered with the other motions before the Court.  Thank

16  you.

17         THE COURT:  Mr. Haysbert.

18         MR. HAYSBERT:  Thank you, Your Honor.  I would

19  first want to apologize to you, as well as outside, on

20  Friday gathering the materials.  I understood that you had a

21  family obligation that you were missing, and I do deeply

22  respect you and the family that you have.  I'm sure did as

23  well.  So my apologies to you for taking up the time.  I

24  want to say just a few brief words in response to

25  Mr. McGavin.

882

1              I want to start with the fact that we are a part of

2    the bar, and we should work together to present a case to

3    the jury that they could see with respect.  I started with

4    the conversation with Mr. McGavin, very rarely wants to

5    speak to me, so that conversation happened through my local

6    counsel, Mr. McKelvey.

7              We were trying to get an agreement to have

8    Mr. Marcus Wilson show up for trial because he was such a

9    critical witness for us.  He had already subpoenaed him, and

10   he had subpoenaed him on days that we were going to call

11   him.  So would you be willing to allow this person to be

12   here?  When I saw Mr. Wilson, or thought I saw Mr. Wilson on

13   Friday, and he was here, there was no agreement, but because

14   he was here, he could be called, and so I called him, but he

15   didn't show up.

16             So I don't know what happened to him, and it may

17   have been because Mr. McGavin released him.  But either way,

18   we had a conversation, and this is not surreptitious.  We

19   have had him on our list, plaintiff witness for months.

20   He's known that we wanted to call Mr. Marcus Wilson.  He's

21   known why.  So there is no last-minute effort to, you know,

22   suddenly get a witness here.  I think what's happening is he

23   understands, Mr. McGavin, how critical this witness is, and

24   is willing to release him in the face of our attempts to

25   reach an agreement to have him here.

JODY A. STEWART, Official Court Reporter

1            So in an abundance of caution, a subpoena was

2    served under the federal rules.  The federal rules don't

3    speak to the time period in which to return a subpoena.  The

4    local rules do.  The local rules don't say, if you serve a

5    subpoena within the 14-day period, that you lose your *pro*

6    *hac vice* or you lose your bar license or you can no longer

7    operate as a lawyer in this courtroom.

8            What it says is the Judge has the authority, you,

9    Your Honor, have the discretion, and ultimately that is all

10   that I can do.  I can only serve the subpoena, which is what

11   my option is, and it's up to you at that point whether or

12   not you are going to allow the subpoena to go forward or

13   not.  There is no violations of the local rules in that

14   sense.

15           THE COURT:  It does except as local Rule 45(e)

16   requires that except as otherwise ordered by the Court or

17   for good cause.

18           MR. HAYSBERT:  Understood.

19           THE COURT:  Subpoenas for attendance need to be

20   served 14 days in advance.  You never asked for any order of

21   the Court in advance.  You just went right ahead and did it,

22   and so the only thing you have to argue is good cause.

23           MR. HAYSBERT:  That is correct, Your Honor.

24           THE COURT:  I made no order.  It was not brought to

25   the Court's attention in advance.  It was just done.

1          MR. HAYSBERT:  Absolutely, Your Honor.  And it's up

2     to the Court's discretion how it wants to do it from there,

3     but I can tell you that we know he's a critical witness.  We

4     have known for years that he is.  We tried to reach an

5     agreement with Mr. McGavin and were unable to.  We saw him

6     in court.  He refused to come in.  We subpoenaed him, and

7     it's up to the Court from there what the Court wants to do,

8     but I will say this.

9          THE COURT:  I don't know that he refused to come in

10    or not.  I don't know anything about him other than he was

11    not under subpoena by you, and he did not come when called.

12    So I don't know anything.  That's as far as I can determine

13    at this point.

14          MR. HAYSBERT:  Understood.  I have one more thing.

15    Your Honor, we have -- the importance of Mr. Wilson comes

16    down to one thing, and that is a work order that he put in

17    before the plaintiff fell.  That work order goes to notice.

18    That work order goes to whether or not there was actually a

19    defect in the floor.  That work order is something that he

20    put in, and in his deposition he stated that he did.  He

21    recognized, he knows about it.  We tried to get that work

22    order in in a number of different ways.  One way is through

23    Marcus Wilson, but there are several other ways we can do

24    it.  We could just move it formally into evidence because of

25    what it is.  We could request that the Court decide that the

1  piece of evidence is important enough to do it without going

2  through a witness.  And we have tried to do that, but we

3  haven't been able to successfully.

4          So this was our last option.  We didn't necessarily

5  need him to bring in this piece of evidence.  But if he's

6  here, then we would like to bring in the piece of evidence

7  through him, especially if we are unable to do it another

8  route.  So that's where we stand, Your Honor.

9          It's within the Court's discretion how it wants to

10 do all of this, but we would ask Your Honor that if you do

11 not allow Marcus Wilson to come in, that you use that as

12 part of your basis for good cause to formally move into

13 admission the work order, and we will be happy to provide

14 you with a proffer of his deposition testimony to support

15 that.  Thank you very much.

16         THE COURT:  Anything else, Mr. McGavin?

17         MR. McGAVIN:  If he was the most important witness

18 for the plaintiff, I think he'd serve him six weeks in front

19 of trial, not the fourth day of trial, and that's the

20 problem, and that's the pattern in this case.  It should be

21 quashed.  It's so incredibly -- I don't know the right word.

22 I would call it -- it's like the idea that we would sit here

23 and wait for an hour and a half.  Everything is revolving

24 around what plaintiff's counsel wants to do, and everybody

25 else is at fault but him.  And at some level the Court has

1    to hold Mr. Haysbert and his local counsel responsible and

2    not pin this on the defense, because if it was the one

3    critical witness and piece of evidence, you might want to

4    issue that subpoena eight weeks in advance and then

5    designate the deposition sections that you wanted in advance

6    as well.  None of that was done.

7            THE COURT:  I understand.

8            MR. McGAVIN:  Thank you.

9            THE COURT:  First, this is my ruling.  I just want

10   to note that the Court has done everything it knows to do to

11   keep this case on track, starting with the hearing on August

12   1 where we took up pretty much a full day to try to bring

13   this case together and get it clear what was being

14   presented, the witnesses.  The Court did everything it could

15   to keep the case moving and to, frankly, help the plaintiff

16   along.

17           Then on August 8, we get here, and there are all of

18   these issues to work out again.  The Court spent that day

19   working them out.  The Court did not quash Mr. Seifert.  It

20   was represented he was a critical witness, and I gave the

21   one -- I should have quashed it, frankly, but I didn't,

22   because you represented it was a critical witness, and I

23   said, okay, I'm not going to, at the start of the case, I'll

24   go ahead and let Mr. Seifert testify.  But you have shown no

25   good cause for the delay on Mr. Wilson.

1          First of all, you say he's critical.  Well, if he's

2    so critical, and you were never able to reach an agreement

3    with opposing counsel, no opposing counsel has to agree to

4    produce a witness, and you didn't have an agreement, and you

5    knew you didn't have an agreement, and you said it's been

6    difficult to get agreement.

7          Okay.  This case was set on March 1.  The trial was

8    set to start on April 8th.  I've written this down without

9    Mr. McGavin even saying anything.  Then you said he's been

10   on the list for months.  Well, if he's so critical, and he's

11   been on the list for months, and you've had from March 1 to

12   August 8, there is no excuse.  There is just no cause,

13   particularly after we have gone through this before in the

14   case.  So we've gone through this before.  The Court has

15   constantly been trying to keep things on track.  I didn't

16   quash Mr. Seifert.  It was all the same issues, except now

17   you say, well, he's critical, but there are other ways.  You

18   did say that.  I don't know if there are other ways or not.

19   First you said he is just critical to our case.  Then you

20   say, well, there are other ways, and you never had an

21   agreement.  I don't know if you and Mr. McGavin are

22   discussing anything, from what I can tell.  We will get to

23   that later.

24          But *pro hac vice* counsel signs on, and you agreed

25   to abide by the federal rules and the local rules of this

1    Court, as does Mr. McKelvey, and he's a member of the bar of

2    this Court, and he knows the rule.  So if he was *pro hac*

3    *vice*, didn't know them, your responsibility was to consult

4    with Mr. McKelvey.  The federal rules and these local rules

5    are clear.

6         They say as follows:  Pursuant to Federal Rule

7    45(d)(3)(A)(i), "On timely motion, the Court for the

8    district where compliance is required must quash or modify

9    subpoena that:  Fails to allow a reasonable time to comply."

10   Local Rule 45(e) then requires that, "Except as otherwise

11   ordered by the Court or for good cause, 'subpoenas or

12   attendance of witnesses or hearings or trials in civil

13   actions shall be served not later than 14 days from the date

14   of the hearing of trial.'"

15        Mr. Wilson was served at the 11th hour.  If things

16   wouldn't have been so delayed, we should have been through

17   with trial on Friday.  But during trial, after basic

18   business hours at 5:25 p.m. on August 11, 2023, and there

19   has been no cause, certainly not good cause, shown for not

20   following these rules.  We had been through them before.

21   You had gotten the benefit of Mr. Seifert.  You knew the

22   rules.  You knew you didn't have an agreement.  You've known

23   this trial has been set since March 1, and, frankly, there

24   is no excuse whatsoever for not having served a timely

25   subpoena on Mr. Wilson.  If you could do it Friday, then you

1  could have done it earlier.  I just don't know.  But that's

2  not the Court's concern.

3          The Court's concern are these rules, and,

4  Mr. Haysbert, you are just as responsible for following

5  these rules as local counsel, and if you don't know and

6  understand the rules, I believe that Mr. McKelvey has been a

7  member of the bar of this Court since 2008.  So if he

8  doesn't know the rules by now, that would shock the Court.

9  You have to consult him, and he has to speak up when the

10 Court asks him.  I asked him repeatedly through this trial,

11 I don't know anything about it.  Friday night he said he

12 didn't know anything about it.

13         When you were out looking for it, he said the only

14 thing he heard was something around, he thought, 3:00, and

15 don't quote me exact time or whatever, but it was some time.

16 When I asked him what do you know about this, and he said he

17 just learned you've done it that afternoon.

18         So he's not being consulted, and he's local

19 counsel, and you're both responsible for following the

20 rules.  This rule had already been violated.  You'd already

21 been cautioned.  You've known about this trial for months.

22 Then you also said you had had him on a list for months.

23         Well, if he was that critical and you had him on a

24 list, follow the rules.  I find no good cause for this

25 subpoena having been served on Mr. Wilson at his place of

```
 1    work, through his manager, but let's just assume that's

 2    service, assume that in and of itself, is not timely, it's

 3    not timely, and it's in violation of the rules.  The federal

 4    rules leave it to the local courts, and the local courts set

 5    their lime limits, and this time limit is set, and if

 6    Mr. McKelvey has been practicing in this court for that many

 7    years, been a member of the bar of this court, he's

 8    responsible for knowing the rules.  I grant the motion to

 9    quash.

10            MR. HAYSBERT:  Thank you very much, Your Honor.

11            MR. McKELVEY:  Your Honor.

12            THE COURT:  Yes, sir.

13            MR. McKELVEY:  I believe Mr. Wilson is here.  Would

14    someone -- I mean, if you are looking to quash the subpoena,

15    is he released or how does the Court want to handle that?

16            THE COURT:  Mr. McGavin can tell him he is

17    released.  I've granted Mr. McGavin's motion.

18            MR. McKELVEY:  Understood.  I just wanted to --

19            THE COURT:  I think that's up to Mr. McGavin.

20            MR. McKELVEY:  Yes, ma'am.

21            THE COURT:  Did you get in touch with your

22    witnesses, Ms. Blake?

23            MR. McGAVIN:  You directed the question to

24    Ms. Blake, but I did notify Mr. Wilson that he would not be

25    needed today, as we were directed by the Court.
```

1          THE COURT:  Well, the subpoena is quashed.

2          MR. McGAVIN:  So if he's here, I would be quite

3    surprised.

4          THE COURT:  Why don't you go out and check and let

5    the Court know.

6          MR. McGAVIN:  Thank you.

7          THE COURT:  In any event, he is quashed.  I'm not

8    going to allow testimony under a subpoena at this late

9    juncture.

10          MR. McGAVIN:  We will check, Your Honor.  Could you

11    tell me which motion you are going to do next?

12          THE COURT:  We will take a recess.  You need to

13    contact your witnesses, I don't know if you have or not,

14    because it's already 12:30, and we've just gotten through

15    the first motion.  We are next going to take up the motion

16    to revoke Mr. Haysbert's *pro hac vice* status.

17          MR. McGAVIN:  Thank you, Your Honor.

18          THE COURT:  That's going to be the next motion that

19    we take up.

20          MR. McGAVIN:  Thank you.

21          THE COURT:  You can go ahead out while I go through

22    them, and then after that we are also going to look at a

23    mistrial, because I think a lot of the matters that are at

24    issue for the revoking the status also tied into the

25    mistrial, at least from the Court's standpoint, not just the

892

1    insurance issue, it's the overall looking at attorney's

2    conduct, looking at what's being proceeded in the court.  I

3    would ask you this, Mr. McKelvey.

4              If the Court revokes Mr. Haysbert's *pro hac vice*

5    status, are you prepared to take over the trial of this case

6    tomorrow in front of the jury?

7              MR. McKELVEY:  Yes, Your Honor.  By tomorrow -- I

8    will be prepared tomorrow.

9              THE COURT:  You will be prepared to take over this

10   case tomorrow?

11             MR. McKELVEY:  If the Court orders that, then, yes.

12             THE COURT:  Thank you.  That would be without any

13   consultation with Mr. Haysbert.  You understand that?  If he

14   is -- if his *pro hac vice* status is denied, he cannot

15   participate any further in this case.

16             MR. McKELVEY:  Understood, Your Honor.  Just to

17   clarify, I would be able to talk to him not in court but

18   just in general and be sure I have the required information.

19             THE COURT:  You should already have it.

20             MR. McKELVEY:  I mean just pointing it out to me

21   and that type of thing, like where it is in the documents, I

22   mean, what notebook, et cetera, that type of thing.

23             THE COURT:  All right.  The Court stands in recess

24   for 15 minutes.

25             (Recess from 12:35 p.m. to 12:55 p.m.)

1          THE COURT:  Mr. McGavin, it's your motion regarding

2     the *pro hac vice* status, subject to revocation.  You can

3     proceed to argue your motion.  I have read your memorandum.

4     You put some caveats in there, and I remember telling you on

5     Friday that I knew it was a lot to get together, and so you

6     could add orally to the motion.  The main thing was that

7     Mr. Haysbert had a chance to respond.  The Court may have

8     additional reasons that it will give Mr. Haysbert to

9     respond.

10          MR. McGAVIN:  Thank you, Your Honor.  It is

11     difficult to try to describe the last two weeks of this

12     case, and it's been suggested by Mr. Haysbert that

13     discussions with counsel, meaning me, have been hard, but

14     I've tried to avoid those, to deal strictly in writing to

15     avoid any misunderstanding.

16          So what happens I think out of the courtroom is a

17     little bit like my first grade cafeteria where we had a

18     cafeteria monitor.  When the monitor is not there, you know,

19     stuff happens, and it's sort of water under the bridge, so

20     to speak, in my mind.  But the way this trial has proceeded,

21     and the imposition upon witnesses and the Court and the

22     conduct does not comply with what's required by the local

23     rules.  There are numerous examples, as we have gone

24     through.

25          So we start on the pretrial on August 1 where

1    counsel did not have exhibits and was clearly not prepared

2    to go through what it was required.  So I gave the Court my

3    book of exhibits, which I'm happy to do, and would share.

4    But in order to make the pretrial meaningful, we had to do

5    that, and which is fine.  We created another book.  But the

6    problem was, based upon the rulings of the Court, we needed

7    to know what was being changed and withdrawn, in particular

8    regarding an animation and a PowerPoint, as well as other

9    exhibits which were still pending.  So the Court had ordered

10   that to be produced.

11           I thought it was to be produced within 24, maybe it

12   was 48 hours, but certainly before the day of trial.  So

13   when I came down Sunday to be ready to go on Tuesday, and we

14   didn't receive anything, and came to court on Tuesday, I had

15   received a message from my staff at about 7:30 in the

16   morning that a box with two binders had arrived at my

17   office, and that was my pretrial list.  That was the

18   animation which, to my knowledge, I don't believe we ever

19   received, and the PowerPoint, which was amended and changed.

20           So that led to the whole inquiry, which took a good

21   part of the day on Tuesday about how did you send it?  And

22   so discovered that it was scheduled to be sent or presented

23   to the FedEx on Saturday, and the FedEx tracking documents

24   clearly demonstrated it was scheduled for delivery in

25   Fairfax, 170 miles from here, on Tuesday morning,

1    notwithstanding the protestations from Mr. Haysbert.

2           So we had to adjust and scramble to get that done.

3    Things do happen in court that nobody expects, but the

4    difficulty was the representations of what had been done.

5    Every time it was, was this done?  What day?  Once the

6    documents started to be produced, it started to show a

7    record of things that were being represented.  It was

8    inconsistent with the documents.  So we continued with that

9    inquiry.

10          We came back on Tuesday for -- we also on that

11   Tuesday dealt with this motion that was received on Sunday

12   evening for remote testimony of Dr. Haider, which we first

13   heard about during the settlement conference that the Court

14   has ordered the Friday before the trial.  The motion was

15   filed Sunday evening, I believe.  The record will reflect.

16   Again, we, on Monday, we filed a brief in opposition the

17   Monday before the trial, addressing these matters

18   questioning where's the plane tickets?  Where's the witness

19   fee?  You can't possibly expect to bring four out-of-state

20   experts on a case of this nature and not pay these folks in

21   advance.

22          You just realistically, logistically, as an

23   experienced trial lawyer, if you are bringing experts from

24   out of state, you have to spend 75, $80,000, easily.  You

25   have to invest that.  I suspected that perhaps the funds had

1    not been paid or the flight arrangements made, which is why

2    we put that in our brief.

3            The Court went into great deal to question that

4    representation that the experts were coming, and imposed

5    requirements on an affidavit from the experts by 5:00 the

6    next day, which would have been Wednesday.  When we appeared

7    in court, we learned that Dr. Haider was withdrawn, which we

8    had prepared for her testimony.  She's withdrawn.  The two

9    other experts are withdrawn.

10           Now the plaintiff is relying only on Dr. Filler,

11   which plaintiffs -- parties can withdraw their experts, but

12   the key to it regarding the *pro hac* issue is representing to

13   the Court that these people are coming, I paid them, plane

14   tickets are issued, hotel arrangements are made.  They're

15   going to be here.  And when called to task on the

16   documentation, those questions are unanswered.

17           After 40 some years of practice, I don't think you

18   need 40 years of practice to know that to fly in experts

19   from California is going to cost a lot of money, or Houston,

20   or Florida.  None of that has been produced ever.  No

21   affidavits, just sorry, just kidding.  I wasn't -- they're

22   not coming.

23           THE COURT:  Also, part of the affidavit was to

24   state what contact you had had not only to arrange for

25   transportation but to be notified of appearance at trial.

1    So none of that is clear to the Court at this point.

2              MR. McGAVIN:  So then we get into the issue of the

3    subpoena to Nick Seifert.  We already discussed that, I

4    think in some detail.  Then there is the Marcus Wilson

5    subpoena, which led to the whole discussion on Friday

6    evening when we are all sitting here, a representation he

7    had been served, which obviously counsel had no direct

8    knowledge of that, I think it's clear from the suggestions

9    that we've heard.

10              Then we get into the Court's frustration and the

11   comments on the record asking counsel why?  Why is this

12   happening?  I don't understand why this is happening.  The

13   Court's comments repeatedly, essentially a warning to

14   counsel, that certain conduct defined in the rules of

15   courtroom decorum, maybe that's an antiquated term, I don't

16   know, but having been a law clerk for Oren Lewis in 1982,

17   his last law clerk, I think I learned pretty well during the

18   course of that year before his death, and having served as

19   the chairman of the magistrate selection committee for many

20   years, interviewing the candidates, or I've served one

21   term -- two terms, magistrate selection chair, as well as

22   being on that committee for almost 20 years, I know what's

23   required of this court, and it requires counsel shall at all

24   times conduct and demean themselves with dignity and

25   propriety.  And, quite simply, that does not mean constantly

1    interrupting the Court, talking over the Court.  Now we are

2    hearing what I would call an obligatory thank you to every

3    ruling, even if it's adverse, which could be construed a

4    particular way, if you wanted.

