# EXHIBIT A

```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        Newport News Division

 3

 4    - - - - - - - - - - - - - - - - - - -
                                          )
 5    JOANN WRIGHT HAYSBERT,              )
                                          )
 6            Plaintiff,                  )
                                          )    CIVIL ACTION NO.
 7    v.                                  )    4:20cv121
                                          )
 8    BLOOMIN' BRANDS, INC., AND          )
      OUTBACK STEAKHOUSE OF FLORIDA,      )
 9    LLC,                                )
                                          )
10            Defendants.                 )
      - - - - - - - - - - - - - - - - - - -
11

12

13                      EXCERPT OF PROCEEDINGS

14          (Direct testimony of Alicia Eleftherion)

15                            DAY 4

16                       Norfolk, Virginia

17                       August 11, 2021

18

19    BEFORE:  THE HONORABLE REBECCA BEACH SMITH, and a Jury
              United States District Judge
20

21

22    APPEARANCES:

23            CRANDALL & KATT
              By:  David A. McKelvey
24                    And
              HAYSBERT & MOULTRIE LLP
25            By:  Nazareth M. Haysbert
                  Counsel for the Plaintiff
```

JODY A. STEWART, Official Court Reporter

```
 1

 2    APPEARANCES CONT'D:

 3

            McGAVIN, BOYCE, BARDOT, THORSEN & KATZ, P.C.
 4        By:   John D. McGavin
                Emily Blake
 5                Counsel for the Defendants

 6

 7

 8                          I N D E X

 9    PLAINTIFF'S
      WITNESSES                DIRECT    CROSS    REDIRECT    RECROSS
10
      ALICIA ELEFTHERION        3         86       88
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    ask the question to.

2          MR. HAYSBERT:  Thank you, Your Honor.

3    BY MR. HAYSBERT:

4    Q.  Right underneath the managing partner at the time was

5    you, right, Ms. Eleftherion?

6    A.  There were three of us, that we were all equal in -- use

7    the word rank, we were all equally management salaried,

8    managers.  There were three of us, yes.

9    Q.  So I'd like to clarify, there was managing partner at the

10   top and then three managers report to him, correct?

11   A.  Correct.

12   Q.  And you were one of those three managers?

13   A.  Correct.

14   Q.  And your specific responsibility was for the front of the

15   house, meaning the dining room?

16   A.  Correct.

17   Q.  Thank you.  When there are spills at the restaurant in

18   the dining room, was there any protocol in place to make sure

19   the effective location was monitored while someone is

20   notified and things can be cleaned up?

21   A.  Yes, sir.

22   Q.  Could you explain?

23   A.  Yes.  In the event of a spill or --

24          THE COURT:  You need to speak up a little bit.

25          THE WITNESS:  I'm so sorry.  I have weak vocal

1   cords.  I apologize.  In the event of a spill or something

2   was even dripped on the dining room floor, whoever notices

3   it first, they are to stay with the spill or the drip and

4   notify someone close by to go and get both the wet floor

5   sign and dry mop, if available, or just dry towels, until

6   that spill can be completely resolved and dried condition to

7   where the floor can be walked on without any kind of issue.

8           MR. HAYSBERT:  Thank you very much.

9   BY MR. HAYSBERT:

10  Q.  Employees are required to wear non-slip shoes, correct?

11  A.  Correct.

12  Q.  Were you working the day of the incident?

13  A.  I was in the building that day, yes.

14  Q.  Were you wearing non-slip shoes?

15  A.  Yes.

16  Q.  Is it correct that every employee that works at

17  Chesapeake Outback is required to wear non-slip shoes?

18  A.  That's correct.

19  Q.  Is it true that between the time that you were there in

20  July 2017/February 2019 as manager, every employee who has

21  worked in the front of the house, the dining room, has to

22  wear non-slip shoes, correct?

23  A.  Correct.

24  Q.  And that would include Lisa Crosby, correct?

25  A.  Correct.

1    Q.  You indicated earlier that you were working the day of

2    the incident.  Where were you?

3    A.  I was actually in the kitchen that day.  There was a

4    need, and I was filling in.

5    Q.  Okay.  So even though your normal responsibility is to

6    manage the front of the house, there was a need for you to be

7    in the back of the house, correct?

8    A.  Correct.

9    Q.  And that's where you were that day?

10   A.  Correct.

11   Q.  In your personal experience, looking back at that day,

12   where was Chip Chase, Norman Chase?

13   A.  I do not believe he was there that day at all.

14   Q.  Okay.  Do you believe Lisa Crosby was there?

15   A.  Yes.  Lisa Crosby was working that day.

16   Q.  So Lisa Crosby was there that day?

17   A.  Yes.

18   Q.  And she was a floor manager on duty that day?

19   A.  Yes.

20   Q.  Can you tell the jury what a floor manager is.

21   A.  A floor manager is just a little bit different than a

22   salaried manager.  We have a lot of salaried employees, a lot

23   of different responsibilities.  A floor manager is

24   essentially a guest advocate, and they're required to move

25   throughout the dining room, speaking to guests, ensuring

