**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

**JOANN WRIGHT HAYSBERT,**

    **Plaintiff,**

**v.**             **Civil Case No.:  4:20-cv-00121**

**BLOOMIN' BRANDS, INC., et al,**

    **Defendants.**

**OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS**

   COMES NOW, Nazareth M. Haysbert ("Mr. Haysbert"), an interested party, by and through the undersigned counsel, and files this Opposition to Defendants' Motion for Sanctions, stating as follows:

### I.  FACTUAL BACKGROUND

### A. Introduction

   This matter involves a contested personal injury case resulting from Plaintiff's slip and fall at an Outback Steakhouse restaurant on May 23, 2018 in Chesapeake, Virginia.  The case was originally filed in the Circuit Court for the City of Hampton, Virginia in June 2020, shortly after the onset of the COVID-19 pandemic.  Defendants removed the case to this Court on or about July 31, 2020, and the matter was assigned to the Honorable Rebecca Beach Smith ("Judge Smith") and Magistrate Judge Douglas Miller ("Judge Miller").  Mr. Haysbert, primary counsel for Plaintiff, and an attorney licensed in California, engaged Newport News attorney Stephen C. Teague ("Mr. Teague"), to serve as local counsel.  Mr. Haysbert filed an Application to Qualify as a Foreign Attorney Under Local Civil Rule 83.1 ("Application") (pro hac vice) on September 8, 2020.  (ECF No.: 13).  Id. The Application was granted on or about September 10, 2020. (ECF

No.: 14).

On November 24, 2020, D. Adam McKelvey ("Mr. McKelvey") noted his appearance as counsel for Plaintiff. (ECF No.: 21). On December 2, 2020, a Consent Order Granting Substitution of Mr. McKelvey as counsel of record for Mr. Teague was entered by the Court. (ECF NO.: 27). For the next 32 months, Mr. McKelvey remained as counsel for Plaintiff, litigating the case alongside Mr. Haysbert.

On August 8, 2023, the case proceeded to a jury trial. During the pendency of the trial, Defendants made several motions, and on day six (6), the jurors were excused from further service. (See ECF No.: 313). On August 23, 2023, the Court issued a Memorandum Opinion granting Defendants' Motion to Quash, Motion to Revoke Pro Hac Vice Status of Mr. Haysbert, and Motion for Mistrial. (See ECF No.: 315) (hereinafter "Opinion" or "Mem. Op."). Mr. McKelvey moved to withdraw as counsel for Plaintiff on September 18, 2023. (ECF No.: 324). That same day, Defendants filed a Motion for Sanctions and Memorandum in Support against Mr. Haysbert and Mr. McKelvey. (ECF Nos.: 326-327). The Motion for Sanctions asks this Court to award Defendants their costs and attorneys' fees from August 6, 2023 through August 14, 2023, which total $59,799.95. (ECF No.: 336). Mr. McKelvey passed away on November 5, 2023. Defendants' Motion for Sanctions against Mr. McKelvey was withdrawn on December 4, 2023. (ECF No.: 348), and Defendants seek sanctions against Mr. Haysbert solely.

**B.  The Course of the Litigation**

From the outset, the case was intensely contested, and multiple discovery disputes ensued. To date, the docket contains more than 350 entries, multiple motions to compel filed by both sides and a number of intense and pivotal hearings were heard by Judge Miller, and later, Magistrate Judge Krask. The case was continued on three separate occasions, once on the

request of Plaintiff because of her COVID-19 illness, once *sua sponte* by the Court, and finally, on the joint request of the parties.  The Parties appeared for two separate settlement conferences, including one ordered by Judge Smith after the Supplemental Pretrial Conference on August 1, 2023, requiring the parties to participate in a settlement conference just four days before trial.

### C. <u>Involvement of Local Counsel</u>

Mr. Haysbert is an attorney in good standing in California, and although originally from Hampton, Virginia, he is licensed only in California.  While an experienced attorney in California, Mr. Haysbert's knowledge and experience with federal court trials prior to the instant case was limited; he had made only one prior appearance. Prior to the instant proceeding, Mr. Haysbert's experience in the Virginia court system was virtually non-existent.  As a result, selection of experienced local counsel was very important.  Mr. Haysbert was initially referred to Mr. Teague, who appeared to be a good fit for the Plaintiff's team.  However, early on, a difference of opinion over legal fees and the need to file various motions, led to the discharge of Mr. Teague.  The situation with Mr. Teague left Mr. Haysbert in a difficult situation, needing local counsel to step in quickly to remain in compliance with the Local Rules.  An online search for attorneys in Virginia with experience as local counsel led to Mr. McKelvey, an attorney with Crandall & Katt, a personal injury law firm out of Roanoke, Virginia, reporting to serve clients in Central and Southwestern Virginia, and reporting experience in state and federal court.[1]  Mr. McKelvey re-counted that he had experience in federal court, but did not disclose that he had only appeared one other time in the United States District Court for the Eastern District of Virginia.[2]  Following preliminary discussions, Mr. McKelvey filed his Notice of Appearance,

---

[1] https://www.crandalllaw.com/
[2] According to Pacer, Mr. McKelvey was counsel of record in the U.S. District Court for the Eastern District of Virginia in only one other case, in 2009, a motor vehicle accident which was filed in the Richmond Division and transferred to the District of Kentucky after two months of litigation. Mr. McKelvey was also not lead counsel, nor

and he was substituted in as local counsel.

Mr. McKelvey and Mr. Haysbert worked closely together over the course of almost three years.  Local Rule 83.1(E) makes clear that local counsel is expected to be actively engaged in all matters in which they appear.  This includes accompanying the pro hac vice attorney to all court appearances, hearings, pre-trials and trial and signing all pleadings.  Local Civ. R. 83.1 (D)(1)(b) and (D)(3).  The Rule also makes clear that local counsel will be held accountable for the case by the Court. Local Civ. R. 83.1 (F).  The practice of law in California is significantly different than in Virginia, making local counsel's involvement and knowledge of the jurisdiction, and to a large degree, the personalities of the designated judges, critically important.  In this case, Mr. McKelvey was intimately and actively involved, but his inexperience in the Eastern District of Virginia and his lack of first-hand knowledge of this Court and Judge Smith created complications during the pendency of the case that were not foreseen by Mr. Haysbert.

## II.    LEGAL STANDARDS

Generally speaking, a federal Court's power to sanction litigants and their attorneys originates from three sources: statutes, rules, or the Court's inherent powers.  "In a proper case, attorney's fees may be assessed against counsel under 28 U.S.C. § 1927, Fed. R. Civ. P. 11, or under the inherent power of the court.  Blair v. Shenandoah's Women's Center, Inc., 757 F. 2d 1435, 1437 (4th Cir. 1985); (ref. Roadway Express, Inc. v. Piper, 447 U.S. 752, 767, 65 L. Ed. 2d 488, 100 S. Ct. 2455 (1980); Robinson v. Ritchie, 646 F.2d 147, 148-49 (4th Cir. 1981)).

### A.  28 United States Code § 1927

Congress enacted the first version of 28 U.S.C. § 1927 (hereinafter "§ 1927") in 1813 as a response to the inquiry to prevent the multiplicity of lawsuits or processes where a single suit

---

was he local counsel. See Perkey et al v. Yamaha Motor Corporation, U.S.A. et al, Civil Case No.: 3:09-cv-00395.

might suffice. <u>Roadway Express v. Piper</u>, 447 U.S. 752, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980) (superseded by statute as stated in <u>Lewis v. Smith</u>, 480 Fed. Appx., 696, 2012 U.S. App. LEXIS 9755 (2012)).  In enacting § 1927, Congress vested courts with the statutory authority to sanction attorneys who unreasonably and vexatiously multiply the proceedings by assessing the fees and costs incurred as a result of those proceedings against the offending attorney. <u>Mulugeta v. Ademachew</u>, 2019 U.S. Dist. LEXIS 2278587 *5 (E.D. Va. 2019); 28 U.S.C. § 1927. However, "the unambiguous text of § 1927 aims only at attorneys who multiply proceedings" and "both multiplication and '[b]ad faith on the part of the attorney' are preconditions to imposing fees under § 1927" <u>Id</u>. (citing <u>E.E.O.C. v. Great Steaks, Inc</u>., 667 F.3d 510, 522 (4th Cir. 2012) (quoting <u>DeBauche v. Trani</u>, 191 F.3d 499, 511 (4th Cir. 1999)).  Importantly, § 1927 focuses on the conduct of the litigation and not on its merits, and "[m]erely negligent conduct will not support an imposition of sanctions under 28 U.S.C. § 1927.  <u>Harshbanger v. Pro'l Evaluation Group, Inc</u>. (In re Gould), 77 Fed. Appx. 155, 161 (4th Cir. 2003) (citing <u>DeBauche v. Trani</u>, 191 F.3d 499, 511 (4th Cir. 1999); <u>see also</u> <u>United States v. Wallace</u>, 296 U.S. App. D.C. 93, 964 F.2d 1214, 1219 (D.C. Cir. 1992).  Section 1927 "requires a finding of counsel's bad faith as a precondition to the imposition of fees." <u>Id</u>. (citing <u>Chaudhry v. Gallerizzo</u>, 174 F.3d 394, 411 n.14 (4th Cir. 1999)

