**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

**JOANN WRIGHT HAYSBERT,**

        **Plaintiff,**

**v.**                                                                 **Civil Case No.:  4:20-cv-00121**

**BLOOMIN' BRANDS, INC., et al,**

        **Defendants.**

**SECOND SUPPLEMENTAL BRIEF IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR SANCTIONS**

COMES NOW, Nazareth M. Haysbert ("Mr. Haysbert"), an interested party, by and through the undersigned counsel, pursuant to the Court's Order of June 12, 2024, and hereby submits the following Second Supplemental Brief in Opposition to Defendants' Motion for Sanctions, together with the attached Declaration (Exhibit 1) in support thereof, stating as follows:

## I.    **INTRODUCTION**

This matter involves a highly contentious personal injury case trial where the personalities of counsel for both parties, as well as the presiding Judge, resulted in a number of unfortunate and rather heated disputes. Although Mr. Haysbert may have made missteps during the intensely contested trial, at no point did his actions - whether viewed discretely or even cumulatively - rise to anything approaching sanctionable misconduct.  Defendants' request for sanctions is without merit, factually or legally.

As explained below, to permit an award of attorney's fees, Defendants must prove that Mr. Haysbert acted in bad faith to cause the mistrial. Defendants, however, have not provided any evidence to support a finding of bad faith. Moreover, the new allegations contained in

Defendants' Supplemental Motion are meritless and irrelevant, and for the reasons discussed infra, should be considered improper. In short, despite adding another 11 pages of information outlining Mr. Haysbert's alleged bad faith, Defendants' Supplemental Motion (ECF No.: 369) ("Supplement" or "Supp.") presents nothing more than baseless speculation, bald conjecture, implausible inferences, unsupported assertions, specious mischaracterizations, and spurious insinuations. While Defendants appear to view any evidentiary dispute, any disagreement about the rules, any difference of opinion or interpretation, any miscommunication, any minor misstatement, any flustered moment, and any objected-to question as an example of bad faith misconduct - that does not make it so. Would this be the case, then every imperfect trial attorney would face a similar motion after a trial, or a mistrial.

Defendants have not provided any evidence or argument from which the Court could conclude that Mr. Haysbert engaged in bad faith, sanctionable misconduct. The sheer volume of accusations or the indignant manner in which they are presented should not convince the Court that Mr. Haysbert's conduct is sanctionable. "It is a tale . . . . full of sound and fury, signifying nothing." William Shakespeare, THE TRAGEDY OF MACBETH 151 (J.C. Scrimgeour ed., MacMillan & Co. 1916) (1623).

## II.    ARGUMENT

### 1.    Overview and Application of the Legal Standard

Defendants' supplemental allegations do not support a finding of bad faith. In their Motion and Supplement, Defendants seek sanctions against Mr. Haysbert for allegedly causing a mistrial under both 28 U.S.C. § 1927 and the Court's inherent powers.[1] Under § 1927, an

---

[1] Defendants also seek sanctions under Federal Rule of Civil Procedure 11 with respect to Mr. Haysbert's Rule 43(a) motion to permit Dr. Haider to testify remotely and two subpoenas. See Def. Mot. at 6-7. Such request, however, was procedurally and substantively improper, as it (i) sought sanctions for matters other than "pleading[s], written motion[s], or other paper[s]" presented to the court, which are outside the scope of the rule; (ii) was not "made

attorney who "multiplies the proceedings in any case unreasonably and vexatiously" may be made to pay "the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct," while a court's inherent powers include the power to "assess attorney's fees as a sanction for the 'willful disobedience of a court order'" or "when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991) (quoting Alyeska Pipeline Service Co. v. Wilderness Society, 421 U. S. 240, 258-59 (1975)).

> A.    *Defendants Must Show That Mr. Haysbert Acted With an "Improper State of Mind" Under both § 1927 and the Court's Inherent Powers*

In their Supplement, Defendants concede that a court must find that a lawyer acted in bad faith in order to impose sanctions under both § 1927 and the Court's inherent powers. See Supp. at 4 (§ 1927), 6 (inherent powers).  Defendants, however, confuse the issue by wrongly suggesting that bad faith can be proven by either an objective test or a subjective test. Id. at 4-5. Understanding the jurisprudence concerning proof of bad faith in the sanctions context begins with the understanding that the concept of bad faith refers to a state of mind. See Colautti v. Franklin, 439 U.S. 379, 296 (1979) (describing bad faith as a type of scienter); see also David E. Pozen, Constitutional Bad Faith, 129 HARV. L. REV. 885, 892 (2016) ("Classic formulations of legal bad faith look to the actor's state of mind and, above all, to her honesty and sincerity."). Bad faith is generally defined as "dishonesty of belief or purpose," "lack of honesty and trust," and "intent to deceive; insincerity, dishonesty; faithlessness, disloyalty; treachery." See id. at 892

---

separately from any other motion"; and (iii) failed to provide Mr. Haysbert the required 21-day safe harbor. See Fed. R. Civ. P. 11(b)-(c). "[F]ailure to comply with the procedural requirements precludes the imposition of the requested sanctions." Brickwood Contrs. v. Datanet Engineering, 369 F. 3d 385, 389 (4th Cir. 2004) (en banc). Because Defendants nevertheless continue to advocate their motion for Rule 11 sanctions (see Supp. at 1 n.1; May 14, 2024 Hearing Transcript (ECF 267) ("Hr'g Tr.") at 9:24-10:2, 16:12-13, Mr. Haysbert, by counsel, served Defendants' counsel on June 13, 2024 with his own motion for Rule 11 sanctions for having signed, filed, submitted and later advocated for their legally frivolous Rule 11 motion. Having given Defendants the appropriate safe harbor, unless the situation is remedied, Mr. Haysbert intends to file this motion on July 8, 2024.

& n.28 (quoting definitions from BLACK'S LAW DICTIONARY, RANDOM HOUSE UNABRIDGED DICTIONARY, and OXFORD ENGLISH DICTIONARY). Thus, while a concept of "objective bad faith" exists, (see id. at 893-94), when a court refers to "bad faith" without more, or to any sort of motive, purpose, or intent, it should be understood to be referring to what is sometimes called "subjective bad faith."

This can be seen, for example, in Chambers, where the Supreme Court contrasted "a court's inherent power to impose attorney's fees as a sanction to cases in which a litigant has engaged in bad faith conduct or willful disobedience of a court's orders" with "other mechanisms [that] permit a court to impose attorney's fees as a sanction for conduct which merely fails to meet a reasonableness standard," such as Rule 11, which "imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith." Chambers, 501 U.S. at 47. The majority in Chambers also responded to concerns from Justice Kennedy in dissent that inherent powers sanctions could have a chilling effect by recalling that "the subjective bad-faith standard [is] difficult to establish and courts were therefore reluctant to invoke it as a means of imposing sanctions" under the pre-1983 version of Rule 11, and "[c]onsequently, there is little risk that courts will invoke their inherent power 'to chill the advocacy of litigants attempting to vindicate all other important federal rights.'" Chambers, 501 U.S. at 47 n.11; see also Purchasing Power LLC v Bluestem Brands, 851 F.3d 1218, 1223-24 (11th Cir. 2017); Atkins Nuclear Secured, LLC v. Aptim Federal Svcs., LLC, 2019 WL 1793137, *4-6 (E.D. Va. April 29, 2019).

In the case of inherent powers sanctions, it is therefore unsurprising that the circuit courts of appeals which have addressed the issue are unanimous that bad faith (i.e., subjective bad faith) is required, as that is the essence of what makes the conduct sanctionable. See Nemeroff v. Abelson, 620 F.2d 339, 348 (2d Cir. 1980); Gillette Foods v. Bayernwald-Fruchteverwertung,

977 F.2d 809, 813-14 (3d Cir. 1992); <u>Smith v. Detroit Federation of Teachers, Local 231</u>, 829 F. 2d 1370, 1375 (6th Cir. 1987); <u>Badillo v. Central Steel & Wire Co.</u>, 717 F. 2d 1160, 1165 (7th Cir. 1983); <u>In re Itel Securities Litigation</u>, 791 F.2d 672, 675 (9th Cir. 1986); <u>Sterling Energy, Ltd. v. Friendly Nat. Bank</u>, 744 F. 2d 1433, 1435 (10th Cir. 1984); <u>Purchasing Power</u>, 851 F.3d at 1223-24 ("The Supreme Court has confirmed by implication that a court's inherent power is governed by a subjective standard."); <u>United States v. Wallace</u>, 964 F. 2d 1214, 1219 (D.C. Cir. 1992).