5           But the most telling were the outbursts in court,

6    slamming paper down, and yelling out at one point, "That's

7    objective evidence."

8           THE COURT:  It was also in front of the jury.

9           MR. McGAVIN:  That is correct, Your Honor.  In

10   front of the jury, so, basically, disrespecting the Court,

11   disrespecting the jury.  If the Court allows that -- there

12   is no apology that fixes that.  Mr. Haysbert can say thank

13   you, thank you, thank you now and be as polite as a choir

14   boy, but this is a serious issue.  It is a gatekeeping

15   function of the Court, and I would just note parenthetically

16   that in Virginia, Virginia State Bar has made it much more

17   difficult to obtain, in state court, *pro hac* admission.

18   This Court has a history of revoking licensure.  Senator

19   Morrissey was revoked long before the state bar revoked his

20   ability to practice.

21          So this Court has been in the forefront, I would

22   suggest, in demanding a particular level of conduct by

23   counsel.  It's an entire collection of difficulty for the

24   defendant to get a fair trial in many ways because it's a

25   bit of a show, and you're in a position where you can't

1    constantly object because then the jury thinks you are

2    hiding things.  But eventually, by Friday evening at 7:30,

3    facing travel home, and we are sitting and waiting for

4    something that once it appeared wasn't even complete and

5    wasn't what was represented, that's when I made this motion

6    to revoke the *pro hac*.

7            I admit that in the discussion and the battle in

8    trial sometimes anyone can become a little less dignified on

9    an occasion, but there is a pattern here, and there's a

10   pattern not only of the failure to follow appropriate

11   decorum, but there is a pattern of representations, which,

12   having it challenged, seeking the documentation, and it's

13   not what's represented repeatedly.

14           Then turning to local counsel and saying, what do

15   you know about this?  And having local counsel say, even on

16   one occasion, I'm sorry I wasn't really paying attention to

17   what was happening.  That did occur.  And essentially just

18   being a ticket to be in this court without active

19   involvement.  These documents are being signed only by

20   Mr. Haysbert, not by local counsel.

21           So simply stated, Your Honor, the privilege to

22   practice in the Eastern District of Virginia and in this

23   court is a high honor and a privilege, and it should not be

24   demeaned, and it doesn't get fixed by the end of starting

25   the next week by thanking the Court constantly and

1    apologizing.  It's too late.  We are talking about a serious

2    matter, serious to the clients for both sides, serious to

3    the jurors who have now been pulled away from their families

4    for all these days.

5          Am I going to court?  Am I not?  What arrangements

6    to make, as well as witnesses, expert witnesses for the

7    defense, Dr. Pugach.  All of those things are cascading to

8    impact this trial.  It is well within the Court's

9    discretion.  I'm sure there are pieces of this that I've

10   missed, but we've cited case law on it, which we rely upon,

11   but I'm certain Mr. McKelvey's indicated that he can try

12   this case, and the case probably will move a little quicker

13   and to the benefit, frankly, of both sides.

14         THE COURT:  But the problem with that is, the Court

15   can't explain to the jury.  Mr. McKelvey hasn't examined a

16   single witness.  He's only answered a few questions, to my

17   knowledge, in front of the jury, and they weren't very

18   definitive answers.

19         The plaintiff would be highly prejudiced if only

20   Mr. McKelvey went forward, and that would be the first thing

21   that would be raised, the very first thing.  Mr. McKelvey,

22   in my opinion, has not shown he is ready to try the case.

23   But even if he is, you've got to tell a jury, who only

24   Mr. Haysbert has examined every witness, only Mr. Haysbert

25   has been presenting evidence to the Court and to the jury,

1    and the Court would have to explain to the jury that

2    Mr. Haysbert is no longer in the case.

3           Now, that immediately is highly prejudicial.  So

4    there would have to be a new trial.  There would have to be.

5    You can't just remove him.  This was the time that the Court

6    thought was the whole case, and the Court has been made to

7    look like it doesn't represent properly, because I

8    specifically told them during voir dire, it was going to be

9    three to four days, because that's what I had been told.

10          So, consequently, the Court hasn't kept its word to

11   the jury in that regard.  I don't know who they may be upset

12   with, whether it be the court or the attorneys.  In any

13   event, you can't have an attorney appearing, lead counsel,

14   he refers to himself as lead counsel, and you can't have him

15   appearing as lead counsel.  The jury doesn't know he's *pro*

16   *hac vice*.  They don't understand *pro hac vice*.

17          Then he's suddenly gone?  It leaves the jury to

18   speculate on things that they shouldn't be speculating on.

19   So the problem is, if Mr. McKelvey is ready, that's great,

20   and if there is a mistrial, then he will have a time in

21   which to advise the Court that the plaintiff wants to go

22   forward with the case, and I'll set all that up if I grant

23   the motion.  But I'm just saying that I'm glad that he says

24   he's ready to go forward because that makes rescheduling

25   easier, but it has to be, in my opinion, before a new jury.

1    That would just waste more time, frankly, because that would

2    not survive an appeal that the lead attorney, the person who

3    has done everything, is all of a sudden not there, and how

4    do you explain it?  There's not something you can do a

5    curative instruction on.  I don't know how you'd explain it.

6           Maybe Mr. Haysbert or Mr. McKelvey can, and argue

7    to the Court that it certainly wouldn't be prejudicial, and

8    they won't argue that it's prejudicial.  But I think the

9    Appellate Court would find it so anyway, because I do, when

10   you have the presence of one attorney, and all of a sudden

11   they're not there.  You can't tell them the attorney is ill.

12   You can't misrepresent to the jury.  He is not ill.  He has

13   not had a family crisis.

14          There is just nothing truthfully to represent to

15   the jury whether he's been removed from the case.  Then

16   that's highly prejudicial.  But go ahead.  I'm glad Mr.

17   McKelvey says he is ready, then that means if there is a

18   mistrial, then he'll be ready to reset it and go forward

19   with another jury as quickly as possible.

20          MR. McGAVIN:  Your Honor, I understand the Court's

21   concerns, and on behalf of my clients, the expense

22   associated with this case has been extraordinary on what is

23   a pretty routine case in many respects.

24          THE COURT:  I couldn't agree with you more.  I

25   don't understand it either.  That's not my role to

1    understand the expenditures.  That's up to the parties.  You

2    have to defend it, and I understand the burden on you.  All

3    these experts, two jury consultants from California,

4    practicing attorney that's been sitting through the whole

5    case that's not admitted, technicians, three technicians

6    now.

7            So, I mean, I don't know what's causing all this

8    turmoil and expense, but that's not the Court's concern.

9    The Court's concern is the conduct of Mr. Haysbert and the

10   violations not only of the local rules but the federal

11   rules.  I will present those to him to respond to if it's

12   not done through what you say.  But there is not only

13   violations of local rules, there's violations of federal

14   rules, and the federal rules he should know.  As *pro hac*

15   *vice* attorney, he is charged with knowing those rules.

16           So, consequently, I know I probably can't include

17   everything, but I've gone through as best as I can, to

18   include incidences that he can respond to, as well as

19   everything that you've mentioned so far.  So you can

20   continue.

21           MR. McGAVIN:  Your Honor, I think I've covered --

22           THE COURT:  We haven't got through the insurance

23   issue yet, because I'm baffled why Mr. Haysbert did, number

24   one, after it was said three times, and then he went back

25   and asked the question to a lay witness, and then also, if I

1    recall, Mr. Chase, he asked the question, and the Court

2    warned him, and what happened?

3            MR. McGAVIN:  Goes to risk management.

4            THE COURT:  Everybody knows what risk management is

5    now.

6            MR. McGAVIN:  Of course, they do.

7            THE COURT:  That's been the whole issue.  Then

8    Mr. Chase.  He says, I give you my word, it's a proper

9    question, and it's not going to result.  Then there was an

10   objection, I sustained it, and we moved on.  It was brought

11   up again with Mr. Chase.  There is all this re-bringing up

12   things that have already been ruled upon or explained, and

13   that's of concern to the Court.  So let's go through that

14   testimony on insurance.

15           MR. McGAVIN:  Thank you, Your Honor.  The key to

16   the insurance piece, of course, is the long discovery battle

17   over seeking that.  So to be clear, the way Bloomin' Brands

18   operates is when a store, an Outback store has an incident,

19   an incident report is filled out, and it goes up to risk

20   management.  There was a claims person, known as Tristal

21   Hall, and Tristal Hall was tasked with the initial

22   investigation.

23           As I'm sure Mr. Haysbert knows, Tristal Hall

24   actually called the guests on May 25, 2018, according to

25   records.  The guest said she didn't want to talk, she was in

1    pain and sleeping, gave her information and says, "Call

2    back."  That is two days post-incident.  So claims, risk

3    management, Tristal Hall was involved in this matter by May

4    25, 2018, two days post-incident, and called the guest.  And

5    so we've known this whole involvement of Tristal Hall.  We

6    had motions to compel heard by Judge Miller.  He denied the

7    request.

8         Mr. Haysbert wanted to subpoena and depose Tristal

9    Hall about her involvement.  We objected, one of the many

10   objections, and motions heard by Judge Miller.  So the fact

11   that the process was in place.

12        THE COURT:  We can argue the mistrial motion

13   separately, but that's what I was referring to.  In other

14   words, there had been rulings on this by the Court.

15        MR. McGAVIN:  Yes.

16        THE COURT:  It was elicited, but then it was

17   re-elicited, and it was re-mentioned.  Anyway, that is part

18   and parcel in some ways of this *pro hac vice* motion.

19        MR. McGAVIN:  Yes, Your Honor, it is.  So I'm sure

20   there is things I've missed, but I think the overarching

21   piece of this is the way this trial has been conducted, not

22   only with the representations, the other things we've

23   mentioned, but the repeated and unrelenting disrespect to

24   the Court and talking over the Court, interrupting the

25   Court, let alone to counsel, but it sends a clear message to

1    the jury, and it does not comply with the local rules.

2          So I'm sure there are other things I've missed.

3    The Court has questions, I'll be happy to respond to any of

4    those other discrete issues or respond once the Court has a

5    chance to talk to Mr. Haysbert.

6          THE COURT:  Well, I'm going to let Mr. Haysbert

7    respond to what you've raised, and I will mention and give

8    each of you a chance to respond to other matters that are on

9    the Court's mind in terms of this motion, and then we will

10   proceed from there.

11         MR. McGAVIN:  Thank you, Your Honor.

12         MR. HAYSBERT:  Thank you, Your Honor.  So I wanted

13   to start back at the beginning of Mr. McGavin's argument.

14   He indicated that there were numerous misrepresentations

15   made to the Court and that one of them included pretrial

16   exhibits.  You know, in hindsight, I look back at that

17   moment, and I wonder if it would have been better not to

18   have sent the exhibits.

19         THE COURT:  What?

20         MR. HAYSBERT:  I wonder if it wouldn't have been

21   better not to send the exhibits through FedEx, because it's

22   caused all sorts of issues for us.  We never received

23   defendant's exhibits after the final status conference on

24   August 1st, any updated exhibits from them.

25         THE COURT:  Because their exhibits didn't change.

```
 1    You had it.  Their exhibits didn't change.  They had the
 2    notebooks.  You had the exhibits as of August 1.
 3              MR. HAYSBERT:  Of the prior year.
 4              THE COURT:  No, at the August 1 conference we had
 5    the exhibits.  Just go ahead.  The August 1 conference will
 6    speak for itself.
 7              MR. HAYSBERT:  So we never received a defense
 8    exhibit book.  We received one before the last trial, but
 9    that was a year ago.
10              THE COURT:  If exhibits haven't changed, and he was
11    there with his paper exhibits.  The courtroom deputy
12    contacted counsel and said you have to be at the August 1
13    conference with your exhibits that you're going to use at
14    trial in paper form.  You arrived, you did not have the
15    exhibits, and you said something about you hadn't been able
16    to get in with your computers.
17              Number one, you hadn't made a computer request as
18    required by our rules.  Number two, everybody was
19    specifically told that we were going to look at paper
20    exhibits.  The reason you look at paper exhibits, if you're
21    on a computer, you have to click to each page.  It's like
22    depositions, you show one page, but that doesn't mean that
23    there is not relevance before that or after that.
24              So, consequently, the Court, through the courtroom
25    deputy, told all counsel to bring their paper exhibits.  The
```

908

1    defendants brought theirs.  They didn't need to send you any

2    copy.  The reason you had to send copies is because you

3    hadn't brought them to the August 1 conference.

4            MR. HAYSBERT:  Thank you, Your Honor.  So I never

5    received any communication from the court deputy via e-mail

6    or phone call stating that I need to bring paper copies of

7    anything.  If I had received it, it would have been there

8    because I know that it was there before the first final

9    status conference.  So I never personally received it.  This

10   was an issue that came up at the final status conference.

11   It was a miscommunication between local counsel and I.  He

12   never provided me any information about it.

13           When I got to the Court with my electronics, I'm

14   assuming I can go in the same way I did before with the

15   electronics at the first final status conference, but was

16   told, no, you can only bring in paper.  He had not

17   previously told me, and the court reporter had never sent me

18   an e-mail or any communication about it.  So, yes, I was

19   receiving information at the last minute and was not aware

20   at all.  And the way that information came in, it didn't

21   come in over a filing, that I would have been charged with

22   receiving.  It was apparently sent through an e-mail to

23   Mr. McKelvey, but I never received it, so I didn't know

24   about that issue.  If I had known about it, Your Honor, I

25   would have been there with paper exhibits.

1            But when I submitted -- what I did first, we had a

2       settlement conference on Friday.  We updated the exhibits to

3       comport with the Court's rulings from August 1st, the final

4       status conference, and then I mailed it at the first

5       opportunity to Mr. McGavin via FedEx on August 5th.  That

6       representation has not changed.  I don't know why there was

7       something that came from -- I wasn't in Malibu.  I have no

8       idea.  My former trial tech was explaining something about

9       if you have a FedEx account, and they have to send something

10      from Malibu -- I didn't understand that.  I don't understand

11      why a FedEx package that I mailed out overnight on August

12      5th wouldn't get there until August 8th.

13            THE COURT:  But you represented to the Court that

14      that's where you saw it.  This is contrary to what I recall

15      you saying at the time, that, yes, it would have originated

16      in Malibu because that's who you use.  You did not go down

17      and get the FedEx, and it says on the FedEx receipts that it

18      starts in Malibu, California.  The FedEx receipts show it

19      starting in Malibu, California, and you represented you use

20      a service out there, and they prepared the label, and then

21      you tell them where to send it, and then you go.

22            But, in any event, the tracker says it started in

23      Malibu.  The receipt that you gave to the Court says FedEx

24      overnight, and it says August 8th delivery.  That's all I

25      can tell you.  So you can offer the reasons, but that's not

1    what the paperwork shows.  The paperwork shows an

2    origination in Malibu, California, and the paperwork shows

3    overnight delivery for August 8.

4           MR. HAYSBERT:  So, Your Honor, in response to that,

5    I can assure the Court, because I am here, I'm an officer of

6    the Court currently, I mailed the package myself via FedEx

7    in Virginia Beach directly to Mr. McGavin's office.  I never

8    sent anything or called anyone to do anything in Malibu.

9           THE COURT:  You didn't, but did somebody on your

10   behalf?

11          MR. HAYSBERT:  No.  I sent it myself.  I sent it

12   via FedEx myself on August 5th, and what I was told by the

13   person at the front desk --

14          THE COURT:  Where did the label originate?

15          MR. HAYSBERT:  The label originated in Virginia

16   Beach.

17          THE COURT:  It was requested from the service.  You

18   told the Court that you use a service in Malibu, and that

19   they would then take care of it from there, and then you go

20   pick up the label.  Maybe my takeaway is wrong, but whatever

21   you say the paperwork is there, and your own technician

22   explained how it got to Malibu, but it says Malibu.

23          MR. HAYSBERT:  I don't know why.

24          THE COURT:  The exhibits say "origination, Malibu."

25          MR. HAYSBERT:  I don't know why, Your Honor.

1   Seriously, that is something I cannot explain.  I can only

2   tell you what I know, and that is I mailed that FedEx

3   package from Virginia Beach at a FedEx store, and I could

4   bring the people in for you to depose tomorrow.

5           THE COURT:  No.  We have dragged this out so much.

6   It's my determination at this point, it's an accumulation of

7   things, and I can only go on the paperwork that has been

8   admitted without objection, presented by you, and we are not

9   going to start calling in people from FedEx stores.  The

10  paperwork submitted by you and what I heard, and I can go

11  back and look at it, is it started in Malibu.  So you can

12  stand there all you want.

13          MR. HAYSBERT:  I would never lie to the Court.

14          THE COURT:  I'm not saying you're lying.  All I'm

15  saying is on Friday night you say it's 6:05 in the morning,

16  but, oh, you made a mistake, it was really 9:00 a.m.  The

17  paperwork is what it is, and my decision will be what it is.

18          MR. HAYSBERT:  Okay.  So I'll move on, but, Your

19  Honor, just so that you are aware of what I did, I wanted to

20  make sure that it was clear that I mailed it FedEx myself in

21  Virginia Beach, had nothing to do with Malibu, don't know

22  anything about Malibu.

23          THE COURT:  You don't know anything about Malibu

24  and sending FedEx packages, is that what you're telling the

25  Court?

1          MR. HAYSBERT:  I'm telling you the truth.  I don't

2     know anything about why anything came from Malibu or was

3     sent to Malibu.  I never called anybody in Malibu.  No one

4     ever called me in Malibu.  I sent that FedEx package, and it

5     was a clean transaction.  I gave it to the front people.

6     They told me it would be there on the 7th.  I paid the $97

7     and some change, and I left the store.  That was it.

8          THE COURT:  Did your offices out in California, did

9     they call Malibu?

10          MR. HAYSBERT:  My office is not in Malibu.  It's in

11     Santa Monica.

12          THE COURT:  I know it's not in Malibu, but that

13     doesn't mean they couldn't contact Malibu.

14          MR. HAYSBERT:  There's nothing --

15          THE COURT:  The paperwork says it originated in

16     Malibu.  You claim the paperwork is wrong.  All right.

17          MR. HAYSBERT:  Your Honor, I can tell you where I

18     mailed it from.  I don't know anything else about Malibu,

19     but I mailed it from Virginia Beach, and that package should

20     have been there on Monday, August 7th.  Why it didn't get

21     there on time, and why Malibu is involved at all, I have no

22     idea.  But I can tell you without a shadow of a doubt that I

23     mailed that package on Saturday, August 5th, at 4:00 p.m.

24     myself and received a FedEx label myself, put it in the --

25     and the guy put it in the package for me and shipped it out.

1    That's what happened.

2          In terms of the remote testimony of Dr. Haider, as

3    I mentioned to the Court on -- at the final status

4    conference, I did not know that Dr. Haider would not be

5    showing up.  I told the Court then I had fully paid

6    Dr. Haider for her testimony at trial.  She had all the

7    payment that she needed to show up.  That was confirmed by

8    her office.

9          So Dr. Haider got in touch with me on, I believe it

10   was Friday, sometime around the settlement conference, and

11   said that she could not make it because her father was in

12   the hospital, or had been in the hospital and was released

13   on August 2nd.  So I tried to get her to come, and we had a

14   discussion about, you know, can -- I mean, what can we do to

15   make it possible for you to come?  Whatever I can do to make

16   it possible for you to come.

17         And, unfortunately, when the Court required all of

18   the medical information, all this other things, she couldn't

19   do it.  So the decision was made to release Dr. Haider from

20   the case.  In an abundance of respect for her father and the

21   situation that she was going through, I did not want her to

22   go through the whole, you know, put all of this in an

23   affidavit by 5:00 p.m. tomorrow, or I don't know what is

24   going to happen.  So I released her.  Dr. Haider, deal with

25   your father.  We will move on with the case, and that's what

1  happened.  There was no misrepresentation there at all.