```
1    guest satisfaction, that they are happy with their food,

2    their service, and speaking to people and just filling any

3    needs they should come across.

4    Q.   That's what Lisa Crosby was?

5    A.   Correct, yes.

6    Q.   Because you were the manager of the front of the house,

7    although you were in the kitchen, did you know whether Joi

8    Myrick was at the hostess stand in the dining room at the

9    time that you were working there?

10   A.   In the morning, I would always pull roster, so I was

11   aware of who was working that day.  I believe Joi was working

12   that day.

13   Q.   And Joi is an African-American lady?

14   A.   Yes, I believe she is.

15             THE COURT:  You talk very quickly.

16             THE WITNESS:  I'm sorry.

17             THE COURT:  You said she was there in the morning.

18   Was she there for the whole day?

19             THE WITNESS:  I don't know what time Joi left that

20   day.  I believe Joi was there at some point in time for her

21   shift.

22   BY MR. HAYSBERT:

23   Q.   Her job was to be the hostess and be stationed at the

24   hostess stand, correct?

25   A.   Correct.
```

1              THE COURT:  For a certain number of hours?

2              THE WITNESS:  Yes, that is correct.

3    BY MR. HAYSBERT:

4    Q.  Was it Joi Myrick's responsibility as the hostess

5    standing at the hostess stand to maintain floor conditions at

6    the restaurant?

7    A.  It is the responsibility of everyone working in the

8    front.

9    Q.  Thank you.  You didn't see Mr. Haysbert fall, did you?

10   A.  No, I did not.

11   Q.  You don't know exactly what caused her to fall?

12   A.  I don't know.

13   Q.  Do you know where she fell?

14   A.  I'm aware of the area, yes.

15   Q.  How are you aware of the area?

16   A.  Lisa Crosby, the next day, made me aware that there was a

17   slip and fall in the dining room, and I asked her where, to

18   show me, and so she showed me the table where it occurred,

19   and so I just -- was trying to inspect things, as I routinely

20   did, so that is how I know.

21   Q.  Did she show you where the fall happened through a

22   picture or photograph?

23   A.  She had taken a picture of the floor, I believe, but she

24   showed me exactly which table it was.

25   Q.  She also showed you a picture of it as well?

1    A.  Yes.

2    Q.  Why did she show you a picture of it?

3    A.  I don't know.

4    Q.  If I may, I'm going to go to Defendant's Exhibit Number

5    1.  Can you see the picture?  Can we publish?

6              THE COURT:  Doesn't get posted to the jury.

7              MR. HAYSBERT:  Only to the witness.

8              THE COURT:  To the witness and counsel and the

9    Court.  I don't see it on my screen.

10             MR. HAYSBERT:  Thank you.

11             THE COURT:  Now I see it.  The Court doesn't mind

12   you asking these questions, but we are asking the same

13   question over and over, and you know there is a witness

14   coming who can testify about this, and I'm not sure where

15   you're going with asking her about this picture, but you can

16   do so.

17             You didn't take this picture, did you.

18             THE WITNESS:  No, Your Honor.

19             THE COURT:  Go ahead.

20   BY MR. HAYSBERT:

21   Q.  You testified that you saw this picture.  Is this the

22   picture you saw?

23   A.  I believe that to be the same picture, yes.

24             MR. HAYSBERT:  Your Honor.

25             THE COURT:  Just keep on.  In the Court's opinion,

Eleftherion, A. - Direct                                                45

1    there are quicker and easier ways to get these exhibits in

2    without asking the same question of the same witnesses, but

3    just to facilitate things, just go ahead.

4             MR. HAYSBERT:  Thank you, Your Honor.  She is here

5    testifying on behalf of Outback.

6             MR. McGAVIN:  Excuse me, Your Honor.  I object to

7    that.  She was not designated to appear today as an employee

8    of Outback.  She's testifying through her personal

9    knowledge.  That's a discovery matter she was produced for,

10   not for Outback Steakhouse.

11            MR. HAYSBERT:  Your Honor, I would object to that.

12            THE COURT:  You all just stop it.  You don't need

13   to object.  She is listed as a witness.  Whether or not

14   she's been properly processed, I don't know at this point.

15   She is listed as a witness, and I'm not getting into this

16   anymore at this point.  I'm tired of one person objecting

17   and then you objecting to him objecting.

18            MR. HAYSBERT:  Okay.

19   BY MR. HAYSBERT:

20   Q.  Ms. Eleftherion, if you could turn your attention to the

21   picture.  Do you recognize this picture, correct?

22   A.  Yes.

23            MR. HAYSBERT:  Your Honor, if I may publish this

24   for the jury.

25            THE COURT:  How do you recognize it?  Establish the

Eleftherion, A. - Direct                                          46

1    foundation and the basis upon which you recognize the

2    picture.

3            THE WITNESS:  Yes, Your Honor.  I believe it's the

4    same -- it looks like the floor at the time, and I believe

5    it's the same picture.  I believe that it is.  It could be a

6    different picture.

7            THE COURT:  The one Ms. Crosby showed you?

8            THE WITNESS:  Yes, Your Honor.

9            THE COURT:  Then anything further you want to say

10   on that, Mr. McGavin?  I'm going to let them see it.

11           MR. McGAVIN:  Of course, Your Honor.  No objection.

12           THE COURT:  Now you get to see the picture.

13   BY MR. HAYSBERT:

14   Q.  This was the picture that Ms. Crosby showed you of the

15   floor, correct?

16   A.  I believe it is, yes.

17   Q.  Do you know when this picture was taken?

18   A.  Ms. Crosby told me she took the picture at the time of

19   the incident or immediately thereafter.

20   Q.  Okay.  Did you verify with her that the photo was

21   correct?

22   A.  Did I verify the photo was correct?  I recognize that

23   space of floor, the area she showed me.  It looks like about

24   the exact same.

25   Q.  Did she give you a time stamp for when the photo was

Eleftherion, A. - Direct                                              47