**B.  <u>Inherent Powers of the United States District Court</u>**

"Federal courts possess certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." <u>Goodyear Tire & Rubber Co. v. Haeger</u>, 581 U.S. 101, 107 127 S.Ct. 1178, 1186, 197 L. Ed. 2d 585 (2017) (citing <u>Link v. Wabash R. Co</u>., 370 U. S. 626, 630-631, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962). The authority includes the ability to fashion an appropriate sanction for conduct

which abuses the judicial process, including an assessment of attorney's fees which reimburse legal fees and costs incurred by the other side.  Id. (citing Chambers v. NASCO, Inc., 501 U. S. 32, 44-45, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991).  Such a sanction, however, when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature, and can go no further than to redress the wronged party for losses sustained. Id.  Indeed, the Court can "shift only those attorney's fees incurred because of the misconduct at issue" and "a sanction counts as compensatory only if it is 'calibrate[d] to [the] damages caused by' the bad-faith acts on which it is based." Id. (citing Mine Workers v. Bagwell, 512 U. S. 821, 834, 114 S. Ct. 2552, 129 L. Ed. 2d 642 (1994). To "calibrate" an award of attorney's fees, the award should cover only the legal bills that the litigation abuse occasioned and there must be a causal link between the litigant's misbehavior and the legal fees paid by the opposing party.  Id.  This causal link is often explained as a but-for test: the complaining party may recover only the portion of fees that he would not have paid but for the misconduct. Id. At 109, 1187, 594 (citing Fox v. Vice, 563 U. S. 826, 836, 131 S. Ct. 2205, 180 L. Ed. 2d 45 (2011).

However, because this inherent power is "not regulated by Congress or the people and is particularly subject to abuse, it must be exercised with the greatest restraint and caution, and then only to the extent necessary." Mulugeta, 2019 U.S. Dist. LEXIS 2278587 *5 (citing United States v. Shaffer Equip. Co., 11 F.3d 450, 461 (4th Cir. 1993)).  It is when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, or if a court finds a fraud has been practiced upon it, or if the temple of justice has been defiled, or if a party delays or disrupts litigation in bad faith, then a court may assess attorney's fees against the responsible party. Id. (citing Chambers v. NASCO, Inc., 501 U. S. at 45).

### C. **Federal Rule of Civil Procedure 11**

Simply stated, "Rule 11 of the Federal Rules of Civil Procedure governs the behavior of attorneys." Colum. Gas Transmission, LLC v. Haas, 2023 U.S. App. LEXIS (4th Cir. 2023). Rule 11 of the Federal Rules of Civil Procedure (hereinafter "Rule 11") provides, in relevant part:

> "(b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
>> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;"

Fed. R. Civ. P. 11(b)(1). Under Rule 11, if, "after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." Fed. R. Civ. P. 11 (c)(1). Finally, a "motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)." Fed. R. Civ. P. 11 (c)(2). "[T]he primary…purpose of Rule 11 is to deter future litigation abuse" but "[o]ther objectives 'include compensating the victims of the Rule 11 violation, as well as punishing present litigation abuse, streamlining court dockets and facilitating court management.'" Andrews & Lawrence Pro Servs., LLC v. Bertinelli, 2023 U.S. App. LEXIS 17162 (2023)(4th Cir.) (citing In re Kunstler, 914 F.2d 505, 522(4th Cir. 1990)). "A legal argument fails to satisfy Rule 11(b)(2) when 'in applying a standard of objective reasonableness, it can be said that a reasonable attorney in like circumstances could not have believed his actions to be legally justified.'" Morris v. Wachovia

7

<u>Sec., Inc</u>., 448 F. 3d 268, 277 (4th Cir. 2006) (citing <u>Hunter v. Earthgrains Co. Bakery</u>, 281 F.3d 144, 153 (4th Cir. 2002).  Moreover, "[t]he legal argument must have absolutely no chance of success under the existing precedent to contravene the rule." <u>Id</u>.

### III.    <u>ARGUMENT</u>

#### A.  <u>Introduction</u>

Simply stated, sanctions are unwarranted in this case.  Despite the Opinion issued by Judge Smith (which will be addressed specifically in Section IV) and Defendants' arguments, there was no bad-faith conduct intended to delay or disrupt the course of litigation; there were no motions, pleadings, or other papers that were presented to the Court for any improper purpose, there was no willful disobedience or intentional disregard of a court order and Mr. Haysbert did not multiply the proceedings in this case unreasonably or vexatiously.

Defendants' Motion for Sanctions and Memorandum in Support (hereinafter "Motion" or "Def. Mot.") requests that this Court impose sanctions against Mr. Haysbert pursuant to § 1927, the "inherent power of the Court" and alternatively, under Rule 11.  <u>See gen</u>. Def. Mot.  The Motion cobbles together a disparate array of alleged misconduct by Mr. Haysbert, pointing to the Opinion, and citing, in conclusory form, that Mr. Haysbert engaged in repeated misconduct, but failing to cite to the transcript of proceedings, and in many instances, failing to cite the specific conduct which is alleged to be sanctionable.  Factual allegations are sprinkled throughout the Motion, making it impossible to determine what is being offered as background or context, and what is specifically alleged to be sanctionable conduct,[3] or simply unprofessional or uninformed

---

[3] This approach could present a constitutional problem, as due process requires that a lawyer receive notice of the "specific conduct considered sanctionable" before sanctions are imposed. <u>Bowers v. Univ. of Va</u>., 2008 WL 2346033 **6 (W.D. Va. 2008) (internal citations omitted); <u>see also</u> <u>Nuwesra v. Merrill Lynch, Fenner & Smith, Inc</u>., 174 F.3d 87, 92 (2d Cir.1999); <u>In re Deville</u>, 280 B.R. 483, 497 (9th Cir. BAP 2002), aff'd, 361 F.3d 539 (9th Cir.2004).

behavior.  See Def. Mot. at pp. 2-6, 12-15. While Mr. Haysbert acknowledges that he erred in certain instances or would have, with the benefit of reflection, done differently in others, his conduct is not worthy of sanction, especially the sanction requested by Defendants.  Defendants' Motion is replete with misleading accusations and mischaracterization of events, and as outlined below, the arguments fall far short of the high bar required to impose sanctions on an attorney. Although there were a series of mishaps, some of which can be attributed to Mr. Haysbert directly, some to Mr. McKelvey, and many of which were beyond the control of Mr. Haysbert, he respectfully asks that this Court reject Defendants' view of the case which has very visibly turned molehills into mountains.

**B.   Sanctions Under § 1927 or the Court's Inherent Powers are Unwarranted Because Defendants Cannot Demonstrate Bad Faith**

Strictly speaking, both § 1927 and the Court's inherent powers require a showing of bad faith, and any sanctions awarded must be compensatory in nature, and have a causal connection to the sanction requested.  In this case, Defendants have asked this Court for an assessment against Mr. Haysbert of all of Defendants' trial attorneys' fees and costs.

Defendants cannot demonstrate bad faith on the part of Mr. Haysbert.  Under § 1927, a court may require an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously" to pay the excess costs that result from the attorney's misconduct.  As Defendants acknowledge, by requiring that the attorney's conduct have been both unreasonable and vexatious, § 1927 sanctions cannot be granted against an individual for action that was merely negligent. Def's Mot. at p. 7. Rather, sanctions may only issue for bad faith conduct. Brubaker v. City of Richmond, 943 F.2d 1363, 1382 n. 25 (4th Cir. 1991). Bad faith, in this context, requires more than objectively unreasonable behavior, as unreasonableness is only one of the two criteria

that must exist for sanctions to be granted, multiplicity is also required. Mulugeta, 2019 U.S. Dist. LEXIS 2278587 *5.

A court may also sanction an attorney based on its inherent powers for the "willful disobedience of a court order" or when the attorney has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Chambers, 501 U.S. at 45-46. Such inherent-powers sanctions also require a showing of bad faith.  As the Supreme Court held in Roadway Express, Inc. v. Powers, a finding of "bad faith … would have to precede any sanction under the court's inherent powers." 447 U.S. 752, 767-68 (1980). Additionally, the Court cautioned that "[b]ecause inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." Id. at 764.