With respect to § 1927, however, Defendants attempt an end-run around the Fourth Circuit's holding in <u>E.E.O.C. v. Great Steaks, Inc.</u>, 667 F.3d 510, 522 (4th Cir. 2012) and elsewhere that "[b]ad faith on the part of the attorney is a precondition to imposing fees under § 1927," (accord <u>Chaudhry v. Gallerizzo</u>, 174 F.3d 394, 411 n.14 (4th Cir. 1999); <u>Brubaker v. City of Richmond</u>, 943 F.2d 1363, 1382 n. 25 (4th Cir. 1991)), by recharacterizing the decisions of other circuits that do not require a showing of bad faith under § 1927. These cases, however, do not merely reflect an alternate "objective" test of bad faith; rather, they permit the imposition of sanctions under § 1927 based on no more than a finding of recklessness. For example, while Defendants quote the First Circuit's opinion in <u>Cruz v. Savage</u>, (<u>see</u> Supp. at 4-5), they avoid the finding where the <u>Cruz</u> court rejected the necessity of finding bad faith. <u>See</u> 896 F.2d 626, 631-32 (1st Cir. 1990) ("while an attorney's bad faith will always justify sanctions under section 1927, we do not require a finding of subjective bad faith as a predicate to the imposition of sanctions"). Thus, just as with inherent powers sanctions, in this circuit a court may not impose sanctions under § 1927 by finding recklessness or anything other than actual bad faith.

*B. The Court Should Apply a Clear and Convincing Standard of Proof*

Mr. Haysbert and Defendants agree that the Fourth Circuit has not decided the

appropriate standard of proof for sanctions under § 1927 and the Court's inherent powers. See Supp. at 1. Nevertheless, "[a]bsent guidance from the Fourth Circuit, 'the general approach of courts in the Fourth Circuit has been to apply the clear and convincing evidence standard. . .'." Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc., No. SAG-18-3403, 2020 WL 1809191, at *4 (D. Md. Apr. 9, 2020) (quoting Steves & Sons, Inc. v. JELD-WEN, Inc., 327 F.R.D. 96, 104 (E.D. Va. 2018)). This Court should do the same.

Applying a clear and convincing standard would align with the majority view, as six of the seven circuit courts of appeals to have decided the question have held that clear-and-convincing is the appropriate standard. See Aoude v. Mobil Oil Corp., 892 F. 2d 1115, 1118 (1st Cir. 1989) (inherent powers); Eisemann v. Greene, 204 F. 3d 393, 395-96 (2d Cir. 2000) (inherent powers and § 1927); In re Moore, 739 F. 3d 724, 730 (5th Cir. 2014) (inherent powers); Bryant v. Military Dept. of Miss., 597 F. 3d 678, 694 (5th Cir. 2010) (§ 1927); United States v. Smiley, 553 F. 3d 1137, 1144 (8th Cir. 2009) (inherent powers); Autorama Corp. v. Stewart, 802 F.2d 1284, 1288 (10th Cir. 1986) (inherent powers); Shepherd v. ABC, 62 F.3d 1469, 1477 (D.C. Cir. 1995) (inherent powers);  Only the Seventh Circuit has adopted a preponderance of the evidence standard. See Ramirez v. T&H Lemont, Inc., 845 F.3d 772, 778-79, 780 (7th Cir. 2016).

The Fourth Circuit has explained, however, that "[b]ecause the inherent power is not regulated by Congress or the people and is particularly subject to abuse, it must be exercised with the greatest restraint and caution, and then only to the extent necessary." United States v. Shaffer Equip. Co., 11 F.3d 450, 462 (4th Cir. 1993). This clearly suggests that a particularly high degree of certainty is required before imposing sanctions under a court's inherent powers. Whether or not that degree of certainty is termed "clear and convincing," it seems impossible to

reconcile "the greatest restraint and caution" with a preponderance standard, under which a fact needs only to be "more likely than not" to be considered proven. See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 US 308, 329 (2007); Hurley v. United States, 923 F. 2d 1091, 1094 (4th Cir. 1991).  In contrast, Defendants point to dicta from the Supreme Court's opinion in Goodyear Tire & Rubber Co. v. Haeger, 581 U.S. 101, 108 (2017), stating that an award of attorney's fees "must be compensatory rather than punitive in nature," to suggest that the Court is required to adopt the Seventh Circuit's outlier position because "other circuits" that adopted a clear and convincing standard did so in the context of sanctions that they considered punitive. See Supp. at 3-4.  Defendants' argument, however, illustrates the perils of relying on decontextualized quotations. In explaining the difference between compensatory and punitive sanctions, Goodyear Tire also provides that if sanctions are not merely compensatory "a court would need to provide procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof." Goodyear Tire, 581 U.S. at 108. If Defendants were correct, this would mean that six federal courts of appeals have not only required application of the wrong standard for compensatory sanctions, but have overseen systemic constitutional violations (without so much as a peep from the Supreme Court or the legal profession) by mandating that punitive sanctions be imposed on a clear and convincing, rather than beyond a reasonable doubt, standard. That, however, seems unlikely.

The better explanation is that, outside of Goodyear Tire, courts have used "punitive" in a way that is not mutually exclusive with "compensatory." Even the Supreme Court in Chambers used "punitive" to describe sanctions with a compensatory effect, explaining that:

> "in the case of the bad-faith exception to the American Rule, 'the underlying rationale of 'fee shifting' is, of course, punitive.' Hall [v. Cole, 412 U.S. 1, 4-5 (1973)]. Cf. Pavelic & LeFlore v. Marvel Entertainment Group, 493 U. S. 120, 126 (1989). '[T]he award of attorney's fees for bad faith serve[s] the same purpose as a

> remedial fine imposed for civil contempt,' because '[i]t vindicate[s] the District Court's authority over a recalcitrant litigant.' Hutto [v. Finney, 437 U.S. 678, 691]. 'That the award ha[s] a compensatory effect does not in any event distinguish it from a fine for civil contempt, which also compensates a private party for the consequences of a contemnor's disobedience.'"

Id., at 691, n. 17. Chambers, 501 U.S. at 54-55 (alterations in citations added) (footnote omitted). The Supreme Court's inconsistent use of "punitive," however, does not mean that appellate opinions which, like Chambers, use the term "punitive" to refer to sanctions that would be described as "compensatory" in the Goodyear Tire sense are now bad law.

Nor is it accurate that circuits which adopted a clear and convincing standard did so "in cases where the court considered the sanction to be punitive," i.e., not compensatory. See Supp. at 3-4. In Shepherd v. ABC, the only case cited by Defendants, the D.C. Circuit explained that "awards of attorneys" fees for bad faith conduct serve the same punitive and compensatory purposes as fines imposed for civil contempt. See Chambers, 501 U.S. at 53-54. As a result, courts require clear and convincing evidence of misconduct before imposing attorneys' fees under their inherent power." Shepherd, 62 F.3d at 1477.

Finally, it is unclear whether Defendants are, for the first time, invoking the distinct "willful disobedience of a court order" category of inherent power sanctions, (see Def. Mot. at 6), describing the "willful disobedience of a court order" category as "relevant here" without pointing to any particular conduct. To the extent that they have, however, such allegations must be proven by clear and convincing evidence because that type of inherent powers sanction is a form of contempt. See Chambers, 501 U.S. at 45 (explaining, with respect to sanctions for "willful disobedience of a court order" that it is "a court's discretion to determine '[t]he degree of punishment for contempt' [which] permits the court to impose as part of the fine attorney's

fees . . . .").[2]   It is well established that contempt must be proven by clear and convincing evidence and subject to additional requirements. See, e.g., In re General Motors Corp., 61 F.3d 256, 258 (4th Cir. 1995).

### C. Injection of Insurance is the Only Plausible Basis for the Relief Sought by Defendants and the Sanction Sought is Not Proper

Defendants claim that "pars[ing] through the trial expenses to determine which were specifically related to the misconduct and which were not" is "not the standard under the court's inherent power to sanction."[3] Supp. at 11.  Instead of presenting the "correct" standard, however, Defendants misleadingly cherry-pick excerpts from the Supreme Court's decisions in Goodyear Tire and Chambers that address situations wholly dissimilar from this one. Defendants completely skip over the actual standard enunciated in Goodyear Tire, and quote only a statement about "exceptional" cases. See id.  However, what the Court in Goodyear Tire actually revealed is that "the court can shift only those attorney's fees incurred because of the misconduct at issue." Goodyear Tire, 581 U.S. at 108 (emphasis added).

> "That kind of causal connection, as this Court explained in another attorney's fees case, is appropriately framed as a but-for test: The complaining party (here, the Haegers) may recover 'only the portion of his fees that he would not have paid but for" the misconduct.'"

---

[2] The cases cited in Chambers confirm that "contempt" refers to civil contempt of court. See Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U. S. 714, 718 (1967) ("And in a civil contempt action occasioned by willful disobedience of a court order an award of attorney's fees may be authorized as part of the fine to be levied on the defendant.") (citing Toledo Scale Co. v. Computing Scale Co., 261 U. S. 399, 428 (1923)). Indeed, the issue in Chambers was itself a civil contempt order. See Chambers, 501 U.S. at 38 ("The ensuing civil contempt proceedings resulted in the assessment of a $25,000 fine against Chambers personally."). This also means that Defendants are being misleading when they use artful quotation to suggest that inherent-powers sanctions allow a court to "vindicate[e] judicial authority without resort to the more drastic sanctions available for contempt of court," see Supp. at 6 (quoting Chambers, 501 U.S. at 46), as that statement pertains only to the bad-faith category of inherent-power sanctions.