2        With respect to the other, the two liability

3  experts, you're right, and you said this on the record

4  before, and Mr. McGavin confirmed it today, I do get to

5  decide what experts or who are my witnesses I want to come,

6  and I made the determination that those experts should not

7  come.  I don't know why they were required to have

8  affidavits, but there was no reason to provide affidavits

9  because I made the decision that they were not going to be

10  the most effective for my case, so I removed them from the

11  case and for no other reason.

12        Regarding the subpoenas to Nick Seifert and Marcus

13  Wilson, we had both of them on the plaintiff's witness list,

14  and we attempted, through an agreement, to get these people

15  here without having to proffer a subpoena to them.

16  Unfortunately, Mr. McGavin refused to agree to allow those

17  witnesses to be called in our case in chief, and he has that

18  right.  But then at that point it's up to me to decide what

19  to do next.

20        Now, I understand the local rules, and I understand

21  the federal rules.  There is a good cause element of those

22  rules.  The good cause element of those rules allow the

23  Court to decide on its own, in its own discretion, to allow

24  the person subpoenaed to come forward and take testimony of

25  that person or not.  It is up to the Court, but I shouldn't

915

1    be penalized, not for a technical violation of the rules,
2    but what I was trying to do is simply bring witnesses to the
3    Court, who are already in Virginia Beach, they live very
4    close by, they were already on the witness list, they were
5    on -- they were on Mr. McGavin's witness list.  They were
6    already on the subpoena.  They were subpoenaed all the way
7    through Friday.  For us, this wasn't -- this isn't like
8    bringing in Dr. Haider from Texas.  These folks are local.
9    There might be good cause to bring them in despite
10   everything that we didn't do.
11        THE COURT:  I ruled upon that in both cases.  I
12   granted you Mr. Seifert, and I made my ruling clear on
13   Mr. Wilson today and the fact that I did not find good cause
14   because it was a repetitive violation that you had been
15   warned about before, but go ahead.  I have already made my
16   rulings on those two.
17        MR. HAYSBERT:  Understood.  Your Honor, that is the
18   point.  You made your rulings on it, and it will lie there.
19   What I'm concerned about is that my very integrity and my
20   ability to practice is being called into question because of
21   a rule that you get to make and that you've made.  It's
22   already been made, and you have the option to do that.
23   That's what the rules are there for.  That's why they say --
24        THE COURT:  I have to make the rulings, I said over
25   and over to you.  He calls it the gatekeeper.  I seem to

JODY A. STEWART, Official Court Reporter

1   think of it as a referee.  You call balls and strikes, but

2   you have to do it under the rules, the applicable rules, the

3   federal rules, the local rules, and the law.  That's what

4   the Court is endeavoring to do.  So I have made my ruling

5   abundantly clear on both of those, and I stand by those two

6   rulings.

7           MR. HAYSBERT:  I stand by it as well, Your Honor.

8   That's where I believe it should lie.  I don't think that

9   that should be something that should bring my ability to

10  practice before the Court.

11          THE COURT:  Maybe it is not just one thing.  Maybe

12  it's the accumulation of all of these things, and the

13  cumulative effect where it just keeps happening and

14  happening and happening after you've been told.

15          MR. HAYSBERT:  I appreciate that, Your Honor.  I'm

16  endeavoring to go through one at a time so I can explain to

17  the Court.

18          THE COURT:  You can certainly, and then I'm going

19  to give you a two-page typed written list that I have, maybe

20  some of the things that you've already said.  Actually, it's

21  a little over two pages typewritten, just my brief, being

22  able to go back through my notes and the transcript, and

23  I'll let you respond to all of that.

24          MR. HAYSBERT:  Sure.  Okay.  Mr. McGavin mentioned

25  my overtaking the Court, interrupting the Court.  My sincere

1    apologies for that.  I'm endeavoring to do better about

2    that.  I believe the Court will see that I'm trying to do

3    that.  I know in the beginning, in an effort to be heard, I

4    was overzealous to try and represent my client, but, Your

5    Honor, under no circumstances was I trying to be devious or

6    deceptive or act without integrity or to intentionally

7    disrespect you, and that was never my intention.  So I would

8    hope that you understand that.  It was only an attempt to

9    be -- to zealously defend my client's rights and for no

10   other reason, that I may have interrupted Your Honor a

11   couple of times and said things that were not appropriate at

12   the time.

13           With respect to the outbursts in court, I

14   apologized to Your Honor then.  To explain my emotion, I

15   felt as if I were between a rock and a hard place with this

16   witness.  I was trying to simply get information into the

17   record the Court could use to make its determination

18   regarding a very important witness, Dr. Filler.

19           I was between objections, and all these sort of

20   things, and I just wanted him to get out his opinions, and

21   when he was finally able to do it, I was very happy, and

22   that was my expression and for no other reason.  So my

23   apologies for that outburst, but I was very happy about the

24   fact that I had been able to get through and get it out

25   because it was so difficult to do, in my opinion.

1            On disrespecting the Court and the jury, I've

2    spoken to the Court about disrespecting the Court.  I have

3    endeavored not to disrespect the jury.  I can understand one

4    would make the argument, well, because we have had delays,

5    and all these sorts of things, and because these witnesses

6    are being brought in, and that sort of thing, you know,

7    that's disrespect to the jury.  And if that's -- Your Honor,

8    if you believe that I'm the one who's delayed this trial,

9    and I'm the one who's done all that, then I apologize to the

10   jury for disrespect.  I meant no disrespect.  I'm simply

11   trying to defend the interest of my client.

12            On Friday there was an issue about the subpoenas

13   for Marcus Wilson and that being incomplete.  I had been

14   informed that the subpoenas were being served, and I believe

15   it had been served, because I saw Ms. Alicia Eleftherion,

16   she came to the witness stand.  I believe I saw Marcus

17   Wilson as well.  So I believe I made that point to the Court

18   earlier.  So I don't understand what the issue was with

19   Friday other than, again, my apologies to the Court for the

20   delay in getting the proof to service of any sort of proof.

21            Typically don't work that fast.  I have never

22   received typically a proof of service the same day that the

23   documents have been served because the person who is out in

24   the field is not the people I'm corresponding with at my

25   local office.  So they have to correspond with those people

1    in the field, and they won't have the ability to sign a

2    proof of service and do those things in a timely manner that

3    the Court wants.  But we were able to get the Court the

4    proof of service on Sunday before 3:00, and we filed that.

5             THE COURT:  Well, I haven't looked at it directly.

6    You may have said you believe they had been served, but the

7    issue is really the violation of the rules that we had

8    already been through before and the late service of the

9    subpoenas.  The real issue is violation of the local rule,

10   which ties onto the Federal Rule, and so, consequently, you

11   may have said believe, but then we had to sit here for

12   however long the record will reflect and wait while you

13   confirmed or did whatever you were doing.

14            So I'm just saying it left the impression with the

15   Court that they had been served, and that's what the Court

16   was concerned about.

17            MR. HAYSBERT:  Understood.  I'll end with that,

18   Your Honor, because I think the more significant issue here

19   is the subpoenas, from what I can see of what Mr. McGavin

20   said, and I want to be clear about this.  My understanding

21   of the rules is that you first start with the threshold

22   question as the attorney, do you believe you have good cause

23   to serve a subpoena within -- within the time strictures or

24   outside of the time strictures provided by the rules.  I

25   believe that there was good cause, Your Honor, and I

```
1   articulated good cause for both Alicia Eleftherion, for

2   Marcus Wilson, and for Nike Seifert.

3        That's where the analysis starts for me as the

4   attorney, looking at what has to be done.  My analysis was,

5   is there good cause for us to submit these subpoenas, and if

6   there is, we will put them in.  Ultimately, it's up to the

7   Court to decide whether there is good cause, and it's at

8   your discretion to decide that.  But, Your Honor, what I'm

9   saying is, in my position, I'm not deliberately attempting

10  to violate rules.  I see them.  I know they say 14 days.

11       THE COURT:  That's going to be up to the Court to

12  determine whether there has been deliberateness in violating

13  rules.  But I think we have gone through the subpoena issue,

14  and I've made my rulings on there.  I did not find good

15  cause, and I allowed you to have Mr. Seifert, but you still

16  knew the time limits.  The issue with the Court is the

17  timing of it and not having at least advised the Court when

18  you knew you had done that that morning, and you say 6:05

19  a.m. and now it's now 9:00 a.m., and all of that that we

20  went through.  Certainly, somebody knows the difference when

21  they are doing something at 6:00 in the morning and 9:00 in

22  the morning.  Be that as it may, the subpoenas are just one

23  thing.  They are not the only or the main.

24       MR. HAYSBERT:  Understood.  So the 6:00 and 9:00,

25  again, this is California time versus Eastern Standard Time,
```

1   so I apologize for the Court for not clearing that up.

2        THE COURT:  Again, you said you were confused?

3        MR. HAYSBERT:  I sent them at 9:00 even.

4        THE COURT:  When you were here, you were confused,

5   you said?

6        MR. HAYSBERT:  Yes.

7        THE COURT:  You had everything mixed up with timing

8   when you were here before the Court on Friday?

9        MR. HAYSBERT:  Correct.  Being under the gun like

10  that, yes, I made the representation that 6:00 a.m., and I

11  was confusing Eastern Standard Time versus Pacific Standard

12  Time.  So I sent them out at 9:00 Eastern Standard Time,

13  which is 6:00 a.m. Pacific Standard Time.

14       THE COURT:  You clarified it now, but you didn't

15  clarify it on the record then.  You clarified it when the

16  Court has made an issue of this and was determined to find

17  out the saga of the subpoenas that were being served all

18  day.  Three of them apparently were served on Friday, so,

19  anyway.

20       MR. HAYSBERT:  I have no issue with that, Your

21  Honor.  I was born to a woman much like you.  So I

22  understand that you want things done in a certain way, and

23  that you have your order, you want to get to the bottom of

24  things.  I have no problem with it because I know I haven't

25  done anything wrong.  I simply wanted to, for the subpoenas,

1    issue them because I believed there was good cause, and at

2    the end of the day the Court has made its rulings, and I

3    believe it should end there.

4            With respect to litigating in this court, Your

5    Honor, I'm honored to litigate in this court on behalf of

6    someone that I care deeply about.  I'm very honored.  I'm

7    from Virginia.  I was born here.  I was reared here, and I

8    deeply understand where I am.  I honor and respect where I

9    am.  I honor and respect you.  So if I've done -- whatever

10   the decision you decide to make, if I have done anything

11   that has been disrespectful towards you, the Court, the jury

12   or where we are, then I would like to apologize for that.

13           Thank you very much, Your Honor.  Do you have any

14   questions for me, I'm happy to take them now or however you

15   like.

16           THE COURT:  You can be seated, and I'll give you a

17   list of things that I have been able to determine through

18   the record, because I have concern over the cumulative

19   effect of these numerous violations of the local rules, the

20   federal rules, and the rulings of the Court, and I'm going

21   to just go through some of them briefly.  When I finish, you

22   can respond, and Mr. McGavin, if he wants to make any

23   response.

24           These are just examples that I've been able to come

25   up with through an examination of notes and some transcripts

1    over the weekend, as much as I could.  I would just note

2    that in a criminal case, I think I tried a major criminal

3    case, it was at least two weeks, only a thousand pages of

4    transcript, and already there is 6 or 700 pages here now.

5    So that tells you how much talking and delay that there has

6    been in this case, why a lot of those pages are with delay

7    and discussing all of these rulings.

8           These are the examples that the Court has.  You

9    attempted to get Dr. Haider's video demonstrative before the

10   jury through Dr. Filler, who did not prepare it and when you

11   knew there were outstanding objections by the defendants.

12          Now let me mention something about this animation.

13   Number one, the Court had not admitted it.  The Court had

14   taken it under advisement.  It was never admitted.  There

15   was no foundation put in for Dr. Filler.  Number one, I note

16   that both reports of Dr. Filler and Dr. Haider were dated

17   the exact same day, September 18, 2020.

18          Number two, there was nothing on the animation,

19   which I viewed, and nothing in the record to show the date

20   of that animation.  Could have been well prepared after the

21   reports because it was prepared as a demonstrative exhibit.

22   It was not part of her report.  It was prepared as a

23   demonstrative exhibit.  It had never been admitted, and

24   there had been no foundation laid of who made it and when

25   they made it.  So there was no foundation whatsoever,

924

1    regardless of it not being produced and it going back and

2    forth.  The Court was concerned with you trying to get in

3    that particular demonstrative through Dr. Filler that had no

4    foundation on the record whatsoever.  He had only in his

5    report said that Dr. Haider was a referring physician and

6    the indicative part of it, but there is no reference to any

7    brain animation, and both reports are filed on the same day,

8    and nobody knows who made that brain animation.  I can only

9    assume, but I haven't heard from her, was Dr. Haider.

10   Nobody knows when it was made, whether it was even made

11   after his report.

12        So there was no way that the Court could let that

13   in without having proffers through Dr. Haider that she had

14   made it, when she had made it, had she shared it.  There was

15   just no foundation there, and it had not been admitted, and

16   you were trying to get it in.  That's when the doctor said,

17   well, I didn't do that.

18        Now, I don't know if he went further to say he

19   hadn't seen it, but I don't think there is anything in the

20   record that indicates that he did see it.  But whatever it

21   was, there was no foundation, nothing to admit that, and you

22   were trying to get it in.  Now, that is just sneaky.  That's

23   what it is.

24        Then what happens is you have Dr. Filler's

25   demonstrative, there was an objection to that, and you were

1    specifically told to get all of the references to his court

2    appearances and his witnesses out of there and have it to at

3    least to the Court and to counsel by Friday.  I believe

4    that's in the transcript, and that was not done.

5            Then when you showed it, I noticed something else.

6    Everybody was quickly going through it, and the

7    demonstrative will show only the lines on the page were

8    deleted.  The title was not.  I'd have to pull it out, but

9    you know, times appeared in court and so forth.  It was just

10   being run through very quickly.  But the headers were not

11   taken off of those pages.  The pages were not eliminated.

12           I never got a good explanation of why it hadn't

13   been done, and even your computer person said, and I know

14   enough about PDF documents to know that you can eliminate

15   pages like that.  So no explanation was ever given to the

16   Court about why it wasn't produced in advance.  It was run

17   through very, very quickly, and I could see the headers.  I

18   went back and looked at it, and it has the headers, and that

19   will show in the record.  I noted it had been prepared for

20   deposition, and the Court ordered that update.  It simply

21   was not properly redacted according to the Court's

22   instructions.  Then again the issue with the animation.

23           Another example is you tried to, allegedly, impeach

24   a witness with a work order, which the Court had reserved

25   ruling on, even though the seemingly real purpose was for

1    the work order to prove negligence, culpable conduct, or a

2    defect.  I know that that's an issue before the Court, but

3    you should have brought that up to the Court before you did

4    that.  You should have brought it up to the Court, and that

5    was not an admitted exhibit.

6         Then you say publish it to the jury.  Then you

7    proceed to explain to the Court.  I've got that somewhere

8    here, and I'll come back to it if I don't, that the Court

9    had to let it in, and that's not what the rule says.  It's

10   up to the Court whether to let it in.  You left out that

11   second paragraph of the rule, the one I read into the

12   record.  I'm not going to read the rule now to take up time,

13   but it's not required.  The implication was the Court was

14   violating the federal rules because you only cited the part

15   that you liked.  You didn't go on to cite the rest of the

16   rule.

17        I had to walk you through on multiple occasions

18   about adverse witnesses and laying a proper foundation.

19   After I went through it the first time with you, you then

20   did it two more times.  You announced in front of the jury,

21   when Mr. Seifert came in, I, referring to yourself, I'm

22   declaring him an adverse witness, something to that effect.

23   You did the same thing with Mr. Chase, something about it

24   was your pronouncement -- I don't have the exact words --

25   that they were adverse witnesses.  We had previously gone

1    through all of this with Ms. Eleftherion, that there is no
2    adverse witness rule, and if a witness turns hostile, what
3    you do is you have a sidebar with the Court, or you say
4    there is a matter you need to take up with the Court.  Then
5    you say that the witness has turned hostile, and you get the
6    Court's permission to go into a cross-examination mode, and
7    I told you that specifically.  Then what did you do?  On two
8    witnesses you then announce in front of the jury, after we
9    had gone through that.  So three times I had to go through
10   the adverse witness procedure with you, and after I had
11   thoroughly gone through it with you, and I could overlook
12   the first time, even though they are the federal rules, and
13   they're not local rules, I had to go through it two more
14   times, and you said it in front of the jury.

15           You never laid a proper foundation for them being
16   adverse, and as I noted for Ms. Eleftherion, she never
17   turned adverse.  You announce in the beginning that that's
18   what she is, but she never really turned adverse.  The point
19   is not her but that I had gone through it twice; once with
20   you, and then you did it twice more, as if you were just
21   ignoring the Court.  I can't cite every time, but there are
22   so many times that the Court made a ruling, and you just
23   turned around and asked the question.  Nobody can object
24   every time asked and answered.  But you kept badgering down
25   on witnesses to be sure you got the answer you wanted, even

1    though it had been asked and answered, and the Court had

2    ruled on some of that.  I can't give you specific examples.

3    I just know the record will reflect that when one goes

4    through it, that the Court would rule, and you'd keep right

5    on going.  A good example of that was the adverse witness

6    rule.

7         I have here, having witnesses repeat their

8    testimony and answer the same questions over and over, and

9    that, consequently, is badgering a witness.  Yet, you would

10   argue later, well, you know I'm prejudiced because I was

11   always called down for badgering witnesses, but it was.  It

12   was just asking the same questions over and over.  We went

13   through so much of that camera up and down, and that's

14   something else.  At least it's my understanding that the

15   only thing that camera captures is the front door and the

16   hostess stand.  It wouldn't have even captured the slip and

17   fall.

18        Now I'm assuming that the defendants would get to

19   that, but the impression that's been left is that somehow

20   the camera tape was destroyed or gone somewhere to, quote,

21   risk management, and that it would have captured the fall.

22   But the testimony is the camera gets the front door, and it

23   gets the hostess stand, and then you showed the picture of

24   Dr. Haysbert, and she is standing at the entrance.  Well,

25   that's where the camera would have captured it.

1          There has been this, again, constant inference, and

2    that inference is not a correct one.  Now, you can ask them

3    if they examined the footage, but to keep inferring that had

4    they examined it that it would have caught the slip and fall

5    is just incorrect under the evidence.

6          I had on here the same as Mr. McGavin had put,

7    failing to come prepared with necessary hard documents after

8    the Court had asked for them, and then wasting over 45

9    minutes of the Court's time on two occasions with at least

10   45 on the FedEx receipt, and then again on the Wilson

11   subpoena incident.  These are the things that are taking so

12   much time that we are not getting through the trial, and it

13   creates the cumulative effect, and it's the cumulative

14   effect on a jury.

15         The violation of the subpoena rules after you had

16   been specifically told.  You know you should have told the

17   Court.  It's just not your decision to say, oh, I've got

18   good cause, I'm going to do this.  The other thing is,

19   issuing a subpoena to Dr. Haider, your own witness, which

20   you knew would be unenforceable, and you admitted that

21   before the Court.  You knew it was unenforceable.  It was

22   unenforceable because it was not within the service area of

23   the Court.  But you said something to the effect, well,

24   she's not a lawyer, she won't know.  So that raises

25   tremendous questions in the Court's mind, is that what you

1    are doing with these subpoenas, getting subpoenas out to

2    people late because they don't really know, and they will

3    think Judge Smith and the Court is requiring these subpoenas

4    for them to be here.  That is of concern to the Court when

5    something like that happens, and you said that about your

6    own expert witness.  I was just shocked when you said that.

7          I mentioned the subpoena issue.  I mentioned the

8    FedEx receipt and the paper documents.  Just totally

9    unprofessional conduct.  This isn't a television program

10   where somebody says an ah-ha, got you, and raises their

11   voice and slams paper down.  You slammed papers down and

12   made outbursts, extreme on one occasion.  It was here, it

13   was right by the microphone when you slammed the paper down

14   at the end of the witness, and I called your attention to

15   it.