```
 1   taken?

 2   A.  She did not give me a time stamp.

 3   Q.  Do you know when the photo was taken, through some

 4   objective evidence?

 5            THE COURT:  When did she show it to you?

 6            THE WITNESS:  I was made aware of this the next

 7   day.  So she showed me the following day.

 8            THE COURT:  The following day?

 9            THE WITNESS:  Yes, Your Honor.

10   BY MR. HAYSBERT:

11   Q.  You have no way of knowing whether or not this picture

12   was taken the moment after the incident happened or the

13   following day, correct?

14   A.  That is correct.  I have no way.

15   Q.  So still safe to say that you still don't know exactly

16   when and where this photo was taken, correct?

17   A.  I do not know the time it was taken, no.  That is the

18   area of the flooring that -- the shading was very unique, put

19   it that way, on the floor.

20   Q.  So it's possible that this photo could have been taken

21   after the floor had been cleaned after the slip and fall?

22            THE COURT:  Establish a basis for that.  Anything's

23   possible.  Just ask her the question.  She says she doesn't

24   know.  She knows Ms. Crosby took it, what Ms. Crosby said,

25   and she saw it the next day.  Now you can argue from that
```

Eleftherion, A. - Direct                                                48

 1   what you want to argue.  You can certainly argue to the jury

 2   inferences that can be drawn.

 3           MR. HAYSBERT:  Thank you, Your Honor.

 4   BY MR. HAYSBERT:

 5   Q.  Wasn't it Norman Chip Chase's job to look into this

 6   incident more closely as managing partner of the Chesapeake

 7   Outback Steakhouse?

 8   A.  As managing partner, he should have been responsible,

 9   yes, to see things through to fruition, yes.

10   Q.  And that would include following up with the plaintiff,

11   if necessary?

12   A.  My understanding is the managing partner, which I am

13   currently, once we call in the incident, they take over from

14   there.

15           MR. HAYSBERT:  I'm going to take this off the

16   screen, Your Honor.

17           THE COURT:  All right.

18   BY MR. HAYSBERT:

19   Q.  I'm going to turn to Defense Exhibit Number 2.  Show this

20   to the witness.  Do you see the picture on your screen?

21   A.  Yes, sir.

22   Q.  Do you know what this picture is?

23   A.  I believe it is a picture of Ms. Haysbert's shoes.

24   Q.  Thank you.

25           MR. HAYSBERT:  Your Honor, may I publish this for

Eleftherion, A. - Direct                                                     49

 1   the jury, this picture?

 2              MR. McGAVIN:  No objection.

 3              THE COURT:  Publish it to the jury.

 4   BY MR. HAYSBERT:

 5   Q.  This is Defense Exhibit Number 2.

 6        It is your understanding that Lisa Crosby took this

 7   picture?

 8   A.  That is my understanding, yes.

 9   Q.  Do you know when she took this picture?

10   A.  I believe she took the picture the same day as this

11   incident occurred.

12   Q.  Do you know whether she took the picture before or after

13   the plaintiff fell?

14   A.  I do not know.

15   Q.  There is a video camera set up outside of the front of

16   the restaurant, correct?

17   A.  Cameras are inside.

18   Q.  So there are no cameras on the outside of the restaurant?

19   A.  There is a camera positioned -- yes, by the to go area,

20   there is a camera positioned there, yes.

21   Q.  That camera faces the front door, correct, so anyone

22   walking in, that camera would see them?

23   A.  The camera is inside the building, and the camera is

24   positioned at the front door, yes.  Positioned at the hostess

25   stand up to a small threshold beyond the front door.

Eleftherion, A. - Direct                                              50

1   Q.   So the camera is positioned above the hostess stand?

2   A.   Correct.

3   Q.   And then the camera looks at -- let's assume this is the

4   hostess stand, and that's the front door (indicating).

5   A.   Yes.

6   Q.   The camera looks down and towards the door?

7   A.   Yes.  It doesn't cover any area past the front doors.

8   Q.   The cameras are working that day, correct?

9   A.   Correct.

10            THE COURT:  This is the entrance?

11            THE WITNESS:  Yes, Your Honor.

12            THE COURT:  Not inside?

13            THE WITNESS:  The camera is inside the building.

14            THE COURT:  The camera is inside, but the picture,

15   you said, stops at the door?

16            THE WITNESS:  Correct, Your Honor.