While Defendants' Motion is replete with conclusory (and baseless) assertions about Mr. Haysbert's state of mind, these assertions are not supported by an affidavit or a single citation to the trial transcript.  The Motion identifies only one possible basis for its conclusion that Mr. Haysbert's alleged misconduct was knowing and intentional, namely that reading from a pre-typed outline of questions for a witness demonstrated that Mr. Haysbert "planned, in advance, to elicit improper testimony" on the subject of insurance. See Def's Mot. at p. 12.  This is a leap much too far. All that Mr. Haysbert's alleged use of pre-written questions demonstrates is that he planned out his questions for witnesses, which demonstrates that he was organized and prepared for trial, also contrary to Defendants' suggestion otherwise.  It is not evidence that Mr. Haysbert intended to elicit specific testimony or that he knew that the testimony that would be elicited was improper.  Mr. Haysbert made a concerted effort to avoid eliciting testimony on the subject of insurance.  Even if that effort was unsuccessful and possibly insufficient or even clumsy, it

demonstrates that Mr. Haysbert did not seek to elicit improper testimony intentionally or in bad faith.

Defendants rely heavily on Judge Smith's Opinion, and the mistrial of the case to support their request for sanctions in the form of attorneys' fees and costs. As demonstrated by the responses to Defendants' allegations below, Mr. Haysbert's actions did not amount to bad faith, or result in the mistrial in this case. To illustrate how Defendants have failed to show that Mr. Haysbert's conduct met the legal standards for awarding sanctions under 28 U.S.C. § 1927 or the Court's inherent powers, Defendants' allegations and specific aspects of the trial are discussed at length below. These examples clearly demonstrate why Mr. Haysbert did not act in bad faith, and why there is no causal connection between his actions and the Defendants' attorneys' fees and costs.

   i.   *Deliberate Injection of Insurance*

Despite its importance to the primary issue underlying the mistrial, Defendants' treatment of this issue is surprisingly cursory. The justification for the mistrial deserves careful explanation and consideration. In this case a mistrial was ordered primarily because the Court believed that Mr. Haysbert had "deliberat[ely] inject[ed] insurance into the case." Mem. Op. at p. 18. Defendants similarly argue that "Haysbert deliberately injected insurance into the proceedings, and this misconduct is fully documented in the court's opinion of August 23, 2023. (ECF 315)." Def's Mot. at 6. For the reasons explained below, the Court was mistaken, and so are Defendants.

Defendants go one step further and argue that this conduct was "intentional" because Mr. Haysbert "knew that by questioning witnesses who was responsible for following up with guests after a slip and fall, he would elicit testimony related to insurance and risk management." Def.

Mot. at p. 12.  According to Defendants, this is apparent because "[Mr.] Haysbert was reading from typed-out questions. Haysbert (and anyone who helped him draft his direct of these witnesses) planned, in advance, to elicit improper testimony." Id.  Aside from the unwarranted attempt to evaluate Mr. Haysbert's own personal state of mind, Defendants have misinterpreted what actually transpired during the trial, and for this reason, reference is made to the trial transcript itself.

As for the Court's reasoning, it first points to Mr. Haysbert's use of the word "ensure" in questioning Alicia Eleftherion ("Ms. Eleftherion") about her responsibilities at the Chesapeake Outback.[4]  Although they sound similar, "ensure" does not mean "insure." Ensure means "to make sure, certain, or safe" while "insure" means "to provide or obtain insurance on or for."[5] And, as the context makes clear, Mr. Haysbert in fact meant "ensure," as "insure" would have made no sense when asking about who was responsible for certain aspects of restaurant operations. Even when Defendants objected to Mr. Haysbert's use of "ensure," their objection

---

[4] That exchange went as follows:

    Q. Okay. You were to ensure there was no grease, cleaning solution, water, soda, Coke left on the floors unattended in the dining room, correct?

    MR. McGAVIN: Objection, Your Honor. The use of the term "ensure." There is no -- law does not require --

    MR. HAYSBERT: Oversee. Oversee. I was saying oversee.

    MR. McGAVIN: May I just --

    MR. HAYSBERT: Sure. Of course.

    MR. McGAVIN: Thank you. I object to the use of "ensure.' It's not the law.

    THE COURT: Rephrase your question, please.

    MR. HAYSBERT: Will do, Your Honor.

    BY MR. HAYSBERT:

    Q. It's your responsibility was to make sure that wet floor signs were put out when needed, correct?

    A. Yes. I had direct oversight of all those things.

    Q. And your job was to ensure that mats were put down when needed, correct?

    THE COURT: Do not use the word "ensure."

    MR. HAYSBERT: I will never use the word "ensure" again.

Tr. 624:16-625:13.

[5] Compare Ensure, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/ensure (last accessed Oct. 4, 2023) with Insure, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/insure (last accessed Oct. 4, 2023).

was that the law does not require the restaurant to "ensure" something, *not* that Mr. Haysbert had

raised the issue of insurance. See Day 4 Tr. 624:19-21, 625:1-2.

The Court next pointed to a different portion of Mr. Haysbert's examination of Ms.

Eleftherion, in which *she* introduced the topic of insurance.[6] The Court also highlighted Mr.

Haysbert's use of the term insurance while he attempted to get the witness to respond *without*

bringing up insurance. Mem. Op. 15 n. 12 (citing Tr. 627:3-6 ("Okay. So let's leave insurance

---

[6] That exchange went as follows:

> Q. Whose responsibility was it at the time that you were the manager of the Outback Steakhouse in Chesapeake to follow up with an injured person who had slipped and fallen?
> A. Correct. If our insurance provider at that time was involved, we had an insurance liaison who would follow up with that person.
> MR. McGAVIN: Objection, Your Honor.
> THE COURT: Sustained.
> MR. HAYSBERT: It's only been said. I don't have a question pending.
> THE COURT: Insurance is not an issue at all in this case.
> BY MR. HAYSBERT:
> Q. So I'm only asking you what you would do in your personal knowledge. Okay. So let's leave insurance out of it. And although insurance is within your personal knowledge, we are leaving insurance out of it.
> THE COURT: Mr. Haysbert, please, follow the Court's rulings.

Day 4 Tr. 626:15-627:8. Following a break so that the Court could entertain an oral motion for a mistrial from Defendants, Mr. Haysbert's questioning of Ms. Eleftherion continued:

> Q. Okay. If a person was injured in the dining room through a slip and fall, whose responsibility is it to follow up with that person at Chesapeake Outback Steakhouse, at the Chesapeake Outback Steakhouse, if anyone?
> MR. McGAVIN: Objection, Your Honor. Object to the form, relevance.
> THE COURT: Let's see. I hope this doesn't go astray.
> MR. HAYSBERT: It won't. I promise you.
> THE WITNESS: There is protocol to follow, any type of incident, whether it's slip and fall or different incident regarding to a guest or somebody who works there, we have to call that into our insurance group.
> MR. McGAVIN: Objection, Your Honor.
> THE COURT: You'd asked that question before, and that's the answer you got. There has been an objection to it, and the Court specifically said there is no insurance in this case, should be no mention of it and no insurance issue. That's the question you asked before that got the same answer.
> MR. HAYSBERT: I said at the Chesapeake Outback Steakhouse, is what I said.
> THE COURT: Whatever. It elicited it. It is along the same lines, and it has now elicited the same response.
> MR. McGAVIN: Your Honor, I renew the motion I previously made.
> THE COURT: I completely strike that question and that answer at this juncture because it's not part of the case. It's improper under the law for it to even be mentioned. I thought you heard that, too, but you didn't as a witness hear that?
> THE WITNESS: Yes, ma'am, I heard you.

Day 4 Tr. 652:7-653:14.

out of it. And although insurance is within your personal knowledge, we are leaving insurance out of it.")).

The transcript from the proceedings very clearly indicates that Mr. Haysbert did not raise the issue of insurance himself or otherwise deliberately elicit the witness' comments about insurance. Indeed, the only time Mr. Haysbert uttered the word "insurance" was in his attempt to stop the witness from testifying further about insurance after she had mentioned it the first time. The record further demonstrates that the Court promptly sustained Defense counsel's objection, issued a curative instruction to the jury and expressly told the witness to "leave insurance out of it." Mr. Haysbert should not be held responsible for the witness's failure to follow the Court's instruction. While Defendants and the Court may believe that Mr. Haysbert's questions were *intended* to elicit testimony on the issue of insurance, this is belied by Mr. Haysbert's effort to stop the witness from mentioning insurance, as well as the Court's own admonition to the witness, on which Mr. Haysbert reasonably relied. Rather, as Mr. Haysbert explained to the Court, his questions were specifically designed to elicit testimony regarding the personal responsibility of the restaurant's managers to follow up with guests who get injured on premises. (See Day 2 Tr. 248:12-141:4.). A major tenant of Plaintiff's case involved Defendants' corporate indifference (see Id. at 248:18-19), and the questions asked of this particular witness were designed to demonstrate that not one individual from the Outback Steakhouse restaurant followed up with the Plaintiff after her fall. Hence, the line of questioning involving whose "responsibility" it was at the time to follow up with an injured person who had slipped and fallen. (See Day 4 Tr. 626:15-17).