[3] Defendants do not address whether this is the correct standard under § 1927 which, by its very terms, limits the amount of an award to "the excess costs, expenses, and attorneys' fees reasonably incurred because of [the sanctionable] conduct" (emphasis added).

Id. at 109 (quoting Fox v. Vice, 563 U.S. 826, 836 (2011)). And, here, the Supreme Court

explains that it means precisely what Defendants claimed was "not the standard":

> "This but-for causation standard generally demands that a district court assess and
> allocate specific litigation expenses — yet still allows it to exercise discretion and
> judgment. The court's fundamental job is to determine whether a given legal fee —
> say, for taking a deposition or drafting a motion — would or would not have been
> incurred in the absence of the sanctioned conduct. The award is then the sum total
> of the fees that, except for the misbehavior, would not have accrued."

Id. at 109-10.  In other words, Defendants are incorrect, and, under the proper but-for standard,

parsing is exactly what is required.

Defendants seek their costs and fees resulting from the August 2023 mistrial. See, e.g.,

Def. Mot. at 10, 15; see gen. Affidavit of John McGavin (ECF 336) at Ex. A (invoices and bills

for trial).  As Mr. Haysbert explained in his Opposition, there is only one but-for cause of the

mistrial: the alleged deliberate injection of insurance into the case. Opp. at 29-30.[4]  While the

Court's opinion refers to other incidents - many of which could not have been germane to the

mistrial, as they occurred outside of the jury's presence - as part of a supposed "cumulation of

misconduct," (id. at 18), it is absolutely clear that the mistrial had a single but-for cause.

Defendants' trial brief on their motion for a mistrial is just as clear: "Defendants . . . hereby

submit this Trial Brief on Defendants' Motion for Mistrial due to Plaintiff injecting insurance

into the trial . . ." ECF No.: 298 at 1.  (Emphasis added).

Defendants look for support to the finding of the trial court in Chambers that "literally

everything the defendant did 'his entire course of conduct' throughout, and indeed preceding, the

---

[4] The nature of this allegation also makes much of the earlier discussion concerning subjective vs. objective bad
faith irrelevant. Judge Smith declared a mistrial because she (mistakenly) believed that Mr. Haysbert deliberately
injected insurance into the case and relied upon a Virginia Supreme court case that also requires deliberateness, even
underlining the word "deliberately" for emphasis. See Mem. Op. at 12-13 (quoting Hope Windows, Inc. v. Snyder,
208 Va. 489, 493 (1968) ("the admission of evidence or argument of counsel deliberately injected into a case")
(emphasis added by Judge Smith)). Defendants, therefore, cannot now suggest that proof of mere recklessness is
sufficient, because the reckless injection of insurance into the case did not cause the mistrial and, consequently,
could not have causal connection to the award sought by Defendants.

litigation was 'part of a sordid scheme' to defeat a valid claim." Supp. at 11.[5]  Unlike the

situation in Chambers, the mistrial here did not result from "literally everything" that Mr.

Haysbert did.

The proper approach is illustrated by the Fourth Circuit opinion in Belue v. Leventhal,

640 F.3d 567 (4th Cir. 2011), where, reviewing the revocation of a lawyer's *pro hac vice* status,

the court explained that:

> "It is true, of course, that the [district] court's order listed several bases for
> revocation and asserted that its decision was based on the totality of the
> circumstances. But it seems equally certain that absent the recusal motion, the
> remaining conduct — relatively minor violations of local rules and filings
> containing controversial arguments — would not have caused the judge to take the
> steps that he did. Therefore, we turn to analyzing the propriety of the recusal
> motion."

Belue, 640 F.3d at 572.[6]

If the Court finds that Mr. Haysbert engaged in sanctionable misconduct (which it should

not), it still cannot automatically award Defendants all of their costs and fees from trial. As noted

above, this is only appropriate in "exceptional cases," where "all [of one party's] legal expenses

in the suit "were caused ... solely by [the sanctioned party's] fraudulent and brazenly unethical

efforts." Goodyear Tire, 581 U.S. at 110. This is not such a case.

First, the Court would have to consider whether Judge Smith's decision to impose a

mistrial was an intervening or superseding cause of Defendants' costs. See gen., e.g., Bridge v.

Phoenix Bond & Indemnity Co., 553 U.S. 639, 658-659 (2008) (explaining that a party cannot

---

[5] In Chambers, the defendant and his counsel was found to have organized a sham real estate transaction to place the properties at issue beyond the court's reach, defied a preliminary injunction by refusing to permit inspection of corporate records, filed "a series of meritless motions and pleadings and delaying actions," and filed a regulatory application that would have defeated the performance of the contract at issue, despite having stipulated that it was enforceable. See Chambers, 501 U.S. at 36-39.

[6] Because the great bulk of Defendants' motion(s) concerns irrelevant allegations, if the Court finds against Mr. Haysbert, it should deny Defendants their costs and fees for making sanctions motion(s) and offset any award against Mr. Haysbert's costs and fees in responding to the slew of allegations by Defendants that could not support the relief that Defendants sought.

"establish[ ] proximate cause" when "an intervening cause break[s] the chain of causation between" the act and the injury); Zahrey v. Coffey, 221 F.3d 342, 351 n.7 (2d Cir. 2000) ("Tort law recognizes that a person whose initial act is the 'but for' cause of some ultimate harm (i.e., the harm would not have happened but for the initial act) is not legally liable for the harm if an intervening act is a 'superseding cause' that breaks the legal chain of proximate cause. See RESTATEMENT (SECOND) OF TORTS § 440 (1965)."

In this case, the Court should find that Judge Smith's decision to grant a mistrial broke the chain of causation between Mr. Haysbert and Defendants' excess costs and fees because it was based on the outdated view that Virginia law required a mistrial. See Mem. Op. at 12-13 (quoting Hope Windows, Inc. v. Snyder, 208 Va. 489, 493 (1968)). As Mr. Haysbert explained in his Opposition, "[t]he time when the mere mention of insurance before a jury in the trial of a negligence case automatically called for a mistrial has long since passed." See Opp. at 14-15 (quoting Riddle v. Exxon Transp. Co., 563 F.2d 1103, 1109 n.6 (4th Cir. 1977)); see also Lombard v. Rohrbaugh, 551 S.E.2d 349, 353-54 (Va. 2001) (explaining that Virginia no longer "adhere[s] to the rule that 'it is reversible error not to grant a mistrial where the reference to insurance is deliberate and for improper purposes.'").  Absent an unbroken causal chain, Defendants are not entitled to shift their fees to Mr. Haysbert.

If the Court determines that the chain of causation was not broken by an intervening cause, it must then proceed to "assess and allocate specific litigation expenses." For guidance on how to do so in the context of a mistrial, the Court should look to In re Gould, the primary legal authority cited in Defendants' original motion. In that case, the Fourth Circuit found that Gould's misconduct had "converted the last day of trial into a hearing on the motion for mistrial" and awarded attorney's fees and costs for that day, explaining that the "attorney's costs incurred by

the [defendant] for the mistrial proceedings were in no way related to the merits of its defense and were not expenses that the [defendant] would have incurred absent [plaintiff counsel's] conduct." <u>See Gould</u>, 77 Fed. App'x at 163 (quoted in Def. Mot. at 12). Similarly, here, in the event of an award, it should properly be limited to the costs and fees associated with making, briefing, and arguing Defendants' motion for a mistrial.

The Court must also account for the fact that Defendants sought sanctions against Mr. McKelvey, in addition to Mr. Haysbert. Here, too, <u>Gould</u> is instructive. In <u>Gould</u>, the trial court had imposed monetary sanctions on both of the plaintiff's lawyers, with each to pay half. On appeal, the Fourth Circuit vacated the sanctions against one of the lawyers, while leaving the remaining lawyer to pay only what had been his half. <u>See Gould</u>, 77 Fed. App'x at 164. Similarly, here, "Defendants request[ed] sanctions against both Plaintiff's counsel under 28 U.S.C. § 1927 and the inherent power of the Court." Def. Mot. at 6. As they made clear, "[a]s the local counsel responsible for these proceedings, McKelvey is also liable for attorney's fees." <u>Id</u>. at 2; <u>see also id</u>. at 3-6, 13-15. However, Mr. McKelvey is, sadly, no longer with us (<u>see</u> ECF No.: 341), and Defendants voluntarily chose to withdraw their motion for sanctions against him. <u>See</u> ECF No.: 348. However, Defendants' decision not to pursue their claim against Mr. McKelvey (or his Estate or firm) is not reason to double the amount of sanctions that Mr. Haysbert would have been required to pay. Thus, following the Fourth Circuit's lead in <u>Gould</u>, the Court should split any amount it elects to award in half and make Mr. Haysbert liable for only one portion.

Finally, in this Circuit, any fee award must account for the sanctioned party's ability to pay. See <u>Salvin</u>, 221 F. App'x at 226 (citing <u>In re Kunstler</u>, 914 F.2d 505, 524 (4th Cir. 1990)). In

this regard, should the Court grant Defendants' motion, Mr. Haysbert reserves the right to submit a declaration attesting to personal financial information relevant to his ability to pay.