16         But during these outbursts, particularly the first

17   one, I could see my courtroom staff particularly, and I

18   could see the jury, and, frankly, people were visibly

19   nervous.  They were visibly nervous.  I will tell you, I had

20   my hand down towards my panic button to call the marshal,

21   and I didn't because I knew if the marshal came in, it would

22   result in a mistrial because this courtroom would have been

23   flooded with people coming in when a judge pushes a panic

24   button.  We all have one, and I was on the verge of pushing

25   that button.

1        Then when the court reporter was asked to read the

2   questions through, things calmed down a little bit, but she

3   was nervous.  She's been my court reporter for so long I

4   can't remember.  You know what?  I know when her voice is

5   shaking.  She was rattled.  Everybody was rattled.  You did

6   it in front of the jury, and there's just no excuse for that

7   kind of conduct.  You do have an intimidating presence

8   through your height and your build, and then to have that

9   outburst like that, it really made everybody, and at least

10  everybody that I could observe in the time, and I

11  don't recall but one other time in my career where I have

12  reached for the panic button, one other time.  Frankly, I've

13  been on the bench for 38 years, and I've never reached for

14  that panic button.  One other time, I was there, but this

15  time I was almost pushing it.

16       The representations to the Court about the FedEx

17  shipping situation, we've been through that.  Leading the

18  Court to believe that Dr. Filler had created a brain map

19  demonstration, at least that's what I thought when you were

20  going to put it in until he said, well, I didn't prepare

21  that.  I don't know if he seen it or not, but I don't even

22  know who prepared it, when he got it, did he get it before

23  his report, and the reports were both filed on the same day,

24  and that was supposedly a demonstrative for Dr. Haider.  So

25  one can draw inferences from that that the demonstrative was

1    prepared.  I don't know if her deposition was taken, but the

2    demonstrative would have been prepared, unless it was at a

3    deposition.  Was her deposition taken?

4            MR. HAYSBERT:  No, Your Honor.

5            THE COURT:  So there is no evidence that it was

6    prepared for a deposition.  So I don't know when it was

7    prepared, for testimony?  That's what I would assume, it was

8    a demonstrative.

9            We have been through the misleading about the

10   timing of the subpoenas.  I felt that was all very

11   misleading on Friday night and time-consuming.

12           Again, you've mischaracterized witness testimony in

13   an attempt to impeach the witness or making small omissions

14   or inconsistencies, and I'll give you an example.  First of

15   all, I don't know how many times I had to explain how you

16   impeach with a deposition.  I'll tell you how it ended up,

17   that I just read them all.  First of all, I told you, you

18   have to first identify the deposition.  Then you have to

19   identify the lines that you want to use.  Then you give it

20   to the Court, and the Court determines whether it's

21   impeaching or not.  If the Court says this isn't

22   impeachment, you can't even give it to the witness.  But I

23   went ahead, and I would say, there was only a small portion

24   in there that was impeaching.  Most of it was not.  So,

25   consequently, I just said, we are never going to get through

1   this trial.  I'm just going to let the witness read it, and

2   we will read it into the trial, and the jury can make the

3   decision, because no matter how many times I told you, you

4   got up there with the deposition, and you didn't identify

5   the deposition, you didn't identify when it was taken.  You

6   didn't ask the person, did you give this deposition on such

7   and such a date?  You have to lay a foundation.

8           I went through that numerous times with you, and

9   you never did get that right.  Finally, I knew that the

10  trial had to move on, so just let the jury hear the

11  testimony, let the jury hear what you think is impeaching,

12  and they can make their own decision.  So that's the way I

13  finally resolved it, but that was not the way to impeach a

14  witness.  Frankly, if you're refreshing recollection, I

15  stretched it a little to even include that.  You show the

16  person the document, they read it, and you say, "Does it

17  refresh your recollection?"  If they say no, you don't get

18  the document in.  If they say yes, they turn the document

19  over, and you say, "How does it refresh your recollection?"

20          Another mischaracterization, and I mentioned this

21  on the record outside of the presence of the jury on later

22  Friday.  But Mr. Robinson testified that Mrs. Haysbert was

23  in the Outback Steakhouse for five to ten minutes on the

24  floor.  I have gone back and looked, and you specifically

25  then just tweaked it, changed it, and made it 20 minutes.  I

1  think jurors notice things like that, frankly.  Jurors

2  observe, and they're smart, and they see things like that.

3          Then you again claimed to be impeaching

4  Mr. Seifert, but there was no material inconsistency in his

5  statement when asked why his name was on the work order.

6  That was properly explained.  But at some point it just

7  became, no matter what our rules and no matter what I told

8  you how to use depositions, you didn't consult with local

9  counsel, and the local counsel didn't come over and write

10 you a note and pull on your sleeve, he just sat there.

11         I'll mention that you saying the Court had to admit

12 remedial measures for certain purposes, and as we went

13 through that, if the word is "may."  It doesn't say "shall."

14 I do agree, it's hard for a record sometimes to reflect, but

15 you were repeatedly, particularly more towards the

16 beginning, interrupting the Court and opposing counsel and

17 witnesses, and being extremely combative, certainly not with

18 Dr. Haysbert or Mrs. Haysbert but with some of the witnesses

19 that were from the Outback.

20         At one point early on, and all the Court is doing,

21 oh, I remember one, the compound question issue.  You jump

22 up and say, "Compound question."  There was nothing compound

23 about that question.  Then Mrs. Haysbert picked up on it.

24 It's like you're signaling the witness, and she picks up on

25 it and says, "Well, I don't understand that question."  So

935

1    there was nothing compound.  It was one question.  There was
2    no compound question in there.
3            I ruled, and those were the kinds of things, you
4    just jumping up, objecting to something.  I don't know what
5    you were trying to do, just stop the testimony or whatever,
6    but you did that.  At one point early on you accused the
7    Court of trying to catch you in something.  Frankly, it's
8    been shown that there were a lot of inconsistencies and
9    misstatements.  The Court wasn't trying to catch you in
10   anything.  As the Court told you, it is just trying to get
11   through this trial and have the rules be followed, the local
12   rules, the federal rules, Federal Rules of Evidence, Federal
13   Rules of Procedure.
14           All the Court was doing was ruling on objections
15   and rules and trying to make this an orderly process,
16   whether you be a gatekeeper or a referee.  I know I'm very
17   aware that revoking an attorney's *pro hac vice* status is a
18   harsh sanction.  But the problem is, when a case has become
19   so affected with all of these red herrings, misleading, all
20   these things that I mentioned, at some point it just becomes
21   a continuum, and it's an accumulation and a repetition of
22   the same thing over and over after there have been
23   objections and the Court has warned you.
24           So those are the things that I was just able in
25   preparing for all of these motions, because there were many

1    to prepare for.  We were working here all weekend.  So those

2    are the things, and you can have an opportunity to respond

3    to any of them that you wish, and likewise, Mr. McGavin, you

4    can make a response to any of them.

5            MR. HAYSBERT:  Thank you, Your Honor.  So go

6    through as many as we can.  Regarding the brain animation,

7    this was a demonstrative.  It was created from the scans

8    that Dr. Filler created when he examined the plaintiff's

9    brain.  So that's all it was, is animating his images and

10   putting it in a form where you could view it differently.

11           THE COURT:  He said he didn't create it.

12           MR. HAYSBERT:  He did not create it.  He created

13   the images that provided the basis for the animation.  So he

14   didn't create the animation himself.  That's not what

15   someone like Dr. Filler has an expertise in.  I didn't even

16   create it.  It was created through a company that takes the

17   images and then fashions them into a demonstrative.

18           THE COURT:  So Dr. Haider hadn't created it,

19   either?

20           MR. HAYSBERT:  It was never Dr. Haider's

21   demonstrative.  I know we -- I heard Mr. McGavin say that at

22   one point, but it was never her demonstrative.

23           THE COURT:  You had it on the list as being a

24   demonstrative for her.

25           MR. HAYSBERT:  It was a demonstrative but not -- it

JODY A. STEWART, Official Court Reporter

1    was for both of them to be able to utilize for different

2    reasons, for different purposes, because they are coming at

3    it from two different perspectives.

4            THE COURT:  Well, now you clearly didn't lay a

5    foundation if you had some company create it, but I'm just

6    going to let you explain, and then I'll decide whether the

7    explanations are just more excuse or really a legitimate

8    explanation.  Now you are telling the Court for the first

9    time that a company created this, and that Dr. Haider didn't

10   create it.  But I know you had listed it for both Dr. Haider

11   and Dr. Filler, but when you asked Dr. Filler, he said, "I

12   didn't do this."

13           MR. HAYSBERT:  He didn't create it, but what he

14   wanted to do, instead of focusing on the whole animation,

15   was take me directly to the image because he recognized we

16   are under the gun, there is no jury in the room, take me to

17   the image.

18           THE COURT:  You don't know what he recognized.

19   That would have been in his mind.  The Court is the one who

20   said, okay, what did you rely on?

21           MR. HAYSBERT:  I think we were both feeling the

22   pressure, and I think that based on that, he said, "Let's

23   just go directly to this image here that I have, and let's

24   just talk about that," because that image clarifies the

25   position that he has, and that is that she suffered a

1    physical injury to her brain, and you can see it, and he

2    wants to describe it.  He said, "You see how the fornix is

3    perfect except for this area here?  Well, that had to have

4    happened through a sudden impact."  He didn't need the

5    animation to show that.  He wanted to go directly to it.

6    That was all that was.

7            THE COURT:  It was the Court who asked did he have

8    anything of Dr. Haysbert's brain and to go directly to it.

9    It was the Court that gave that instruction.

10           MR. HAYSBERT:  Yes.  Okay.  So the foundation would

11   not have -- would not need to be brought in through Dr.

12   Haider.  She didn't create the images.  These images were

13   created by him, and these are images that were part of her

14   brain, right.  So those images were just fashioned into an

15   animation, and that was the brain animation.

16           THE COURT:  He said he didn't do it.  If someone

17   says they haven't done the exhibit, and there is no

18   establishment that he had relied on it or used it.  I mean,

19   you had to lay a foundation before you could let it in.

20   That animation, it's even worse now that I hear that some

21   company did it, and I don't know when they did it or what,

22   but they are not here.

23           MR. HAYSBERT:  It didn't come in anyway, so I think

24   the issue should moot itself by the fact that it wasn't

25   allowed to be shown to the jury, and he went directly to the

1    picture, and that's where we ended.

2        THE COURT:  The time that's been extended on all of

3    this.  This is a slip and fall case.  I'm not saying the

4    injuries aren't serious, but it's a slip and fall case in

5    Outback Steakhouse.  It shouldn't be taking this kind of

6    time, because things have not been presented timely to the

7    other side, timely to the Court, and the local rules and the

8    federal rules are not being followed, even after a warning.

9        MR. HAYSBERT:  So, Your Honor, I attempted to have

10   Dr. Filler testify as to these images through the format of

11   the demonstrative.  They were stopped by the Court.

12   Dr. Filler referred to the piece of paper, and so we never

13   went that far.  I'm not a sneaky person.  I wasn't trying to

14   sneak anything in.  I'm not that kind of person.

15        So I wanted him to reference it.  It was created.

16   It was created based on his images.  I thought it was a

17   really powerful piece of evidence, and I thought he would

18   speak to that one.  Now, he said -- I think he said, because

19   I haven't looked at that part of the deposition, that he

20   didn't create that, but he had definitely seen it before.

21   In fact, I know he saw it because his office told me that he

22   did via e-mail.

23        THE COURT:  That's hearsay.  That's an e-mail.  You

24   never asked the question of him, "Have you seen it, and did

25   you use this for your opinion?"  You never asked him had he

1    seen it when he said he didn't create it, and there was an

2    objection, I think, and I sustained it, you moved on.

3              MR. HAYSBERT:  Yes, ma'am.

4              THE COURT:  You never established that he had

5    looked at it.

6              MR. HAYSBERT:  Understood.  I wanted to move on,

7    Your Honor, given everything that I've shared so far, but,

8    yes, we never got there.

9              The date of the animation would be -- the animation

10   was created something separate from the date the images that

11   cause an animation to come into being were created.  We know

12   those dates because those dates are --

13             THE COURT:  They're not on the record.  They

14   weren't on the record.

15             MR. HAYSBERT:  You mean the image?

16             THE COURT:  You are just representing things that

17   you know.  But if it's not on the record, how can the Court

18   know?

19             MR. HAYSBERT:  Well, he did indicate in his

20   testimony the date that the images were done, because we

21   were trying to make the determination whether or not it

22   happened before the car accident or after, and that's when

23   he specified the date that the images were done.

24             THE COURT:  You are talking about the MRI or his

25   image that he had done.  He explained the difference between

JODY A. STEWART, Official Court Reporter

```
 1    the three forms of MRI and how his, what is it --

 2               MR. HAYSBERT:  DTI.

 3               THE COURT:  -- DTI worked and that it was the high

 4    form.  We heard all that.

 5               MR. HAYSBERT:  Right.  And the DTI images are the

 6    ones that you see in his report that are animated into the

 7    brain map, is what I'm sharing with the Court.

 8               THE COURT:  But he said he had never seen it or he

 9    said he didn't prepare it.

10               MR. HAYSBERT:  Yes, which is correct, but he had

11    seen it.

12               THE COURT:  We didn't get to that.

13               MR. HAYSBERT:  Okay.  Perfect.

14               So you made a reference that I attempted to impeach

15    a witness with a work order that the Court had not yet ruled

16    on.  So the work order that you're referring to is work

17    order 1 on the exhibit list.  That is one the Court had not

18    yet ruled on.  We had work order 2 as an impeachment

19    evidence, and we believe that she impeached herself, and

20    that is when we attempted to impeach her with the work order

21    2.

22               THE COURT:  Which never showed the Court the

23    document.

24               MR. HAYSBERT:  I did.  I provided it.

25               THE COURT:  Yes.  You started right into
```

1    impeachment, and we argued the rule.  Anyway, the record

2    will reflect exactly what happened.

3         MR. HAYSBERT:  Okay.  Your Honor, if I implied that

4    the Court violated the federal rules, my apologies.  I never

5    meant to do that.  I was simply arguing on behalf of my

6    client a piece of evidence that we believed had impeachment

7    value, and we thought should come in.  It is the Court's

8    ruling on that.

9         I do have to apologize regarding the adverse

10   witnesses.  I know I heard you tell me once you don't have

11   to do that.  There is some -- there is a rule here that it's

12   not -- I did it again, Your Honor -- and I did it again,

13   Your Honor, and I want to apologize the mistake I made.  It

14   was on my list, and I read the first thing that I saw there,

15   and that was a mistake.  It happened twice, it did not

16   happen three times.  It happened twice.

17        THE COURT:  It happened twice after I had explained

18   it to you.  I explained it to you with Ms. Eleftherion, and

19   then it happened twice after that with Mr. Seifert and

20   Mr. Chase.

21        MR. HAYSBERT:  Regarding badgering the witness,

22   Your Honor, you have brought up the issue of Christopher

23   Robinson.  I recall Christopher Robinson saying at one point

24   20 minutes.  He had changed his answer several times and

25   went from 5 to 10 to 10 to 15 to 15 to 20.  I don't have his

1     testimony, but I believe that that's there, and that's why I

2     reference the question again.  It wasn't to be sneaky.  It

3     was to provide him -- you know, you said 15 to 20 minutes,

4     and that's what I believe was his prior testimony.  That's

5     why I mentioned it.  I would never, again, sneakily try to

6     get it -- it was actually better for me for it to be 15 to

7     20 minutes, but I impeached him to say it was five minutes.

8     I'm not trying to hide anything or be sneaky.

9              You understand what I'm saying?  He was talking

10    about how long the plaintiff had been on the floor.

11    Everyone could agree being on the floor for 15 or 20 minutes

12    is worse than being on the floor for 5 minutes.  I was

13    simply trying to get his testimony the way that he had

14    described it to me, and he confirmed it.

15             Regarding taking up the Court's time, 45 minutes

16    for the FedEx receipt, that's a mistake of mine.  I mean, I

17    had to go to a local print shop and call FedEx and have them

18    print it, so it took some time.  Nowadays, I have a printer

19    in the car.  For the Wilson event, 45 minutes as well.  I

20    wanted to get the Court the service, but, unfortunately, I

21    couldn't get that to the Court.  That's what you wanted, and

22    I couldn't get that to you.  I can only give you the next

23    best thing, which was a status of service on them and a

24    verification from my process server that he had been served

25    and the specific date and time that he had been served.

944

1          Regarding Dr. Haider, I know we have talked about

2    this several times.  I never, and if I misstated something

3    in my prior testimony to the Court, through my apologies,

4    but I never provided that to her so that she could think

5    this is a valid subpoena, and this is supposed to make me

6    come to Virginia.

7          We already knew her father was in trouble, and for

8    me it was, if anybody should have anything to say to you

9    about where you have to be, should you decide to come, we do

10   have -- we have this information for you.  I can send it to

11   you so you can have them look at it.  It was never -- it

12   was, this is supposed to be a valid subpoena, this is

13   something to be something that you have to serve, you know.

14   It was nothing like that.  But I wanted to give her some

15   information so they could look and see, okay, there is a

16   court process happening, and if you have to be there, fine.

17   But it was never to be served.

18          THE COURT:  So you sent out a subpoena with the

19   Judge's name on it, the court, the date, signed by you, with

20   no intention of ever having it served because you can't have

21   a subpoena served over a hundred miles, and my recall is you

22   thought that might make her appear.

23          MR. HAYSBERT:  No, it was never --

24          THE COURT:  Something to that effect.  All I'm

25   saying is that you sent a subpoena to your own expert

1    witness that you knew was not a valid subpoena, and now you

2    are saying you really never had any intention of having it

3    served.

4          MR. HAYSBERT:  We never served it.  It was no

5    intention --

6          THE COURT:  But you couldn't serve it.

7          MR. HAYSBERT:  True, but we never served it, and we

8    never intended to do so.  It was to provide her with

9    information to give to whoever she needed to provide it to

10   to let them know what she had to do or what she might be

11   doing at a particular date and particular time.  It was

12   simply for her information.

13         Your Honor, I do want to apologize for making your

14   office and the Court nervous.  That wasn't my intention to

15   do that.  Again, I was happy in the moment.  I wasn't upset

16   or angry or was trying to do anything that would threaten

17   anyone in the courtroom, and especially not you, Your Honor.

18   I would never want to do it.  I worked for a federal judge.

19   I was a law clerk for the chief judge of the Western

20   District of Oklahoma, and she was a female, first

21   African-American female.

22         I understand what you go through from the back, and

23   I would never want to put you or anyone in your courtroom in

24   a position to feel threatened or to be nervous.

25         THE COURT:  Were you an intern or a term law clerk?

946

```
1              MR. HAYSBERT:  I was a law clerk.

2              THE COURT:  For a year after you graduated from law

3     school?

4              MR. HAYSBERT:  No, this was during law school.

5              THE COURT:  It was during law school?

6              MR. HAYSBERT:  During law school.

7              THE COURT:  You would have been considered what's

8     called an intern.

9              MR. HAYSBERT:  Correct.  I take that back.  I was

10    an intern for Judge Vicki Miles-LaGrange.

11             So the part about the television program, the

12    dramatics, Your Honor, I'll tone that down.  I was in the

13    moment, and that was something that I thought would help

14    keep the attention of the jury on what I was trying to get

15    them to see.  Thank you for confirming for me how to impeach

16    for the deposition and refresh prior recollection.  My

17    apologies for getting that wrong.

18             Regarding Nick Seifert, I believe that there was an

19    impeachment issue because Nick Seifert represented on the

20    stand he didn't know why his name was on the work order.

21    When I asked him the same question at his deposition, he

22    said my name was on the work order because I'm the joint

23    venture partner.  Okay.  Well, now you are saying I don't

24    know, and before you said you were the joint venture partner

25    and that's why your name was on that order, as if you run
```

 1    the show there and at a number of other Outback Steakhouses,
 2    then I'd like the same attitude.  I want the same
 3    information provided to the jury, and that work order was
 4    something that your name was on because you are the joint
 5    venture partner.
 6              THE COURT:  He said he guessed, and then he did the
 7    time frame of his joint venture, but, anyway.
 8              MR. HAYSBERT:  That's why I thought it held some
 9    impeachment value.  Ultimately, you get to make the decision
10    on that.
11              THE COURT:  Well, I'll let the jury hear and decide
12    it, if it goes that far.
13              MR. HAYSBERT:  That is correct, and I appreciate
14    that.
15              Regarding the subsequent remedial measures issue,
16    I'm glad that Your Honor gave us the opportunity to brief it
17    because it allowed me to think about it some more, and also
18    to see where it is up to the Judge's discretion what to do
19    about it.  What I see here is a situation where I'm not sure
20    how the work order 2 would be a subsequent remedial measure
21    because if, in the opinion of opposing counsel and Nick
22    Seifert and Bloomin' Brands and Outback Steakhouse, that the
23    floor was changed because of soda fountain leak, then that
24    soda fountain leak isn't referenced anywhere in that work
25    order, so then it wouldn't be a subsequent remedial measure.