17            THE COURT:  So the picture is taken from the

18   inside, but this portrays the outside?

19            THE WITNESS:  Once you would open those front doors

20   to the outside, there would be nothing past that portion,

21   correct.

22   BY MR. HAYSBERT:

23   Q.   Is there a camera -- just to establish this, is there a

24   camera outside the restaurant that captures anything

25   happening outside of the restaurant?

Eleftherion, A. - Direct                                                51

1           THE COURT:  Well, as I understand your testimony,

2    this captures the outside entrance, does it not?

3           THE WITNESS:  In a very limited way.  If I were to

4    prop the front door open, it would cover a small part of the

5    porch.

6    BY MR. HAYSBERT:

7    Q.  Thank you.  So this picture that you see here, could this

8    picture have been captured by the Outback Steakhouse camera?

9    A.  It's a video -- it's a video camera.

10   Q.  Well, you can still take a still from a video camera as a

11   picture, right?

12   A.  I personally do not know how to do that.

13   Q.  I'm not asking you how to do that.  Excuse me.  Sorry to

14   interrupt you.  I'm not asking you if you know how.  It can

15   be done, though, correct?

16   A.  I believe so.

17   Q.  So it's possible that this photo was taken by a camera

18   situated outside of the Outback Steakhouse, correct?

19   A.  I do not believe that it was.

20   Q.  Well, on what basis do you not believe that it was?

21   A.  Lisa showed me the picture that she has taken of the

22   floor, and she showed me the picture -- she showed me this

23   picture.  It was on her cell phone.

24   Q.  Okay.  So the picture of these shoes were on Lisa

25   Crosby's cell phone?

Eleftherion, A. - Direct                                              52

1   A.  If I recall correctly, yes.

2   Q.  How did the pictures get on Lisa's cell phone?

3   A.  She said she took a picture of the floor.  It made sense

4   to me, she had taken a picture of the shoes at the same time.

5   Q.  Did she tell you that she took a picture of plaintiff's

6   shoes?

7   A.  She did, yes.

8   Q.  Did she tell you why?

9   A.  She did not tell me, no.

10  Q.  So she took a picture of plaintiff's shoes at some point

11  before or after the incident, you don't know, correct?

12  A.  Correct.

13  Q.  Because you don't have a time stamp, correct?

14  A.  Correct.

15  Q.  You don't have any metadata for the picture, correct?

16  A.  Correct.

17  Q.  And because the picture was taken on the cell phone, you

18  don't have that cell phone, it wasn't yours, right?

19          THE COURT:  You don't know whether the picture was

20  taken on the cell phone.  It was shown to you from a cell

21  phone?

22          THE WITNESS:  Correct.

23          MR. HAYSBERT:  Understood.  That's fine.

24  BY MR. HAYSBERT:

25  Q.  So let's go back to the camera situated inside the store.

JODY A. STEWART, Official Court Reporter

1    Okay.  This is the camera above the hostess stand that

2    extends towards the front door, correct?

3    A.  Correct.

4    Q.  Was the camera working on the date of the incident?

5    A.  Yes, it was.

6    Q.  Thank you.  So that camera would have shown you anyone

7    coming into the door of the front door and would also show

8    you anyone going out the front door, correct?

9    A.  Correct.

10   Q.  Okay.  Did you capture any footage of just before the

11   incident happened when Dr. Haysbert walked into the floor --

12   I'm sorry, into the Outback Steakhouse?

13   A.  I don't know.

14   Q.  When you say you don't known, what do you mean?  You

15   don't know if you captured any footage?

16   A.  Correct.

17        THE COURT:  It didn't capture any of it, she said.

18   You didn't capture any of this?  You weren't running the

19   video camera?  These were things shown to you by Ms. Crosby?

20        THE WITNESS:  Correct.

21        THE COURT:  That's mischaracterizing her testimony.

22   She did not capture any of this.

23        MR. HAYSBERT:  Your Honor, I'm basing my line of

24   questioning on the fact that she shared with the jury and

25   all of us that she was responsible for the front of the

Eleftherion, A. - Direct                                              54

1    house floors.

2          THE COURT:  She's testified about these, and she

3    says it's a running video.  Just ask her if she captured

4    any.  Then you can follow up, if she did.  It's the form of

5    your question.

6          MR. HAYSBERT:  Okay.  Then I will redirect the