As a legal matter, while Hope Windows, Inc. v. Synder, 208 Va. 489, 158 S.E. 2d 722 (Va. 1968), is indeed still good law in Virginia, "[t]he time when the mere mention of insurance

before a jury in the trial of a negligence case automatically called for a mistrial has long since

passed." Riddle v. Exxon Transp. Co., 563 F.2d 1103, 1109 n.6 (4th Cir. 1977); see also

Lombard v. Rohrbaugh, 551 S.E.2d 349, 353-54 (Va. 2001) (holding that the mention of

insurance coverage in a negligence suit is no longer reversible error in Virginia). Under these

circumstances, where inadmissible testimony is not deliberately elicited and merely incidental, a

court's "prompt action in striking improper references to the defendant's insurance from the

record, coupled with instructions admonishing the jury to disregard such matter, sufficiently

protects the defendant's right." Riddle, 563 F.2d at 1109 n.6; see also Lombard, 551 at 353-54.

Accordingly, had the Court not jumped to the erroneous conclusion that Mr. Haysbert was

engaged in deliberate misconduct, it could have immediately issued a straightforward curative

instruction to disregard the brief references to insurance that occurred. That it chose to eventually

declare a mistrial instead does not suggest or prove that Mr. Haysbert acted unreasonably and

vexatiously to cause such an outcome or engaged in willful disobedience. Even if, as the Court

found, he "should have known" that his questions would elicit responses related to insurance (see

Mem. Op. at p. 18), that is negligence, at most, not the bad faith conduct required for an award of

sanctions against him.

   ii.      *Final Pre-trial Conference*

        Defendants assert that "[t]he case came before the court on August 1, 2023 for a Pre-trial.

At the Pre-trial, plaintiff's counsel brought no exhibits and was unprepared for the hearing."

Def. Mot. at p. 2.  The Final Pre-trial Conference to which Defendants refer was, in reality, a

Supplemental Pre-trial Conference. (See ECF No.: 270)  An earlier, extensive Final Pre-trial

Conference had been held on July 29, 2022 with rulings issued by Judge Krask on the exhibits

offered by both Plaintiff and Defendants. (ECF No.: 243)  While it is true that Mr. Haysbert did

not bring paper copies of the exhibits to the Supplemental Pre-trial Conference, it is patently untrue that he was unprepared.  The neglect to bring paper copies of exhibits was an innocent mistake.  The Court's clerk had reached out to counsel to ask that they bring paper copies of their exhibits to the conference.  However, while the clerk had usually communicated with both Mr. McKelvey and Mr. Haysbert, this time *only* Mr. McKelvey was informed of the need to bring paper copies, not Mr. Haysbert.  Due to an error in communication, that message never reached Mr. Haysbert and he expected to be allowed to access his laptop to review the exhibits. Tr. 75:4-12.  An unfortunate mistake, certainly, but not the substance of mistrials and sanctions.

iii.    *Delivery of Exhibits*

Defendants claim that despite being ordered to provide paper copies of exhibits, "on the first day of the trial, the exhibits were not available to the defense. Instead, they were delivered by Federal Express Delivery to defense counsel's office in Fairfax, thereby preventing counsel from reviewing assessing or evaluating the material."  Def. Mot. at pp. 2-3. In essence, Defendants allege that Mr. Haysbert violated a court order by failing to provide copies of Plaintiff's final exhibits before trial. Def. Mot. at p. 2-3.  Yet again, Defendants have mischaracterized the situation. While it is true that Plaintiff's exhibit list and exhibits did not reach Defense counsel by 11:00 a.m. on August 7, as the Court had ordered (see ECF No.: 273) this was the result of unfortunate confusion with FedEx, not deliberate misconduct.  As Mr. Haysbert explained to the Court, he dropped off the final exhibit binders at FedEx in Norfolk on the afternoon of Saturday, August 5, to be sent overnight to Defense counsel's Fairfax office. Day 1 Tr. 94:15-2094:15-20. At the time, Mr. Haysbert asked the FedEx clerk specifically about when the package would be delivered and he was assured that it would be delivered on the morning of August 7.  For some reason, however, the package was not delivered until the

morning of August 8, the first day of trial, rather than the next day as Mr. Haysbert had expected. Had Mr. Haysbert, in an abundance of caution, double-checked the receipt he received instead of relying on the statement made by the Fedex representative, he might have noticed that, contrary to his understanding of the overnight service he had purchased, the receipts noted delivery was scheduled for the morning of August 8. Mr. Haysbert did not have any reason to disbelieve what the FedEx representative had orally confirmed, and therefore expected that the package would, in fact, be delivered overnight. See Day 1 Tr. 90:17-23 ("I was told that it would be overnighted and would arrive at his office on Monday. That's what I was told there when I dropped the package off and paid the money."). The most likely explanation appears to be that, unbeknownst to Mr. Haysbert, the FedEx location which he used had its last Saturday pick-up at 2:30 p.m. and no Sunday pickup, meaning that an overnight package dropped off around 4:00 p.m. on Saturday, August 5 would not be picked up until Monday, August 7 or delivered until Tuesday, August 8. While unfortunate, this was a good faith mistake by Mr. Haysbert, however, not the willful disobedience of the Court's order and it cannot be stated that he intentionally failed to provide Defense counsel with copies of final exhibits before trial or deliberately violated the Court's Order.

      iv.    *Witness Subpoenas Issued by Mr. Haysbert*

Defendants point to the issuance of two subpoenas as evidence of an "improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Def. Mot. at pp. 6-7. According to Defendants, on the day before trial, August 7, Mr. Haysbert issued a subpoena, without the signature of local counsel for an Outback employee, and in response the defense submitted a motion to quash. Def. Mot. at p. 3. The Court took that matter up on the first day of trial, and ultimately based on the representations of Haysbert that the witness was

17

critical to Plaintiff's case to 'prove control between Bloomin' Brands and Outback,' required that the improper subpoena be enforced.  Id.  The second instance involved a witness who was under defense subpoena, but was released. Def. Mot. at p. 4.  Mr. Haysbert had issued a subpoena for the second witness' appearance, the Court ordered the documentation for this subpoena, and the defense successfully moved to quash the subpoena. Def. Mot. at p. 5.

Neither subpoena was improper.  Although Defendants do not explain why they consider the issuance of the witness subpoenas improper, their argument appears to reflect the Court's conclusion that failing to subpoena a witness at least two weeks in advance of trial is a *per se* violation of Local Civil Rule 45(E). See Mem. Op. 8. It is not. Local Civil Rule 45(E) provides that:

> "*Except as otherwise ordered by the Court for good cause shown*, subpoenas for attendance of witnesses at hearings or trials in civil actions shall be served not later than fourteen (14) days before the date of the hearing or trial."

Local R. 45(E).  (Emphasis added).  However, a local rule must be read together with the corresponding Federal Rule of Civil Procedure. Federal Rule of Civil Procedure 45(d)(3)(A) provides, in relevant part, that:

> On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
>
> (i)      fails to allow a reasonable time to comply[.]

Fed. R. Civ. P. 45(d)(3)(A).  In other words, the Court has the discretion to enforce or quash a subpoena issued less than two weeks in advance depending on whether it allows a reasonable time to comply and whether good cause existed for the belated issuance. This is also the advice that Mr. Haysbert received from Norman Thomas, a member of the Bar of this Court, with whom he consulted. See Day 1 Tr. 8:7-15. The fact that Mr. Haysbert sought advice and acted consistently with the advice he received demonstrates that he was not acting in bad faith,

regardless of whether the advice was correct.  Indeed, the Court declined to quash the subpoena. Day 1 Tr. 62:22-24 ("I'm going to deny the motion to quash because I do find that he is an important witness."). While the Court apparently came to regret its decision, that regret does not mean that Mr. Haysbert acted improperly.  The same logic applies to the issuance of the subpoena issued for the second witness.  Defendants had identified this particular witness on the Final Pre-trial Order, issued a subpoena compelling his appearance, then released him.  Plaintiff, who had also listed this particular witness, relied on Defendants' subpoena, which is not at all unusual. When Defendants released the witness, this required a last-minute subpoena to be issued, and it was in this haste that the signature of Mr. McKelvey was not also included on the subpoena, which was not filed with the Court, and did not constitute a pleading, motion or notice. Mr. Haysbert's issuance of the two eleventh-hour subpoenas was not for an improper purpose.  It is nonsensical to argue that the decision to issue subpoenas to secure two critical witnesses was an attempt by Mr. Haysbert intended to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

   *v.*     *Motion for Remote Testimony*

       Defendants contend that "[t]he misconduct began with an untimely motion to allow remote testimony on August 6, which ultimately demonstrated that [Mr.] Haysbert had not made arrangements for his out of state experts to appear in person." Def. Mot. at p. 10.  Defendants argue, unconvincingly, that when challenged on the proof of preparation, Mr. Haysbert withdrew 3 of the experts and never submitted the information ordered by the Court.  Defendants link this alleged behavior to their unnecessary incursion of fees "[i]n short, there was no proof that the experts were even scheduled to appear. Counsel for the defense was forced to brief the motion

and prepare for the experts' cross-examination, when, clearly, the experts were not even scheduled to appear in person." Id.