## 2. <u>Defendants Provide No Evidence of Bad Faith Misconduct</u>

To succeed on their motion, Defendants must prove that Mr. Haysbert acted in bad faith <u>to cause the mistrial</u>. They cannot. Defendants have provided no evidence to support the conclusion that Mr. Haysbert acted deliberately or in bad faith and have barely even attempted to apply the law to the facts. In support of their allegations, Defendants rely on three sources: (i) the bald assertions of counsel; (ii) Judge Smith's opinion on Defendants' motions to quash a subpoena, remove Mr. Haysbert's pro hac vice status, and for a mistrial; and (iii) the record of trial. As explained below, the first two are not admissible evidence and the third fails to support an inference of bad faith.

### A.  *Assertions Are Not Evidence*

Defendants' efforts to show bad faith rest predominantly on the unsupported assertions of counsel in Defendants' briefs with respect to Mr. Haysbert's state of mind. For example, Defendants assert without evidence that:[7]

> i.    "[Mr.] Haysbert violated the rules of court repeatedly [and] <u>deliberately</u>" (Def. Mot. at 2);
>
> ii.    "Plaintiff's counsel came to trial prepared with a litigation strategy and outlines for witness testimony <u>that they knew</u> would elicit evidence that would violate established Virginia precedent" (Def. Mot. at 9; <u>see</u> <u>also</u> Supp. at 14);
>
> iii.    "[Mr.] <u>Haysbert knew</u> . . . he would elicit testimony related to insurance and risk management." (Def. Mot. at 12);
>
> iv.    "[Mr.] Haysbert . . . <u>planned</u>, in advance, to elicit improper testimony." (Def. Mot. at 12);

---

[7] All emphases added.

v.    "[Mr.] Haysbert came to trial 'prepared' to ask these questions, <u>knowing</u> the questions themselves were improper or that they would illicit [sic] improper evidence." (Supp. at 8-9);

vi.    "[Mr.] Haysbert . . . consistently <u>attempted</u> to prejudice the jury against the Defendants . . . ." (Supp. at 10);[8]

vii.    "[Mr.] Haysbert <u>knew</u> that these assertions were false." (Supp. at 10);

viii.    "Counsel for [Mr.] Haysbert argues that the decision to not to call certain experts at trial is 'litigation strategy.' However, that is not the case if [Mr.] Haysbert <u>never intended</u> to call these experts in the first place." (Supp. at 20);

ix.    "[Mr.] Haysbert <u>had no qualms</u> with asking improper questions or referencing evidence that <u>he knew</u> was not admissible." (Supp. at 21); and

x.    "[Mr.] Haysbert acted <u>intentionally</u> . . . to cause a mistrial." (Supp. Mot. at 26).

Despite Defendants' attempt to convince this Court otherwise, the unsworn statements of counsel in briefs are not evidence. <u>See</u> <u>Kulhawik v. Holder</u>, 571 F. 3d 296, 298 (2d Cir. 2009); <u>Skyline Corp. v. N.L.R.B.</u>, 613 F.2d 1328, 1337 (5th Cir. 1980); <u>Travaglio v. American Express Co.</u>, 735 F. 3d 1266, 1270 (11th Cir. 2013); <u>Bell v. United Princeton Properties, Inc.</u>, 884 F. 2d 713, 720 (3d Cir. 1989); <u>Campania Mgmt., Inc. v. Rooks, Pitts & Poust</u>, 290 F. 3d 843, 853 (7th Cir. 2002).  Nor are they among the forms of evidence upon which a court may rely in hearing a motion. <u>See</u> Fed. R. Civ. P. 43(c). Even if Defendants' counsel submitted these assertions in a sworn affidavit, they would still not be proper evidence, as counsel lacks personal knowledge of Mr. Haysbert's state of mind. <u>See</u> Fed. R. Evid. 602 ("A witness may testify to a matter only if . . . the witness has personal knowledge of the matter."); <u>see also</u> <u>Sierra Club v. EPA</u>, 292 F. 3d 895, 901 (D.C. Cir. 2002); <u>Luevano v. Holder</u>, 660 F. 3d 1207, 1212-13 (10th Cir. 2011).  Only Mr. Haysbert knows what was in his mind and in his heart. Unless the record clearly supports a finding that the conduct was "so obviously improper that no other explanation exists," as

---

[8] "'[A]ttempt' . . . implies both purpose and the effort to carry that purpose into effect." <u>Merritt v. Commonwealth of Va.</u>, 164 Va. 653, 657 (1935).

discussed below in Section C, the Court must disregard all unsupported assertions about what Mr. Haysbert knew or intended.  The record does not support such a finding.

### B.   The Memorandum Opinion is Inadmissible Hearsay

With respect to Judge Smith's opinion, Defendants inappropriately seek to convert an appellate standard of review into a substantive rule of evidence. See Supp. at 14-15.  However, the Court is not reviewing Judge Smith's order granting Defendants' motion for a mistrial and for revocation of Mr. Haysbert's *pro hac vice* status "to determine whether there is support for Judge Smith's factual findings in the record," as suggested by Defendants (Supp. at 15); it is deciding a motion for sanctions in the first instance. And in doing so, Judge Smith's opinion is not proper evidence.[9]

This is because, as every circuit to address the issue has concluded, "judicial findings of facts are hearsay, inadmissible to prove the truth of the findings unless a specific hearsay exception exists."[10] United States v. Sine, 493 F.3d 1021, 1036 (9th Cir.2007); see also Nipper v. Snipes, 7 F.3d 415, 417 (4th Cir.1993); Int'l Land Acquisitions, Inc. v. Fausto, 39 Fed. App'x 751, 756-57 (3d Cir. 2002); United States v. Jeanpierre, 636 F. 3d 416, 423-24 (8th Cir. 2011); Herrick v. Garvey, 298 F.3d 1184, 1191-92 (10th Cir. 2002); United States v. Jones, 29 F.3d 1549, 1554 (11th Cir.1994); cf. United States v. Dupree, 706 F. 3d 131. 136-38 (2d Cir. 2013) (holding that a court order was not hearsay because it was offered to prove notice, not the truth of its contents).  Motions require admissible evidence. See Fed. R. Evid. 101 ("These rules apply to proceedings in United States courts. The specific courts and proceedings to which the rules

---

[9] For the reasons given above, Defendants' counsel's self-serving attempts in their briefs and oral arguments to bolster the credibility of Judge Smith's findings are also not evidence. Moreover, by asserting personal knowledge of the facts, they violate their ethical obligations. See Virginia Rules of Professional Conduct 3.4(f) ("A lawyer shall not . . . assert personal knowledge of facts in issue except when testifying as a witness . . . .").

[10] The exception for factual findings from an investigation contained at Federal Rule of Evidence 803(8)(A)(iii) (or its predecessor, Rule 803(8)(C)), however, does not apply. See, e.g., Nipper, 7 F.3d at 417.

apply, along with exceptions, are set out in Rule 1101."), 1101 ("These rules apply to proceedings before . . . United States district courts;" "These rules apply in . . . civil cases and proceedings," and listing exceptions that are not relevant here); <u>see also</u>, e.g., <u>Livingston v. K-Mart Corp</u>., 32 F. Supp. 2d 369, 376 (S.D. W.Va. 1998) ("Plaintiffs provide no affidavits, deposition testimony, death certificates, or any other admissible evidence for the Court to consider in support of these allegations."); <u>Childress v. Roberts</u>, 2019 WL 211089, *3 (D.S.C. Jan. 16, 2019) ("Childress' motion for sanctions should be denied because he has not provided admissible evidence to support his request for sanctions.").

Reliance on Judge Smith's opinion would also be problematic because Mr. Haysbert had no opportunity to contest those findings and, for findings that do not appear in the trial record, the Court cannot even "determine whether there is support for Judge Smith's factual findings in the record," as Defendants suggest. <u>See</u> Supp. at 15. ("For findings that do appear in the trial record, the Court can and should rely on that record.") Furthermore, as Mr. Haysbert explained in his Opposition, "[f]or reasons that remain unclear, Judge Smith approached Mr. Haysbert with mistrust and suspicion and afforded him treatment different from that of other attorneys," and that Judge Smith's negative predisposition towards Mr. Haysbert "may have impacted Judge Smith's views of Mr. Haysbert's actions at trial and must be taken into account when considering the Judge's uncharitable characterizations of the same." Opp at. 31-32. Judge Norman Thomas, in his declaration, confirms that Judge Smith was visibly mistrustful of, and frustrated by, Mr. Haysbert. Judge Thomas' observations also demonstrate, at a minimum, that Judge Smith's characterization of certain events is not the only, and perhaps not the best, way of interpreting the events.