1    But, nevertheless, we provided our brief to the Court on

2    that issue, and the Court will decide what it wants to do.

3            THE COURT:  You can always, if you're going to

4    impeach, reserve the opportunity to recall the witness,

5    because, you know, as I told the jury in the beginning, you

6    put your direct evidence on, they then defend, and then you

7    can come back with any rebuttal and impeachment.

8            In my opinion, that's the way would have been the

9    best to try to do that, because then you would know whether

10   the work order was in or not.  One other thing, this is just

11   something that I want to say about the rules.  You said a

12   couple of times, and it's in my mind but it wasn't on my

13   typed list, you kept saying, "It's authenticated.  It's

14   authenticated."  Authentication doesn't make a document

15   admissible.

16           A menu from a restaurant can be authenticated.

17   That doesn't make it relevant, and it doesn't make it

18   admissible.  Authenticity is the threshold requirement for

19   any piece of evidence like that.  So authenticity is a

20   floor, not a ceiling, and because something is authentic

21   doesn't make it relevant or properly admissible under the

22   rules and the law before the jury.

23           You said that at least two times, and I know once

24   clearly you said in front of the jury, again giving the

25   impression that it's an authentic document.

1        Well, as I say, a menu could be authentic but that

2   doesn't mean it comes into evidence or is relevant.  That

3   was another misimpression in front of the jury.  You argued

4   with the Court on that.  You said it's authentic.  Anyway, I

5   have to go back, but I know you said it's authentic at least

6   twice, and I know you said it at least once in front of the

7   jury.

8        MR. HAYSBERT:  The last note I had, Your Honor, was

9   again about interrupting the Court and not allowing you to

10  speak, and again I want to apologize for that.  I will

11  endeavor to do better, if you allow me to.  That's all.

12  Thank you.

13       THE COURT:  Anything else, Mr. McGavin, that you

14  want to mention or say?

15       MR. McGAVIN:  Yes, Your Honor.  Would the Court

16  permit me to use the document camera, please?

17       THE COURT:  Yes.  Whatever you do, I'll let

18  Mr. Haysbert respond.

19       MR. McGAVIN:  Thank you.  What I'm displaying is

20  plaintiff's final exhibit list filed with the Court on

21  August 2, 2023.  P1 is the animation, and it's called Haider

22  demonstrative and images, brain map animation.  So we just

23  heard counsel say he never once said this was Haider's

24  demonstrative.  Well, of course he did.  It's right here on

25  his final pretrial exhibit list of August 2, 2023.  That's

1    not just, oh, we never said this was going to be Dr.

2    Haider's.  Of course, it is.  And what happened is, I'll

3    check the transcript, because I believe it was ordered of

4    Dr. Filler.

5              THE COURT:  It was Friday.  I recall that.  I

6    haven't gone back and read it, but something was by Friday,

7    and it wasn't -- I believe it was the update on Dr. Filler's

8    demonstrative.

9              MR. McGAVIN:  Right.  Well, there was an update on

10   Dr. Filler's, but once we got into court, he started saying,

11   well, these are slides in here for photophobia and anger and

12   irritability, and he said, well, those don't apply.  We will

13   talk about that with the motion regarding Dr. Filler, of

14   course, on his foundation, but I just want to be clear, we

15   didn't make it up to call this Haider's demonstrative.  It's

16   how it's labeled and identified on the final pretrial list

17   of August 2.  The other thing, Your Honor, regarding this

18   work order 2, and --

19             THE COURT:  This was the one with Mrs. Eleftherion.

20             MR. McGAVIN:  Right.  So she was asked about this,

21   and what I've highlighted is the date for it, August 27,

22   2018, which was after the soda failure.  So now I'm

23   confronted with impeaching on an irrelevant matter, meaning

24   replacing the floors and the damage from the flood which

25   made the floors buckle.  The Court mentioned this, and it

1    wasn't on your list, but I do think it's very significant.

2              THE COURT:  What are you reading from?  The

3    highlighted portion?

4              MR. McGAVIN:  Would you ask that again?  I didn't

5    hear you.

6              THE COURT:  Where are you reading from on the

7    document?

8              MR. McGAVIN:  Yes.  I'll use my pen.  First, here

9    is the date created.

10             THE COURT:  Okay.

11             MR. McGAVIN:  Then problem description.  "Our

12   floors are so bad people are tripping.  There's mold.

13   There's warping."  That's the issue they were facing with

14   the water flood, and so it's now created this suggestion

15   that there's this work order that was withheld.

16             By the way, plaintiff states they just got this on

17   August 1.  Never produced it to us.  It's not relevant to

18   this incident because it's related to the flood.  Wasn't

19   exchanged in discovery.  This is the point -- overarching

20   point I wanted to make, which the Court pointed out

21   regarding Robinson.  I hadn't read his transcript, but I

22   certainly was very surprised to hear the 20-minute estimate.

23   I don't believe he said it.  But here, if you recall the

24   testimony when Mr. Haysbert started to use this exhibit, he

25   was talking about tripping, not slipping or falling, but

1    suddenly we have moved to tripping, and I couldn't really

2    figure out where we were going with that because he was

3    trying to conflate tripping with slipping and falling.  That

4    is deliberately misleading the jury about why people are

5    talking about tripping.  When floors buckle, they get wet,

6    and they buckle up from the water flood, people tripping.

7            THE COURT:  You are saying the water is cleaned up

8    but the floor has buckled?

9            MR. McGAVIN:  Right.  The wood warps.  They are

10   wood floors.  They warp and they buckle.

11           THE COURT:  I have a question, and I can't remember

12   whether I asked it at the time because we stopped

13   Ms. Eleftherion's testimony.  I have a question on why this

14   wasn't produced during discovery.

15           MR. McGAVIN:  We didn't have it, and it's not a

16   work order that was responsive to the request.  I'd have to

17   go back and look at the request.

18           THE COURT:  I don't know how Mr. Haysbert got it

19   and why he didn't -- why somebody didn't list it on their

20   exhibit list.

21           MR. McGAVIN:  He didn't get it until August 1,

22   2023.

23           THE COURT:  August 1, 2023.  Where did he get that

24   from?

25           MR. McGAVIN:  He put it in the affidavit or in his

1  response on the subsequent remedial measures.

2          THE COURT:  Oh, okay.  It's in that.

3          MR. McGAVIN:  It's in ECF 300.

4          THE COURT:  I've got it.  I was focused right now

5  on this other issue, and it's in the remedial measures

6  portion that has been filed.

7          MR. McGAVIN:  Yes, Your Honor.  But my point of it

8  is, now that I've had a chance to reflect on it, what he was

9  trying to do was conflate and mislead Ms. Eleftherion, who

10  she would have said yes to anything.  I mean, she was just

11  trying to -- she was not hostile at all.  She was completely

12  cooperative.

13          When the term "tripping" was being used, I couldn't

14  at the time understand.  But now I understand, because it's

15  a way of misleading the jury to say there is tripping going

16  on, and that was part of the problem existing May 23, 2018.

17  It wasn't.

18          THE COURT:  Ms. Eleftherion was a nervous witness,

19  that was clear.  She was shaking kind of the whole time.

20          I'll let Mr. Haysbert respond now to the two things

21  that you have shown the Court.

22          MR. McGAVIN:  Thank you, Your Honor.

23          MR. HAYSBERT:  Thank you, Your Honor.  So with

24  respect to the brain map demonstrative, there were two

25  demonstratives that were included as P1.  One demonstrative

1    is this two-page document.

2         THE COURT:  I know that.  That's when the animation

3    came up in the August 1st hearing.

4         MR. HAYSBERT:  Correct.

5         THE COURT:  When you mentioned it, and everybody

6    said, well, I haven't seen any animation.  So that was when

7    it came up in the discussion of P1, when you mentioned the

8    animation, and everybody said, well, we haven't seen the

9    animation.  That's how it came up.  But it was under P1.

10   That's what you've been complaining, that the animation was

11   part of P1.

12        MR. HAYSBERT:  Well, it became a part of P1, Your

13   Honor, because we discussed it, and, you know, we have the

14   brain demonstrative, and we say, okay, we will make that

15   part of P1.

16        THE COURT:  It was part of P1, and it hadn't been

17   produced.  That's how we got into all of the other

18   discussions.

19        MR. HAYSBERT:  That's correct, Your Honor.  But it

20   was also -- it was something, as I mentioned then, it was

21   based on the brain scans that were created by Dr. Filler.

22   So they weren't Haider's demonstratives.  These are Haider's

23   demonstratives.  If we are going to get technical, these two

24   pages are hers that she could use during her testimony.  But

25   the brain animation is something that both Dr. Haider and

955

1    Dr. Filler could use as part of their testimony, because

2    they are taking it from two different perspectives.

3            THE COURT:  The record is what it is on this.

4            MR. HAYSBERT:  Sure.

5            THE COURT:  I understood the animation to be part

6    of P1.

7            MR. HAYSBERT:  Yes.  Understood.  But it was --

8    okay.  I won't belabor it, but, again, Dr. Filler -- it's

9    Dr. Filler's brain map animation based on the scans.  We

10   already have a P2 of all the things.

11           THE COURT:  He said that he did not do that.  I'm

12   not going to go back over it.  Dr. Filler specifically said,

13   "I didn't do that."  He said he did not do it when he was

14   asked.  "I didn't do that.  I have this demonstrative."

15           MR. HAYSBERT:  And technically he didn't, but it

16   came from his brain scams.  So he said substantive.  We

17   won't go over it.

18           The second thing that defense counsel brought up

19   was the work order 2, and that's something that I will

20   appreciate hearing more from the Court about because I don't

21   understand why it wasn't provided to us in discovery.  It

22   was responsive to the same question that was asked.

23           THE COURT:  Where did you get it from?

24           MR. HAYSBERT:  I got it from Service Channel.

25           THE COURT:  Who?

1          MR. HAYSBERT:  Service Channel, the third party

2     that handles all the work orders.  We received it from

3     Service Channel.

4          THE COURT:  Service Channel?

5          MR. HAYSBERT:  Service Channel.  That's the name of

6     the company.

7          THE COURT:  So the risk management?

8          MR. HAYSBERT:  No.  This is a third-party company.

9          THE COURT:  I have never heard of Service Channel

10    so I don't know.  That's never been part of anything that's

11    been presented to the Court.  It's not in.  We will

12    determine whether it comes in and the circumstances of it,

13    if appropriate.

14          MR. HAYSBERT:  Sure.  That's something I wanted to

15    just bring to the attention of the Court that it should have

16    been produced in discovery.  Now that we have it, it's

17    responsive to the same discovery request that we provided

18    the Court before, our request for production of documents

19    number 24, and Outback Steakhouse's part of P set 2.  The

20    same information was also requested in our initial round of

21    discovery in August of 2020.

22          THE COURT:  All the discovery issues have been

23    resolved, and we're not going to go back through discovery.

24    We can go through how you got it, if appropriate.  Nobody

25    said there is a violation.  It hadn't been brought to the

957

1   Court's attention.  I don't know anything about this

2   document until we get to the remedial measures.

3           MR. HAYSBERT:  We can bring it to the Court's

4   attention because it was not provided, and that violated the

5   Court order when it wasn't done.

6           THE COURT:  There is no motion in front of me.  I

7   am not going off now on a tangent about a document in

8   discovery because all the discovery issues have been

9   resolved.  That doesn't mean that you can't use it.  I

10  haven't ruled on that.  But we are not going off onto a

11  discovery tangent now because we're here at trial.

12          All I was saying is it wasn't listed, and then now

13  they are saying you got it August 1, and I haven't heard of

14  the place you got it, but if we can establish how it was at

15  the appropriate time, we will do it, but not in the middle

16  of this matter.  I'm not paying any attention to that on

17  this matter.

18          MR. HAYSBERT:  Understood, Your Honor.

19          THE COURT:  As far as I'm concerned, it's part of

20  the remedial measures issue.

21          MR. HAYSBERT:  I'm not exactly sure why it was

22  brought up, but I wanted to respond to it.  Thank you.

23          THE COURT:  You've responded, and I'm frankly not

24  considering that evidence on the current motion.  It will be

25  considered on the remedial measures, if appropriate.

1          Counsel, the next matter that we are going to take

2     up is the motion for a mistrial that's pending before the

3     Court.  It's 10 minutes to 3:00.  We will reconvene at 3:30.

4     So if you all need to eat lunch or whatever, you can do that

5     now, and we are going to reconvene and take up the next

6     motion, which is the motion for a mistrial.

7          Court stands in recess until 3:30.

8          (Luncheon recess from 2:48 p.m. to 3:32 p.m.)

9          THE COURT:  Mr. McGavin, we are now on your motion

10    for a mistrial.  You can go forward with any argument.

11         MR. McGAVIN:  Thank you, Your Honor.  Your Honor,

12    on behalf of the defendants, we made an oral motion for a

13    mistrial when Mr. Haysbert was pursuing the line of

14    questioning for which he knew inevitably required responses

15    related to insurance.  The reason we know that is due to the

16    expensive discovery record in this case whereby plaintiff

17    sought the deposition of Tristal Hall.  Ms. Hall was the

18    risk management person.  At the time it was Gallagher

19    Bassett, who is the third-party administrator for the

20    insurance company and for the self-insured retention that

21    Outback has.

22         We also know that on or about May 25, 2018, two

23    days post-incident, Ms. Hall contacted the guest, who didn't

24    want to talk, she was in pain and sleeping, gave her my

25    info, and asked her to call back.  We also know that

959

1   Mr. Haysbert --

2         THE COURT:  I thought the testimony was that there

3   was never any call back.

4         MR. McGAVIN:  That's incorrect.  There is a record

5   of it.

6         THE COURT:  That's okay.  Maybe I misheard the

7   testimony, but I thought the testimony was maybe it was that

8   neither one of the people at the store called back.

9         MR. McGAVIN:  That's the point.

10        THE COURT:  Again, that implies that there was no

11  callback, but there was a callback.

12        MR. McGAVIN:  Yes.  It was a callback from the

13  insurance, and what the point that was so misleading about

14  it is Mr. Haysbert was trying to imply that, well, Lisa

15  Crosby didn't call back and Chip Chase didn't call back.

16  That's why.  This goes to Tampa, where the risk management

17  team gets assigned all claims, and then they reach out,

18  prepare a file, investigate, and then, in most cases, they

19  get resolved.  That's the insurance side of it.

20        THE COURT:  Was all that on the record, that it

21  went to insurance, and there was a call back to the

22  plaintiff?

23        MR. McGAVIN:  I don't know if that record of the

24  call back is reflected in the depositions.  They are so

25  long, Your Honor.  Lisa Crosby was seven hours.

960

1          THE COURT:  You said there was an e-mail of some

2     sort?

3          MR. McGAVIN:  Yes.  There is a record in the

4     Gallagher Bassett record, which I could show you.

5          THE COURT:  That's okay.  Mr. Haysbert will offer

6     some explanation, I'm sure.

7          MR. McGAVIN:  Well, the point is that to suggest

8     that Lisa Crosby was going to call back, or Chip Chase was

9     going to call back, that's not how it works, and so what

10    happened is we have this discovery battle over whether

11    Tristal Hall was going to have to produce her claims file,

12    which is something Mr. Haysbert asked for.  We objected.

13    Judge Miller determined it didn't have to be disclosed.

14    Then there was a request to take her deposition, which we

15    objected to, and Judge Miller dealt with that, too.  I don't

16    want to get too far.

17         THE COURT:  That's okay because the Court at this

18    juncture doesn't want to go back through discovery rulings.

19    You go ahead.

20         MR. McGAVIN:  Nor do I, Your Honor.  But it's

21    important to understand.

22         THE COURT:  It was deliberate.

23         MR. McGAVIN:  Yes.  That there was a clear

24    understanding that there was insurance involved.

25    Mr. Haysbert noted his representation on June 22, 2018,

```
1   issued a spoliation letter, and then there was the motion

2   for spoliation regarding the video.  We had -- we went round

3   and round and round on all that.  There was no video, so.

4           But, in any event, I bring that up because there

5   would be no reason to be exploring with these witnesses,

6   once you submit the incident report, who is going to call

7   back.  And what's the process?  Because the answer

8   inevitably is risk management.  What we heard from the

9   witnesses that were asked that question is, risk management.

10          THE COURT:  Or insurance.

11          MR. McGAVIN:  Or directly insurance.  They're the

12  same thing.  So when it first came up, I objected on the

13  grounds of relevance.  I couldn't say more, obviously,

14  without injecting that issue.  This wasn't just inadvertent.

15          THE COURT:  I've got the transcript here.  That was

16  proper timely objection.  You objected to, I think,

17  "ensure."

18          MR. McGAVIN:  Yes.

19          THE COURT:  It was sustained.  At some point

20  Mr. Haysbert said, "I'll never use the word 'ensure' again,"

21  or something like that, but then when the word "insurance"

22  was mentioned, you objected.

23          MR. McGAVIN:  I did, because the point on the

24  "ensure" was it is not standard for a property owner to an

25  invitee.  It's reasonable care.  It's not -- they're not
```

1    ensuring that no one could ever fall.  They can't prevent

2    people from falling.  There is many reasons why people fall.

3    They might have a -- may faint or pass out for reasons

4    unknown.

5              So that's why we made the motion for mistrial,

6    reluctantly.  A mistrial means we have to come back.

7              THE COURT:  They have to first determine they want

8    to.

9              MR. McGAVIN:  That's true.

10             THE COURT:  They first have to determine the Court

11   would give them some amount of time whether to notify the

12   Court whether they are seeking a new trial.

13             MR. McGAVIN:  Obviously.

14             THE COURT:  If it occurs, I will set the proper

15   parameters that the law requires me to set, the law and the

16   rules.

17             MR. McGAVIN:  Correct.  So his question was whose

18   responsibility was it at the time you were the manager of

19   the Outback Steakhouse in Chesapeake to follow up with an

20   injured person who had slipped and fallen?  We cite that on

21   brief.  That's so obvious.  As the Court said at the time,

22   it's insurance and Tort Law 101, and *Hope Windows*, which is

23   the leading case on this issue from 1968, it's still the law

24   in Virginia.

25             So sometimes the courts are inclined to grant a

1    curative instruction, but the way this has been developed, I

2    almost have to say to the jury, because the Court is

3    correct, the plaintiff is trying to create this inference,

4    both with the camera issue and the callback, that somehow we

5    were hiding this, because what he said in opening is, by the

6    way, completely inappropriate, corporate indifference.

7    That's basically failure to accept responsibility and pay us

8    the amount of money we want.

9         That's irrelevant.  This is a slip and fall case

10   with disputed liability.  So to make that kind of

11   inflammatory argument, and then take down this line of

12   questioning, I almost have to jump up and say, well, wait a

13   minute, the way this works is we have a risk management

14   team.  There is an insurance company, a third-party

15   administrator, and so on and so forth.  But I don't want to

16   do that.  Leave that out.

17        I don't think anybody on this jury is going to

18   assume that Outback Steakhouse, with 500 facilities around

19   the country, is, you know, not viable.  It's a huge company.

20   I get that.  But why put me in the position of having to:

21   One, object.  Now they think I'm hiding something; and,

22   number two, knowingly go down this irrelevant path.  It

23   makes no difference whether we call back or we didn't and

24   who called back.  The issue is, was the floor slippery,

25   inherently; did we know; or, number two, was there a foreign

1    substance on the floor that we either -- did we know about

2    it and fail to clean, or was it open and obvious, and we

3    didn't need to warn.