7    witness, but I would still like to get the same information

8    from the witness that I started with.

9    BY MR. HAYSBERT:

10   Q.  Which is, you are responsible for the front of the house,

11   which is the area in the dining room, correct?

12   A.  Correct.

13   Q.  You were not in the dining room at the time of the

14   incident, correct?

15   A.  Correct.

16   Q.  So if you needed to be assured of what happened in the

17   front of the house, you would need to check the video,

18   correct?

19   A.  Correct.

20   Q.  Okay.  And so my question is, did you check the cameras

21   for -- just because you just indicated they were working that

22   day, did you check the cameras for just before Dr. Haysbert

23   walked in the door and also right as Dr. Haysbert was walking

24   out?  Did you check the cameras for that information?

25   A.  I did not.

Eleftherion, A. - Direct                                                                55

1    Q.   Why not?

2    A.   At that time I did not have access to the camera codes to

3    go back and play that video.

4    Q.   Who had access?

5    A.   The managing partner would have had access.

6    Q.   But as the manager of the Outback Steakhouse at that

7    time, could you not have asked, because you were responsible

8    for the front of the house, to check the cameras to see

9    whether or not what had happened right before Dr. Haysbert

10   walked in and right around the time she was leaving?

11   A.   It was something at that time that was exclusively

12   controlled by the managing partner.

13   Q.   Again, you could have asked the managing partner, who

14   controlled the cameras, you, as the manager and the

15   responsible person for the front of the house, could have

16   asked the managing partner to check the cameras because you

17   were responsible for that area, correct, but you didn't?

18   A.   Correct.

19   Q.   That video, the one above the hostess stand, only would

20   have shown to the front area of the floor.  Would that video

21   have showed you who was at the hostess stand at the time that

22   Dr. Haysbert approached the hostess stand?

23   A.   Yes.

24   Q.   And it would have showed you who came out from behind the

25   hostess stand and pointed, if anyone pointed to the restroom,

1    that camera would have shown you that?

2    A.   I didn't quite understand your question.

3    Q.   That camera could have showed you who came out from

4    behind the hostess stand and pointed out the restroom to

5    Dr. Haysbert?

6    A.   Yes.  Unless they went off camera, yes.

7    Q.   Understood.  Okay.  You never asked Mr. Chase to check

8    the cameras, correct?

9    A.   I did ask Mr. Chase about the incident.

10   Q.   I'm asking a very specific question.  I'm talking about

11   the camera above the hostess stand.  Did you ask Mr. Chase to

12   check the camera?

13   A.   I did not, no.

14   Q.   You were responsible for the front of the house at that

15   time, correct?

16   A.   I was the front of the house manager at that time, yes.

17   Q.   And you were in the kitchen at that time, correct?

18   A.   Yes.  It was the end of my shift, and, yes, I was in the

19   kitchen.

20   Q.   You were at the Outback Steakhouse at that time, correct?

21   A.   Yes.  Correct.

22   Q.   And Mr. Chase wasn't there, correct?

23   A.   Correct.

24   Q.   And so the person who would have been in control of the

25   front of the house and the back of the house would have been

1    you, correct?

2    A.  Correct.

3    Q.  And that person was you, correct?

4    A.  Correct.

5    Q.  On that day, correct?

6    A.  Yes.

7    Q.  When Dr. Haysbert slipped and fell, correct?

8    A.  Correct.

9    Q.  Did you ever see a video of the -- just before the

10   incident occurred, or right after the incident occurred, when

11   Dr. Haysbert was leaving the Outback Steakhouse?

12   A.  No, I did not.

13   Q.  You never saw any sort of video?

14   A.  Video, no.

15   Q.  And you never asked anyone for video?

16   A.  I did not ask for video, no.

17   Q.  Did you not care to see the video to see what happened?

18          MR. McGAVIN:  Objection, argumentative.  This is

19   also repetitive.

20          THE COURT:  Sustained.

21          MR. HAYSBERT:  I'll withdraw the question.

22   BY MR. HAYSBERT:

23   Q.  That video that was right above the hostess stand that

24   was pointing out towards the front door, if anyone were

25   escorting Dr. Haysbert to the door, it would have shown that

Eleftherion, A. - Direct                                           58