Defendants' contentions are without merit, and yet again, mischaracterize the events in question. On August 6, Mr. Haysbert filed a motion requesting that Plaintiff's expert, Dr. Huma Haider ("Dr. Haider"), be allowed to testify remotely via Zoom from Houston, Texas where she lives. (ECF No.: 274.). While the motion may have been "untimely" from the perspective of the Court's video conference system policy (see ECF No.: 285 at 2-3), it was filed within days of Mr. Haysbert first learning of a potential issue from Dr. Haider. See Day 1 Tr. 29:8-20. Dr. Haider's father had recently been hospitalized for respiratory failure. Although he had initially been released from the hospital a few days earlier, his condition was worsening and he appeared to be at the end of his life, with Dr. Haider responsible for his end-of-life care. She had proffered this fact in a Declaration submitted to the Court. (See Ex. 1 to ECF No.: 275). Mr. Haysbert explained that travelling to Virginia at that time would be an undue burden on Dr. Haider and that remote testimony could be allowed "[f]or good cause in compelling circumstances and with appropriate safeguards." Fed. R. Civ. P. 43(a). Judge Smith apparently considered that the circumstances did not warrant allowing Dr. Haider to testify remotely, as is her prerogative. (See ECF 285 at 4). However, and perhaps most importantly, rather than simply deny the motion, or take the motion under advisement and suggest what further information might be necessary to constitute "good cause and compelling circumstances" Judge Smith engaged in an intrusive inquiry into Dr. Haider's father's medical condition, including by demanding the submission of the father's medical records (Day 1 Tr. 9:1-18), and accused Mr. Haysbert of "try[ing the] case … by ambush." Day 1 Tr. 10:25. Furthermore, apparently believing (without any reason) that the entire story was a ploy to cover up the fact that Dr. Haider had never planned to appear, Judge

Smith demanded that Mr. Haysbert produce Dr. Haider's plane and hotel reservations, as well as correspondence between Mr. Haysbert and Dr. Haider regarding her travel logistics. See Day 1 Tr. 9:18-10:3, 19:13-19, 43:3-7, 45:12-47:9. Astoundingly, Judge Smith further demanded sworn affidavits (by the next day) from Plaintiff's other expert witnesses stating their plans to attend and the arrangements that had been made, despite their having no connection to the motion regarding Dr. Haider's testimony. Day 1 Tr. 47:22-48:2. Lastly, as illustrated by Defendants' own prerogative in releasing a witness (see section vi, below), Plaintiff is ultimately able to present or release witnesses as necessary. To argue that counsel was required to brief, and prepare for a witness at trial, when that witness was ultimately not called in entirely specious.

    *vi.*    *Other Trial Conduct*

Following Judge Smith's lead in the Opinion, Defendants' Motion complains of a myriad of inappropriate behavior on the part of Mr. Haysbert. In truth, the allegations mischaracterize events and are misleading in terms of what actually occurred. Certain additional incidents of trial referenced by Defendants are discussed below.

Defendants accuse Mr. Haysbert of mischaracterizing witness testimony during his questioning, although they do not point to any specific examples. Def. Mot. at p. 5. Nevertheless, this statement appears to be a reference to the Court's charge that Mr. Haysbert, in questioning a witness described the witness as having testified earlier that Plaintiff was on the ground 15 to 20 minutes after her fall when, in fact, the testimony had been 10 to 15 minutes. Day 4 Tr. 758:18-19, 742:17-22. This was an innocent misstatement, likely caused by the fact that the witness had also just testified that the fall occurred 15 to 20 feet away from him. Id. at 742:7-9. It is clear that Mr. Haysbert did not intentionally mischaracterize the witness' testimony to obtain some advantage given the fact that Mr. Haysbert attempted to use the prior

deposition testimony of the witness to refresh his recollection that he had originally estimated 5 minutes. Id. at 759:2-25. Moreover, this was not a material fact and any mischaracterization could not have prejudiced the jury in any way.

Defendants further accuse Mr. Haysbert of "constantly attempt[ing] to confuse and prejudice the jury" by, among other things, "calling Defendants' employees 'adverse'". Def. Mot. at p. 13. This is entirely inaccurate. Mr. Haysbert requested permission from the Court to treat two witnesses associated with Defendants as adverse witnesses. Day 4 Tr. 707:21-23, 765:17-19. Defendants ignore the significant difference between asking permission and declaring something to be the case. Moreover, while the Court correctly explained that the primary distinction with respect to an adverse witness is the kind of examination allowed (namely, the use of leading questions) (see id. Day 4 Tr. 708:3-11, 765:21-766:3), it was incorrect to state that permission to do so may not be requested before a witness begins to testify, when Federal Rule of Evidence 611(c) provides that leading questions should be allowed "when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party" (emphasis added). Mr. Haysbert was thus well within his rights to make such a request with respect to Defendants' employees, even if the Court erroneously believed that he was not. As such, Mr. Haysbert did not improperly declare Defendants' employee-witnesses to be "adverse."

Defendants also accuse Mr. Haysbert of "insinuating [that] Defendants had a video of the slip and fall that they destroyed." Def. Mot. at 13; but cf. Op. 7 ("suggesting that the restaurant had a camera that could have captured Plaintiff's fall when the camera was only positioned to capture the front entrance/host stand area"). Mr. Haysbert did no such thing. While Mr. Haysbert certainly asked witnesses about the presence of a camera at the restaurant and what the camera would have captured, he never argued that the camera had caught Plaintiff's fall on video or that

Defendants had destroyed any video. Instead, that appears to be pure speculation on the part of Defendants and the Court—who don't even agree as to what Mr. Haysbert was supposedly "insinuating" or "suggesting." Instead, as the totality of Mr. Haysbert's questions make clear, he was getting at the issue of whether any pre-existing dizziness or unsteadiness on the part of Plaintiff could have caused her slip and fall. See Day 4 Tr. 675:3-7 (Mr. Haysbert: "The camera where the hostess stand, looking towards the front door, would it not have showed Dr. Haysbert if she were coming inside the door, whether or not she was showing signs of dizziness or unsteadiness?").  It is not inappropriate to ask questions that the defense does not like, and which may require Defense counsel to argue to the jury about what certain testimony means and doesn't mean.  However, if Defendants had legitimate concerns with Mr. Haysbert's questions about the camera, their remedy would have been an objection, not a motion for sanctions.

Defendants assert that Mr. Haysbert attempted to use expert witness Dr. Aaron Fuller to "back-door" Dr. Haider's opinions through the use of a "brain animation" demonstrative exhibit. Def's Mot. at 5. This appears to reflect some confusion on the part of the Court, which erroneously believed that the brain animation was an exhibit belonging to Dr. Haider, not Dr. Filler. See Day 4 Tr. 632:6-7 ("As far as I'm concerned, that's a backdoor way of trying to get in Dr. Haider's demonstrative exhibit."); Day 5 Tr. 90:8-11 ("You attempted to get Dr. Haider's video demonstrative before the jury through Dr. Filler, who did not prepare it…."); id. at 91:2-9 ("The Court was concerned with you trying to get in that particular demonstrative through Dr. Filler…. He had only in his report said that Dr. Haider was a referring physician and the indicative part of it, but there is no reference to any brain animation, and both reports are filed on the same day, and nobody knows who made that brain animation. I can only assume, but I haven't heard from her, was Dr. Haider.").

The Court's assumption, however, was wrong. The brain animation was not Dr. Haider's. Rather, it was an animation of the brain scans created by Dr. Filler, prepared by a third-party vendor at the request of Mr. Haysbert for the possible use of Dr. Haider and Dr. Filler at trial. See Day 5 Tr. 103:5-104:3. Accordingly, Mr. Haysbert's attempt to use the animation in his examination cannot be considered an attempt, backdoor or otherwise, to sneak Dr. Haider's opinions past the watchful eye of the Court.

To the extent that Defendants are complaining that Dr. Filler's expert testimony relied on indications from Dr. Haider (see Day 3 Tr. 453:8-13), Federal Rule of Evidence 703 allows experts to rely on inadmissible facts or data, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." See also Id. at 435:6-21 (Dr. Filler: "[A] a physician generally doesn't have to get every aspect of history by inspecting themselves. We read reports from other doctors."). While the Court disagreed (see Id. at 437:10-11, 439:7-9), losing an evidentiary ruling is not tantamount to bad faith or grounds for sanctions. Similarly, had Mr. Haysbert attempted to elicit testimony from Dr. Filler beyond the scope of his report, defense counsel could object. Objections, not sanctions, are the appropriate remedy to a disagreement over expert testimony.