## C.  The Record Itself Does Not Suggest Even an Inference of Bad Faith

Although Mr. Haysbert acknowledges that bad faith may be inferred from indirect evidence, it may be inferred <u>only</u> when the conduct is so "obviously" improper that no other explanation exists. <u>Samsung Elecs. v. NVIDIA Corp.</u>, 160 F. Supp. 3d 866, 874 (E.D. Va. 2015) ("In such cases, bad faith is inferred because the different factual positions are so obviously contradictory that the party could only be asserting them intending to mislead the court."); see <u>Ripley v. United States</u>, 220 U.S. 491, 496 (1911) ("it is certain that we may not draw the inference of bad faith unless the findings are so clear on the subject as to cause such inference to be plain beyond controversy"); <u>Purchasing Power</u>, 851 F.3d at 1224-25 ("in the absence of direct evidence of subjective bad faith, this standard can be met if an attorney's conduct is so egregious that it could only be committed in bad faith").  However, a "district court may not draw an inference of bad faith when a party has plausible reasons" for its actions. <u>Advanced Magnetic Closures, Inc. v. Rome Fastener</u>, 607 F. 3d 817, 829 (Fed. Cir. 2010).

In this case, there is no basis to infer that Mr. Haysbert engaged in bad faith misconduct. In the first place, as explained in Mr. Haysbert's Opposition and <u>infra</u>, the overwhelming majority of instances cited by Defendants do not actually describe misconduct. Cf. <u>Miller v. City of L.A.</u>, 661 F.3d 1024, 1029 (9th Cir. 2011) ("We conclude that Arias couldn't have acted in bad faith if he did not, in fact, violate the district court's order. You can't have chicken parmesan without chicken; you can't have an amazing technicolor dreamcoat without a coat; you can't have ham and eggs if you're short of ham or eggs. And you can't have a bad faith violation without a violation.").  The limited instances where Mr. Haysbert did err, however, cannot support an inference of bad faith, as they were not so obviously improper that no other explanation exists.

And, while Mr. Haysbert does not seek to excuse his mistakes, he has given reasonable explanations for what occurred, which Defendants have overwhelmingly ignored.

For instance, in support of what they describe as the possibility of "infer[ring] bad faith intent from the fact that [Mr.] Haysbert's examinations of witnesses were all prepared in advance of trial," (Supp. at 8,[11]) Defendants point to Lasar v. Ford Motor Co., 399 F.3d 1101 (9th Cir. 2005), and claim that the propriety of inferring bad faith from the use of prepared witness examinations "is exactly what the Court held in Lasar." Id.  It was not. At issue in Lasar was an opening statement, which the attorney told the court had been crafted deliberately and carefully. In contrast, the issue of insurance did not come up in this case in the context of an opening statement, where the lawyer is the only one responsible for what is said; in contrast, the issue was first raised by a witness. See Opp. at 13. Thus, Lasar stands, at most, for the proposition that a carefully and deliberately pre-written statement is evidence that the attorney intended that statement (or, more accurately, that such a finding is not clearly erroneous). Similarly, as Mr. Haysbert explained in his opposition, "[a]ll that Mr. Haysbert's alleged use of pre-written questions demonstrates is that he planned out his questions for witnesses." Opp. at 10.[12] Lasar does not purport to address whether it was possible to infer from the questions that Mr. Haysbert asked that he intended to elicit testimony on the subject of insurance.[13]

---

[11] Here, Defendants are advancing an argument that was first identified by Mr. Haysbert in his attempt to provide a comprehensive response to Defendants' vague allegation. Compare Opp. at 10-12 with Def. Mot. at 9, 12-13.

[12] Defendants have provided no evidence that Mr. Haysbert's written notes for the witness examination contained the particular questions at issue or that Mr. Haysbert read them verbatim.

[13] In a footnote, Defendants also attempt to "extend" without explanation the conclusion in Salvin v. Am. Nat'l Ins. Co., 281 F. App'x 222 (4th Cir. 2008) that "[b]y refusing to voluntarily dismiss the case once its lack of merit became evident, [the plaintiff] protracted the litigation" in a manner sanctionable under § 1927, id. at 226-27, "to [Mr.] Haysbert's failure to inform the Court and counsel when he reasonably knew that he would not be calling Plaintiff's experts in-person at trial." Supp. at 4 n.2. Even if Mr. Haysbert had withheld his decision not to call certain witnesses from opposing counsel (which, while he would have been within his rights to do so, he did not), doing so could not plausibly have "protracted the litigation" or "multiplie[d] the proceedings" similarly to pursuing a meritless lawsuit.

Defendants, lacking any evidence that Mr. Haysbert so intended, fall back on the unfounded assertion that Mr. Haysbert "kn[ew] the questions themselves were improper or that they would illicit [sic] improper evidence." Supp. at 8-9; see also id. at 25. However, as Mr. Haysbert explained in his Opposition and further states in the attached Declaration, he "did not know that any of my questions would cause a witness to mention insurance. I did not plan, in advance or otherwise, to elicit testimony related to "insurance," whether proper or improper. I had no interest in raising the issue of insurance and I never did anything at trial with the intention of doing so. I did not plan out my witness questions "knowing the questions were improper or that they would elicit improper evidence."  Haysbert Decl. at 2.

The "evidence" to which Defendants point does nothing to contradict Mr. Haysbert's denial. For example, Defendants point to a century-old California case in which the verdict was overturned because the judge permitted the plaintiff's lawyer to ask his client a question, the answer to which "could serve no purpose except to get before the jury the fact that the [defendant] carried indemnity insurance." See Supp. at 24 (quoting Squires v. Riffe, 211 Cal. 370, 373-74 (1931)). Defendants, however, ignore the sentence immediately prior, which comprises the court's entire reasoning as to scienter: "It must be presumed that counsel for the plaintiff knew the answer which his client would give to the objectionable question." Squires, 211 Cal. at 274. Because that is not the case here, Squires is inapposite.

Defendants also point to an evidentiary ruling requiring Mr. Haysbert to redact references to insurance from an exhibit, which showed that Mr. Haysbert was "on notice of the dangers of injecting insurance into this case." Supp. at 25. What it doesn't show, however, is that Mr. Haysbert's questions were intended to raise the issue of insurance.  The same is true with respect to "[Mr.] Haysbert's personal communication with Defendants' risk management team and

extensive discovery. . . ." <u>Id</u>. As explained in Mr. Haysbert's Opposition, "[e]ven if, as the Court found, he 'should have known' that his questions would elicit responses related to insurance (<u>see</u> Mem. Op. at p. 18), that is negligence, at most," rather than bad faith, and cannot support an award of sanctions. Opp. at 15.

Defendants acknowledge Mr. Haysbert's explanation that "his questions were specifically designed to elicit testimony regarding the personal responsibility of the restaurant's managers to follow up with guests who get injured on premises," but object to the relevance of that line of questions. <u>See</u> Supp. at 25-26 (citing Opp. at 14). Even if such questions were not relevant (which Defendants do not get to determine unilaterally), <u>the fact that Mr. Haysbert intended to elicit testimony on something other than insurance prevents a finding that he intended in bad faith to raise the issue of insurance</u>.[14]

Defendants, perhaps aware of the weakness of their argument, advance a new theory, asserting that "even if this Court could find this particular question was not bad faith, after Judge Smith instructed the jury that insurance was not an issue (the curative instruction), Haysbert turned to the jury and stated the word 'insurance' three more times," which Judge Smith found to be deliberate. <u>See</u> Supp. at 25. As explained in Mr. Haysbert's Opposition, what Defendants leave out is that Mr. Haysbert was merely echoing the Court's instruction and attempting to get the witness to answer his question <u>without</u> mentioning insurance. <u>See</u> Opp. 13-14. Defendants provide no reason why the Court should consider Mr. Haysbert's <u>unplanned</u> repetition of the Court's instruction to be a deliberate attempt to inject insurance into the case, and Mr. Haysbert does not recall even turning towards the jury, and if he did, it was unintentional. <u>See</u> Haysbert

---

[14] Defendants do exactly what they blame Mr. Haysbert for when, in the paragraph before, they state that "[Mr.] Haysbert's continued arguments that Ms. Eleftherion is to blame 'for injecting insurance' shows that [Mr.] Haysbert refuses to take accountability for his own actions," Supp. at 25.

Decl. at 3.  Even if Mr. Haysbert could have better phrased his response to Ms. Eleftherion bringing up insurance, that is a far cry from the claim that he deliberately raised a prohibited topic.[15]

Defendants also overstep when they now accuse Mr. Haysbert not only of deliberately raising the issue of insurance, but deliberately causing a mistrial. See Supp. at 26. Such an accusation would be defamatory if made outside a court of law and is unworthy of a response. For the avoidance of doubt, however, Mr. Haysbert "den[ies] in the strongest possible terms that I intentionally sought a mistrial." Haysbert Decl. at 4. As Mr. Haysbert explains, he thought "that the trial was going well for my client and that the jury appeared receptive to our evidence. A mistrial was the last thing I wanted." Id.

     D.    *Defendants' Supplemental Allegations Have No Merit*

Defendants once again submit a confusing laundry list of alleged bad acts - many of them for the first time. While the inclusion in some instances of citations to the transcript is an improvement over Defendants' original motion, Defendants' poorly explained tables, narrative paragraphs, and bullet-point lists, as well as other randomly placed accusations, still fail to clearly identify the specific conduct about which they complain or what about it was allegedly improper, and sanctionable.