4          Then there is issues of contributory negligence and

5    then proximate cause.  But whether somebody called back in 1

6    day or 2 or 7 or 12 is completely irrelevant, and there's

7    only one purpose, to create this impression of, quote,

8    corporate indifference and force the defendant to object to

9    exclude it at the risk of injecting insurance in the case.

10   It shouldn't have been done.  It's basic, it's basic

11   Virginia law.

12         I don't know what the law is in California.  I

13   think they can do all kinds of things over there.  It's much

14   broader, I know.  But here in Virginia, *Hope Windows* is

15   still a good law.  In my view, a curative instruction, based

16   upon this record, I don't know how you fix everything that's

17   been done, that puts the kind of popping up and down like a

18   jack-in-the-box.  And even by the end of the second day, as

19   I discussed with my colleague at counsel table, I'm just

20   going to have to just sit here and let this go in hopes that

21   we can finish.  Eventually, I guess, that's the strategy.

22   What I mean is not object as much, you kind of have to let

23   things go.

24         THE COURT:  That's what I was saying.  Ask the

25   repeated questions, asked and answered.  If we jumped up to

1   every one of those, or the Court called it down, we would

2   never get through trial.

3           MR. McGAVIN:  You said that to me, Your Honor, at

4   one of my objections, or words to that effect.  I was trying

5   to take that to heart, and I understand the issue.  So

6   simply stated, it violates longstanding Virginia law.

7   There's no reason -- it wasn't inadvertent, it's the

8   inescapable path that we were on, and the evidence that was

9   being sought regarding the callback is completely

10  irrelevant.  Thank you.

11          THE COURT:  Well, I want to read into the record

12  here.  I know it's in your briefs, but I want to read it

13  directly from the transcript what we are talking about.  The

14  first references are on Page 10 and 11.  I would start it at

15  line 15.  This is with Ms. Eleftherion:  "So would part of

16  that overseeing responsibility include following up an

17  injured person who had slipped and fallen on the floors?  It

18  was not, no.

19          "Question:  I'm sorry?

20          "Answer:  No, that was not part of my

21  responsibilities at the time.

22          "Question:  Whose responsibility was it at the time

23  that you were the manager of the Outback Steakhouse in

24  Chesapeake to follow up with an injured person who had

25  slipped and fallen?

1           "Correct.  If our insurance provider at the time

2     was involved, we had an insurance liaison who would follow

3     with that person."

4           Now, this is after we have gone through the issue

5     of using the word "ensure," and would you make sure or

6     whatever, and Mr. Haysbert says, "I'm never going to say the

7     word "ensure" again."

8           Then Mr. McGavin objects immediately, and the Court

9     sustained.

10          "Mr. Haysbert:  It's only been said.  I don't have

11     a question pending.

12          "The Court:  Insurance is not an issue at all in

13     this case."

14          Then Mr. Haysbert follows up with question to the

15     witness:  "So I'm only asking you what you would do in your

16     personal knowledge.  Okay.  So let's leave insurance out of

17     it.  And although insurance is within your personal

18     knowledge, we are leaving insurance out of it."  Three

19     times.  And you say, "It's within your personal knowledge,

20     we are leaving that out."

21          Now, that alone, in my mind, could cause a mistrial

22     because you use "insurance" three times in one question, and

23     implied that she knew about it, but we are going to leave

24     that out.  But it keeps on.

25          "The Court:  Mr. Haysbert, please follow the

1    Court's rulings.

2            "Mr. Haysbert:  Yes, ma'am.

3            "Mr. McGavin, Your Honor, I have a motion.

4            "The Court:  Let's do things this way."  He

5    objected, and then we went on with this, and then he had a

6    motion, all in the same sequence.  I'm going from Page 10 to

7    Page 11:

8            I'll go back.

9            "The Court:  Mr. Haysbert, please follow the

10   Court's rulings.

11           "Mr. Haysbert:  Yes, ma'am.

12           "Mr. McGavin:  Your Honor, I have a motion."

13           And I said, "Well, let's do things this way.  I

14   think it's a good time for the jury to take a luncheon

15   recess, because it is after 1:00 now, and I think lunch is

16   being bought in for you.  So we will be in luncheon recess

17   until 2:00, and I would ask that you, Ms. -- how do you say

18   your last name?"  And she said, "Eleftherion."  And I then

19   instructed her she was in the middle of her testimony, and

20   so forth.  That's on Pages 10 and 11.

21           So we come back.  Now, this is on Page 36.  This is

22   really disturbing to the Court because you were asking the

23   same question.  It's now, no, I was asking about Outback

24   Steakhouse or something like that.  Well, you asked about

25   Chesapeake Outback Steakhouse in both of those questions.

1   But you come back, and now I'm on Page 36, line 13:

2            "Okay.  If a person was injured in the dining room

3   through a slip and fall, whose responsibility was it to

4   follow up with that person at Chesapeake Outback Steakhouse,

5   at the Chesapeake Outback Steakhouse, if anyone?

6            "Mr. McGavin:  Objection, Your Honor.  Object to

7   the form, relevance.

8            "The Court:  Let's see.  I hope this doesn't go

9   astray.

10           "Mr. Haysbert to the Court:  It won't.  I promise

11  you.

12           "The witness:  There is protocol to follow, any

13  type of incident, whether it's a slip and fall or different

14  incident regarding to a guest or somebody who works there,

15  we have to call in our insurance group."  It's basically the

16  same question, just re-arranged in a few words, and the

17  Court caught it and warned you about it.

18           Then when you came out with the answer, there was

19  an objection.  I said to Mr. Haysbert, "You've asked that

20  question before, and that's the answer you got.  There has

21  been an objection to it, and the Court specifically said

22  there is no insurance in this case.  There should be no

23  mention of it and no insurance issue.  That's the question

24  you asked before that got the same answer.

25           "Mr. Haysbert:  I said at the Chesapeake Outback

JODY A. STEWART, Official Court Reporter

1    Steakhouse, is what I said.

2          "The Court:  Whatever.  It elicited it.  It is

3    along the same lines, and it has now elicited the same

4    response.

5          "Mr. McGavin:  Your Honor, I renew the motion I

6    previously made.

7          "The Court:  I completely strike that question and

8    that answer at this juncture because it's not part of the

9    case.  It's improper under the law for it to even be

10   mentioned.  I thought you heard that, too, but you didn't,

11   as the witness, hear that?"

12         The witness says:  "Yes, ma'am, I heard it.

13         "Mr. Haysbert:  If I move on.  Thank you, Your

14   Honor.  Thank you, Ms. Eleftherion."

15         She's a witness.  She heard it, but then you asked

16   the question, and she's nervous as she can be, and she's

17   under oath.  She answered it the same way.

18         So it is of great concern to the Court that early

19   on, Pages 10, 11 we had this.  We took a break.  The Court

20   made rulings.  The Court did the best it could to keep it as

21   low key in front of the jury, and then you come right back

22   with basically the same question, and I warned you, and it

23   got the same answer.

24         Then on top of that, Mr. McGavin now says you knew

25   all of this.  So you explain to the Court how this wasn't

 1    deliberate.  Then before that, you had gone through all of

 2    this.  "Do you make sure?  Do your ensure?"  That was the

 3    whole colloquy before that was objected to, and then that's

 4    when you said, "I'll never say that word again."  But then

 5    you asked questions that obviously elicited insurance.

 6           So that's what's at issue in regard to this

 7    witness.  It was also elicited risk management from

 8    Mr. Chase.  I've checked his transcript, and it was.  But in

 9    any event, so it was asked even again the same thing where

10    you knew it was going to be risk management with Mr. Chase.

11    So please explain it now, Mr. Haysbert.

12           MR. HAYSBERT:  First, I would like to say, Your

13    Honor, Tristal Spanola works for Bloomin' Brands, not for a

14    risk management.  So we don't know any connection that we

15    are aware of.

16           THE COURT:  What are you saying?

17           MR. HAYSBERT:  Tristal Spanola.  He mentioned

18    Tristal Spanola again.

19           THE COURT:  Well, they are both defendants in the

20    case, and we've gone through that.

21           MR. HAYSBERT:  She has nothing to do with

22    insurance, is what I'm saying.  We didn't know she had any

23    connection to any sort of insurance.  So Tristal Spanola,

24    from what we know of, was a Bloomin' Brands' employee.

25           Secondly, the proper order of events, in terms of

1  representations regarding getting back with -- because

2  that's where the whole context of this whole line of

3  questioning came from, is that Chip Chase provided his card

4  to Dr. Haysbert's daughter.  Lisa Crosby provided her --

5          THE COURT:  Chip Chase?  I thought it was through

6  Robinson that wrote down the number.

7          MR. HAYSBERT:  I'm sorry.  Lisa Crosby provided

8  Chip Chase's card to Dr. Haysbert's daughter.

9          THE COURT:  I don't believe he was even there.

10         MR. HAYSBERT:  He was there in the kitchen.

11         THE COURT:  He wasn't out in the area.

12         MR. HAYSBERT:  Correct.  I'm sorry.  Lisa Crosby

13 provided Chip Chase's card to Dr. Haysbert's daughter, and

14 then also Lisa Crosby provided her own number to

15 Dr. Haysbert's daughter.  The testimony was that he provided

16 the numbers, called those numbers, and nobody ever got back

17 to us.  So then my follow-up, the reason we got into this

18 context was, well, whose responsibility is it within the

19 Outback Steakhouse itself to follow up with customers?  The

20 reason I asked this question is because it was elicited in

21 deposition about the managing partner of the restaurant is

22 the one who ultimately is supposed to follow up.

23         Ms. Eleftherion said in her deposition that

24 ultimately, because I wasn't the managing partner, that was

25 Chip Chase's role.  Lisa Crosby also said in her testimony,

1   if she is allowed to testify, that it was also Mr. Chase's

2   role.

3         So what I'm eliciting from two individuals that

4   worked there that were key managers, critical managers, was

5   that there was no personal responsibility that they were

6   giving themselves to follow up with anyone.  In Lisa

7   Crosby's situation, she gave her number to Mrs. Haysbert and

8   said if you ever need anything, get back to me.

9         According to Ms. Eleftherion's testimony, she is

10  the guest relations person, the guest advocate.  If anyone

11  should be in a position to do that, it would be Lisa Crosby.

12  So why isn't anyone following up with Mrs. Haysbert?  Why

13  isn't anyone taking any personal responsibility for what

14  happened at this restaurant?  Why are we talking about

15  anything else outside of that?  I have no idea.  I didn't

16  deliberately elicit testimony to talk about insurance, not

17  at all.

18        THE COURT:  Why did you ask the second question the

19  same way, just tweaking it a little it?

20        MR. HAYSBERT:  You instructed her not to talk about

21  insurance.

22        THE COURT:  Well, then why did you ask the

23  question?  I cautioned you on that question.  I cautioned

24  you on that question, Mr. Haysbert.

25        MR. HAYSBERT:  You also cautioned the witness, Your

1  Honor.

2          THE COURT:  I cautioned you on that question, and

3  it elicited the same answer.  I'm not going to keep bringing

4  up the word.  It wasn't necessary, because I had already

5  done what I should do, and then I cautioned you on the

6  question, and you went right ahead with it.

7          MR. HAYSBERT:  Your Honor, you did caution me on

8  the line of questioning.

9          THE COURT:  On Page 36.

10         MR. HAYSBERT:  Understood.  And, Your Honor, I

11 wasn't trying to deliberately bring in the response again.

12 In fact, I heard her -- I heard you provide her the similar

13 instruction, "We are not talking about insurance," and so

14 I'm expecting -- my question, which could have been worded

15 better, I would give you that, I could have said, you know,

16 "Within the four corners of the Outback Steakhouse itself,

17 who is the person that's responsible for making sure that

18 any follow up that goes to an individual that's been through

19 something, that person within that restaurant follows up

20 with that person?  I could have said it more articulately,

21 but I wasn't deliberately trying to elicit an answer

22 regarding insurance.  That isn't what I was doing.  If you

23 had given her the instruction, that you're not supposed to

24 talk about insurance.  I'm not trying to blame her.  I know

25 that she was nervous.  Every witness here, you know, most

1    people haven't been here before, and I was being as nice as

2    I could to Ms. Eleftherion.  I was treating her very

3    respectfully, but I wasn't trying to get her to say anything

4    about insurance.  That's my answer.

5              THE COURT:  Any response, Mr. McGavin?

6              MR. McGAVIN:  You know, attachments to our motion,

7    Your Honor, we include Page 315 of the deposition of

8    Ms. Eleftherion.

9              THE COURT:  You either put it up, or I can get to

10   it.  I've got it here.

11             MR. McGAVIN:  I'll put it up, with the Court's

12   permission.

13             THE COURT:  You have my permission.

14             MR. McGAVIN:  Thank you.

15             THE COURT:  It's part of your motion, but I've got

16   a lot of depositions here.

17             MR. McGAVIN:  I know, Your Honor.  So I highlighted

18   in yellow, and we are talking about the incident report in

19   this section beginning Page 315 at line 5.

20             "At what point in time could it have come across in

21   an e-mail?"

22             "Answer:  I honestly don't remember.  I am thinking

23   that when we initially called the incident in to our

24   insurance, that they had requested anything that we had, and

25   I, again -- I don't remember very well, but I think we

JODY A. STEWART, Official Court Reporter

1    had -- I think we had sent it to them."

2          So he says, well, what do you mean?  Well, I'm not

3    quoting he says:

4          "We sent it to them?" question.

5          "Answer:  The restaurant.  I did not personally

6    send it."  So now you can see we are talking about the

7    incident report.  So where does the incident report go?

8    It's sent into our insurance.

9          So this is Ms. Eleftherion testifying about what

10   happens when an incident report is prepared.  It's required

11   to be prepared on the day of -- the next day of the event,

12   and it's sent to whom?  And Ms. Eleftherion's understanding,

13   and mine as well, it's going to the risk

14   management/insurance department.

15         So what apparently Mr. Haysbert is trying to do is

16   try to argue the risk management department at Bloomin'

17   Brands, who is self-insured at some level, is not insurance.

18   Of course, it is.  They're self-insured up to a certain

19   level.  Then they have excess upon excess upon excess.  Of

20   course, it is their insurance department.  That's where the

21   incident report goes.  There is no debate about that.  And

22   in the world of a key manager at Outback, they sent it to

23   insurance.  That's who handles it.  That's who resolves

24   these cases.  So to try to slice the onion so carefully when

25   we have it right here, when he asked where does the incident

1    report go?  We send it to our insurance.

2           THE COURT:  I know it's in the record because I've

3    looked at it.  You attached all those depositions.  But can

4    you just go to the front and tell the Court the date of the

5    deposition?

6           MR. McGAVIN:  Yes, I can, Your Honor.  We have it

7    here.

8           THE COURT:  It is here.  I have them all

9    paper-clipped.

10          MR. McGAVIN:  I understand, Your Honor.  This is

11   the remote videotaped deposition of Alicia Louise

12   Eleftherion, May 13th, 2021.  Believe me, this is fully

13   explored because here we have Ms. Eleftherion with a

14   deposition that's 331 pages.  It concluded at 5:15 p.m.  It

15   commenced at 8:22 a.m.  So that's all in, and we kept

16   careful notes.  It was a full seven-hour deposition, and

17   Mr. Haysbert certainly had every opportunity to ask

18   repetitive questions, which he did, and I objected

19   repeatedly, asked and answered.  He had a full record,

20   nothing withheld.  So he knew.  It's evident right here.

21          Thank you, Your Honor.

22          MR. HAYSBERT:  Your Honor, if I may.  The

23   deposition testimony that he just provided to you was in the

24   context of discussing an incident report.  That was not an

25   exhibit in this case, was never discussed at trial, and

1    never came up.  I made no reference in the incident report

2    here.  In fact, my entire line of questioning at the time

3    this came up had to do with safety at the Outback and

4    accountability by managers.  That was all.  So this wasn't

5    deliberate.

6        You cured it with a curative instruction.  You

7    provided the information to everyone that they needed to

8    know to protect the record, and that's where we stand.

9    Everyone saw the witness was nervous, including the jury.

10   They knew that she -- she is a nervous person, or she was

11   nervous on the stand.  I think anyone would recognize that,

12   and maybe she would say something that, you know, she

13   misheard or she heard the judge to tell her to do something

14   that she didn't do, and I think that that was adequately

15   protected by your curative instruction, Your Honor.  I truly

16   do believe that.  I don't believe that this -- and this is

17   my personal opinion -- that something the jury gave much

18   thought to, especially after you provided that instruction.

19   But I can tell you where I stand, and that is there was no

20   deliberation on my part to focus on insurance or to try and

21   get insurance involved in this.

22       In the context of that deposition, that was an

23   incident report that I was referring to.  That's the only

24   reason it came up, because she was saying incident reports

25   have to be sent into the insurance company.  But there is no

JODY A. STEWART, Official Court Reporter

1    incident report in this case.  It wasn't on the exhibit

2    list, and I planned to make no reference to it, never made

3    any reference to it.  I simply wanted to know who at the

4    Outback holds them personally accountable to customers when

5    you tell them you are going to follow up with them, you

6    actually do it.

7            MR. McGAVIN:  Your Honor, may I respond very

8    briefly?

9            THE COURT:  Yes.

10           MR. McGAVIN:  Thank you.  There was an incident

11   report, and Mr. Haysbert knows it, and he filed a motion to

12   compel production of it.  We withheld it because it was sent

13   to the insurance company as part of the claims process, and,

14   therefore, it was not produced.  So he knows.

15           THE COURT:  It was ruled on in discovery.

16           MR. McGAVIN:  Yes.  So he knows that.  He sought

17   it.  He wanted it.  Judge Miller refused to allow it because

18   it was prepared in anticipation of litigation.  So for him

19   to stand here and say there was no incident report on the

20   witness list, obviously, because it injects insurance into

21   the case, and he's created the record here in this case,

22   through Mr. Chase, that an incident report has to be

23   prepared, and anybody who's a key manager can fill it out,

24   and it was done.  So to represent to the Court there was no

25   incident report in this case, that's just false.

1          THE COURT:  Well, if you would have tried to

2   introduce it at trial after the ruling of Judge Miller and

3   any appeal to the District Judge, it would have been, again,

4   a violation of the rules.

5          MR. McGAVIN:  Yes.

6          THE COURT:  A violation of the Court's orders.

7          MR. McGAVIN:  I'm reminded by Ms. Blake, who's

8   asked me for you to consider this, at Page 2 of our brief,

9   we are citing Mr. Chase's testimony.

10         THE COURT:  Let me go to Page 2 of your brief.

11  It's right here.

12         MR. McGAVIN:  I had forgotten this, Your Honor,

13  honestly.

14         Thank you, Ms. Blake.

15         THE COURT:  I had mentioned Mr. Chase, too, that it

16  came up yet again during Mr. Chase.  But let me get this

17  paper clip off of here.  Go ahead.  I'm on your trial brief.

18  There are so many pieces of paper here.  I'm sorry.  I'm on

19  your trial brief as defendant's motion for mistrial, ECF

20  Number 298, and I believe that Mr. Chase's deposition

21  testimony from May 12th, 2021, is set forth in the middle of

22  the page.

23         MR. McGAVIN:  Yes.  And specifically Mr. Haysbert

24  asked:  "Did you respond to the other possibly two slip and

25  fall incidents that occurred at the restaurant?

1              "Respond to the guest directly, no.

2              "Why not?

3              "Because once it's filed through the system,

4    normally it's taken care of through the claims.

5              "When you say it's normally taken care of through

6    the claims, what are you referring to?

7              "I mean any information, or if something is, you

8    know, wrong, more than what the guest says, you know,

9    follow-up, make sure that the guest is okay, and that's done

10   through the claim."

11             Claim is insurance.

12             "When you say following up to make sure the guest

13   is okay is done through the claim, what are you referring

14   to?

15             "I mean if a guest falls, and they say they're

16   perfectly fine, you know, there's no issues, there's a claim

17   filed anyway just to make sure that everything is okay."

18             And we have a similar reference, I believe, in Lisa

19   Crosby's deposition that we cited, but there is no -- this

20   is so obvious for a company of the size of this that has its

21   own self-insurance, 500 facilities, they have a claim, they

22   take it right on up, and there is an insurance process,

23   there is an entire team.