```
1   person escorting her to the door, correct?
2   A.  Correct.
3   Q.  So if Ms. Haysbert was escorting her mother to the door,
4   it could have shown her escorting her mother to the door,
5   correct?
6   A.  Correct.
7   Q.  It would have been able to capture how quickly they were
8   moving or whether they were moving very slowly or barely at
9   all, correct?
10  A.  Correct.
11  Q.  It, likewise, would have also shown anyone else in the
12  restaurant who was taking or escorting Dr. Haysbert to the
13  door, correct?
14  A.  Correct.
15  Q.  Someone like Lisa Crosby, who you said in your testimony
16  was a guest advocate and there to help customers, it would
17  have shown her taking or escorting Dr. Haysbert to the door,
18  if she'd actually done that?
19  A.  Correct.
20  Q.  But you never saw any camera footage?
21  A.  The camera footage would not have --
22  Q.  I'm asking you a very specific question.  You never saw
23  the camera footage?
24  A.  Correct.
25  Q.  You never asked for it?
```

Eleftherion, A. - Direct                                              59

1   A.  Correct.

2   Q.  So you wouldn't know one way or the other whether -- how

3   Dr. Haysbert got to the door or whether she was escorted by

4   her daughter or by Lisa Crosby or anyone else, correct?

5           THE COURT:  Wait just a minute.

6           MR. McGAVIN:  Objection, asked and answered.  This

7   is very repetitive.

8           THE COURT:  I agree.

9   BY MR. HAYSBERT:

10  Q.  The camera where the hostess stand, looking towards the

11  front door, would it not have showed Dr. Haysbert if she were

12  coming inside the door, whether or not she was showing signs

13  of dizziness or unsteadiness?

14  A.  It would have showed anyone coming out of the door, yes.

15  Q.  And would have shown Dr. Haysbert if she was showing any

16  signs of dizziness or unsteadiness, correct?

17  A.  If dizziness is something you can visually pick up on,

18  yes.

19  Q.  Can you pick up dizziness from a camera, Ms. Eleftherion?

20          MR. McGAVIN:  Excuse me, Your Honor.  I must

21  object.  This is speculative.

22          THE COURT:  It's beyond this particular witness's

23  knowledge of facts and expertise.  You'd have to show that

24  she has experience in judging how you determine somebody's

25  dizzy when you are looking at a camera.