Finally, Defendants suggest that Mr. Haysbert attempted to introduce objected-to evidence - specifically, a PowerPoint from Dr. Filler and restaurant work orders - before the Court had ruled on the objections. See Def's Mot. at 12. Mr. Haysbert did not do any such thing. With respect to the PowerPoint, it was the Court that instructed Mr. Haysbert to use the PowerPoint in his examination of Dr. Filler. See Day 4 Tr. 454:11-21. While Mr. Haysbert inadvertently neglected to redact a part of the PowerPoint with references to Dr. Filler's experience as an expert witness (see Day 5 Tr. 91:24-95:22), that page was not intentionally

shown to the jury, and nothing of substance was listed on the said page. Moreover, on such a tangential issue, the jury could have been instructed to ignore the page.

With respect to the first work order, Mr. Haysbert did not ignore that the Court had yet to rule on admissibility; he attempted to obtain a ruling from the Court. Mr. Haysbert made efforts to lay the required foundation and argued to the Court in support of his position. See, e.g., Day 4 Tr. 587:24-588:15, 722:21-723:22, 727:6-16. While he requested permission to publish the exhibit to the jury, he never did so because the Court denied his request. See id. at 778:11-24. With respect to the second work order, Mr. Haysbert did not have the opportunity to seek to have it admitted before the mistrial was declared. See id. at 790:17-791:16. Here, again, Defendants seem to confuse requesting permission with doing. Defendants' real complaint appears to be that they hold a different view from Mr. Haysbert as to the relevance of the work order. See id. at 776:1-15.

Defendants' complaints continue, and the responses to the allegations are summarized below.

1.    Mr. Haysbert did not serve a subpoena on his own expert. See Def's Mot. at 4. Rather, he provided Dr. Haider with a copy of a subpoena in the hope that it might be helpful for her in explaining to others that she had to attend court. See Day 5 Tr. 112:7-12. (This should, however, be further evidence against Defendants' charge that Mr. Haysbert never intended Dr. Haider to testify.)

2.    Mr. Haysbert did not interrupt the Court, talk over the Court and counsel, or disrupt the proceedings "[o]n many occasions." Def's Mot. at 5. While Mr. Haysbert acknowledges interrupting or talking over the Court on a few occasions, he apologized and attempted to do better. Day 5 Tr. 83:25-84:12 ("My sincere apologies for that. I'm endeavoring

to do better about that. I believe the Court will see that I'm trying to do that. I know in the beginning, in an effort to be heard, I was overzealous to try and represent my client, but, Your Honor, under no circumstances was I trying to be devious or deceptive or act without integrity or to intentionally disrespect you, and that was never my intention. So I would hope that you understand that.").[7]

3.       Mr. Haysbert did not improperly ask the same questions of witnesses over and over. See Def's Mot. at 5. At times, interruptions required Mr. Haysbert to reestablish the line of questioning. He may also have inadvertently repeated questions. If Defendants were concerned with any particular questions, they could have objected.  Trials are never perfect, and attorneys cannot be expected to be flawless in the presentation of evidence.

4.       The fact that trial was taking longer than anticipated, even if it resulted from Mr. Haysbert's approach to trial is not improper. Def. Mot. at pp. 7, 14-15.

5.       Mr. Haysbert did not have "absolutely no regard for this Court's rulings," nor did he "constantly attempt to confuse and prejudice the jury against Defendants." Def. Mot. at p. 13. Mr. Haysbert also did not fail to "conduct himself with dignity and propriety," Def. Mot. at p. 14, or "persistently act[] in a manner unacceptable to common standards of decency and decorum." Def. Mot. at p. 15.  This is simply rhetoric on the part of Defendants designed to cast a negative light on Mr. Haysbert.

The instances outlined above demonstrate that Mr. Haysbert did not act with malicious intent, bad faith or willfulness. He simply advocated for his client within the bounds of the law and his professional and ethical obligations, in the midst of a contentious and difficult trial, before a Judge who had not been exceptionally accommodating.

---

[7] Defense counsel, in response, chose to ridicule Mr. Haysbert's politeness. See Day 5 Tr. 65:1-14 ("Mr. Haysbert can say thank you, thank you, thank you now and be as polite as a choir boy....").

**C.** <u>**Sanctions Pursuant to Rule 11 Are Procedurally Improper and Completely Without Merit**</u>

Defendants argue, in the alternative, that Rule 11 sanctions should be imposed on Mr. Haysbert based on the motion to allow Dr. Haider to testify remotely and the subpoenas issued for Nick Seifert and Marcus Wilson. Def. Mot. at p. 6. According to Defendants, the "motion and subpoenas were presented for an 'improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation'" under Rule 11. <u>Id</u>. at pp. 6-7. Defendants also argue that "Plaintiff's motion and subpoenas were not 'warranted by existing law', nor was there 'a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.'" <u>Id</u>.

Rule 11 requires that an attorney, in signing a pleading, certify that it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation. Defendants point specifically to the motion filed by Plaintiff to allow Dr. Haider to appear at trial remotely, and to the last-minute two subpoenas issued by Mr. Haysbert. Plaintiff's motion to allow remote testimony was not filed, nor the subpoenas issued, for an "improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." They also were not "[un]warranted by existing law" or lacking "a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."

First, with respect to the motion relative to Dr. Haider, it was expressly permitted under Rule 43(a), which provides:

> "[f]or good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location."

Fed. R. Civ. P. 43(a). The fact that the Court did not rule in favor of Plaintiff's motion before subsequent events rendered it moot does not mean that the argument was frivolous. Second, the issuance of the two subpoenas,[8] after the standard 14-day period was not frivolous or improper, because as explained above in Section III, the Court has the discretion to enforce or quash a subpoena issued less than two weeks in advance depending on whether it allows a reasonable time to comply and whether good cause existed for the belated issuance.  The fact that Defendants refer to the subpoena and its presentation as improper (Def. Mot. at p. 3, 6) does not make it so.  In the <u>Columbia Gas</u> case, where sanctions under Rule 11 were found to be unwarranted, the Court found that although the defendant had argued that the filing of the lawsuit "was wrong," there was no evidence that counsel for Columbia Gas believed he was filing the lawsuit with an improper purpose, but rather the record reflected that a plausible legal claim was presented.  <u>Colum. Gas Transmission, LLC</u>, 2023 U.S. App. LEXIS 19300 at 10.  Similarly, Mr. Haysbert filed the motion expressly permitted by the Rules and issued the last minute subpoenas which were not prohibited, but could be quashed based on the Court's discretion.

### D.  <u>Defendants Cannot Establish a Causal Connection Between the Sanction Requested and the Conduct</u>

The essence of Defendant's motion, and the entire bases of their request for an award of costs and fees, is that Mr. Haysbert's alleged misconduct caused a mistrial, resulting in Defendants being forced to bear the costs of trial twice. <u>See</u> Def's Mot. at 9 ("Their intentional misconduct resulted in a mistrial and requires the entire case to be tried again. Thus, this Court is

---

[8] Procedurally, on its face, Rule 11 only applies to "a pleading, written motion, or other paper" presented to the court. ("Rule 11 applies to written documents, whether containing statements made under oath or not, that a party or its attorneys submit to a federal court.")  JENNER & BLOCK PRACTICE SERIES, SANCTIONS UNDER RULE 11, p. 21 (2010).  As a result, because subpoenas are not papers filed with the court, they cannot form the basis of a motion for sanctions under Rule 11. Sanctions for subpoenas that impose an undue burden or expense are covered by Rule 45(a), not Rule 11.

well within its discretion to shift all of Defendants' trial attorneys' fees and costs to Plaintiff's counsel.") However, sanctions under both Section 1927 and a court's inherent powers require a causal link between the misconduct and the fees. Goodyear Tire & Rubber Co. v. Haeger, 137 S. Ct. 1178, 1186 n.5 (2017).

Defendants' motion is filled with complaints about conduct that did not (or could not) cause the mistrial.  In this case a mistrial was ordered primarily because the Court (erroneously) believed that Mr. Haysbert had "deliberat[ely] inject[ed] insurance into the case."  Mem. Op. at p. 18.  Although the Court also referred to a supposed "cumulation of misconduct" that purportedly "had a prejudicial effect on the jury and [could not] be cured by any type of curative instruction" (plus the prejudice to Plaintiff that would occur from the jury seeing counsel for Plaintiff disappear midway through a trial) (id. at pp. 19-20), it is only with respect to the insurance issue that the Court found "this issue alone is grounds for a mistrial." Id. at p. 19; cf. Belue v. Leventhal, 640 F. 3d 567, 572 (4th Cir. 2011) (explaining that the court would focus its analysis on the alleged misconduct without which the district court would not have acted, rather than on the "relatively minor violations of local rules and filings containing controversial arguments" also cited as bases for the district court's action).