Much as he did in his original Opposition, Mr. Haysbert will attempt in this Section to respond to each of Defendants' allegations, all of which are without merit. To be absolutely

---

[15] Indeed, you can almost follow Mr. Haysbert's thought process in what he said. First, he began by trying to limit to scope of Ms. Eleftherion's responses, stating "So I'm only asking you what you would do in your personal knowledge. Okay. So let's leave insurance out of it." Then, realizing that "in your personal knowledge" is not sufficiently restrictive to exclude insurance, he followed up: "And although insurance is within your personal knowledge, we are leaving insurance out of it." While Mr. Haysbert should not have stated that "insurance is within your personal knowledge," that was already evident from Ms. Eleftherion's response. And nothing about that phrase or its context suggests that it was deliberate or premeditated.

clear: the incidents listed by Defendants range from complete mischaracterizations or misrepresentations on Defendants' part to inadvertent mistakes by Mr. Haysbert. At no point did Mr. Haysbert willfully disobey a court order or otherwise engage in deliberate misconduct.

### 1. Attempting to Introduce an Excluded Video

Defendants' characterization suggests that Mr. Haysbert sought to introduce an exhibit that was excluded during a Pre-trial conference and stated that it was not the day in the life video, but then later admitted that it was a portion of the day-in-the-life-video. Supp. at 15. This is untrue and Defendants completely conflate the events in question. During the trial, Mr. Haysbert sought the Court's permission to play a brief excerpt of a longer "day-in-the-life" video, in order to rebut Defendants' efforts to impeach Plaintiff's testimony about her condition. Defendants' citation to the trial transcript conveniently leaves out Mr. Haysbert's explanation that "we talked about this extensively with Judge Krask. What he ruled then was the entire day-in-the-life video could not be included. But he did not rule out excerpts of that video from coming in." Day 3 Tr. 397:7-13. At worst, this was a misunderstanding as to the scope of an evidentiary ruling. And, after a discussion outside of the jury's presence, Judge Smith ruled that the excerpt was excluded as well, and the proceedings continued without incident. See Day 3 Tr. 398:22-399:22.

### 2. Unredacted Filler Powerpoint

In support of this alleged bad faith, Defendants point to Mr. Haysbert's alleged failure to produce a redacted Powerpoint, and in the midst of Dr. Filler's direct examination, certain slides were discussed in front of the jury. Supp. at 15. Mr. Haysbert, as acknowledged in his Opposition, he "inadvertently neglected to redact a part of the PowerPoint with references to Dr. Filler's experience as an expert witness (see Day 5 Tr. 91:24-95:22)." However, "that page was

not intentionally shown to the jury, and nothing of substance was listed on the said page." Opp. at 24-25.  In an undisguised effort to further muddy the waters, Defendants also incorrectly claim that the unredacted portions contained "extremely prejudicial" information about TBI.  Supp. at 16 & n.8 (citing to portions of the transcript discussing medical information).  This is not the case, because as Defendants are aware (from the portion of pretrial conference transcript cited), Judge Smith requested only that references to court rulings be removed from the PowerPoint. See ECF No.: 286, Tr. 61:25-62:2.

### 3.  Mailing the Binders

Once again, Defendants attempt to turn this unfortunate mistake into something sinister on the part of Mr. Haysbert.  As Mr. Haysbert explained consistently to the Court and in his Opposition, he dropped off the binders at FedEx on the afternoon of Saturday, August 5th for overnight delivery on Monday, August 7th.  Due to a miscommunication with the FedEx clerk, the binders were delivered instead on Tuesday, August 8th.  In his Opposition, Mr. Haysbert explained what most likely happened, which is consistent with the receipt showing a "ship date" of August 5th. See Opp. at 16-17; Day 1 Tr. 92:16-24.  This was a mistake, not gamesmanship, not an underhanded tactic and not any sort of malfeasance. Defendants, however, attempt to move the proverbial goal posts by demanding a dated receipt. Supp. at 16. Mr. Haysbert provided Judge Smith with the receipt he received from FedEx – after the fact.  This receipt shows that the package was in FedEx possession in Norfolk, Virginia at 4:01 p.m. on Saturday, 8/5/23.  A copy is attached as Exhibit 2.  As noted, this receipt was secured on Judge Smith's request - after the fact, not simultaneously with the package drop off.  Mr. Haysbert can do no more.  The Court should accept Mr. Haysbert's word that he did not realize that the FedEx location which he used had its last Saturday pick-up at 2:30 p.m. and no Sunday pickup, meaning

24

that an overnight package dropped off around 4:00 p.m. on Saturday, August 5 would not be picked up until Monday, August 7 or delivered until Tuesday, August 8. The Court should not interpret a misstep as bad faith.

### 4.    Withdrawing Expert Witnesses

Defendants continue to point to the withdrawal of three expert witnesses during the trial and claim that Mr. Haysbert has never produced any documentation to verify that his experts ever had any intention of testifying at trial. Supp. at 7. First, Defendants' continued demands for communications between Mr. Haysbert and Dr. Haider, Dr. Feigenheimer, and Mr. Avrit concerning their travel plans are inappropriate, as such materials are protected from disclosure under Federal Rule of Civil Procedure 26(b)(4)(C).[16] Defendants may not use their motion for sanctions to obtain materials to which they are not entitled and Mr. Haysbert, on principle, declines to provide them, but will offer the following information to rebut the implication that the expert witnesses were identified with no intention of having them appear for trial to leverage some aspect of the case.

Defendants' accusation that Mr. Haysbert engaged in sanctionable, bad-faith conduct by not "inform[ing] the Court and counsel when he reasonably knew that he would not be calling Plaintiff's experts in-person at trial," (Supp. at 4 n.2), has no basis in fact or law. Plaintiff initially identified five expert witnesses. Defendants elected not to take their depositions. On Day 2 of the trial, Plaintiff withdrew three of the five witnesses, but confirmed for the Court that Dr. Filler would be present (Day 2 Tr. 132: 6-10), and Dr. Filler did in fact testify on August 9, 2023. Mr. Haysbert emphatically rejects Defendants' baseless claim that he never intended to have these expert witnesses testify or that he violated his duty of candor by including them on

---

[16] As a result of a typo, this provision was erroneously identified in Mr. Haysbert's Opposition as Rule 26(b)(3)(C). See Opp. at 32.

the witness list. As he confirms, "when I disclosed Dr. Haider, Dr. Feigenheimer, and Mr. Avrit as expert witnesses and when I included them on Plaintiff's witness list I did not know that I would not call them to testify. That decision was made on the evening of the first day of trial." Haysbert Decl. at 5.

Further, Defendants assertion, for which they provide no authority, that filing a witness list is a representation that an attorney intends to call every person on the list to testify, and that not calling every witness is improper. See Supp. at 20. Mr. Haysbert emphatically rejects Defendants' baseless claim that he never intended to have these expert witnesses testify or that he violated his duty of candor by including them on the witness list. "[I]t is elementary that litigants are not required to call every witness identified on their witness lists. The witness list simply provides notice to the court and to opposing counsel of the witnesses who may be presented at trial. Whether a litigant actually calls all, or any, of the witnesses on its witness list is purely a matter of trial strategy." United States v. Bond, 552 F.3d 1092, 1097 (9th Cir. 2009). Indeed, Defendants also included witnesses on their list that they decided not to call (see Opp. at p. 19), and, as Judge Smith explained during trial, "you don't have to use an exhibit, you don't have to call a witness, but you do have to" list them. Day 3 Tr. 378:17-20.

     5.  Wilson Subpoena

It is unclear what Defendants are now alleging with respect to the subpoena issued by Mr. Haysbert for Marcus Wilson. Supp. at 19. Defendants suggest that Mr. Haysbert was told that he could not rely on defense subpoenas and would have to subpoena his own witnesses, but then complain that Mr. Haysbert subpoenaed Marcus Wilson. Id. Mr. Haysbert had subpoenaed a number of witnesses, and as he explained to the Court, he had not initially subpoenaed Marcus Wilson (who was on both the Plaintiff's witness list and the Defendants' witness list) because he

had been subpoenaed by the Defendants. Day 2 Tr. 133:1. Mr. Haysbert previously explained why his subpoena of Mr. Wilson was not improper. <u>See</u> Opp. at 17-19.

6.  <u>Dr. Filler's Reliance on Dr. Haider's Indications</u>

Defendants continue to assert that Mr. Haysbert argued a position without any legal support, and argued with Judge Smith over her ruling. Supp. at 17. Mr. Haysbert addressed this issue in his Opposition. <u>See</u> Opp. at 23-24. In short, Dr. Filler's expert testimony <u>permissibly</u> relied on indications from Dr. Haider because Federal Rule of Evidence 703 allows experts to rely on inadmissible facts or data, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." While the Court disagreed, losing an evidentiary ruling is not tantamount to bad faith or grounds for sanctions. Further, there is nothing wrong with arguing a legal matter to the Court, even if the Court disagrees. In many cases, doing so is necessary to preserve a claim of error on appeal or to fulfill the lawyer's duty to "zealously assert[] the client's position under the rules of the adversary system." Va. R. Pro. Conduct, pmbl.