24             This is fully explored, and we are dancing on the

25   head of a pin here to try to say, oh, gee, I never really

1    would have thought they would talk about insurance.  To the

2    extent, by the way, that Mr. Haysbert thinks that's

3    important that Mr. Chase or Lisa Crosby had an obligation to

4    follow up, actually, they didn't.  It was up to claims to

5    get back with the person who makes a claim, and that's what

6    that is.  So there is no good explanation to say I didn't

7    know or didn't expect it.

8              THE COURT:  Mr. Haysbert.

9              MR. HAYSBERT:  Yes, Your Honor.  So contrary to

10   what Mr. McGavin has represented to the Court, the incident

11   report was provided to me, and if you look back at the

12   deposition testimony that he provided, you will clearly see

13   that the document that I put on the Elmo, we did it

14   remotely, put on the computer screen was the incident

15   report, and we were talking about that with respect to

16   Alicia Eleftherion.

17             So the incident report was provided.  It was

18   deliberately left off the exhibit list, never came in, never

19   became an issue.  It had to do with insurance, and we were

20   not trying to touch it.

21             With respect to Chip Chase and Alicia Eleftherion,

22   these are two key managers at the facility that were there

23   on the day of the accident.  When you are down near the

24   accident, and you give the person who has been involved in

25   the accident your card, and someone tells them, here is my

1    number, from the location, then you would expect some type

2    of follow-up, especially them reaching out to you.

3    Testimony was elicited that they called the numbers that

4    they were provided.  No one ever responded to them.

5         The other part of what I was trying to elicit from

6    Alicia Eleftherion is when you were responsible for

7    everything that happened in the front of the house, is it

8    your responsibility to follow up with the person?  If it's

9    not yours, who working at the Outback, either at the time

10   the incident happened or overall, has to follow up with the

11   individual who went through the slip and fall?  And it was

12   never meant to deliberately elicit any sort of information

13   regarding insurance.  Never asked those specific questions

14   at deposition, never intended for it to go to insurance at

15   all.  Thank you, Your Honor.

16        THE COURT:  Is there anything anyone wants to say

17   any further on the mistrial or the reasons for the

18   revocation of Mr. Haysbert before I make my rulings?

19        MR. McGAVIN:  Just very briefly, Your Honor.  I

20   would say this is not an isolated incident in the conduct of

21   this trial, and the totality of the circumstances require

22   that not only the plaintiff get a fair trial but the defense

23   as well.  Just in two days of testimony to have this many

24   issues arise, we believe, will deprive the defense an

25   opportunity to have a fair trial.

1        It's not just the insurance, but when you consider

2   the rare, if ever, motion to revoke a *pro hac*, I've never

3   made such a motion, but I feel it's appropriate, and when

4   you consider the entire circumstances, this trial is tainted

5   by the conduct of Mr. Haysbert, and he should be precluded

6   from this case or, frankly, any other in the Eastern

7   District.  Thank you.

8        THE COURT:  I will begin my ruling on declaring the

9   mistrial in the case.  I would start with the case from the

10  Fourth Circuit that was actually cited by the plaintiff in

11  it's brief, ECF Number 296 at 5-6, when the Court is

12  determining whether an error in a case can be cured by a

13  cautionary instruction, it is within the discretion of the

14  trial court, "Because the Trial Judge can best evaluate the

15  atmosphere of the trial and the possibility of prejudice."

16  That is the case of *Riddle versus Exxon Transportation*

17  *Company*.  It's a Fourth Circuit case, 1977.  It's 563 F.2d

18  1103, and that is a standard whereby the Trial Judge is in

19  the best position to assess the overall atmosphere and the

20  possibility of prejudice, and that if an error can be cured

21  by a cautionary instruction.  I will be addressing those

22  matters in my ruling.

23        When it comes to a trial court's discretion to

24  declare or decline to declare a mistrial, "The exercise of

25  such discretion will not ordinarily be disturbed unless

1    clearly erroneous."  That's from *Bright v. Coastal Lumber*

2    *Company*, 962 F.2d at 365 at 370, and it's a 1992 Fourth

3    Circuit case.

4            There are some internal citations, quotation marks

5    there.  I'm not going to go through.  I'm just going through

6    some legal standards now.  In Virginia, "A Court is required

7    to grant a new trial, if requested, when the prejudicial

8    effect of an improper remark or question is overwhelming,

9    such that it cannot be cured by a cautionary instruction."

10   That is *Lowe v. Cunningham*, 268 Virginia at 268, 273.  It's

11   a 2004 Virginia Supreme Court case, and the explanation by

12   the Court that is, they have some internal citations, that

13   is because, "A mistrial should be ordered when there has

14   been interference with a fair trial."  That's concerned

15   under Virginia law as well as federal law that there be a

16   fair trial.  The quote there was from *Riner v. Commonwealth*,

17   268 Va. 296 at 315/'16, 2004 case.

18           Moreover, as the defendants cite, "The rule in

19   Virginia is that in an action to recover damages for

20   personal injuries, the admission of evidence or argument of

21   counsel deliberately injected into a case to inform the jury

22   that a defendant is insured against the accident is

23   reversible error."

24           That's cited in their brief at 298 at 1, and it's

25   quoting the seminal case, *Hope Windows, Inc., v. Snyder*, 208

1    Va. 489 at 493.  It's a 1968 case.  So those are some basic

2    legal standards.

3           The Court also understands that granting a mistrial

4    is an extreme measure.  The Court also understands that

5    revoking a *pro hac vice* application is an extreme measure.

6           As an aside, I will say, to my memory, I have never

7    declared a mistrial in a civil case, as I recall.  I do

8    recall two criminal cases in which I granted a mistrial

9    because the prosecutor either failed to disclose evidence

10   that should have been disclosed in discovery under the law

11   and/or made an improper or inflammatory remark in statements

12   or arguments before the jury or in questioning a witness.

13          So I do recall, in my soon to be almost four

14   decades on the bench, having granted two criminal mistrials,

15   and I don't recall any civil.  But it's been a long time,

16   and it's not something that the Court takes light and

17   understands the severity and the seriousness of it.

18          The Court also understands the importance of the

19   Court's role to enforce the rules of procedure and evidence,

20   and to ensure that there is a fair trial for both sides.  I

21   cannot remember revoking a *pro hac vice* status because I

22   have never had a *pro hac vice* attorney step over the line

23   the way that the Court feels that Mr. Haysbert has with

24   repeated warnings, repeated admonitions.

25          I would say that in all of my years, I don't ever

1   recall this kind of extraordinary leeway being given by the

2   Court as it has in this case regarding the last-minute

3   nature of so many matters and the failure to follow the

4   rules, which I'm going to go through or have gone through in

5   many instances and the reasons that I will also revoke his

6   *pro hac vice* status because many of the reasons that support

7   the revocation of Mr. Haysbert's *pro hac vice* status also

8   support declaring a mistrial.  They are in many ways

9   intertwined.

10          I will address the insurance issue, but I'll also

11  address how all of this is intertwined because you have to

12  look at attorney conduct.  You have to look at the overall

13  proceeding.  You have to look at the atmosphere of trial,

14  and, frankly, I agree at this point this case has just been

15  infected with problems the entire trial, and it does thwart

16  fairness.  It thwarts fairness for all parties.

17          The Court would not be doing its duty to leave

18  Mr. Haysbert in this case under the conditions that have

19  occurred and that is not fair to plaintiff and what he has

20  done, and what has been injected into the case is not fair

21  to the defendant.  Again, I'm going to go through all of

22  those matters.

23          The bottom line on this is the Court has lost trust

24  in Mr. Haysbert's representations to the Court and the

25  pattern that has occurred.  I'm going to go through all of

1    that.  There is just a pattern here of rules violations,

2    example, the subpoenas, example repeated asked and answered

3    questions, having to explain adverse witness rules, the

4    problems with Dr. Filler and the animations, the deposition

5    explanations that have had to be made, the talking over the

6    Court, talking over witnesses, and particularly these

7    outbursts that have occurred.

8              One thing I didn't say earlier, but I'll say

9    tonight.  It was noted on the record, United States Marshal

10   was in here on Friday night because it was way after hours,

11   and, frankly, they had become aware, there is a court

12   security officer in here, there are people observing in

13   here, and the marshal had become aware of the situation.

14             So that is how strong the outbursts, particularly

15   the first one, were viewed, because this Court is not used

16   to such outbursts from practitioners, and particularly in

17   front of a jury.  It is bad enough in front of the Court but

18   not in front of the jury.  So I would just make that as an

19   aside.  It was noted on the record that the marshal was

20   sitting right at the back of the courtroom and stayed with

21   the proceeding until it was over and made sure that the

22   judge and the court personnel were out of the courthouse

23   safely.  So I would just mention that as an aside to the

24   seriousness of what occurred with the outburst.

25             It's not only the Court losing, I meant to say

1    trust in his representations to the Court and to the jury,

2    because much of this has been represented to the jury in

3    this case.  So that concerns the Court in both of those

4    regards.

5             I think I mentioned the adverse witness rules and

6    the deposition rules and the animation, which we've already

7    discussed.  So I want to indicate that many of the reasons

8    that support the revocation, and I'm going to go through

9    those, of Mr. Haysbert's *pro hac vice* status with the Court

10   also support declaring a mistrial.  These include

11   Mr. Haysbert's failure to follow the rules and the rulings

12   of the Court, his misconduct in front of the jury, including

13   at least two outbursts, his intentional line of questioning

14   that injected insurance into the case, his backdoor attempts

15   to introduce evidence that was not yet admitted or ruled on,

16   and his blatant mischaracterization of witness's testimony,

17   when he would re-ask a question, all of which has no doubt

18   had a prejudicial effect on the jury in this case, in my

19   opinion.  Those things are just incapable of a curative

20   instruction.  I would agree that one mention of insurance

21   can be handled by a curative instruction.  But what concerns

22   the Court here on the mention of insurance, first of all, it

23   was clear from Judge Miller's rulings, at some point Judge

24   Krask took over the case, as the Court said last week, the

25   first encounter it had had with the attorneys was at the

1    conference it called, and then I called that conference to

2    try to keep everything on line, and I've endeavored to do

3    that, and I'm going to go through those efforts in summary

4    form.

5         When I find out, based upon these depositions that

6    I had been presented and read, and based upon the discovery

7    in this case, the second incident, particularly, was

8    uncalled for.  But also the statement that bothered the

9    Court tremendously, and maybe the Court could have done a

10   curative instruction on that, but it bothered the Court

11   particularly when it was mentioned again when the Court

12   rules, Mr. McGavin objects, and it's sustained, and he then

13   starts explaining to the witness that insurance is not an

14   issue in the case, or the Court says that.  "Insurance is

15   not an issue in the case."  Then Mr. Haysbert couldn't let

16   it go.  He had to then mention it three times in his next

17   question, and the last time was particularly harmful, and,

18   in my opinion, deliberate.  He says, "So, I'm only asking

19   you about what you would do in your personal knowledge.

20   Okay.  So let's leave insurance out of it."  You didn't stop

21   there.  You then had to say, "And although insurance is

22   within your personal knowledge," you didn't need to say

23   that.  That's just telling the jury, the witness, you know

24   about it, you're just not saying it because you can't say

25   it.

1          Then you said, "We are leaving insurance out of

2     it."  You mentioned it three times.  And when it happened, I

3     was particularly concerned because you made a statement to a

4     witness, and then you are blaming her when she says it

5     again.  But you've said to her, "It's within your personal

6     knowledge."  And I said, "Please follow the Court's

7     rulings."  I warned you then, and you said you would.  Then

8     we sent the jury out.  We had our discussions.

9          Then you come back after the break on Page 36, and

10    you basically asked the same question, you tweak some words.

11    I read that.  Mr. McGavin objects, and I say to you, "I hope

12    this doesn't go astray," and you say, "I promise you, Judge,

13    it won't."

14         So you couldn't just stop.  That's what's occurred

15    throughout this trial.  Leave it alone.  She said it, and I

16    ruled it wasn't an issue in the case, and had you stopped at

17    one, but you had to say it three more times, and you had to

18    say, "It's within your personal knowledge."  Then on top of

19    that, you then go back pages later -- this is what 's

20    happening -- you want to get this in, so pages later you go

21    back, you ask basically the same question, and this is the

22    excerpt from the transcript that I read as Court Exhibit 1

23    for this hearing.  You interjected again.

24         Then on top of that, Mr. Chase comes in, and first

25    you blurt out that he is an adverse witness after we have

1    been through Ms. Eleftherion, and I told you that is not up

2    to you to declare, you have to approach the Court and get

3    permission.  The only thing it does is allow you to

4    cross-examine.

5         You blurted that out after we had gone through it,

6    and then you asked him questions about that you knew would

7    elicit risk management.  Frankly, everybody at this point

8    knows that risk management is the insurance division.  So I

9    have a hard time not ruling that that questioning along the

10   lines of insurance was not -- I find that it was deliberate.

11   But even if it wasn't, this trial is so infected by other

12   problems and prejudice, and the Court has diligently tried

13   to control this.

14        I've endeavored to do everything I can to keep this

15   trial moving forward.  I don't want to declare a mistrial,

16   but this conduct can't be tolerated by the Court.  The Court

17   just can't tolerate this conduct from an attorney admitted

18   to the court, much less a *pro hac vice*.  That is not a

19   right.  It is a permissive admission.

20        I thought we had started off to a pretty solid

21   start on August 1.  The Court spent a whole day with

22   counsel, and then much into the night getting out the order

23   the very next day that said where we were.  Nobody objected

24   to that order.  Nobody called the Court's attention to

25   anything in that order, and that order specifically said

1    this is the final governing document.  This is going to

2    govern the trial.

3            Then I tried to get your witnesses here.  That's

4    why I didn't quash Mr. Seifert.  I wanted you to get your

5    witnesses here.  The Court wants the case to go to trial.

6    The problem is, things just kept happening repetitively on

7    the same thing.  We have been through them when we were

8    talking about the *pro hac vice*, and I think many of your

9    responses were just simply disingenuous.  It's the same

10   thing:  "I'm sorry.  I thought it was" -- "I didn't realize

11   it was 9:00 a.m.  I was confused with Pacific time" -- "oh,

12   I was a law clerk.  Oh, no, I really wasn't.  It was while I

13   was in law school."

14           Well, all judges, many of us, and I can't right now

15   because of the size of my chambers, but we have interns and

16   externs.  There are very specific rules for interns and

17   externs and their access to courts and what they can have.

18   But it was just again that little tweaking.  It's not the

19   one thing, it's always the tweaking of the information.

20   Because you were not a law clerk.  You were an intern.  That

21   was again a tweaking of the information.

22           Of course, I looked at Mr. McKelvey's bio.  Of

23   course, I looked at your bio.  Of course, I looked at

24   Mr. McGavin's.  Of course, I looked at Ms. Blake's.  So, you

25   know, it's right in your bio, public bio.  I knew from our

993

        1    court records when Mr. McKelvey had been entered.  The judge

        2    just doesn't sit up here in a vacuum.

        3            So, consequently, you keep saying you're trying to

        4    do better, but it's like a day late and a dollar short at

        5    this point in the trial.  In my mind, you have been somewhat

        6    disingenuous with the Court, that's as best in some of these

        7    representations.

        8            In any event, I tried to keep this case moving.  I

        9    think that one of the final straws here was what I consider

       10    the surreptitiousness of these subpoenas.  You could have

       11    said something to the Court.  You could have said, I've now

       12    located.  When something goes on until 8:00 at night, and

       13    somebody doesn't have the documents.  Your computer person

       14    was running all over the place to get copies.  We have to

       15    bring in the process server because we really don't know,

       16    and the times are changing.  The subpoenas are changing.

       17    But it's the accumulation.  It's the cumulative effect.  You

       18    can't just keep at it and keep at it.  Sometimes it's not

       19    just one thing.  So even if, and I do find that it was

       20    deliberate injection of insurance, but even if it was not a

       21    deliberate injection of insurance, there is so much here,

       22    and I will keep going through it.

       23            The other thing is not only the August 1st

       24    conference, but I delayed this trial one whole day, and

       25    finally had to dismiss the jury, trying to sort out the

1  last-minute issues.  Everything seems to have been last

2  minute in this case when you've known about a trial since

3  March 1, and you don't have subpoenas out.  Everything's

4  just been last minute; not having the documents here, and

5  then Federal Expressing them when the receipt says it's

6  going to arrive on the 8th.  It's just been last minute

7  everything and an excuse for everything.  I simply do not

8  accept all those excuses.

9          Somebody can't have that many excuses for

10  everything.  The other thing is, I didn't rule out Dr.

11  Haider, even though you violated the rules there.  You

12  hadn't given the proper notice under the rules.  It wasn't

13  apparently until Judge Miller said it.  Because settlement

14  conferences have not been in front of me.  I don't engage in

15  those with attorneys that are going to be coming before me

16  for trial, even in a jury trial.  I know some judges do.  I

17  do not.  Judge Miller says, well, I don't know how you're

18  going to get zoom in front of Judge Smith.  I'm

19  paraphrasing.  I wasn't there, and I don't know.  But from

20  what I've gathered through you all is, you're not going to

21  get zoom next week on a witness, and cited the rule to you.

22  That rule specifically says that testimony, what is it, Rule

23  43?  Isn't that the rule number?

24          MR. McGAVIN:  Yes, Your Honor.

25          THE COURT:  I think that is the rule number.  I

1    know about the rule, and I'm pretty sure it's Rule 43, and

2    it hasn't been changed.  The pandemic was an exception.  The

3    rule specifically says testimony must be presented live in

4    court, and anything that is presented remotely has to be,

5    and it says, for good cause.  I'm not going to go back

6    through that whole ruling.  But it also, the case law says

7    it's not because somebody's relative, they've got a

8    caretaking responsibility.  But I didn't deny you

9    Dr. Haider.  I said we need more information.

10           Frankly, it wasn't clear to me that you ever

11   planned to bring her here.  I said I need more information

12   in the affidavit.  Are there other people to do the care

13   taking?  Was she planning to keep her regular schedule?  She

14   didn't have to go through lots of things.  She knows whether

15   they made appointments or not.  Just ask whoever made your

16   appointments.  The things that the Court asked were to be

17   sure that she was coming, and if she wasn't coming, that

18   there was proper cause under the law and the rules.

19           So we start out like that, but I didn't deny it.  I

20   let you go forward and try.  Then, as it turned out, you are

21   certainly entitled to withdraw your witnesses, but then you

22   came in, and none of the experts were coming but Dr. Filler.

23   So I don't know why, but I can tell you that I was

24   endeavoring to be sure that the rules were being followed,

25   trying to prevent points that could have caused great harm

1    to your case.

2          There was not a legitimate reason given, at least

3    in that, and I won't go back through it in the first

4    affidavit that was filed on Sunday night at 10:00-something,

5    I recall.  I'm going from my memory now.  I don't have it in

6    front of me.  But there was something filed at 10:00, I

7    think 10:05 on Sunday night.  That would have been August 6.

8    Then something else filed at 6:00-something in the morning

9    on Monday.  I think that was the response to motion to

10   quash.  I'm not looking at my docket right now.  I just know

11   there were two filings in there.  There was the motion to

12   quash, and then there was the response, and in the meantime

13   I believe that the Dr. Haider filing came in Sunday evening.

14   It was either Sunday evening or Monday morning.  I'm not

15   sure it would have come in had Judge Miller not said you

16   can't do this.

17         You had not informed the Court when we were in our

18   hearing on August 1, you didn't say anything about any of

19   those people coming in by zoom.  You didn't say a word about

20   it to the Court.  It is nowhere in that record.  So I

21   allowed you Mr. Seifert against the time limits, and then I

22   did not quash -- or tell you you couldn't use Dr. Haider.  I

23   just did legal and rule requirements.

24         I don't know how I will do a curative instruction

25   on certain things.  A curative instruction at this point on

1    insurance would even draw more attention to it since it's

2    been mentioned so many times.  But even if I could do a

3    curative instruction there, I tried during the trial by

4    striking an answer, but how do you cure an instruction to

5    the jury that these other errors have occurred, the subpoena

6    errors, for instance.  Juries don't understand these things.

7    Juries don't understand the references that you've made.

8    They just don't understand the procedures.  I'm not saying

9    they don't understand the evidence.  They do.  They

10   understand facts, and they listen well.  But they don't

11   understand these procedural errors.  Those are very

12   difficult to give a jury the instructions in regard to.