Moreover, contrary to the Court's claim, it cannot be that every aspect of the supposed "cumulation of misconduct" had a prejudicial effect that could not be cured. See Mem. Op. at 19. This is because, among other reasons, the Court's list of supposed misconduct includes actions that did not occur in front of the jury. For example, Mr. Haysbert's alleged "failure to follow the rules and the rulings of the court," (id.), included his supposed belated issuance of subpoenas to multiple witnesses. Id. at 8.  The jury, however, is not privy to information about subpoenas or how far in advance they were issued, and it is impossible for a jury to be prejudiced by

something that it does not know about or, indeed, has nothing to do with the substance of the dispute. Defendant's Motion also complains of actions that the Court did not even include within its alleged "cumulation of misconduct," such as Mr. Haysbert's decision to withdraw three of the expert witnesses that he had considered calling. See Def. Mot. At p. 10. That counsel for Defendants was forced to prepare for witnesses that were ultimately not called to testify is part of the trial process, not something for which they are entitled to compensation.

Defendants argue that the "intentional misconduct resulted in a mistrial and requires the entire case to be tried again" and that the Court is within its discretion to shift all of Defendants' trial attorneys' fees and costs. Defendants misapply the "but-for" test. "A court may award *only* those fees that the innocent party would not have incurred in the absence of litigation misconduct." Goodyear, 581 U.S. at 590. (Emphasis added). As the Fourth Circuit explained in Six v. Generations Fed. Credit Union, 891 F.3d 508, 520 (2018) (4th Cir.), "[a]n award of costs, expenses, and attorney's fees pursuant to § 1927 is compensatory in nature—not punitive. It requires the court to show a causal link between wrongful conduct and an unreasonable and vexatious multiplication of proceedings, then to connect the costs wrongfully incurred *as a result of the sanctioned attorney's conduct* to the amount awarded to the moving party." Id. (Emphasis added). In the Six case, sanctions were awarded under the court's inherent authority and § 1927 (as requested in this case) when the sanctionable conduct involved an effort to hide relevant facts from the district court and opposing counsel for almost two years and "intentionally misled the [district court] about the relevant facts to gain a tactical advantage and prevail on pending arbitration motions." Id. The sanction included legal fees that were generated because the actions of the attorneys *created* the need to litigate an unnecessary side issue, and their continuing conduct "also generated additional, unnecessary costs of appeal to the Fourth

30

Circuit." Id.  In imposing the sanction, which was affirmed by the Court of Appeals for the

Fourth Circuit, the "court tailored the award of 'attorney's fees and expenses of $70,147.70 in

connection with a renewed motion to dismiss and the first appeal' directly to those costs incurred

due to the three attorneys' 'bad faith and vexatious conduct . . . in multiplying the proceedings

and violating their duty of candor to the Court." Id. (citing to the underlying case, Dillon v. BMO

Harris Bank, N.A., 2017 U.S. Dist. LEXIS 18877, 2017 WL 564501, at *8.  (M.D.N.C. Feb. 10,

2017).

       The instant situation is completely distinguishable. Even if any misconduct occurred,

which Mr. Haysbert emphatically denies, it did not create any additional or unnecessary

litigation, or generate additional, unnecessary costs, even though a mistrial occurred.  Defendants

were obligated to prepare for trial, and even prepare for witnesses who might not be called,

irrespective of the outcome during trial, and a mistrial is simply an incident of trial and can occur

even in the absence of misconduct.

## IV.     THE COURT'S MEMORANDUM OPINION[9]

       Regrettably, for not only Mr. Haysbert, but also the Plaintiff in this case, Judge Smith's

scathing Opinion, has become well-publicized and widely disseminated.[10]   For whatever reason,

Judge Smith appeared frustrated with the fact that this case was proceeding to trial, even making

an off the record comment during the Supplemental Final Pre-trial Conference that this case was

not worth the amount contemplated by Plaintiff.  From the start of the trial, for reasons that

remain unclear, Judge Smith approached Mr. Haysbert with mistrust and suspicion and afforded

him treatment different from that of other attorneys. This preconception may have impacted

---

[9] The statements below are not intended to impugn the integrity of Judge Smith, but rather demonstrate that Mr. Haysbert may have been a victim of implicit bias.
[10] See https://valawyersweekly.com/2023/09/25/attorneys-conduct-results-in-mistrial/.  Multiple other legal sites have likewise published the opinion, further unfairly tarnishing the reputation of Mr. Haysbert.

Judge Smith's views of Mr. Haysbert's actions at trial and must be taken into account when considering the Judge's uncharitable characterizations of the same. This dynamic is best illustrated by three examples: (i) Judge Smith's intrusive and unjustified inquiry into the travel plans of Plaintiff's expert witnesses in response to a motion that one witness be allowed to testify remotely due to her father's declining health; (ii) her conclusion, discussed above, that Mr. Haysbert's use of the term "ensure" was a deliberate attempt to inject insurance into the case, and (iii) Judge Smith's characterization of Mr. Haysbert's alleged "outburst."

First, as outlined above, after learning that Dr. Haider's father had been hospitalized for respiratory failure, then released, but with worsening conditions that suggested end of life, Mr. Haysbert filed a motion requesting that Dr. Haider be allowed to testify remotely. There was nothing nefarious about the request, and while not generally favored, it was a viable alternative under the Federal Rules of Civil Procedure. Instead of simply denying the motion, or taking it under advisement pending a Supplemental Declaration with additional information, Judge Smith engaged in a lengthy inquiry into Dr. Haider's father's medical condition, other family members who could care for him,  a dialogue over the meaning of the word "caregiver", and demanding the submission of the father's medical records and that Mr. Haysbert produce Dr. Haider's plane and hotel reservations, as well as correspondence between Mr. Haysbert and Dr. Haider regarding her travel logistics, even though such information is protected from disclosure under Federal Rule of Civil Procedure 26(b)(3)(c).  See Day 1 Tr. 9:18-10:3, 19:13-19, 43:3-7, 45:12-47:9. Astoundingly, Judge Smith further demanded sworn affidavits (by the next day) from Plaintiff's other expert witnesses stating their plans to attend and the arrangements that have been made, despite their having no connection to the motion regarding Dr. Haider's testimony. Id at. 47:22-48:2.

By making these unjustified demands, which go well beyond what was needed to rule on Plaintiff's motion, Judge Smith demonstrated a suspicion and mistrust of Mr. Haysbert for which she really had no legitimate basis. Witness travel arrangements are not the Court's concern, as counsel is fully within his rights to decide whether or not to actually call someone on its witness list to testify. Mr. Haysbert had represented as an officer of the court that Dr. Haider and other expert witnesses were planning to come and Judge Smith had no grounds to disbelieve him.   It would be one thing if this kind of mistrust simply reflected Judge Smith's general attitude towards the attorneys that appeared before her, but it does not. While Defendants also had expert witnesses that it planned to call, Judge Smith made no similar demands from defense counsel for proof of their witnesses' plans to attend court.

As previously discussed, Judge Smith's conclusion that Mr. Haysbert's use of the term "ensure" reflected a deliberate attempt to inject insurance into the case is patently absurd. As an indicator of just how uncharitable Judge Smith's attitude towards Mr. Haysbert was, however, it says a great deal. Such a conclusion could only be reached by someone who already assumed the worst of Mr. Haysbert and applied the most negative interpretation possible to his actions. None of us, if subjected to that kind of treatment, would emerge unscathed. When someone is as committed to finding fault in a person as Judge Smith appears to have been, they will manage to find fault.

The final illustrative example of Judge Smith's bias is interpretation of Mr. Haysbert's alleged "outburst," which Judge Smith described as "extreme." See Day 5 Tr. 97:11-12. Based on the facts described by the Court, this appears to be a reference to an incident that occurred on the third day of trial, in which Mr. Haysbert allegedly slammed a piece of paper down on a table and yelled "no further questions." Day 3 Tr. 484:25-485:4. Mr. Haysbert does not recall yelling

33

or slamming anything, but he has apologized to the Court, and apologizes again today. See Day 3

Tr. 485:11. Judge Smith's description of that incident, as well as her response, are so

exaggerated, it bears quoting in full:

> "But during these outbursts, particularly the first one, <u>I could see my courtroom staff particularly, and I could see the jury, and, frankly, people were visibly nervous.</u> They were visibly nervous. I will tell you, <u>I had my hand down towards my panic button to call the marshal,</u> and I didn't because I knew if the marshal came in, it would result in a mistrial because this courtroom would have been flooded with people coming in when a judge pushes a panic button. We all have one, and I was on the verge of pushing that button.
>
> Then when the court reporter was asked to read the questions through, things calmed down a little bit, but she was nervous. She's been my court reporter for so long I can't remember. You know what? <u>I know when her voice is shaking. She was rattled. Everybody was rattled.</u> You did it in front of the jury, and there's just no excuse for that kind of conduct. <u>You do have an intimidating presence through your height and your build</u>[11], and then to have that outburst like that, it really made everybody, and at least everybody that I could observe in the time, and I don't recall but one other time in my career where I have reached for the panic button, one other time. Frankly, I've been on the bench for 38 years, and I've never reached for that panic button. One other time, I was there, but this time I was almost pushing it."

Day 5 Tr. 97:16-98:15 (emphasis added).