7.  <u>Signing Subpoenas</u>

Defendants appear to suggest that Mr. Haysbert should be sanctioned for violating a local rule, even though no rule is cited, and no specifics are given suggesting how said rule was violated. Defendants point to a reminder from the Court that "local counsel is supposed to be signing the pleadings when they are coming into the Court," as if a subpoena was a pleading filed with the court. <u>See</u> Fed. R. Civ. P. 7(a) (defining pleadings). Next, however, Defendants compound this error by pointing to Local Civil Rule 83.1(E)(1), which permits out-of-state attorneys "admission in a specific case and to appear and sign pleadings and other filings," and Local Civil Rule 83.1(F), which requires every "pleading or other filing" to be signed by local

27

counsel. In Defendants' novel interpretation, however, this means that a subpoena is either "a pleading or other filing" that must be signed by local counsel, or it is not "a pleading or other filing" and may not be issued by an attorney admitted pro hac vice.

This logic, however, cannot survive even the most basic scrutiny. A subpoena is not a pleading. It is also self-evidently not a filing because it does not get filed. But the idea, essential to Defendants' conclusion, that an attorney admitted pro hac vice is permitted only to "sign pleadings and other filings" is absurd. By Defendants' logic, an attorney admitted pro hac vice - or a federal government attorney, who is likewise authorized only to "appear and sign pleadings and other filings," (see Loc. Civ. R. 83.1(D)) - would be prohibited from examining witnesses, taking depositions, propounding discovery requests, making opening statements, and so forth, as those actions, like signing subpoenas, go beyond signing pleadings and other filings.

        8.   <u>Instructing the Jury</u>

Once again, it is unclear exactly what Defendants are alleging when they allege that Mr. Haysbert gave "instructions to the jury, contrary to the law." Supp. at 20.  Mr. Haysbert did no such thing: he responded to an objection from Defendants' counsel. In doing so, Mr. Haysbert stated that, if the Court did not want him to recall the Plaintiff to testify further as to her injuries, "we would have to take Dr. Filler's expert opinion about what's going on with her brain based on his examination and the fact that he is a qualified neurosurgeon." Judge Smith apparently misheard Mr. Haysbert, as she responded that "[t]hey," meaning the jury, "do not have to accept his opinion." Day 3 Tr. 467:1-16. But that is neither what Mr. Haysbert had said, nor what he meant.

        9.   <u>Testifying During Witness Examination</u>

Defendants claim that Mr. Haysbert was not simply interrupting, but "he would stand up

and testify while another witness was on the stand." Supp. at 20. Simply put, this is a gross mischaracterization of the incidents of trial, and such gamesmanship with events ought not be tolerated by this Court.  In the first example cited by Defendants, Mr. Haysbert objected to Mr. McGavin's mischaracterization of Dr. Filler's testimony and responded to a question from the Court. In the second example, Mr. Haysbert objected to a question from Mr. McGavin and, during the ensuing cross-talk, stated, "Your Honor, that's what she testified to earlier today." Accordingly, Defendants' assertion that "during the cross of Dr. Filler, Haysbert interrupted, not to object, but to testify and recount the evidence for the jury" is simply false.

10. <u>Miscellaneous Allegations</u>

In the next series of bullet points (<u>see</u> Supp. at 21-24), Defendants attempt to turn ordinary evidentiary issues into a bad-faith scheme to "(1) force [Defendants] to object and make it appear to the jury like they are hiding something; or (2) not object because the prejudice of the objection outweighed the prejudice of the inadmissible evidence." <u>Id</u>. Mr. Haysbert responds briefly to the underlying allegations:

i.    Mr. Haysbert addressed the issue of Dr. Filler's reliance on Dr. Haider's indications in his Opposition, <u>see</u> Opp. at 24, which Defendants ignore. (Supp. at 21, first bullet).

ii.   Defendants blame Mr. Haysbert for withdrawing a question that was inadvertently improper. That *ex post* realization, however, is not evidence of an *ex ante* intent to ask an improper question. (Supp. at 21, second bullet).

iii.  Mr. Haysbert asked, "You provided an affidavit in this case, didn't you?" Mr. McGavin stated, "Objection." The Court responded, "Sustained," and Mr. Haysbert asked a different question. Day 4 Tr. 613:18-20. This is not misconduct. (Supp. at 21, third bullet).

iv.   Defendants misrepresent Judge Krask's ruling, which sustained in part Defendants' objections to the use of Outback "policy and practice" exhibits to fix the standard of care, but reserved ruling as to other uses of those exhibits. <u>See</u> ECF 243 at 5. Nothing about Mr. Haysbert's unobjected-to question about how the Chesapeake Outback handles spills suggests that he was trying to use Outback's policies to evidence the standard of care. (Supp. at 21, fourth bullet).

v.      There is no basis for Defendants' suggestion that a floor being slick, slippery, or defective excludes the possibility of it being wet. Indeed, the work order that Mr. Haysbert referenced in the portion of his opening statement quoted by Defendants, (<u>see</u> Supp. at 22 n.10), states that the floor was defective precisely because it would collect moisture and become slippery. (Supp. at 22, unindented bullet).

vi.     It is unclear what Defendants are suggesting when they raise the issue of "digital manipulation." (Supp. at 22, last indented bullet).

vii.    As Mr. Haysbert explained in his Opposition, there was nothing improper with requesting permission to treat a witness as adverse under Federal Rule of Evidence 611(c). <u>See</u> Opp. at 22. (Supp. at 24).

viii.   As Mr. Haysbert explained in his Opposition, which Defendants appear to completely ignore, Defendants' speculation as to the reasons for Mr. Haysbert's questions about the security camera is belied by the record. <u>See</u> Opp. at 22-23 (quoting Day 4 Tr. 675:3-7 (Mr. Haysbert: "The camera where the hostess stand, looking towards the front door, would it not have showed Dr. Haysbert if she were coming inside the door, whether or not she was showing signs of dizziness or unsteadiness?")). (Supp. at 23, first unindented bullet and both indented bullets).

ix.     While Defendants may consider a question irrelevant, even if true, that does not make it sanctionable. (Supp. at 23, last bullet).

Finally, Defendants also assert that Mr. Haysbert should be sanctioned for his unspecified "conduct during the trial" under the Court's "inherent power to impose order, respect, decorum, silence, and compliance with lawful mandates," even though said conduct "may be difficult to discern from the record." Supp. at 9 (quoting <u>Shaffer</u>, 11 F.3d at 461). Quite frankly, this request is patently absurd - Defendants fail to outline the conduct at issue or even allege specific action that could amount to bad faith. Moreover, while a court unquestionably possesses the inherent "power to impose order, respect, decorum, silence, and compliance with lawful mandates," that does not mean that every moment of disorder or breach of decorum may be subsequently punished by an award of attorney's fees. As the very next sentence from <u>Shaffer</u> warns, the inherent power to sanction "must be exercised with the greatest restraint and caution, and then only to the extent necessary." <u>Shaffer</u>, 11 F.3d at 462.

## III.    <u>RENEWED MOTION TO STRIKE</u>

Respectfully, although this Court denied Mr. Haysbert's Motion to Strike, stating that it "gave leave to counsel for both parties to submit additional briefing on any issues raised during the hearing, as they deemed prudent" (ECF No.: 371), Mr. Haysbert renews his objection[17] to the Court's consideration of Defendants' Supplemental Motion, providing further support as follows.

Defendants' original motion for sanctions "cobble[d] together a disparate array of alleged misconduct . . . in conclusory form," without "cit[ing] the specific conduct" at issue, making it "impossible to determine . . . what is specifically alleged to be sanctionable," Opp. at 8. Defendants' original motion also never explained how, in their view, the relevant legal standards applied to Mr. Haysbert's actions or even which conduct was alleged to be sanctionable under 28 U.S.C. § 1927 or the Court's inherent powers.  Without more, this raises constitutional concerns, "as due process requires that a lawyer receive notice of the 'specific conduct considered sanctionable' before sanctions are imposed." Opp. at 8 n. 3. As a result, no court should properly award sanctions based on Defendants' motion. Cf. <u>Roadway Express, Inc. v. Piper</u>, 447 US 752, 757 (1980) ("Like other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice").  Responsibility for a flawed motion lies with Defendants alone. They chose when to file their motion and what to include. It was their strategic choice to submit a deficient motion which they now seek to supplement, clearly attempting to salvage their motion with the inclusion of new arguments and new allegations.  This Court can, and should see failure to raise these issues initially as a waiver of such arguments and should not consider any allegations not made with their original motion because an argument not raised in an initial brief is waived. <u>See</u>, e.g., <u>West Virginia CWP Fund v. Stacy</u>, 671 F. 3d 378, 389 (4th Cir. 2011) (holding that a

---

[17] If only for purposes of specifically preserving the issue for appeal.

contention made for the first time at oral argument was waived) (citing United States v. Bowles, 602 F.3d 581, 583 n. 1 (4th Cir. 2010)); see also United Sates v. Smalls, 720 F. 3d 193, 197(4th Cir. 2013).; M.B. v. Fairfax Cnty. Sch. Bd., 2023 WL 5367524, at *11 (E.D. Va. Aug. 22, 2023) (holding that "it is well-established that an argument raised for the first time in a reply brief is waived and will not be considered"); Ilozor v. Hampton Univ., No. 4:06CV90, 2007 WL 1310179, at *13-14 (E.D. Va. May 3, 2007) (new evidence is not permitted in a reply brief). The same is true for arguments not raised in a motion. Mich. Catholic Conference & Catholic Family Svcs. v. Burwell, 755 F.3d 372, 396 n.14 (6th Cir. 2014), vacated and remanded on other grounds by 575 U.S. 981 (2015).