13         The improper impeachment.  That would be extremely

14   difficult to explain.  That's why I just let it go to the

15   jury.  I'm not going to go through all that impeachment, but

16   it just wasn't handled correctly.  I said so before.  I'm

17   not going to go back through and try to cure that with a

18   jury to say you should do this, you should do that.  I just

19   let it go in.  It's not any one thing like that.  It's the

20   cumulative effect.  Also, in front of the witness, in front

21   of the jury, declaring two witnesses adverse after we had

22   gone through all of the rulings with Ms. Eleftherion.

23         I may be repeating myself, but as I said earlier,

24   there are so many things, and I know my law clerk and I have

25   talked about it.  There are so many moving parts.  One part

JODY A. STEWART, Official Court Reporter

1    moves into the other.  All of these violations are moving

2    parts that come together and create an overall atmosphere of

3    a trial.

4            As the *Riddle* case says, the trial judge is in the

5    best position to determine, through the overall atmosphere,

6    whether there can be a fair trial.  I am truly of the

7    opinion at this juncture, given all that has occurred, there

8    cannot be a fair trial.

9            There were attempts to elicit hearsay and opinions

10   from witnesses after you've been instructed not to do so

11   with earlier witnesses.  I found those in the transcript.

12   The constant objections at some point.  I basically told

13   Mr. McGavin to stop, and then your objection, I still can't

14   get over compound question.  I don't know.  Maybe you were

15   trying to signal something to Mrs. Haysbert.  It wasn't

16   compound, and it wasn't very important, in the Court's mind.

17   But it wasn't a compound question.  You just keep

18   interjecting all of this.

19           The work order on the subsequent remedial measures,

20   which I am not going to directly rule on that today.  I'll

21   tell you why, because at the end, it's not the admissibility

22   so much that supports the mistrial, it's plaintiff's

23   counsel, before the jury, kept mentioning the work orders

24   and going through those and trying to get it in when he knew

25   they were objected to.

1          He represented they were being used for permissive

2     purposes, including impeachment, and then he mentioned

3     something about warning, and then he made an attempt to

4     quickly publish one of those work orders to the jury through

5     Mr. Seifert, near minutes after this whole conversation had

6     taken place.

7          The Court instructed the jury that the issue of the

8     floor change, remedial measures was still under advisement.

9     It's, again, this trying to get in the animation, it's

10    trying to get in the work order, and yet you continue to

11    focus on it.  You just wouldn't give the Court a chance to

12    rule, you kept focusing on it, and it had not been ruled

13    admissible.  Then, this is a quote from the record, you told

14    the jury that the work order was, "An authenticated

15    document."  Now, how do you explain in a curative

16    instruction authentication?  To a jury that means it's a

17    real document.  It's part of this case.  They don't

18    understand the rules of authenticity being the floor.

19    Authenticity is the floor.  You can't get anything in any

20    record if it's not authenticated.  Once it's authenticated,

21    there is so much more that needs to be done, and the Court

22    had ruled that.  You would say that in front of the jury.

23    "Well, it's an authenticated record."  Well, that's makes

24    the jury think, well, you know, somebody's bias, not letting

25    them get a work order in, and Mr. McGavin is objecting, and

1   it's a threshold requirement.  It was just misleading.

2   Again, it's this misleading of the jury.  Adverse witness.

3   Deposition impeachment and designations.  The work order

4   being authentic.  Every opportunity you've got, you slip

5   something like that in.  I think I'm on Page 4 or 5 now, and

6   all of the excuses given for the things before, the vast

7   majority I found to be disingenuous, and I'll go through

8   some of that in a minute.

9           Frankly, in my view, and I'm not ruling upon it,

10  and I'll say why and how later, but certainly it's up to the

11  Court to decide whether it's permissive purposes.  I truly

12  feel like you were trying to get that in to show negligent

13  conduct, and that you were not really doing impeachment.

14  The testimony that came out, there wasn't anything on the

15  floor to put up a sign.  You are talking about when they

16  repaired it, putting up a sign or something.  I don't know

17  that you ever showed there was anything on the floor.  Your

18  witness, your plaintiff -- and I can understand.  She was

19  upset.  She was shaken by the fall.  She didn't look at her

20  clothes.  She didn't look at the floor.  Her daughter, the

21  same way.  In any event, you kept trying to get these work

22  orders in.  The only thing I can think of was to show

23  negligence.  But, you know, I'm not ruling on any of that

24  right now.  Again, I'll mention it later.

25          You just continued to focus on it by the

1    authenticated document and after the Court had ruled and

2    said we are not doing that right now.  This makes testimony

3    confusing and misleading to a jury.  I'm just not sure on

4    these things that the jury at this point, I would have to

5    give a litany of limiting instructions, and I just don't

6    think the jury can follow those limiting instructions.  Even

7    if they could, the case is infected at this point.

8          A cautionary instruction or a couple of cautionary

9    instructions, this has all happened before a jury over just

10   three days, and all this has been going on.  Again, Dr.

11   Filler's testimony, we may or may not get to that, but was

12   there any Rule 26(a) disclosure that he relied on

13   Dr. Haider's clinical evaluation?  I couldn't find one.

14   Maybe there was.  But I wasn't aware of any 26(a), and that

15   relates to the Court's bigger concern regarding repeated

16   mention during Dr. Filler's testimony of Dr. Haider's

17   evaluation, and then you withdrew her as a witness, and the

18   backdoor attempt to play the brain animation.  Those are

19   what is of concern to the Court.  That was not created by

20   Dr. Filler, and there had been no foundation for who did it.

21         Now you tell me it was a company and when it was

22   done.  It was no foundation to even use that as a

23   demonstrative exhibit.  I thought Dr. Haider would establish

24   that, but then she didn't come, and he certainly couldn't

25   establish it because he said he didn't prepare it.  Then

1002

1    putting on his demonstrative and quickly going through it

2    with the title still being on there.  Then the Court has to

3    go back and try very hard at the inception not to taint the

4    jury to think anything is going on.

5          So, consequently, you knew of the outstanding

6    objections, and that's very concerning.  You knew of the

7    objections to the demonstrative exhibit of Dr. Filler, and

8    you knew of the objection to the admissibility of the

9    animation, and with Dr. Filler's objective, I'm the one who

10   said do you have anything with Ms. Haysbert's brain imaging?

11   Then you objected to a question about an MRI, who he's the

12   one set up here explaining to us, the only witness we have,

13   that explained the difference in the three types of MRIs.

14   Then you object to a question because he's asked, which was

15   perfectly appropriate, and it had come out through your own

16   witness, that she had this MRI.  You objected to it.  It's

17   just been one thing after another.  The Court just feels

18   like, you know, it can't control you because you just don't

19   observe the Court's rulings, and you just go right back at

20   it.

21         Then every time the Court would look, which the

22   Court can, to Mr. McKelvey, he didn't know.  He didn't

23   participate in examining one witness.  When I asked him

24   questions, he didn't know.  One time he did say he hadn't

25   really been paying attention.  He didn't know.  I asked him

1003

1    about the subpoena on Friday.  I should be able to turn to

2    local counsel.  When I asked him about the subpoena on

3    Friday, well, the first thing he heard of it was, I think he

4    said, about 3:00 this afternoon when we were talking about

5    the subpoenas.

6         It's clear to the Court that he has not been fully

7    involved in this case, and the Court's very disappointed

8    because the Court cannot ignore the reality of the situation

9    that has taken place here in court and the rules that there

10   be local counsel and that the local counsel be prepared to

11   go forward with the case.

12        I guess I would say that overall it's the

13   cumulative conduct under the rules and rulings of the Court

14   that cause the Court to declare a mistrial, which cannot be

15   cured by an instruction to the jury on all the issues

16   involved.  Although the parties were aware of the trial date

17   since March 1, 2023, and the Court has made every attempt to

18   keep this properly on track, it has been infected with

19   delay, untimeliness, and the failure to follow the rules and

20   the rulings of the Court, and the Court cannot accept this,

21   and the case simply cannot go forward under those

22   circumstances.

23        Now, the first thing that I would say is the Court

24   will reduce its rulings today to a written opinion.  I

25   obviously, with the motion coming on Friday, and everything

1004

1    being filed over the weekend, the Court has endeavored to

2    make this ruling as coherent as I can, but it does reserve

3    the opportunity to reduce today's oral rulings to a writing.

4           Obviously, it had to be made today because we

5    cannot keep a jury here.  Consequently, and, again, I would

6    go back to, even if there wasn't grounds for the mistrial

7    just based on the insurance, Mr. Haysbert is being removed

8    from his *pro hac vice* status, and a jury trial here can't go

9    forward fairly because there is not any way for the Court to

10   explain *pro hac vice* status and all of a sudden the one

11   individual who has examined every witness, I think referred

12   to himself in introducing himself, I think, as lead counsel.

13   I know he always says that to the Court.

14          So he then just disappears, there is not any way,

15   and I, frankly, am of the opinion that Mr. McKelvey says he

16   can go forward with this, but it hasn't been demonstrated to

17   the Court that he is able to go forward with this without

18   prejudice to the plaintiff at this juncture.

19          That doesn't mean he can't stay in the case,

20   because as far as the Court is concerned, now whatever delay

21   it is, gives the chance to whoever is trying the case, and

22   if it's Mr. McKelvey, fine, to get it straight, get the

23   witnesses here.

24          There is no excuse if the case goes forward in a

25   new trial not to have witnesses here, not to know how to

1   impeach people with deposition testimony, not to be blurting

2   out adverse witness, not to be trying to get in evidence

3   that's been declared inadmissible, not following the local

4   rules of the Court in regard to zoom and subpoenas going out

5   and all of the matters that have been mentioned.

6           So, in my opinion, this is actually to

7   Dr. Haysbert's benefit because there is at least now a

8   chance to get some of these constant procedural and rule

9   problems straightened out without there being basically a

10  change in -- doesn't change the liability issues, it doesn't

11  change the causation issues, and it doesn't change the

12  damages issues, but at least you can get the case in order

13  to go forward.

14          So, again, I reserve the opportunity to reduce this

15  to writing, and I think that this at least gives an

16  opportunity for the plaintiff to go forward in a timely,

17  organized matter under the Federal Rules of Evidence and

18  procedure and the local rules of this court and the law.

19          What the Court is requiring at this point is that,

20  number one, plaintiff, through Mr. McKelvey, he's still in

21  the case as local counsel, he's agreed to stay in the case

22  as local counsel.  I specifically asked him that earlier.

23  He has 21 days to notify the Court if a new trial date

24  should be set.

25          The Court will direct that any new trial be

1    re-assigned to another judge of this Court with a new jury.

2    That judge can also determine how to handle Dr. Filler's

3    testimony, since it would be going before that judge, and

4    decide the causation question, which I frankly have great

5    reservations about, and the admissibility of the work

6    orders, and the remedial issues.  I would prefer that the

7    judge who is going to handle this trial be the one to make

8    the rulings on Dr. Filler, which have been briefed, and the

9    remedial issues that are taking place.

10           If plaintiff for some reason desires to secure new

11   local counsel, I don't know what her relationship is, it's

12   hard to tell, but what the plaintiff's relationship is with

13   Mr. McKelvey, but he said he's willing to proceed, and if

14   she's willing for him to proceed, then that's the way it is

15   at this point.  He would not be able to remove himself from

16   the case without permission from a judge of this Court and

17   without the plaintiff's agreement to it.

18           But he is the one responsible at this juncture for

19   notifying the Court within 21 days if a new trial date is

20   sought.  If it is not, then the case would be dismissed from

21   the Court's docket.  I would say that the Court, as I said,

22   will direct that any new trial be assigned to another judge

23   of this Court, and any newly assigned judge can determine

24   any withdrawal of local counsel and any *pro hac vice* motions

25   that may come before the Court for any new trial.

JODY A. STEWART, Official Court Reporter

1          Any delay will allow, as I said, for proper

2     preparation.  Facts, causation, and damages claims for

3     plaintiff do not change.

4          Neither counsel, and I would say this strongly

5     because the jury will be told this, and this is certainly

6     evidence for extreme sanction by the Court, our local rules

7     do not allow any attorney or anyone on their behalf to

8     communicate with any juror in the case.  Are you familiar

9     with that rule, Mr. McKelvey?

10          MR. McKELVEY:  Yes, Your Honor.

11          THE COURT:  I'm telling you that rule now that you

12     may not, you were admitted for a limited purpose, and it was

13     before this jury, and you and no one on your behalf may

14     contact these jurors, and if you do, the jurors have been

15     instructed that if any attorney that appeared in this case

16     while they were jurors, or anyone on their behalf, should

17     contact them -- I don't know what you do in California, but

18     here we don't allow it.

19          So if you contact them, they will immediately

20     notify the Court, and you need to be aware of that and the

21     seriousness with which that conduct is viewed by the Eastern

22     District of Virginia.

23          Mr. McKelvey, are there any questions about the

24     Court's instructions going forward?

25          MR. McKELVEY:  Your Honor, let me, is it okay if I

1008

1  repeat what I have down just to be sure that I'm correct on

2  everything the Court said?

3          THE COURT:  Sure.  Let me go to my page.

4          MR. McKELVEY:  Yes, ma'am.

5          THE COURT:  Let me go to the page where I've got it

6  all written out.

7          MR. McKELVEY:  Yes, ma'am.

8          THE COURT:  I think I can still read it.  I'm not

9  sure anybody else can.  Give me a minute.

10          MR. McKELVEY:  Yes, ma'am.

11          THE COURT:  All right.

12          MR. McKELVEY:  Thank you, Your Honor.  First one

13  is, plaintiff has 21 days -- these are just paraphrased.

14          THE COURT:  That's fine.

15          MR. McKELVEY:  Plaintiff has 21 days to notify the

16  Court if a new trial -- if she seeks a new trial in this

17  case.

18          THE COURT:  Any trial date should be set.

19          MR. McKELVEY:  Yes, ma'am.  If a new trial date

20  should be set.  If so, then, again, just paraphrasing,

21  different judge and jury, obviously different jury but be

22  referred to a different judge, and that judge will rule on

23  the motions regarding Dr. Filler and subsequent remedial

24  measures.

25          THE COURT:  Yes, sir.

1009

```
1          MR. McKELVEY:  Three, plaintiff can obtain other
2    counsel but only -- I can withdraw if the plaintiff wants me
3    to, but she has to have other local counsel prior to that
4    withdrawal, is more or less how I took that.
5          THE COURT:  Yes.
6          MR. McKELVEY:  Any motions regarding that issue
7    will be taken up with the new judge, if it's obviously a new
8    trial sought.  Facts, claims and causation issues are going
9    to be the same for the plaintiff, and then no communication
10   with the jury.
11         THE COURT:  Yes.
12         MR. McKELVEY:  Thank you, Your Honor.
13         THE COURT:  Mr. McGavin, do you have anything else?
14         MR. McGAVIN:  Your Honor, I assume it will take a
15   few days to prepare the opinion?
16         THE COURT:  I'll endeavor to get it out by the end
17   of August, hopefully in the next couple of weeks.
18         MR. McGAVIN:  That brings me to the 21-day deadline
19   on making a decision by selecting a new trial date.  Does
20   the 21 days begin with entry of the order or does it run
21   from today?
22         THE COURT:  It can begin with entry of the order.
23         MR. McGAVIN:  So when we receive the memorandum
24   opinion, that's when the 21 days begins?
25         THE COURT:  I think you could make it before then,
```

1  but, yes, because I put pretty much everything on the

2  record, but I'll let the 21 days be from when the Court

3  issues the order.

4          MR. McGAVIN:  Thank you, Your Honor.  Then, as to

5  the status of the 26(a) disclosures.

6          THE COURT:  Wait just a minute.

7          MR. McGAVIN:  Your Honor, the second issue relates

8  to the 26(a) disclosures.  There will be no new 26(a)

9  disclosures?  Those are locked in where they were, is that

10 what the Court was saying?

11         THE COURT:  A new judge can take that up.

12         MR. McGAVIN:  Thank you, Your Honor.

13         THE COURT:  As far as I'm concerned, any of these

14 issues, I said I would reduce this to writing, so I'm

15 hesitant on that because my mistrial ruling is final.  Well,

16 it's really an interlocutory ruling under the law, but if

17 you look at the case law, it is.  I don't know why it would

18 take more than 21 days.  I have made my ruling from the

19 bench.

20         Mr. Haysbert is disqualified as *pro hac vice*

21 counsel in this case and on your motion, and for the reasons

22 I said, and the mistrial has been declared, and the jury is

23 being sent away.  I think it can go either way whether the

24 21 days runs from today or from when I get the order out,

25 because one way or the other, whether it's considered today,

1    I don't know what more information they need to decide.  I'm

2    not going to sit here and straighten out things that may

3    have to be taken up.  I would assume there are no further

4    26.

5         MR. McGAVIN:  Thank you, Your Honor.

6         THE COURT:  I would assume there are no further

7    such designations, and I would assume that the claims in the

8    case can't change, but I'm not making any ruling past a

9    mistrial or past disqualification of Mr. Haysbert.

10         MR. McGAVIN:  Thank you, Your Honor.

11         THE COURT:  The question of Ms. Deajah Clark is now

12    moot, but I would put on the record as an exhibit in this

13    hearing that this subpoena is signed by Mr. Haysbert on

14    August 10th directing Ms. Clark to be before me in this

15    court on August 11 and 14 between 10:00 and 6:00 p.m.  It

16    was served by Ms. Donaldson on 8-11-2023 at 2:20 p.m. on

17    8-11-23 to Ben Mayo, a manager.  I assume that's the manager

18    that she talked about for the Roadhouse, and that is what

19    she has given as the proof of service.  It just came through

20    from the case manager to the Court.  We will make that the

21    next exhibit, Ms. Armstrong, and I have one more question

22    for you.

23         I just wanted to clear up one other matter.  Here

24    is the Deajah Clark, and that should be an exhibit.  I will

25    let your 21 days run from when I issue the order.  That will

1    give you more time, Mr. McKelvey, to discuss the matter with

2    Dr. Haysbert and how she wants to proceed.  So I don't see

3    that as a major delay.  The 21 days will run from the time I

4    issue the written order, and that will be in the written

5    order, the 21 days from the date of this order.  So that

6    will be the effective date of it for complying, will be from

7    the date of that order.

8            The other thing is, I just asked Ms. Armstrong

9    about the paper exhibits.  She says that she communicated

10   that to local counsel.  She's communicated that to

11   Mr. McKelvey.  So, apparently, again, there must have been a

12   lack of communication as between the *pro hac vice* counsel

13   and local counsel.  So that's all that she said, is that she

14   did communicate it to Mr. McKelvey.  It wasn't communicated

15   to Mr. Haysbert.  But that doesn't excuse that there was an

16   arrival there without the exhibits and that there had been

17   no request for electronic equipment to be brought into the

18   courthouse and approved by the Court when you arrived with

19   computers, and all of those rules are on the website.

20           Then, I will endeavor to get this written opinion

21   out as quickly as possible, and the Court stands in recess

22   until tomorrow at 11:00 a.m.

23           I would tell you, Mr. McKelvey, if you want to be

24   here, Mr. McGavin, if you want to be here, the jury is going

25   to be dismissed tomorrow.  I don't know whether you want to

1    be here or not.  All it is going to be is dismissed and told

2    the rule by the clerk that they can't talk to anybody.

3        MR. McGAVIN:  Your Honor, if I may be excused, I

4    would prefer not to be here.

5        MR. McKELVEY:  I would request the same thing.

6        THE COURT:  I will excuse you both.  I think that

7    would be a further expenditure of your time that's

8    unnecessary for your clients.

9        MR. McGAVIN:  Thank you, Your Honor.

10        MR. McKELVEY:  Thank you, Your Honor.

11        THE COURT:  Then the Court stands in recess until

12    tomorrow.

13            (Hearing adjourned at 5:18 p.m.)

14                    CERTIFICATION

15

16        I certify that the foregoing is a correct transcript

17    from the record of proceedings in the above-entitled matter.

18

19

20        X_____/s/_____x

21                Jody A. Stewart

22        X_____8-27-2023 _____x

23                Date

24

25

JODY A. STEWART, Official Court Reporter