Simply put, even if Mr. Haysbert had slammed a piece of paper down and yelled "no

further questions," as if in a television program, see Day 5 Tr. 97:9-11, it beggars belief that such

actions would make the courtroom staff and jury "visibly nervous," and cause "everybody [to be]

rattled.[12]" Additionally, the notion that Mr. Haysbert's actions were so threatening that they

almost necessitated her using the panic button for the first time in her 38 years on the bench is

---

[11] These comments stand in stark contrast to an earlier comment on the second day of trial when Judge Smith asked Mr. Haysbert to "speak up" commenting at the time that he had a very "soft voice." Day 2 Tr. 122:25, 123:1.

[12] Plaintiff retained the services of Norman A. Thomas, a former Judge on the Circuit Court for the City of Norfolk, and a civil appeals attorney, to observe the entire proceeding. Upon request, Mr. Thomas can provide a Declaration, or testify at a hearing on the Motion for Sanctions.

simply not reasonable and raises a number of questions when directed toward an attorney who also happens to be Black.[13]  To be clear, Mr. Haysbert does not challenge whether Judge Smith's description is, in fact, how she remembers the incident, and he is not arguing with her version of events, but that in and of itself is the problem: Judge Smith's negative disposition towards Mr. Haysbert appears to have significantly and unfairly colored her perception of his behavior.

It is undisputed that Judge Smith, as with most others associated with the legal system, is committed to equal justice under the law and her reputation on the bench precedes her. However, it should be understood that no one is immune from the possibility of implicit bias, including Judge Smith, because implicit bias is just that - it is triggered unconsciously, and we are largely unaware of its occurrence. "Implicit biases are attitudes or stereotypes that affect our understanding, comprehension, decisions and actions - including inferences and conclusions - in an unconscious manner."  Donald, Bernice, Circuit Judge, <u>Judges On Race: Reducing Implicit Bias In Courtrooms By U.S.</u> (December 6, 2020),

<u>https://www.law360.com/articles/1309550/judges-on-race-reducing-implicit-bias-in-courtrooms</u>).  Implicit biases are activated involuntarily, without awareness, intention or control and they "can be either positive or negative, and everyone is susceptible." <u>Id</u>. (citing Stasts, Cheryl, et al., <u>State of the Science: Implicit Bias Review, Kirwan Institute for the Study of Race</u>

---

[13] Sadly, and largely undeserving, the scary or angry Black man is a well-known stereotype in American culture. Like all stereotypes, it provides a cognitive shortcut to frame and contextualize another person's behavior, albeit one that can lead to different perceptions of the same conduct depending on the race of the actor. <u>See</u>, e.g., <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 (Marshall, J. concurring) (noting that unconscious bias "may lead [a prosecutor] easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically"); <u>Miller-El v. Dretke</u>, 545 U.S. 231, 267-68 (Breyer, J. concurring) (noting that a person may not even be aware of how their biases affect their judgments).  There is also a well-documented tendency on the part of people of all races to perceive Black men as larger and more physically threatening than white men of equal stature. <u>See</u> also, Kenneth Lawson, <u>Police Shootings of Black Men and Implicit Racial Bias: Can't We All Just Get Along</u>, 37 U. HAW. L. REV. 339, 350-58 (2015); 7/19/13 Remarks by President Barack Obama on Trayvon Martin, White House Press Briefing Room ("There are very few African-Americans who haven't had the experience of getting on an elevator and a woman clutching her purse nervously and holding her breath until she had a chance to get off.") (quoted in <u>Floyd v. City of New York</u>, 959 F. Supp. 2d 540, 587 (S.D.N.Y. 2013)).

and Ethnicity (2017),   http://kirwaninstitute.osu.edu/implicit-bias-training/resources/2017-implicit-bias-review.pdf.  Even the Office of the Executive Secretary of the Supreme Court of Virginia addressed the concern in 2020, commenting that

> "…implicit bias involves far more subtle stereotypical associations. People are unaware that they are thinking or acting in a particular way because of the influence of that bias. Researchers have learned that individuals are more likely to rely on the automatic processing by their brains, sometimes referred to as 'intuition' or 'gut feelings', when they must make decisions quickly."

Margaret Hannapel Ogden, Ethics & Professionalism: Interrupting Implicit Bias to Improve Mental Health in the Legal Profession, (October 16, 2020), https://vjlap.org/wp-content/uploads/2020/10/Ethics-Implicit-Bias-and-Mental-Health-Written-Materials.pdf. Clearly, although the topic is controversial, it has been embraced as a concern by a wide segment of society.  At least three states, New York, New Jersey and California, where Mr. Haysbert is licensed now require that members take implicit bias courses. Virginia has agreed that implicit bias courses count for required ethics credit.  It can be a logical explanation for uncharacteristic behavior, and act as a barrier to objective and unprejudiced justice.

For these reasons, when evaluating the allegations against Mr. Haysbert that Defendants draw from the Opinion, the Court should evaluate the evidence for itself and determine whether it actually supports the charges against Mr. Haysbert.

## V.   CONCLUSION

A request for sanctions is a very serious matter, and one which cannot and should not be taken lightly, under any circumstances, and whether defensible or not.  In this instance, while there is no basis for awarding sanctions for any number of reasons, Mr. Haysbert has taken this matter very seriously, and to heart. Simply having to defend the Motion and endure the fallout

resulting from Judge Smith's Opinion declaring a mistrial and revoking his pro hac vice status, along with the public humiliation, has been overwhelming, and to large degree, life changing.

Defendants go to great length to throw darts and point fingers, emphatically arguing that Mr. Haysbert engaged in a deliberate pattern of reprehensible and inappropriate conduct. Defendants' interpretation is in error. While there were certainly missteps and mishaps that arose during the trial, there was never a point in time where Mr. Haysbert acted intentionally, maliciously, or willfully. Each concern raised by Defendants, standing alone, is easily explained and addressed, and should be summarily dismissed. Defendants would have this Court draw the inference that the culmination of events demonstrates that Mr. Haysbert's actions are worthy of sanction. Mr. Haysbert solemnly urges this Court to not take this approach and to review each situation standing alone, and appreciate the reasonable and logical explanations offered. The events were born of a combination of unfortunate circumstances (Dr. Haider, for example), inadvertence (Fedex, for example), miscommunication (the Supplemental Final Pre-trial Conference, for example), and even inadvertent actions (injection of insurance into the trial, for example). Had Mr. Haysbert not been pressed to locate replacement local counsel, he might have found a more experienced attorney. He did not. Had local counsel been more experienced in this jurisdiction, and with this Court in particular, it might have made a difference. He was not. Had this case been settled in one of the two settlement conferences, it would have made a difference. It was not. Had Judge Smith issued curative instructions, attempted to guide or mentor Mr. Haysbert, or reacted differently to the issues that plagued the trial, it might have made a difference. She did not. Had Mr. Haysbert been more experienced in federal court, or in this jurisdiction, it might have made a difference. He was not. Regrettably, while Mr. Haysbert has taken this matter with the utmost seriousness and appropriate level of respect, this entire

matter can and should be described quite simply as a *tempest in a teapot*, and the Motion for Sanctions should be dismissed.

WHEREFORE, Nazareth M. Haysbert, by and through the undersigned counsel, hereby respectfully requests that this Court dismiss the Defendants' Motion for Sanctions and for such further relief as the Court determines necessary.

Respectfully submitted,

Date: December 18, 2023          By:     _____/s/_____
                                         Mary T. Morgan, Esq.
                                         Virginia State Bar No. 44955
                                         *Counsel for Interested Party,*
                                         *Nazareth M. Haysbert, Esq.*
                                         INFINITY LAW GROUP, P.L.C.
                                         4646 Princess Anne Road, Unit 104
                                         Virginia Beach, Virginia 23462
                                         Telephone: (757) 609-2702
                                         Facsimile: (866) 212-1310
                                         Email: mary@infinitylawva.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of December 2023, I will electronically file the

foregoing with the Clerk of Court using the CM/EMF system, which will send a notification of

such filing (NEF) to all counsel of record, including:

> John D. McGavin, Esq.
> McGavin, Boyce, Bardot,
> Thorsen & Katz, P.C.
> 9990 Fairfax Boulevard, Suite 400
> Fairfax, Virginia 22030
> jmcgavin@mbbtklaw.com
> *Counsel for Defendants*

I FURTHER CERTIFY that I will send the document by electronic mail and U.S. Mail to

the following non-filing user:

> Joann Haysbert
> 244 William R. Harvey Way
> Hampton, VA 23669
> Email: joannhaysbert@yahoo.com
> *Plaintiff*

> _____/s/_____
> Mary T. Morgan, Esq.
> Virginia State Bar No. 44955
> *Counsel for Interested Party,*
> *Nazareth M. Haysbert, Esq.*
> Infinity Law Group, P.L.C.
> 4646 Princess Anne Road, Unit 104
> Virginia Beach, Virginia 23462
> Telephone: (757) 609-2702
> Facsimile: (866) 212-1310
> Email: mary@infinitylawva.com