In this case, even if the Court "gave leave to counsel for both parties to submit additional briefing on any issues raised during the hearing," Defendants did not seek, and the Court did not grant, leave for Defendants to amend or supplement their motion for sanctions. Indeed, by styling their supplemental brief as a "supplemental motion" without taking the form of a motion or adhering to the requirements under Federal Rule of Procedure 7(b)(1) that a motion "state with particularity the grounds for seeking the [court] order," (see also Loc. Civ. R. 7(A), (F)), it is not even clear what Defendants think is the effect of their "supplemental motion."

There is no reason for the Court to ratify Defendants unilateral decision to expand the allegations contained in their motion, belatedly provide arguments or evidence that should, and could have been provided initially, and generally attempt to rehabilitate their initial motion in light of Mr. Haysbert's extensive and in-depth opposition. To do so would be inappropriate. See, e.g., LG Elecs., Inc. v. Advance Creative Computer Corp., 131 F. Supp. 2d 804, 809 (E.D. Va. 2001) ("[T]he local rules are meant to prevent the kind of 'add-on' filing that the parties have engaged in here. It is the intent behind the rules that parties file complete motions and

32

accompanying documentation and that parties not make supplemental arguments or reassertions upon the whim of the parties.").

If Defendants wished to include new allegations, evidence, and arguments in their motion for sanctions, they should have sought leave of the Court to do so. In this circuit, when amending a pleading would require changes to a Court's schedule, leave should only be given for good cause.[18] Nourison Rug Corp. v. Parvizian, 535 F. 3d 295, 298 (2008). This is true even if the Court had not set a deadline for amendments. See Carlisle v. Allianz Life Ins. Co. of N. Am., 540 F. Supp. 3d 567, 571 (E.D. Va. 2021). In this case, Defendants have not shown good cause to amend their motion for sanctions. "Good cause" is primarily a question of timeliness and diligence. See Carlisle, 540 F. Supp. 3d at 571 (citing Montgomery v. Anne Arundel Cnty., Md., 182 F. App'x 156, 162 (4th Cir. 2006)). Defendants filed their supplemental motion nearly nine months after their initial motion, yet it contains not a single allegation, argument, piece of evidence, or legal authority that could not have been included in their original motion, had they acted diligently. See, e.g., Kentucky Press Ass'n, Inc. v. Kentucky, 355 F.Supp.2d 853, 865 (E.D. Ky. 2005) ("The Court denies the plaintiff's motion to supplement its response because the case was decided prior to the response time, but was not initially cited by the plaintiff."); Jones v. Wills, 2021 WL 4951651, *3 (S.D. Ill. Oct 25, 2021) ("Jones attempts to raise new arguments in support of his motion for sanctions, but his original motion is already fully briefed. He had access to the documents he referenced at the time he filed his initial motion and has had ample time to raise these arguments prior to his current filing. As the motion has already been fully briefed, the Court will not allow Jones to raise additional arguments at this time.").

---

[18] Defendants' supplemental motion was filed on May 29, 2024. Because Mr. Haysbert would need to be permitted a response, Defendants could not have filed their supplemental motion without necessitating a delay in the hearing that was scheduled for June 13, 2024.

As another court in this circuit explained in an analogous situation:

"Defendants filed this motion roughly two-and-a-half months after they filed their initial motion to dismiss. This fact alone is a sufficient basis for denying the motion. . .  Defendants do not identify any new developments in the law or in this case, which may have been a legitimate reason to grant leave. Rather, Defendants appear to seek leave only to present an argument that they neglected to include in their initial motion. Such an oversight is an insufficient reason to allow Defendants what is essentially a second motion."

Roberts v. Ofc. of the Sheriff for Charles Cnty., 2012 WL 12762, *4 (D. Md. Jan. 3, 2012).

Defendants here are not unsophisticated *pro se* litigants for whom the Court may reasonably choose to grant some leeway; rather, they are a major national restaurant chain and a publicly traded corporation that last year had over $4.6 billion in revenue and over $250 million net income,[19] who are represented by sophisticated and very experienced counsel. Through their motion for sanctions, Defendants seek to invoke the power of this Court to deprive Mr. Haysbert of his property to the extent of well over $60,000. See ECF No.: 336. In such circumstances, procedural regularity is particularly important to ensuring that the correct outcome is reached. See Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 591-92 ("[P]rocedural regularity at least renders arbitrary action more difficult. Moreover, proper procedures will surely eliminate some of the arbitrariness that results, not from malice, but from innocent error. 'Experience teaches . . . that the affording of procedural safeguards, which by their nature serve to illuminate the underlying facts, in itself often operates to prevent erroneous decisions on the merits from occurring.'") (quoting Silver v. N.Y. Stock Exchange, 373 U.S. 341, 366 (1963)).

IV.    **CONCLUSION**

Defendants' arguments seeking imposition of sanctions on Mr. Haysbert relies almost

---

[19] This document is available at https://investors.bloominbrands.com/static-files/d653a2f0-ac33-4137-80f8-93636fba2f03 (last accessed June 25, 2024). On page 65, Bloomin' Brands lists their "Total revenues" for fiscal year 2023 as $4,671,470,000 and "Net income" as $254,414,000.

exclusively on their interpretation of what transpired during the trial, and as this Court pointed out during the hearing on May 15, "…people get upset in a trial. Attorneys get upset. People say and do things in the heat of the moment that they would not do or reflect back and realize that they have misspoken or acted inappropriately…I think it would be fairly difficult to prove that there is bad faith in those types of actions." Yet, that is exactly what Defendants ask this Court to do, in using the benefit of hindsight to portray an attorneys' actions during trial to suggest that his conduct was, in fact, not only improper, but sanctionable. Defendants emphatically argue - but do not even begin to prove - that Mr. Haysbert intentionally engaged in a deliberate pattern of reprehensible and inappropriate conduct. While there were certainly missteps and mishaps that arose during the trial, there was never a point in time where Mr. Haysbert acted intentionally, maliciously, or willfully, and Defendants cannot show otherwise. A contested trial with objections, arguments, skirmishes, and zealous representation - and even a mistrial - should not be interpreted as atypical, with each discrete encounter scrutinized for an attorney's subjective intent.

WHEREFORE, Nazareth M. Haysbert, by and through the undersigned counsel, hereby respectfully requests that this Court dismiss Defendants' Motion for Sanctions and Supplemental Motion for Sanctions and for such further relief as the Court determines necessary.

Respectfully submitted,

Date: July 1, 2024          By:          _____/s/_____
                                          Mary T. Morgan, Esq.
                                          Virginia State Bar No. 44955
                                          *Counsel for Interested Party, Nazareth M. Haysbert*
                                          INFINITY LAW GROUP, P.L.C.
                                          4646 Princess Anne Road, Unit 104
                                          Virginia Beach, Virginia 23462
                                          Telephone: (757) 609-2702
                                          Facsimile: (866) 212-1310
                                          Email: mary@infinitylawva.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 1st day of July 2024, I will electronically file the foregoing with the Clerk of Court using the CM/EMF system, which will send a notification of such filing (NEF) to all counsel of record, including:

> John D. McGavin, Esq.
> Emily K. Blake, Esq.
> MCGAVIN, BOYCE, BARDOT,
> THORSEN & KATZ, P.C.
> 9990 Fairfax Boulevard, Suite 400
> Fairfax, Virginia 22030
> jmcgavin@mbbtklaw.com
> *Counsel for Defendants*

I FURTHER CERTIFY that I will send the document by electronic mail and U.S. Mail to the following non-filing user:

> Joann Haysbert
> 244 William R. Harvey Way
> Hampton, VA 23669
> Email: joannhaysbert@yahoo.com
> *Plaintiff*

                                          _____/s/_____
Mary T. Morgan, Esq.
Virginia State Bar No. 44955
*Counsel for Interested Party,*
*Nazareth M. Haysbert, Esq.*
INFINITY LAW GROUP, P.L.C.
4646 Princess Anne Road, Unit 104
Virginia Beach, Virginia 23462
Telephone: (757) 609-2702
Facsimile: (866) 212-1310
Email: mary@infinitylawva.com